## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee,*

v.

TRIANGLE MEDIA CORPORATION, et al.,

*Defendants-Appellees.*

v.

WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A.,
proposed Intervenors,

*Movants-Appellants,*

THOMAS W. MCNAMARA,

*Receiver-Appellee.*

On Appeal from the United States District Court
for the Southern District of California
No. 3:18-cv-01388-LAB-WVG
Hon. Larry Alan Burns

### RECEIVER-APPELLEE'S
### SUPPLEMENTAL EXCERPTS OF RECORD
Volume 1 of 2 – Pages 1-SER-1 to 1-SER-252

Logan D. Smith (SBN 212041)
Cornelia J. B. Gordon (SBN 320207)
MCNAMARA SMITH LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
lsmith@mcnamarallp.com
cgordon@mcnamarallp.com
*Attorneys for Receiver-Appellee*
*Thomas W. McNamara*

Logan Smith (SBN 212041)
lsmith@mcnamarallp.com
Cornelia J.B. Gordon (SBN 320207)
cgordon@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401

*Attorneys for Court-Appointed Receiver
Thomas W. McNamara*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>TRIANGLE MEDIA CORPORATION, a Delaware corporation, also doing business as Triangle CRM, Phenom Health, Beauty and Truth, and E-Cigs; JASPER RAIN MARKETING LLC, a California limited liability company, also doing business as Cranium Power and Phenom Health; HARDWIRE INTERACTIVE INC., a British Virgin Islands corporation, also doing business as Phenom Health, Beauty and Truth, and E-Cigs; and BRIAN PHILLIPS, individually and as an officer of Triangle Media Corporation,<br><br>    Defendants. | Case No. 3:18-cv-01388-LAB-LL<br><br>**OPPOSITION TO PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S MOTION TO INTERVENE**<br><br>JUDGE:   Hon. Larry A. Burns<br>CTRM:    14A<br>DATE:    January 24, 2022<br>TIME:    11:30 a.m. |

1

# TABLE OF CONTENTS

2

I. INTRODUCTION .................................................................................................1
II. LEGAL STANDARD ........................................................................................2
III. ARGUMENT ....................................................................................................3
    A.    Wells Fargo's Characterization of this Action Is Misleading .............3
        1.    The FTC Proceeded on Two Alternative Grounds....................4
        2.    The Receiver's Appointment Is Not Contingent upon or
                Pursuant to Section 13(b)..........................................................6
        3.    The Stipulated Judgments Are Not Subject to Attack..............7
    B.    Wells Fargo's Motion to Intervene Is Untimely, Whether
        Analyzed As of Right or Permissively.................................................8
        1.    Wells Fargo Can Offer No Reason for Its Delay ......................8
        2.    The Stage of the Proceedings Renders Wells Fargo's
                Motion Untimely .....................................................................19
        3.    The Prejudice to the Receiver and the FTC Renders
                Wells Fargo's Motion Untimely..............................................20
    C.    Wells Fargo Does Not Have a Significant Protectable Interest
        That Will Be Impaired by the Disposition of This Action .................21
        1.    Wells Fargo Lacks a Significant Protectable Interest..............21
        2.    Wells Fargo Has No Interest That Will Be Impaired by
                Disposition of This Action........................................................22
    D.    Wells Fargo Does Not Meet the Criteria for Permissive
        Intervention .......................................................................................23
IV. CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Alaniz v. Tillie Lewis Foods,*
 572 F.2d 657 (9th Cir. 1978)..........................................................................19

*Alt v. U.S. E.P.A.,*
 758 F.3d 588 (4th Cir. 2014)........................................................................18

*AMG Capital Management, LLC v. Federal Trade Commission* ("*AMG Capital*"),
 141 S. Ct. 1341 (2021) ...................................................................................7

*Animal Legal Def. Fund v. United States Food & Drug Admin.,*
 No. 12-CV-04376-EDL,
 2017 WL 11640662 (N.D. Cal. Apr. 24, 2017) ............................................15

*Banco Popular de Puerto Rico v. Greenblatt,*
 964 F.2d 1227 (1st Cir. 1992) .................................................................14, 19

*Cody v. SoulCycle, Inc.,*
 No. CV1506457MWFJEMX,
 2017 WL 8811114 (C.D. Cal. Sept. 20, 2017)..............................................22

*Davis v. J.P. Morgan Chase & Co.,*
 775 F. Supp. 2d 601 (W.D.N.Y. 2011) ........................................................22

*Donnelly v. Glickman,*
 159 F.3d 405 (9th Cir. 1998).........................................................2, 3, 21, 22

*Empire Blue Cross & Blue Shield v. Janet Greeson's A Place For Us,*
 62 F.3d 1217 (9th Cir.1995)..........................................................................19

*Freedom from Religion Found., Inc. v. Geithner,*
 644 F.3d 836 (9th Cir. 2011)........................................................................23

*FTC v. AMG Cap. Mgmt., LLC* ("Ninth Circuit *AMG* Opinion"),
 910 F.3d 417 (9th Cir. 2018)..................................................................17, 18

*FTC v. Cardiff,*
 No. EDCV182104DMGPLAX,
 2021 WL 3616071 (C.D. Cal. June 29, 2021) ......................................4, 5, 6

*FTC v. Credit Bureau Ctr., LLC* ("*Credit Bureau*"),
 937 F.3d 764 (7th Cir. 2019)........................................................................17

*FTC v. Credit Bureau Ctr., LLC,*
 No. 17 C 194,
 2021 WL 4146884 (N.D. Ill. Sept. 13, 2021) .................................................5

*FTC v. Electronic Payment Solutions of America, Inc.,*
 2019 WL 5884761 (D. Ariz. Sept. 10, 2019)................................................18

*FTC v. Elegant Solutions, Inc.,*
 2020 WL 2125164 (C.D. Cal. Jan. 20, 2020) ...............................................18

*FTC v. Jason Cardiff*,
　　2020 WL 8176097 (C.D. Cal. Aug. 7, 2020) ................................................. 18

*FTC v. Noland*,
　　No. CV-20-00047-PHX-DWL,
　　2020 WL 4530458 (D. Ariz. Aug. 6, 2020) .................................................... 6

*FTC v. Noland*,
　　No. CV-20-00047-PHX-DWL,
　　2021 WL 3290461 (D. Ariz. Aug. 2, 2021) ........................................... 10, 17

*FTC v. Simple Health Plans LLC*,
　　No. 18-CV-62593,
　　2021 WL 4050819 (S.D. Fla. Sept. 5, 2021) .................................................. 5

*FTC v. Zurixx, LLC*,
　　No. 2:19-CV-00713-DK-DAO,
　　2021 WL 3510804 (D. Utah Aug. 10, 2021) ................................... 10, 16, 17

*GOL Supply Boats, L.L.C. v. Castro*,
　　Case No. 06-cv-1758,
　　2009 WL 10728643 (E.D. La. Mar. 6, 2009) ................................................ 19

*Gonzalez v. Arizona*,
　　No. CV 06-1268 PHXROS,
　　2006 WL 2246365 (D. Ariz. Aug. 2, 2006) .................................................. 24

*In re Bodeker*,
　　525 B.R. 770 (D. Mont. 2015) ........................................................................ 7

*Key Bank of Puget Sound v. Alaskan Harvester*,
　　738 F. Supp. 398 (W.D. Wash. 1989) .......................................................... 10

*League of United Am. Citizens v. Wilson*,
　　131 F.3d at 1308 ............................................................................................ 24

*Lewis v. First Am. Title Ins. Co.*,
　　No. 1:06-CV-478-EJF-LMB,
　　2010 WL 3735485 (D. Idaho Aug. 5, 2010) ....................................... 9, 14, 15

*Montgomery v. United States*,
　　No. 09-CV-1588 JLS WVG,
　　2012 WL 124854 (S.D. Cal. Jan. 17, 2012) ................................................. 19

*Orange Cty. v. Air California*,
　　799 F.2d 535 (9th Cir. 1986).............................................................. 3, 8, 19

*Perry v. Schwarzenegger*,
　　630 F.3d 898 (9th Cir. 2011).................................................................. 3, 24

*R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*,
　　584 F.3d 1 (1st Cir. 2009) ............................................................................ 14

*SEC v. Wencke*,
　　622 F.2d 1363 (9th Cir. 1980)....................................................................... 6

*Smith v. L.A. Unified Sch. Dist.*,
    830 F.3d 843 (9th Cir. 2016) .......................................................................... 15

*Snoqualmie Indian Tribe v. Washington*,
    No. 3:19-CV-06227-RBL,
    2020 WL 4729178 (W.D. Wash. Apr. 16, 2020) ......................................... 19

*Stadnicki on Behalf of LendingClub Corp. v. Laplanche*,
    804 Fed. App'x 519 (9th Cir. 2020) ................................................................ 3

*U.S. v. Mylife.com, Inc.*,
    2020 WL 8483884 (C.D. Cal. Oct. 1, 2020) ................................................ 18

*United States v. Alisal Water Corp.*,
    370 F.3d 915 (9th Cir. 2004) ............................................................... 3, 8, 16

*United States v. State of Or.*,
    913 F.2d 576 (9th Cir. 1990) ........................................................................ 14

*Venegas v. Skaggs*,
    867 F.2d 527 (9th Cir. 1989) ........................................................................ 24

**I.**

**INTRODUCTION**

Wells Fargo's request to intervene is premised on a fallacy: that the stipulated judgments entered by the parties in this case were "predicated on Section 13(b)," and that because the Supreme Court invalidated the FTC's ability to seek monetary relief under Section 13(b) in *AMG Capital Management, LLC v. Federal Trade Commission* ("*AMG Capital*"), 141 S. Ct. 1341 (2021), the Receiver's ability to pursue claims against Wells Fargo on behalf of the Receivership Entities would be "contrary to *AMG Capital's* directive that money damages cannot be awarded under Section 13(b)."

But the FTC's case and the judgments here were not "predicated" on Section 13(b).  Here, unlike in *AMG Capital*, the FTC proceeded under two alternative grounds for relief: under Section 13(b) and under Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA").  ROSCA provides an independent avenue for the FTC to recover equitable monetary relief and an entirely separate basis for the stipulated judgments.  So, even if the Bank could intervene (it does not qualify to do so), and then somehow succeed under its Section 13(b) theory (it cannot), the judgments would remain intact under ROSCA and the Receiver's case against Wells Fargo would not be affected.

Disregarding these realities, Wells Fargo seeks intervention as of right or, in the alternative, permissive intervention.  The Bank is not entitled to intervene under either standard.  The Court's analysis can begin and end with the first element – timeliness.  If Wells Fargo wanted to challenge the Receiver's motion for authorization to engage contingency counsel, it could have done so when the Receiver's motion was filed in October of 2019.  For two years Wells Fargo did nothing.  And Wells Fargo continued to do nothing, even when: (1) the Receiver sent it a draft complaint and informed the Bank of his intent to pursue claims against it in April of 2020 (*see* Declaration of Logan D. Smith ("Smith Decl.") Ex.

1; *see also id.* Ex. 2), (2) the *AMG Capital* opinion was issued in April 2021, (3) the Receiver filed a motion to extend the Receivership deadline in this case's sister action, *Federal Trade Commission v. Apex Capital Group, LLC, et al.* ("*Apex*"), Case No. 2:18-cv-9573 (C.D. Cal.), in July 2021 (Smith Decl. Ex. 3; *see also id.* Ex. 4), or when (4) Wells Fargo embarked on an abortive effort to intervene in *Apex* in August 2021 (*see id.* Exs. 5, 6). The Bank had yet another chance to raise the issue when it moved to dismiss the Receiver's case on the merits in *McNamara v. Wells Fargo & Co.*, 3:21-cv-01245-LAB (S.D. Cal.) (the "Receiver's case") in August 2021. But Wells Fargo did nothing. Instead, it waited until its motion to dismiss the Receiver's case was fully briefed and ripe for decision before moving to intervene in this case on November 10, 2021.

Wells Fargo's motion to intervene should be taken for what it is: a tactical maneuver intended to burden the Receiver by forcing him to litigate in three fora (here, in *Apex*, and in the Receiver's case) and thereby driving up costs, unnecessarily burdening this Court, the *Apex* Court, and the FTC, and providing itself with an avenue for immediate appeal when its motion to intervene is denied. The Court should deny Wells Fargo's motion to intervene.

## II.

## LEGAL STANDARD

To intervene as of right, (1) a proposed intervenor's motion must be timely; (2) the proposed intervenor must have a significant protectable interest in the suit in which he is seeking to intervene; (3) the disposition of the suit must potentially "impair or impede the applicant's ability to protect its interest," and (4) the proposed intervenor's interest must not be adequately represented by those already parties to the suit. *See Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998). "An applicant who seeks permissive intervention must prove that it meets three threshold requirements: (1) it shares a common question of law or fact with the main action; (2) its motion is timely; and (3) the court has an independent basis for

jurisdiction over the applicant's claims." *Id.* at 412.  Even if the proposed intervenor meets all three criteria, permissive intervention is committed to the district court's discretion.  *Id.*  "Failure to satisfy any one of the requirements [for intervention] is fatal to the application."  *Perry v. Schwarzenegger*, 630 F.3d 898, 903 (9th Cir. 2011) (alteration in original) (citation omitted).

Both intervention as of right and permissive intervention require that the applicant's motion to intervene be timely.  "In determining timeliness, three factors are weighed: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay."  *Orange Cty. v. Air California*, 799 F.2d 535, 537 (9th Cir. 1986).  Wells Fargo bears the burden of showing that all requirements for intervention have been met.  *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004). "Because timeliness is analyzed even more strictly for a motion for permissive intervention" than intervention as of right, an "alternative request for permissive intervention is necessarily untimely" when a movant fails to satisfy the timeliness element for intervention as of right.  *Stadnicki on Behalf of LendingClub Corp. v. Laplanche*, 804 Fed. App'x 519, 522 (9th Cir. 2020) (citation omitted).

## III.

## ARGUMENT

### A.  Wells Fargo's Characterization of this Action Is Misleading

Wells Fargo's mischaracterization of this action creates a foundation for its arguments that is fundamentally flawed.  Contrary to what Wells Fargo's briefing suggests, the FTC sought and obtained monetary relief on two alternative grounds, only one of which (Section 13(b)) was affected by the Supreme Court's decision in *AMG Capital*; the Receiver's appointment was not pursuant to or contingent upon Section 13(b); and the stipulated judgments, which are the basis for the relief the Receiver seeks in his action against Wells Fargo, are final and not subject to attack. Only after Wells Fargo's mischaracterizations are stripped away can its underlying

1   arguments be viewed in their proper context.  Then, for the reasons discussed

2   below in Parts III.B-D, those arguments can be summarily denied.

3               1.   The FTC Proceeded on Two Alternative Grounds

4         The crux of Wells Fargo's argument for intervention is that the FTC's case

5   was predicated *only* on Section 13(b), and since *AMG Capital* determined that the

6   FTC could not seek monetary relief based on that section, the Receiver cannot

7   pursue claims against the Bank.  Wells Fargo's argument is grounded in a distorted

8   characterization of the FTC's case here.  Throughout its motion, Wells Fargo

9   falsely claims that the stipulated judgments are "contrary to *AMG Capital*'s

10  directive that monetary damages cannot be awarded under Section 13(b)," that "the

11  FTC elected to forego the…remedies set forth in Section 19 of the FTC Act and

12  instead, pursue[] both injunctive and equitable monetary relief…under Section

13  13(b)," and that the Receiver's appointment was based solely on Defendants'

14  violations of Section 13(b).  *See*, *e.g.*, ECF No. 153-1 at 1, 3, 3 n.3.

15        None of this is true.  Unlike in *AMG Capital*, where the FTC proceeded

16  solely under Section 13(b), the FTC proceeded here under *two alternative grounds*

17  *for relief*.  Wells Fargo deliberately downplays the FTC's assertion of parallel

18  violations of Section 5 of the Restore Online Shoppers' Confidence Act

19  ("ROSCA"), 15 U.S.C. § 8404, in this case from its inception – which was not the

20  case in *AMG Capital* – and limits its discussion of ROSCA to a single, misleading

21  footnote (Mot. at 3 n.3).  Wells Fargo does not address, anywhere, the fact that

22  ROSCA provides a separate avenue for the FTC to recover equitable monetary

23  relief that is distinct from and in addition to Section 13(b), because "ROSCA

24  authorizes the FTC to enforce ROSCA and to treat violations of the statute as a

25  rule violation under Section 18 of the FTC Act, 15 U.S.C. § 57a," for which "the

26  FTC may pursue recovery for [injured] consumers in a suit under Section 19 of the

27  FTC Act, 15 U.S.C. § 57b."  *FTC v. Cardiff*, No. EDCV182104DMGPLAX, 2021

28  WL 3616071, at *2 (C.D. Cal. June 29, 2021).

Multiple courts have explicitly found that the Supreme Court's opinion in *AMG Capital* has not limited the FTC's ability to pursue equitable monetary relief under ROSCA.  *See, e.g.*, *FTC v. Credit Bureau Ctr., LLC*, No. 17 C 194, 2021 WL 4146884, at *3 (N.D. Ill. Sept. 13, 2021), *appeal pending* ("[S]ection 5(a) of ROSCA plainly authorizes [the FTC] to seek monetary relief for ROSCA violations via sections 18 and 19 of the FTC Act."); *FTC v. Simple Health Plans LLC*, No. 18-CV-62593, 2021 WL 4050819, at *2 (S.D. Fla. Sept. 5, 2021) ("Based on a review of the Supreme Court's holding in AMG, the plain language of Act and the TCFAPA, and the allegations in the original Complaint, the Court finds that it had authority under § 19 of the Act to issue the preliminary injunction, order the asset freeze, and appoint the Receiver.").  To the Receiver's knowledge, no court has found otherwise.

A review of the Court orders and the parties' pleadings and briefing in this action confirms that here, unlike in *AMG Capital*, ROSCA was put forth as a separate, alternative ground for relief.  ROSCA is referenced throughout the Complaint (including as a basis for subject matter jurisdiction, in two counts, and as a separate ground for relief, *see* ECF No. 1), in the FTC's application for a temporary restraining order (ECF Nos. 5-6), in the TRO itself (ECF No. 11), in the Court's memorandum order granting the FTC's request for a preliminary injunction (ECF No. 74), in the PI itself (ECF No. 75), and in the stipulated permanent injunctions (ECF Nos. 126-27).

A direct citation to Section 19 is unnecessary to seek relief under ROSCA; only ROSCA need be cited.  *Cardiff* specifically held that "[b]ecause Section 19 merely provides for methods of enforcement and the nature of relief for violations under Section 18, the FTC did not need to specifically cross-reference Section 19 to put Defendants on notice of the factual basis for the ROSCA claim and the remedy sought thereunder."  *Cardiff*, 2021 WL 3616071, at *2.  Wells Fargo cites *Cardiff* in its motion, but it egregiously misstates the case's holding, stating that

the court there "den[ied] the FTC's ability to seek damages under alternative theories of liability" (Mot. at 9-10).  What the court *actually* held was that the FTC could have pursued such money damages if they had timely disclosed their ROSCA damages expert, effectively validating the FTC's use of ROSCA to secure equitable monetary relief.  *See Cardiff*, 2021 WL 3616071, at *6.

>    2.   The Receiver's Appointment Is Not Contingent upon or Pursuant to Section 13(b)

Wells Fargo also attempts to bolster its arguments by tethering the Receiver's appointment to the relief sought by the FTC.  But its arguments reflect a fundamental misunderstanding of a receiver's role in an action brought by the FTC.  Contrary to what Wells Fargo argues (*see, e.g.*, Mot. at 5-7), the Receiver was not appointed by the FTC or pursuant to the FTC Act – not under Section 13(b), ROSCA, EFTA, or any other provision.  Rather, he was appointed pursuant to the Court's equitable powers.  *See, e.g.*, *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980) ("The power of a district court to impose a receivership …derives from the inherent power of a court of equity to fashion effective relief."); *FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2020 WL 4530458, at *3 (D. Ariz. Aug. 6, 2020) (gathering cases).  So long as he is empowered by Court order to "[i]nstitute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve the assets of the Receivership Entities, or … to carry out the Receiver's mandate under this Order," he can continue to pursue recoveries on behalf of the Receivership Entities.  *See* ECF No. at 19.  Wells Fargo's argument that the Receiver cannot somehow recover an identified asset (its claims against Wells Fargo) after *AMG Capital* has no basis.  The result in *AMG Capital* does not govern this case, much as Wells Fargo might wish it were otherwise.

///

///

### 3.    The Stipulated Judgments Are Not Subject to Attack

Wells Fargo tries to equate this case to *AMG Capital*.  In that case, the Monitor's appointment was terminated because the FTC's monetary judgment, which was based solely on Section 13(b), was vacated.  Here, the *stipulated judgments*, which were premised on both Section 13(b) and ROSCA violations, still stand – and in fact, Wells Fargo has not challenged them, even though it originally told the Receiver's counsel in August that it would be attacking the judgments when it moved to intervene.  *See* ECF Nos. 126, 127 at 2; Smith Decl. ¶ 7.

But even if the judgments were premised *solely* on Section 13(b), the Receiver would remain empowered to recover funds for the Estate based on those *final* monetary judgments.  "A mere change in decisional law," such as the Supreme Court's decision in *AMG Capital*, "after entry of a final order rarely constitutes an exceptional circumstance that would justify relief [from a judgment]."  *In re Bodeker*, 525 B.R. 770, 774 (D. Mont. 2015), aff'd, 689 F. App'x 879 (9th Cir. 2017).  A change in decisional law following entry into a settlement agreement is specifically **not** such an "exceptional circumstance," since "Rule 60(b)(6) [governing relief from judgments] was not intended to relieve a party from a settlement agreement entered voluntarily with the advice of counsel."  *Id.*; *see also Apex*, ECF No. 207 at 6 (rejecting attempt by two non-receivership defendants to undo their own stipulated monetary judgment post-*AMG Capital* because defendants had "decided to settle this case and freely entered into the Stipulated Judgment" and had been "fully aware of the challenges to the FTC's authority to recover equitable monetary relief pursuant to Section 13(b)" when settling).

///

///

///

**B.      Wells Fargo's Motion to Intervene Is Untimely, Whether Analyzed As of Right or Permissively**

Wells Fargo seeks intervention as of right or, in the alternative, permissive intervention.  Though the standard for each type of intervention differs, the Court's analysis can begin and end with the one requirement they share: that the proposed intervenor's application must be timely.  Whatever date the Court chooses to use as its starting point for that analysis, Wells Fargo's motion fails the timeliness test.

In the Ninth Circuit, courts evaluate whether a proposed intervenor is timely under the following standard: "A party must intervene *when he knows or has reason to know* that his interests *might* be adversely affected by the outcome of litigation." *Alisal Water,* 370 F.3d at 923 (emphasis added).  Such timeliness is assessed by weighing three factors: the reason for and length of delay, the stage of the proceedings at which intervention is sought, and the prejudice to other parties. *See Orange Cty.*, 799 F.2d at 537.  Wells Fargo's motion fails on all three fronts. It cannot offer any legitimate explanation for its protracted and repeated delays (over two years) before moving for relief in this case; its request comes after this case has been administratively closed; and allowing it to intervene would prejudice the FTC and the Receiver by forcing both to litigate across multiple actions, not to mention the unnecessary burden on the Court.

1.      Wells Fargo Can Offer No Reason for Its Delay

Wells Fargo cannot make a bid for intervention where, as here, it chose to sit on the sidelines as key dates passed, and where it only moved to intervene when it judged that doing so would be to its advantage.  Despite Wells Fargo's attempts to color it otherwise, delay for tactical reasons does not make a filing "timely." Rather, it renders Wells Fargo's motion *untimely* on its face, as courts have found motions to intervene untimely where the proposed intervenors could "offer nothing beyond tactical reasoning as the reason for the delay." *See, e.g.*, *Lewis v. First Am. Title Ins. Co.*, No. 1:06-CV-478-EJF-LMB, 2010 WL 3735485, at *4 (D. Idaho

Aug. 5, 2010), *report and recommendation adopted*, 2010 WL 3735712 (D. Idaho Sept. 14, 2010); *Nat. Res. Def. Counsel v. Locke*, Case No. 01-cv-01-0421, 2009 WL 10681122, at *8 (N.D. Cal. July 31, 2009) (rejecting intervention where timing of motion to intervene based on "strategic" decision that delaying filing would be more cost-effective); *GOL Supply Boats, L.L.C. v. Castro,* Case No. 06-cv-1758, 2009 WL 10728643, at * 1 (E.D. La. Mar. 6, 2009) ("[A] tactical decision … does not counsel in favor of permitting intervention.").

The dates that Wells Fargo has chosen to use as the starting point for the Court's timeliness analysis are, as discussed further below in Part III.B.1.b, inconsistent with the case law within this Circuit.  However, in order to make it absolutely clear that Wells Fargo has no excuse for its delay (and its motion should be denied as untimely) *even if* those dates are used, this brief first addresses the timeliness of Wells Fargo's motion using Wells Fargo's preferred dates.

> ### a.   *Wells Fargo's Delay Is Inexcusable Even Based on Its Own Chosen Dates*

Wells Fargo glosses over everything it knew or should have known before April 22, 2021, and instead argues that the "grounds supporting [its] intervention as of right" arose "with the *AMG Capital* decision in April 2021 and the filing of the Wells Fargo Litigation…in July 2021." Mot. at 15.  Even if the Court were to use those cherry-picked, self-serving dates as the starting point, Wells Fargo does not (and cannot) explain why it waited month (May), after month (June), after month (July), after month (August), after month (September), after month (October), into November, to file this motion.

> ### i.   *Wells Fargo's First Proposed Starting Date: The AMG Capital Opinion*

The first of Wells Fargo's proposed starting dates is the Supreme Court's April 22, 2021 decision in *AMG Capital*.  That case addressed a high-profile circuit split that was being closely watched by every litigant in an FTC case and every

1   large law firm in the country.  Wells Fargo and its counsel were on notice of its

2   holding almost as soon as the opinion was issued.[1]  Wells Fargo offers the Court

3   no explanation for why it then waited nearly ***seven months*** from the *AMG Capital*

4   decision to file an intervention motion here.  During that entire time, Wells Fargo

5   knew that the Receiver was still actively pursuing his claims against it, because the

6   Bank continued speaking to the Receiver into July and even participated in a

7   second round of mediation with the Receiver on April 29, 2021.

8       Because courts require proposed intervenors to move to intervene with

9   expediency as soon as they know or should know that their interests might be

10  affected, proposed intervenors must offer an explanation for any delay.  In *Key*

11  *Bank of Puget Sound v. Alaskan Harvester*, 738 F. Supp. 398 (W.D. Wash. 1989),

12  for example, the court denied leave to intervene where the proposed intervenor

13  "failed to identify any specific facts pertaining to the nearly four month delay in

14  filing" that could "explain[] its tardy prosecution of its claim."  *Id.* at 405.

15  Compare that to here, where Wells Fargo has offered no excuse for its decision to

16  let seven months elapse before moving to intervene.  The length of Wells Fargo's

17  delay is particularly stark when compared to that of other potential intervenors who

18  have tried to blame their late requests for intervention on the *AMG Capital*

19  opinion.  These intervenors have had their motions deemed untimely despite

20  moving *much* faster than Wells Fargo did here.  *See FTC v. Zurixx, LLC*, No. 2:19-

21  CV-00713-DK-DAO, 2021 WL 3510804, at *4 (D. Utah Aug. 10, 2021) (motion

22  to intervene citing *AMG Capital* filed on May 11, 2021 – less than three weeks

23  after decision – denied as untimely); *FTC v. Noland*, No. CV-20-00047-PHX-

24  DWL, 2021 WL 3290461, at *4 (D. Ariz. Aug. 2, 2021) (motion to intervene citing

25  ///

26  

27  [1] For example, Wells Fargo's counsel in this action, McGuire Woods, immediately
    published a News Alert about the decision on its website dated April 22, 2021. *See*
28  https://www.mcguirewoods.com/client-resources/Alerts/2021/4/us-supreme-court-
    rejects-federal-trade-commissions-restitution-authority.

*AMG Capital* filed on June 1, 2021 – less than six weeks after decision – denied as untimely).

If Wells Fargo had really viewed *AMG Capital* as a watershed event as it claims, it would have immediately moved to intervene in this action following that decision. Wells Fargo's unexplained failure to do so promptly after the *AMG Capital* decision was issued merits denial of the motion on untimeliness grounds.

> ii. *Wells Fargo's Second Proposed Starting Date: The Filing of the Receiver's Lawsuit*

Wells Fargo's second proposed start date for a timeliness analysis is the filing of the Receiver's complaint on July 8, 2021. Even if the initiation of that lawsuit were the turning point (it is not), Wells Fargo should have immediately moved to intervene at that time. Instead, it weighed its options and decided to wait more than ***four months*** to move to intervene after being sued.

Wells Fargo let several key dates and events after the filing of the Receiver's lawsuit – all of which should have spurred it to intervene – pass without moving to intervene, starting with the filing of the lawsuit itself on July 8. And then, on July 9, 2021, the day after the Receiver's complaint was filed, the **non-receivership** defendants in Triangle's sister action, *Apex*, filed a motion based on *AMG Capital* to modify the permanent injunction to which they had stipulated prior to the Supreme Court's decision. The *Apex* non-receivership defendants asked the court "to vacate or set aside the monetary judgment" in light of *AMG Capital*'s "holding that Section 13(b) of the Federal Trade Commission Act…does not authorize an award of monetary relief," arguing in part that relief should be granted "on the ground that prospective enforcement of the monetary judgment (since it has not been executed) would be inequitable."[2]  *See Apex*, ECF No. 182 at 4-5.

///

---

[2] Because the *Apex* defendants bringing the motion were not receivership entities, the Receiver did not file a brief in response to the motion.

Wells Fargo did not attempt to join that motion or otherwise intervene, despite being fully aware that it had been filed, or so the Receiver presumes; given that Wells Fargo and the Receiver had been engaged in mediation for more than a year, specifically with respect to the *Apex* matter and this one, diligence required Wells Fargo's counsel to monitor the *Apex* and *Triangle* dockets. Wells Fargo then let another key opportunity for intervention pass on July 23, 2021 (a full two weeks after the Receiver had sued it) when it did not oppose or object to the Receiver's filing in *Apex* of a motion to extend the receivership deadline. That motion, which is attached hereto as Exhibit 3, featured a lengthy discussion of the Receiver's lawsuit against Wells Fargo and cited the lawsuit as the primary reason to extend the receivership – practically an invitation for Wells Fargo to voice its dissent. *See Apex*, ECF No. 186-1; Smith Decl. Ex. 3; *see also id.* Ex. 4 (order granting motion). **Yet the Bank did nothing.** No oppositions were filed or objections raised to the motion, which was granted by the court on August 12, 2021. *Apex*, ECF No. 192.

Meanwhile, the other *Apex* motion – the motion to vacate the judgment or modify the permanent injunction filed by the non-receivership defendants in *Apex* – was fully briefed by August 16, and both sides had filed proposed statements of decision by August 18. On August 19, counsel for Wells Fargo emailed the Receiver's counsel to request a meet and confer (as required by CDCA local rules) in advance of moving to intervene in *Apex*, specifying that it was seeking to intervene in order "to challenge the order appointing the receiver to pursue Wells Fargo and the previously entered stipulated judgment based on the recent AMG/FTC decision holding that the FTC does not have authority under Section 13(b) to obtain equitable monetary relief." Smith Decl. Ex. 5. The meet and confer occurred on August 23, 2021. *Id.* ¶ 8.

On August 25, Wells Fargo filed a lengthy motion to dismiss in the Receiver's case. This would have been the place for the Bank to make its Section

13(b) arguments, but it did not raise or even refer to the issue in its motion.  On August 30, five days later and eleven days after Wells Fargo initially notified Receiver's counsel of its intent to intervene in Apex, the Bank reversed course.  It informed the Receiver that it would *not* be filing a motion to intervene in *Apex*, though it vaguely referenced making a "future filing" at some point.  Smith Decl. Ex. 6.  Wells Fargo's reasons for retreating are known only to the Bank and its counsel, but the *Apex* Court denied the motion to modify the stipulated permanent injunction a few days after that, on September 3.  In its order, the *Apex* Court rejected all of the non-receivership defendants' arguments in the process – including the argument that applying the stipulated judgment against them "prospectively [wa]s no longer equitable" in light of *AMG Capital*.  *See Apex*, ECF No. 207; Smith Decl. Ex. 7.

At each of these junctures, Wells Fargo made a conscious decision not to file its motion to intervene.  It chose to hold off on moving to intervene until after it had filed its reply in support of its motion to dismiss in the Receiver's case on October 25.  The *very next day*, on October 26, the Bank resurfaced and raised the intervention issue again.  *See* Smith Decl. Ex. 8.  This time, however, Wells Fargo notified the Receiver's counsel that it intended to intervene both in *Apex* and in this action.  But even then, Wells Fargo did not move with dispatch.  It took the Bank another two weeks, until November 10, to file its motion in this case.  By that point, the *AMG Capital* decision was almost seven months old and the Receiver's complaint had been on file for more than four months.

The only logical explanation for Wells Fargo's conduct – and in particular its decision, after the Receiver sued it in July 2021, to start and abort a motion to intervene in *Apex* in August, before finally moving to intervene here, on November 10 – seems to be that it saw some tactical advantage in refraining from diligently pursuing intervention, and that it then decided it would be better off seeking relief in this action before *Apex*.  As of the time of filing this brief, Wells Fargo has still

1    not filed its motion to intervene in *Apex*, which was supposedly ready to file in

2    August.

3          Courts have found intervention untimely in this exact scenario.  *See, e.g.*, *R*

4    *& G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 8-10 (1st Cir.

5    2009) (finding two-and-a-half-month delay unreasonable where proposed

6    intervenor – "a sophisticated financial institution with lawyers on staff" – had

7    threatened intervention on August 14 based on facts known in July, but

8    "inexplicably waited until October 2 before moving to intervene"); *Banco Popular*

9    *de Puerto Rico v. Greenblatt*, 964 F.2d 1227, 1231 (1st Cir. 1992) (affirming

10   denial of request to intervene three months after notice of action and citing *Nat'l*

11   *Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 367-68

12   (1973) (applicant untimely who "procrastinated for eighteen days") and *FTC v.*

13   *American Legal Distribs, Inc.*, 890 F.2d 363, 365 (11th Cir. 1989) (per curiam)

14   (same; delay of two months)); *see also Lewis*, 2010 WL 3735485, at *4.

        **b.     *Wells Fargo's Delay Becomes Even More Indefensible When***

15

16                   ***Analyzing the Timeline of Its Intervention Correctly***

17         Wells Fargo has proffered starting dates that conveniently frame its delay as

18   a matter of months as opposed to years.  But those dates are not consistent with the

19   correct analysis for intervention, which requires the potential intervenor to "act as

20   soon as he knows or has reason to know that his interests might be adversely

21   affected by the outcome of the litigation."  *United States v. State of Or.*, 913 F.2d

22   576, 589 (9th Cir. 1990) (internal quotation marks and citation omitted).

23         Wells Fargo was on notice that its "interests" in this case[3] could be affected

24   as of October 22, 2019, when the Receiver filed his motion for authorization to

25   engage contingency counsel (ECF No. 136) and made public his intent to pursue

26   _____

[3] For the reasons discussed below in Part III.C.1, the Receiver does not believe
27   Wells Fargo has a legally protectable interest. For purposes of the timeliness
     discussion, however, the Receiver assumes Wells Fargo has some arguable
28   interest.

claims against Wells Fargo on behalf of the Receivership Entities.  Wells Fargo was, of course, familiar with the Triangle fraud before that date – not only because of its extensive banking relationship with Defendants (which was at issue in the Receiver's case), but also because Wells Fargo had been directly served with the TRO requiring it to freeze accounts related to the Triangle fraud in July 2018.

Regardless, however, Wells Fargo absolutely ***knew*** that its interests might be affected as of April 1, 2020, when it was directly sent a letter from the Receiver's counsel along with a copy of the Receiver's draft complaint.  *See* Smith Decl. Ex. 1; *see also id.* Ex. 2 (email from Wells Fargo's counsel confirming receipt).  At that point, or at any point thereafter, Wells Fargo could have moved to intervene to protect its supposed interests. Wells Fargo chose not to do so in April 2020, or for more than eighteen months thereafter.  Waiting a year and a half, as Wells Fargo did, before moving to intervene after receiving direct knowledge that one's interest might be affected is the definition of inexcusable delay.

Whether that delay was the *de facto* result of Wells Fargo's lack of diligence or a tactical maneuver – only Wells Fargo knows for sure – is irrelevant, because neither is an acceptable reason for delay in this Circuit.  *See, e.g.*, *Animal Legal Def. Fund v. United States Food & Drug Admin.*, No. 12-CV-04376-EDL, 2017 WL 11640662, at *2 (N.D. Cal. Apr. 24, 2017) ("The diligence of the would-be intervenor after he has received actual or constructive notice of the impending threat to his interests forms the focus of the timeliness inquiry."); *see also Lewis*, 2010 WL 3735485, at *4.

The "crucial date for assessing the timeliness of a motion to intervene" is *not*, as Wells Fargo appears to propose, the date when a proposed intervenor feels the case law is strong enough that he might prevail on its underlying motion. It is "when proposed intervenors ***should have been aware*** that their interests would not be adequately protected by the existing parties." *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016) (emphasis added).  Wells Fargo has argued that

its interests will not be protected by the existing parties because the FTC's case against Defendants is complete, and Defendants would have no interest in jeopardizing their settlements with the FTC. ECF No. 153-1 at 18. Both of those things have been true since May 30, 2019 – *two and a half years ago*. By its own admission, then, Wells Fargo "should have been aware that [its] interests would not be adequately protected by the existing parties" the moment it was on notice of the Receiver's intent to pursue claims against it. *See, e.g.*, *Alisal Water Corp.*, 370 F.3d at 923 (test is "constructive notice" of potentially adverse interest). As a factual matter, while the date of Wells Fargo's constructive or actual notice is likely *earlier* than April 1, 2020, it is indisputable that Wells Fargo knew everything it needed to know to intervene in this action by *at least* April 1, 2020: it knew the Receiver was actively pursuing claims specifically against it, and it also know there was no defendant left in this action to represent its interests.

As discussed above, Wells Fargo tries to delay the start date by pointing to the *AMG Capital* decision in April 2021. But that decision did not create Wells Fargo's purported interest in this action. Courts presented with the same question – whether the decision in *AMG Capital* can justify a late-filed motion to intervene – have confirmed that the Supreme Court's decision cannot serve as the starting date for a timeliness analysis. In *Federal Trade Commission v. Zurixx, LLC*, No. 2:19-CV-00713-DK-DAO, 2021 WL 3510804 (D. Utah Aug. 10, 2021), for example, the court dismissed the proposed intervenors' argument that their attempted intervention (more than eighteen months after the receiver suspended Zurixx's operations) was timely because of the "'landmark shift' occasioned by the *AMG Capital Management* case," concluding that "even if *AMG Capital Management* does weaken Plaintiffs' case, *it does not change the nature of [the intervenors]' interest in this proceeding*." *Id.* at *4 (emphasis added). The court explained that because the *AMG Capital* decision "[a]t best…affect[ed] the

///

1 strength of [intervenors]' position," it did "not excuse or explain the lateness of

2 th[e] intervention motion." *Id.*

3    Similarly, in *Federal Trade Commission v. Noland*, No. CV-20-00047-PHX-

4 DWL, 2021 WL 3290461 (D. Ariz. Aug. 2, 2021), the proposed intervenors

5 attempted without success to argue that *AMG Capital* "shifted the legal landscape"

6 and therefore justified their delay in seeking to intervene. *See id.* at *4. As in

7 *Zurixx*, the court dismissed these arguments, noting that "the Proposed Intervenors

8 became aware as early as January 2020 (and by no later than September 2020) that

9 their protected interests were being affected by this litigation and that the existing

10 parties were purportedly not protecting those interests," and that "[a]lthough the

11 Proposed Intervenors may view *AMG Capital* []as providing additional support for

12 the arguments they wish to advance, they have been aware of those arguments for a

13 very long time." *Id.*

14    Wells Fargo could have moved to intervene and made the same argument it

15 makes now – that the FTC cannot obtain equitable monetary relief under Section

16 13(b) – when it first became on notice of the Receiver's intent to sue it. The *AMG

17 Capital* decision was not born in a vacuum. The same issues discussed by the

18 Supreme Court were analyzed by the Ninth Circuit in its December 3, 2018

19 opinion (*see FTC v. AMG Cap. Mgmt., LLC* (the "Ninth Circuit *AMG* Opinion"),

20 910 F.3d 417 (9th Cir. 2018), *rev'd and remanded*, 141 S. Ct. 1341 (2021)), in the

21 parties' briefing on AMG Capital's petition for writ of certiorari (granted on July

22 9, 2020), and at oral argument before the Supreme Court on January 13, 2021. The

23 decision was also preceded by a circuit split, in which the Seventh Circuit, unlike

24 the Ninth Circuit, ruled against the FTC. *See FTC v. Credit Bureau Ctr., LLC*

25 ("*Credit Bureau*"), 937 F.3d 764 (7th Cir. 2019).

26    With this context, it becomes clear that the decision in *AMG Capital* did not

27 create Wells Fargo's "interest" here. Wells Fargo had the right to challenge

28 existing Ninth Circuit law, just as multiple defendants within this Circuit

challenged the Ninth Circuit *AMG* Opinion pre-*AMG Capital*. *See, e.g.*, Defs.'
Mot. for Recons., *FTC v. Electronic Payment Solutions of America, Inc.*, 2019 WL
5884761 (D. Ariz. Sept. 10, 2019) (seeking reconsideration of motion for judgment
on the pleadings in light of *Credit Bureau* opinion); Defs.' Mot. to Dissolve
Prelim. Inj., *FTC v. Elegant Solutions, Inc.*, 2020 WL 2125164 (C.D. Cal. Jan. 20,
2020) (citing *Credit Bureau* and arguing that Section 13(b) does not authorize
monetary relief); Defs.' Mot. for Summ. J., *FTC v. Jason Cardiff*, 2020 WL
8176097 (C.D. Cal. Aug. 7, 2020) (same); Defs.' Mot. to Dismiss Compl., *U.S. v.
Mylife.com, Inc.*, 2020 WL 8483884 (C.D. Cal. Oct. 1, 2020) (same).

Wells Fargo's "deliberate forbearance…engenders little sympathy." *Alt v.
U.S. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014) ("*Alt*"). It stood idly by on the
sidelines and did *nothing* even as it monitored the litigation. For eighteen months
after the Receiver informed Wells Fargo that he was pursuing claims against it,
Wells Fargo made transparently strategic decisions not to intervene in either this
action or *Apex*. Courts have routinely and resoundingly rejected intervention
motions filed belatedly where, as here, the proposed intervenor made a decision,
for tactical reasons, not to intervene earlier. In *Alt*, for example, the Fourth Circuit
held that an intervenor was not timely where its decision was based on its failed
"execution of its legal strategy." *Id.* It held:

> Belying its late entry, [the purported intervenor] CBF was not at all unaware
> of what was transpiring in the district court. Instead, CBF candidly
> acknowledges that it had closely monitored the proceedings in Alt's lawsuit
> and made a strategic decision not to devote its "limited resources" to the
> matter at an earlier stage, believing the court would grant the EPA's motion
> to dismiss. Stated plainly, CBF admits that it gambled and lost in the
> execution of its litigation strategy."

*Id.* (quoting *Moten v. Bricklayers, Mason & Plasterers, Intern. Union of Am.*, 543
F.2d 224, 228 (D.C. Cir. 1976) (holding motion to intervene as untimely when
intervenors' decision "not to seek intervention much earlier" was "informed" and
"tactical").

The First Circuit similarly found a purported intervenor's "failure to act for over three months, though armed with full knowledge, to be inexpiable," noting that "it seem[ed] inequitable to allow a latecomer, who fiddled while Rome burned, to collect a share of the fire insurance." *Banco Popular*, 964 F.2d at 1234; *see also Empire Blue Cross & Blue Shield v. Janet Greeson's A Place For Us,* 62 F.3d 1217, 1221-22 (9th Cir.1995) (citing *Banco Popular*); *N. Carolina State Conf. of the NAACP v. Cooper*, Case No. 1:18-cv-1034, 2021 WL 3639493, at * 2 (M.D.N.C. Aug. 17, 2021) (discussing *Banco Popular*).  Wells Fargo's "tactical decision…to delay assertion of [its] claims" in this action "does not counsel in favor of permitting intervention." *GOL Supply Boats*, 2009 WL 10728643, at * 1.

> 2. The Stage of the Proceedings Renders Wells Fargo's Motion Untimely

As a general rule, courts do not look favorably upon belated, post-judgment requests for intervention.  *See, e.g.*, *Snoqualmie Indian Tribe v. Washington*, No. 3:19-CV-06227-RBL, 2020 WL 4729178, at *1 (W.D. Wash. Apr. 16, 2020) ("The general rule [is] that a post-judgment motion to intervene is timely if filed within the time allowed for the filing of an appeal, which is 30 days for most civil cases." (internal quotation marks and citation omitted)).  "[W]here a lot of water has passed under the bridge and the case has proceeded to settlement, this factor [stage of the proceedings] weighs heavily against finding [an intervenor's] motion is timely." *Montgomery v. United States*, No. 09-CV-1588 JLS WVG, 2012 WL 124854, at *8 (S.D. Cal. Jan. 17, 2012).

The stipulated judgments here were entered on May 30, 2019, and this case was administratively closed on November 19, 2019.  As a result, Wells Fargo is seeking to intervene at as late a stage of the proceeding as might be imagined.  It should not be allowed to do so.  *See, e.g.*, *Orange Cty.*, 799 F.2d at 537-38 (finding intervention on eve of settlement untimely was not abuse of discretion); *Alaniz v. Tillie Lewis Foods*, 572 F.2d 657, 659 (9th Cir. 1978) (affirming denial of motion

to intervene on timeliness grounds after finding "first factor weigh[ed] heavily against appellants" where intervention was sought after entry of a consent decree).

### 3. The Prejudice to the Receiver and the FTC Renders Wells Fargo's Motion Untimely

Finally, the prejudice to both the Receiver and the FTC is significant. In taking the actions it has, Wells Fargo has chosen to burden two separate District Courts with motions to intervene, instead of making its arguments in a single case – the Receiver's case – when filing its pending motion to dismiss. If Wells Fargo is successful, both District Courts will have to address Wells Fargo's underlying motions on their merits (or lack thereof); if unsuccessful, Wells Fargo could then burden the Ninth Circuit with two appeals.

In addition to unnecessarily burdening this Court (and others), Wells Fargo's tactical decision to split its legal arguments across three cases significantly prejudices both the Receiver and the FTC. As discussed above, Wells Fargo waited until the day after it filed its reply in support of its motion to dismiss in the Receiver's case to seek intervention here. This was an obvious attempt to secure another avenue to argue for dismissal and a second bite at the apple. In so doing, Wells Fargo has forced the Receiver to expend Estate resources litigating two motions, across two separate actions, in addition to pursuing his case against Wells Fargo. The reality is that Wells Fargo could have raised the Receiver's ability to pursue claims against the Bank post-*AMG Capital* in the Receiver's case against Wells Fargo. It chose not to do so at the expense of the Receivership Estate.

There also exists a very real prejudice to the FTC, which is discussed at greater length in the Agency's brief. Because of Wells Fargo, the FTC is now being forced to litigate in a resolved action with final judgments that was closed from its perspective prior to Wells Fargo's filing. *See* ECF No. 142 at 2 (closing case and extending receivership "for the sole purpose of [the Receiver] pursuing litigation against Wells Fargo").

**C.   Wells Fargo Does Not Have a Significant Protectable Interest That Will Be Impaired by the Disposition of This Action[4]**

      1.    <u>Wells Fargo Lacks a Significant Protectable Interest</u>

Although Wells Fargo claims it is "indisputable" that it has a "significant protectable interest" in this action, its interest (to the extent it has one) is actually in the case where the Receiver has sued Wells Fargo, not in the case brought by the FTC.  "An applicant has a 'significant protectable interest' in an action if (1) it asserts an interest that is protected under some law, and (2) there is a 'relationship' between its legally protected interest and the plaintiff's claims." *Donnelly*, 159 F.3d at 409.  Wells Fargo's alleged interest here, in its own words, is "not having to defend itself against litigation that this Court authorized based on an invalidated legal principle [damages premised on Section 13(b)]."  Mot. at 16.  This is a bald statement made, tellingly, without any legal citation or support.  Setting aside the fact that, as discussed above in Part III.A.1, the FTC sought relief and settled its claims for monetary relief based on two provisions in the alternative, only one of which was Section 13(b), it is clear for the reasons discussed below that Wells Fargo does not have any interest to protect in the *FTC*'s action against Defendants.

Wells Fargo is careful in how it articulates its "interest," but at its core that interest is essentially a "right not to be sued" – in other words, a kind of immunity from suit akin to double jeopardy, qualified immunity, or sovereign immunity, which is entirely different from a *defense* to liability.  *Cf. DC Comics v. Pac. Pictures Corp.*, 706 F.3d 1009, 1015 (9th Cir. 2013) (distinguishing between immunity from suit and defense against liability in context of discussion of

---

[4] The Receiver agrees with Wells Fargo that none of the other parties to this case have interests aligned with it at present, though it bears noting that Defendants certainly had motivation to (and did) fight the FTC's claims before settling. *See, e.g.* ECF Nos. 34, 36.  As discussed at length above, however, this fact cuts strongly against Wells Fargo's grounds for intervening, because it means Wells Fargo knew that no defendant would come to its defense from the moment it was on notice that the Receiver was pursuing claims against it in October 2019.

collateral order doctrine); *Davis v. Streekstra*, 227 F.3d 759, 762 (7th Cir. 2000) (distinguishing, in same context, between "a right not simply to prevail" and a right "to be free from litigation, along the lines of double jeopardy…absolute or qualified immunity from suit…and sovereign immunity under the eleventh amendment").

Wells Fargo is obviously not immune from suit. Wells Fargo certainly has a right to "defend itself against litigation" brought by the Receiver – but it can and must do so *in the action the Receiver initiated against Wells Fargo*, where it filed a motion to dismiss before separately seeking to move to intervene here. That right to "defend" cannot serve as the basis for a legally protectable interest here.

2.   <u>Wells Fargo Has No Interest That Will Be Impaired by Disposition of This Action</u>

That Wells Fargo has no grounds for intervention becomes even more apparent when examining the third requirement for intervention as of right, which is that the disposition of the suit in which intervention is sought must potentially "impair or impede the applicant's ability to protect its interest." *See Donnelly*, 159 F.3d at 409. Even where protectable interests exist, courts have regularly denied intervention in analogous contexts (largely class actions) where there exist other mechanisms for potential intervenors to protect their rights. *See, e.g.*, *Cody v. SoulCycle, Inc.*, No. CV1506457MWFJEMX, 2017 WL 8811114, at *4 (C.D. Cal. Sept. 20, 2017) ("Many district courts have similarly denied intervention where putative class members can adequately protect their interests via the Rule 23 mechanisms [*e.g.* objecting to class settlement or opting out]."); *Davis v. J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601, 605 (W.D.N.Y. 2011) ("Intervention is not necessary here to protect the proposed intervenors' or other class members' interests, and there are alternatives open to them which would be less disruptive to these proceedings and to the interests of the settling parties.").

///

Wells Fargo tries to get around the fact that it has an alternative forum to adjudicate these issues by claiming that it can only make its Section 13(b) arguments here, because the order authorizing the Receiver to engage contingency counsel was entered in this case.  But Wells Fargo does not – and cannot – offer any reason why it was somehow prohibited from making those same arguments in the Receiver's case.  Wells Fargo tries to rely on language in the Court's order authorizing the Receiver to engage contingency counsel, which states that "the Court shall continue to retain jurisdiction over the Receivership" (ECF No. 142 at 3), to argue that the Court "expressly retained jurisdiction over the Receivership and matters relating to 'the enforcement of the Court's judgments.'"  ECF No. 153-1 at 17.  The Court's retention of jurisdiction, however, is not relevant in the context of Wells Fargo's actual question: *i.e.*, whether or not the receiver as plaintiff can "prospectively recover monetary judgments potentially exceeding $160,000,000 based on the outstanding balance in the equitable monetary judgments awarded to the FTC as part of the underlying Section 13(b) proceedings."  *Id.* at 14.  *That* is an independent legal question about the effect of *AMG Capital*, not a matter unique to the operation of the receivership or specific to the judgments at issue here.  There is absolutely no reason why that issue must be decided in the action in which the Receiver was appointed, and Wells Fargo's argument is all the more specious where, as here, the action the Receiver has brought against Wells Fargo is in the same court and before the same judge as the action in which he was appointed.

**D.    Wells Fargo Does Not Meet the Criteria for Permissive Intervention**

For Wells Fargo to qualify for permissive intervention, its motion must be timely and share a common question of law or fact with the main action.[5]  Even

---

[5] The Receiver agrees with Wells Fargo that pursuant to *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011), it need not establish an independent basis for jurisdiction (typically the third factor of the analysis).

where an intervenor meets these criteria, "the court may also consider other factors in the exercise of its discretion, including 'the nature and extent of the intervenors' interest' and 'whether the intervenors' interests are adequately represented by other parties.'" *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 955 (9th Cir. 2009) (citing and quoting *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977)). "Rule 24(b)(3) also requires that the court 'consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Perry*, 587 F.3d at 955 (citing and quoting Fed. R. Civ. P. 24(b)(3)).

Wells Fargo's request for permissive intervention is untimely for the same reasons discussed above. A determination of timeliness for permissive intervention "consider[s] precisely the same three factors—the stage of the proceedings, the prejudice to existing parties, and the length of and reason for the delay—that [the court] consider[s] in determining timeliness [for intervention as of right]." *League of United Am. Citizens v. Wilson*, 131 F.3d 1297, 1308 (9th Cir. 1997). "In the context of permissive intervention, however, [the court] analyze[s] the timeliness element more strictly than ... with intervention as of right." *Id.* Because Wells Fargo's motion to intervene as of right is untimely, its request for permissive intervention likewise falls on that ground.

Beyond that, however, there is the issue of judicial economy to consider. *See, e.g.*, *Venegas v. Skaggs*, 867 F.2d 527, 531 (9th Cir. 1989), *aff'd sub nom. Venegas v. Mitchell*, 495 U.S. 82, 110 (1990) ("[J]udicial economy is a relevant consideration in deciding a motion for permissive intervention."). That includes "judicial economy concerns regarding the multiplication of proceedings." *See Gonzalez v. Arizona*, No. CV 06-1268 PHXROS, 2006 WL 2246365, at *2 (D. Ariz. Aug. 2, 2006), *aff'd*, 485 F.3d 1041 (9th Cir. 2007). As discussed above, Wells Fargo already has a forum to raise these issues: the Receiver's case against it. Allowing it to intervene in this case would result in judicial inefficiencies and

would lead to a "multiplication of proceedings," and increasing the burden on this Court substantially. *See id.* The Receiver submits that under these circumstances, Wells Fargo's requests for both intervention as of right and permissive intervention should be denied.

## IV.

## CONCLUSION

For the reasons discussed above, the Receiver respectfully requests that the Court deny Wells Fargo's motion to intervene.

Dated: December 20, 2021          MCNAMARA SMITH LLP

By:   /s/ Logan D. Smith
Logan D. Smith
Email: lsmith@mcnamarallp.com
*Attorneys for Court-Appointed Receiver,*
*Thomas W. McNamara*

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of December, 2021, the foregoing document was electronically transmitted to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.

**VIA CM/ECF**
Samantha Gordon
Matthew H. Wernz
Federal Trade Commission
230 South Dearborn, Suite 3030
Chicago, IL 60604
Tel.:  312-960-5623 (Gordon)
Tel.:  312-960-5596 (Wernz)
sgordon@ftc.gov
mwernz@ftc.gov
*Attorneys for Plaintiff Federal Trade Commission*

**VIA CM/ECF**
Jonathan W. Ware
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-9528
Washington, D.C. 60604
Tel.:  202-326-2726
jware1@ftc.gov
*Attorneys for Plaintiff Federal Trade Commission*

**VIA CM/ECF**
Adam L. Braverman
United States Attorney
Rebecca G. Church
Assistant U.S. Attorney
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel.:  619-546-7701/7721
Fax:   619-546-7751
rebecca.church@usdoj.gov
*Attorneys for Plaintiff Federal Trade Commission*

**VIA CM/ECF**
Frederick K. Taylor
Matthew B. Shields
Nicholas S. Kawuka
Procopio Cory Hargreaves
and Savitch LLP
525 B Street, Suite 2200
San Diego, CA 92101-4469
Tel.:  619-238-1900
Fax:   619-235-0398
fkt@procopio.com
matthew.shields@procopio.com
nka@procopio.com
*Attorneys for Defendants Triangle Media Corporation; Jasper Rain Marketing, LLC; and Brian Phillips*

**VIA CM/ECF**
Ari N. Rothman
Witt W. Chang
Venable LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Tel.:  310-229-9900
Fax:   310-229-9901
anrothman@venable.com
wchang@venable.com
*Attorneys for Defendants Hardwire Interactive Inc. and Devin Keer*

**VIA CM/ECF**
Gerald S. Sachs
Stephen R. Freeland
Venable LLP
600 Massachusetts Ave., NW
Washington, DC 20001
Tel.:  202-344-4000
Fax:   202-344-8300
gssachs@venable.com
srfreeland@venable.com
*Attorneys for Defendant Hardwire Interactive Inc. and Devin Keer*

1

**VIA CM/ECF**
David C. Powell
Anthony Q. Le
Jenny Yi
McGuireWoods LLP
Two Embarcadero Center, Suite 1300
San Francisco, CA 94111-3821
Tel.:   415-844-9944
Fax:   415-844-9922
dpowell@mcguirewoods.com;
ale@mcguirewoods.com;
jyi@mcguirewoods.com
*Attorneys for Proposed Intervenors*
*Wells Fargo & Company and Wells*
*Fargo Bank N.A.*

**VIA CM/ECF**
Molly M. White
McGuireWoods LLP
1800 Century Park East, 8th Floor
Los Angeles, CA 90067-1501
Tel.:   310-315-8200
Fax:   310-315-8210
mwhite@mcguirewoods.com
*Attorneys for Proposed Intervenors*
*Wells Fargo & Company and Wells*
*Fargo Bank N.A.*

**VIA CM/ECF**
Karl S. Kronenberger
Kronenberger Rosenfeld
150 Post Street, Suite 520
San Francisco, CA 94108
Tel.:   415-955-1155
Fax:   415-955-1158
karl@krinternetlaw.com
*Attorneys for Defendant Global*
*Northern Trading Limited*

**VIA EMAIL/U.S. MAIL**
Nicole Phillips
7750 Via Francesco, Unit 1
San Diego, CA 92129
Tel.:   619-972-2345
elocint@gmail.com
*Interested Party*


  /s/ Logan D. Smith
Logan D. Smith
Email:  lsmith@mcnamarallp.com
*Attorneys for Court-appointed Receiver,*
*Thomas W. McNamara*

Case No. 3:18-cv-01388-LAB-LL
CERTIFICATE OF SERVICE

1 | Logan D. Smith (SBN 212041)
lsmith@mcnamarallp.com
2 | Cornelia J. B. Gordon (SBN 320207)
cgordon@mcnamarallp.com
3 | McNamara Smith LLP
655 West Broadway, Suite 900
4 | San Diego, California 92101
Telephone: 619-269-0400
5 | Facsimile: 619-269-0401

6 | *Attorneys for Court-Appointed Receiver*
*Thomas W. McNamara*

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10

11 | FEDERAL TRADE COMMISSION, | Case No. 3:18-cv-01388-LAB-LL

12 | Plaintiff, | **DECLARATION OF LOGAN D. SMITH IN SUPPORT OF RECEIVER'S OPPOSITION TO**
13 | v. | **PROPOSED INTERVENORS WELLS FARGO & COMPANY**
14 | TRIANGLE MEDIA CORPORATION, | **AND WELLS FARGO BANK N.A.'S MOTION TO INTERVENE**
a Delaware corporation, also doing
15 | business as Triangle CRM, Phenom
Health, Beauty and Truth, and E-Cigs; | JUDGE: Hon. Larry A. Burns
16 | JASPER RAIN MARKETING LLC, a | CTRM: 14A
California limited liability company, also | DATE: January 24, 2022
17 | doing business as Cranium Power and | TIME: 11:30 a.m.
Phenom Health; HARDWIRE
18 | INTERACTIVE INC., a British Virgin
Islands corporation, also doing business
19 | as Phenom Health, Beauty and Truth,
and E-Cigs; and BRIAN PHILLIPS,
20 | individually and as an officer of Triangle
Media Corporation,
21
Defendants.
22

23

24

25

26

27

28

I, Logan D. Smith, hereby declare as follows:

1. I am counsel of record for Thomas W. McNamara in his capacity as Court-appointed Receiver of the Receivership Entities in this action, and I am also counsel of record for Thomas W. McNamara in his capacity as Court-appointed Receiver in *Federal Trade Commission v. Apex Capital Group LLC, et al.* ("Apex Case"), No. 2:18-cv-09573-JFW (JPRx) (C.D. Cal.). I have personal knowledge of the facts set forth in this Declaration and if called as a witness I could and would competently testify to the facts stated herein.

2. I make this declaration in connection with the concurrently filed Opposition to Proposed Intervenors Wells Fargo & Company and Wells Fargo Bank N.A.'s Motion to Intervene ("Opposition").

3. Attached hereto as Exhibit 1 is a true and correct copy of an email and attached letter, both dated April 1, 2020, from counsel for the Receiver, Jonathan Rotter, to Wells Fargo regarding a proposal for pre-filing mediation. The April 1, 2020 email included, as an attachment, copies of draft complaints and a proposed Tolling Agreement (which are not included in this Exhibit).

4. Attached hereto as Exhibit 2 is an email dated April 13, 2020 from Wells Fargo's counsel confirming its receipt of the April 1, 2020 email and correspondence from Mr. Rotter (attached as Exhibit 1).

5. Attached hereto as Exhibit 3 is a true and correct copy of the Receiver's Notice of Unopposed Motion and Unopposed Motion to Extend Completion Deadline for Receivership and Interim Status Report filed on July 23, 2021 in the Apex Case, ECF Nos. 186, 186-1.

6. Attached hereto as Exhibit 4 is a true and correct copy of the Order Granting Receiver's Unopposed Motion to Extend Completion Deadline for Receivership and Interim Status Report, entered on August 12, 2021 in the Apex Case, ECF No. 198.

///

7.     Attached hereto as Exhibit 5 is a true and correct copy of an email dated August 19, 2021 from Wells Fargo's counsel to me, informing me that "Wells Fargo plans to file a motion to intervene in the FTC action involving your office—*FTC v. Apex*, No. 2:18-cv-9573-JFW (C.D. Cal.)—to challenge the order appointing the receiver to pursue Wells Fargo and the previously entered stipulated judgment based on the recent AMG/FTC decision holding that the FTC does not have authority under Section 13(b) to obtain equitable monetary relief. *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021)."

8.     As counsel for the Receiver, I met and conferred with Wells Fargo's counsel regarding the filing of a motion to intervene in the Apex Case on August 23, 2021.

9.     Attached hereto as Exhibit 6 is a true and correct copy of an email dated August 30, 2021 from Wells Fargo's counsel to me regarding Wells Fargo's intervention motion in the Apex Case, informing me that "[Wells Fargo] will not be filing the intervention motion that we discussed last week."

10.     Attached hereto as Exhibit 7 is a true and correct copy of the Order filed on September 3, 2021 (ECF No. 207).  The Order denied Defendants Sia Transact Pro's and Mark Moskvins's Motion to Modify, Vacate, or Set Aside Monetary Portion of Stipulated Permanent Injunction and Monetary Judgment, which had been filed in the Apex Case on July 9, 2021 (ECF No. 182).

11.     Attached hereto as Exhibit 8 is a true and correct copy of an email dated October 26, 2021 from Wells Fargo's counsel to me regarding Wells Fargo's intervention motion in the Apex Case.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 20th day of December, 2021, in San Diego, California.

        /s/ Logan D. Smith
        Logan D. Smith

1

## **EXHIBIT INDEX**

2   No.                                                                                      Page

3   1   Email from J. Rotter to Wells Fargo's Counsel re:
        Proposal for Pre-Filing Mediation (April 1, 2020) ................................. 3
4

5   2   Email from A. Baiardo to J. Rotter re: McGuire Woods'
        representation of Wells Fargo (April 13, 2020) ...................................... 6

6   3   *Federal Trade Commission v. Apex Capital Group LLC, et al.*,
        No. 2:18-cv-09573-JFW (JPRx) (C.D. Cal.), ECF Nos. 186,
7       186-1, Receiver's Notice of Unopposed Motion and Unopposed
        Motion to Extend Completion Deadline for Receivership and
8       Interim Status Report (July 23, 2021) ..................................................... 7

9   4   *Federal Trade Commission v. Apex Capital Group LLC, et al.*,
        No. 2:18-cv-09573-JFW (JPRx) (C.D. Cal.), ECF No. 198
10      Order Granting Receiver's Unopposed Motion to Extend
        Completion Deadline for Receivership and Interim Status
11      Report (August 12, 2021) ....................................................................... 18

12  5   Email from Wells Fargo's Counsel to L. Smith re:
        Wells Fargo Motion to Intervene (August 19, 2021) .......................... 20
13

14  6   Email from Wells Fargo's Counsel to L. Smith re:
        Wells Fargo Intervention Motion (August 30, 2021) .......................... 22

15  7   *Federal Trade Commission v. Apex Capital Group LLC, et al.*,
        No. 2:18-cv-09573-JFW (JPRx) (C.D. Cal.), ECF No. 207,
16      Order Denying Defendants Sia Transact Pro's and Mark
        Moskvins's Motion to Modify, Vacate, or Set Aside Monetary
17      Portion of Stipulated Permanent Injunction and Monetary
        Judgment (September 3, 2021) ............................................................... 23
18

19  8   Email from Wells Fargo's Counsel to L. Smith re:
        Wells Fargo Intervention Motion (October 26, 2021) ......................... 31

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

| | |
|---|---|
| **From:** | Jonathan Rotter <JRotter@glancylaw.com> |
| **Sent:** | Wednesday, April 1, 2020 5:01 PM |
| **To:** | douglas.edwards@wellsfargo.com; david.j.rice@wellsfargo.com |
| **Cc:** | Thomas McNamara; Logan Smith; Edward Chang; Lionel Glancy; Mary Jane Fait |
| **Subject:** | Proposal for Pre-Filing Mediation and Tolling Agreement - McCraner et al. v. Wells Fargo; Receiver v. Wells Fargo (email 1 of 2) |
| **Attachments:** | Letter [FINAL].PDF; Tolling Agreement [FINAL].PDF; 2020.04.01 Draft Complaint - Receiver v. Wells Fargo - For Settlement Purposes Only [FINAL].PDF; 2020.04.01 Draft Complaint - McCraner v. Wells Fargo - For Settlement Purposes Only [FINAL].PDF |

Dear Mr. Edwards and Mr. Rice,

Please see the attached correspondence proposing presuit mediation of the claims addressed in the attached draft complaints. I will send the exhibits via separate email following this one to make sure that this email does not bounce for size reasons.

Sincerely,

Jonathan Rotter

_____

Jonathan Rotter
Partner
Glancy Prongay & Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

Voice: 310-201-9150
Fax: 310-201-9160
jrotter@glancylaw.com
www.glancylaw.com

_____
This e-mail message is confidential, is intended only for the named recipient(s) above, and may contain information that is privileged, attorney work product, or otherwise be exempt from disclosure under applicable law. If you received this message in error, please immediately notify the sender by return e-mail and delete this e-mail message from your computer. Thank you.

1

EXHIBIT 1
Page 3

1-SER-39



Jonathan Rotter
jrotter@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
T: 310.201.9150

April 1, 2020

***Via Email***:

Douglas R. Edwards, Chief Legal Officer
douglas.edwards@wellsfargo.com

David J. Rice, Assistant General Counsel
david.j.rice@wellsfargo.com

***Via FedEx:***

Law Department
Wells Fargo & Co., Wells Fargo Bank, N.A.
Law Department, 45 Fremont St, 26th Fl
San Francisco, CA 94105

     Re:    **Proposal for Presuit Mediation and Tolling Agreements**
              *McCraner et al. v. Wells Fargo & Company and Wells Fargo Bank, N.A.*;
              *Thomas W. McNamara, as Receiver v. Wells Fargo & Company and Wells Fargo Bank, N.A.*

Dear Mr. Edwards and Mr. Rice:

Beginning over a decade ago, Wells Fargo conspired with several fraudulent enterprises to defraud consumers. The Federal Trade Commission recently shut down those enterprises via litigation. Wells Fargo continued to aid and abet the fraudulent enterprises until the very moment they were shut down.

We represent consumers harmed by those schemes and the Court-appointed receiver for two of the fraudulent enterprises shut down by the Federal Trade Commission. We are prepared to bring suit against Wells Fargo for aiding and abetting the fraud and related claims. Draft complaints are enclosed.

Despite the fact that we are prepared to litigate, we write in advance to see whether Wells Fargo is interested in attempting to resolve the disputes without litigation. We understand that Wells Fargo has regularly utilized the Hon. Daniel Weinstein and the Hon. Layn Phillips as

EXHIBIT 1
Page 4

April 1, 2020
Page 2

mediators in matters of significance.  If Wells Fargo will agree to engage in presuit mediation before Judge Weinstein or Judge Phillips, then please execute the enclosed tolling agreement and return to me via email no later than April 15, 2020, and please let me know with whom we should communicate to schedule the mediation.

Very truly yours,

*/s/ Jonathan M. Rotter*

Attachments:
Tolling Agreement, Draft Complaints

Cc:
Thomas W. McNamara
Logan Smith
Edward Chang
Lionel Glancy
Mary Jane Fait

# EXHIBIT 2

From: Baiardo, Alicia A. [mailto:ABaiardo@mcguirewoods.com]
Sent: Monday, April 13, 2020 12:43 PM
To: Jonathan Rotter <JRotter@glancylaw.com>
Cc: Powell, David C. <DPowell@mcguirewoods.com>
Subject: McCraner and McNamara Matters

Good Afternoon Mr. Rotter,

My partner Dave Powell and I tried to reach you earlier today by telephone to introduce ourselves.  We
will be representing Wells Fargo with regards to the proposed McCraner and McNamara matters.  Do
you have time later this afternoon or tomorrow for a short call? We are in receipt of your invitation to
mediate and proposed tolling agreement.

Best regards,
Ali Baiardo

Alicia Anne Baiardo
McGuire Woods LLP
T: 415.844.1973
_____

This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the
intended recipient, please advise by return e-mail and delete immediately without reading or
forwarding to others.

EXHIBIT 2
Page 6

1-SER-43

# EXHIBIT 3

1-SER-44

Logan D. Smith (SBN 212041)
lsmith@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
Facsimile:  619-269-0401

*Attorneys for Receiver,*
*Thomas W. McNamara*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:18-cv-09573-JFW (JPRx) |
| Plaintiff, | **RECEIVER'S NOTICE OF UNOPPOSED MOTION AND UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE FOR RECEIVERSHIP AND INTERIM STATUS REPORT** |
| v. | |
| APEX CAPITAL GROUP, LLC, et al., | |
| Defendants. | |

JUDGE:   Hon. John F. Walter
CTRM:    7A
DATE:     August 23, 2021
TIME:     1:30 p.m.

TO THE HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT COURT JUDGE, AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 23, 2021 at 1:30 p.m. in Courtroom 7A of the United States District Court for the Central District of California, located at 350 W. First Street, Los Angeles, California, Thomas W. McNamara, the Court-appointed receiver of the Receivership Entities, will present his Unopposed Motion to Extend Completion Deadline for Receivership.  Counsel for the Federal Trade Commission does not object to this motion.

EXHIBIT 3
Page 7

1       This motion is supported by this notice of motion and motion, the

2 concurrently filed memorandum of points and authorities, all pleadings and records

3 on file, and any argument heard hereon.

4

5 Dated:  July 23, 2021            MCNAMARA SMITH LLP

6

7                   By:   /s/ Logan D. Smith
                      Logan D. Smith

8                       *Attorneys for Receiver,*
                      *Thomas W. McNamara*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all participants in the case who are registered CM/ECF users.

 /s/ Logan D. Smith

Logan D. Smith
*Attorney for Receiver,*
*Thomas W. McNamara*

Case No. 2:18-cv-09573-JFW (JPRx)
CERTIFICATE OF SERVICE

EXHIBIT 3
Page 9

1-SER-47

1  Logan D. Smith (SBN 212041)
   lsmith@mcnamarallp.com
2  McNamara Smith LLP
   655 West Broadway, Suite 900
3  San Diego, California 92101
   Telephone: 619-269-0400
4  Facsimile:  619-269-0401

5  *Attorneys for Receiver,*
   *Thomas W. McNamara*
6

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11  FEDERAL TRADE COMMISSION,           Case No. 2:18-cv-09573-JFW (JPRx)

12              Plaintiff,              **MEMORANDUM OF POINTS AND
                                        AUTHORITIES IN SUPPORT OF
13       v.                            RECEIVER'S UNOPPOSED
                                        MOTION TO EXTEND
14  APEX CAPITAL GROUP, LLC, et al.,    COMPLETION DEADLINE FOR
                                        RECEIVERSHIP AND INTERIM
15              Defendants.             STATUS REPORT**

16                                      JUDGE:    Hon. John F. Walter
                                        CTRM:     7A
17                                      DATE:     August 23, 2021
                                        TIME:     1:30 p.m.
18

19

20

21

22

23

24

25

26

27

28

                                        Case No. 2:18-cv-09573-JFW (JPRx)
   MPAs ISO RECEIVER'S UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE

EXHIBIT 3
Page 10

1-SER-48

The Court-appointed receiver, Thomas W. McNamara (the "Receiver"), respectfully moves to extend the completion deadline for the receivership for an additional year, until September 12, 2022, and hereby provides this interim status report regarding the receivership tasks that remain to be completed. The Receiver submits that good cause exists to extend the receivership for the reasons set forth below.

## I.

## INTRODUCTION AND BACKGROUND

The Receiver was first appointed over the Receivership Entities in a temporary capacity by a Temporary Restraining Order ("TRO") entered on November 16, 2018 (ECF No. 16), which appointment was confirmed, and the temporary designation removed, by the Preliminary Injunctions entered on December 18, 2018 (ECF Nos. 40 and 41). On September 11, 2019, the Court entered two Stipulated Orders for Permanent Injunction and Monetary Judgment, resolving all matters in dispute between the FTC and Defendants David Barnett, Phillip Peikos, and the Receivership Entities. *See* ECF No. 120 (the "Barnett Order") and ECF No. 121 (the "Peikos Order").[1]

The Barnett and Peikos Orders direct the Receiver to recover and liquidate Receivership Estate assets. The Barnett Order included a receivership termination provision, requiring the Receiver to complete his duties and file his final report and final fee application within six months after entry of the order, by March 11, 2020, "**unless this time was extended for good cause**." Barnett Order at 27-28 (Section XIII, Termination of Receivership) (emphasis added); *see also* Peikos Order at 29. On March 9, 2020, the Court subsequently extended the completion

///

---

[1] A third Stipulated Order of Permanent Injunction and Monetary Judgment was later entered as to Defendants Mark Moskvins and SIA Transact Pro (ECF No. 142), but these defendants are not subject to the receivership and therefore not affected by this request to extend the receivership.

1   deadline to March 11, 2021.  *See* ECF No. 152.  On March 9, 2021, this Court

2   extended the receivership through September 11, 2021.  *See* ECF No. 172.

3        For the reasons explained below, the Receiver believes that good cause

4   exists to extend the receivership's completion deadline to September 12, 2022 in

5   order to enable the Receiver to complete his remaining responsibilities and

6   maximize the recovery of receivership assets for the benefit of the Receivership

7   Estate.

8                                    **II.**

9                            **DISCUSSION**

10        The Receiver has completed the vast majority of his duties under the Barnett

11   and Peikos Orders, and there are minimal ongoing receivership expenses.  There

12   are, however, a limited number of important tasks that have yet to be completed,

13   and chief among them is the resolution of the Receiver's recently-filed complaint

14   against Wells Fargo.

15   **A.   The Lawsuit Against Wells Fargo**

16        On July 8, 2021, the Receiver filed a lawsuit against Wells Fargo &

17   Company and Wells Fargo Bank, N.A. (collectively referred to herein as "Wells

18   Fargo" or the "Bank").[2]  A copy of the complaint is attached as Exhibit 1.  On that

19   same day, a second, related lawsuit was filed against Wells Fargo by consumer

20   victims seeking certification of a class.[3]

21   ///

22

23   _____

23   [2] The Receiver sued Wells Fargo for aiding and abetting fraud, conspiracy to
24   commit fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary
     duty, violation of California Penal Code § 496, violation of California Business &
25   Professions Code § 17200, aiding and abetting fraudulent transfers and/or voidable
     transfers, unjust enrichment, negligence, and for an accounting.

26   [3] The class action lawsuit seeks to hold Wells Fargo accountable for aiding and
27   abetting fraud, conspiracy to commit fraud, violation of California Penal Code
     § 496, and violation of California Business & Professions Code § 17200.  The
28   class is represented by counsel Glancy Prongay & Murray LLP, which is one of the
     law firms representing the Receiver in his lawsuit against Wells Fargo.

_____

                              2        Case No. 2:18-cv-09573-JFW (JPRx)
          MPAs ISO RECEIVER'S UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE

EXHIBIT 3
Page 12

1-SER-50

1    Since discovering Wells Fargo's involvement in the Apex consumer scheme,

2    the Receiver has aggressively investigated the underlying facts.  Based on that

3    investigation, the Receiver concluded that Wells Fargo knowingly provided critical

4    assistance to Apex's principals, along with the principals of another, similar "risk-

5    free" trial scheme run by Triangle Media Corporation ("Triangle").[4]

6    As previously reported to the Court, in late October 2019 and January 2020,

7    the Receiver filed motions in the *Triangle* and *Apex* actions, respectively, advising

8    both Courts that he wished to retain contingency counsel to pursue claims against

9    Wells Fargo on behalf of the Receivership Entities for the extensive harm that

10   Wells Fargo caused them.  In the *Triangle* action, on November 19, 2019, Judge

11   Burns ruled that "the Court finds good cause exists to grant the Receiver's motion

12   to (1) extend the receivership for the sole purpose of pursuing litigation against

13   Wells Fargo, (2) permit the Receiver to retain contingency counsel, and (3)

14   administratively close the case while that litigation is pursued."  On March 9,

15   2020, this Court likewise permitted the Receiver to retain contingency counsel to

16   pursue claims against Wells Fargo.

17   After obtaining court approval and hiring counsel, the Receiver and counsel

18   engaged in pre-filing settlement discussions and voluntary exchanges of

19   information with Wells Fargo from Spring 2020 through Summer 2021.  During

20   the period when settlement discussions continued with the assistance of the

21   mediators,[5] the parties were operating under Tolling Agreements which extended

22

23   [4] Apex and Triangle were sued in separate actions by the FTC, and the Receiver
     was appointed in each of the cases to determine whether the businesses could
     continue to be operated lawfully and profitably, and to protect assets and maximize
24   the value of Receivership Estate.  The Receiver determined the Apex and Triangle
     businesses were fraudulent "continuity" schemes that could not continue to
25   operate.  Apex and Triangle were both offering internet-based, deceptive "free
     trial" products to consumers, who were then charged the full price for the trial
26   product and also enrolled in expensive, ongoing continuity plans without their
     knowledge or consent.

27   [5] The Receiver and Wells Fargo participated in confidential mediation in
     November 2020 and again in April 2021.
28

3          Case No. 2:18-cv-09573-JFW (JPRx)
MPAs ISO RECEIVER'S UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE

EXHIBIT 3
Page 13

1-SER-51

1   through July 7, 2021.  Immediately after the Tolling Agreements lapsed, the

2   Receiver and the consumer victims filed their lawsuits against Wells Fargo in the

3   Southern District of California.  The lawsuits were filed in the Southern District of

4   California because it was the venue in which the FTC first brought its litigation

5   against Triangle and because the FTC had also filed suit in that District against a

6   third Southern California continuity scheme called Tarr Inc., which was similar to

7   those run by Apex and Triangle.  Just as was the case with Apex and Triangle,

8   Wells Fargo provided atypical banking services to Tarr Inc. and a host of related

9   shell companies.  The Receiver's case and the consumers' case were reassigned

10  post-filing to Judge Larry Burns, who is the judge in the FTC's lawsuits against

11  Triangle and Tarr.

12      The Receiver is now actively pursuing his litigation against Wells Fargo and

13  believes it is a worthy case that could result in a substantial recovery for the

14  Receivership Estate.  Any recovered funds will ultimately be returned to the FTC,

15  which will then make distributions to the consumer victims of these frauds.

16  Significantly, the Receiver will be able to litigate this case *without* the

17  Receivership Entities incurring any costs and fees of litigation.  This was a key

18  factor in the Receiver's decision to pursue the litigation.  Because the Receiver was

19  able to hire contingency counsel, who expressly agreed to a contingent fee model

20  and to advance all costs, the Receivership will not be required to expend resources

21  in pursuing the case and will thus bear none of the financial risk.  If that were not

22  the case, the costs and legal fees required to take on such a deep-pocketed financial

23  institution would have been prohibitive.

24      As set forth in greater detail in the Complaint, the Receiver's case against

25  Wells Fargo is centered around the bank's continued willingness over a span of

26  years to deviate from accepted banking standards and practices and provide

27  atypical banking services in aid of the Apex and Triangle continuity schemes.

28  Both "risk-free" trial enterprises required a continuous stream of Wells Fargo bank

1   accounts for their dozens of shell companies to continue to operate, since those

2   shell companies were constantly being shut down by credit card processors

3   concerned about fraudulent activity and excessive consumer chargebacks.  The

4   Receiver has gathered evidence that Wells Fargo acted in a manner unlike any of

5   its banking peers during the relevant time period by opening more than 150 bank

6   accounts for the Apex and Triangle enterprises.

7        The root cause of Wells Fargo's conduct was the high-pressure sales culture

8   in place at the time, which caused Wells Fargo Community Bank employees and

9   branches to work under constant pressure to cross-sell and to open as many

10  accounts as possible, including under threat of termination.  Wells Fargo has

11  previously been subject to regulatory, civil, and criminal sanctions arising out of

12  this sales culture.  Those sanctions, which included substantial fines and

13  remediation efforts, were focused on compensating Wells Fargo's own customers

14  after Wells Fargo's Community Bank employees had opened fraudulent bank

15  accounts in the customers' names without their consent.  While the conduct here

16  has the same root cause (Wells Fargo's sales culture), the Receiver's case is

17  focused on conduct that Wells Fargo has not yet been held accountable for, where

18  its Community Bank employees and branches aided fraudulent enterprises by

19  opening scores of bank accounts for them – accounts which should never have

20  been opened.  Wells Fargo has never compensated the victims of this newly-

21  identified consequence of its toxic sales culture.  Those victims include consumers

22  as well as the Receivership Entities, both of which were harmed by Wells Fargo's

23  misconduct.

24  **B.    Claims Against European Beach Club and Corporation**

25       As previously noted in status reports provided to the Court, in addition to the

26  Wells Fargo lawsuit, the Receiver has also engaged counsel to investigate and

27  pursue claims against a beach club located in Greece and a related corporation

28  based in Cyprus.  *See* ECF Nos. 157 (Fourth Interim Status Report), 158 (Fifth

1    Interim Status Report).  The claims pursued relate to funds that the Receivership

2    Entities provided as "loans" to the beach club and shares in that beach club that

3    were sold to the Receivership Entities by the Cypriot corporation.

4           The COVID-19 pandemic disrupted the Greece and Cyprus court systems.

5    The lawsuit filed in Cyprus was stalled for a substantial period, but court activity

6    has now restarted.  The Receiver has been, and will continue to be, very careful in

7    evaluating the merits at each stage before moving forward.  For the time being, the

8    Receiver has instructed counsel to prioritize settlement discussions, which have

9    been initiated.  It is too early to tell whether these efforts will be successful.  At the

10   conclusion of the settlement discussion, the Receiver will base subsequent

11   decisions about how to proceed on counsel's further analysis and advice.

12   **C.     Payments on Convertible Notes**

13          The Receiver also continues to receive quarterly interest payments on ten

14   convertible promissory notes issued by a video e-commerce startup, Cinsay.  These

15   notes are set to mature between August 2022 and July 2023.  Should the Receiver

16   complete his other duties prior to the termination of the interest payments, the

17   Receiver will suggest that payments be made directly to the FTC.

18   **D.     Artwork**

19          Lastly, the Receiver will continue his efforts to sell artwork, which was

20   initially purchased by Defendant Barnett for approximately $70,000.  Despite

21   various and continued efforts to do so, the Receiver has not been able to liquidate

22   the ten pieces of art.  The Receiver will continue to market them until they are

23   sold.

24   ///

25   ///

26   ///

27   ///

28   ///

6        Case No. 2:18-cv-09573-JFW (JPRx)
MPAs ISO RECEIVER'S UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE

EXHIBIT 3
Page 16

## III.

## CONCLUSION

Based on the foregoing, the Receiver respectfully requests that the Court modify Section XIII (Termination of Receivership) of the Stipulated Permanent Injunction (ECF No. 120 at 27-28) and extend the receivership completion deadline to September 12, 2022, unless the Court subsequently extends that date for good cause.

Dated:  July 23, 2021                    MCNAMARA SMITH LLP

By:    /s/ Logan D. Smith
Logan D. Smith
*Attorney for Receiver,*
*Thomas W. McNamara*

---

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>**CIVIL MINUTES -- GENERAL**</u>

Case No.   **CV 18-9573-JFW(JPRx)**                              Date:  August 12, 2021

Title:        Federal Trade Commission -*v*- Apex Capital Group, et al.

**PRESENT:**
              **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

        **Shannon Reilly**                        **None Present**
        **Courtroom Deputy**                      **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
              None                                        None

**PROCEEDINGS (IN CHAMBERS):**      **ORDER GRANTING RECEIVER'S UNOPPOSED**
                                    **MOTION TO EXTEND COMPLETION DEADLINE FOR**
                                    **RECEIVERSHIP AND INTERIM STATUS REPORT [filed**
                                    **7/23/21; Docket No. 186]**

        On July 23, 2021, Receiver Thomas W. McNamara ("Receiver") filed an Unopposed Motion to Extend Completion Deadline for Receivership and Interim Status Report ("Motion").  Plaintiff and Defendants did not file Oppositions.[1]  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument.  The hearing calendared for August 23, 2021 is hereby vacated and the matter taken off calendar. After considering the moving papers, and the arguments therein, the Court rules as follows:

        Pursuant to Local Rule 7-9, Plaintiff and Defendants were required to file and serve their Oppositions or Notices of Non-Opposition "not later than twenty-one (21) days before the date designated for the hearing of the motion."  *See* Local Rule 7-9.  Local Rule 7-12 provides that "[t]he failure to file any required document, or the failure to file it within the deadline, may be deemed consent to the granting . . . of the motion."  *See* Local Rule 7-12.  Plaintiff and Defendants have failed to file a timely Opposition.  Pursuant to Local Rule 7-12, the Court deems Plaintiff's and Defendants' failure to file an Opposition or to otherwise comply with Local Rule 7-9 as consent to the granting of the Receiver's Motion.

        Accordingly, the Receiver's Motion is **GRANTED**.  Section XIII of the Stipulated Order for Permanent Injunction and Monetary Judgment (Docket No. 120) is hereby modified to provide that

_____

        [1]  In his Motion, the Receiver states that counsel for the Federal Trade Commission does not oppose to this Motion.

the deadline for the Receiver to complete his duties shall be September 12, 2022.

      IT IS SO ORDERED.

EXHIBIT 5

| | |
|---|---|
| **From:** | Le, Anthony Q. <ALe@mcguirewoods.com> |
| **Sent:** | Thursday, August 19, 2021 3:17 PM |
| **To:** | Logan Smith |
| **Cc:** | White, Molly M.; Baiardo, Alicia A. |
| **Subject:** | FTC v. Apex Capital, No. 2:18-cv-9573-JFW (C.D. Cal.) - Wells Fargo Motion to Intervene |

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. _____

Counsel,

As you are aware, McGuireWoods LLP represents Wells Fargo Bank in connection with a recent lawsuit involving your office by Thomas McNamara, as the court-appointed receiver for Triangle Media Corporation and Apex Capital Group.  This lawsuit is entitled *Thomas McNamara v. Wells Fargo & Company et al.*, No. 3:21-cv-01245-LAB-LL, and is now pending in the Southern District of California.

We are writing to follow-up on our call this afternoon to meet and confer under C.D. Cal. Local Rule 7-3.  As we mentioned, Wells Fargo plans to file a motion to intervene in the FTC action involving your office—*FTC v. Apex*, No. 2:18-cv-9573-JFW (C.D. Cal.)—to challenge the order appointing the receiver to pursue Wells Fargo and the previously entered stipulated judgment based on the recent AMG/FTC decision holding that the FTC does not have authority under Section 13(b) to obtain equitable monetary relief.  *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021).

Please call us at your convenience, or let us know when you are available to discuss.  Our contact information is below.  Thanks in advance.

Molly White
mwhite@mcguirewoods.com
(310) 956-3423

Ali Baiardo
abaiardo@mcguirewoods.com
(415) 844-1973

Anthony Le
ale@mcguirewoods.com
(415) 844-1975


**Anthony Q. Le**
Associate
McGuireWoods LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111-3821
T:  +1 415 844 1975
M: +1 949 244 8270
F:  +1 415 844 1918
ale@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

EXHIBIT 5
Page 20

McGuireWoods

---

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

EXHIBIT 5
Page 21

# EXHIBIT 6

| | |
|---|---|
| **From:** | Lally, Kevin M. <KLally@mcguirewoods.com> |
| **Sent:** | Monday, August 30, 2021 3:57 PM |
| **To:** | Logan Smith |
| **Cc:** | Baiardo, Alicia A.; Le, Anthony Q. |
| **Subject:** | Wells Fargo Intervention Motion |

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. _____

Logan,

Please be advised that we will not be filing today the intervention motion that we discussed last week.  In advance of a future filing, we will get your updated position, provide you with a draft of the joint statement to the Court for your review, and propose potential hearing dates for the motion.

Please do not hesitate to call me should you have any questions.

Regards,

Kevin Lally

**Kevin M. Lally**
Partner
McGuireWoods LLP
Wells Fargo Center
South Tower
355 S. Grand Ave., Suite 4200
Los Angeles, CA 90071-3103
T:  +1 213 457 9862
F:  +1 213 457 9882
klally@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

McGUIREWOODS

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

1

EXHIBIT 6
Page 22

1-SER-63

EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>CIVIL MINUTES -- GENERAL</u>

Case No.    **CV 18-9573-JFW(JPRx)**                    Date: September 3, 2021

Title:        Federal Trade Commission -v- Apex Capital Group, et al.

=================================================================

PRESENT:
            **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

        **Shannon Reilly**                        **None Present**
        **Courtroom Deputy**                      **Court Reporter**


**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
            None                                        None

**PROCEEDINGS (IN CHAMBERS):**        **ORDER DENYING DEFENDANTS SIA TRANSACT PRO'S AND MARK MOSKVINS'S MOTION TO MODIFY, VACATE, OR SET ASIDE MONETARY PORTION OF STIPULATED PERMANENT INJUNCTION AND MONETARY JUDGMENT [filed 7/9/21; Docket No. 182]**

On July 9, 2021, Defendants Sia Transact Pro ("Sia") and Mark Moskvins ("Moskvins") (collectively, the "Transact Pro Defendants") filed a Motion to Modify, Vacate, or Set Aside Monetary Portion of Stipulated Permanent Injunction and Monetary Judgment ("Motion"). On August 9, 2021, Plaintiff the Federal Trade Commission (the "FTC") filed its Opposition. On August 16, 2021, Defendants filed a Reply. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument. The matter was, therefore, removed from the Court's August 30, 2021 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.        Factual and Procedural Background**

On November 14, 2018, the FTC filed a Complaint against Apex Capital Group, LLC ("Apex"), together with its two United States based principals, Phillip Peikos ("Peikos") and David Barnett ("Barnett"), Omni Group Ltd. ("Omni"), and ten United Kingdom registered shell companies[1] (collectively, the "Apex Defendants"). Docket No. 1. On May 30, 2019, the FTC filed a

_____

        [1]  The ten United Kingdom registered shell companies include Capstone Capital Solutions Limited, Clik Trix Limited, Empire Partners Limited, Interzoom Capital Limited, Lead Blast Limited, Mountain Venture Solutions Limited, Nutra Global Limited, Rendezvous It Limited, Sky Blue Media Limited, and Tactic Solutions Limited.

First Amended Complaint, which added the Transact Pro Defendants.  Docket No. 73.  In the First Amended Complaint, the FTC alleged two claims against the Transact Pro Defendants: (1) credit card laundering in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") (Count VI); and (2) chargeback manipulation in violation of Section 5 of the FTC Act (Count VII).[2]  The FTC alleged that the Apex Defendants engaged in a scheme to offer phony "free trials" of personal care products and dietary supplements in order to obtain consumers' credit and debit card information and then placed recurring charges on the cards without the consumers' authorization.  The FTC also alleged that the Apex Defendants and Transact Pro Defendants worked together to perpetuate this scheme through credit card laundering and chargeback manipulation.  The FTC sought, amongst other remedies, equitable monetary relief under Section 13(b) of the FTC Act.

On January 15, 2020, the Court entered a Stipulated Order for Permanent Injunction and Monetary Judgment ("Stipulated Judgment") pursuant to a settlement between the FTC and the Transact Pro Defendants.  See Docket Nos. 141 and 142.  In the Stipulated Judgment, the FTC and the Transact Pro Defendants agreed that the Transact Pro Defendants would pay $3.5 million "within ten (10) days."  Stipulated Judgment, 20:9-12.  In addition, the Transact Pro Defendants "waive[d] all rights to appeal or otherwise challenge or contest the validity of this Order."  Id., at 2:17-18.

On April 22, 2021, in an unrelated action, the Supreme Court unanimously held that Section 13(b) of the FTC Act does not authorize the FTC to seek, or a court to award, equitable monetary relief.  AMG v. Capital Management, LLC v. Federal Trade Commission, 141 S.Ct. 1341, 1344 (2021).

## II.    Legal Standard

Federal Rule of Civil Procedure 60(b) provides for reconsideration of a final judgment or order where one or more of the following is shown: (1) "mistake, inadvertence, surprise or excusable neglect"; (2) "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)"; (3) "fraud . . . , misrepresentation, or misconduct by an opposing party"; (4) "the judgment is void"; (5) "the judgment has been satisfied, released, or discharged"; (6) "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).

In exercising its discretion in determining whether Rule 60(b) applies, courts should be mindful that there is a compelling interest in finality of judgments and final judgments should not be disturbed lightly.  See Matton Steamboat Co. v. Murphy, 319 U.S. 412, 415 (1943) ("The purpose of statutes limiting the period for appeal is to set a definite point of time when litigation shall be at an end, unless within that time the prescribed application has been made; and if it has not, to advise prospective appellees that they are freed of the appellant's demands"); Paddington Partners v. Bouchard, 34 F.3d 1132, 1144 (2d Cir. 1994) (Rule 60 "preserves a balance between serving

---

[2]  On September 11, 2019, the Court entered a Stipulated Order for Permanent Injunction and Monetary Judgment as to the Apex Defendants pursuant to a settlement between the FTC and the Apex Defendants.  See Docket Nos. 120 and 121.

Initials of Deputy Clerk  _sr_
EXHIBIT 7
Page 24

the ends of justice and ensuring that litigation reached an end within a finite period of time"). Thus, "[r]econsideration for any of the reasons set forth in Rule 60(b) is an 'extraordinary remedy that works against the interest of finality and should be imposed only in exceptional circumstances.'" *Audionics Sys., Inc. v. AAMP of Fla., Inc.*, 2015 WL 11201243, at *7 (C.D. Cal. Nov. 4, 2015) (citations omitted). "Motions for relief from judgment pursuant to Rule 60(b) are addressed to the sound discretion of the district court and will not be reversed absent an abuse of discretion." *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004).

## III.    Discussion

In light of the Supreme Court's holding in *AMG*, the Transact Pro Defendants now seek to set aside that portion of the Stipulated Judgment requiring the Transact Pro Defendants to pay $3.5 million in equitable monetary relief on the grounds that: (1) it is void for lack of jurisdiction pursuant to Rule 60(b)(4); (2) prospective enforcement of the equitable monetary relief portion of the Stipulated Judgment would be inequitable pursuant to Rule 60(b)(5); and (3) the profound change in law announced by the Supreme Court in *AMG* creates "extraordinary circumstances" necessitating relief pursuant to Rule 60(b)(6). The FTC argues that the Transact Pro Defendants' Motion is meritless, and that the Transact Pro Defendants settled despite knowing that the Supreme Court was reviewing the issue of whether Section 13(b) of the FTC Act authorized the FTC to seek equitable monetary relief.

### A.    Rule 60(b)(4)

The Transact Pro Defendants argue that the Court should vacate the equitable monetary relief portion of the Stipulated Judgment pursuant to Rule 60(b)(4). Specifically, the Transact Pro Defendants argue that because Section 13(b) never permitted the FTC to recover monetary relief, that portion of the Stipulated Judgment is invalid because the Court lacked jurisdiction to enter it. The FTC argues that the Transact Pro Defendants waived their right to challenge the validity of the Stipulated Judgment. In addition, the FTC argues that specific provisions of the FTC Act are not the only source of the Court's jurisdiction over this action, and, as a result, a misinterpretation of those provisions cannot render the Stipulated Judgment void.

As the Supreme Court held in *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010), "[a] judgment is not void . . . simply because it is or may have been erroneous." "Instead, Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *Id.* at 271 (citations omitted). "Total want of jurisdiction must be distinguished from an error in the exercise of jurisdiction, and only rare instances of a clear usurpation of power will render a judgment void." *Id.* (quoting *United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 661 (1st Cir. 1990)) (internal alterations and quotation marks omitted). "[T]he scope of what constitutes a void judgment is narrowly circumscribed, and judgments are deemed void only where the assertion of jurisdiction is truly unsupported." *Hoffmann v. Pulido*, 928 F.3d 1147, 1151 (9th Cir. 2019). For example, in *Hoffmann*, the Ninth Circuit denied the plaintiff relief under Rule 60(b)(4), holding that although the magistrate judge lacked statutory authority to dismiss his complaint, the dismissal was "[a]t worst, . . . an error regarding the contours of a magistrate judge's authority pursuant to 28 U.S.C. § 636," which "is not equivalent to acting with total want of jurisdiction and does not render the judgment a complete nullity." *Hoffman*, 928 F.3d

Initials of Deputy Clerk  _sr_
EXHIBIT 7
Page 25

at 1151.  The Ninth Circuit held that because there was "plainly an 'arguable basis'" for the magistrate judge's assertion of jurisdiction – namely, that magistrate judges had routinely dismissed actions in similar situations prior to a recent Ninth Circuit decision prohibiting the practice – the judgment did not "fall into the narrowly circumscribed set of void judgments" under Rule 60(b)(4).  *Id.*  Similarly, in *United States v. Philip Morris USA Inc.*, 840 F.3d 844, 850 (D.C. Cir. 2016), the D.C. Circuit held that a court's authority to fashion relief under a particular statute is "fundamentally different from a court's subject matter jurisdiction over a case and from its personal jurisdiction over the parties, both of which concern the power to proceed with a case at all."  As a result, the D.C. Circuit concluded that "Rule 60(b)(4) does not permit relief where a court has exceeded its remedial authority" because "[s]uch errors are simply not the type of fundamental defects the [Supreme] Court had in mind in *Espinosa*."  *Id.* at 276 (*citing Boch Oldsmobile, Inc.*, 909 F.2d at 662 ("Consent decrees that run afoul of the applicable statutes lead to an erroneous judgment, not to a void one")).

In this case, the Court concludes that the portion of the Stipulated Judgment granting the FTC equitable monetary relief was erroneous because it was not authorized by Section 13(b).  However, the Court also concludes that portion of the Stipulated Judgment was not void within the meaning of Rule 60(b)(4) because, as in *Hoffman*, there was plainly an "arguable basis" for the Court's exercise of jurisdiction in issuing the Stipulated Judgment, namely that the Ninth Circuit at the time construed Section 13(b) as authorizing courts to fashion equitable monetary relief.  *See, e.g., Federal Trade Commission v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994).  In addition, the Court agrees with the reasoning of the D.C. Circuit in *Philip Morris* that Rule 60(b)(4) does not permit relief where a court has merely exceeded its remedial authority.  Otherwise, "[c]omplex remedial schemes in voting rights, securities fraud, affirmative action, prison conditions, and scores of other cases could all be challenged [under Rule 60(b)(4)] on the ground that the remedies imposed were, in one litigant's view, unauthorized by the statute at issue."  *Philip Morris*, 840 F.3d at 851.  Such a broad reading of Rule 60(b)(4) would contravene the Supreme Court's warning in *Espinosa* that the list of defects rendering a judgment void must be "'exceedingly short,' lest 'Rule 60(b)(4)'s exception to finality swallow the rule.'"  *Id.* (quoting *Espinosa*, 559 U.S. at 270) (internal alterations omitted).

Accordingly, the Transact Pro Defendants are not entitled to relief under Rule 60(b)(4).

## B.   Rule 60(b)(5)

The Transact Pro Defendants argue that the Court should vacate the equitable monetary relief portion of the Stipulated Judgment because Rule 60(b)(5) permits a court to vacate a judgment when "applying it prospectively is no longer equitable."  Because the Transact Pro Defendants never paid the $3.5 million in equitable monetary relief, they argue that the equitable monetary relief portion of the Stipulated Judgment is prospective.  The FTC argues that the overwhelming weight of authority establishes that monetary judgments are not "prospective" within the meaning of Rule 60(b)(5).

Rule 60(b)(5) provides that a court may relieve a party from a final judgment where "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable."  However, the portion of Rule 60(b)(5) that provides a court may relieve a party from final judgment where

Initials of Deputy Clerk   sr
EXHIBIT 7
Page 26

1-SER-68

"applying it prospectively is no longer equitable" only applies to prospective injunctive relief, and not the monetary judgment challenged by the Transact Pro Defendants.  *See California by & though Becerra v. U.S. Environmental Protection Agency*, 978 F.3d 708, 713-17 (9th Cir. 2020) (discussing Rule 60(b)(5) as the standard for modifying an injunction "with prospective effect," in contrast to "judgments that offer a present remedy for a past wrong").  Indeed, a provision of an order only has "prospective application" under Rule 60(b)(5) if it is "executory" or involves "the supervision of changing conduct or conditions."  *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138-39 (D.C. Cir. 1988) ("That a court's action has continuing consequences, however, does not necessarily mean that it has 'prospective application'").  Monetary judgments are not executory and do not require the supervision of changing conduct.  *See, e.g., Cook v. Birmingham News*, 618 F.2d 1149, 1152 (5th Cir. 1980) (contrasting provisions "that have prospective effect . . . with those that offer a present remedy for a past wrong"); *United States v. Eyler*, 778 F. Supp. 1553, 1557 (M.D. Fla. 1991) (back pay award is "present" rather than "prospective" remedy).  In addition, the fact that a monetary judgment has not yet been paid does not make it "prospective."  *See, e.g., Stokors S.A. v. Morrison*, 147 F.3d 759, 762 (8th Cir. 1998) ("[W]hile the judgment against Morrison may be 'prospective' to the extent that he has failed to pay it in a timely manner, it is . . . not 'prospective' for purposes of Rule 60(b)(5)"); *see also* 12 *Federal Practice*, § 60.47[1][b] (2021) ("Even if the judgment debtor has not yet paid the judgment . . . it is not 'prospective,' since it is not executory and involves no judicial supervision of changing conduct or conditions"); *Flexiteek Americas, Inc. v. PlasTEAK, Inc.*, 2012 WL 5364263, *6 (S.D. Fla. Sept. 10, 2012) (concluding that judgment does not qualify as "prospective" under Rule 60(b)(5) even "where a money judgment is 'prospective' in the more general sense that it remains unpaid"), *modified on other grounds*, 2012 WL 5364247 (S.D. Fla. Oct. 31, 2012).

Accordingly, the Transact Pro Defendants are not entitled to relief under Rule 60(b)(5).

## C.   Rule 60(b)(6)

The Transact Pro Defendants argue that the Court should vacate the equitable monetary relief portion of the Stipulated Judgment pursuant to Rule 60(b)(6) because there was a "profound" change in the law announced by the Supreme Court in *AMG* and this "extraordinary circumstance . . . overrides any otherwise usual consideration of finality of interest."  Motion, 5: 11-16.  The Transact Pro Defendants also argue that it would be a "manifest injustice" if the FTC attempts to enforce the equitable monetary relief portion of the Stipulated Judgment.  The FTC argue that free, calculated, and deliberate choices, such as the one the Transact Pro Defendants made in deciding to settle this action, can never form the basis for Rule 60(b)(6) relief.

Rule 60(b)(6) is a "catch-all" provision allowing for relief from a judgment or order for "any other reason that justifies relief."  *Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097, 1102 (9th Cir. 2006).  This rule is used to prevent "manifest injustice" where "extraordinary circumstances" are present.  *Id.*  However, when "a party makes a conscious and informed choice of litigation strategy, [that party] cannot seek extraordinary relief [under Rule 60(b)(6)] merely because his assessment of the consequences was incorrect."  *In re Master Key Antitrust Litig.*, 76 F.R.D. 460, 464 (D. Conn. 1977), *aff'd*, 580 F.2d 1045 (2d Cir. 1978).  For example, in *Ackermann v. United States*, 340 U.S. 193 (1950), the Supreme Court reviewed a motion to vacate filed by a party who declined to appeal, only to have a similarly situated co-party successfully appeal.  *Id.* at 194-95.  The Supreme Court declined to give the petitioner the benefit of an appeal he chose not

to take:

> His choice was a risk, but calculated and deliberate and such as follows a free choice.  Petitioner cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong . . . There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from.

*Id.* at 198; *see also Schwartz v. United States*, 129 F.R.D. 117, 123 (D. Md. 1990) (refusing to vacate settlement under *Ackermann* where plaintiff chose "to forgo the risk of litigation and settle," reflecting an "exercise of free will"), *aff'd,* 976 F.2d 213 (4th Cir. 1992).  In addition, in *Master Key*, 76 F.R.D. at 462, the remote purchaser plaintiffs sued the manufacturer defendants pursuant to Section 4 of the Clayton Act.  After the parties settled, "the Supreme Court held [in an unrelated action] that remote purchasers have no cause of action against manufacturers pursuant to § 4 of the Clayton Act."  *Id.* (*citing Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)).  However, the court denied the defendants' subsequent Rule 60(b) motion to set aside the settlement, and concluded that "[t]he holding in *Ackermann* is controlling here."  *Id.* at 464.

In this case, as in *Ackermann* and *Master Key*, the Transact Pro Defendants decided to settle this case and freely entered into the Stipulated Judgment, and, as a result, cannot be relieved of those decisions simply because those decisions now seem ill conceived.  Indeed, before deciding to settle, the Transact Pro Defendants were fully aware of the challenges to the FTC's authority to recover equitable monetary relief pursuant to Section 13(b).  Specifically, on August 21, 2019, while the FTC pursued its Section 13(b) case against the Transact Pro Defendants, the Seventh Circuit held in *Federal Trade Commission v. Credit Bureau Center, LLC*, 937 F.3d 764, 767 (7th Cir. 2019), "that section 13(b) does not authorize restitutionary relief."  The next day, Moskvins sent a copy of the *Credit Bureau* case to his attorneys, stating that "[a]ttached is [an] example of [a] recently won case that may be helpful in terms of [the] FTC['s] power to collect money."  In addition, Moskvins subsequently forwarded his attorneys an email with the subject line: "**BREAKING: FTC Loses Authority to Collect Damages?**"  Moskvins's email contained a link to a website that had posted an article entitled, "Seventh Circuit Drops Bomb on FTC," which stated "[m]ake no mistake.  The FTC's remedial authority is now in doubt."  The article also stated that "[t]he potential impact of this decision is significant and has potentially presented interesting opportunities for defendants facing FTC enforcement lawsuits."  One of the Transact Pro Defendants' attorneys responded to Moskvins and stated: "[g]reat case, Mark.  The Seventh Circuit's opinion creates a circuit split on monetary recovery, which will obviously be an important issue for us down the road."  Moreover, the Transact Pro Defendants and their attorneys relied on the Seventh Circuit decision in *Credit Bureau* during the parties' mediation and subsequent settlement discussions to negotiate a favorable settlement because of the risk that the FTC might lose its authority to seek equitable monetary relief.  Therefore, in light of the fact that the Transact Pro Defendants, and their attorneys, knew about the challenges to the FTC's authority to recover equitable monetary relief pursuant to Section 13(b) and, indeed, used those challenges to negotiated a more favorable settlement, the Transact Pro Defendants are not entitled to relief

Initials of Deputy Clerk __sr__

EXHIBIT 7
Page 28

under Rule 60(b)(6).[3]

In response, the Transact Pro Defendants argue that *Ackermann* and *Master Key* do not prevent this Court from applying the seven factor test set forth in *Phelps v. Alameida*, 569 F.3d 1120 (9th Cir. 2009), and applied in *Henson v. Fidelity National Financial, Inc.*, 943 F.3d 434 (9th Cir. 2019). Applying the *Phelps* factors, the Transact Pro Defendants argue that they are entitled to relief pursuant to Rule 60(b)(6). In *Phelps*, the Ninth Circuit considered six factors in determining whether relief under Rule 60(b)(6) was warranted: (1) "the nature of the intervening change in the law"; (2) the movant's "interest in pursuing relief"; (3) the parties' "reliance interest in the finality of the case"; (4) "the delay between the judgment and the Rule 60(b) motion"; (5) "the relationship between the original judgment and the change in the law"; and (6) "concerns of comity." *Phelps*, 569 F.3d at 1135-39. However, the Ninth Circuit cautioned that its discussion of the *Phelps* factors, which arose in the *habeas corpus* context, "was not meant to impose a rigid or exhaustive checklist, because Rule 60(b)(6) is a grand reservoir of equitable power, and it affords courts the discretion and power to vacate judgments whenever such action is appropriate to accomplish justice." *Id.* at 445 (*citing Phelps*, 569 F.3d at 1135) (internal quotation marks and alterations omitted). In addition, the Ninth Circuit held that, especially when "a district court is faced with applying [the *Phelps*] factors in an entirely new context, the court should assess how that different context might alter the calculus of the factors' application, and whether those factors adequately capture all of the relevant circumstances." *Id.* at 446. In other words, the Ninth Circuit requires courts to "consider all of the relevant circumstances surrounding the specific motion before the court in order to ensure that justice be done in light of all the facts." *Id.* at 440. Moreover, the Ninth Circuit cautioned that "a change in the controlling law can – but does not always – provide a sufficient basis for granting relief." *Id.* at 444 (holding that "[t]o assess a Rule 60(b)(6) motion predicated on an intervening change in the law, a district court must evaluate the circumstances surrounding the specific motion before the court" and that this "case-by-case inquiry requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts") (*citing Phelps*, 569 F.3d at 1132-33) (internal quotation marks and alterations omitted).

In this case, even assuming that the *Phelps* factors apply (and it is not clear that they do), those factors weigh heavily against finding that the Transact Pro Defendants have established "extraordinary circumstances" necessitating relief under Rule 60(b)(6). With respect to the first factor regarding nature of the intervening change in law, although the Transact Pro Defendants argue that the Supreme Court overturned "settled" precedent in *AMG*, it is not clear that the

---

[3] Although Moskvins submitted a declaration with his Motion stating that he "was unaware of any legal challenges to the FTC's monetary authority" when he chose to settle, Moskvins submitted a supplemental declaration with his Reply acknowledging his previous declaration was misleading and not accurate, claiming that, at the time he signed his previous declaration, he "did not have a ready recollection of legal aspects of events occurring in the case two years ago." According to Moskvins, his review of the FTC's Opposition and accompanying evidence had suddenly "refreshe[d] [his] recollection" that he had been aware of the Seventh Circuit's holding in *Credit Bureau* and that his attorneys had discussed that case in the Transact Pro Defendants' mediation brief and at the mediation.

Initials of Deputy Clerk _sr_

EXHIBIT 7
Page 29

1-SER-71

precedent was "settled" because a circuit split existed regarding the FTC's ability to seek equitable monetary relief pursuant to Section 13(b).  Indeed, Judge O'Scannlain stated in his concurrence in *FTC v. AMG Capital Management, LLC*, 910 F.3d 417. 429 (9th Cir. 2018), that the Ninth Circuit's decision to follow earlier precedent concluding that the FTC could recover equitable monetary relief pursuant to Section 13(b) was "unfortunate" and an "impermissible exercise of judicial creativity" that "contravenes the basic separation-of-powers principle that leaves to Congress the power to authorize (or to withhold) rights and remedies."  With respect to the second factor regarding pursuing relief and the third factor regarding the parties' reliance interest in the finality of the case, the Transact Pro Defendants were fully aware that a change in the law was possible, if not probable.  Despite this awareness, the Transact Pro Defendants made an informed decision to choose the certainty and finality of a comparatively favorable settlement, rather than to incur additional expenses and risk the possibility of a far greater monetary judgment if there was no change in the law.  The fourth factor regarding the delay between the judgment and the Rule 60(b) motion favors the Transact Pro Defendants because they filed their Rule 60(b) motion within a reasonable time after the Supreme Court's decision in *AMG*.  The fifth factor, which looks at the closeness of the relationship between the decision resulting in the original judgment and the subsequent decision that represents a change in the law, does not apply in this case because the original judgment was the result of a settlement.  Similarly, the sixth factor, the need for comity between the independently sovereign state and federal judiciaries, does not apply.

Accordingly, the Transact Pro Defendants are not entitled to relief under Rule 60(b)(6).

## IV.   Conclusion

For all the foregoing reasons, Defendants' Motion is **DENIED**.

IT IS SO ORDERED.

Initials of Deputy Clerk  _sr_

EXHIBIT 7
Page 30

# EXHIBIT 8

| | |
|---|---|
| **From:** | Lally, Kevin M. <KLally@mcguirewoods.com> |
| **Sent:** | Tuesday, October 26, 2021 1:42 PM |
| **To:** | Logan Smith |
| **Subject:** | RE: Wells Fargo Intervention Motion (Apex) |

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. _____
Logan,

Do you have time for a follow-up meet and confer tomorrow.  We intend to proceed with a motion to intervene and would like to address briefing schedules and whether you would consent to the unsealing of any of the following sealed materials:  Court's modified TRO order (Dkt. 15), declarations in support of extending out the Receivership (Dkt. 146, 168).  I am booked at 2-3 pm, but otherwise am available.

Regards,

Kevin



**Kevin M. Lally**
McGuireWoods LLP
T: +1 213 457 9862

---

**From:** Logan Smith <lsmith@mcnamarallp.com>
**Sent:** Monday, August 30, 2021 5:40 PM
**To:** Lally, Kevin M. <KLally@mcguirewoods.com>
**Cc:** Baiardo, Alicia A. <ABaiardo@mcguirewoods.com>; Le, Anthony Q. <ALe@mcguirewoods.com>
**Subject:** Re: Wells Fargo Intervention Motion

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

Many thanks for letting me know, Kevin.

Regards,
Logan

> On Aug 30, 2021, at 3:56 PM, Lally, Kevin M. <KLally@mcguirewoods.com> wrote:
>
> CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.
> _____
> Logan,

EXHIBIT 8
Page 31

Please be advised that we will not be filing today the intervention motion that we discussed last week.  In advance of a future filing, we will get your updated position, provide you with a draft of the joint statement to the Court for your review, and propose potential hearing dates for the motion.

Please do not hesitate to call me should you have any questions.

Regards,

Kevin Lally


**Kevin M. Lally**
Partner
McGuireWoods LLP
Wells Fargo Center
South Tower
355 S. Grand Ave., Suite 4200
Los Angeles, CA 90071-3103
T:  +1 213 457 9862
F:  +1 213 457 9882
klally@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

McGuireWoods

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

2

EXHIBIT 8
Page 32

1-SER-75

JONATHAN W. WARE
DC Bar No. 989414; VA Bar No. 77443
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC 20580
Tel: (202) 326-2726; Fax: (202) 326-3197
jware1@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | Case No. 3:18-cv-01388-LAB-LL |
| Plaintiff, | Judge: Hon. Larry A. Burns |
| v. | **DECLARATION OF LOGAN D. SMITH PURSUANT TO 28 U.S.C. § 1746** |
| **TRIANGLE MEDIA CORPORATION; JASPER RAIN MARKETING LLC; HARDWIRE INTERACTIVE INC.; GLOBAL NORTHERN TRADING LIMITED; BRIAN PHILLIPS; and DEVIN KEER,** | |
| Defendants. | |

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

1-SER-76

# DECLARATION OF LOGAN D. SMITH
## PURSUANT TO 28 U.S.C. § 1746

I have personal knowledge of the facts set forth below and am competent to testify about them.  I am a United States citizen over the age of 18.  If called as a witness, I could and would testify as follows:

(1)    I am licensed to practice law in California.

(2)    I am an attorney with McNamara Smith LLP and represent Thomas W. McNamara, the court-appointed receiver (the "Receiver") in *Federal Trade Commission v. Triangle Media, et al.*, No. 3:18-cv-01388-LAB-LL (S.D. Cal.) (the "Triangle Case") and in *Federal Trade Commission v. Apex Capital Group LLC, et al.*, No. 2:18-cv-09573-JFW (JPRx) (C.D. Cal.) (the "Apex Case").  I have been involved with the Receiver's investigation in those cases and in his litigation related to Wells Fargo & Company and Wells Fargo Bank, N.A. (together, "Wells Fargo") in *McNamara v. Wells Fargo & Company and Wells Fargo Bank, N.A.*, No. 3:21-cv-01245-LAB-LL (S.D. Cal.) (the "Receiver's Suit").

**The Receiver's Appointments**

(3)    The Court in the Triangle Case appointed the Receiver as temporary receiver on June 29, 2018 (Triangle Case ECF No. 11), and as permanent receiver on August 24, 2018 (Triangle Case ECF No. 75).

(4)    The Court in the Apex Case appointed the Receiver as temporary receiver on November 16, 2018 (Apex Case ECF No. 16), and as receiver on December 18, 2018 (Apex Case ECF Nos. 40, 41).

**The Receiver's Investigations**

(5)    Upon his appointment, the Receiver began to marshal the assets of the estates in each case, as required by each appointing court.  To that end, on September 18, 2018, Wells Fargo issued a cashier's check to the Receiver for $1,181,479.83, which represented the sum across 40 bank accounts identified by

1

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

Wells Fargo and the Receiver as belonging to the Triangle Case defendants or otherwise subject to the Receiver's control.  Similarly, on January 24, 2019, Wells Fargo transferred to the Receiver $57,464.96, which represented the sum across 17 bank accounts identified by Wells Fargo and the Receiver as belonging to the Apex Case defendants or otherwise subject to the Receiver's control.

(6)     On May 2, 2019, the Receiver served Wells Fargo Bank, N.A. a Rule 45 subpoena seeking information about accounts in the Apex Case.

(7)     The Receiver's investigation in the Triangle Case and the Apex Case identified more than 150 accounts that Wells Fargo opened for the defendants in those cases through approximately 100 shell companies.

**The Receiver's Pursuit of Claims Against Wells Fargo**

(8)     On October 22, 2019, the Receiver publicly sought court approval in the Triangle Case to hire contingency counsel to pursue claims against Wells Fargo (Triangle Case ECF No. 136), which the court granted on November 19, 2019 (Triangle Case ECF No. 142), the same day it closed the case.

(9)     On February 4, 2020, the Receiver publicly sought court approval in the Apex Case to hire contingency counsel to pursue claims against Wells Fargo (Apex Case ECF Nos. 144, 148), and the court granted that request on March 9, 2020 (Apex Case ECF No. 153).  The court in the Apex Case administratively closed that case on January 15, 2020.

**Wells Fargo's Affirmative Actions Concerning the Receiver's Suit**

(10)    On April 1, 2020, the Receiver sent Wells Fargo draft complaints against it relating to Wells Fargo's actions underlying the Triangle Case and the Apex Case, along with a draft tolling agreement and proposed mediation of the claims.

2

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

1-SER-78

(11)   On April 13, 2020, counsel for Wells Fargo (McGuire Woods LLP) responded to the Receiver's April 1, 2020 communications and spoke to the Receiver's counsel by phone the next day.

(12)   On April 15, 2020, Wells Fargo executed the tolling agreement, sent it to the Receiver, and stated it would be in touch within 30 days about mediation.

(13)   On April 29, 2020, Wells Fargo requested that the Receiver provide the documents the bank had produced to the Receiver via the subpoena described above.  The Receiver provided those to Wells Fargo a week later.

(14)   On May 7, 2020, Wells Fargo requested an extension until June 12, 2020 to consider mediation.

(15)   On May 18, 2020, Wells Fargo requested the Receiver provide certain deposition transcripts and documents.  The Receiver provided certain documents to the bank on May 21, 2020.

(16)   On May 27, 2020, Wells Fargo requested a summary of allegations concerning a third FTC case, *FTC v. Tarr, Inc.,* No. 3:17-cv-02024-KSC (S.D. Cal.), which involved similar conduct and timing as the Triangle Case and Apex Case and in which the Receiver's law firm (Glancy Prongay & Murray LLP) represented a consumer victim.  Counsel provided the requested summary on June 9, 2020.

(17)   On June 12, 2020, Wells Fargo agreed to mediate the Receiver's proposed suits before Judge Weinstein.

(18)   On June 16, 2020, Wells Fargo asked the Receiver about documents related to the Triangle Case, which the Receiver provided on June 19, 2020.

(19)   On June 26, 2020, Wells Fargo sent the Receiver an amended and executed tolling agreement.

(20)   On July 28, 2020, Wells Fargo and the Receiver agreed on October 14, 2020 as the mediation date concerning the Receiver's proposed suits.

3

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

1      (21)   On September 10, 2020, Wells Fargo requested to move the mediation

2   to the first week of November 2020.

3      (22)   On November 5, 2020, Wells Fargo and the Receiver mediated their

4   claims before Judge Weinstein and Ambassador David Carden, but were unable to

5   reach a resolution.

6      (23)   Following the mediation, between November 2020 and June 2021,

7   Wells Fargo and the Receiver continued to have discussions and exchange

8   information with each other with the involvement of Judge Weinstein and

9   Ambassador Carden.

10      (24)   On March 3, 2021, Wells Fargo and the Receiver extended their

11   tolling agreement through May 28, 2021.

12      (25)   On April 29, 2021, Wells Fargo and the Receiver participated in a

13   second round of mediation before Judge Weinstein and Ambassador Carden.

14      (26)   On May 25, 2021, Wells Fargo and the Receiver extended their tolling

15   agreement through June 23, 2021, while the parties continued to have follow-up

16   discussions through the mediators.

17      (27)   On June 23, 2021, Wells Fargo and the Receiver extended their tolling

18   agreement through July 7, 2021.

19      (28)   On July 8, 2021, the Receiver filed his complaint in the Receiver Suit.

20      (29)   On July 28, 2021, Wells Fargo and the Receiver jointly moved the

21   court in the Receiver's suit for an extension of time to respond to the Receiver's

22   complaint (Receiver's Suit ECF No. 9), which the court granted on June 30, 2021

23   (Receiver's Suit ECF No. 12).

24      (30)   On August 19, 2021, counsel for Wells Fargo called and emailed the

25   Receiver's counsel, stating Wells Fargo wanted to meet and confer with the

26   Receiver regarding Wells Fargo's "plans to file a motion to intervene in the FTC

27   action involving [the Receiver's] office—*FTC v. Apex*, No. 2:18-cv-9573-JFW

28

4

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

1-SER-80

(C.D. Cal.)—to challenge the order appointing the receiver to pursue Wells Fargo and the previously entered stipulated judgment based on the recent AMG/FTC decision holding that the FTC does not have authority under Section 13(b) to obtain equitable monetary relief. *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021)."

(31)   On August 23, 2021, counsel for Wells Fargo and the Receiver held a meet and confer, where Wells Fargo indicated its intent to file a motion to intervene in the Apex Case on August 30, 2021.

(32)   On August 25, 2021, Wells Fargo filed a motion to dismiss the Receiver's suit, along with a memorandum in support and other related documents (ECF No. 14).  The Receiver filed his opposition on October 8, 2021 (ECF Nos. 15, 16), and Wells Fargo filed its reply on October 25, 2021 (ECF Nos. 17, 18).

(33)   On August 30, 2021, counsel for Wells Fargo emailed counsel for the Receiver, stating that Wells Fargo would not be filing its motion to intervene and would reach back out in advance of any future filing.

(34)   On October 26, 2021, counsel for Wells Fargo emailed the Receiver's counsel, indicating Wells Fargo intended to move to intervene in the Apex Case and wanted to schedule a meet and confer.  In subsequent discussions, Wells Fargo's counsel informed the Receiver's counsel that Wells Fargo intended to move to intervene in the Triangle Case in the Southern District of California where there is no obligation to meet and confer before filing.

**The Apex Case**

(35)   In the Apex Case, the FTC's November 14, 2018 Complaint and May 30, 2019 First Amended Complaint each stated that it sought relief, including monetary relief, "pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. § 53(b) and 57b, Section 5 of ROSCA, 15 U.S.C. § 8404, Section 917(c) of the

5

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

1   EFTA, 15 U.S.C. § 1693o(c), and the Court's own equitable powers."  Apex Case

2   ECF Nos. 1 at 3, 35-36; 73 at 3, 35-44.

3        (36)   The court's temporary restraining order, preliminary injunction, and

4   permanent injunctions in the Apex Case each cited Sections 13(b) and 19 of the

5   FTC Act, as well as Sections 8303 and 8404 of ROSCA as a basis for those

6   actions.  Apex Case ECF Nos. 16 at 2, 4-5 (TRO); 40 at 1-4 (preliminary

7   injunction); 41 at 1-4 (preliminary injunction); 120 at 1-2 (permanent injunction of

8   September 11, 2019); 121 at 1-2 (same); 142 at 1-2 (permanent injunction of

9   January 15, 2020).

10        (37)   Attached hereto as **Exhibit A** is a true and correct copy of the

11   Receiver's Notice of Unopposed Motion and Unopposed Motion to Extend

12   Completion Deadline for Receivership and Interim Status Report (Apex Case ECF

13   Nos. 186, 186-1, filed July 23, 2021).

14        (38)   Attached hereto as **Exhibit B** is a true and correct copy of the Order

15   granting the Receiver's Unopposed Motion to Extend Completion Deadline for

16   Receivership and Interim Status Report (Apex Case ECF No. 198, entered August

17   12, 2021).

18        (39)   Attached hereto as **Exhibit C** is a true and correct copy of the Court's

19   September 3, 2021 Order Denying Defendants SIA Transact Pro's and Mark

20   Moskvins's Motion to Modify, Vacate, or Set Aside Monetary Portion of

21   Stipulated Permanent Injunction and Monetary Judgment (Apex Case ECF

22   No. 207).

23        I declare under penalty of perjury that the foregoing is true and correct.

24

25   Executed on: December 20, 2021     /s/ Logan D. Smith

26                                      Logan D. Smith

27

28                          6

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

1-SER-82

**Index of Exhibits**

Exhibit No.                                                                 Page #

A. Receiver's Notice of Unopposed Motion and Unopposed Motion To
   Extend Completion Deadline For Receivership and Interim Status
   Report (Apex ECF Nos. 186, 186-1) ............................................................ 1

B. Order Granting Receiver's Unopposed Motion To Extend Completion
   Deadline For Receivership and Interim Status Report (Apex ECF No.
   198).............................................................................................................. 12

C. Order Denying Defendants Sia Transact Pro's and Mark Moskvins's
   Motion To Modify, Vacate, Or Set Aside Monetary Portion Of
   Stipulated Permanent Injunction and Monetary Judgment (Apex ECF
   No. 207)...................................................................................................... 14

Case No. 3:18-cv-01388-LAB-LL
FTC's Opposition to Wells Fargo's Motion to Intervene

# Exhibit A

Logan D. Smith (SBN 212041)
lsmith@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401

*Attorneys for Receiver,*
*Thomas W. McNamara*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>        Plaintiff,<br><br>     v.<br><br>APEX CAPITAL GROUP, LLC, et al.,<br><br>        Defendants. | Case No. 2:18-cv-09573-JFW (JPRx)<br><br>**RECEIVER'S NOTICE OF UNOPPOSED MOTION AND UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE FOR RECEIVERSHIP AND INTERIM STATUS REPORT**<br><br>JUDGE:   Hon. John F. Walter<br>CTRM:    7A<br>DATE:    August 23, 2021<br>TIME:    1:30 p.m. |

TO THE HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT COURT JUDGE, AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 23, 2021 at 1:30 p.m. in Courtroom 7A of the United States District Court for the Central District of California, located at 350 W. First Street, Los Angeles, California, Thomas W. McNamara, the Court-appointed receiver of the Receivership Entities, will present his Unopposed Motion to Extend Completion Deadline for Receivership. Counsel for the Federal Trade Commission does not object to this motion. **Exhibit A Page 1**

This motion is supported by this notice of motion and motion, the concurrently filed memorandum of points and authorities, all pleadings and records on file, and any argument heard hereon.

Dated: July 23, 2021                    MCNAMARA SMITH LLP

                                        By: ___/s/ Logan D. Smith_____
                                        Logan D. Smith
                                        *Attorneys for Receiver,*
                                        *Thomas W. McNamara*

**Exhibit A**
**Page 2**

2                    Case No. 2:18-cv-09573-JFW (JPRx)
RECEIVER'S UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all participants in the case who are registered CM/ECF users.

 /s/ Logan D. Smith
Logan D. Smith
*Attorney for Receiver,*
*Thomas W. McNamara*

**Exhibit A**
**Page 3**

Case No. 2:18-cv-09573-JFW (JPRx)
CERTIFICATE OF SERVICE

Logan D. Smith (SBN 212041)
lsmith@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401

*Attorneys for Receiver,*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:18-cv-09573-JFW (JPRx) |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RECEIVER'S UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE FOR RECEIVERSHIP AND INTERIM STATUS REPORT** |
| v. | |
| APEX CAPITAL GROUP, LLC, et al., | |
| Defendants. | |
| | JUDGE: Hon. John F. Walter |
| | CTRM: 7A |
| | DATE: August 23, 2021 |
| | TIME: 1:30 p.m. |

**Exhibit A**
**Page 4**

The Court-appointed receiver, Thomas W. McNamara (the "Receiver"), respectfully moves to extend the completion deadline for the receivership for an additional year, until September 12, 2022, and hereby provides this interim status report regarding the receivership tasks that remain to be completed. The Receiver submits that good cause exists to extend the receivership for the reasons set forth below.

## I.

## INTRODUCTION AND BACKGROUND

The Receiver was first appointed over the Receivership Entities in a temporary capacity by a Temporary Restraining Order ("TRO") entered on November 16, 2018 (ECF No. 16), which appointment was confirmed, and the temporary designation removed, by the Preliminary Injunctions entered on December 18, 2018 (ECF Nos. 40 and 41). On September 11, 2019, the Court entered two Stipulated Orders for Permanent Injunction and Monetary Judgment, resolving all matters in dispute between the FTC and Defendants David Barnett, Phillip Peikos, and the Receivership Entities. *See* ECF No. 120 (the "Barnett Order") and ECF No. 121 (the "Peikos Order").[1]

The Barnett and Peikos Orders direct the Receiver to recover and liquidate Receivership Estate assets. The Barnett Order included a receivership termination provision, requiring the Receiver to complete his duties and file his final report and final fee application within six months after entry of the order, by March 11, 2020, "**unless this time was extended for good cause**." Barnett Order at 27-28 (Section XIII, Termination of Receivership) (emphasis added); *see also* Peikos Order at 29. On March 9, 2020, the Court subsequently extended the completion

///

---

[1] A third Stipulated Order of Permanent Injunction and Monetary Judgment was later entered as to Defendants Mark Moskvins and SIA Transact Pro (ECF No. 142), but these defendants are not subject to the receivership and therefore not affected by this request to extend the receivership.

Exhibit A
Page 5

deadline to March 11, 2021. *See* ECF No. 152. On March 9, 2021, this Court

extended the receivership through September 11, 2021. *See* ECF No. 172.

For the reasons explained below, the Receiver believes that good cause

exists to extend the receivership's completion deadline to September 12, 2022 in

order to enable the Receiver to complete his remaining responsibilities and

maximize the recovery of receivership assets for the benefit of the Receivership

Estate.

## II.

## DISCUSSION

The Receiver has completed the vast majority of his duties under the Barnett

and Peikos Orders, and there are minimal ongoing receivership expenses. There

are, however, a limited number of important tasks that have yet to be completed,

and chief among them is the resolution of the Receiver's recently-filed complaint

against Wells Fargo.

**A.    The Lawsuit Against Wells Fargo**

On July 8, 2021, the Receiver filed a lawsuit against Wells Fargo &

Company and Wells Fargo Bank, N.A. (collectively referred to herein as "Wells

Fargo" or the "Bank").[2]  A copy of the complaint is attached as Exhibit 1. On that

same day, a second, related lawsuit was filed against Wells Fargo by consumer

victims seeking certification of a class.[3]

///

_____

[2] The Receiver sued Wells Fargo for aiding and abetting fraud, conspiracy to
commit fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary
duty, violation of California Penal Code § 496, violation of California Business &
Professions Code § 17200, aiding and abetting fraudulent transfers and/or voidable
transfers, unjust enrichment, negligence, and for an accounting.

[3] The class action lawsuit seeks to hold Wells Fargo accountable for aiding and
abetting fraud, conspiracy to commit fraud, violation of California Penal Code
§ 496, and violation of California Business & Professions Code § 17200. The
class is represented by counsel Glancy Prongay & Murray LLP, which is one of the
law firms representing the Receiver in his lawsuit against Wells Fargo.

**Exhibit A
Page 6**

2                    Case No. 2:18-cv-09573-JFW (JPRx)
MPAs ISO RECEIVER'S UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE

1    Since discovering Wells Fargo's involvement in the Apex consumer scheme,

2  the Receiver has aggressively investigated the underlying facts.  Based on that

3  investigation, the Receiver concluded that Wells Fargo knowingly provided critical

4  assistance to Apex's principals, along with the principals of another, similar "risk-

5  free" trial scheme run by Triangle Media Corporation ("Triangle").[4]

6    As previously reported to the Court, in late October 2019 and January 2020,

7  the Receiver filed motions in the *Triangle* and *Apex* actions, respectively, advising

8  both Courts that he wished to retain contingency counsel to pursue claims against

9  Wells Fargo on behalf of the Receivership Entities for the extensive harm that

10  Wells Fargo caused them.  In the *Triangle* action, on November 19, 2019, Judge

11  Burns ruled that "the Court finds good cause exists to grant the Receiver's motion

12  to (1) extend the receivership for the sole purpose of pursuing litigation against

13  Wells Fargo, (2) permit the Receiver to retain contingency counsel, and (3)

14  administratively close the case while that litigation is pursued."  On March 9,

15  2020, this Court likewise permitted the Receiver to retain contingency counsel to

16  pursue claims against Wells Fargo.

17    After obtaining court approval and hiring counsel, the Receiver and counsel

18  engaged in pre-filing settlement discussions and voluntary exchanges of

19  information with Wells Fargo from Spring 2020 through Summer 2021.  During

20  the period when settlement discussions continued with the assistance of the

21  mediators,[5] the parties were operating under Tolling Agreements which extended

22

23  [4] Apex and Triangle were sued in separate actions by the FTC, and the Receiver
     was appointed in each of the cases to determine whether the businesses could
24   continue to be operated lawfully and profitably, and to protect assets and maximize
     the value of Receivership Estate.  The Receiver determined the Apex and Triangle
25   businesses were fraudulent "continuity" schemes that could not continue to
     operate.  Apex and Triangle were both offering internet-based, deceptive "free
26   trial" products to consumers, who were then charged the full price for the trial
     product and also enrolled in expensive, ongoing continuity plans without their
27   knowledge or consent.

28  [5] The Receiver and Wells Fargo participated in confidential mediation in
     November 2020 and again in April 2021.

**Exhibit A**
**Page 7**

3    Case No. 2:18-cv-09573-JFW (JPRx)
MPAs ISO RECEIVER'S UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE

1   through July 7, 2021.  Immediately after the Tolling Agreements lapsed, the
2   Receiver and the consumer victims filed their lawsuits against Wells Fargo in the
3   Southern District of California.  The lawsuits were filed in the Southern District of
4   California because it was the venue in which the FTC first brought its litigation
5   against Triangle and because the FTC had also filed suit in that District against a
6   third Southern California continuity scheme called Tarr Inc., which was similar to
7   those run by Apex and Triangle.  Just as was the case with Apex and Triangle,
8   Wells Fargo provided atypical banking services to Tarr Inc. and a host of related
9   shell companies.  The Receiver's case and the consumers' case were reassigned
10   post-filing to Judge Larry Burns, who is the judge in the FTC's lawsuits against
11   Triangle and Tarr.

12         The Receiver is now actively pursuing his litigation against Wells Fargo and
13   believes it is a worthy case that could result in a substantial recovery for the
14   Receivership Estate.  Any recovered funds will ultimately be returned to the FTC,
15   which will then make distributions to the consumer victims of these frauds.
16   Significantly, the Receiver will be able to litigate this case *without* the
17   Receivership Entities incurring any costs and fees of litigation.  This was a key
18   factor in the Receiver's decision to pursue the litigation.  Because the Receiver was
19   able to hire contingency counsel, who expressly agreed to a contingent fee model
20   and to advance all costs, the Receivership will not be required to expend resources
21   in pursuing the case and will thus bear none of the financial risk.  If that were not
22   the case, the costs and legal fees required to take on such a deep-pocketed financial
23   institution would have been prohibitive.

24         As set forth in greater detail in the Complaint, the Receiver's case against
25   Wells Fargo is centered around the bank's continued willingness over a span of
26   years to deviate from accepted banking standards and practices and provide
27   atypical banking services in aid of the Apex and Triangle continuity schemes.
28   Both "risk-free" trial enterprises required a continuous stream of Wells Fargo bank

**Exhibit A**
**Page 8**

4     Case No. 2:18-cv-09573-JFW (JPRx)
MPAs ISO RECEIVER'S UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE

accounts for their dozens of shell companies to continue to operate, since those shell companies were constantly being shut down by credit card processors concerned about fraudulent activity and excessive consumer chargebacks. The Receiver has gathered evidence that Wells Fargo acted in a manner unlike any of its banking peers during the relevant time period by opening more than 150 bank accounts for the Apex and Triangle enterprises.

The root cause of Wells Fargo's conduct was the high-pressure sales culture in place at the time, which caused Wells Fargo Community Bank employees and branches to work under constant pressure to cross-sell and to open as many accounts as possible, including under threat of termination. Wells Fargo has previously been subject to regulatory, civil, and criminal sanctions arising out of this sales culture. Those sanctions, which included substantial fines and remediation efforts, were focused on compensating Wells Fargo's own customers after Wells Fargo's Community Bank employees had opened fraudulent bank accounts in the customers' names without their consent. While the conduct here has the same root cause (Wells Fargo's sales culture), the Receiver's case is focused on conduct that Wells Fargo has not yet been held accountable for, where its Community Bank employees and branches aided fraudulent enterprises by opening scores of bank accounts for them – accounts which should never have been opened. Wells Fargo has never compensated the victims of this newly-identified consequence of its toxic sales culture. Those victims include consumers as well as the Receivership Entities, both of which were harmed by Wells Fargo's misconduct.

**B.      Claims Against European Beach Club and Corporation**

As previously noted in status reports provided to the Court, in addition to the Wells Fargo lawsuit, the Receiver has also engaged counsel to investigate and pursue claims against a beach club located in Greece and a related corporation based in Cyprus. *See* ECF Nos. 157 (Fourth Interim Status Report), 151 (Fifth

**Exhibit A
Page 9**

Interim Status Report).  The claims pursued relate to funds that the Receivership Entities provided as "loans" to the beach club and shares in that beach club that were sold to the Receivership Entities by the Cypriot corporation.

The COVID-19 pandemic disrupted the Greece and Cyprus court systems. The lawsuit filed in Cyprus was stalled for a substantial period, but court activity has now restarted.  The Receiver has been, and will continue to be, very careful in evaluating the merits at each stage before moving forward.  For the time being, the Receiver has instructed counsel to prioritize settlement discussions, which have been initiated.  It is too early to tell whether these efforts will be successful.  At the conclusion of the settlement discussion, the Receiver will base subsequent decisions about how to proceed on counsel's further analysis and advice.

**C.  Payments on Convertible Notes**

The Receiver also continues to receive quarterly interest payments on ten convertible promissory notes issued by a video e-commerce startup, Cinsay.  These notes are set to mature between August 2022 and July 2023.  Should the Receiver complete his other duties prior to the termination of the interest payments, the Receiver will suggest that payments be made directly to the FTC.

**D.  Artwork**

Lastly, the Receiver will continue his efforts to sell artwork, which was initially purchased by Defendant Barnett for approximately $70,000.  Despite various and continued efforts to do so, the Receiver has not been able to liquidate the ten pieces of art.  The Receiver will continue to market them until they are sold.

///
///
///
///
///

**Exhibit A**
**Page 10**

## III.

## CONCLUSION

Based on the foregoing, the Receiver respectfully requests that the Court modify Section XIII (Termination of Receivership) of the Stipulated Permanent Injunction (ECF No. 120 at 27-28) and extend the receivership completion deadline to September 12, 2022, unless the Court subsequently extends that date for good cause.

Dated:  July 23, 2021                    MCNAMARA SMITH LLP

                                         By:   /s/ Logan D. Smith
                                         Logan D. Smith
                                         *Attorney for Receiver,*
                                         *Thomas W. McNamara*

**Exhibit A**
**Page 11**

# Exhibit B

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

## CIVIL MINUTES -- GENERAL

Case No.   **CV 18-9573-JFW(JPRx)**                    Date:  August 12, 2021

Title:      Federal Trade Commission -v- Apex Capital Group, et al.

**PRESENT:**

   **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

   **Shannon Reilly**                          **None Present**
   **Courtroom Deputy**                        **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**     **ATTORNEYS PRESENT FOR DEFENDANTS:**
           None                                       None

**PROCEEDINGS (IN CHAMBERS):**     **ORDER GRANTING RECEIVER'S UNOPPOSED MOTION TO EXTEND COMPLETION DEADLINE FOR RECEIVERSHIP AND INTERIM STATUS REPORT [filed 7/23/21; Docket No. 186]**

On July 23, 2021, Receiver Thomas W. McNamara ("Receiver") filed an Unopposed Motion to Extend Completion Deadline for Receivership and Interim Status Report ("Motion").  Plaintiff and Defendants did not file Oppositions.[1]  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument.  The hearing calendared for August 23, 2021 is hereby vacated and the matter taken off calendar. After considering the moving papers, and the arguments therein, the Court rules as follows:

Pursuant to Local Rule 7-9, Plaintiff and Defendants were required to file and serve their Oppositions or Notices of Non-Opposition "not later than twenty-one (21) days before the date designated for the hearing of the motion."  *See* Local Rule 7-9.  Local Rule 7-12 provides that "[t]he failure to file any required document, or the failure to file it within the deadline, may be deemed consent to the granting . . . of the motion."  *See* Local Rule 7-12.  Plaintiff and Defendants have failed to file a timely Opposition.  Pursuant to Local Rule 7-12, the Court deems Plaintiff's and Defendants' failure to file an Opposition or to otherwise comply with Local Rule 7-9 as consent to the granting of the Receiver's Motion.

Accordingly, the Receiver's Motion is **GRANTED**.  Section XIII of the Stipulated Order for Permanent Injunction and Monetary Judgment (Docket No. 120) is hereby modified to provide that

---

   [1] In his Motion, the Receiver states that counsel for the Federal Trade Commission does not oppose to this Motion.

                                                          **Exhibit B**
                                                          **Page 12**

the deadline for the Receiver to complete his duties shall be September 12, 2022.

IT IS SO ORDERED.

**Exhibit B**
**Page 13**
Initials of Deputy Clerk __sr__

# Exhibit C

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No.    **CV 18-9573-JFW(JPRx)**                    Date: September 3, 2021

Title:        Federal Trade Commission -v- Apex Capital Group, et al.

**PRESENT:**

     **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

     **Shannon Reilly**                          **None Present**
     **Courtroom Deputy**                        **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**     **ATTORNEYS PRESENT FOR DEFENDANTS:**
             None                                        None

**PROCEEDINGS (IN CHAMBERS):**    **ORDER DENYING DEFENDANTS SIA TRANSACT PRO'S AND MARK MOSKVINS'S MOTION TO MODIFY, VACATE, OR SET ASIDE MONETARY PORTION OF STIPULATED PERMANENT INJUNCTION AND MONETARY JUDGMENT [filed 7/9/21; Docket No. 182]**

        On July 9, 2021, Defendants Sia Transact Pro ("Sia") and Mark Moskvins ("Moskvins") (collectively, the "Transact Pro Defendants") filed a Motion to Modify, Vacate, or Set Aside Monetary Portion of Stipulated Permanent Injunction and Monetary Judgment ("Motion"). On August 9, 2021, Plaintiff the Federal Trade Commission (the "FTC") filed its Opposition. On August 16, 2021, Defendants filed a Reply. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument. The matter was, therefore, removed from the Court's August 30, 2021 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.      Factual and Procedural Background**

        On November 14, 2018, the FTC filed a Complaint against Apex Capital Group, LLC ("Apex"), together with its two United States based principals, Phillip Peikos ("Peikos") and David Barnett ("Barnett"), Omni Group Ltd. ("Omni"), and ten United Kingdom registered shell companies[1] (collectively, the "Apex Defendants"). Docket No. 1. On May 30, 2019, the FTC filed a

---
        [1] The ten United Kingdom registered shell companies include Capstone Capital Solutions Limited, Clik Trix Limited, Empire Partners Limited, Interzoom Capital Limited, Lead Blast Limited, Mountain Venture Solutions Limited, Nutra Global Limited, Rendezvous It Limited, Sky Blue Media Limited, and Tactic Solutions Limited.

**Exhibit C**
**Page 14**

First Amended Complaint, which added the Transact Pro Defendants. Docket No. 73. In the First Amended Complaint, the FTC alleged two claims against the Transact Pro Defendants: (1) credit card laundering in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") (Count VI); and (2) chargeback manipulation in violation of Section 5 of the FTC Act (Count VII).[2] The FTC alleged that the Apex Defendants engaged in a scheme to offer phony "free trials" of personal care products and dietary supplements in order to obtain consumers' credit and debit card information and then placed recurring charges on the cards without the consumers' authorization. The FTC also alleged that the Apex Defendants and Transact Pro Defendants worked together to perpetuate this scheme through credit card laundering and chargeback manipulation. The FTC sought, amongst other remedies, equitable monetary relief under Section 13(b) of the FTC Act.

On January 15, 2020, the Court entered a Stipulated Order for Permanent Injunction and Monetary Judgment ("Stipulated Judgment") pursuant to a settlement between the FTC and the Transact Pro Defendants. *See* Docket Nos. 141 and 142. In the Stipulated Judgment, the FTC and the Transact Pro Defendants agreed that the Transact Pro Defendants would pay $3.5 million "within ten (10) days." Stipulated Judgment, 20:9-12. In addition, the Transact Pro Defendants "waive[d] all rights to appeal or otherwise challenge or contest the validity of this Order." *Id.*, at 2:17-18.

On April 22, 2021, in an unrelated action, the Supreme Court unanimously held that Section 13(b) of the FTC Act does not authorize the FTC to seek, or a court to award, equitable monetary relief. *AMG v. Capital Management, LLC v. Federal Trade Commission*, 141 S.Ct. 1341, 1344 (2021).

## II.    Legal Standard

Federal Rule of Civil Procedure 60(b) provides for reconsideration of a final judgment or order where one or more of the following is shown: (1) "mistake, inadvertence, surprise or excusable neglect"; (2) "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)"; (3) "fraud . . . , misrepresentation, or misconduct by an opposing party"; (4) "the judgment is void"; (5) "the judgment has been satisfied, released, or discharged"; (6) "any other reason that justifies relief." Fed. R. Civ. P. 60(b).

In exercising its discretion in determining whether Rule 60(b) applies, courts should be mindful that there is a compelling interest in finality of judgments and final judgments should not be disturbed lightly. *See Matton Steamboat Co. v. Murphy*, 319 U.S. 412, 415 (1943) ("The purpose of statutes limiting the period for appeal is to set a definite point of time when litigation shall be at an end, unless within that time the prescribed application has been made; and if it has not, to advise prospective appellees that they are freed of the appellant's demands"); *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1144 (2d Cir. 1994) (Rule 60 "preserves a balance between serving

---

[2] On September 11, 2019, the Court entered a Stipulated Order for Permanent Injunction and Monetary Judgment as to the Apex Defendants pursuant to a settlement between the FTC and the Apex Defendants. *See* Docket Nos. 120 and 121.

**Exhibit C**
**Page 15**

the ends of justice and ensuring that litigation reached an end within a finite period of time").  Thus, "[r]econsideration for any of the reasons set forth in Rule 60(b) is an 'extraordinary remedy that works against the interest of finality and should be applied only in exceptional circumstances.'" *Audionics Sys., Inc. v. AAMP of Fla., Inc.*, 2015 WL 11201243, at *7 (C.D. Cal. Nov. 4, 2015) (citations omitted).  "Motions for relief from judgment pursuant to Rule 60(b) are addressed to the sound discretion of the district court and will not be reversed absent an abuse of discretion."  *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004).

## III.    Discussion

In light of the Supreme Court's holding in *AMG*, the Transact Pro Defendants now seek to set aside that portion of the Stipulated Judgment requiring the Transact Pro Defendants to pay $3.5 million in equitable monetary relief on the grounds that: (1) it is void for lack of jurisdiction pursuant to Rule 60(b)(4); (2) prospective enforcement of the equitable monetary relief portion of the Stipulated Judgment would be inequitable pursuant to Rule 60(b)(5); and (3) the profound change in law announced by the Supreme Court in *AMG* creates "extraordinary circumstances" necessitating relief pursuant to Rule 60(b)(6).  The FTC argues that the Transact Pro Defendants' Motion is meritless, and that the Transact Pro Defendants settled despite knowing that the Supreme Court was reviewing the issue of whether Section 13(b) of the FTC Act authorized the FTC to seek equitable monetary relief.

### A.    Rule 60(b)(4)

The Transact Pro Defendants argue that the Court should vacate the equitable monetary relief portion of the Stipulated Judgment pursuant to Rule 60(b)(4).  Specifically, the Transact Pro Defendants argue that because Section 13(b) never permitted the FTC to recover monetary relief, that portion of the Stipulated Judgment is invalid because the Court lacked jurisdiction to enter it.  The FTC argues that the Transact Pro Defendants waived their right to challenge the validity of the Stipulated Judgment.  In addition, the FTC argues that specific provisions of the FTC Act are not the only source of the Court's jurisdiction over this action, and, as a result, a misinterpretation of those provisions cannot render the Stipulated Judgment void.

As the Supreme Court held in *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010), "[a] judgment is not void . . . simply because it is or may have been erroneous."  "Instead, Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard."  *Id.* at 271 (citations omitted).  "Total want of jurisdiction must be distinguished from an error in the exercise of jurisdiction, and only rare instances of a clear usurpation of power will render a judgment void."  *Id.* (*quoting United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 661 (1st Cir. 1990)) (internal alterations and quotation marks omitted).  "[T]he scope of what constitutes a void judgment is narrowly circumscribed, and judgments are deemed void only where the assertion of jurisdiction is truly unsupported."  *Hoffmann v. Pulido*, 928 F.3d 1147, 1151 (9th Cir. 2019).  For example, in *Hoffmann*, the Ninth Circuit denied the plaintiff relief under Rule 60(b)(4), holding that although the magistrate judge lacked statutory authority to dismiss his complaint, the dismissal was "[a]t worst, . . . an error regarding the contours of a magistrate judge's authority pursuant to 28 U.S.C. § 636," which "is not equivalent to acting with total want of jurisdiction and does not render the judgment a complete nullity."  *Hoffman*, 928 F.3d

**Exhibit C**
**Page 16**
Initials of Deputy Clerk __sr__

at 1151. The Ninth Circuit held that because there was "plainly an 'arguable basis'" for the magistrate judge's assertion of jurisdiction – namely, that magistrate judges had routinely dismissed actions in similar situations prior to a recent Ninth Circuit decision prohibiting the practice – the judgment did not "fall into the narrowly circumscribed set of void judgments" under Rule 60(b)(4). *Id.* Similarly, in *United States v. Philip Morris USA Inc.*, 840 F.3d 844, 850 (D.C. Cir. 2016), the D.C. Circuit held that a court's authority to fashion relief under a particular statute is "fundamentally different from a court's subject matter jurisdiction over a case and from its personal jurisdiction over the parties, both of which concern the power to proceed with a case at all." As a result, the D.C. Circuit concluded that "Rule 60(b)(4) does not permit relief where a court has exceeded its remedial authority" because "[s]uch errors are simply not the type of fundamental defects the [Supreme] Court had in mind in *Espinosa*." *Id.* at 276 (*citing Boch Oldsmobile, Inc.*, 909 F.2d at 662 ("Consent decrees that run afoul of the applicable statutes lead to an erroneous judgment, not to a void one")).

In this case, the Court concludes that the portion of the Stipulated Judgment granting the FTC equitable monetary relief was erroneous because it was not authorized by Section 13(b). However, the Court also concludes that portion of the Stipulated Judgment was not void within the meaning of Rule 60(b)(4) because, as in *Hoffman*, there was plainly an "arguable basis" for the Court's exercise of jurisdiction in issuing the Stipulated Judgment, namely that the Ninth Circuit at the time construed Section 13(b) as authorizing courts to fashion equitable monetary relief. *See, e.g., Federal Trade Commission v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994). In addition, the Court agrees with the reasoning of the D.C. Circuit in *Philip Morris* that Rule 60(b)(4) does not permit relief where a court has merely exceeded its remedial authority. Otherwise, "[c]omplex remedial schemes in voting rights, securities fraud, affirmative action, prison conditions, and scores of other cases could all be challenged [under Rule 60(b)(4)] on the ground that the remedies imposed were, in one litigant's view, unauthorized by the statute at issue." *Philip Morris*, 840 F.3d at 851. Such a broad reading of Rule 60(b)(4) would contravene the Supreme Court's warning in *Espinosa* that the list of defects rendering a judgment void must be "'exceedingly short,' lest 'Rule 60(b)(4)'s exception to finality swallow the rule.'" *Id.* (*quoting Espinosa*, 559 U.S. at 270) (internal alterations omitted).

Accordingly, the Transact Pro Defendants are not entitled to relief under Rule 60(b)(4).

## B.   Rule 60(b)(5)

The Transact Pro Defendants argue that the Court should vacate the equitable monetary relief portion of the Stipulated Judgment because Rule 60(b)(5) permits a court to vacate a judgment when "applying it prospectively is no longer equitable." Because the Transact Pro Defendants never paid the $3.5 million in equitable monetary relief, they argue that the equitable monetary relief portion of the Stipulated Judgment is prospective. The FTC argues that the overwhelming weight of authority establishes that monetary judgments are not "prospective" within the meaning of Rule 60(b)(5).

Rule 60(b)(5) provides that a court may relieve a party from a final judgment where "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." However, the portion of Rule 60(b)(5) that provides a court may relieve a party from final judgment where

Exhibit C
Page 17
Page 4 of 8
Initials of Deputy Clerk ___sr___
1-SER-103

"applying it prospectively is no longer equitable" only applies to prospective injunctive relief, and not the monetary judgment challenged by the Transact Pro Defendants.  *See California by & though Becerra v. U.S. Environmental Protection Agency*, 978 F.3d 708, 713-17 (9th Cir. 2020) (discussing Rule 60(b)(5) as the standard for modifying an injunction "with prospective effect," in contrast to "judgments that offer a present remedy for a past wrong").  Indeed, a provision of an order only has "prospective application" under Rule 60(b)(5) if it is "executory" or involves "the supervision of changing conduct or conditions."  *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138-39 (D.C. Cir. 1988) ("That a court's action has continuing consequences, however, does not necessarily mean that it has 'prospective application'").  Monetary judgments are not executory and do not require the supervision of changing conduct.  *See, e.g., Cook v. Birmingham News*, 618 F.2d 1149, 1152 (5th Cir. 1980) (contrasting provisions "that have prospective effect . . . with those that offer a present remedy for a past wrong"); *United States v. Eyler*, 778 F. Supp. 1553, 1557 (M.D. Fla. 1991) (back pay award is "present" rather than "prospective" remedy).  In addition, the fact that a monetary judgment has not yet been paid does not make it "prospective."  *See, e.g., Stokors S.A. v. Morrison*, 147 F.3d 759, 762 (8th Cir. 1998) ("[W]hile the judgment against Morrison may be 'prospective' to the extent that he has failed to pay it in a timely manner, it is . . . not 'prospective' for purposes of Rule 60(b)(5)"); *see also* 12 *Federal Practice*, § 60.47[1][b] (2021) ("Even if the judgment debtor has not yet paid the judgment . . . it is not 'prospective,' since it is not executory and involves no judicial supervision of changing conduct or conditions"); *Flexiteek Americas, Inc. v. PlasTEAK, Inc.*, 2012 WL 5364263, *6 (S.D. Fla. Sept. 10, 2012) (concluding that judgment does not qualify as "prospective" under Rule 60(b)(5) even "where a money judgment is 'prospective' in the more general sense that it remains unpaid"), *modified on other grounds*, 2012 WL 5364247 (S.D. Fla. Oct. 31, 2012).

Accordingly, the Transact Pro Defendants are not entitled to relief under Rule 60(b)(5).

## C.     Rule 60(b)(6)

The Transact Pro Defendants argue that the Court should vacate the equitable monetary relief portion of the Stipulated Judgment pursuant to Rule 60(b)(6) because there was a "profound" change in the law announced by the Supreme Court in *AMG* and this "extraordinary circumstance . . . overrides any otherwise usual consideration of finality of interest."  Motion, 5: 11-16.  The Transact Pro Defendants also argue that it would be a "manifest injustice" if the FTC attempts to enforce the equitable monetary relief portion of the Stipulated Judgment.  The FTC argue that free, calculated, and deliberate choices, such as the one the Transact Pro Defendants made in deciding to settle this action, can never form the basis for Rule 60(b)(6) relief.

Rule 60(b)(6) is a "catch-all" provision allowing for relief from a judgment or order for "any other reason that justifies relief."  *Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097, 1102 (9th Cir. 2006).  This rule is used to prevent "manifest injustice" where "extraordinary circumstances" are present.  *Id.*  However, when "a party makes a conscious and informed choice of litigation strategy, [that party] cannot seek extraordinary relief [under Rule 60(b)(6)] merely because his assessment of the consequences was incorrect."  *In re Master Key Antitrust Litig.*, 76 F.R.D. 460, 464 (D. Conn. 1977), *aff'd*, 580 F.2d 1045 (2d Cir. 1978).  For example, in *Ackermann v. United States*, 340 U.S. 193 (1950), the Supreme Court reviewed a motion to vacate filed by a party who declined to appeal, only to have a similarly situated co-party successfully appeal.  *Id.* at 194-95.  The Supreme Court declined to give the petitioner the benefit of an appeal he chose not

**Exhibit C**
**Page 18**

Initials of Deputy Clerk  _sr_

to take:

> His choice was a risk, but calculated and deliberate and such as follows a free choice. Petitioner cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong . . . There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from.

*Id.* at 198; *see also Schwartz v. United States*, 129 F.R.D. 117, 123 (D. Md. 1990) (refusing to vacate settlement under *Ackermann* where plaintiff chose "to forgo the risk of litigation and settle," reflecting an "exercise of free will"), *aff'd,* 976 F.2d 213 (4th Cir. 1992). In addition, in *Master Key*, 76 F.R.D. at 462, the remote purchaser plaintiffs sued the manufacturer defendants pursuant to Section 4 of the Clayton Act. After the parties settled, "the Supreme Court held [in an unrelated action] that remote purchasers have no cause of action against manufacturers pursuant to § 4 of the Clayton Act." *Id.* (*citing Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)). However, the court denied the defendants' subsequent Rule 60(b) motion to set aside the settlement, and concluded that "[t]he holding in *Ackermann* is controlling here." *Id.* at 464.

In this case, as in *Ackermann* and *Master Key*, the Transact Pro Defendants decided to settle this case and freely entered into the Stipulated Judgment, and, as a result, cannot be relieved of those decisions simply because those decisions now seem ill conceived. Indeed, before deciding to settle, the Transact Pro Defendants were fully aware of the challenges to the FTC's authority to recover equitable monetary relief pursuant to Section 13(b). Specifically, on August 21, 2019, while the FTC pursued its Section 13(b) case against the Transact Pro Defendants, the Seventh Circuit held in *Federal Trade Commission v. Credit Bureau Center, LLC*, 937 F.3d 764, 767 (7th Cir. 2019), "that section 13(b) does not authorize restitutionary relief." The next day, Moskvins sent a copy of the *Credit Bureau* case to his attorneys, stating that "[a]ttached is [an] example of [a] recently won case that may be helpful in terms of [the] FTC['s] power to collect money." In addition, Moskvins subsequently forwarded his attorneys an email with the subject line: "**BREAKING: FTC Loses Authority to Collect Damages?**" Moskvins's email contained a link to a website that had posted an article entitled, "Seventh Circuit Drops Bomb on FTC," which stated "[m]ake no mistake. The FTC's remedial authority is now in doubt." The article also stated that "[t]he potential impact of this decision is significant and has potentially presented interesting opportunities for defendants facing FTC enforcement lawsuits." One of the Transact Pro Defendants' attorneys responded to Moskvins and stated: "[g]reat case, Mark. The Seventh Circuit's opinion creates a circuit split on monetary recovery, which will obviously be an important issue for us down the road." Moreover, the Transact Pro Defendants and their attorneys relied on the Seventh Circuit decision in *Credit Bureau* during the parties' mediation and subsequent settlement discussions to negotiate a favorable settlement because of the risk that the FTC might lose its authority to seek equitable monetary relief. Therefore, in light of the fact that the Transact Pro Defendants, and their attorneys, knew about the challenges to the FTC's authority to recover equitable monetary relief pursuant to Section 13(b) and, indeed, used those challenges to negotiated a more favorable settlement, the Transact Pro Defendants are not entitled to relief

under Rule 60(b)(6).[3]

In response, the Transact Pro Defendants argue that *Ackermann* and *Master Key* do not prevent this Court from applying the seven factor test set forth in *Phelps v. Alameida*, 569 F.3d 1120 (9th Cir. 2009), and applied in *Henson v. Fidelity National Financial, Inc.*, 943 F.3d 434 (9th Cir. 2019). Applying the *Phelps* factors, the Transact Pro Defendants argue that they are entitled to relief pursuant to Rule 60(b)(6). In *Phelps*, the Ninth Circuit considered six factors in determining whether relief under Rule 60(b)(6) was warranted: (1) "the nature of the intervening change in the law"; (2) the movant's "interest in pursuing relief"; (3) the parties' "reliance interest in the finality of the case"; (4) "the delay between the judgment and the Rule 60(b) motion"; (5) "the relationship between the original judgment and the change in the law"; and (6) "concerns of comity." *Phelps*, 569 F.3d at 1135-39. However, the Ninth Circuit cautioned that its discussion of the *Phelps* factors, which arose in the *habeas corpus* context, "was not meant to impose a rigid or exhaustive checklist, because Rule 60(b)(6) is a grand reservoir of equitable power, and it affords courts the discretion and power to vacate judgments whenever such action is appropriate to accomplish justice." *Id.* at 445 (*citing Phelps*, 569 F.3d at 1135) (internal quotation marks and alterations omitted). In addition, the Ninth Circuit held that, especially when "a district court is faced with applying [the *Phelps*] factors in an entirely new context, the court should assess how that different context might alter the calculus of the factors' application, and whether those factors adequately capture all of the relevant circumstances." *Id.* at 446. In other words, the Ninth Circuit requires courts to "consider all of the relevant circumstances surrounding the specific motion before the court in order to ensure that justice be done in light of all the facts." *Id.* at 440. Moreover, the Ninth Circuit cautioned that "a change in the controlling law can – but does not always – provide a sufficient basis for granting relief." *Id.* at 444 (holding that "[t]o assess a Rule 60(b)(6) motion predicated on an intervening change in the law, a district court must evaluate the circumstances surrounding the specific motion before the court" and that this "case-by-case inquiry requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts") (*citing Phelps*, 569 F.3d at 1132-33) (internal quotation marks and alterations omitted).

In this case, even assuming that the *Phelps* factors apply (and it is not clear that they do), those factors weigh heavily against finding that the Transact Pro Defendants have established "extraordinary circumstances" necessitating relief under Rule 60(b)(6). With respect to the first factor regarding nature of the intervening change in law, although the Transact Pro Defendants argue that the Supreme Court overturned "settled" precedent in *AMG*, it is not clear that the

---

[3] Although Moskvins submitted a declaration with his Motion stating that he "was unaware of any legal challenges to the FTC's monetary authority" when he chose to settle, Moskvins submitted a supplemental declaration with his Reply acknowledging his previous declaration was misleading and not accurate, claiming that, at the time he signed his previous declaration, he "did not have a ready recollection of legal aspects of events occurring in the case two years ago." According to Moskvins, his review of the FTC's Opposition and accompanying evidence had suddenly "refreshe[d] [his] recollection" that he had been aware of the Seventh Circuit's holding in *Credit Bureau* and that his attorneys had discussed that case in the Transact Pro Defendants' mediation brief and at the mediation.

**Exhibit C**
**Page 20**

Initials of Deputy Clerk  _sr_

precedent was "settled" because a circuit split existed regarding the FTC's ability to seek equitable monetary relief pursuant to Section 13(b).  Indeed, Judge O'Scannlain stated in his concurrence in *FTC v. AMG Capital Management, LLC*, 910 F.3d 417. 429 (9th Cir. 2018), that the Ninth Circuit's decision to follow earlier precedent concluding that the FTC could recover equitable monetary relief pursuant to Section 13(b) was "unfortunate" and an "impermissible exercise of judicial creativity" that "contravenes the basic separation-of-powers principle that leaves to Congress the power to authorize (or to withhold) rights and remedies."  With respect to the second factor regarding pursuing relief and the third factor regarding the parties' reliance interest in the finality of the case, the Transact Pro Defendants were fully aware that a change in the law was possible, if not probable.  Despite this awareness, the Transact Pro Defendants made an informed decision to choose the certainty and finality of a comparatively favorable settlement, rather than to incur additional expenses and risk the possibility of a far greater monetary judgment if there was no change in the law.  The fourth factor regarding the delay between the judgment and the Rule 60(b) motion favors the Transact Pro Defendants because they filed their Rule 60(b) motion within a reasonable time after the Supreme Court's decision in *AMG*.  The fifth factor, which looks at the closeness of the relationship between the decision resulting in the original judgment and the subsequent decision that represents a change in the law, does not apply in this case because the original judgment was the result of a settlement.  Similarly, the sixth factor, the need for comity between the independently sovereign state and federal judiciaries, does not apply.

Accordingly, the Transact Pro Defendants are not entitled to relief under Rule 60(b)(6).

**IV. Conclusion**

For all the foregoing reasons, Defendants' Motion is **DENIED**.

IT IS SO ORDERED.

1   **MCGUIREWOODS LLP**
    DAVID C. POWELL (SBN 129781)
2   dpowell@mcguirewoods.com
    ALICIA A. BAIARDO (SBN 254228)
3   abaiardo@mcguirewoods.com
    Two Embarcadero Center, Suite 1300
4   San Francisco, CA 94111-3821
    Telephone: 415.844.9944
5   Facsimile: 415.844.9922

6   **MCGUIREWOODS LLP**
    KEVIN M. LALLY (SBN 226402)
7   klally@mcguirewoods.com
    355 S. Grand Avenue, Suite 4200
8   Los Angeles, CA 90071
    Telephone: 213.627.2268
9   Facsimile: 213.627.2579

10
    Attorneys for Proposed Intervenors
11  Wells Fargo & Company and
    Wells Fargo Bank N.A.
12

13                    **UNITED STATES DISTRICT COURT**

14                   **SOUTHERN DISTRICT OF CALIFORNIA**

15  FEDERAL TRADE                    CASE NO. 18-cv-1388-LAB-LL
    COMMISSION,
16                                   Judge: Hon. Larry Alan Burns
              Plaintiff,
17                                   **PROPOSED INTERVENORS WELLS**
         v.                          **FARGO & COMPANY AND WELLS**
18                                   **FARGO BANK N.A.'S REQUEST**
    TRIANGLE MEDIA                   **FOR JUDICIAL NOTICE IN**
19  CORPORATION;                     **SUPPORT OF MOTION TO**
    JASPER RAIN MARKETING            **INTERVENE**
20  LLC;
    HARDWIRE INTERACTIVE             Date: January 10, 2022
21  INC;                             Time: 11:15 a.m.
    GLOBAL NORTHERN                  Ctrm: 14A
22  TRADING LIMITED; BRIAN
    PHILLIPS; and DEVIN KEER,
23

24            Defendants.

25

26

27

28
_____
PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO INTERVENE

**TO THE HONORABLE COURT AND ALL PARTIES OF RECORD:**

Pursuant to Rule 201 of the Federal Rules of Evidence, Proposed Intervenors Wells Fargo & Company and Wells Fargo Bank N.A. (collectively "Wells Fargo") respectfully request the Court take judicial notice of the following documents in support of their Motion to Intervene:

1.    Monitor Thomas M. McNamara's Statement re: July 13, 2021 Status Conference, filed as ECF No. 1333 on July 7, 2021 in *Federal Trade Commission v. AMG Services, Inc., et al.,* Case No. 2:12-cv-00536-GMN-VCF (D. Nev.), attached hereto as **Exhibit A**.

2.    FTC's Response to Defendants' Response to Monitor's Request for Status Conference, filed as ECF No. 1311 on May 20, 2021 in *Federal Trade Commission v. AMG Services, Inc., et al.,* Case No. 2:12-cv-00536-GMN-VCF (D. Nev.), attached hereto as **Exhibit B**.

3.    Plaintiff-Receiver Thomas M. McNamara's Complaint, filed as ECF No. 1 on July 8, 2021, in *Thomas W. McNamara v. Wells Fargo & Company, et al.,* Case No. 3:21-cv-01245-AJB-JLB (S.D. Cal.), attached hereto as **Exhibit C**.

4.    Receiver's Notice of Related Cases Under Civil Local Rule 40.1.f-g, filed as ECF No. 2 on July 8, 2021, in *Thomas W. McNamara v. Wells Fargo & Company, et al.,* Case No. 3:21-cv-01245-AJB-JLB (S.D. Cal.), attached hereto as **Exhibit D**.

5.    Report of Clerk and Order of Transfer Pursuant to "Low-Number" Rule, filed as ECF No. 8 on July 8, 2021, in *Thomas W. McNamara v. Wells Fargo & Company, et al.,* Case No. 3:21-cv-01245-AJB-JLB (S.D. Cal.), attached hereto as **Exhibit E**.

//

//

//

2
PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO INTERVENE

1-SER-109

1    6.    Federal Trade Commission public statement in June 2020 on "Triangle

2    Media Refunds", published on the FTC's website

3    https://www.ftc.gov/enforcement/cases-proceedings/refunds/triangle-media-refunds

4    (last accessed November 10, 2021), attached hereto as **Exhibit F.**

5    Rule 201 makes facts that "can be accurately and readily determined from

6    sources whose accuracy cannot be reasonably questioned" the proper subject of

7    judicial notice.  Fed. R. Evid. 201. Rule 201(c)(2) provides that the Court "must take

8    judicial notice [of such a matter] if a party requests it and the court is supplied with

9    the necessary information." *Id*.

10   Here, the existence and content of filings from the litigation brought by the

11   Federal Trade Commission ("FTC") in *Federal Trade Commission v. AMG*

12   *Services, Inc., et al.,* Case No. 2:12-cv-00536-GMN-VCF (D. Nev.), and the

13   Receiver in *Thomas W. McNamara v. Wells Fargo & Company, et al.,* Case No.

14   3:21-cv-01245-AJB-JLB (S.D. Cal.), are proper subjects of judicial notice.  *See*,

15   *e.g.*, *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take

16   judicial notice of undisputed matters of public record…including documents on file

17   in federal or state courts"); *Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d

18   1149, 1158 (C.D. Cal. 2011) (taking judicial notice "of complaints filed by the

19   Plaintiffs in related proceedings, as well as complaints and orders from other

20   cases"); *Chrisanthis v. U.E.*, No. C 08-02472 WHA, 2008 WL 4848764, at *2 (N.D.

21   Cal. Nov. 7, 2008) ("When adjudicating a motion to dismiss, a court may take

22   judicial notice of public filings."); *Ramirez v. Quemetco, Inc.*, No. 17-cv-03384,

23   2017 WL 2957935, at *3 (C.D. Cal. July 11, 2017) (taking judicial notice of

24   declaration filed in another case).

25   //

26   //

27   //

28

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO INTERVENE

1       Attached hereto as **Exhibits A-F** are copies of public filings in litigation

2  brought by the FTC and the Receiver in different actions.  Wells Fargo respectfully

3  requests the Court take judicial notice of these documents, and the facts they

4  evidence.

5

6  DATED: November 10, 2021                    Respectfully submitted,

7                                              MCGUIREWOODS LLP

8                                              /s/ Alicia A. Baiardo

9                                              Kevin M. Lally, Esq.

10                                             David C. Powell, Esq.

11                                             Alicia A. Baiardo, Esq.

12                                             Attorneys for Proposed Intervenors Wells

13                                             Fargo & Company and Wells Fargo Bank
                                               N.A.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO INTERVENE

1-SER-111

1                **<u>CERTIFICATE OF SERVICE</u>**

2        I hereby certify that on November 10, 2021, the foregoing document was filed

3 electronically in the Court's Electronic Case Filing system ("ECF"); thereby upon

4 completion the ECF system automatically generated a Notice of Electronic Filing

5 ("NEF") as service through CM/ECF to registered e-mail addresses of parties of

6 record in the case.

7

8                       */s/ Alicia A. Baiardo*
                          Alicia A. Baiardo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1  Maria A. Gall (NV 14200)
   gallm@ballardspahr.com
2  Ballard Spahr LLP
   1980 Festival Plaza Drive, Suite 900
3  Las Vegas, NV 89135-2958
   Tel.:   702-471-7000
4  Fax:   702-471-7070

5  Logan D. Smith (*Pro Hac Vice*)
   lsmith@mcnamarallp.com
6  Sanjay Bhandari (*Pro Hac Vice*)
   sbhandari@mcnamarallp.com
7  McNamara Smith LLP
   655 West Broadway, Suite 900
8  San Diego, California 92101
   Tel.:   619-269-0400
9  Fax:   619-269-0401
   *Attorneys for Court-Appointed Monitor,*
10 *Thomas W. McNamara*

11              UNITED STATES DISTRICT COURT

12                 DISTRICT OF NEVADA

13  FEDERAL TRADE COMMISSION,              Case No. 2:12-cv-00536-GMN-VCF

14                    Plaintiff,           **MONITOR'S STATEMENT RE:**
                                           **JULY 13, 2021 STATUS CONFERENCE**
15          v.
                                           Judge:    Hon. Gloria M. Navarro
16  AMG SERVICES, INC., et al.,            Date:     July 13, 2021
                                           Time:     10:00 a.m.
17                    Defendants, and

18  PARK 269 LLC, et al.,

                        Relief Defendants.

19

20

21

22

23

24

25

26

27

28

In light of the Court's Amended Order granting the Monitor's Motion to Extend Time for Completion Deadline and setting a status conference for July 13, 2021 (the "Amended Order," ECF No. 1327), Thomas W. McNamara, in his capacity as Court-appointed Monitor, respectfully submits this statement regarding items he requests be addressed at the hearing:

As the Court is aware, on June 9, 2021, the court in *United States v. Scott Tucker, et al.*, No. 16-cr-00091-PKC (S.D.N.Y.) issued a Preliminary Order of Forfeiture as to Substitute Assets ("Preliminary Forfeiture Order"),[1] which impacts the vast majority of the assets currently held by the Monitor. Any challenges to the Preliminary Forfeiture Order, including claims to assets identified therein, are required to be brought in and adjudicated by the Southern District of New York. *See* Preliminary Forfeiture Order, pp. 9-10, ¶¶ 4-7 (setting forth the procedure for adjudicating the claims of anyone claiming an interest in the subject assets). There is no reason the New York proceedings need delay the conclusion of the Monitorship.[2]

## I. DISPOSITION OF REMAINING ASSETS

The Monitor has identified the following categories of Assets of the Monitorship Estate which are *not* identified in the Preliminary Order of Forfeiture. The Monitor requests the Court's guidance and instruction regarding these Assets at the upcoming hearing. In connection with that request, the Monitor offers suggested courses of action for each of the categories.

### A. Ongoing Litigation

Several cases brought by the Monitor were still in progress (though stayed) when the Supreme Court issued its decision in the appeal of this action.[3] Given the potential for recovery,

---

[1] The Preliminary Forfeiture Order was attached as Exhibit A to the FTC's Response to Monitor's Motion to Extend Completion Deadline (ECF No. 1319-1).

[2] The Preliminary Forfeiture Order provides that if the Monitorship is terminated prior to the entry of a Final Order of Forfeiture, the Government is authorized to take possession of the identified assets and "to keep them in its secure, custody and control." (*See* ECF No. 1319-1 at ¶ 2.)

[3] These cases are: *McNamara v. Charles Hallinan, et al.*, No. 2:17-cv-02966-GMN-NJK (D. Nev.), *McNamara v. Linda Hallinan, et al.*, No. 2:17-cv-02967-GMN-BNW (D. Nev.), *McNamara v. Patten, et al.*, No. 2:17-cv-02968-GMN-NJK (D. Nev.), *McNamara v. Selling Source, LLC, et al.*, No. 2:17-cv-02969-GMN-DJA (D. Nev.), *McNamara v. Stealth Power, LLC*, No. 2:18-cv-01813-GMN-DJA (D. Nev.), and *McNamara v. Intercept Corp., et al.*, No. 2:18-cv-02281-GMN-VCF (D. Nev.) (collectively referred to herein as the "Ongoing Litigation").

the Ongoing Litigation is an Asset of the Monitorship Estate, as that term is defined in the Monitor Order. *See* Monitor Order (ECF No. 1099) at Definitions, A ("'Asset' means…any legal or equitable interest in, right to, or claim to, any real, personal, or intellectual property wherever located…., regardless of when any Defendant acquired such interest, right, or claim.") As such, the Monitor is obligated to consider the appropriate disposition of the Ongoing Litigation in connection with the wind down of the Monitorship.

The Monitor believes that he no longer has the authority to pursue the Ongoing Litigation in light of the Supreme Court's reversal of the monetary judgment in this matter. Lacking that authority, the Monitor is of the view that he must dismiss the litigation as part of the wind down process. Before doing so, however, the Monitor recommends allowing a limited period of time (such as 30 days) in which any party or parties may come before the Court and assert an interest in the Ongoing Litigation. For instance, a Defendant, a governmental agency, or a third party may move to assume control over or intervene in some or all of the Ongoing Litigation. If no movant comes forward prior to the expiration of this limited period, the Monitor will then dismiss the Ongoing Litigation.

### B. Defendants' Documents and Electronic Data/Documents

The Monitor is in possession of Defendants' documents obtained during the Monitor's investigation, including over 200 banker's boxes of hard copy documents gathered from Defendants' files from their Overland Park, Kansas facilities and a voluminous quantity of electronic data (collectively, the "Documents"). The Monitor believes that the Documents properly belong to the Defendants upon the termination of the Monitorship. The Monitor proposes that the Defendants shall be provided 30 days to notify the Monitor of their intent to take possession of the Documents and 45 days thereafter to take possession of the Documents. Should none of the Defendants take possession of the Documents within 75 days, the Monitor would be authorized to shred, delete, or otherwise destroy the Documents.

///

///

///

2

C.     **The Judgments**

The Monitor currently holds several outstanding judgments against various third-parties (collectively the "Judgments"). The Judgments include the following:

- A judgment in the amount of $2,416,666.36 against David Feingold, Dylan, Jagger Investment Co., Inc., Homeowners Realty, LLC, UMR Building LLC, and United Material Recovery, LLC (ECF Nos. 1290, 1291). This judgment arose out of investments made by EVAS Investments LLC, TBC Investments, LLC (a/k/a Think Big Partners), Lightbridge and Level 5 Recycling Holding Company, LLC (a/k/a Level 5 Recycling), all of which Scott Tucker was the sole or majority owner;

- A judgment in the amount of $2,000,000 plus post-judgment interest against WhamTech, Inc. This judgment arose out of a loan made to WhamTech by Black Creek Capital Corporation, a Monitorship entity;

- A judgment in the amount of $952,104.47 plus prejudgment interest of $627,860.00 through July 1, 2019, and interest accruing since at $528.95 per day against United Resource Holdings, LLC, Kendallwood Senior Properties, LLC, John T. Julian, Linda L. Julian, and Paul K. Thoma. This judgment arose out of loans made to these entities/individuals by Westfund, LLC, a Monitorship entity; and

- A judgment in the amount of $516,928.33 plus prejudgment interest of $340,885.52 through July 1, 2019, and interest accruing since at $287.18 per day against United Resource Holdings, LLC, Milan Development Group, LLC, John T. Julian, and Paul K. Thoma (*see* ECF No. 1277). This judgment also arose out of loans made to these entities/individuals by Westfund, LLC, a Monitorship entity.

The Monitor believes that he no longer has the authority to pursue collection of the Judgments in light of the Supreme Court's decision.[4] As such, similar to the suggestion in connection with Ongoing Litigation, the Monitor recommends that a limited period of time (such as 30 days) be provided to allow for a governmental agency or other third party to appear before the Court and assert an interest in the Judgments. If a movant does not appear prior to the expiration of the limited period, then the Defendants shall have an additional 30 days in which to take steps to effectuate an assignment of the Judgments.

///

///

///

---

[4] The Monitor's efforts to collect on the Judgments have been unsuccessful thus far, and the Monitor believes any future collection efforts are likely to face a variety of challenges.

3

**D. Pending and Voided Settlements**

The Monitor entered into a settlement agreement with non-party Ward Katz regarding an ownership interest in certain property (the "Katz Settlement Agreement"). Under the terms of the Katz Settlement Agreement, Ward Katz and related entities agreed to pay the Monitor $175,000 per the terms of the agreement. (ECF No. 1307-1.) The Katz Settlement Agreement is contingent upon Court approval, which motion is currently pending before this Court. (ECF No. 1307.) The motion to approve the settlement was filed on March 23, 2021, and thus prior to the Supreme Court's decision; however, in light of the Supreme Court's ruling, the Monitor does not believe he currently has the authority to pursue the pending motion to approve the settlement. The Monitor therefore recommends that some limited period of time (again, 30 days seems appropriate) be provided to allow for a Defendant, a governmental agency, or a third party to move the Court to assert a right to pursue the pending motion. If no movant comes forward prior to the expiration of this limited period, the Monitor will withdraw the motion before this Court and dismiss the underlying litigation pending in Kansas.

Second, as previously noted for the Court, the Monitor is presently holding $510,000 in settlement payments made by a third party pursuant to a confidential Court-approved settlement entered last year. The express terms of that settlement agreement, however, allow the settling party to declare the settlement null and void and demand the return of the settlement payments if the Supreme Court reversed the decision in this case. The settling party has now declared the settlement void in light of the Supreme Court's decision and is seeking return of the payments made. Accordingly, the Monitor respectfully requests the Court's approval to return those funds to the third party.

///
///
///
///
///
///

4

II.     **CONCLUSION**

Once the above issues have been resolved, the Monitor will promptly file his Final Report and wind down the Monitorship consistent with the terms of the Monitor Order.  (ECF No. 1099, *see* § XVIII, Monitor's Final Report and Disbursements of Assets.)  The Monitor looks forward to addressing the above-identified matters and any other issues the Court would like to discuss at the status conference on July 13, 2021.

Dated:  July 7, 2021                                    McNamara Smith LLP

                                                                       By:____/s/ Logan D. Smith_____
                                                                              Logan D. Smith (*Pro Hac Vice*)
                                                                              lsmith@mcnamarallp.com
                                                                              Sanjay Bhandari (*Pro Hac Vice*)
                                                                              sbhandari@mcnamarallp.com
                                                                              655 West Broadway, Suite 900
                                                                              San Diego, California 92101
                                                                              Tel.:         619-269-0400
                                                                              Fax:         619-269-0401

                                                                              Maria A. Gall (NV 14200)
                                                                              gallm@ballardspahr.com
                                                                              Ballard Spahr LLP
                                                                              1980 Festival Plaza Drive, Suite 900
                                                                              Las Vegas, NV 89135-2958
                                                                              Tel.:         702-471-7000
                                                                              Fax:         702-471-7070

                                                                              *Attorneys for Court-Appointed Monitor,*
                                                                              *Thomas W. McNamara*

5

1    **CERTIFICATE OF SERVICE**

2         I hereby certify that on the 7th day of July, 2021, pursuant to Fed. R. Civ. P. 5(b), I
     served via CM/ECF or delivered by email and mailing in the U.S. Mail a true and correct copy of
3    the foregoing **MONITOR'S STATEMENT RE: JULY 13, 2021 STATUS CONFERENCE**,
     postage prepaid and addressed to the following:

4

5    **VIA CM/ECF**                              **VIA CM/ECF**
     Kimberly L. Nelson                          Paul C. Ray
6    Federal Trade Commission                    Paul C. Ray, Chtd.
     600 Pennsylvania Ave. NW                    8670 West Cheyenne Avenue, Suite 130
7    Mail Stop CC-9528                           Las Vegas, NV 89129
     Washington, DC 20580                        Tel.:   702-823-2292
     Tel.:   202-326-3304                        Fax:    702- 823-2384
8    Fax:    202-326-3197                        Email: paulcraylaw@gmail.com
     Email: knelson@ftc.gov                      *Attorneys for AMG Capital Management, LLC;*
9    *Attorneys for FTC*                         *Level 5 Motorsports, LLC; Black Creek*
                                                 *Capital Corporation; Broadmoor Capital*
10                                               *Partners, LLC; Scott A. Tucker; Park 269 LLC*

11   **VIA EMAIL**
     Kim Tucker
12   7118 Village Drive
     Prairie Village, KS 66208
13   kim@kimtucker.net
     *Pro Se*
14

15     /s/ Logan D. Smith
     Logan D. Smith
16   *Attorneys for the Court-Appointed Monitor,*
     *Thomas W. McNamara*
17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

1   Christopher Chiou
    Acting UNITED STATES ATTORNEY
2   District of Nevada
    Nevada Bar No. 14853
3   Blaine T. Welsh
4   Assistant United States Attorney
    Nevada Bar No. 4790
5   501 Las Vegas Blvd. South, Suite 1100
    Las Vegas, Nevada 89101
6   Phone: (702) 388-6336
7   Facsimile: (702) 388-6787
    Email: Blaine.Welsh@usdoj.gov
8

9   Kimberly L. Nelson
    FEDERAL TRADE COMMISSION
10  600 Pennsylvania Avenue, NW
    Mailstop CC-9528
11  Washington, D.C. 20580
    Phone: (202) 326-3304
12  Facsimile: (202) 326-3197
13  Email: knelson@ftc.gov
    *Attorney for Plaintiff Federal Trade Commission*
14

15                  **UNITED STATES DISTRICT COURT**
16                      **DISTRICT OF NEVADA**

17  | FEDERAL TRADE COMMISSION, |
18  |                Plaintiff,     | Case No. 2:12-cv-536 |
19  |                               |
    |            v.                 | **RESPONSE OF FEDERAL TRADE**
20  |                               | **COMMISSION TO DEFENDANTS'**
21  | AMG Services, Inc., *et al.*, | **RESPONSE TO MONITOR'S**
    |                               | **REQUEST FOR STATUS**
22  |            Defendants, and    | **CONFERENCE (ECF NO. 1309)**
23  | Park 269 LLC, *et al.*,        |
24  |            Relief Defendants. |
25
26
27
28

Plaintiff, Federal Trade Commission ("FTC"), joins in the Monitor's request for a status conference once the case has been remanded to this Court.  But first, the FTC must correct the false statements in Defendants' Response to Monitor's Request for Status Conference (ECF No. 1309, "Response") concerning the origin of the monitorship.

Defendants Scott Tucker, AMG Capital Management, LLC, Level 5 Motorsports, LLC, Black Creek Capital Corporation, and Broadmoor Capital Partners (collectively, "Tucker Defendants") misrepresent the series of events that led to the parties' agreement in the Order Appointing Monitor and Freezing Assets (ECF No. 1099 (the "Monitor Order")).  The post-judgment Monitor Order was not imposed on the Tucker Defendants, or Relief Defendants Park 269 LLC and Kim Tucker.  Quite the opposite – the parties' counsel heavily negotiated the Monitor Order, and then jointly requested that this Court enter it.  *See, e.g.,* Joint Motion to Enter Stipulated Order Appointing Monitor and Freezing Assets (ECF No. 1095).  The Tucker Defendants and Relief Defendants had a choice:  (a) enter into the Monitor Order; or (b) pursue their appeals, and obtain a stay of execution by posting an appeal bond.  *See, e.g.,* FED. R. CIV. P. 62.  They did not choose route (b), perhaps in part because Defendant Scott Tucker was facing potential jail time for his role in the same payday lending scam at issue in this case.  Regardless of the motivation, in no way was the Monitor Order entered against the Tucker Defendants and Relief Defendants without their input and consent.[1]

Further, every action the Monitor has instituted to recover funds or liquidate assets has been expressly authorized by the Tucker Defendants and Relief Defendants.  The Monitor liquidated some assets pursuant to the specific provisions negotiated in the Monitor Order.  Other assets he sold only after express authorization from the asset holder pursuant to Section VIII of the Monitor Order.  Monitor Order, Sections VIII.B-C (Monitor can liquidate assets after Tucker

---

[1] This Court extended the duration of the Monitor's appointment *without objection* just last summer.  *See* Monitor's Motion to Extend Completion Deadline for Monitor (First Request) (ECF No. 1093) (requesting two-year extension); and Order (ECF No. 1094) (extending Monitorship for an additional year).

2

Defendants' or Relief Defendants' written consent; and approving the agreed-upon sale of all assets of Level 5 Motorsports. Finally, assets recovered from third parties were expressly contemplated, and permitted, under the Monitor Order. *See* Sections VIII.G, R-T. In short, there have been no surprises for any of the defendants – everything that has been liquidated was done with their permission. For that reason, the Tucker Defendants' argument that the Monitor should not be paid for this work is disingenuous.

Although the monetary relief awarded in this case will be vacated because it was predicated on Section 13(b) authority that no longer exists, other circumstances may prevent the Tucker Defendants and Relief Defendants from recovering anything from the Monitorship Estate. Specifically, the assets the Monitor holds in the Monitorship account are likely all subject to recovery in Defendant Scott Tucker's criminal case. As this Court is aware, Scott Tucker was convicted in a criminal action brought by the United States Attorney's Office for the Southern District of New York. *United States v. Scott Tucker, et al.*, No. 16 cr 091 (PKC) (S.D.N.Y.) (the "Criminal Case"). In the Criminal Case, the Court entered a $3.5 billion judgment against Scott Tucker, and imposed a 200-month prison sentence, which Tucker is currently serving.[2] *See* Judgment in a Criminal Case (Criminal Case ECF No. 322) (entering 200-month prison sentence plus three years of supervised release); Amended Preliminary Order of Forfeiture as to Specific Property/Money Judgment at 8 (Criminal Case ECF No. 344) (entering $3.5 billion money judgment). Defendant Tucker has not satisfied the $3.5 billion criminal judgment.

Lastly, the FTC joins in the Monitor's request for a status conference. The FTC supports an orderly wind-up of the Monitorship Estate similar to that already contained in Section XVIII of the Monitor Order. Given the numerous issues that remain in both the Monitor's third-party recovery actions, and those in the Criminal Case, a status conference will allow the Court and the parties to address all of these matters at once. However, until the remand issues, this Court lacks

---

[2] Defendant Tucker has exhausted all appeals of his conviction. *Scott Tucker v. United States*, No. 20-6936 (U.S.) (*cert. denied* Feb. 22, 2021).

1  jurisdiction to act.  *See* FED. R. CIV. P. 60(a), 62.1; *McClatchy Newspapers v. Central Valley*

2  *Typographical Union*, 686 F.2d 731, 734 (9th Cir. 1982) (holding that the filing of a notice of

3  appeal generally divests the district court of jurisdiction over the matters appealed).  Given the

4  complexity of the issues, but also the need for enforceable orders on these subjects, the FTC

5  requests that the Court **not** schedule the status conference until the case has been formally

6  remanded to this Court.

7

8  Dated: May 20, 2021                    Respectfully submitted by:

9                                          /s/ Kimberly L. Nelson

10                                         Kimberly L. Nelson
                                           FEDERAL TRADE COMMISSION
11                                         600 Pennsylvania Avenue, NW
                                           Mailstop CC-9528
12                                         Washington, D.C. 20580
                                           Phone:  (202) 326-3304
13                                         Facsimile:  (202) 326-3197
                                           Email:  knelson@ftc.gov
14                                         *Attorney for Plaintiff Federal Trade Commission*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

**CERTIFICATE OF SERVICE**

I, Kimberly L. Nelson, certify that, as indicated below, the parties listed below were served by ECF with **RESPONSE OF FEDERAL TRADE COMMISSION TO DEFENDANTS' RESPONSE TO MONITOR'S REQUEST FOR STATUS CONFERENCE (ECF NO. 1309)** filed with the Court.

**Sanjay Bhandari:** sbhandari@mcnamarallp.com; jjacobs@mcnamarallp.com
**Gregory A Brower:** gbrower@swlaw.com
**Alyssa D. Campbell:** acampbell@laic-law.com
**Joshua M Dickey:** jdickey@baileykennedy.com, krodman@baileykennedy.com, smurnane@baileykennedy.com, bkfederaldownloads@baileykennedy.com
**Kelly H. Dove:** kdove@swlaw.com; mawilliams@swlaw.com; DOCKET_LAS@swlaw.com; sdugan@swlaw.com
**Nicole Ducheneaux:** nducheneaux@bigfirelaw.com, swhitford@bigfirelaw.com
**Michael R Ernst:** mre@juww.com, kom@juww.com, em@juww.com
**Craig B. Friedberg:** attcbf@cox.net, attcbf@pacernotice.com, attcbf@yahoo.com, cbfriedberg@justice.com, attcbf@hotmail.com
**Nathan F. Garrett:** ngarrett@gravesgarrett.com, ecf@gravesgarrett.com, nkruger@gravesgarrett.com
**Andrew P Gordon:** agordon@mcdonaldcarano.com, cgerard@mcdonaldcarano.com
**Von S. Heinz:** vheinz@lrrc.com, dprovost@lrrc.com, jestrada@lrrc.com
**Richard Howell:** rhowell@kirkland.com
**Charles Kalil:** ckalil@kirkland.com
**Andrew A. Kassof:** andrew.kassof@kirkland.com, sheri.gorniak@kirkland.com
**Nick J. Kurt:** nkurt@berkowitzoliver.com, vphommachanh@berkowitzoliver.com
**Darren J. Lemieux:** dlemieux@lrrc.com, darren-lemieux-3750@ecf.pacerpro.com, twallace@lrrc.com
**Bradley S. Lui:** BLui@mofo.com, cwoods@mofo.com
**David J. Merrill:** david@djmerrillpc.com
**Jeffrey D. Morris:** jmorris@berkowitzoliver.com
**Victoria W. Ni:** vni@publicjustice.net
**Francis J. Nyhan:** jnyhan@ndnlaw.com, sballuff@ndnlaw.com, fbrooks@ndnlaw.com
**Paul C. Ray:** paulcraylaw@aol.com, paulcraylaw@gmail.com
**Brian R. Reeve:** brian.reeve@cityofhenderson.com
**E. Leif Reid:** lreid@lewisroca.com, mhudgens@lewisroca.com, amcdannald@ewisroca.com, dlemieux@ewisroca.com, e-leif-reid-0530@ecf.pacerpro.com
**L. Christopher Rose:** lcr@h2law.com, jd@juwlaw.com, FedCt@juwlaw.com
**Robert L. Rosenthal:** rrosenthal@howardandhoward.com, jw@h2law.com, bdunn@howardandhoward.com
**Joseph Sakai:** sakaij@sheppardmullin.com, sasmith@sheppardmullin.com, carltonm@ballardspahr.com, LitDocket_West@ballardspahr.com
**Logan D. Smith:** lsmith@mcnamarallp.com, jjacobs@mcnamarallp.com, tmcnamara@mcnamarallp.com

5

1      **Whitney P Strack:** pstrack@gravesgarrett.com, ecf@gravesgarrett.com, nkruger@gravesgarrett.com

2      **Jeremy R. Vanderloop:** jvanderloop@madvanlaw.com

     **Abran E. Vigil:** vigila@ballardspahr.com, carltonm@ballardspahr.com,

3      LitDocket_West@ballardspahr.com, LVDocket@ballardspahr.com

4      **Bradley Weidenhammer:** bweidenhammer@kirkland.com, mel.cribbin@kirkland.com, lally.gartel@kirkland.com

5      **Blaine T. Welsh:** Blaine.Welsh@usdoj.gov, maria.covarrubias@usdoj.gov,

     sogol.ghadiri-king@usdoj.gov, samira.tamules@usdoj.gov, allyson.beyer@usdoj.gov,

6      eunice.jones@usdoj.gov, sandra.yasenchak@usdoj.gov, maritess.recinto@usdoj.gov,

     dionne.white@usdoj.gov, CaseView.ECF@usdoj.gov, Angelina.villalpando@usdoj.gov

7      **Martin L. Welsh:** mwelsh@lvlaw.com, k.bratton@hayesandwelsh.onmicrosoft.com,

8      m.mchenry@lvlaw.com

9   I further certify that the parties listed below were served by electronic mail.

10

     **Kim C. Tucker**

11      7118 Village Drive

     Prairie Village, KS 66208

12      kim@kimtucker.net

13

14   May 20, 2021                      /s/ Kimberly L. Nelson

15                                  Kimberly L. Nelson

16

17

18

19

20

21

22

23

24

25

26

27

28

6

# EXHIBIT C

LOGAN D. SMITH (#212041)
CORNELIA J.B. GORDON (#320207)
**MCNAMARA SMITH LLP**
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401
Email: lsmith@mcnamarallp.com

LIONEL Z. GLANCY (#134180)
JONATHAN M. ROTTER (#234137)
GARTH A. SPENCER (#335424)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-201-9160
Email: info@glancylaw.com

*Attorneys for Receiver, Thomas W. McNamara*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS W. MCNAMARA, as the Court-Appointed Receiver for Triangle Media Corporation, Apex Capital Group, LLC; and their successors, assigns, affiliates, and subsidiaries,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO & COMPANY, a corporation, WELLS FARGO BANK, N.A., a national banking association,<br><br>Defendants. | Case No. **'21CV1245 AJB JLB**<br><br>**RECEIVER'S COMPLAINT FOR:**<br><br>**(1) Aiding and Abetting Fraud;**<br>**(2) Conspiracy to Commit Fraud;**<br>**(3) Breach of Fiduciary Duty;**<br>**(4) Aiding and Abetting Breach of Fiduciary Duty;**<br>**(5) Aiding and Abetting Conversion;**<br>**(6) Violation of California Penal Code § 496;**<br>**(7) Violation of California Business & Professions Code § 17200;**<br>**(8) Aiding and Abetting Fraudulent Transfers and/or Voidable Transfers;**<br>**(9) Unjust Enrichment/Constructive Trust;**<br>**(10) Negligent Supervision (in the Alternative);**<br>**(11) Negligence (in the Alternative); and**<br>**(12) Request for an Accounting**<br><br>**JURY TRIAL DEMAND** |

Case No. _____
RECEIVER'S COMPLAINT

Plaintiff, Thomas W. McNamara ("Plaintiff" or "Receiver"), in his capacity as the court-appointed receiver for the Triangle and Apex Enterprises, as defined below, hereby brings the following Complaint against Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo," the "Bank," or "Defendants") and alleges the following.

## I. INTRODUCTION: A NEW REVELATION OF WELLS FARGO'S FACILITATION OF CONSUMER FRAUD

1.     The Receiver brings this action against Wells Fargo to recover damages suffered as a result of Wells Fargo's knowing provision of substantial assistance to two multi-million-dollar fraudulent schemes perpetrated by the former operators of Triangle Media Corporation ("Triangle") and Apex Capital Group ("Apex").[1]

2.     The Receiver was appointed after the Federal Trade Commission ("FTC") brought lawsuits against the Triangle and Apex Enterprises in 2018. The Enterprises ran similar, though separate, Internet risk-free trial schemes marketing dozens of products, most of which were personal care products and dietary supplements that purported to promote enhanced weight loss, hair growth, clear skin, muscle development, sexual performance, and cognitive abilities. Consumers were offered "free" trials of the products for "just the cost of shipping and handling," usually $4.95. Two weeks after consumers signed up for the "trial," they were charged the full price of the product (roughly $90) and enrolled in continuity programs, which continued to ship products on a monthly basis—charging the consumer the full $90 each time, of course. Cancellation was difficult and obtaining a refund was nearly impossible. The schemes, a category of frauds

---

[1] Triangle and Apex, along with their related entities and the individuals controlling those entities, are referred to herein as the "Triangle Enterprise" and the "Apex Enterprise," respectively, and collectively as the "Enterprises."

1  known as "negative option schemes,"[2] were incredibly successful, raking in more
2  than $200 million from consumers.

3      3.    To execute the schemes, the Enterprises recruited unrelated
4  individuals (sometimes referred to as "fronts", "signors", "nominees" or "straw
5  owners") and paid them a modest monthly fee for the use of their names and
6  identities to establish approximately 100 shell companies. The Enterprises then
7  immediately turned to Wells Fargo, which opened scores of Wells Fargo bank
8  accounts – more than 150 in total[3] – in the names of the shell companies. Having
9  the Wells Fargo bank accounts was a prerequisite for the Enterprises to secure
10  accounts with merchant processors, which the Enterprises needed to accept
11  consumers' credit and debit card payments.

12      4.    Crucially, the Enterprises were able to obtain continued access to
13  accounts with merchant processors, while concealing the identities of the
14  Enterprises' owners from the merchant processors. The practice of processing
15  credit card transactions through other companies' merchant accounts is known as
16  "credit card laundering," and it is an unlawful practice used by fraudulent
17  merchants, like the Enterprises, to circumvent credit card associations' monitoring
18  programs and avoid detection by consumers and law enforcement.

19      5.    Through his independent investigation, which gave him access to the
20  Enterprises' email communications with Wells Fargo and Wells Fargo bank
21  account statements, the Receiver discovered that Wells Fargo was providing
22  substantial, knowing assistance to both the Triangle and Apex Enterprises' sales

23  ———————————————

24  [2] "Risk-free" trial scams are sometimes referred to as negative option scams,
25  because they require consumers to affirmatively opt out (*i.e.*, exercise a negative
    option) of a program to avoid being charged.

26  [3] References to the numbers of Apex and Triangle-related bank accounts identified
27  herein are estimates based on calculations made by the Receiver using only on
    information presently available to him. The number is likely to grow when
28  information on Wells Fargo is received in discovery.

1   scams.

2       6.    Wells Fargo bankers were aware of the Enterprises' risk-free trial

3   schemes, understood the people listed as "owners" of the Wells Fargo accounts did

4   not actually own or control them, and knew the Enterprises were engaged in credit

5   card laundering.  Despite this knowledge, Well Fargo gladly opened ***more than***

6   ***150 bank accounts for the shell companies and straw owners***, ***sometimes opening***

7   ***as many as 6 bank accounts in one day***.  Wells Fargo then allowed millions of

8   dollars to be deposited in the accounts, knowing that these funds were unlawfully

9   obtained in the risk-free trial schemes, and afterwards allowing the Enterprises'

10  operators to transfer their ill-gotten gains from the shell accounts to third-party

11  bank accounts, including accounts located outside of the United States.

12      7.    The principals of the Apex and Triangle Enterprises came to rely

13  heavily upon Wells Fargo to aid their frauds by providing them with law oversight

14  and atypical banking services, widely deviating from accepted banking standards

15  and violating applicable banking laws and regulations.  As one telling example of

16  this from very early in the Triangle scheme, owner Brian Phillips recruited a son

17  and his mother to serve as straw owners of two of the shell companies Phillips

18  actually owned. Wells Fargo promptly opened the bank accounts for the shell

19  companies, listing the straw owners as "owners" of the accounts, and gave Phillips

20  complete control over the shell accounts to Phillips. When the son expressed

21  concerns that Wells Fargo might call his unaware mother to conduct due diligence

22  into the relationship, Phillips plainly explained that it was Wells Fargo, and that

23  would not be happening, emailing him:

24

25  | From: | Brian Phillips <brian@trianglemediacorp.com> |
    | Sent: | Friday, November 11, 2011 8:18 PM |
26  | To: | Marty |
    | Subject: | Re: Please see attached document |
27
    Dude, you still don't understand how wells is totally different. The bank won't be calling her
28
    On Nov 11, 2011 11:01 PM, "Marty" <mglinsky1@comcast.net> wrote:
    Brian- Mom faxed signed doc to Wells Fargo today. Should we have a prepatory conv - you/me/mom so she
    doesnt get blindsided again?

    Thanks Marty G.

Phillips was right. Wells Fargo didn't call her.

8. And during the period in which the Apex and Triangle Enterprises' risk-free trial scams were operating, Wells Fargo was indeed "totally different" from its banking peers. As Wells Fargo has since *admitted*, Wells Fargo's established corporate policies and sales incentives were fueling a high-pressure sales culture that required its bankers to open as many accounts as possible. As a direct result of that pernicious sales culture, and with the ongoing knowledge and authorization of Wells Fargo, an array of Wells Fargo bankers in multiple branch offices in California (and in a few cases, Texas) deliberately assisted the operators of the Apex and Triangle risk-free trial scams for an astonishingly long period of time: from at least 2009 to 2018 for the Triangle fraud and from at least 2014 to 2018 for the Apex fraud ("the Relevant Period"), until the filing of the FTC actions finally shut them down.

9. The Bank's high-pressure sales culture and near unattainable sales goals drove Wells Fargo bankers to open accounts regardless of the risk to the Bank or others; if the employees failed to deliver, the consequences were severe: "[i]t was common knowledge within the Bank that employees who could not meet sales goals could and would be terminated," and "[e]mployees' incentive compensation and promotional opportunities depended on their ability to meet the unreasonable sales goals."[4] As discussed in greater detail below, this drive for new accounts aligned perfectly with the Enterprises' constant need for shell accounts.

10. In the aftermath of Wells Fargo's much-publicized unauthorized accounts scandal caused by this sales culture, Wells Fargo's newly-installed CEO described the bank's corporate policies as excessively "focus[ed] on growing the

---

[4] January 23, 2020 Office of the Comptroller of the Currency Notice Of Charges For Orders Of Prohibition And Orders To Cease And Desist And Notice Of Assessments Of A Civil Money Penalty, AA-EC-2019-82 et al. (Jan. 23, 2020) ("OCC Notice of Charges") ¶¶ 72, 77.

number of accounts," admitting that Wells Fargo's actions were "just stupid." Unfortunately for Wells Fargo and the victims here, this "stupid" conduct had devastating consequences, as these policies encouraged and rewarded Wells Fargo bankers for aiding and abetting fraud in order to satisfy the pressurized sales culture and hit sales quotas. The Receiver's investigation revealed that Wells Fargo knowingly facilitated the opening of accounts by the Enterprises' principals for use in their fraud, all while making a conscious decision to let the fraud go unreported.

11. Wells Fargo's misconduct centered around the Community Bank, which was the largest of Wells Fargo's three business units and contributed more than half (and in some years more than three-quarters) of the Bank's revenue. The Community Bank was responsible for the everyday banking products sold to businesses such as the Enterprises in this case.

12. Commenting on the widespread nature of Wells Fargo's misconduct in the Community Bank, the Office of the Comptroller of the Currency (the "OCC"), the federal bank regulator which ensures safe and sound banking, found that: "To the extent [Wells Fargo] did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank." OCC Notice of Charges ¶ 6. Consistent with this finding, the Receiver's investigation has led him to conclude that Wells Fargo intentionally designed and maintained controls which served to conceal—rather than unmask—its customers' illegal activities, which Wells Fargo was actively facilitating.

13. Wells Fargo knowingly assisted the operators of the Apex and Triangle Enterprises, including by, among other things: (i) authorizing or allowing the use of atypical banking procedures to assist the Enterprises in their frauds, (ii) counseling the Enterprises on how to set up deceptive bank accounts with straw owners, which enabled them to hide the fraud, (iii) accepting deposits obtained

---

5

Case No. _____
RECEIVER'S COMPLAINT

1  through the fraud, and (iv) authorizing suspicious inter-company transfers that
2  enabled the wrongdoers to secrete the proceeds of their fraud, including in
3  accounts located outside of the United States.

4      14.    Wells Fargo has admitted wrongdoing and paid substantial fines and
5  restitution for one consequence of its illegal sales culture, namely, the creation of
6  fraudulent accounts in customers' names, opened without their consent. But the
7  Receiver's investigation revealed that there were other, previously unidentified
8  consequences of Wells Fargo's sales culture and its actions here: in this case, the
9  consequences were hundreds of millions of dollars in harm, done to the thousands
10 of consumers who signed up for Apex's and Triangle's risk-free trials, and the
11 resulting liability of the Receivership Entities to make the defrauded consumers
12 whole.  To date, Wells Fargo has never compensated this newly-identified category
13 of victims, including the Receivership Entities, that were harmed by Wells Fargo's
14 sales culture and the resulting conduct that aided these fraudulent businesses.

15     15.    The Receiver is therefore seeking to recover damages for the harm
16 proximately caused to the Apex and Triangle Receivership Entities by Wells
17 Fargo, including, but not limited to: (i) the Receivership Entities' legal obligations
18 to satisfy the FTC judgments, which were premised on misconduct that could not
19 have occurred but for Wells Fargo's assistance, (ii) the fees charged by Wells
20 Fargo in connection with their account services, (iii) the account funds which were
21 improperly transferred out of the Receivership Entities' accounts by Wells Fargo at
22 the direction of the Enterprises' principals, and (iv) the costs of defending the
23 actions by the FTC (including the resulting Receiverships).

24 **II.**    **PRIOR FEDERAL TRADE COMMISSION PROCEEDINGS AND**
25         **THE APPOINTMENTS OF THE RECEIVER**

26     16.    In June 2018 and November 2018, the FTC brought separate lawsuits
27 in the Southern and Central Districts of California against Triangle Media
28 Corporation and Apex Capital Group, LLC and their related entities (the

"*Triangle*" and "*Apex*" actions), respectively, each of which was operating deceptive online risk-free trial offer schemes in violation of consumer protection statutes.   The FTC sued to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten gains, and other equitable relief. The FTC filed amended complaints in December 2018 and May 2019 in the Triangle and Apex actions, respectively.

### A.    The *Apex* Action

17.    Plaintiff is the Court-appointed Receiver in the *Apex* action: *Federal Trade Commission v. Apex Capital Group, LLC, et al.,* Case No. 2:18-cv-09573-JFW *(JPRx)* (C.D. Cal.).    The Apex Preliminary Injunctions (the "Apex PIs," *id.*, ECF Nos. 40 (Peikos) and 41 (Barnett)) direct the Receiver to preserve the value of the assets of the Receivership Estate and authorize the Receiver to institute actions to preserve or recover those assets.  *See id.*, ECF Nos. 40, 41 at 19-23.

18.    Receivership Entities subject to the *Apex* action are expressly defined to include the following: the Corporate Defendants,[5] the Wyoming Related Companies,[6] and the U.K. Related Companies.[7]  Apex PIs at 7, Definition K.  In addition, the term "Receivership Entities" is defined to include "any other entity that has conducted any business related to Defendants' marketing or sale of

---

[5] The Corporate Defendants include: Apex Capital Group, LLC; Capstone Capital Solutions Limited; Clik Trix Limited; Empire Partners Limited; Interzoom Capital Limited; Lead Blast Limited; Mountain Venture Solutions Limited; Nutra Global Limited; Omni Group Limited; Rendezvous IT Limited; Sky Blue Media Limited; and Tactic Solutions Limited; and each of their subsidiaries, affiliates, successors, and assigns.  Apex PIs at 6, Definition C.

[6] The Wyoming Related Companies include entities formed in Wyoming by Defendants, in the names of nominees, for the sole purpose of fronting merchant accounts.  They are identified in Exhibit A to the *Apex* action Complaint.

[7] The U.K. Related Companies include entities formed in the U.K. by Defendants, in the names of nominees, to front merchant accounts.  They are identified in Exhibit B to the *Apex* action Complaint.

---

products with a Negative Option Feature, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant." *Id*. To date, the Receiver has determined that multiple additional entities qualify as Receivership Entities under this definition.[8] These entities are collectively referred to herein as the "Apex Enterprise."

19. As alleged in the *Apex* Complaint, Philip Peikos ("Peikos") and his one-time partner, David Barnett ("Barnett), and their agents ran an online "free trial" subscription scam through the Apex Enterprise. Peikos was the Chief Executive Officer and co-owner of Apex. At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Apex Enterprise.

20. Barnett was the Chief Operating Officer of the Apex Enterprise. He was a co-owner of the Apex Enterprise until at least late 2017, when he transferred his shares to Peikos. At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Apex Enterprise.

21. On September 11, 2019, the FTC and the *Apex* defendants stipulated to the entry of Orders for Permanent Injunctions (barring them from their illegal conduct) and Monetary Judgments resolving all matters in dispute between them.

**B. The *Triangle* Action**

22. Plaintiff is also the Court-appointed Receiver in the *Triangle* action:

---

[8] These include five nominee entities formed by Defendants for the purpose of opening new merchant accounts to conduct business inextricably related to the *FTC v. Apex* defendants' sale of products with a Negative Option Feature: Albright Solutions LLC ("Albright"); Asus Capital Solutions LLC ("Asus Capital"); Element Media Group LLC ("Element"); NextLevel Solutions LLC ("NextLevel"); and Vortex Media Group LLC ("Vortex").

Case No. _____
RECEIVER'S COMPLAINT

*FTC v. Triangle Media Corporation, et al,* 3:18-cv-01388 (LAB-LL) (S.D. Cal.).[9] The Temporary Restraining Order (the "Triangle Order," *id.*, ECF No. 11) which first appointed the Receiver directs the Receiver to preserve the value of the assets of the Receivership Estate and authorizes the Receiver to institute actions to preserve or recover those assets. *See id.* at 18-19.

23.     Receivership Entities subject to the Triangle Receivership are expressly defined to include Corporate Defendants Triangle Media Corporation ("Triangle"), Hardwire Interactive Inc. ("Hardwire"), and Jasper Rain Marketing LLC ("Jasper Rain"), and their respective dbas.[10] Triangle Order at 8, Definition N.  Receivership Entities also include "any other entity that has conducted any business related to Defendants' marketing of negative option offers, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant."[11] These Entities are collectively referred to herein as the "Triangle Enterprise."

24.     Brian Phillips ("Phillips") and his agents operated the Triangle online "free trial" subscription scam.  During the relevant period, Phillips was an owner and officer of the Triangle Enterprise.  At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the

---

[9] In the *Triangle* Complaint, the Corporate Defendants are defined as:  Triangle Media Corporation also doing business as Triangle CRM, Phenom Health, Beauty and Truth, and E-Cigs; Jasper Rain Marketing LLC also doing business as, and each of their subsidiaries, affiliates, successors, and assigns. The Individual Defendant is Brian Phillips.

[10] These dbas include Cranium Power, Phenom Health, Beauty and Truth, and E-Cigs.

[11] The Receiver has determined that additional entities fall within this definition of Triangle-related Receivership Entities: (1) Global Northern Trading Ltd. ("Global Northern"), a Canadian corporation as to which Triangle transferred more than $44 million during the period 2013-2018; and (2) the nominee entities formed and controlled by Phillips but deliberately placed in the names of nominees.

authority to control, or participated in the acts and practices of the Triangle Enterprise.

25.    During the relevant period, Devin Keer ("Keer") was also an owner and officer of the Triangle Enterprise.  At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control or participated in the acts and practices of the Triangle Enterprise.

26.    On May 30, 2019, the FTC and the *Triangle* defendants stipulated to the entry of Orders for Permanent Injunctions (barring them from their illegal conduct) and Monetary Judgments resolving all matters in dispute between them.

**C.    The Receiver's Investigation of Wells Fargo and Discovery of Wells Fargo's Wrongful Conduct.**

27.    After conducting his initial investigations, the Receiver filed preliminary reports as to his conclusions in each of the Triangle and Apex FTC actions.  In both cases, the Receiver determined that the businesses could not continue to be operated lawfully and profitably.

28.    Based on initial and subsequent reviews of internal Apex and Triangle emails and bank records, the Receiver's investigation revealed that Wells Fargo was aiding and abetting both Enterprises by providing similar atypical banking services, as detailed herein, in furtherance of the frauds.

29.    During the investigation, the Receiver issued subpoenas to Wells Fargo regarding their relationships with the Apex and Triangle Enterprises.    In response, Wells Fargo made incomplete productions.  On information and belief, numerous internal bank records, including electronic documents and internal communications, still exist regarding the Apex and Triangle Enterprises, as Wells Fargo was obligated under applicable banking regulations and laws to maintain such records.

30.    In late October 2019 and January 2020, the Receiver filed motions in

the *Triangle* and *Apex* actions, respectively, advising the Courts that he wished to retain counsel to pursue claims against Wells Fargo on behalf of the Receivership Entities. In the *Triangle* action, on November 19, 2019, Judge Burns ruled that "the Court finds good cause exists to grant the Receiver's motion to (1) extend the receivership for the sole purpose of pursuing litigation against Wells Fargo, (2) permit the Receiver to retain contingency counsel, and (3) administratively close the case while that litigation is pursued." In the *Apex* action, on March 9, 2020, Judge Walter similarly permitted the Receiver to retain contingency counsel to pursue claims against Wells Fargo.

## III. PARTIES

31. Plaintiff Thomas W. McNamara is the Court-appointed Receiver of the Triangle and Apex Entities. Triangle's principal place of business was 1350 Columbia Street, San Diego, California 92101 until May 17, 2018, when it filed paperwork with the California Secretary of State changing its principal place of business to Tampa, Florida, though the center of operations remained in San Diego. Apex was a Wyoming limited liability company which had business addresses in Westlake Village, California; Jackson, Wyoming; Beverly Hills, CA; and Woodland Hills, CA, though it was always, to the Receiver's knowledge, operated out of California during the Relevant Period.

32. Defendant Wells Fargo & Company is a nationwide, diversified, financial services company. Upon information and belief, its corporate headquarters are located in San Francisco, California. Defendant Wells Fargo & Company is the parent company of Wells Fargo Bank, N.A.

33. Defendant Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States. Upon information and belief, its corporate headquarters are located in South Dakota. It maintains multiple offices in the State of California and the Southern District of California for the purposes of maintaining checking, savings, business, and merchant accounts, and engaging in

1    other business activities.

2    34.    The Defendants are collectively referred to herein as "Wells Fargo,"

3    the "Bank," or "Defendants."

4    **IV.    JURISDICTION AND VENUE**

5    35.    This Court has jurisdiction over this matter under 28 U.S.C. § 754, 28

6    U.S.C. § 1345, and 28 U.S.C. § 1367(a), and the doctrines of supplemental and

7    ancillary jurisdiction.  *See S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir.

8    2004) ("[T]he receiver's complaint was brought to accomplish the objectives of the

9    Receivership Order and was thus ancillary to the court's exclusive jurisdiction over

10   the receivership estate").

11   36.    Venue in the Southern District of California is proper pursuant to 28

12   U.S.C. § 1391, because the *Triangle* Court retained jurisdiction of this matter for

13   all purposes and appointed the Permanent Receiver in the Southern District of

14   California on August 24, 2018,  and because this proceeding is supplemental to

15   *FTC v. Triangle.  See Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 n.6 (6th

16   Cir. 1981) ("[W]here jurisdiction is ancillary, the post-jurisdictional consideration

17   of venue is ancillary as well."), and because the *Triangle* action was initiated prior

18   to the filing of the *Apex* action in the Central District of California.

19   37.    The Court may exercise personal jurisdiction over the Defendants

20   pursuant to 28 U.S.C. § 1692 because the funds sought to be recovered are assets

21   of the Receivership Entities under the Court's Orders issued in the *Triangle* and

22   *Apex* actions.

23   38.    This Court also has personal jurisdiction over Defendants named in

24   this Complaint because Wells Fargo conducted business in California and it

25   participated in California-based fraudulent schemes that injured Californians.

26   Venue is also proper in this District because the conduct at issue took place and

27   had an effect in this District and Wells Fargo regularly conducted and still

28   regularly conducts substantial banking business in this District.  Defendants have

sufficient minimum contacts with the Southern District of California arising from the specific conduct committed in or directed to the Southern District of California.

## V. WELLS FARGO'S UNATTAINABLE SALES GOALS AND HIGH-PRESSURE SALES CULTURE DROVE ITS BANKERS TO PARTICIPATE IN THE ENTERPRISES' FRAUDS

39. During the Relevant Period, Wells Fargo engaged in rampant sales misconduct from the top down. That misconduct has been repeatedly confirmed by multiple regulators, hearings, and lawsuits. In September 2016, the CFPB imposed a fine of $100 million against Wells Fargo for opening more than two million new accounts not requested by customers in order to generate illicit fees. The company also paid $35 million to the Office of the Comptroller of the Currency and $50 million to the City and County of Los Angeles.

40. Despite signing consent orders with the CFPB and OCC, in 2018, those same two agencies fined Wells Fargo again (this time for *one billion* dollars) for selling unnecessary products to customers and for engaging in other improper practices. Later, in February 2020, Wells Fargo agreed to pay *three billion* dollars to resolve federal civil and criminal investigations into the consumer account scandal; the settlement of those matters included a deferred prosecution agreement.

41. Wells Fargo's sales misconduct began at least as early as 2002. At that time, the Bank's internal investigations unit noticed an increase in "sales integrity" cases. According to Wells Fargo's employees, sales goals were impossible to meet, and incentives for compensation and ongoing employment necessitated "gaming" the system. Gradually, "gaming," which was defined in the Wells Fargo Code of Ethics as "the manipulation and/or misrepresentation of sales or referrals . . . in an attempt to receive compensation or to meet sales goals," became commonplace.

42. To meet company sales quotas, employees opened accounts and credit lines, ordered credit cards without their customers' permission, and forged client

signatures on paperwork.  Some employees urged family members to open ghost accounts.

43.     Between 2011 and 2015, Wells Fargo employees opened more than 1.5 million deposit accounts and more than 565,000 credit card accounts that may not have been authorized.  On a per-employee basis, the reports of sales-related misconduct tripled from the second quarter of 2007 through the fourth quarter of 2013.

44.     Despite Wells Fargo's payment of a combined $185 million penalty to the OCC, CFPB, and the City and County of Los Angeles in 2016 to settle charges related to consumer account fraud, the next year in an August 4, 2017 quarterly 10-Q filing, Wells Fargo said it had expanded the period targeted for review (previously 2011 through 2015) to 2009 through 2016 and disclosed that the expansion of the review period could reveal a "significant increase" in unauthorized accounts.

45.     On January 23, 2020, the OCC brought additional charges against several Wells Fargo executives for allowing long-term sales misconduct.  As the OCC put it:

> **The Bank tolerated pervasive sales practices misconduct as an acceptable side effect of the Community Bank's profitable sales model**, and declined to implement effective controls to catch systemic misconduct.  Instead, to avoid upsetting a financially profitable business model, senior executives…turned a blind eye to illegal and improper conduct across the entire Community Bank….**To the extent the Bank did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank**.  In short, Bank senior executives favored profits and other market rewards over taking action to stop the systemic issuance of unauthorized products and services to customers.

(Emphasis added).

46.     In 2020, Wells Fargo also entered into a Deferred Prosecution Agreement ("DPA") with the United States Attorney's Offices for the Central District of California and the Western District of North Carolina that included a

"Statement of Facts" in which Wells Fargo "admitted, accepted, acknowledged as true" (among other things) that "[d]espite [having] knowledge of the widespread sales practices problems" as early as 2002 and through 2016, "Community Bank senior leadership failed to take sufficient action to prevent and reduce the incidence of unlawful and unethical sales practices." According to the DPA, Wells Fargo was alerted to the fraud by "Wells Fargo's internal investigations unit, the Community Bank's own internal sales quality oversight unit, and managers leading the Community Bank's geographic regions, as well as regular complaints by lower-level employees and Wells Fargo customers reporting serious sales practices violations."

47. In the wake of Wells Fargo's consumer account scandal, the federal bank regulators, the OCC and the Federal Reserve, initiated a multi-phase "Sales Practices and Incentive Compensation Horizontal Review,"[12] with the goals including to determine whether *other* banks doing the very same things that Wells Fargo did. After conducting its investigation, the regulators OCC concluded in 2017 that Wells Fargo was unique in terms of its sales culture, which prompted employees to open unauthorized, and even fraudulent, accounts in order to meet daily new account goals and keep their jobs. The banking regulators' review confirmed that Wells Fargo's banking peers, unlike Wells Fargo, had taken seriously the significant compliance risks caused by an overly aggressive sales culture and lax oversight of branches.

48. In other words, Wells Fargo's misconduct was not the norm within the industry and was tethered to Wells Fargo's uniquely toxic sales culture. That same culture is at issue here but in an entirely different context, and one that was only discovered after the Receiver was appointed. Here, Wells Fargo's corporate focus

---

[12] That review initially covered all large national banks, like Wells Fargo, and later significant regional banks.

on the opening of new accounts at any cost resulted in the Bank opening *roughly one hundred and fifty bank accounts for shell companies across the Apex and Triangle frauds*—accounts which Apex and Triangle's principals required to secure merchant payment processing services (leaning on Wells Fargo's imprimatur and reference letters to convince the processors of the accounts' legitimacy) and then used to launder the proceeds from their consumer frauds.

## VI. WELLS FARGO'S CREATION AND MAINTENANCE OF BANK ACCOUNTS FOR DECEPTIVE SHELL COMPANIES WERE ESSENTIAL TO THE FRAUDS

49. The Apex and Triangle frauds were simple in concept: bait consumers with deceptive internet ads offering "risk-free" trials for only the cost of shipping, and then use the consumers' billing information to charge for the product and impose a monthly continuity charge. Make it impossible to cancel. These schemes defrauded consumers of hundreds of millions of dollars.

50. Simple as it was, the con was effective. Consumers would be offered a full month's supply of a featured product and, at the time of the initial order, would only pay the nominal cost for the shipping and handling of the product. But if the consumer did not cancel the order and return the unused portion of the product within a short period of time (often, fourteen calendar days), the Triangle and Apex Enterprises would automatically charge the consumer's card for the full price of the product (usually around $87 or $89). The consumer would also be enrolled in an auto-ship program when signing up for the "risk-free" trial offer—meaning that unless the subscription was affirmatively canceled, the consumer was automatically charged monthly for additional product.

51. Both the Apex and Triangle schemes required access to a steady stream of new bank accounts to function. As such, Wells Fargo and the Enterprises' objectives were aligned: the Enterprises needed new bank accounts on a regular basis, and Wells Fargo was constantly pressuring its sales employees to

open more bank accounts. As a result, the Enterprises, the individuals behind them, and the bank developed a symbiotic relationship. Without Wells Fargo's assistance, the Enterprises' frauds could not have survived (let alone thrived) for as long as they did.

**A.     The Payment Processing System and Credit Card Laundering**

52.     In order to charge consumers' credit or debit cards, the Triangle and Apex Enterprises (the "merchants") needed to establish an account with a merchant processor. Merchant processors have access to credit card associations ("card networks") like MasterCard and VISA and thereby enable merchants to charge consumers' credit cards.

53.     Card networks require all participants within their networks to comply with detailed rules, including screening processes and underwriting standards for merchants. These rules are put in place (1) to ensure that the merchants whose purchases are being processed are legitimate, bona fide businesses, and (2) to screen out merchants engaged in potentially fraudulent or illegal practices. The rules also prohibit "credit card laundering," which encompasses the practice of processing card charges through the merchant accounts of shell companies like those used by the Enterprises.

54.     Merchants who pose a heightened risk of fraud to the card networks are subject to closer scrutiny by their merchant processors and may have their access to the card networks capped or terminated altogether.

55.     One sign of potential illicit activity by a merchant is the generation of an excessive number of transactions which have to be refunded to consumers ("chargebacks").

56.     Consumers initiate "chargebacks" when they dispute card charges (most often because of fraud or unauthorized use) by contacting their "issuing bank," which is the bank that issued the credit card to the consumer. When a consumer successfully disputes the charge, the consumer's issuing bank credits the

consumer's card for the disputed amount, and then recovers the chargeback amount from the merchant processor. The merchant processor, in turn, collects the chargeback amount from the bank account of its merchant client. In this case, merchant processors would seek to collect chargebacks from the Enterprises' Wells Fargo accounts.

57. In order to detect and prevent illegal, fraudulent, or unauthorized merchant activity, the card networks operate various chargeback monitoring and fraud monitoring programs. These chargeback monitoring programs are designed to flag merchant accounts with excessive chargeback ratios or an excessive number of chargebacks. For example, if a merchant account has chargeback levels that exceed the thresholds set by VISA's chargeback monitoring program, the merchant is subject to additional monitoring requirements and, in some cases, penalties, and termination.

58. Credit card laundering is commonly used by merchants who cannot meet a merchant processor's underwriting criteria or who cannot obtain merchant accounts under their own names (whether because of a prior history of excessive chargebacks, complaints, use of sales or industry practices prohibited by merchant processors, or other signs of illegal activity). To conceal their identities, merchants which are engaged in fraud will often create shell companies to act as fronts, and apply for merchant accounts under the names of these shell companies. Once the shell merchant accounts are approved, the fraudulent merchants then launder their own transactions through the shell companies' merchant accounts. This allows the merchants to circumvent card associations' onboarding and monitoring programs and avoid detection by consumers and law enforcement.

59. When a merchant is terminated, or if it has a high-risk account or excessive chargebacks, its name (and that of the merchant's owner) is put on a blacklist, which is often referred to as the "MATCH" list ("Merchant Alert To Control High-Risk"), as a terminated merchant file ("TMF"). Other reasons for

---

18     Case No. _____
RECEIVER'S COMPLAINT

being listed as a terminated merchant file include merchant collusion, fraud, and money laundering. Merchant processors use the MATCH list to screen potential merchant clients, and merchants on the list are often unable to open an account with a new merchant processor.

60. For credit card laundering to be effective long-term and on a large scale, then, a merchant needs access to a ready supply of merchant processing accounts, so that the merchants can move sales from one shell company to a newly-created shell company once the profits have been reaped and the chargeback rates or other "red flags" have attracted attention. An absolute prerequisite to a merchant processing account is a bank account in a shell company's name. Luckily for Apex and Triangle (and unluckily for consumers), Wells Fargo was more than happy to provide the latter.

**B.      Apex and Triangle's (Mis)Use of the Credit Card Processing System**

61. Entities associated with the Triangle and Apex Enterprises showed up again and again on the MATCH list during the Relevant Period, because they were flagged as high risk and/or routinely had high card chargebacks.

62. The average chargeback rate in the United States is 0.2% of the transaction rate and a chargeback rate greater than 1% is considered excessive. The Triangle and Apex Entities' chargeback rates were astronomical, with both and averaging over 20% on a monthly basis, with some months having chargeback rates of 70% or higher. The merchant processors would typically cancel accounts when chargebacks exceeded 3% of sales—a regular occurrence for the Apex and Triangle Entities.

63. Merchant processors would not deal with repeat offenders like the Apex and Triangle principals. To get around the merchant processors' restrictions, Apex and Triangle's owners hid their connection to the fraudulent businesses (and the high chargeback rates that they generated) by creating phony shell companies.

64.     The Apex and Triangle Enterprises used a host of straw owners (which they sometimes referred to as "fronts" or "nominees" or "signors") to act as the "owners" of the shell companies.  These straw owners were individuals who would act as the "front" for a shell company, often in exchange for a payment of about $500 per month, typically.  The Enterprises would orchestrate the formation of the shell companies, the opening of the necessary Wells Fargo bank accounts, and the completion of applications for merchant processing in the shell companies' names.  When the merchant processor inevitably terminated processing for a shell company (typically due to excessive chargebacks), the Apex and Triangle Enterprises would use a new nominee to form another shell company and restart the whole process.  Rinse and repeat.

65.     For the scheme to work, the shell companies needed to be able to establish depository accounts with an actual bank.  Without bank accounts, merchant processing could not be acquired, and without bank accounts, the shell companies would have nowhere to transfer the funds they took from consumers.

66.     Enter Wells Fargo.  Wells Fargo's employees gladly helped the Enterprises set up bank accounts for the shell companies and readily provided them with bank reference letters, which the shell companies often needed to secure merchant processing services.  Merchant processors would never have provided merchant processing for the shell companies had they known the identity of the entities' true owners (Apex and Triangle's principals).

67.     When merchant processors charged consumers' cards for Apex or Triangle products, the transactions were processed through accounts secured in the names of the shell companies.  The consumer payments would then be sent to accounts at Wells Fargo, which nominally belonged to the shell companies but which were actually controlled by the owners of the Apex and Triangle Enterprises.  As discussed below, Wells Fargo was well aware of the shell companies' true ownership yet continued to assist the Enterprises in their creation

of shell bank accounts needed to perpetrate and conceal their fraud.

68.    From at least 2014 through 2018 for the Apex Enterprise, and 2009 through 2018 for the Triangle Enterprise, Wells Fargo provided vital access to the enable the Enterprises to open approximately 150 Apex and Triangle shell bank accounts to accept fraudulently-obtained payments from consumers.  As detailed herein, Wells Fargo knew of this scheme, counseled the Enterprises' principals, and helped them hide the true ownership of the accounts.

## VII.    WELLS FARGO'S KNOWING INVOLVEMENT IN THE FRAUDS

### A.    Wells Fargo's Support of the Apex Enterprise

69.    Wells Fargo bankers in California regularly and repeatedly helped Apex executives advance their credit card laundering scheme in a number of ways. Wells Fargo bankers like Dominic Testa (Westlake Village Branch) developed long-term business relationships with Apex's principals: Peikos (Co-Owner), Barnett (Co-Owner), and Raul Camacho ("Camacho," Apex Chief Financial Officer).  Testa and other Wells Fargo bankers were able to keep—and grow—the Bank's business with Apex because Wells Fargo was willing to wade into the muck in ways that other banks would not.

70.    As early as 2014, Wells Fargo was helping Apex executives to open, and also close, accounts for dozens and dozens of shell companies owned and controlled by Apex owners Peikos and Barnett.  Wells Fargo, and in particular banker Testa, knew that Peikos and Barnett were using these shell companies to run high-risk internet sales operations that bilked consumers out of millions of dollars.  At the same time, Wells Fargo had visibility into the high number of chargeback refunds that were being withdrawn from the shell companies' Wells Fargo accounts to repay the alarmingly high proportion of consumers who disputed the charges.

71.    By early 2015, Apex employee Camacho was Testa's primary Apex contact point.  Camacho was also often listed as the "owner" of the Wells Fargo

accounts Testa opened for the shell companies, although Testa was acutely aware that Peikos and Barnett were the true owners of Apex and the shell company bank accounts – and Camacho took directions from them. Testa, and other Wells Fargo bankers, also readily provided prized anonymous bank reference letters for the shell company accounts, which Apex then used to support merchant processing applications by the shell companies. Without Wells Fargo's imprimatur, these shell companies would not have been able to secure the essential merchant processing accounts. Further, without Wells Fargo's continually providing atypical bank services for Apex-related shell companies in a host of ways, the Apex fraudulent enterprise would not have been able to exist.

72. The Apex Enterprise generated millions of dollars in revenues— money that left the shell companies' accounts almost as soon as it hit them. Those funds went straight into the laundering chute, where Peikos and Barnett used the Wells Fargo accounts to clean the money, transferring the funds into external personal and third-party accounts to which they had access.

73. The success of Apex's fraudulent scheme was by no means inevitable. Wells Fargo in particular was in a rare position to stop the fraud very early on. Moreover, it had an obligation to do so pursuant to a host of banking regulations and laws. But it never did.

74. Instead, Wells Fargo actively assisted the Apex Enterprise by establishing dozens (upon dozens) of bank accounts for the Enterprises' shell companies, providing the corresponding bank reference letters for those shell companies, allowing Apex's principals to "wash" the dirty proceeds of their fraud by transferring funds through their Wells Fargo accounts, and otherwise performing atypical banking services for these fraudulent Enterprises. Through this and other conduct, coupled with their intentionally lax oversight, Wells Fargo flouted standard banking practices and in the process violated the Bank Secrecy Act, anti-money laundering ("AML") laws, and the Bank's own internal policies

and procedures as they were written; as a result, Wells Fargo's conduct caused hundreds of millions of dollars in harm to consumers and to the Receivership Entities.

75.    During the Relevant Period, the Apex principals dealt primarily with Wells Fargo bankers at a San Diego branch and at the Westlake Village Branch in the Los Angeles area, though other branches and bankers assisted the fraud. For instance, Wells Fargo's Woodland Hills office opened at least seven accounts for anonymous Wyoming LLCs that were part of the Apex Enterprise, and closed four of those accounts once the associated shell companies lost their access to merchant processing services (*i.e.*, the ability to charge consumers' credit cards).

76.    On information and belief, the Wells Fargo bankers at the San Diego Branch, the Westlake Village Branch, and the Woodland Hills Branch, just like numerous other Wells Fargo Community Bank branches during the Relevant Period, were operating under intentionally deficient bank practices and policies effected by the most senior executives at Wells Fargo. Those practices and policies featured a reckless quota system that improperly pressured and incentivized Wells Fargo employees to provide atypical banking services, bend the rules, and even commit fraud when performing what should have been routine business tasks.

(i)    The San Diego Branch

77.    In the Wells Fargo branch located at First and Market Street in downtown San Diego (the "San Diego Branch"), several bankers, often collaborating with one another as well as with Apex principals, knowingly facilitated Apex's fraud for their own—and Wells Fargo's—financial gain.

78.    Apex's relationship with the San Diego Branch began in January 2014, when on two separate days Barnett walked into the branch with formation documents for eight Wyoming LLCs and asked to open bank accounts in each LLC's name. Barnett had no history with the bank; he was a walk-in off the street.

Case No. _____
RECEIVER'S COMPLAINT

The LLC documents that Barnett presented to the branch were also suspect with numerous indicia of fraud: they were nearly identical, with each of the LLCs based in Wyoming (which allows for the creation of LLCs without identification of the principals, effectively anonymizing the entities), each having the same Wyoming mail drop as its business address, and each having been formed on the same day four months earlier.

79.     Basic (AML) training that Wells Fargo bankers should have received during the Relevant Period taught how and why anonymous LLC accounts with shared addresses (especially a shared Wyoming mail drop) are used to camouflage ownership and further frauds.  Such basic AML training alerted bankers to look for transactions with other internal accounts in order to identify undisclosed relationships.   The circumstances required that all of the Apex accounts be evaluated together with bankers looking for similarities and patterns of activity that indicate fraud.

80.     Under many banks' policies, a customer who provided the same Wyoming mail drop address for multiple applications would have had those applications further reviewed and then rejected for failing to satisfy bank customer identification requirements.  At a minimum and per industry practice, additional follow-up by Wells Fargo was required.   A bank following the requisite due diligence consistent with industry practice would not have permitted these accounts to be opened.

81.     But the Wells Fargo banker didn't ask questions.  Instead, the banker promptly completed eight identical—generic—applications for Wells Fargo accounts for the shell companies.  Each of the accounts were funded with minimal opening deposits (generally $100, which was the minimum amount necessary for the banker to get sales quota credit for opening the account), and each of the account applications projected annual gross sales of $100.

82.     Under Wells Fargo's toxic sales culture and compensation system,

Case No._____
RECEIVER'S COMPLAINT

Barnett's appearance at the Wells Fargo branch was manna from heaven for the banker and Wells Fargo. While most banks would have refused to open the accounts or at least conducted more diligence, Wells Fargo just opened the accounts. And not just eight accounts. The banker opened sixteen accounts, when, unprompted, she opened a savings account for each of the eight checking accounts Barnett had requested.

83. The savings accounts were superfluous from the customer's perspective, but they were nevertheless valuable to Wells Fargo's bankers because they counted towards the extreme sales quotas that Wells Fargo put in place. Much later, upon a request to close some accounts by Peikos, Testa confirmed that the "[savings] accounts really have no purpose and can be shut down…".

84. After his initial success in establishing the shell company accounts at Wells Fargo, Barnett returned to the same branch three more times over the next seven months (March, August and September), opening 22 more business bank accounts for 11 more anonymous Wyoming LLCs. Each of these shell company bank account applications had the same indicia of fraud as the first batch, including anonymous principals, similar deposit and anticipated revenues information, and the same Wyoming mail drop address. Each time, Wells Fargo conducted no investigation, instead rubber-stamping the new accounts. When necessary, Wells Fargo also closed accounts that Apex had burned due to egregiously high chargeback rates.

85. For these later applications, Wells Fargo had the benefit of being able to review the activity in the prior Apex shell companies' bank accounts. Across the accounts, the same pattern of activity reappeared: after millions of dollars in consumer charges were deposited into the accounts (which had projected sales of $100 on their applications), extraordinarily high chargebacks would follow. In some monthly Wells Fargo account statements, the chargeback rates for these companies exceeded 70% and 80%.

86.     Wells Fargo was fully aware that Apex was burning through shell companies, due to these high chargeback rates, which caused merchant processors to cease doing business with the shells, because Peikos and Barnett were also regularly asking Wells Fargo to close old accounts for shell companies that could no longer access merchant processing services due to their high chargeback rates.

87.     Notwithstanding numerous indicia of fraud, the rigorous Know-Your-Customer ("KYC") and AML requirements that were in place for the branch, and Wells Fargo's own internal policies and procedures that required (in theory) enhanced scrutiny of high-risk companies such as those associated with the Apex Enterprise, the San Diego Branch quickly approved every application and opened the accounts.

88.     Wells Fargo bankers at the San Diego Branch also provided reference letters which validated the shell companies' Wells Fargo accounts.  Initially, these letters were addressed to Barnett, but in May 2014, Apex's atypical banking requests to Wells Fargo grew bolder—and Wells Fargo's complicity in the fraud expanded.  Barnett asked the San Diego Branch to re-execute and re-sign *ten* reference letters for the initial Wyoming LLCs for which the branch had opened accounts; the new letters would have Barnett's name removed, making them anonymous, "Dear Company" letters.

89.     Without blinking, the San Diego Branch banker quickly re-executed the ten Wells Fargo reference letters, amending the address associated with the accounts to include just the company name, without any address and without Barnett's name.  Wells Fargo accommodated this remarkable request for anonymity without comment or question.

Case No. _____
RECEIVER'S COMPLAINT

**BEFORE:**          **AFTER:**



90.     Under these particular circumstances, and given the Bank's KYC and Enhanced Due Diligence obligations for these high-risk customers, acceding to specific requests to omit this same owner's name from all ten of the reference letters previously issued for supposedly separate anonymous LLCs deviated from accepted banking practice. While providing bank reference letters can be appropriate in other instances, the circumstances here made it clear to Wells Fargo that there were heightened risks that the bank reference letters would be misused. This should have set off alarm bells. It did not.

91.     That is especially the case, because of Apex's choice of the so-called "anonymous LLCs" from Wyoming as its preferred corporate form. As Wells Fargo knew, using anonymous LLCs created a high risk for financial crime that, from the outset, should have resulted in a higher level of scrutiny by Wells employees of both the accounts and their related individuals. Wells Fargo should not only have categorized these accounts as high risk, requiring enhanced due diligence prior to opening the account, but going forward, Wells Fargo should also have treated these supposedly separate shell accounts with enhanced monitoring as

1   a family of accounts from a risk compliance perspective.

2       92.    Globally-recognized account opening and oversight standards in place

3   for decades have classified anonymous LLCs entities as "high risk" entities and

4   warned that these entities are one of the most widely used vehicles in laundering of

5   the proceeds of crime, corruption, and other malfeasance.  Therefore, Wells Fargo

6   was required to conduct due diligence sufficient to establish the true beneficial

7   owners of LLCs before allowing them access to bank accounts—and were further

8   required to document the results of that diligence correctly in the bank's files in

9   order to assist the bank in its future monitoring endeavors.

10      93.    In light of the increased risks created from the outset, Barnett's

11  specific request to reissue generic no-name letters to 10 related anonymous LLCs

12  was highly suggestive of credit card laundering by Apex.  As the Bank knew, Apex

13  could easily conceal the identities of its blacklisted owners from merchant

14  processors by submitting applications in straw owners' name that were supported

15  by the essential no-name reference letters from Wells Fargo.  And that's exactly

16  what Apex did.

17      94.    The most basic compliance training would have taught these bankers

18  that such tactics were highly suggestive of card laundering or some other nefarious

19  activity.  This means one of two things is true: either Wells Fargo's high-pressure

20  sales culture made it clear that identifying and stopping fraud was secondary to the

21  Bank's profit motive, or Wells Fargo's training and oversight were intentionally

22  designed to be so deficient that its employees were clueless as to the most obvious

23  signs of fraud.

24      95.    In August 2014, Barnett was back and opened ten more Wyoming

25  LLC shell company accounts at the San Diego Branch (this time with a different

26  banker), and he requested and received ten more no-name reference letters.  Like

27  the banker before her, the banker wrote and executed anonymous reference letters

28  for the shell companies: they did not identify the accounts owners or include any

other identifying information, e.g., company addresses. Rather than take any of the steps required by a bank when undertaking typical due diligence for new customers, multiple bankers at Wells Fargo's San Diego Branch instead continued to process identical business account applications. These bankers did so, because at Wells Fargo, opening these bank accounts was not only profitable for the Bank, but was also personally beneficial to Wells Fargo's employees, who were acting under corporate edicts to meet daily account opening goals.

96. Despite the fact the initial shell companies accounts were established in January 2014 with a $100 deposit and minimal ($100) projected annual sales, deposit activity in the accounts was immediate, dramatic and inconsistent with the account applications. Millions of dollars began to flow through the accounts almost at once.

97. In the month of February, these Wells Fargo Apex accounts took in $810,000 in consumer credit card payments from Apex's high-risk merchant processors. From February to December 2014, the Apex Wells Fargo accounts took in a whopping $12,300,000 in consumer credit card payments forwarded by merchant processors.[13] The vast difference between the expected and actual account activity was obvious to Wells Fargo and a huge red flag, which a bank following standard industry practice was required to investigate.

98. Within a short time, the shell company bank accounts also began to suffer staggering merchant chargebacks and refunds. As a group, the Apex shell company bank accounts at Wells Fargo suffered more than 22% in chargebacks/refunds in 2014 through mid-2015. To put these numbers into perspective, a 1% chargeback rate is considered excessive and grounds to terminate a merchant's account with a merchant processor.

---

[13] This number is based only on information presently available to the Receiver, and is expected to grow when complete monthly account statements are received in discovery.

Case No. _____
RECEIVER'S COMPLAINT

99.     In some months, the chargeback rate was much higher.  As just one example, the August 2014 statement for an Apex shell company named "Bold Media" reflects a chargeback rate of 78% for the month.

100.   And the immense chargeback activity was obvious to Wells Fargo, on a monthly basis, given that the monthly account statements for all of the shell companies similarly reflected pages of chargebacks.  As the below example makes clear, the shell accounts' Wells Fargo monthly statements specifically identify the chargebacks in the "Withdrawals/Debits" column – often in the very same amounts again and again, for example, $87.67 and 97.88 (or multiplies thereof), as consumer after consumer requested chargebacks on their credit cards.

Account number: ████2051 ■ November 1, 2014 - November 30, 2014 ■ Page 9 of 11

WELLS FARGO

## Transaction history (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|-------|-------------|----------|--------|---------|
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.88 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.88 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 97.88 | |
| 11/25 | | Bkcd Processing Bkcd Depsit 20 411 272400398512 Lion Capital LLC | | 145.69 | |
| 11/25 | | Bkcd Processing Bkcd Depsit 20 411 272400398421 Lion Capital LLC | | 592.23 | 721.29 |
| 11/26 | | Bkcd Processing Bkcd Depsit 20 411 272400398512 Lion Capital LLC | 172.73 | | |
| 11/26 | | Bkcd Processing Bkcd Depsit 20 411 272400398512 Lion Capital LLC | 395.29 | | |
| 11/26 | | Bkcd Processing Bkcd Depsit 20 411 272400398512 Lion Capital LLC | 552.80 | | |
| 11/26 | | Bkcd Processing Bkcd Depsit 20 411 272400398405 Lion Capital LLC | 1,559.51 | | |
| 11/26 | | Humboldt MS Deposit 141125 8 7201693883 Healthy Choice Savings | | 39.95 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 73.41 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 73.41 | |
| 11/26 | | Bkcd Processing Bkcd Crgbik 20 411 272400398512 Lion Capital LLC | | 82.72 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbik 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398421 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 97.88 | |
| 11/26 | | Humboldt MS Deposit 141125 8 7201693981 8446072489 Dermanique | | 195.76 | |
| 11/26 | | Humboldt MS Deposit 141125 8 7201693889 8446317914 Dermanique | | 195.76 | |
| 11/26 | | Bkcd Processing Bkcd Depsit 20 411 272400398421 Lion Capital LLC | | 257.05 | 1,568.02 |
| 11/26 | | Bkcd Processing Bkcd Depsit 20 411 272400398405 Lion Capital LLC | 39.19 | | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 411 272400398512 Lion Capital LLC | | 87.67 | |

31

Case No. _____

RECEIVER'S COMPLAINT

101. Of course, Wells Fargo also knew about these excessive chargebacks, because Wells Fargo's very own customers, using credit cards issued by Wells Fargo, were among the many Apex customers requesting such chargebacks on their credit cards. Wells Fargo's own customers even made consumer complaints about the "risk-free" trial schemes to the Better Business Bureau.

102. Wells Fargo deliberately overlooked this early and obvious aberrational activity in the Apex shell company accounts. Had even minimal investigation under standard banking procedures been conducted, with such obvious red flags – as Wells Fargo was required to do – the consumer losses could have been staunched almost immediately. Wells Fargo took a different path instead.

103. As described further below, Barnett's role as Apex's primary bank contact and shell company account opener transitioned to Apex co-owner Peikos in 2015 and Apex employee Camacho at the direction of Peikos.

(ii) <u>The Westlake Village Branch</u>

104. In April of 2015, the initial Apex shell company accounts that Barnett had established in 2014 had been open for fifteen months; most were inactive after having received (and then having transferred out) millions of dollars of consumer funds, even accounting for staggering consumer chargebacks. These chargebacks, which ran through the Wells Fargo accounts, had resulted in nearly all of the shell companies being terminated by their merchant processors. In spite of all this, Wells Fargo was still anxious to expand its business with Apex.

105. Beginning in early 2015, Apex began to use Los Angeles County Wells Fargo branches, and its principals developed relationships with the Wells Fargo bankers at a Los Angeles County office located in Westlake Village (the "Westlake Village Branch"). Like the bankers at the San Diego Branch, the Wells Fargo bankers at the Westlake Village Branch were happy to facilitate Apex's ongoing consumer fraud and card-laundering activities in exchange for a revenue

32

Case No. _____
RECEIVER'S COMPLAINT

boost and assistance hitting sales quotas—even if that meant assisting a fraud and deliberately turning a blind eye to conduct that any banker would have recognized as bearing numerous indicia of fraud.

106. David Hannig ("Hannig") was an Assistant Vice President and Sr. Business Sales Consultant for Wells Fargo Merchant Services. On information and belief, Hannig was based out of the Los Angeles area but worked regularly with a number of branches, including the Westlake Village Branch, where he held meetings with Apex personnel and Wells Fargo customers.

107. Dominic Testa ("Testa") was a Business Banking Specialist for Wells Fargo at the Westlake Village Branch. On information and belief, Hannig and Testa had a close working relationship with each other and communicated frequently about how they could expand Wells Fargo's business with and sell new bank products to the Apex Enterprise.

108. The Westlake Village Branch was located nearby Apex's office in Woodland Hills, California. Wells Fargo banker Testa, who was part of Wells Fargo's Community Bank division, was able to develop and sustain a long-term and ongoing business relationship with the Apex Enterprise. He was particularly friendly with Apex's employee and CFO, Camacho, who often referred to Testa with nicknames like "bud." As Testa knew, Camacho was simply an employee of Apex and was not the true "owner" of any account in his name. Testa knew that Camacho was taking his instructions directly from Peikos, who was the true owner and controller of Apex. Testa also knew that Camacho was only an "owner" on paper of the accounts and shell companies held in his name.

109. Testa's interactions with Peikos and Camacho made it clear from early on that Peikos was the boss. As just one example, on April 17, 2015, Testa emailed Peikos about opening "new accounts for you". Testa noted "I'm assuming you'll be using Wyoming like your other LLCs" and requested the documentation and identification of the "owner." Peikos responded that Camacho, and not Peikos,

Case No. _____
RECEIVER'S COMPLAINT

would be the "owner" of the LLCs and the bank accounts that Peikos was instructing Testa to set up: "So we are clear, [Camacho] will be the 100% owner on these accounts, and I will have access like the current ones were set up." The "current ones" Peikos was referring to were the roughly 40 shell company accounts that Barnett had opened in San Diego which were lying mostly unused at that point because they had lost access to merchant processing services as a result of their extraordinarily high consumer chargeback rates. Testa told Peikos that he would put a fee waiver on the accounts for the next three months and recommended that Peikos "[k]eep in contact with me on when they should be closed and I can do it over the phone."

110. During this same time, Hannig, in coordination with Testa, encouraged the Apex Enterprise to apply for merchant processing with Wells Fargo. Apex employee Chris Carr met with Hannig and identified shell companies and products for which Apex wanted to obtain merchant processing services.

111. Wells Fargo requires merchant account applicants to undergo an underwriting process intended to ensure the applicant is a legitimate and creditworthy business and to weed out merchants engaged in illegal conduct and required the legitimacy of the business be verified/validated. Any material discrepancies must be documented, investigated, and resolved and the source of the verification should be in the merchant file. The Bank forbid the solicitation of merchants engaged in certain unacceptable business practices because they were presumptively illegal, violated card association rules, or created excessive risk exposure for the Bank.

112. Several days after their in-person meeting, on April 21, 2015, Carr followed up with an email to Hannig containing information for two shell companies. This opened a string of emails between the two in rapid succession, with emails being exchanged often literal minutes apart. Carr wrote, "Here is some information on the corps and URLs that we wanted to lead off with . . . Please let

us know if you require additional information to Pre-fill these apps for us. We are eager to get started so as soon as you can send us the paperwork, we will turn it around with any additional documentation you require. Thanks!" Carr identified Arturo Oliveros and Julia Buenrostro as the "owners" of shell companies Alpha Group, LLC and Crest Capital LLC, respectively, both of which had the same Wyoming mail drop listed as their business address. Carr listed the shell companies' businesses as "supplement[s]" and "health plus", respectively, and included links to the companies' websites, www.virilitymuscle.com and www.evermaxbody.com.

113. Hannig reviewed the material and linked websites and quickly responded, identifying crucial and fundamental discrepancies in the information Apex provided:

Chris,

The bottom of the websites show different LLC's then what is listed below. That will need to be changed to the below listed LLC's on the websites before I can even start the process. **The people you listed below are not owners on the Wells Fargo bank account that you gave us. They must be owners of the business in order to use their name on the merchant accounts. The address also does not match up to what is on the website.** Everything needs to be matched up on the accounts or the applications won't not pass the submission process.

Thank you,

David Hannig

(Emphasis Added).

114. Carr quickly replied claiming to have corrected the issues:

David,

Thanks for your reply. The company names and addresses have been updated on the websites.

The Websites just had the product name in the footer as a placeholder until we got all of the docs in order.

***Arturo Oliveros and Julia Buenrostro are owners of the entities listed.***

1    Thanks! - Chris

2    (Emphasis added).

3    ****

4    115.  Almost immediately, Hannig again responded:

5    I see the names changed so that will work. **The bank accounts still do not**
6    **show them as owners. Coordinate with Dominic [Testa] on how to get**
7    **this updated. Here is what we have listed on the bank accounts:**



18   David Hannig
     Assistant Vice President
19   Business Sales Consultant
     Wells Fargo Merchant Services

20   (Emphasis Added).

21   116.  The irregularities Hannig identified were troubling, particularly since,

22   as Hannig knew, Apex had already opened (and in almost every case, burned

23   through) roughly 40 shell bank accounts with Wells Fargo in which millions of

24   dollars had flowed through.  Apex's excuses and scramble to alter website and

25   product information on the fly only reinforced what Hannig already knew to be

26   true: that the "owners" of the shell companies were owners in name only.

27   117.  But most troubling were the discrepancies in information regarding

28   the key issue of the beneficial ownership of these anonymous Wyoming LLCs.

                              36              Case No.
                                      RECEIVER'S COMPLAINT

The two shell companies, Alpha Group and Crest Capital, had Wells Fargo accounts opened by Apex principal Barnett a year earlier in San Diego. When he opened the accounts, Barnett claimed to be the sole owner of the companies and presented anonymous Wyoming LLC documents and the same maildrop address for these shell companies.

118. By April of 2015, when Hannig flagged the issues, the accounts had been open for 11 months and had taken in more than a quarter of a million dollars in consumer payments from merchant processor deposits. But Hannig was now being told that the account holder, Barnett, did not in fact own the shell companies – and two people (Oliveros and Buenrostro), who were not listed on those Wells Fargo bank accounts or identified in any Wells Fargo bank records, did.

119. Such information was an obvious indication that Apex was engaged in credit card laundering by listing owners on merchant account applications for an anonymous LLC, thus obscuring the identity of the true owners.

120. Apex's next response, sent just 23 minutes later, should have been even more alarming to Hannig and Testa. Rather than "updating" the information, Apex instead changed course and told Wells Fargo they had decided to use instead new anonymous Wyoming LLCs, supposedly now "owned" by Camacho, to apply for the merchant accounts. The new shell companies shared (as did every one of the Apex shell companies) the same Wyoming mail drop address.

> From: Chris Carr [mailto:chris@apexcapitalgrp.com]
> Sent: Tuesday, April 21, 2015 4:03 PM
> To: Hannig, David
> Cc: Raul A; Phillip Peikos; Testa, Dominic J
> Subject: Re: Information for New MIDs
>
> I see you are correct. Those accounts are, indeed, in David Barnett's name. **On review, we decided that we would like to run those two websites through these new corps that we just set up. They are owned by our CFO Raul Camacho**[. . . ]
>
> Raul will come in tomorrow and open bank accounts at your branch. EIN numbers are forthcoming. Websites have been updated. Sorry for all the changes. Will you be in tomorrow to help us set up the

1      accounts?

2      Thanks! - Chris

3      (Emphasis Added.)

4      121. The response of Hannig, who was specifically seeking to provide

5 *merchant banking* for Apex, was problematic. He simply suggested Apex

6 coordinate with the bank to get the ownership "updated". Notably, Hannig did not

7 copy the actual account holder, Barnett, on any of this correspondence.

8      122. Hannig's cursory review had immediately identified fundamentally

9 inconsistent information about the LLCs' ownership, the ownership of the bank

10 accounts, and discrepancies between the websites and the products which Apex

11 was hoping to sell on them. He had pointed out that the irregularities and

12 discrepancies would cause the merchant applications he wanted to present on

13 Apex's behalf to be rejected. As a merchant banker, Hannig knew that the

14 discrepancies in the owners, coupled with the use of anonymous Wyoming LLCs

15 and the pattern of burning through the LLCs' bank accounts, were indicative of

16 fraud.

17      123. Instead of doing what he should have done under standard banking

18 procedures – *e.g.*, refuse to submit the shell account's merchant processing

19 applications; ask questions and demand answers about the troubling and

20 inconsistent information being revealed; and communicate his concerns and report

21 suspicious activity through Wells Fargo's established channels — Hannig simply

22 directed Apex on how to change its paperwork, so the applications would not be

23 flagged, allowing him to potentially pad his sales numbers and the bank itself to

24 expand its banking relationship with the fraudulent Apex Enterprise.

25      124. During the years when the Apex fraud was in full bloom, on

26 information and belief, such aggressive sales tactics were rewarded within Wells

27 Fargo's misaligned compensation system. Hannig himself was recognized as a

28 Wells Fargo "Sales Star" (winning that award in 2013, 2014, 2015, 2016, and

2017), and he was also named the #1 Wells Fargo Sales Representative out of 500 employees in 2013 and 2016.

125. Hannig was not the only Wells Fargo banker to advance Apex's ongoing fraud, however. In light of Wells Fargo's pernicious sales culture and misaligned compensation system, this type of employee misconduct repeated itself again and again, across Wells Fargo bankers and branches. Indeed, as recently as January 23, 2020, the OCC recognized: "[t]he Bank tolerated pervasive sales practices misconduct as an acceptable side effect of the Community Bank's profitable sales model, and declined to implement effective controls to catch systemic misconduct. Instead, to avoid upsetting a financially profitable business model, senior executives…turned a blind eye to illegal and improper *conduct across the entire Community Bank*." (Emphasis added.)

126. Apex's last-minute pivot to the two new corporations they had "just set up" for merchant processing and which were now supposedly "owned" by Apex employee Camacho, necessitated getting new Wells Fargo bank accounts opened before the merchant account application could be completed. Testa was more than happy to oblige. When Camacho sent Testa documents for one of the new LLCs (with a Wyoming operating agreement signed that same day, April 21, 2015), Testa replied that the documents were "perfect" and the accounts were promptly opened.

127. Once the new bank accounts were opened, Apex submitted the merchant processing application to Hannig listing Camacho as the "owner" and listing the Wyoming mail drop as the address. But on April 30, 2015, Hannig informed Apex that higher-ups at Wells Fargo had rejected the application, as he had received a "decline email due to an unqualified business model for Wells Fargo. We tried, thank you for considering us."

128. In response to questions from Apex, Hannig said the application was rejected because the companies were selling supplements. In other words, despite

39

Case No. _____
RECEIVER'S COMPLAINT

Hannig's questionable efforts to obtain Wells Fargo's merchant processing services for Apex, Wells Fargo's merchant banking division had (correctly) categorized the shell companies as high-risk businesses with which they did not want a relationship. The Bank's merchant division was unwilling to take on the risk of processing for these companies, recognizing that they were in an industry rife with consumer deception, and there was the potential for high chargebacks and losses *for Wells Fargo* caused by fraudulent activity.

129. Of course, Wells Fargo was still perfectly willing to continue servicing the fraudulent LLCs at the branch level and opening bank accounts for additional shell companies, while letting *other* merchant processors (who had less insight into Apex's illegitimacy, and no insight into its obfuscated performance history and ownership legerdemain, and who would be reassured by the fact that Wells Fargo had approved them for bank accounts) take on that risk – and while allowing Apex to deceive more unsuspecting consumers (including even Wells Fargo's own credit card holders) with the lure of "free trial" products.

130. Knowing what it did, Wells Fargo was legally required to take a number of steps, including conducting a further investigation into the Apex Enterprise, evaluating patterns of misconduct and suspicious activity across the entire Apex relationship, terminating the Bank's relationship with Apex, its principals, and its associated shell companies, and/or following the Wells Fargo established procedures for reporting the suspicious activity both internally and externally.

131. Wells Fargo did none of these things. Instead, it kept doing business and looking for growth opportunities with Apex. Through Testa, Wells Fargo continued to open numerous shell company accounts for Apex. Similarly, Hannig periodically attempted to get merchant processing for Apex shell companies but was ultimately always unsuccessful.

132. In December of 2015, Camacho accidentally sent a spreadsheet of

active and pending "MID's" (merchant processing accounts) to Hannig. The spreadsheet listed more than 25 LLCs with bank accounts at Wells Fargo, along with their corresponding accounts at various merchant processors. As was the case when Hannig had identified and flagged the central issue months earlier, *the purported owners of the LLCs were not the Wells Fargo account holders.* The spreadsheet made it absolutely clear that, at a minimum, Apex was engaged in large-scale credit card laundering and was using shell companies and straw owners to secure merchant processing services—something any banker in Hannig's position would have immediately recognized, particularly because of the incident some months earlier.

133. Within minutes, Camacho recognized that he did not want that spreadsheet in the Bank's files. He wrote to Hannig, asking him to "[p]lease delete ASAP" and adding that he "would greatly appreciate if you can keep the information confidential." Camacho concluded the email by asking Hannig to confirm with him once the email had been deleted.

134. Hannig promptly replied "Deleted." On information and belief, Hannig's prompt deletion of this e-mail and attachment from Wells Fargo records violated both Bank policy and the law. As an executive at Wells Fargo, Hannig had a duty under a number of federal laws to investigate and report Apex's suspicious activities. Those obligations did not disappear just because a customer asked that Hannig delete an email.

135. The spreadsheet was not sent to Hannig in a vacuum. Both he and Testa knew exactly who this very high-risk customer was. They were all too aware of Apex's history of hiding the true owners of the anonymous shell companies they created – and they had even helped Apex to mask these beneficial ownership issues and sanitize its merchant processing application at Wells Fargo. Hannig and Testa also knew that Wells Fargo had analyzed Apex's high-risk business earlier that year and had declined to provide merchant processing services to it. In light of the

Case No. _____
RECEIVER'S COMPLAINT

above, on information and belief, the deletion of Camacho's email and failure to take steps to report the suspicious actions were deliberate efforts to aid and abet Apex's fraud.

136. Notwithstanding its knowledge of obvious fraud, Wells Fargo and the Westlake Village Branch continued to open bank accounts for Apex shell companies throughout 2015, 2016, 2017, and 2018; the new accounts only stopped when the FTC filed its lawsuit against Apex. In 2015, Camacho opened 14 more Wells Fargo accounts for 13 anonymous shell companies. In 2016, Camacho opened six accounts for six shell companies; in 2017, 19 accounts for 19 shell companies; and in 2018 12 accounts for 12 shell companies. In total, Wells Fargo opened *at least* 92 bank accounts for more than 70 shell companies over the course of just four years.

137. When opening and servicing the accounts, Wells Fargo bankers continued to provide atypical banking services, asking no questions and deliberately ignoring Apex's obvious efforts to launder money it obtained operating its high-risk, fraudulent business through anonymous shell companies fronted by straw owners.

138. The pattern was clear – and only became clearer with time: Apex, primarily through Camacho, would periodically request that Wells Fargo close existing shell companies' bank accounts after those shell companies had been blacklisted and lost their merchant processing because of the massive levels of chargebacks. At the same time, Camacho would request Wells Fargo open new shell company bank accounts—often six new bank accounts at a time—of which Camacho would be the "owner". In this way, Wells Fargo's conduct enabled Apex to cycle through the burned shell companies and their associated bank accounts before creating new, "unrelated" and anonymous LLCs to use to defraud consumers.

139. As was the case with the San Diego Branch, the Westlake Village

Branch, via Testa, was more than willing to supply no-name reference letters for the shell companies. Testa provided large tranches of reference letters, routinely issuing 6 letters, and on one occasion 12 letters, at a time. He was also willing to vary the format and information contained in the reference letters based on requests made Camacho.

140. Across multiple branches and multiple bankers, between 2014 and 2018, Wells Fargo assisted the Apex Enterprise by opening account, after account, after account, for a host of shell companies. These shell companies were "anonymous" LLCs based out of Wyoming, though true their owners were not anonymous to Wells Fargo—Wells Fargo was well aware that all of these companies and accounts were part of the Apex Enterprise, owned and controlled by Barnett and Peikos. That was clear not only based on the fact that core Apex personnel were always the ones opening the accounts, and also from the email that Camacho mistakenly sent to Hannig, which spelled out exactly what Apex was doing. Yet Wells Fargo was more than happy to keep, and even pursue, Apex's business by facilitating Apex's ongoing fraud.

**B.    Wells Fargo's Support of the Triangle Enterprise**

(i) Overview

141. At the same time that Wells Fargo was providing banking services to the Apex Enterprise, it was also providing those same services to the Triangle Enterprise, which was also running "free trial" scams out of Southern California and which was operating using a business model strikingly similar to Apex's.

142. In the case of Triangle, as with Apex, multiple Wells Fargo bankers across multiple branches developed long-term and ongoing business relationships with Triangle's owner and controller, Brian Phillips; as with Apex, these Wells Fargo bankers eagerly opened bank accounts for a host of companies that they knew were shells being used by Phillips. And as with Apex, Wells Fargo's clear-eyed support of the Triangle Enterprise resulted in millions of dollars in consumer

harm—damages which spilled over to the Receivership Entities.

143. Wells Fargo began providing services to Phillips and Triangle in at least 2009. In addition to opening and closing accounts and executing reference letters for Phillips and his shell companies, Wells Fargo also provided a host of other services, including payroll services and tax return preparation. In each instance, Wells Fargo took instructions from Phillips and provided information directly to him, understanding that he was the owner and controller of all Triangle-related accounts even though numerous others were listed as the "owners" of the accounts. Wells Fargo provided these services to Phillips and Triangle even though it knew that those services were a prerequisite for money laundering and fraudulent business activity.

144. Like Apex, the Triangle fraud relied on the use of shell companies with straw owners, which Triangle generally referred to as "nominees", to keep their fraudulent businesses running. Phillips recruited nominees to be the "owners" of the shell companies by offering them a monthly fee, such as $500 per month, for allowing Phillips to use their names and identities to establish shell companies and accompanying bank accounts at Wells Fargo. Phillips' only requirement to qualify was that the nominees not be blacklisted on the MATCH list as a previously terminated merchant.

145. Phillips then served as the conduit between Wells Fargo and each nominee in order to secure the Wells Fargo bank accounts needed to carry out the Triangle fraud. Each time, Wells Fargo rubber-stamped the applications. From there, Phillips used the corporate documents and Wells Fargo account information (along with the essential Wells Fargo reference letters) to obtain merchant processing services in the nominee's name, which allowed the Triangle Enterprise to perpetrate its "free trial" scam at consumers' expense.

146. None of this would have been possible without Wells Fargo. Each time Phillips opened a new shell account, he instructed Wells Fargo that the

Case No. _____
RECEIVER'S COMPLAINT

1-SER-173

nominee was the "100 % owner" on paper, but Phillips was always to be given immediate access and full control as a "co-signer" of the Wells Fargo bank account belonging to the supposed "100% owner." Each shell company's account opening paperwork falsely represented Phillips as a rank-and-file employee of the shell company—its supposed "Data Specialist" —a transparent effort understood by Wells Fargo to mask Phillips' true ownership of all of the shell companies. Wells Fargo always accommodated "employee" Phillips' requests, which was not in line with banking practices. As a result, Wells Fargo knew that Phillips retained the unfettered ability to transfer money from a nominee's shell account directly into the primary Triangle Enterprise account at Wells Fargo, which Wells Fargo knew was owned by Phillips.

147. The troubling pattern repeated itself, again and again, with Phillips driving all communications with Wells Fargo for the nominees. Notwithstanding known abuse of beneficial ownership for these types of high-risk businesses, and mounting evidence that Phillips was actively engaged in such abuse, Wells Fargo bankers happily opened this stream of new accounts in the names of nominees (in keeping with its sales culture prizing growth above all else). All the while Wells Fargo bankers conducted the most minimal level of due diligence, if any, on the nominee "owners", largely relying on Phillips' vouching for the new nominee "owner." Phillips himself routinely filled out the forms and gathered and submitted the signatures of the "owners" to Wells Fargo. If a Wells Fargo banker requested a cursory phone call with the "owner" before opening an account, Phillips arranged it. In the latter years of the fraud, Phillips even walked nominees into the local branches, and Wells Fargo promptly accepted the paperwork from the new "owners" before turning around to give "employee" Phillips full control as the co-signer. This arrangement benefitted Wells Fargo as well as Triangle and Phillips, because it gave Wells Fargo an easy way to open new accounts in perpetuity.

148.  After dealing with the "owners" on only the most perfunctory level at account opening, if at all, Wells Fargo then dealt thereafter with Phillips, understanding him as their customer and the actual owner of all of the accounts. At Phillips' direction, Wells Fargo regularly swept funds in the shell company accounts into Triangle's primary bank account at Wells Fargo.  Once transferred to Triangle's main account, the funds would almost immediately be sent to a Canadian company owned by Triangle, Global Northern, at a Canadian bank.  In turn, Global Northern would forward the funds to Hardwire accounts in Hong Kong or Thailand.  Hardwire would then wire money back to Triangle in the U.S. to cover expenses to complete the laundering of the funds.

149.  From the very start, Phillips and Triangle's offshore-based principal, Devin Keer relied upon Wells Fargo as the best (and perhaps only) banking option for opening scores of essential bank accounts for the shell companies.  In 2009, near the start of Triangle's implementation of its "free trial" scam, Keer, then in Canada, emailed a merchant processor to ask:

> Do you guys work with/know any corp services type guys who incorporate US corps quickly?  Brian [Phillips] has a corp in NV that he just set up but there's no bank accounts and stuff set up yet.  Would like your advice on the whole US corp issue before we drive down to Seattle to open bank accounts - if we can set up another corp for the purpose of this…deal that might be a better play for us.

The processor promised to look into it, but before he could, Keer wrote back: "*I think we can get Wells to take care of it*."  (Emphasis added.)  As it turned out, Keer was right.

150.  Phillips, Keer, and Triangle relied on Wells Fargo to deliberately overlook obvious beneficial ownership issues, which Wells Fargo was happy to do. Phillips was so confident in Wells Fargo's pliancy that when one nominee raised a concern about what would happen if Wells Fargo contacted his mother (whom he had enlisted to serve as another nominee for Phillips in 2011), Phillips responded by dismissing his concerns wholesale, responding, "***Dude, you still don't***

---

46

Case No.
RECEIVER'S COMPLAINT

1   *understand how wells is totally different. The bank won't be calling her.*"
2   (Emphasis added). Wells didn't call.

3       151.   Instead of conducting an investigation, increasing its monitoring of
4   the Triangle accounts, reporting suspicious or unusual activity internally or
5   externally, or simply refusing to provide banking services to the Triangle fraud,
6   time and again Wells Fargo acceded to Phillips's requests for the Bank to open
7   new shell company accounts with nominee owners, effectively legitimizing the
8   shells in the eyes of the merchant processors.

9             (ii) <u>The Keller, Texas Branch</u>

10      152.   The relationship between Wells Fargo, Phillips, and Triangle began in
11   Texas on September 2, 2009, when Wells Fargo's Keller, Texas branch, principally
12   through banker Lea Walker ("Walker"), but with assistance of others in the branch,
13   including the branch manager, began opening shell company accounts for Phillips
14   and providing him with reference letters.

15      153.   In roughly one year, Walker opened at least eight shell company
16   accounts for Phillips and provided him with four reference letters for these
17   accounts.

18      154.   In 2011, Walker opened four more accounts for shell companies at
19   Phillips' request, providing him with three reference letters. That year, another
20   banker at the Keller, Texas branch, opened two more shell company accounts for
21   Phillips and signed another reference letter. Walker continued to open additional
22   shell accounts for Phillips into 2012. In total, this Wells Fargo branch opened
23   more than 20 banks account at Phillips' request, with roughly half of those being
24   for shell accounts nominally owned by others.

25      155.   Wells Fargo's understanding of Phillips' ownership interest in the
26   accounts is abundantly clear in May 2012 emails that Phillips and Walker
27   exchanged, in which Phillips asked Walker to remove certain approval
28   requirements so that he could generate and send wires for accounts that he did not

own on paper.  Walker immediately fulfilled Phillips' request, which would have been unthinkable if she were not aware that he was the true owner of the accounts and that the purported "owner" was just a nominee.

(iii)   The Southern California Branches

156.   In or about 2013, Phillips began moving his banking relationship with Wells Fargo to Southern California.  Across multiple Wells Fargo Community Bank branches in Southern California (and in partnership with multiple Wells Fargo bankers), Phillips came to open dozens more Wells Fargo accounts as the Triangle scheme expanded.  In total, over the course of the Triangle scheme, Wells Fargo opened more than 85 Triangle-related accounts in California and Texas at Phillips' request.  While Wells Fargo knew that all of the accounts were under Phillips' exclusive control, over 60% (approximately 55) of those accounts were bank accounts for the shell companies that were "owned" in the names of the nominees.  Wells Fargo also opened more than 30 corporate bank accounts that Phillips directly owned.  These included, most notably, numerous Wells Fargo bank accounts for the Triangle Media Corporation, into which Phillips regularly requested that Wells Fargo transfer funds from the shell company accounts "owned" by others, which Wells Fargo always did.

157.   Between 2013 and Triangle's demise in 2018, Phillips' business with Wells Fargo in California expanded rapidly.  Over a nine-month period in 2015 alone, Wells Fargo opened a total of 12 shell company accounts "owned" by nominees for Phillips.  Phillips established a close and continued relationship with Wells Fargo across multiple branches in Southern California.  In total, over a dozen Wells Fargo Community Bank branches in Southern California provided an array of banking services for Phillips, Triangle, and his many related shell companies.  Between fall 2013 and the end of Triangle in 2018, Wells Fargo opened more than 60 accounts at Phillips' request.  More than 40 of those bank accounts, however, were for shell companies supposedly not "owned" by Phillips.

48

Case No. _____
RECEIVER'S COMPLAINT

Phillips was a repeat player at many branches, including San Diego (1st and Market – 5 accounts and 3 reference letters), El Cajon (6 shell accounts and 9 reference letter), Palomar Vista (8 accounts and 2 reference letters), and San Marcos (6 accounts and 1 reference letter).  Additionally, Phillips often made requests to open accounts to his Relationship Managers (Albana and Cording) working out of the Escondido branch, who expedited that process.  Albana and Cording played the essential role of providing Phillips with ready access to reference letters (they wrote more than 30 such letters between 2015 and 2018).

158.   The scope of the branches involved emphasizes that this was not one bad banker or one bad branch—rather, the bad conduct was reliably endemic at Wells Fargo.  While the Escondido Branch was probably the worst offender (as discussed below), the misconduct at issue occurred across the Southern California branches noted above, all of which were operating under Wells Fargo's toxic sales culture.  For example, in 2015 a banker from the San Diego Branch came to Phillips's aid when he asked her to set up a bank account for a shell company "with me and another signer on it."  The banker responded that she needed the nominee owner's information to open the account, but that she would "switch the relationship once I have it."  Phillips sent the banker the information she requested (the nominee's driver license, phone number, and social security number, among other things), and the banker proceeded to open the account, apparently untroubled by the fact that Phillips—not the nominee—was the one providing the information to open an account for a company that purported to be owned by the nominee.

159.   The Wells Fargo bankers knew that all of these accounts were related, but on information and belief, that relationship was never risk-rated, monitored, or otherwise managed as would be befitting a relationship encompassing the volumes, number of accounts and global scope of what was an enterprise—not a series of individually-owned accounts.

Case No. _____
RECEIVER'S COMPLAINT

(iv)   The Escondido Branch

160.   Wells Fargo bankers at the Escondido Branch were especially accommodating to Phillips, particularly Haiman Albana ("Albana"), who was a Vice President and Business Relationship Manager at the branch, and Brian Cording ("Cording"), who was a Vice President and Senior Business Relationship Manager.  Compliance "rules" were easily bent or discarded for Phillips, in line with the OCC's conclusion that "[t]o the extent [Wells Fargo] did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank."  Albana, for example, initially told Phillips on October 30, 2013, that a shell company account (which Phillips had requested on October 24) hadn't yet been set up because Albana was "waiting to hear back from my compliance department" about it—but when Phillips complained that "when [he] was working with the branch on this stuff they could turn it around in 1 day" and asked whether he should "reach out to my branch contact," Albana sent him the forms for the next step *less than one hour later*.

161.   On August 25, 2014, Phillips sent an email to Albana about one shell company's accounts, asking Albana "to make sure that my name is not showing up on the [Vital Global Marketing] account (7355) at all.  These are [the nominee]'s accounts of which I have access too.  ***Can you please work to have my name replaced with her name?***  Let me know how quickly we can get this taken care of?" (Emphasis added.)  About a week later, Phillips forwarded forms purportedly completed by the nominee to add her and remove him from the shell account, at which point a Wells Fargo effected the change.

162.   Cording was fully aware that Phillips was the one in control of the shell accounts that Triangle had at Wells Fargo.  On August 19, 2015, for example, Phillips complained to Cording that he couldn't see accounts for shell companies H1 Marketing, Brand Junction, and Total Market Products "at the moment in a

single portal view on my wells fargo login." Phillips explained that he "need[ed] to have key executive access" to the shell company accounts because "they need[ed] to have my status changed in the company." Cording immediately made changes to the profiles in Wells Fargo's system in order to allow Phillips "to see the accounts with the ability to transfer into the 3 of them."

163. Meanwhile, Phillips was making changes to the ownership of the Vital Global Marketing account—the account which, roughly a year earlier, he'd had Wells Fargo scrub his name from. Phillips sent over the paperwork to have the old nominee "owner" removed from the account on August 28, 2015. Less than a week later, he asked to have a different nominee added to another Vital Global Marketing account (x1053); a Wells Fargo banker business associate gave the new nominee control over the account, but when Phillips asked for documentation of a change in ownership, the Wells Fargo employee explained she would need an amended operating agreement. A few days after that, Cording chimed in to explain that the change in ownership would require a new account. The Wells Fargo employee sent over the required paperwork, explaining that Phillips "would want to list [the new nominee] as 100% owner to match your documents." Recognizing Phillips's true role in the operation, the banker added, "You will also need to list anyone (like yourself) who might have control of the company," and warned Phillips that as the technical owner of the shell company, the new nominee would have control over the other Vital Global Marketing account (x7355)—a warning she would not have needed to give if she'd believed the nominee was, in fact, the owner.

164. Cording also continued to accommodate Phillips' requests for visibility into accounts purportedly owned by others. On May 5, 2016, Phillips asked Cording to add another shell account, Sunset Order Marketing, to his "consolidated Business banking view in the portal." Cording asked another banker to make the change without hesitation. That banker, however, pointed out that the

nominee for the account was the "100% owner, so in order to grant [Phillips] combine[d] view through online banking" she would need approval from the nominee. Phillips then asked, "why do these accounts keep getting setup this way where I have no right to visibility. Can we please get this and all accounts going forward switched to be in my consolidated view."

165. The Wells Fargo banker was quick to offer a couple work arounds:

> If you aren't owner they can't automatically grant you combined view because you can transfer between other entities and personal accounts that way. **The work around is to have the owner grant you this authority but our online department requires it in writing incase there is some sort of internal fraud or something with the business, WF won't be liable**.

> Unfortunately we cannot automatically do this every time. We have the work around but it requires an extra step. **In order to avoid this entirely we do offer the CEO portal for our large business clients**. (Emphasis added.)

166. Phillips made it absolutely clear that he wanted full access to multiple accounts for companies in which he had, on paper, no ownership interest. Though this is an obvious indication of potential fraud, no one at Wells Fargo appeared troubled by the request. In fact, when Phillips expressed exasperation with the process, one Wells Fargo banker even sympathized, apologizing for the Bank's (flimsy) procedural hurdle: "I'm sure somewhere along the lines an employee transferred out money from a business to his/her personal accounts and WF took a significant loss. So they now require an acknowledgement from the owner stating they are ok with the combine view."

167. Wells Fargo clearly understood that Phillips was in charge and that the nominee owner of the company was more or less irrelevant, but the Bank continued to do business with Phillips and Triangle. Wells Fargo did so in violation of KYC rules and regulations, which required the Bank to have a relationship with each of its customers. That posed a problem since Wells Fargo's only relationship with the shell companies was through Phillips.

Case No. _____
RECEIVER'S COMPLAINT

168. The rules changed in May 2016, but by December 2017—nearly a year and a half later—Wells Fargo had not yet implemented them. On information and belief, the new rule, in fact, simply reflected what had been accepted as standard practices at many other banks for a number of years (but of course not Wells Fargo), going back as far as the establishment of new rules after the September 11, 2001 terrorist attacks. That month, Cording emailed Phillips to explain the Bank's obligations under the "new" rule:

> In May 2016, the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) issued a rule strengthening the due diligence that certain financial institutions must perform with respect to their customers. The new rule requires that financial institutions thoroughly understand the nature of the business of each of their clients.Wells Fargo and other banks are required to comply with these new and existing regulations related to the prevention of financial crimes. As a result, we are enhancing our internal compliance and risk related policies. Because of the size and scope of our organization, we are starting to collect customer information now to ensure that we are able to comply with the federal deadline.

169. Cording sent Phillips pre-filled paperwork for 10 companies, seven of which were shell companies *but all of which listed Phillips as the owner*. This was inconsistent with the owners listed on the Wells Fargo bank records, but Cording clearly considered Phillips to be the actual owner of all 10 companies in spite of this. Predictably, Phillips responded and asked to have the "docs changed around" so he could "coordinate for each of the people to sign." Cording replied: "Happy to do it, ***I think the challenge is we may not be sure of the owners of each entity***." Not only did Wells Fargo have zero idea who its account owners were (showing how little the Bank was concerned about Triangle's proliferation of shell accounts), but Cording, apparently unperturbed, continued doing business with Phillips even after he was once more faced with proof that Phillips was the *de facto* owner for a host of shell companies.

(v) Triangle's Attempts at Securing ACH Processing

170. Phillips periodically looked into securing ACH processing services from Wells Fargo, which would give Triangle another avenue to accept customer

---

53

Case No.
RECEIVER'S COMPLAINT

payments..  Wells Fargo's incentive was obvious: they would be able to collect processing fees for any transactions that Triangle ran.

171.  As early as 2014, Albana was working with Phillips to try and secure web-based ACH processing for Triangle.  Apologizing for the delay in getting approval for Phillips' application, Albana explained that "[a]s you know your industry is high risk and the bank is scrutinizing each detail prior to getting approval, I am working diligently with credit supervision to get the approval."  In response to requests from Albana, Phillips provided him with a client list, sample agreement, key officer bios, and additional information.

172.  The 2014 push to get ACH processing for Triangle through Wells Fargo was dead by August, however.  As Keer wrote to another Triangle employee, "the entire ACH deal with Wells was scuttled because of some random text on [the Triangle website]."

173.  Emails the following month between Triangle personnel make it clear exactly what, in one employee's words, "wells' compliance team saw" that caused the Bank to back off: an old website for Triangle Media Corporation, which touted the company's ability to "provide expertise for your high-risk business" because its "seamless solutions offer your business the ability to market concepts normally rejected by traditional processors and banks."

174.  While Triangle had already removed the problematic language from its website, it was still popping up as the top google search for "Triangle Media," so   Phillips and his employees made efforts to bury it by "get[ting] new content to pile over the [problematic language]."

175.  Wells Fargo's compliance team's decision to reject Triangle's processing application demonstrates, as with the Bank's rejection of the Apex merchant processing applications, that Wells Fargo was unwilling to take on the risk of processing for these companies.  The Bank was careful when its own potential exposure was on the line.  Of course, the Bank remained perfectly willing

54

Case No. _____
RECEIVER'S COMPLAINT

to continue servicing the fraudulent shell companies at the branch level, open bank accounts for additional shell companies, and take other atypical steps to assist the schemes' success.

176. Despite the compliance team's decision to nix ACH processing, the sales imperative at the Bank was overwhelming. One year later in 2015, Cording, was doing his best to get ACH approval for Phillips and Triangle once again. Cording emailed Phillips that after "thinking through my strategy to get ACH approved on Triangle Media," he thought it would be useful to have some balance sheets and income statements, because they would allow him to "utilize the financial strength of the business [to] mitigate any risks."

177. Cording still had not managed to obtain approval for Triangle to use Wells Fargo's ACH processing in early 2017, but that didn't mean that he had stopped trying. On February 16, he wrote Phillips that "[w]e did do some further due diligence internally and there is potential for us to fulfill the ACH request as well as we may have a solution for the account needs." Although it does not appear that Cording was ultimately able to secure ACH processing for Triangle, the fact that he was still willing to try (and that Wells Fargo was still apparently considering it) in light of everything that Cording and Wells Fargo knew about Phillips and Triangle speaks for itself. The evidence firmly establishes that Wells Fargo knew exactly what Triangle was doing, and that by assisting Triangle, it was violating banking regulations and the Bank's own (on paper) policies and procedures.

(vi) <u>Wells Fargo Authorized Suspicious and Unusual Transactions that Made No Economic Sense.</u>

178. As all of the above examples indicate, Wells Fargo knew from very early on in its relationship with Triangle that Triangle was using nominees as fronts for shell companies, with Phillips regularly insisting that the nominees (as opposed to Phillips, who Wells Fargo knew was the true owner) be listed as the

55

Case No.
RECEIVER'S COMPLAINT

"100% owners" of the accounts. Wells Fargo bankers had obligations under standard banking practices and banking laws and regulations to investigate and report Phillips' manipulation of the shell companies' beneficial ownership. Had Wells Fargo conducted a real investigation, its findings would have compelled it to refuse to do any more business with Phillips, shut down Phillips' accounts, and/or follow Wells Fargo's established processes regarding the making of internal and external reports of suspicious activity. In reality, of course, given all that it knew by this point, Wells Fargo already understood what the results of any such investigation would be.

179. Wells Fargo knew that Triangle's shell companies continually suffered massive chargebacks. Like with Apex, this was abundantly clear from the shell companies' monthly account statements.

180. Wells Fargo had an obligation under banking laws and regulations to look at the family of Triangle accounts as a whole, rather than looking at individual account activity in isolation. If one Triangle-related account needed to be closed, then all other Triangle accounts likely would have to be closed too. This obligation required the Bank to reassess its dealings with the Triangle Enterprise on a regular basis, including whenever it opened a new account at Phillips' request.

181. Wells Fargo was therefore obligated when conducting its account opening and at least annual diligence for Triangle-related entities under standard AML procedures to assess both new – and existing accounts in the context of the overall relationship with Triangle's beneficial owners and key parties, namely Phillips who had more than 30 personal and corporate accounts with Wells Fargo (in addition to the more than 50 shell accounts).

182. In particular, Wells Fargo should have conducted a critical examination of transfers between Phillips-owned and Phillips-associated companies, which there is no indication it did—even though there were multiple indicia of fraud present. Wells Fargo knew that Phillips was regularly requesting

that the Bank move money into his main Wells Fargo Triangle account, which Phillips himself exclusively owned. At Phillips' direction, Wells Fargo regularly processed suspicious large-figure, round-number transfers out of shell accounts (which were nominally owned by others) and into his own Triangle account. Wells Fargo bankers should have pressed Phillips on why significant amounts of money were being sent from accounts owned by others to Phillips' Triangle account, all while the listed owners (nominees) were receiving only nominal payments from the accounts that they supposedly owned. Wells Fargo was also knew that funds which hit Wells Fargo's Triangle account were regularly being transferred overseas. If Wells Fargo had any concern for protecting the interests of these "owners," or complying with anti-fraud or AML regulations, it would not have permitted Phillips and Triangle to do what they were doing.

183. Wells Fargo had no such concerns. Instead, after Wells Fargo had enabled Phillips himself, and not the supposed "owners," to direct these transfers from the LLC accounts to his Triangle accounts, thereafter Wells Fargo even transferred the recently-deposited funds from the Triangle account entirely out of the United States.

184. While Wells Fargo was disregarding problematic and unusual account activity, Wells Fargo was not at all ignoring Phillips or Triangle's accounts. However, instead of vigilantly monitoring these accounts for suspicious behavior in the context of a high-risk customer in a high-risk industry, making all manner of suspicious transactions out of accounts he did not "own," Wells Fargo was nurturing its relationship with Phillips to try to grow Wells Fargo's business. In other words, Wells Fargo was doing what it did best: opening accounts wherever it could, whether by providing new banks accounts for the shell companies or trying to provide add-on banking services, such as ACH processing, merchant processing, or even access to foreign accounts. Cross-selling clients, not compliance or client oversight, was the priority for Wells Fargo. *See, e.g.,* American Banker, *Bankshot:*

*Wells Fargo Should Have Seen Add-on-product Trouble Coming,* Kevin Wack, July 19, 2018.

185.   It is particularly troubling that over many years, Wells Fargo used so-called "Relationship Managers" (in this case Albana and Cording operating out of the Escondido branch) to serve as lead salespersons seeking to grow the Triangle relationship as much as possible.  Wells Fargo flouted the common industry role that positions such as Relationship Managers have as experienced bankers, providing an extra "first line of defense" layer of protection for a bank against fraud and money laundering.

186.   Wells Fargo designed a corporate structure prioritizing sales that instead used its designated Relationship Managers in a way that perpetuated fraud and weakened risk compliance, unlike other banks of its size.  Typically, a banker in such a position will conduct periodic due diligence reviews across families of accounts, especially for accounts like Triangle, operating in high-risk industries rife with fraud.  At other institutions following standard banking practices, a designated account representative such as this would have adhered to procedures such as requiring visits to an owner's place of business.  Such designated account representatives would also have been responsible for being familiar with the specific activity in the account and its purpose, and for providing updated predictions of expected activity in order to facilitate centrally managed, automated monitoring for potentially suspicious activity.  But, as Brian Phillips had learned early on, Wells Fargo was "totally different."

**C.    Wells Fargo Aided and Abetted Fraudulent Transfers**

187.   There is additional evidence of Wells Fargo's knowledge of the scammers' modus operandi.  Millions of dollars consumers paid into the various shell company accounts were diverted to the individual fraudsters to maintain their lavish personal lifestyle, or to funnel monies out of the Enterprises into real estate and investments that they would purchase via trusts and corporations.  For

Case No. _____
RECEIVER'S COMPLAINT

example, in July 2014 emails between Triangle's Phillips and Tim Morgan, a Wells Fargo Private Mortgage Banker, Phillips notified Morgan that Phillips would receive a $2 million wire from Hardwire (a defendant in the FTC case), and then asked, "will this money need to be 'seasoned' before being used for a house purchase?"

188.   As set forth herein, Peikos and/or Barnett, and Phillips controlled the Apex and Triangle Enterprises (which are now Receivership Entities), and directed them to make numerous transfers out of proceeds of the fraud to themselves, and third parties (including Wells Fargo).  At the time of each fraudulent transfer, they intended to delay, defraud, or hinder their creditors (most notably the Receivership Entities under their control).

189.   Through the numerous acts identified herein, Wells Fargo substantially assisted Phillips, Peikos and Barnett in making these fraudulent transfers, despite knowing that the transfers were unlawful, they controlled the Receivership Entities and had no lawful claim to fraudulently-obtained consumer funds. Wells Fargo knowingly transferred shell company account funds to other Receivership Entity shell company accounts and then directly to Phillips, Peikos, and/or Barnett or to other third parties (at the direction of Phillips, Peikos, and/or Barnett) without the shell companies receiving a reasonably equivalent value in exchange for the transfers and which depleted the shell companies of all or substantially all of their assets.

190.   The transfers from the Wells Fargo accounts of the Receivership Entities to Phillips, Peikos, Barnett and Wells Fargo constitute fraudulent transfers under the California UVTA and UFTA for the following reasons, among others:

191.   Phillips, Peikos and Barnett made the transfers to themselves or third parties with the actual intent to hinder, delay, or defraud consumers;

192.   Phillips, Peikos and Barnett engaged in the free-trial schemes knowing that their assets and the assets of the Receivership Entities they controlled

Case No._____
RECEIVER'S COMPLAINT

were unreasonably small considering that all of the assets were obtained by frauds on consumers and did not belong to them;

Phillips, Peikos and Barnett knew that through their fraudulent schemes, they incurred debts to the Receivership Entities and consumers beyond their ability to pay;They retained possession or control of the assets after the transfers.

193. The Receivership Entities did not receive a reasonably equivalent value in exchange for the transfers from the Wells Fargo accounts because Phillips, Peikos, and Barnett drained the accounts for their own personal use and benefit, and the shell companies acted as mere pass-throughs to allow the fraudsters to avoid detection by creditors of their ownership and control of the funds;

194. The Receivership Entities had no assets other than the fraudulently-obtained funds before or after the transfers;

195. The transfers to Phillips, Peikos, and Barnett were as corporate insiders of the Receivership Entities;

196. The transfers among and from the Wells Fargo accounts were intended to conceal the true ownership and recipients of the funds;

197. When the transfers were made, Phillips, Peikos and Barnett knew they were likely to be sued for their wrongdoing;

198. Phillips, Peikos, and Barnett removed and concealed receipt of the consumer funds from the Wells Fargo accounts by transferring them to unrelated, unidentified and undisclosed personal and offshore accounts;

199. The transfers were of substantially all the Receivership Entities' assets;

200. The Receivership Entities were insolvent or became insolvent shortly after the transfers were made or the obligations were incurred; and

201. The transfers occurred shortly before or shortly after the substantial debts to consumers were incurred.

202. Despite knowing that Phillips, Peikos and Barnett had no lawful claim

to the consumer funds and Phillips, Peikos, and Barnet lacked the assets to pay such amounts back to the Receivership Entities, Wells Fargo transferred such consumer funds, and depleted the Receivership Entities' assets, which allowed Phillips, Peikos, and/or Barnett to receive such funds directly.

203. Based on the allegations above, these transfers of Receivership Entity funds to Wells Fargo and Phillips, Peikos, and Barnett constitute fraudulent transfers which must be returned to the Receivership Entities. Accordingly, the Receiver seeks to recover as fraudulent transfers all Receivership Entity/consumer funds received by Wells Fargo as well as those funds transferred to Phillips, Peikos, and Barnett.

204. Wells Fargo knowingly aided and abetted the fraudulent transfers from the Receivership Entities under the control of Phillips, Peikos, and/or Barnett. This substantial assistance included the fraudulent transfer of consumer funds from the Wells Fargo accounts to Phillips, Peikos, and Barnett.

205. In addition, Wells Fargo accepted payments of consumer funds from Receivership Entities in connection with setting up and maintaining the fraudulent accounts. By collecting fees, charges, fines, reserve amounts, and other payments generated by the shell companies' and other Receivership Entities' payment processing, Wells Fargo was asserting that the Receivership Entities had a valid obligation to make these payments to Wells Fargo.

206. Wells Fargo, as a knowing aider and abettor of the fraudulent schemes, was not entitled to receive, and could not take in good faith, these payments from the Receivership Entities' funds derived from payments by defrauded consumers in connection with setting up and maintaining the fraudulent accounts for the Receivership Entities and thus constitute fraudulent transfers which must be returned to the Receivership Entities.

Case No. _____
RECEIVER'S COMPLAINT

## VIII. KNOWING VIOLATIONS OF BANKING LAWS AND PROCEDURES

207. Wells Fargo repeatedly and knowingly violated banking rules and regulations in its assistance and facilitation of the Apex and Triangle Enterprises, which is further evidence that Wells Fargo knew exactly what it was doing to assist a fraud. The lengths to which Wells Fargo went to substantially aid and abet these fraudulent enterprises is evidenced by not only their willful disregard of standard banking procedures, but also Wells Fargo's continued violations of a dizzying array of banking laws designed to protect against fraud and money laundering.[14]

208. The Bank Secrecy Act ("BSA") makes it a criminal act for banks and other financial institutions to aid and abet criminals in the laundering of money. FinCEN is the federal regulatory agency responsible for issuing regulations to combat money laundering. FinCEN defines money laundering as the process of making illegally-gained proceeds (*i.e.*, "dirty money") appear legal (*i.e.*, "clean"). Typically, it involves three steps: placement, layering, and integration. First, the illegitimate funds are introduced into a legitimate financial system (placement). Then, the money is moved around to create confusion, sometimes by wiring or transferring the funds through numerous accounts (layering). Finally, it is integrated into the financial system through additional transactions until the "dirty money" appears "clean" (integration).[15]

209. Under the BSA, banks must comply with certain Customer Identification Program (CIP) requirements when opening new accounts, including

---

[14] Plaintiff is not bringing any claims for violating the Bank Secrecy Act or related regulations, nor is he alleging that an express or implied duty arose to Plaintiff based on Wells Fargo's BSA violations. Wells Fargo's duties directly arose to the Receivership Entities as Wells Fargo's customers.

[15] *See* "History of Anti-Money Laundering Laws," FinCEN, *available at* https://www.fincen.gov/history-anti-money-laundering-laws.

maintaining account-opening procedures detailing the identifying information that must be obtained from each customer. As an established nationwide banking system, Wells Fargo and its bankers knew what these requirements were.

210. Section 326 of the USA PATRIOT Act was enacted following the 9/11 terrorist attacks and jointly implemented by the federal banking regulators, requires that banks to meet minimum standards with regard to collection of the name, address, date of birth and tax identification number or other means of positive identification for all customers for which it opens an account.

211. A circular issued jointly by the then four federal bank regulatory agencies, joining with FinCEN and the Department of Treasury stated that:

> "a bank's CIP **must** include risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable. ***It is critical that each bank develop procedures to account for all relevant risks including those presented by the types of accounts maintained by the bank***, the various methods of opening accounts provided, the type of identifying information available, and the bank's size, location, and type of business or customer base. ***Thus, specific minimum requirements in the rule, such as the four basic types of information to be obtained from each customer, should be supplemented by risk-based verification procedures, where appropriate, to ensure that the bank has a reasonable belief that it knows each customer's identity.*** (Emphasis added.)

212. Additionally, Wells Fargo was required as a part of federally-mandated account opening process to understand the business/account use ("Know Your Customer"), and to add extra steps in due diligence, especially where, as was the case with both Triangle and Apex, high risk existed: Customer Due Diligence ("CDD") and Enhanced Due Diligence ("EDD").

213. During the Relevant Period, it was standard industry practice (and expected by banks of Wells Fargo's size) to provide its branch employees with tailored training on how to comply with these laws and regulations, including how recognize and escalate suspicious activity in their roles.

Case No. _____
RECEIVER'S COMPLAINT

214. Wells Fargo was required to train its employees on how to comply with the BSA and USA PATRIOT Act, including but not limited to:

- The importance of getting accurate identity information and beneficial owner identification;

- The ability to identify and act upon red flags for suspicious activity, including but not limited to

  o Suspicious designation of beneficiaries, assignees or joint owners
  o Suspicious use of multiple accounts
  o Transactions out-of-pattern for the customer or business situation
  o Transactions that don't make economic sense

- Understanding of various types of activity that require reporting in a number of categories including:

  o 31-Fraud, including
    ▪ e-credit/debit card
    ▪ h-mass marketing
    ▪ i-pyramid scheme

  o 33-Money Laundering
    ▪ d-suspicious designation of beneficiaries, assignees or joint owners
    ▪ h-suspicious use of multiple accounts
    ▪ l-transactions out-of-pattern for customers

  o 34-Identification/Documentation.

215. The regulatory requirements under the BSA placed central importance on vigilantly monitoring to identify and verify customers and beneficial owners, to understand the nature and purpose of customer relationships to develop an accurate customer risk profile, and to undertake ongoing monitoring for reporting suspicious transactions and to maintain and update customer information.

216. In a branch system, like Wells Fargo maintained, the branch employees were required to have a central role in complying with the law and related regulations. Among other things, branch employees were typically the

Case No._____
RECEIVER'S COMPLAINT

primary source of reporting suspicious activity up the chain within Wells Fargo to enable the bank to determine whether it needed to take steps to fulfill its obligations to report such activity externally (to FinCEN). Wells Fargo routinely failed to follow the requirements of BSA/AML/CIP for Apex and Triangle. Wells Fargo's Community Bank gave its branches wide discretion and deficient oversight in performing these tasks, while at the same time incentivizing branch employees to open accounts and cross-sell under a high-pressure quota system.

217. As examples, Wells Fargo knowingly allowed accounts to have incorrect addresses and use identical Wyoming mail drops (in the case of Apex). Instead of identifying and verifying actual beneficial owners of the shell companies, Wells Fargo knew that actual owners were different from the listed owners, and undertook any number of steps to mask or paper over such inconsistencies.

218. Wells Fargo deliberately failed to compile an adequate customer risk profile for all of the shell companies. If the Bank had used commercially reasonable risk assessment techniques, it would never have opened these accounts or would have immediately closed the accounts after it processed transactions that were clearly suspicious.

219. Further, Wells Fargo knew that Apex and Triangle shell companies were routinely executing suspicious transactions using their Wells Fargo accounts, such as transferring funds between accounts and to external accounts in "round" dollar amounts—that is, round numbers with zeros on the end (*e.g.*, $100,000). An abundance of "round" dollar transactions (which the Apex and Triangle shell companies certainly had) is indicative of money laundering and has been referred to as "a fingerprint of fraud." *See* Nigrini, Mark J., "Round numbers: A fingerprint of fraud," Journal of Accountancy (May 1, 2018), *available at* https://www.journalofaccountancy.com/issues/2018/may/fraud-round-numbers.html.

220. As even the most cursory reviews of monthly account statements made abundantly clear, Wells Fargo was well aware of the Apex and Triangle shell companies' high chargeback rates, which were well in excess of the permitted chargeback rates under Visa/Mastercard rules for high-risk merchants.

221. Regardless of the vantage point from which the Apex and Triangle Enterprises are viewed, Wells Fargo knew that they were high-risk relationships and accounts for multiple reasons. As such, Wells Fargo knew that they were required to classify the family of Apex and Triangle accounts as high risk for misuse and as such, subject them to heightened oversight and enhanced due diligence.

222. Further, Wells Fargo was well aware that Apex and Triangle were classified as high risk by merchant processors, including Wells Fargo's own merchant processing group. This provided yet another reason for active monitoring of these accounts by Community Bank employees and branches.

223. Indeed, the Bank's very own Merchant Processing Agreement and Credit Risk Guidelines confirm the many risks created by businesses like Apex and Triangle. The Processing Agreement specifically prohibits the solicitation of merchants engaged in certain unacceptable business practices, because they were presumptively illegal, violated card association rules, or created excessive risk exposure. The prohibited categories included, for example, debt consolidation services, Get Rich Quick Opportunities, and any merchant engaged in any form of deceptive marketing practices.

224. Wells Fargo also prohibited the solicitation of merchants selling nutraceuticals through free trial offers, unless specifically pre-approved by Wells Fargo. And when Wells Fargo periodically evaluated, and on several occasions reviewed, completed applications, for the Apex and Triangle Enterprises Wells Fargo declined to provide merchant processing. (The exception was the small amount Triangle legacy merchant processing through a third party, which

---

66           Case No._____

RECEIVER'S COMPLAINT

1 apparently stayed below Wells Fargo's radar for years – either by mistake or policy
2 design.)

3      225. Wells Fargo's Credit Risk Guidelines (the "Guidelines") require
4 that merchants be scrutinized for evidence of deceptive marketing practices and, if
5 found, immediately compel the merchant to eliminate these practices or terminate
6 the merchant. The Guidelines provide numerous examples of common warning
7 signs of potential deceptive marketing practices, almost all of which the
8 Enterprises employed. These include negative options and industries where
9 deceptive marketing practices were prevalent, such as nutraceuticals. Further, the
10 Guidelines specifically warn about merchants opening multiple accounts,
11 particularly via multiple shell companies with the same or similar principals (in
12 some cases, hired "mules" with little or no business involvement which may be
13 submitted to obscure the true ownership).

14 **IX. WELLS FARGO EXECUTIVES AUTHORIZED AND RATIFIED**
15        **BANKER PARTICIPATION IN THE FRAUDS**

16      226. Evidence of Wells Fargo's executives' pressure on managers and
17 employees to participate in the fraudulent misconduct alleged herein also is set
18 forth in numerous governmental and private lawsuits. In the SEC's complaint
19 against Carrie L. Tolstedt, Senior Executive Vice President of Community
20 Banking for Wells Fargo filed on November 13, 2020, the SEC alleged that for
21 several years, until mid-2016, Wells Fargo opened millions of accounts or sold
22 products that were unauthorized or fraudulent, and others that were unneeded and
23 unwanted by retail banking customers.

24      227. The Community Bank, which Tolstedt led from 2007 through mid-
25 2016, was responsible for managing the large network of bank branches, referred
26 to within Wells Fargo as "stores," as well as other sales channels through which
27 Wells Fargo offered its products. The branches employed, among others, bankers
28 who were generally responsible for offering accounts and financial products or

services to customers. The bankers reported up through managers of the branches to Regional Bank Executives, who reported to Tolstedt. In addition, the persons who managed the various groups organized around products that the Community Bank offered also reported up to Tolstedt.

228. The Community Bank also had financial and risk officers who reported to Tolstedt and assessed the Community Bank's business progress and its risks. Those persons provided information to the financial and risk officers for the Company overall, often after first discussing the information with Tolstedt. In addition, at least quarterly, Tolstedt met with the CEO (and frequently others) to discuss the business of the Community Bank and to make strategic plans.

229. During the Relevant Period, Wells Fargo's CEO and other high-level executives and directors of the Bank encouraged employees to deliberately ignore indicia of fraud if it helped the Bank's bottom line—instructions which led to Wells Fargo and its employees aiding and abetting the Enterprise schemes.

230. Other higher-level employees and agents of Wells Fargo in the Community Bank branches encouraged and instructed their bankers and employees to do the same. These higher-level employees and agents included:

- David Hannig, who was an Assistant Vice President and Business Sales Consultant for Wells Fargo Merchant Services, and who worked directly with Apex's Barnett, Peikos, Camacho, and Carr;

- Lea Walker, who was a Business Specialist and subsequently an Assistant Vice President at Wells Fargo in the Keller, TX branch (910 Keller Parkway, Keller, TX 76248), and who worked directly with Triangle's Phillips;

- Haiman Albana, who was a Business Relationship Manager at Wells Fargo associated in the Escondido, CA branch (500 La Terraza Boulevard, Suite 200, Escondido, CA 92025), and who worked directly with Triangle's Phillips; and

- Brian Cording, who was a Senior Business Relationship Manager at Wells Fargo associated with the Escondido, CA branch (500 La Terraza Boulevard, Suite 200, Escondido, CA 92025), and who worked directly with Triangle's Phillips.

231. These are just some of the Wells Fargo employees who knowingly

Case No. _____
RECEIVER'S COMPLAINT

1 acted in collaboration and collusion with Apex and Triangle in furtherance of the
2 unlawful schemes. Wells Fargo authorized or ratified the acts of these employees
3 as alleged herein.

4 **X.     INFORMATION ALLEGATIONS**

5 232. Allegations made in this Complaint are based on information and
6 belief, except those allegations that pertain directly to the Receiver, which are
7 based on his personal knowledge. The Receiver's information and belief is based
8 on, *inter alia,* the investigation and review of publicly filed documents and from
9 the Receiver appointed in the FTC actions described above and his attorneys. Each
10 and every allegation and factual contention contained in this Complaint has
11 evidentiary support or, alternatively, is likely to have evidentiary support after
12 reasonable opportunity for further investigation or discovery by the Receiver or his
13 counsel.

14 **XI.    DELAYED DISCOVERY BY THE RECEIVER AND ESTOPPEL**

15 233. First and foremost, the Receiver's discovery of the Receivership
16 Entities' claims against Wells Fargo was impossible until his appointment; prior to
17 that, the Receivership Entities were controlled by Phillips, Barnett, and Peikos,
18 which made discovery of their wrongdoing impossible. The statutes of limitations
19 were tolled until the time of the Receiver's appointment.

20 234. The statutes of limitations were tolled past that point, however,
21 because the Receiver did not (and could not have) discovered the fraud
22 immediately upon his appointment. The Receiver only discovered Wells Fargo's
23 misconduct related to the Apex and Triangle Enterprises in 2019. There were two
24 primary reasons for this: (1) Wells Fargo took steps to conceal its role in the Apex
25 and Triangle frauds; and (2) the Receiver did not receive responses to subpoenas it
26 issued to Wells Fargo until June and July of 2019, before which there was
27 insufficient documentary evidence for the Receiver to discover the claims. Once
28 the Receiver and his counsel had the documents in hand, they were finally able to

piece together Wells Fargo's role in facilitating the Apex and Triangle frauds, and to confirm that the Bank knew of the fraudulent nature of the Apex and Triangle Enterprises.[16]

235. Because of Phillips's, Peikos's and Barnett's efforts to conceal the Apex and Triangle frauds from consumers, along with the role Wells Fargo played in those frauds, Wells Fargo is estopped from contending that any of the Receiver's claims are barred by applicable statutes of limitations.

## XII.  CAUSES OF ACTION

## **First Cause of Action**

## **(Aiding and Abetting Fraud)**

236.  The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

237.  Phillips, Peikos, and Barnett, via the Apex and Triangle Enterprises, operated online "free trial" scams, which falsely advertised that consumers would only be charged the cost of shipping in exchange for a trial of a product.  In reality, the consumers were being signed up for a subscription service and charged for the full price of the product on the next billing cycle unless they affirmatively canceled the subscription.

238.  Wells Fargo knew that the Apex and Triangle Enterprises were engaged in a high-risk, fraudulent business, and Wells Fargo knew that they were required to terminate or further investigate that business pursuant to the BSA, FinCEN regulations, and their own internal policies. Multiple Wells Fargo employees across multiple branches deliberately turned a blind eye to the Apex and Triangle frauds, because the large number of accounts needed by the Apex and Triangle Enterprises helped them to meet otherwise-unattainable sales quotas set

---

[16] The Receiver did not file until now pursuant to a Tolling Agreement with Defendants.

Case No._____
RECEIVER'S COMPLAINT

by Wells Fargo's corporate headquarters. Wells Fargo's corporate policies encouraged sales misconduct by setting unrealistic sales goals and requiring bankers to open as many accounts, and to sell as many services and bank products, as possible.

239. Wells Fargo provided substantial assistance to the intentional torts committed by the primary wrongdoers by, among other things, creating accounts for shell companies used by the Apex and Triangle Enterprises to secure critical merchant processing services; assisting the Apex and Triangle principals in hiding their ownership of those accounts from the merchant processors, so that the principals could continue to secure merchant processing services for the underlying fraud; and allowing Apex and Triangle to launder money obtained from defrauded consumers through their Wells Fargo accounts.

240. The substantial assistance that Wells Fargo provided to the Apex and Triangle frauds proximately caused substantial damages to the Receivership Entities in an amount to be proven at trial. These damages include, but are not limited to: the fees charged by Wells Fargo for their banking services, which directly furthered the fraudulent schemes and depleted the funds of the Receivership Entities; the Receivership Entities' legal obligations to satisfy the FTC Judgments, which require the Receivership Entities to make whole the consumers who were defrauded as a result of the Apex and Triangle frauds that Wells Fargo facilitated; all fees and costs necessitated by the need to establish a Receivership; and the costs of defending the action by the FTC (including the resulting Receiverships).

241. Wells Fargo's conduct was intentional, fraudulent, willful, malicious, and intended to injure the Receivership Entities, by virtue of which the Receiver prays for an award of exemplary and punitive damages.

## **Second Cause of Action**

### **(Conspiracy to Commit Fraud)**

242. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

243. Philips, Peikos, and Barnett engaged in the primary wrongs described herein.

244. Wells Fargo entered into a conspiracy with Phillips, Barnett, and Peikos to perpetuate their frauds. Wells Fargo agreed to assist the frauds by, among other things, and as described herein, (i) opening accounts for dozens of shell companies, which Wells Fargo knew were owned and controlled by Apex and Triangle's principals, (ii) executing reference letters that gave legitimacy to the shell companies and allowed them to secure merchant processing services, (iii) accepting as deposits funds which Wells Fargo knew were fraudulently obtained from consumers, (iv) transferring those funds to other accounts (including foreign accounts), which allowed the Apex and Triangle principals to launder the money they derived from the frauds, and (v) continually providing atypical banking services.

245. The Receivership Entities suffered damages that were proximately caused by Wells Fargo's participation in the conspiracy (without which the Apex and Triangle Enterprises could not have functioned) and which are described herein.

### **Third Cause of Action**

### **(Breach of Fiduciary Duty)**

246. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

247. Wells Fargo owed fiduciary duties to the Receivership Entities pursuant to their bank/client relationships. Wells Fargo had a duty to their customers, the Receivership Entities, to discharge its duties in good faith, with reasonable care, and in a manner reasonably believed to be in the Receivership Entities' best financial interests.

Case No. _____
RECEIVER'S COMPLAINT

248. Wells Fargo knew that Phillips, Peikos, and Barnett were engaging in fraud as described herein.

249. Wells Fargo breached the fiduciary duties it owed to the Receivership Entities by willfully, fraudulently, recklessly, and/or negligently engaging in conduct which was not in the best financial interests of the Receivership Entities. Specifically, Wells Fargo (i) diverted funds that belonged to the Receivership Entities into Phillips, Peikos, and Barnett's pockets, and (ii) failed to, or refused to, fulfill its "know your customer" obligations, conduct due diligence, and abide by other banking regulations and standard practices.

250. Wells Fargo's breaches of the fiduciary duties it owed to the Receivership Entities actually and proximately caused financial injury to the Receivership Entities as described herein.

**<u>Fourth Cause of Action</u>**

**(Aiding and Abetting Breach of Fiduciary Duty)**

251. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

252. At all material times, Phillips, Peikos, and Barnett owned or controlled their respective Receivership Entities. As the owners of the Triangle or Apex Enterprises, they had a fiduciary relationship with the Receivership Entities because the entities were under their complete control. Phillips, Peikos, and Barnett owed the Receivership Entities a fiduciary duty to act in good faith, with reasonable care, and in a manner reasonably believed to be in the Receivership Entities' best financial interests.

253. Phillips, Peikos, and Barnett breached their fiduciary duties owed to their respective Receivership Entities by willfully, fraudulently, recklessly, and/or negligently engaging in conduct which was not in the best financial interests of the Receivership Entities by engaging in the primary wrongs described herein and by diverting the Receivership Entities' assets into their own pockets with no

Case No. _____
RECEIVER'S COMPLAINT

legitimate or justifiable business purpose.

254.   Phillips, Peikos, and Barnett's breaches of the fiduciary duties they owed to the Receivership Entities actually and proximately caused financial injury to the Receivership Entities, as described herein, in an amount to be proven at trial.

255.   Wells Fargo had actual knowledge of Phillips, Peikos, and Barnett's breaches of their fiduciary duty and rendered substantial assistance in regard to such breaches by affording them or their agents special privileges, by enabling and allowing continuous, suspicious, and obviously fraudulent banking activity, and by failing to adhere to federal, local and internal regulatory banking procedures and policies.

256.   Wells Fargo is liable for all damages actually and proximately caused to the Receivership Entities through its acts and omissions, including those damages described above, in an amount to be proven at trial.

## Fifth Cause of Action

### (Aiding and Abetting Conversion)

257.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

258.   Phillips, Peikos, and Barnett wrongfully asserted dominion and control over the funds in the Apex and Triangle Enterprise accounts, which rightfully belonged to their respective Receivership Entities, by misappropriating consumer funds from those accounts and using the funds for their personal use and benefit.  Phillips, Peikos, and Barnett's actions resulted in the conversion of funds belonging to the Receivership Entities.

259.   Wells Fargo had actual knowledge of Phillips, Peikos, and Barnett's misappropriation of the Receivership Entities' funds, because those funds were wrongfully transferred into, between, and out of accounts held by Wells Fargo.

260.   Wells Fargo rendered substantial assistance to Phillips, Peikos, and Barnett in their conversion of the Receivership Entities' funds by executing their

transactions, even though doing so violated banking regulations and other prudent and sound banking practices and procedures.

261. Wells Fargo is therefore liable for all damages actually and proximately caused to the Receivership Entities based on the conversion of funds undertaken by Phillips, Peikos, and Barnett, in an amount to be proven at trial.

### Sixth Cause of Action

### (Violation of California Penal Code § 496)

262. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

263. Penal Code § 496(c) permits "any" person who has been injured by a violation of § 496(a) to recover three times the amount of actual damages, costs of suit and attorney's fees in a civil suit. Penal Code § 496(a) creates an action against "any" person who (1) receives "any" property that has been obtained in any manner constituting theft, knowing the property to be so obtained, or (2) conceals, withholds, or aids in concealing or withholding "any" property from the owner, knowing the property to be so obtained.

264. Under Penal Code § 7, "person" includes a corporation as well as a natural person. Wells Fargo Bank, N.A., as a national banking association, and Wells Fargo & Co., as a corporation, are "persons" capable of violating § 496(a).

265. Phillips, Peikos, and Barnett obtained consumer funds by theft under Penal Code § 484, because those funds were obtained "knowingly and designedly, by any false or fraudulent representation or pretense," from consumers. These funds were so obtained because, among other things, consumers were falsely informed they were signing up for free trials but ended up paying for products or subscriptions without their consent.

266. Wells Fargo, knowing of their frauds, deliberately concealed and aided in concealing those frauds by, *inter alia*, hiding the identity of the individuals who were committing the fraud, and by setting up and maintaining the fraudulent

1    accounts as described herein.

2        267.   Additionally, Wells Fargo knowingly transferred property that was

3    wrongfully obtained from consumers to Phillips, Peikos, Barnett, or third parties at

4    their behest, as described herein.

5        268.   As a direct and proximate result of Wells Fargo's violations of Penal

6    Code § 496(a), the Receivership Entities were deprived of assets.   Pursuant to

7    Penal Code § 496(c), the Receiver seeks statutory treble damages, costs of suit, and

8    reasonable attorney's fees.

9                        **Seventh Cause of Action**

10      **(Violation of California Business and Professions Code § 17200)**

11       269.   The Receiver repeats and realleges the allegations of each and every

12   one of the prior paragraphs, inclusive, as if fully set forth herein.

13       270.   Business & Professions Code §§ 17200, et seq., prohibit acts of

14   "unfair competition," a term which is defined by Business & Professions Code

15   § 17200 as including "any unlawful, unfair or fraudulent business act or

16   practice…."

17       271.   Defendants have violated Business & Professions Code section

18   17200's prohibition against engaging in unlawful, unfair, and/or fraudulent

19   business practices by, *inter alia*, aiding and abetting fraud, conspiring to commit

20   fraud, and violating California Penal Code § 496.

21       272.   The Receivership Entities suffered injury in fact and lost money as a

22   result of Wells Fargo's substantial assistance in these unlawful business acts and

23   practices.

24       273.   As a result of Defendants' violations of Business & Professions Code

25   § 17200, et seq., the Receiver is entitled to equitable relief in the form of full

26   restitution of all monies wrongfully paid pursuant to the fraudulent schemes aided

27   and abetted by Defendants.

28

---

**<u>Eighth Cause of Action</u>**

**(Aiding and Abetting Fraudulent Transfer/Voidable Transaction)**

274.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

275.  Prior to the establishment of the Receiverships, the physical operations of the Receivership Entities with which Defendants did business were primarily in the State of California. The *FTC v. Triangle* and *FTC v. Apex* actions in which the Receiver was appointed were then filed in the United States District Court for the Southern and Central Districts of California, respectively.

276.   Effective January 1, 2016, California (similar to the majority of other States) adopted a version of the Uniform Voidable Transactions Act ("UVTA"), codified at California Civil Code §§ 3439, et seq.  The UVTA defines a voidable transfer to include the following types of transfer or obligations incurred by a debtor:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> (1)  With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (2)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>
> (A)  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (B)  Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
>
> (b)  In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:
>
> (1)  Whether the transfer or obligation was to an insider.
>
> (2)  Whether the debtor retained possession or control of the property transferred after the transfer.

---

77

Case No. _____
RECEIVER'S COMPLAINT

(3)  Whether the transfer or obligation was disclosed or concealed.

(4)  Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5)  Whether the transfer was of substantially all the debtor's assets.

(6)  Whether the debtor absconded.

(7)  Whether the debtor removed or concealed assets.

(8)  Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9)  Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10)  Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11)  Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

277.  California Civil Code §3439.05(a) provides that transfers are voidable as to present creditors as follows:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

278.  The UVTA provides the following definitions, in relevant part:

(b)  "Claim," except as used in "claim for relief," means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

(c)  "Creditor" means a person that has a claim, and includes an assignee of a general assignment for the benefit of creditors, as defined in Section 493.010 of the Code of Civil Procedure, of a debtor.

(d)  "Debt" means liability on a claim.

(e)  "Debtor" means a person that is liable on a claim.

279.   Phillips, Peikos and Barnett are "debtors" under the UVTA because they are liable to the Receivership Entities and consumers who have a right to reimbursement for their claims of consumer fraud under the FTC judgments. Said Receivership Entities and consumers are "creditors" with "claims" under the meaning of the UVTA.

280.   Prior to enactment of the UVTA, and relevant to transfers by Defendants prior to 2016, the California Uniform Fraudulent Transfer Act ("UFTA"), formerly codified at California Civil Code §§ 3439, et seq. ("UFTA"), provided in §3439.04:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

281.   A "transfer" was defined in the UFTA to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." (Civ. Code, former § 3439.01, subd. (i)).  A similar definition is found as subdivision (m) of the UVTA with one minor revision: "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, license and creation of a lien or other encumbrance."

282.   As set forth herein, Phillips, Peikos, and/or Barnett controlled the

Case No. _____
RECEIVER'S COMPLAINT

1  Receivership Entities and directed them to make numerous transfers out of

2  proceeds of the fraud to themselves, and third parties (including Wells Fargo).  At

3  the time of each fraudulent transfer, they intended to delay, defraud, or hinder their

4  creditors (most notably the Receivership Entities under their control).

5      283.  Through the numerous acts identified herein, Wells Fargo

6  substantially assisted Phillips, Peikos and Barnett in making these fraudulent

7  transfers, despite knowing that the transfers were unlawful, and that they controlled

8  the Receivership Entities and had no lawful claim to fraudulently-obtained

9  consumer funds. Wells Fargo knowingly transferred shell company account funds

10 to other Receivership Entity shell company accounts and then directly to Phillips,

11 Peikos, and/or Barnett or to other third parties (at the direction of Phillips, Peikos,

12 and/or Barnett) without the shell companies receiving a reasonably equivalent

13 value in exchange for the transfers and which depleted the shell companies of all or

14 substantially all of their assets.

15     284.  The transfers from the Wells Fargo accounts of the Receivership

16 Entities to Phillips, Peikos, Barnett and Wells Fargo constitute fraudulent transfers

17 under the California UVTA and UFTA for the following reasons, among others:

       (a)   Phillips, Peikos and Barnett made the transfers to themselves or third parties with the actual intent to hinder, delay, or defraud creditors (including the Receivership Entities and consumers);

       (b)   Phillips, Peikos and Barnett engaged in free trial schemes knowing that their assets and the assets of the Receivership Entities they controlled were unreasonably small considering that all of the assets were obtained by frauds on consumers and did not belong to them;

       (c)   Phillips, Peikos and Barnett knew that through their fraudulent schemes, they incurred debts to the Receivership Entities and consumers beyond their ability to pay;

       (d)   Phillips, Peikos and Barnett retained possession or control of the assets after the transfers;

       (e)   The Receivership Entities did not receive a reasonably equivalent value in exchange for the transfers from the Wells Fargo accounts because Phillips, Peikos, and Barnett drained the accounts for their own personal use and benefit, and the

shell companies acted as mere pass-throughs to allow the fraudsters to avoid detection by creditors of their ownership and control of the funds;

(f)  The Receivership Entities had no assets other than the fraudulently-obtained funds before or after the transfers;

(g)  The transfers to Phillips, Peikos, and Barnett were as corporate insiders of the Receivership Entities;

(h)  The transfers among and from the Wells Fargo accounts were intended to conceal the true ownership and recipients of the funds;

(i)  When the transfers were made, Phillips, Peikos and Barnett knew they were likely to be sued for their wrongdoing;

(j)  Phillips, Peikos, and Barnett removed and concealed receipt of the consumer funds from the Wells Fargo accounts by transferring them to unrelated, unidentified and undisclosed personal and offshore accounts;

(k)  The transfers were of substantially all the Receivership Entities' assets;

(l)  The Receivership Entities were insolvent or became insolvent shortly after the transfers were made or the obligations were incurred; and

(m)  The transfers occurred shortly before or shortly after the substantial debts to consumers were incurred.

285.  Despite knowing that Phillips, Peikos and Barnett had no lawful claim to the consumer funds and Phillips, Peikos, and Barnet lacked the assets to pay such amounts back to the Receivership Entities, Wells Fargo transferred such consumer funds, and depleted the Receivership Entities' assets, which allowed Phillips, Peikos, and/or Barnett to receive such funds directly.

286.  Based on the allegations above, these transfers of Receivership Entity funds to Wells Fargo and Phillips, Peikos, and Barnett constitute fraudulent transfers which must be returned to the Receivership Entities.  Accordingly, the Receiver seeks to recover as fraudulent transfers all Receivership Entity/consumer funds received by Wells Fargo as well as those funds transferred to Phillips, Peikos, and Barnett.

287.  Wells Fargo knowingly aided and abetted the fraudulent transfers

from the Receivership Entities under the control of Phillips, Peikos, and/or Barnett. This substantial assistance included the fraudulent transfer of consumer funds from the Wells Fargo accounts to Phillips, Peikos, and Barnett.

288.  In addition, Wells Fargo accepted payments of consumer funds from Receivership Entities in connection with setting up and maintaining the fraudulent accounts. By collecting fees, charges, fines, reserve amounts, and other payments generated by the shell companies' and other Receivership Entities' payment processing, Wells Fargo was asserting that the Receivership Entities had a valid obligation to make these payments to Wells Fargo.

289.  Wells Fargo, as a knowing aider and abettor of the fraudulent schemes, was not entitled to receive, and could not take in good faith, these payments from the Receivership Entities' funds derived from payments by defrauded consumers in connection with setting up and maintaining the fraudulent accounts for the Receivership Entities, and thus these payments constitute fraudulent transfers which must be returned to the Receivership Entities.

290.  Accordingly, the Receiver seeks to recover as fraudulent transfers any (a) Receivership Entity funds taken from the Wells Fargo accounts and transferred to Phillips, Peikos, and Barnett as a result of the fraudulent schemes and b) payments to Wells Fargo from Receivership Entities in connection with setting up and maintaining the fraudulent accounts.

291.  The Receiver therefore asks that the Court order Wells Fargo to pay to the Receiver all fraudulent transfers they received or transferred, as alleged herein and as further shown by proof at trial. The Receiver further asks that he be awarded pre- and post- judgment interest from Defendants from the date of the receipt of each fraudulent transfer.

## Ninth Cause of Action

### (Unjust Enrichment/ Constructive Trust)

292.  The Receiver repeats and realleges the allegations of each and every

one of the prior paragraphs, inclusive, as if fully set forth herein.

293. Wells Fargo received payments (whether denominated as "fees," "charges," "fines," "reserves," or otherwise) from the Receivership Entities' accounts used in connection with the processing and maintenance of accounts, and also transferred fraudulently-obtained funds to Peikos, Barnett, and Phillips.

294. The payments received by Wells Fargo were made in furtherance of the fraudulent schemes and Wells Fargo has been unjustly enriched by the amount of these payments.

295. In addition, through Wells Fargo's knowing and substantial assistance in the wrongful transfer of account funds from the Receivership Entities, entities and individuals who owned or controlled the Receivership Entities were unjustly enriched in the amount of these transfers.

296. Because of Wells Fargo's own unjust enrichment and its knowing assistance in unjustly enriching the perpetrators of the frauds, the Receiver seeks an equitable remedy ordering that Wells Fargo is holding, and shall continue to hold, in constructive trust for the Receiver, the amount of the payments and transfers to itself, as well as funds in Wells Fargo accounts which were wrongfully transferred to third parties, including those who owned or controlled the Receivership Entities.

297. The Receiver further asks that he be awarded pre- and post- judgment interest from Defendants from the date of the receipt of each fraudulent transfer.

**Tenth Cause of Action (In the Alternative)**

**(Negligent Supervision)**

298. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

299. In the alternative to Causes of Action One through Nine, Wells Fargo negligently supervised the Wells Fargo employees named and/or described herein.

300. Wells Fargo knew or should have known that the policies and

Case No. _____
RECEIVER'S COMPLAINT

procedures permeating its Community Bank regarding sales incentives and quotas were deficient and created a sales culture pressuring its employees into opening accounts without concern for the repercussions, and which directly contributed to and incentivized branch-level employees under the fear of being terminated, aiding and abetting the Apex and Triangle frauds, cutting corners, and disregarding both applicable Bank procedures (on paper) and legal obligations when opening and monitoring accounts, and under the BSA and related rules. Wells Fargo's knowledge of its own toxic sales culture is described herein.

301. Wells Fargo also knew or should have known that a corporate policy pushing employees to open as many accounts as possible would facilitate money laundering activities, as it would make it substantially easier for the Bank's customers to open dozens of shell companies. The relevance of shell companies to money laundering and fraud is discussed herein.

302. Wells Fargo knew or should have known that its lax oversight and its implementation, design, and maintenance of proper controls to ensure branch-level compliance in the Community Bank with all legal obligations, including under the BSA, and to protect against fraudulent conduct, were deficient and would directly contribute to branch-level bankers' misconduct, by providing atypical services, assisting the frauds, and taking steps to conceal—rather than unmask or report—the Apex and Triangle Entities' fraud.

303. Wells Fargo knew or should have known that its deficient policies for the Community Bank, as detailed herein, leading to Wells Fargo's facilitation of the Apex and Triangle Enterprises' consumer fraud and money laundering activities would result in increased liabilities for, and substantial damage to, the Receivership Entities as described herein.

304. Had Wells Fargo properly supervised its employees, properly put in place appropriate policies and procedures in the Community Bank regarding sales practices and incentives, properly implemented, designed, and maintained proper

Case No. _____
RECEIVER'S COMPLAINT

controls to ensure branch-level compliance in the Community Bank with industry standards and norms, and/or monitored and terminated employees who engaged in misconduct (none of which occurred), the Receivership Entities would not have suffered the damages that they did.

### Eleventh Cause of Action (In the Alternative)

### (Negligence)

305. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

306. In the alternative to Causes of Action One through Nine, the acts and omissions of Wells Fargo as described herein were negligent.

307. Wells Fargo provided banking services to the Apex and Triangle Receivership Entities; as such, these entities were Wells Fargo's clients.

308. Because the Receivership Entities were customers of Wells Fargo, the Bank owed them a duty to act with reasonable care in its dealings with, and in performing its services for, the Receivership Entities and their accounts. That duty included, without limitation, the duty to use the requisite care, skill and diligence to detect, investigate and/or prevent the use of Wells Fargo accounts to perpetrate fraud.

309. Wells Fargo breached this duty because, without limitation, it established corporate policies that prioritized the opening of accounts above anything else—a policy which uniquely incentivized its employees to facilitate the banking activities of shell companies, which any banker would know were key indicia of fraud and money laundering. Despite fully understanding that the accounts opened by Apex and Triangle personnel were for shell companies used to hide the true ownership of the accounts, Wells Fargo failed to timely stop or take any action to prevent the fraud, including the transfer of Receivership Entities' assets to Phillips, Peikos, Barnett, and/or third parties.

310. Wells Fargo's breaches of its duties proximately caused damages to

the Receivership Entities in an amount to be determined at trial, because those breaches allowed Phillips, Peikos, Barnett, and/or third parties to commit massive fraud and to siphon off funds that rightfully belonged to the Receivership Entities for their own, personal use.

**Twelfth Cause of Action**

**(Request for an Accounting)**

311.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

312.   To ascertain the exact amounts received by Wells Fargo in connection with the Apex and Triangle Enterprises the Receiver seeks entry of an order compelling Wells Fargo to file with the Court and serve upon the Receiver an accounting, under oath, detailing: (i) the amounts received from all accounts owned or controlled by the Receivership Entities or related individuals and entities, including Peikos, Barnett, and Phillips; (ii) the current locations of the amounts, including the specific bank accounts to which any funds were transferred; and (iii) the fees which Wells Fargo obtained as a result of doing business with the Apex and Triangle Enterprises.

**XIII.  PRAYER FOR RELIEF**

WHEREFORE, the Receiver respectfully prays for judgment against Defendants as follows:

1.   For all applicable damages to the Receivership Entities proximately caused by Wells Fargo's tortious conduct, including punitive damages pursuant to California Civil Code § 3294, and treble damages pursuant to California Penal Code § 496(c); in an amount to be determined at trial;

2.   For the return of funds acquired by Wells Fargo through fraudulent transfers and/or unjust enrichment at the expense of the Receivership Entities, including, but not limited to, funds acquired as fraudulent

1  obligations supposedly owed to the Wells Fargo by the Receivership
2  Entities;

3     3.    For imposition of a constructive trust in favor of the Receiver as to all
4  funds received by Wells Fargo from the Receivership Entities;

5     4.    For a judgment ordering Wells Fargo to file an accounting, under
6  oath, as requested herein;

7     5.    For pre- and post- judgment interest;

8     6.    For attorneys' fees and costs: and

9     7.    For such other and further relief as the Court may deem proper.

10  **XIV. JURY DEMAND**

11  The Receiver demands a jury trial.

12  Respectfully Submitted,

13

14  DATED: July 8, 2021       By:*/s/  Lionel Z. Glancy*

15  **GLANCY PRONGAY & MURRAY LLP**
16  Lionel Z. Glancy
   Jonathan M. Rotter
17  Garth A. Spencer
   1925 Century Park East, Suite 2100
18  Los Angeles, California 90067
   Telephone:  310-201-9150
19  Facsimile:  310-201-9160
   Email: info@glancylaw.com

20

21  **MCNAMARA SMITH LLP**

22  Logan D. Smith
   Cornelia J.B. Gordon
23  655 West Broadway, Suite 900
   San Diego, California 92101
24  Telephone:  619-269-0400
   Facsimile:   619-269-0401
25  Email: lsmith@mcnamarallp.com

26  *Attorneys for Court-Appointed Receiver*
   *Thomas W. McNamara*

27

28

# EXHIBIT D

1  LOGAN D. SMITH (#212041)
   CORNELIA J.B. GORDON (#320207)
2  **MCNAMARA SMITH LLP**
   655 West Broadway, Suite 900
3  San Diego, California 92101
   Telephone:  619-269-0400
4  Facsimile:   619-269-0401
   Email: lsmith@mcnamarallp.com
5
   LIONEL Z. GLANCY (#134180)
6  JONATHAN M. ROTTER (#234137)
   GARTH A. SPENCER (#335424)
7  **GLANCY PRONGAY & MURRAY LLP**
   1925 Century Park East, Suite 2100
8  Los Angeles, California 90067
   Telephone:  310-201-9150
9  Facsimile:   310-201-9160
   Email: info@glancylaw.com
10
   *Attorneys for Receiver, Thomas W. McNamara*
11
                    UNITED STATES DISTRICT COURT
12
                  SOUTHERN DISTRICT OF CALIFORNIA
13
   THOMAS W. MCNAMARA, as the          Case No. **'21CV1245 AJB JLB**
14 Court-Appointed Receiver for Triangle
   Media Corporation, Apex Capital Group,  **RECEIVER'S NOTICE OF**
15 LLC; and their successors, assigns,      **RELATED CASES UNDER CIVIL**
   affiliates, and subsidiaries,            **LOCAL RULE 40.1.f-g**
16
                    Plaintiff,           Related Cases:
17                                       *Federal Trade Commission v. Triangle*
        v.                               *Media Corp., et al.*, Case No. 3:18-cv-
18                                       01388-LAB-LL (S.D. Cal.)
   WELLS FARGO & COMPANY, a
19 corporation, WELLS FARGO BANK,        *Federal Trade Commission v. Apex*
   N.A., a national banking association,  *Capital Group, LLC, et al.*, Case No.
20                                       2:18-cv-09573-JFW-JPR (C.D. Cal.)
                    Defendants.
21

22

23        Counsel for Plaintiff Thomas W. McNamara, as the Court-appointed

24 Receiver for Triangle Media Corporation, Apex Capital Group, LLC ("Receiver")

25 hereby provides this Notice of Related Case pursuant to CivLR 40.1.f, which

26 requires counsel to notify the Court of any related cases. The following cases are

27 related to this matter:

28

                              1            Case No.
                   RECEIVER'S NOTICE OF RELATED CASES

- *Federal Trade Commission v. Triangle Media Corp., et al.*, Case No. 3:18-cv-01388-LAB-LL (S.D. Cal.); and

- *Federal Trade Commission v. Apex Capital Group, LLC, et al.*, Case No. 2:18-cv-09573-JFW-JPR (C.D. Cal.).

Civil Local Rule 40.1.g states that cases are related when the previous action and the new action appear to:

    1.    Involve some of the same parties and are based on the same or similar claims, or

    2.    Involve the same property, transaction, patent, trademark, or event, or

    3.    Involve substantially the same facts and the same questions of law.

CivLR 40.1.g.

One or more of these criteria are met.

The plaintiff in this lawsuit is the court-appointed receiver in the *Triangle Media* and *Apex Capital* actions. The receiver brings this action against the Defendants for conduct arising out of the same underlying facts at issue in the foregoing lawsuits, including, *inter alia*, Defendants' alleged aiding and abetting of the fraudulent schemes at issue therein.

The *Triangle Media* action was the first of the cases filed, on June 25, 2018, and has been proceeding before Judge Larry A. Burns since October 29, 2018. If a different judge heard this matter, there would be a substantial duplication of labor.

Accordingly, Receiver's counsel hereby provides notice that these cases are related under CivLR 40.1.g.

Dated: July 8, 2021          GLANCY PRONGAY & MURRAY LLP

By:   */s/ Lionel Z. Glancy*
Jonathan M. Rotter
Lionel Z. Glancy
Garth A. Spencer
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-201-9160
Email: info@glancylaw.com

2                Case No.
RECEIVER'S NOTICE OF RELATED CASES

Logan D. Smith
Cornelia J.B. Gordon
MCNAMARA SMITH LLP
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401
Email: lsmith@mcnamarallp.com

*Attorneys for Court-Appointed Receiver*
*Thomas W. McNamara*

3     Case No.
RECEIVER'S NOTICE OF RELATED CASES

# EXHIBIT E

# United States District Court
## SOUTHERN DISTRICT OF CALIFORNIA

Thomas W. McNamara as the Court-Appointed
Receiver for Triangle Media Corporation, Apex Capital
Group, LLC, and their successors, assigns, affiliates,
and subsidiaries

Plaintiff,

v.

Wells Fargo & Company, a corporation; et al

Defendant.

Case No. 3:21-cv-01245-AJB-JLB

**REPORT OF CLERK AND ORDER
OF TRANSFER PURSUANT TO
"LOW-NUMBER" RULE**

## REPORT OF CLERK PURSUANT TO LOW NUMBER RULE

Re: "Low-Numbered Case No.: 3:18-cv-01388-LAB-LL

Title: Federal Trade Commission v. Triangle Media Corporation et al

Nature of Case: 370 Other Fraud

The above "low-numbered" case and the present case appear:

| | | |
|---|---|---|
| ☐ | (1) | to arise from the same or substantially identical transactions, happenings or events; or |
| ☒ | (2) | involve the same or substantially the same parties or property; or |
| ☒ | (3) | involve the same patent or trademark or different patents or trademarks covering the same or substantially identical things; or |
| ☒ | (4) | call for determination of the same or substantially identical questions of law; or |
| ☐ | (5) | where a case is refiled within one year of having previously been terminated by the Court; or |
| ☐ | (6) | for other reasons would entail unnecessary duplication of labor if heard by different judges. |

New Case #: **3:21-cv-01245-LAB-LL**

This case was transferred pursuant to the Low-Number Rule. The related cases have been assigned to the same judge and magistrate judge but they are NOT CONSOLIDATED at this point; all pleadings must still be filed separately in each case.

**John Morrill, Clerk of Court,**

Dated: 7/12/21

By: s/J. Mueller

J. Mueller, Deputy

## ORDER OF TRANSFER PURSUANT TO "LOW-NUMBER" RULE

I hereby consent to transfer of the above-entitled case to my calendar pursuant to Local Rule 40.1, Transfer of Civil Cases under "Low-Number" Rule.

Dated: 7/19/21

Larry Alan Burns
United States District Judge

It appearing that the above-entitled case is properly transferable in accordance with the provisions of the Low-Number Rule, IT IS HEREBY ORDERED that this case is transferred to the calendar of Judge Larry Alan Burns and Magistrate Judge Linda Lopez for all further proceedings.

Dated: 7/16/21

Anthony J. Battaglia
United States District Judge

# EXHIBIT F



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

# Triangle Media Refunds

## Share This Page

June 2020

**PRODUCTS:** dietary supplements, skin creams, e-cigarettes

## FTC returns money to people who were charged for "risk-free" trial products

The FTC is mailing checks totaling more than $8.7 million to 187,425 people who signed up online for "risk-free" trial offers, but were then charged full price and enrolled in expensive continuity plans without their knowledge. Triangle Media Corporation used trial offers to market and sell a variety of products online, including skin creams, electronic cigarettes, and dietary supplements.

If you get a check, please cash it within 90 days.

If you have any questions, please call the refund administrator at 1-877-625-9411.

## Consumer Information

Blog: Don't let "FREE" cost you

"Free" Trial Offers?

## Related News

FTC Sending Refund Checks Totaling More Than $8.7 Million to Consumers Defrauded by Deceptively Marketed Online "Risk-Free Trial" Offers

Online Marketers Barred from Deceptive "Free Trial" Offers, Unauthorized Billing

FTC Halts Online Marketers Responsible for Deceptive "Free Trial" Offers



ftc.gov

1-SER-225

Andrew W. Robertson (SBN 62541)
arobertson@mcnamarallp.com
Edward Chang (SBN 268204)
echang@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401

*Attorneys for Court-Appointed Receiver*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 3:18-cv-01388-LAB-LL |
| Plaintiff, | **RECEIVER'S REPLY IN SUPPORT OF MOTION FOR AUTHORIZATION TO ENGAGE CONTINGENCY FEE COUNSEL AND EXTEND RECEIVERSHIP** |
| v. | |
| TRIANGLE MEDIA CORPORATION, a Delaware corporation, also doing business as Triangle CRM, Phenom Health, Beauty and Truth, and E-Cigs; JASPER RAIN MARKETING LLC, a California limited liability company, also doing business as Cranium Power and Phenom Health; HARDWIRE INTERACTIVE INC., a British Virgin Islands corporation, also doing business as Phenom Health, Beauty and Truth, and E-Cigs; and BRIAN PHILLIPS, individually and as an officer of Triangle Media Corporation, | JUDGE:  Hon. Larry A. Burns<br>CTRM:  14A<br>DATE:  November 25, 2019<br>TIME:  11:30 a.m. |
| Defendants. | |

1    The Court-Appointed Receiver, Thomas W. McNamara ("Receiver"), by

2 and through his counsel of record, respectfully submits this reply brief in support

3 of his Motion for Authorization to Engage Contingency Fee Counsel and Extend

4 Receivership (ECF No. 136).

5 **I.    DISCUSSION**

6    Defendants Hardwire Interactive, Inc. ("Hardwire"), Devin Keer ("Keer")

7 and Global Northern Trading Limited ("Global Northern" and collectively, the

8 "Hardwire Defendants"), oppose the Receiver's Motion to Engage Contingency

9 Counsel and Extend the Receivership.  Their sole argument is that they will

10 somehow be prejudiced by continuing the asset freeze over them and preventing

11 their access to funds held in foreign financial institutions.  *See* ECF No. 138

12 (Hardwire and Keer Opp. at 5); ECF No. 140 (Global Northern Opp.).  This is not

13 so.

14    First, this issue has been resolved.  The FTC has now specifically informed

15 both Hardwire and Global Northern that each "has met its obligations under

16 Section VI of the Order and, therefore, pursuant to Section X of the Order **the**

17 **Asset Freeze as to [each] is dissolved**."  *See* Exhibits 1 and 2 (November 12, 2019

18 letters from the FTC to Defendants dissolving asset freeze as to Defendants)

19 (emphasis added).  Quite simply, the FTC's letter resolves Hardwire Defendants'

20 only grounds for objecting to the Receiver's tailored request to extend the

21 Receivership for the singular purpose of pursuing litigation against Wells Fargo to

22 recover Receivership assets.

23    Furthermore, in addition to the FTC's representations directly to Hardware

24 and Global Northern that the asset freeze is now dissolved, the Hardwire

25 Defendants' claims that they could suffer prejudice from the Receiver's limited

26 request rings hollow because of their prior position on this very issue.  Specifically,

27 in contrast to its current position, Hardwire's counsel asserted that the stipulated

28 final judgment did not prohibit foreign banks from releasing foreign reserves:

Would you please confirm that, given the entry of the final order and modifications to the asset freeze, that **the final order does not prohibit foreign banks holding wholly foreign reserves from releasing those reserves their beneficiaries located wholly outside of the United States**?  Although we agreed that Hardwire and Keer could keep the foreign reserves, and section IX(B)(1) limits the Receiver's duties to taking custody of all assets of Hardwire Receivership Defendants in the United States, we would like you to please confirm that the order does not prohibit the foreign banks from releasing the foreign reserves to the foreign beneficiary corporations.  Would you please let me know your views?

Email from Ari Rothman dated May 31, 2019 (emphasis added).  A true and correct copy is attached hereto as Exhibit 3.  The FTC later confirmed that the stipulated final judgment does not prohibit foreign banks from releasing foreign reserves.  *See* Exhibit 4.

In light of the above, any claims of prejudice by Hardwire Defendants are not credible.  The Receiver's motion has established good cause to extend the receivership for the singular purpose of attempting to recover specifically-identified assets through litigation against Wells Fargo.

Lastly, Defendants Brian Phillips, Triangle Media Corporation, and Jasper Rain (collectively the "Triangle Defendants") do not oppose in principle extending the receivership or the appointment of contingency counsel.  ECF No. 139 at pp. 1-2.  Although the Triangle Defendants claim that the Receiver's proposed order is somehow "inadequate and must be revised," they are apparently seeking to modify the stipulated final judgment, and not the Receiver's proposed order to approve engaging contingency counsel and extending the receivership.  *Id.* at 2. To the extent the Triangle Defendants wish to modify the stipulated final judgment in any respect, the Triangle Defendants should bring a motion before the Court to amend that order, so that any of their concerns may be properly addressed.

///

///

///

1  Responding to the instant motion to extend the receivership is simply not the place

2  to address any such concerns.[1]

3  **II.    CONCLUSION**

4          For the foregoing reasons, the Receiver requests that the Court grant the

5  Receiver's Motion for Authorization to Engage Contingency Fee Counsel and

6  Extend Receivership.

7

8  Dated:  November 15, 2019              MCNAMARA SMITH LLP

9
                                         By:    /s/ Edward Chang
10                                          Edward Chang
                                            *Attorneys for Court-Appointed Receiver,*
11                                          *Thomas W. McNamara*
                                            Email: echang@mcnamarallp.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  [1]  The Receiver will provide a substantive response, if necessary, to the Triangle
    Defendants' possible modifications to the stipulated judgment if a motion seeking
28  such relief is filed.

---

                                 3              Case No. 3:18-cv-01388-LAB-LL
            RECEIVER'S REPLY ISO MOTION TO ENGAGE CONTINGENCY COUNSEL

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of November 2019, the foregoing document was electronically transmitted to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.

**VIA CM/ECF**
Samantha Gordon
Matthew H. Wernz
Federal Trade Commission
230 South Dearborn, Suite 3030
Chicago, Illinois 60604
Tel.:  312-960-5623 (Gordon)
Tel.:  312-960-5596 (Wernz)
sgordon@ftc.gov
mwernz@ftc.gov
*Attorneys for Plaintiff Federal Trade Commission*

**VIA CM/ECF**
Adam L. Braverman
United States Attorney
Rebecca G. Church
Assistant U.S. Attorney
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel.:  619-546-7701/7721
Fax:  619-546-7751
rebecca.church@usdoj.gov
*Attorneys for Plaintiff Federal Trade Commission*

**VIA CM/ECF**
Frederick K. Taylor
Matthew B. Shields
Nicholas S. Kawuka
Procopio Cory Hargreaves
and Savitch LLP
525 B Street, Suite 2200
San Diego, CA 92101-4469
Tel.:  619-238-1900
Fax:  619-235-0398
fkt@procopio.com
matthew.shields@procopio.com
nka@procopio.com
*Attorneys for Defendants Triangle Media Corporation; Jasper Rain Marketing, LLC; and Brian Phillips*

**VIA CM/ECF**
Ari N. Rothman
Witt W. Chang
Venable LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Tel.:  310-229-9900
Fax:  310-229-9901
anrothman@venable.com
wchang@venable.com
*Attorneys for Defendant Hardwire Interactive Inc.*

**VIA CM/ECF**
Gerald S. Sachs
Stephen R. Freeland
Venable LLP
600 Massachusetts Ave., NW
Washington, DC 20004
Tel.:  202-344-4000
Fax:  202-344-8300
gssachs@venable.com
srfreeland@venable.com
*Attorneys for Defendant Hardwire Interactive Inc.*

**VIA CM/ECF**
Karl S. Kronenberger
Kronenberger Rosenfeld
150 Post Street, Suite 520
San Francisco, CA 94108
Tel.:  415-955-1155
Fax:  415-955-1158
karl@krinternetlaw.com
*Attorneys for Defendant Global Northern Trading Limited*

 /s/ Edward Chang
Edward Chang
Attorneys for Receiver, Thomas W. McNamara

1

**EXHIBIT INDEX**

2

No.                                                                                      Page

3    1    FTC Letter dissolving asset freeze as to Hardwire

4         Interactive, Inc. (November 12, 2019) .......................................................1

5    2    FTC Letter dissolving asset freeze as to Global Northern
          Trading Limited (November 12, 2019) ....................................................2

6    3    Email from Ari Rothman to Counsel (May 31, 2019) ............................3

7    4    Email exchange between A. Rothman and FTC

8         (May 31-June 6, 2019) ............................................................................4

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



United States of America
## FEDERAL TRADE COMMISSION
MIDWEST REGION

Samantha Gordon
Staff Attorney

230 South Dearborn Street, Suite 3030
Chicago, Illinois  60604

312.960.5623
sgordon@ftc.gov

November 12, 2019

Ari N. Rothman
Venable LLP
600 Massachusetts Avenue, NW
Washington, DC 20001

      Re:    *FTC v. Triangle Media Corporation, et al.*, 18-cv-1388-LAB (NLS)

Counsel:

On May 30, 2019, the federal district court in the Southern District of California entered the attached Stipulated Order resolving the claims the Federal Trade Commission asserted against Hardwire Interactive, Inc. ("Hardwire").  Hardwire has met its obligations under Section VI of the Order and, therefore, pursuant to Section X of the Order the Asset Freeze as to Hardwire is dissolved.

If you have any questions, feel free to email me at sgordon@ftc.gov or call me at 312.960.5623.

Best regards,

Samantha Gordon
Staff Attorney

Enclosures

EXHIBIT 1
Page 1

# EXHIBIT 2



United States of America
## FEDERAL TRADE COMMISSION
MIDWEST REGION

Samantha Gordon
Staff Attorney

230 South Dearborn Street, Suite 3030
Chicago, Illinois 60604

312.960.5623
sgordon@ftc.gov

November 12, 2019

Karl S. Kronenberger
Kronenberger Rosenfeld, LLP
150 Post Street, Ste. 520
San Francisco, CA 94108

   Re:  *FTC v. Triangle Media Corporation, et al.*, 18-cv-1388-LAB (NLS)

Counsel:

   On May 30, 2019, the federal district court in the Southern District of California entered the attached Stipulated Order resolving the claims the Federal Trade Commission asserted against Global Northern Trading Limited. ("Global Northern"). Global Northern has met its obligations under Section VI of the Order and, therefore, pursuant to Section X of the Order the Asset Freeze as to Global Northern is dissolved.

   If you have any questions, feel free to email me at sgordon@ftc.gov or call me at 312.960.5623.

Best regards,

*Samantha Gordon*

Samantha Gordon
Staff Attorney

Enclosures

EXHIBIT 2
Page 2

1-SER-235

# EXHIBIT 3

| | |
|---|---|
| **From:** | Rothman, Ari N. |
| **To:** | Gordon, Samantha; Wernz, Matthew H.; Thomas McNamara; Edward Chang |
| **Subject:** | Hardwire/Final Order |
| **Date:** | Friday, May 31, 2019 9:10:14 AM |

Dear All:

Would you please confirm that, given the entry of the final order and modifications to the asset freeze, that the final order does not prohibit foreign banks holding wholly foreign reserves from releasing those reserves their beneficiaries located wholly outside of the United States?  Although we agreed that Hardwire and Devin Keer could keep the foreign reserves, and section IX(B)(1) limits the Receiver's duties to taking custody of all assets of Hardwire Receivership Defendants in the United States, we would like you to please confirm that the order does not prohibit the foreign banks from releasing the foreign reserves to the foreign beneficiary corporations.

Would you please let me know your views?

Thank you.

Ari N. Rothman, Esq. | Venable LLP
office +1 202.344.4220 | mobile U.S. +1 818.925.6114 | mobile worldwide +44 7452.382668
600 Massachusetts Avenue, NW, Washington, DC 20001
ANRothman@Venable.com | www.venable.com/ari-n-rothman

************************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
************************************************************************

EXHIBIT 3
Page 3

# EXHIBIT 4

**Thomas McNamara**

| | |
|---|---|
| **From:** | Gordon, Samantha <sgordon@ftc.gov> |
| **Sent:** | Thursday, June 06, 2019 12:48 PM |
| **To:** | Rothman, Ari N.; Thomas McNamara; Edward Chang |
| **Cc:** | Wernz, Matthew H. |
| **Subject:** | RE: Hardwire/Final Order |

Ari,

Per our conversation today, this is to confirm that (1) the FTC received the wire transfer in the amount of $3,027,388.36 on May 31, 2019, and (2) that the Modified Stipulated Final Order does not prohibit the foreign banks from releasing the foreign reserves to the foreign beneficiary corporations.

Best,

Sam

---

**Samantha Gordon** | Staff Attorney | Federal Trade Commission | 230 South Dearborn, Ste. 3030, Chicago, IL 60604
Tel: 312.960.5623 | Fax: 312.960.5600 | sgordon@ftc.gov

**From:** Rothman, Ari N. <ANRothman@Venable.com>
**Sent:** Monday, June 03, 2019 9:14 AM
**To:** Gordon, Samantha <sgordon@ftc.gov>; Wernz, Matthew H. <mwernz@ftc.gov>; tmcnamara@mcnamarallp.com; echang@mcnamarallp.com
**Subject:** RE: Hardwire/Final Order

Dear All:

We released to the FTC the $3MM wire this past Friday.  Would you (Sam or Matt) please confirm that the FTC received it?

I would also appreciate a response to the email below at your earliest convenience.

Thank you.

Ari

**Ari N. Rothman, Esq.  | Venable LLP**
**office** +1 202.344.4220 | **mobile U.S.** +1 818.925.6114 | **mobile worldwide** +44 7452.382668
600 Massachusetts Avenue, NW, Washington, DC 20001
ANRothman@Venable.com | www.venable.com/ari-n-rothman

**From:** Rothman, Ari N.
**Sent:** Friday, May 31, 2019 12:10
**To:** 'Gordon, Samantha' <sgordon@ftc.gov>; 'Wernz, Matthew H.' <mwernz@ftc.gov>; 'tmcnamara@mcnamarallp.com' <tmcnamara@mcnamarallp.com>; 'echang@mcnamarallp.com' <echang@mcnamarallp.com>
**Subject:** Hardwire/Final Order

1

EXHIBIT 4
Page 4

Dear All:

Would you please confirm that, given the entry of the final order and modifications to the asset freeze, that the final order does not prohibit foreign banks holding wholly foreign reserves from releasing those reserves their beneficiaries located wholly outside of the United States?  Although we agreed that Hardwire and Devin Keer could keep the foreign reserves, and section IX(B)(1) limits the Receiver's duties to taking custody of all assets of Hardwire Receivership Defendants in the United States, we would like you to please confirm that the order does not prohibit the foreign banks from releasing the foreign reserves to the foreign beneficiary corporations.

Would you please let me know your views?

Thank you.

**Ari N. Rothman, Esq. | Venable LLP**
**office** +1 202.344.4220 | **mobile U.S.** +1 818.925.6114 | **mobile worldwide** +44 7452.382668
600 Massachusetts Avenue, NW, Washington, DC 20001
ANRothman@Venable.com | www.venable.com/ari-n-rothman

**********************************************************************
This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.
**********************************************************************

2

EXHIBIT 4
Page 5

1-SER-240

1  Andrew W. Robertson (SBN 62541)
   arobertson@mcnamarallp.com
2  Edward Chang (SBN 268204)
   echang@mcnamarallp.com
3  McNamara Smith LLP
   655 West Broadway, Suite 1600
4  San Diego, California 92101
   Telephone: 619-269-0400
5  Facsimile:  619-269-0401

6  *Attorneys for Court-Appointed Receiver*
   *Thomas W. McNamara*
7

8                  UNITED STATES DISTRICT COURT

9                SOUTHERN DISTRICT OF CALIFORNIA

10

11  FEDERAL TRADE COMMISSION,          Case No. 3:18-cv-01388-LAB-LL

12              Plaintiff,              **MEMORANDUM OF POINTS AND
                                        AUTHORITIES IN SUPPORT OF**
13       v.                            **RECEIVER'S MOTION FOR
                                        AUTHORIZATION TO ENGAGE**
14  TRIANGLE MEDIA CORPORATION, a      **CONTINGENCY FEE COUNSEL
    Delaware corporation, also doing business  AND EXTEND RECEIVERSHIP**
15  as Triangle CRM, Phenom Health, Beauty
    and Truth, and E-Cigs; JASPER RAIN
16  MARKETING LLC, a California limited  JUDGE:   Hon. Larry A. Burns
    liability company, also doing business as  CTRM:    14A
17  Cranium Power and Phenom Health;    DATE:    November 25, 2019
    HARDWIRE INTERACTIVE INC., a        TIME:    11:30 a.m.
18  British Virgin Islands corporation, also
    doing business as Phenom Health, Beauty
19  and Truth, and E-Cigs; and BRIAN
    PHILLIPS, individually and as an officer
20  of Triangle Media Corporation,

21              Defendants.

22

23

24

25

26

27

28

## I. Introduction

On September 9, 2019, this Court granted receiver Thomas W. McNamara's (the "Receiver") motion to extend the receivership to complete an investigation into a potential receivership estate lawsuit against a domestic financial institution. *See* ECF No. 134.  The receivership was extended until October 24, 2019.  The Receiver and counsel have completed their investigation and believe that the litigation should be pursued against the financial institution, Wells Fargo and Company ("Wells Fargo") (including its corporate siblings).  As such, the Receiver respectfully requests the Court's permission to engage contingency counsel and seeks to extend the receivership for the singular and limited purpose of allowing the Receiver to pursue the litigation for the reasons detailed herein.

As pursuing this litigation is the only remaining duty for the Receiver, the Receiver respectfully suggests that the case could be administratively closed, but the Court retain jurisdiction and permit the Receivership to continue for the limited purpose of allowing the pursuit of the contemplated litigation.  A similar approach was followed in connection with a receivership in this district.  *See S.E.C. v. Khanna* and *CFTC v. Khanna*, No. 3:09-cv-01783-BEN-WVG, ECF No. 130 (S.D. Cal. Mar. 18, 2013), Order Closing Actions and Retaining Post-Judgment Jurisdiction Over Receivership (attached hereto as Exhibit A).

## II. Request to Hire Contingency Counsel

The Receiver and counsel have now completed their investigation into a potential lawsuit.  The Receiver believes that the anticipated litigation against Wells Fargo is meritorious, and the potential recovery for the Receivership Estate is significant.  But all litigation is uncertain.  It will be expensive, as the conduct involved occurred over several years and involved many individuals and entities, and the case will be likely be vigorously defended at all stages.

The Receiver has evaluated the balance of (1) the assessment that viable claims exist that should be vigorously pursued with (2) the potential costs to the

Receivership Estate in bringing the litigation.  Because the litigation will likely be hard-fought, expensive, and long, the Receiver has determined that the cost and risk of pursuing litigation on an hourly basis would be prohibitive.  This caused the Receiver to evaluate alternative fee arrangements, which would shift the risk away from the Receivership Estate.  While a hybrid (reduced hourly rate and reduced contingency rate) arrangement was considered, the Receiver ultimately concluded that a pure contingency fee arrangement makes the most sense; a contingency fee arrangement eliminates direct costs to the Receivership Estate because the significant professional fees necessary to prosecute the cases would not be paid by the estate.  Attorney's fees would only be paid out of litigation recoveries should the cases be successfully settled or litigated.

The Receiver generally has the discretion to hire counsel as he deems necessary.  *See* Preliminary Injunction, Section XVII. Receivership Duties, "IT IS FURTHER ORDERED that the Receiver is directed and authorized to accomplish the following: . . . H. "Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order".  (ECF No. 75 at p. 18.)  However, it is common when a receiver intends to retain contingency counsel to seek permission for the retention from the appointing court.  *See e.g.*, *S.E.C. v. Capital Cove Bancorp, LLC*, et al., Case No. CV15-000980-JLS (C.D. Cal.); *S.E.C. v. Diversified Lending Group, Inc., et al.*, Case No. 2:09-cv-01533-R-SS (C.D. Cal.); *S.E.C. v. Ruderman, et al.*, Case No. 2:09-cv-02974-VBF (C.D. Cal.).[1]

Based upon his conclusion that the only way to pursue the litigation is on a contingency basis, the Receiver reached out to experienced contingency counsel to

---

[1] If the Court deems it necessary, the Receiver can describe underlying facts and theories that will be pursued in the litigation via an *in camera* submission (which would avoid publicly revealing his evaluation of the litigation and legal strategy and potentially harm the prosecution of the case).

discuss possible claims that might be brought and the potential contours of litigation.  As a result of these discussions, he identified and has spoken on numerous occasions with partners at Glancy Prongay & Murray LLP, a national law firm based in Los Angeles with offices in New York and Berkeley which prosecutes class action cases and complex litigation in federal and state courts throughout the country.  Glancy Prongay & Murray has reviewed substantial materials regarding the potential case provided by the Receiver, and its lawyers have conducted their own independent investigation into the merits of a prospective litigation.[2]

Glancy Prongay & Murray has concluded that it is willing to pursue the litigation on behalf of the Receiver.  The firm has represented investors and consumers for over 25 years in financial and consumer fraud cases.  It specializes in prosecuting class actions and complex litigation in federal and state courts throughout the country.  As lead counsel or as a member of the Plaintiff's Counsel Executive Committees, the firm has recovered billions for its clients.  As such, the Receiver believes the firm is eminently qualified to represent the Receivership Estate's interest.[3]

---

[2]  The Receiver initially identified the facts and potential claims, and he and attorneys at McNamara Smith LLP (where the Receiver is a partner) then conducted an in-depth factual examination to support possible claims.  This information was then presented to Glancy Prongay & Murray for evaluation which, in turn, conducted its own review over the course of several months.

[3]  It is likely that Glancy Prongay & Murray will also pursue claims on behalf of the class of defrauded Triangle consumers.  Under established receivership law, a Receiver generally has no standing to bring any claims directly for victim consumers.  *See, e.g., Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 625-26 (6th Cir. 2003) (discussing cases).  Accordingly, the Receiver has different causes of action against the financial institution than defrauded Triangle consumers do.  However, because of the identity of interests between defrauded consumers and the Receivership Estate, the Receiver's claims could be pursued at the same time as claims on behalf of a class of defrauded Triangle consumers were being pursued.  Coordinating with a related class of victims has been an effective strategy employed by several receivers to enlarge the recovery for the estate.  *See e.g., SEC v. NASI*, Case No. 2:14-cv-07249 (C.D. Cal.) ECF No. 284 (explaining coordination between receiver and class in motion to approve global settlement).

---

1    McNamara Smith professionals have dedicated substantial efforts over the
2    last year working closely with the Receiver to understand the facts, identify various
3    parties and review voluminous transactions related to the litigation.  They are thus
4    uniquely suited to prosecute the litigation because of their in-depth understanding
5    of the factual background and deep knowledge of the legal issues peculiar to
6    receiverships.  McNamara Smith attorneys regularly represent fiduciaries,
7    including receivers, in matters across the country, and they have worked with the
8    Receiver to return more than $100 million to defrauded investors and consumers.
9    The firm is willing to continue on in collaboration with Glancy Prongay & Murray
10   pursuant to a contingency fee arrangement.

11       Here, Glancy Prongay & Murray has agreed to act as counsel for the
12   Receiver for a contingent fee equal to 28.5% of the gross recovery up until a ruling
13   on summary judgment and 33.3% contingent fee on gross recovery received after a
14   ruling on summary judgment.  Under this arrangement, the Receivership Estate
15   will ***not*** be obligated to advance litigation costs, *e.g.*, court fees, discovery and
16   expert costs.  The proposed contingent fees fall well within the range of fees
17   approved in other receivership cases, and the Receiver believes that the proposed
18   arrangement is reasonable, especially in light of the agreement by counsel to
19   advance litigation costs and thus remove any financial risk to the Receivership
20   Estate.  The Receiver negotiated with Glancy, Prongay & Murray for the costs of
21   the litigation to be fronted by counsel, under the express condition that the
22   Receivership Estate will only be responsible for the costs in the event that there is a
23   recovery through settlement or judgment.  The Receiver believes that this is the
24   most cost-effective approach and will also result in the greatest possible recovery
25   for the Receivership Estate.

26   **III.    The Proposed Terms of the Contingent Fee Agreement Are Reasonable**

27       The Court's power to supervise an equity receivership and to determine the
28   appropriate action to be taken in the receivership, including the retention and

1   compensation of counsel, is extremely broad.  *See SEC v. Capital Consultants,*

2   *LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (district court has broad discretion to

3   approve appropriate action to be taken in the administration of a receivership); *see*

4   *also CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) ("This

5   court affords 'broad deference' to the [district] court's supervisory role and 'we

6   generally uphold reasonable procedures instituted by the district court that serve

7   th[e] purpose' of orderly and efficient administration of the receivership for the

8   benefit of creditors.").

9        Courts in this Circuit have considered and approved contingent fee

10  arrangements in order to compensate a receiver's counsel to recover assets for the

11  receivership.  There is no particular formula employed by the courts.  *See e.g.*,

12  *S.E.C. v. Diversified Lending Group, Inc., et al.*, Case No. 2:09-cv-01533-R-SS

13  (C.D. Cal.) (district court approved contingent fee arrangement, including

14  25 percent of pre-suit recovery, 35 percent if settled up until 120 days before trial

15  and 45 percent thereafter); *S.E.C. v. Ruderman, et al.*, Case No. 2:09-cv-02974-

16  VBF (C.D. Cal.) (approving contingency fee arrangement, 33 percent of recovery

17  up to 60 days before trial, 40 percent after that date); *S.E.C. v. Capital Cove*

18  *Bancorp, LLC, et al.*, Case No. CV15-000980-JLS (C.D. Cal.) (approving

19  contingency fee of between 25 and 40 percent, rate changing depending on timing

20  and size of gross recoveries).

21       In a recent case, *S.E.C. v. JCS Enterprises, Inc., et al.,* Case No. 14-CV-

22  80468 (S.D. Fla.), the district court approved a standard contingent fee

23  arrangement for one counsel (25 percent of gross recoveries before summary

24  judgment, and 30 percent after that date) and a hybrid contingent agreement for a

25  second counsel ($200 per hour and 20% of gross recoveries).  *See also S.E.C. v.*

26  *We the People, Inc. of the United States*, Case No. 2:13-cv-14050-JEM (S.D. Fla.)

27  (approving a 33.3 percent contingent fee).

28  ///

Here, the total contingent fee is equal to 28.5% of the gross recovery up until a ruling on summary judgment, and 33.3% contingent fee on gross recovery received after a ruling on summary judgment.  Under this arrangement, the Receivership Estate will ***not*** be obligated to advance litigation costs, *e.g.*, court fees, discovery and expert costs.  The proposed contingent fees fall well within the range of fees approved in other receivership cases, and the Receiver believes that the proposed arrangement is reasonable, especially in light of the agreement by counsel to advance litigation costs and thus remove any financial risk to the Receivership Estate.

**IV.     The Receivership Should Be Extended for the Limited Purpose of Pursuing the Litigation**

As the Court is aware, the litigation is the only remaining item to complete in the receivership.  The Receiver respectfully requests that the receivership be extended only for the limited purpose of pursuing the litigation.  In another case in this District, the Court administratively closed the underlying cases, but allowed the receivership to continue to complete necessary duties.  *See S.E.C. v. Khanna* and *CFTC v. Khanna*, Order Closing Actions and Retaining Post-Judgment Jurisdiction Over Receivership (attached hereto as Exhibit A).  The Receiver believes that since all other duties are completed other than this Receivership that a similar approach makes sense, such that this case could be administratively closed but the Court should retain jurisdiction and permit the Receivership to continue for the limited purpose allowing the Receivership to pursue the contemplated litigation.

**V.     Conclusion**

Based on the foregoing, the Receiver respectfully requests that the Court take the following steps, as set forth in the Proposed Order, submitted herewith: (1) grant the Receiver permission to engage contingency counsel to represent the Receiver, as identified herein; (2) extend the receivership for the singular limited

1   purpose of allowing the Receiver to pursue the litigation discussed above; and

2   (3) administratively close the case but retain jurisdiction over the Receivership to

3   permit the Receiver to pursue the litigation described above.

4

5   Dated:  October 22, 2019                    MCNAMARA SMITH LLP

6

7                                        By:___/s/ Edward Chang_____
                                             Edward Chang
8                                            *Attorneys for Court-Appointed Receiver,*
                                             *Thomas W. McNamara*
9                                            Email: echang@mcnamarallp.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **EXHIBIT INDEX**

2

Exhibit                                                                                                      Page

3     A        S.E.C. v. Khanna and CFTC v. Khanna,
               No. 3:09-cv-01783-BEN-WVG, ECF No. 130
               (S.D. Cal. Mar. 18, 2013), Order Closing Actions
4              and Retaining Post-Judgment Jurisdiction Over Receivership...............1

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

1

2013 MAR 18  AM 10: 19

2

3

4   BY _____

5

6

7

8   **UNITED STATES DISTRICT COURT**

9   **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11   SECURITIES AND EXCHANGE COMMISSION, | ) Case Nos. 09cv1784 BEN (WVG) |
| 12 | )            09cv1783 BEN (WVG) |
| Plaintiff, | ) **ORDER CLOSING ACTIONS AND** |
| 13 | ) **RETAINING  POST-JUDGMENT** |
| v. | ) **JURISDICTION OVER** |
| 14 | ) **RECEIVERSHIP** |
| MOHIT A. KHANNA, et al., | ) |
| 15 | ) |
| Defendants. | ) |
| 16 | ) |
| 17   U.S. COMMODITY FUTURES TRADING | ) |
| 18   COMMISSION, et al., | ) |
| 19      Plaintiffs, | ) |
| 20   v. | ) |
| 21   MOHIT A. KHANNA, et al., | ) |
| 22      Defendants. | ) |
| 23 | |

24

25

26

27

28

Case Nos. 09cv1783/09cv1784 BEN (WVG)
ORDER CLOSING ACTIONS & RETAINING POST-JUDGMENT JURISDICTION OVER
RECEIVERSHIP

EXHIBIT A
Page 1

1-SER-251

1    On March 11, 2013, this Court held a joint a hearing in these two related
2    matters concerning a Ponzi scheme operated by Defendant Mohit Khanna under
3    the name MAK 1 Enterprises: (1) *U.S. Commodity Futures Trading Commission,*
4    *et al. v. Khanna, et al.,* Civ. Case No. 09-cv-01783-BEN-WVG; and (2)
5    *Securities and Exchange Commission v. Khanna, et al.,* Civ. Case No. 09-cv-
6    01784-BEN-WVG.

7    As was confirmed on the record at that hearing, the Court has now entered
8    its final judgments as to all claims and defendants in these matters.  However, the
9    court-appointed receiver (Thomas W. McNamara) in these two matters continues
10   to collect and administer funds as to third parties who benefited from, or lost
11   money in, the Ponzi scheme.  Thus, although these matters are complete and can
12   be administratively designated as closed, the Court has retained jurisdiction over
13   the Receivership, and shall continue to administer the Receivership until it is
14   terminated.

15   Accordingly, it is hereby ordered that the Court Clerk administratively
16   close the file in: (1) *U.S. Commodity Futures Trading Commission, et al. v.*
17   *Khanna, et al.,* Civ. Case No. 09-cv-01783-BEN-WVG; and (2) *Securities and*
18   *Exchange Commission v. Khanna, et al.,* Civ. Case No. 09-cv-01784.
19   Notwithstanding such closure, the Court shall continue to retain jurisdiction over
20   the Receivership. As to matters related to the Receivership or the enforcement of
21   the Court's judgments, filings and other proceedings in these two matters may
22   therefore continue until further order of this Court.  Except as expressly stated in
23   this order, all other orders and judgments of the Court remain in force and effect.

24   **IT IS SO ORDERED.**

25

26   Dated: 3/18/2013

27                                     HON. ROGER T. BENITEZ,
                                       UNITED STATES DISTRICT JUDGE
28

1   Case Nos. 09cv1783/09cv1784 BEN (WVG)
ORDER CLOSING ACTIONS & RETAINING POST-JUDGMENT JURISDICTION OVER
RECEIVERSHIP

EXHIBIT A
Page 2