No. 22-56012

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellee*,

v.

TRIANGLE MEDIA CORPORATION, *et al.*,
*Defendants*,

v.

WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A.,
*Movants-Appellants*.

THOMAS W. MCNAMARA,
*Receiver-Appellee*

Appeal from the United States District Court
for the Southern District of California
No. 3:18-cv-01388-LAB-WVG
Hon. Larry A. Burns

## SUPPLEMENTAL EXCERPTS OF RECORD
## OF APPELLEE
## THE FEDERAL TRADE COMMISSION

(*Counsel listed on following page*)

ANISHA S. DASGUPTA
*General Counsel*

JOEL MARCUS
*Deputy General Counsel*

Of Counsel:
JONATHAN W. WARE
*Attorney*

MICHAEL BERGMAN
*Attorney*

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3184
mbergman@ftc.gov

## SUPPLEMENTAL EXCERPTS OF RECORD INDEX

| Document Name | ECF No. | Date | SER Page # |
|---|---|---|---|
| Declaration of Logan D. Smith (Att. 1 to the FTC's Response in Opposition to Motion to Intervene) | 167-1 | 12/20/2021 | 4 |
| Wells Fargo's Request for Judicial Notice In Support of Motion to Intervene (Ex. C – Receiver's Complaint in *McNamara v. Wells Fargo & Co.*, Case No. 3:21-cv-01245-AJB-JLB (S.D. Cal.)) | 154 | 11/10/2021 | 11 |
| Wells Fargo [Proposed] Motion to Vacate the Court's Order Authorizing Receiver to Sue Wells Fargo | 153-2 | 11/10/2021 | 105 |
| Memorandum in Support of Receiver's Motion for Authorization to Engage Contingency Fee Counsel and to Extend Receivership | 136-1 | 10/22/2019 | 110 |
| Memorandum Order re: Preliminary Injunction | 74 | 8/24/2018 | 118 |
| Preliminary Report of Temporary Receiver | 30 | 7/16/2018 | 148 |
| First Supplemental Declaration of Douglas McKenney in support of FTC Opposition to Modify Temporary Restraining Order | 28-1 | 7/16/2018 | 152 |
| Declarations in Support of FTC Motion for Temporary Restraining Order, Asset Freeze, Appointment of a Receiver and Other Equitable Relief | 5-3 | 6/25/2018 | 156 |

1

1
2
3
4
5

JONATHAN W. WARE
DC Bar No. 989414; VA Bar No. 77443
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC 20580
Tel: (202) 326-2726; Fax: (202) 326-3197
jware1@ftc.gov

6
7

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

8
9
10

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20
21
22

**FEDERAL TRADE COMMISSION,**

                                    Plaintiff,

                    v.

**TRIANGLE MEDIA CORPORATION;
JASPER RAIN MARKETING LLC;
HARDWIRE INTERACTIVE INC.;
GLOBAL NORTHERN TRADING
LIMITED;
BRIAN PHILLIPS; and
DEVIN KEER,**

                                    Defendants.

Case No. 3:18-cv-01388-LAB-LL

Judge:  Hon. Larry A. Burns

**DECLARATION OF LOGAN D.
SMITH PURSUANT TO
28 U.S.C. § 1746**

23
24
25
26
27
28

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

**FTCSER-4**

# DECLARATION OF LOGAN D. SMITH
## PURSUANT TO 28 U.S.C. § 1746

I have personal knowledge of the facts set forth below and am competent to testify about them. I am a United States citizen over the age of 18. If called as a witness, I could and would testify as follows:

(1)   I am licensed to practice law in California.

(2)   I am an attorney with McNamara Smith LLP and represent Thomas W. McNamara, the court-appointed receiver (the "Receiver") in *Federal Trade Commission v. Triangle Media, et al.*, No. 3:18-cv-01388-LAB-LL (S.D. Cal.) (the "Triangle Case") and in *Federal Trade Commission v. Apex Capital Group LLC, et al.*, No. 2:18-cv-09573-JFW (JPRx) (C.D. Cal.) (the "Apex Case"). I have been involved with the Receiver's investigation in those cases and in his litigation related to Wells Fargo & Company and Wells Fargo Bank, N.A. (together, "Wells Fargo") in *McNamara v. Wells Fargo & Company and Wells Fargo Bank, N.A.*, No. 3:21-cv-01245-LAB-LL (S.D. Cal.) (the "Receiver's Suit").

**The Receiver's Appointments**

(3)   The Court in the Triangle Case appointed the Receiver as temporary receiver on June 29, 2018 (Triangle Case ECF No. 11), and as permanent receiver on August 24, 2018 (Triangle Case ECF No. 75).

(4)   The Court in the Apex Case appointed the Receiver as temporary receiver on November 16, 2018 (Apex Case ECF No. 16), and as receiver on December 18, 2018 (Apex Case ECF Nos. 40, 41).

**The Receiver's Investigations**

(5)   Upon his appointment, the Receiver began to marshal the assets of the estates in each case, as required by each appointing court. To that end, on September 18, 2018, Wells Fargo issued a cashier's check to the Receiver for $1,181,479.83, which represented the sum across 40 bank accounts identified by

1

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

FTCSER-5

Wells Fargo and the Receiver as belonging to the Triangle Case defendants or otherwise subject to the Receiver's control.  Similarly, on January 24, 2019, Wells Fargo transferred to the Receiver $57,464.96, which represented the sum across 17 bank accounts identified by Wells Fargo and the Receiver as belonging to the Apex Case defendants or otherwise subject to the Receiver's control.

(6)     On May 2, 2019, the Receiver served Wells Fargo Bank, N.A. a Rule 45 subpoena seeking information about accounts in the Apex Case.

(7)     The Receiver's investigation in the Triangle Case and the Apex Case identified more than 150 accounts that Wells Fargo opened for the defendants in those cases through approximately 100 shell companies.

**The Receiver's Pursuit of Claims Against Wells Fargo**

(8)     On October 22, 2019, the Receiver publicly sought court approval in the Triangle Case to hire contingency counsel to pursue claims against Wells Fargo (Triangle Case ECF No. 136), which the court granted on November 19, 2019 (Triangle Case ECF No. 142), the same day it closed the case.

(9)     On February 4, 2020, the Receiver publicly sought court approval in the Apex Case to hire contingency counsel to pursue claims against Wells Fargo (Apex Case ECF Nos. 144, 148), and the court granted that request on March 9, 2020 (Apex Case ECF No. 153).  The court in the Apex Case administratively closed that case on January 15, 2020.

**Wells Fargo's Affirmative Actions Concerning the Receiver's Suit**

(10)   On April 1, 2020, the Receiver sent Wells Fargo draft complaints against it relating to Wells Fargo's actions underlying the Triangle Case and the Apex Case, along with a draft tolling agreement and proposed mediation of the claims.

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

(11)   On April 13, 2020, counsel for Wells Fargo (McGuire Woods LLP) responded to the Receiver's April 1, 2020 communications and spoke to the Receiver's counsel by phone the next day.

(12)   On April 15, 2020, Wells Fargo executed the tolling agreement, sent it to the Receiver, and stated it would be in touch within 30 days about mediation.

(13)   On April 29, 2020, Wells Fargo requested that the Receiver provide the documents the bank had produced to the Receiver via the subpoena described above.  The Receiver provided those to Wells Fargo a week later.

(14)   On May 7, 2020, Wells Fargo requested an extension until June 12, 2020 to consider mediation.

(15)   On May 18, 2020, Wells Fargo requested the Receiver provide certain deposition transcripts and documents.  The Receiver provided certain documents to the bank on May 21, 2020.

(16)   On May 27, 2020, Wells Fargo requested a summary of allegations concerning a third FTC case, *FTC v. Tarr, Inc.,* No. 3:17-cv-02024-KSC (S.D. Cal.), which involved similar conduct and timing as the Triangle Case and Apex Case and in which the Receiver's law firm (Glancy Prongay & Murray LLP) represented a consumer victim.  Counsel provided the requested summary on June 9, 2020.

(17)   On June 12, 2020, Wells Fargo agreed to mediate the Receiver's proposed suits before Judge Weinstein.

(18)   On June 16, 2020, Wells Fargo asked the Receiver about documents related to the Triangle Case, which the Receiver provided on June 19, 2020.

(19)   On June 26, 2020, Wells Fargo sent the Receiver an amended and executed tolling agreement.

(20)   On July 28, 2020, Wells Fargo and the Receiver agreed on October 14, 2020 as the mediation date concerning the Receiver's proposed suits.

3

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

(21)   On September 10, 2020, Wells Fargo requested to move the mediation to the first week of November 2020.

(22)   On November 5, 2020, Wells Fargo and the Receiver mediated their claims before Judge Weinstein and Ambassador David Carden, but were unable to reach a resolution.

(23)   Following the mediation, between November 2020 and June 2021, Wells Fargo and the Receiver continued to have discussions and exchange information with each other with the involvement of Judge Weinstein and Ambassador Carden.

(24)   On March 3, 2021, Wells Fargo and the Receiver extended their tolling agreement through May 28, 2021.

(25)   On April 29, 2021, Wells Fargo and the Receiver participated in a second round of mediation before Judge Weinstein and Ambassador Carden.

(26)   On May 25, 2021, Wells Fargo and the Receiver extended their tolling agreement through June 23, 2021, while the parties continued to have follow-up discussions through the mediators.

(27)   On June 23, 2021, Wells Fargo and the Receiver extended their tolling agreement through July 7, 2021.

(28)   On July 8, 2021, the Receiver filed his complaint in the Receiver Suit.

(29)   On July 28, 2021, Wells Fargo and the Receiver jointly moved the court in the Receiver's suit for an extension of time to respond to the Receiver's complaint (Receiver's Suit ECF No. 9), which the court granted on June 30, 2021 (Receiver's Suit ECF No. 12).

(30)   On August 19, 2021, counsel for Wells Fargo called and emailed the Receiver's counsel, stating Wells Fargo wanted to meet and confer with the Receiver regarding Wells Fargo's "plans to file a motion to intervene in the FTC action involving [the Receiver's] office—*FTC v. Apex*, No. 2:18-cv-9573-JFW

4

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

FTCSER-8

(C.D. Cal.)—to challenge the order appointing the receiver to pursue Wells Fargo and the previously entered stipulated judgment based on the recent AMG/FTC decision holding that the FTC does not have authority under Section 13(b) to obtain equitable monetary relief. *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021)."

(31)    On August 23, 2021, counsel for Wells Fargo and the Receiver held a meet and confer, where Wells Fargo indicated its intent to file a motion to intervene in the Apex Case on August 30, 2021.

(32)    On August 25, 2021, Wells Fargo filed a motion to dismiss the Receiver's suit, along with a memorandum in support and other related documents (ECF No. 14).  The Receiver filed his opposition on October 8, 2021 (ECF Nos. 15, 16), and Wells Fargo filed its reply on October 25, 2021 (ECF Nos. 17, 18).

(33)    On August 30, 2021, counsel for Wells Fargo emailed counsel for the Receiver, stating that Wells Fargo would not be filing its motion to intervene and would reach back out in advance of any future filing.

(34)    On October 26, 2021, counsel for Wells Fargo emailed the Receiver's counsel, indicating Wells Fargo intended to move to intervene in the Apex Case and wanted to schedule a meet and confer.  In subsequent discussions, Wells Fargo's counsel informed the Receiver's counsel that Wells Fargo intended to move to intervene in the Triangle Case in the Southern District of California where there is no obligation to meet and confer before filing.

**The Apex Case**

(35)    In the Apex Case, the FTC's November 14, 2018 Complaint and May 30, 2019 First Amended Complaint each stated that it sought relief, including monetary relief, "pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. § 53(b) and 57b, Section 5 of ROSCA, 15 U.S.C. § 8404, Section 917(c) of the

5

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

FTCSER-9

EFTA, 15 U.S.C. § 1693o(c), and the Court's own equitable powers."  Apex Case ECF Nos. 1 at 3, 35-36; 73 at 3, 35-44.

(36)  The court's temporary restraining order, preliminary injunction, and permanent injunctions in the Apex Case each cited Sections 13(b) and 19 of the FTC Act, as well as Sections 8303 and 8404 of ROSCA as a basis for those actions.  Apex Case ECF Nos. 16 at 2, 4-5 (TRO); 40 at 1-4 (preliminary injunction); 41 at 1-4 (preliminary injunction); 120 at 1-2 (permanent injunction of September 11, 2019); 121 at 1-2 (same); 142 at 1-2 (permanent injunction of January 15, 2020).

(37)  Attached hereto as **Exhibit A** is a true and correct copy of the Receiver's Notice of Unopposed Motion and Unopposed Motion to Extend Completion Deadline for Receivership and Interim Status Report (Apex Case ECF Nos. 186, 186-1, filed July 23, 2021).

(38)  Attached hereto as **Exhibit B** is a true and correct copy of the Order granting the Receiver's Unopposed Motion to Extend Completion Deadline for Receivership and Interim Status Report (Apex Case ECF No. 198, entered August 12, 2021).

(39)  Attached hereto as **Exhibit C** is a true and correct copy of the Court's September 3, 2021 Order Denying Defendants SIA Transact Pro's and Mark Moskvins's Motion to Modify, Vacate, or Set Aside Monetary Portion of Stipulated Permanent Injunction and Monetary Judgment (Apex Case ECF No. 207).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: December 20, 2021        /s/ Logan D. Smith_____
                                      Logan D. Smith

6

Case No. 3:18-cv-01388-LAB-LL
Smith Decl. ISO FTC's Opposition to Wells
Fargo's Motion to Intervene

**MCGUIREWOODS LLP**
DAVID C. POWELL (SBN 129781)
dpowell@mcguirewoods.com
ALICIA A. BAIARDO (SBN 254228)
abaiardo@mcguirewoods.com
Two Embarcadero Center, Suite 1300
San Francisco, CA 94111-3821
Telephone: 415.844.9944
Facsimile: 415.844.9922

**MCGUIREWOODS LLP**
KEVIN M. LALLY (SBN 226402)
klally@mcguirewoods.com
355 S. Grand Avenue, Suite 4200
Los Angeles, CA 90071
Telephone: 213.627.2268
Facsimile: 213.627.2579

Attorneys for Proposed Intervenors
Wells Fargo & Company and
Wells Fargo Bank N.A.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TRIANGLE MEDIA CORPORATION; JASPER RAIN MARKETING LLC; HARDWIRE INTERACTIVE INC; GLOBAL NORTHERN TRADING LIMITED; BRIAN PHILLIPS; and DEVIN KEER,<br><br>Defendants. | CASE NO. 18-cv-1388-LAB-LL<br><br>Judge: Hon. Larry Alan Burns<br><br>**PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO INTERVENE**<br><br>Date: January 10, 2022<br>Time: 11:15 a.m.<br>Ctrm: 14A |

**TO THE HONORABLE COURT AND ALL PARTIES OF RECORD:**

Pursuant to Rule 201 of the Federal Rules of Evidence, Proposed Intervenors Wells Fargo & Company and Wells Fargo Bank N.A. (collectively "Wells Fargo") respectfully request the Court take judicial notice of the following documents in support of their Motion to Intervene:

1.     Monitor Thomas M. McNamara's Statement re: July 13, 2021 Status Conference, filed as ECF No. 1333 on July 7, 2021 in *Federal Trade Commission v. AMG Services, Inc., et al.,* Case No. 2:12-cv-00536-GMN-VCF (D. Nev.), attached hereto as **Exhibit A**.

2.     FTC's Response to Defendants' Response to Monitor's Request for Status Conference, filed as ECF No. 1311 on May 20, 2021 in *Federal Trade Commission v. AMG Services, Inc., et al.,* Case No. 2:12-cv-00536-GMN-VCF (D. Nev.), attached hereto as **Exhibit B**.

3.     Plaintiff-Receiver Thomas M. McNamara's Complaint, filed as ECF No. 1 on July 8, 2021, in *Thomas W. McNamara v. Wells Fargo & Company, et al.,* Case No. 3:21-cv-01245-AJB-JLB (S.D. Cal.), attached hereto as **Exhibit C**.

4.     Receiver's Notice of Related Cases Under Civil Local Rule 40.1.f-g, filed as ECF No. 2 on July 8, 2021, in *Thomas W. McNamara v. Wells Fargo & Company, et al.,* Case No. 3:21-cv-01245-AJB-JLB (S.D. Cal.), attached hereto as **Exhibit D**.

5.     Report of Clerk and Order of Transfer Pursuant to "Low-Number" Rule, filed as ECF No. 8 on July 8, 2021, in *Thomas W. McNamara v. Wells Fargo & Company, et al.,* Case No. 3:21-cv-01245-AJB-JLB (S.D. Cal.), attached hereto as **Exhibit E**.

//

//

//

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO INTERVENE

6.     Federal Trade Commission public statement in June 2020 on "Triangle Media Refunds", published on the FTC's website https://www.ftc.gov/enforcement/cases-proceedings/refunds/triangle-media-refunds (last accessed November 10, 2021), attached hereto as **Exhibit F.**

Rule 201 makes facts that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned" the proper subject of judicial notice.  Fed. R. Evid. 201. Rule 201(c)(2) provides that the Court "must take judicial notice [of such a matter] if a party requests it and the court is supplied with the necessary information." *Id.*

Here, the existence and content of filings from the litigation brought by the Federal Trade Commission ("FTC") in *Federal Trade Commission v. AMG Services, Inc., et al.,* Case No. 2:12-cv-00536-GMN-VCF (D. Nev.), and the Receiver in *Thomas W. McNamara v. Wells Fargo & Company, et al.,* Case No. 3:21-cv-01245-AJB-JLB (S.D. Cal.), are proper subjects of judicial notice.  *See*, *e.g.*, *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record…including documents on file in federal or state courts"); *Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d 1149, 1158 (C.D. Cal. 2011) (taking judicial notice "of complaints filed by the Plaintiffs in related proceedings, as well as complaints and orders from other cases"); *Chrisanthis v. U.E.*, No. C 08-02472 WHA, 2008 WL 4848764, at *2 (N.D. Cal. Nov. 7, 2008) ("When adjudicating a motion to dismiss, a court may take judicial notice of public filings."); *Ramirez v. Quemetco, Inc.*, No. 17-cv-03384, 2017 WL 2957935, at *3 (C.D. Cal. July 11, 2017) (taking judicial notice of declaration filed in another case).

//

//

//

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO INTERVENE
**FTCSER-13**

Attached hereto as **Exhibits A-F** are copies of public filings in litigation brought by the FTC and the Receiver in different actions. Wells Fargo respectfully requests the Court take judicial notice of these documents, and the facts they evidence.

DATED: November 10, 2021

Respectfully submitted,

MCGUIREWOODS LLP

/s/ Alicia A. Baiardo
Kevin M. Lally, Esq.
David C. Powell, Esq.
Alicia A. Baiardo, Esq.

Attorneys for Proposed Intervenors Wells Fargo & Company and Wells Fargo Bank N.A.

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO INTERVENE

1

## <u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on November 10, 2021, the foregoing document was filed

3  electronically in the Court's Electronic Case Filing system ("ECF"); thereby upon

4  completion the ECF system automatically generated a Notice of Electronic Filing

5  ("NEF") as service through CM/ECF to registered e-mail addresses of parties of

6  record in the case.

7

8                              */s/ Alicia A. Baiardo*
                                Alicia A. Baiardo
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

# EXHIBIT C

LOGAN D. SMITH (#212041)
CORNELIA J.B. GORDON (#320207)
**MCNAMARA SMITH LLP**
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401
Email: lsmith@mcnamarallp.com

LIONEL Z. GLANCY (#134180)
JONATHAN M. ROTTER (#234137)
GARTH A. SPENCER (#335424)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-201-9160
Email: info@glancylaw.com

*Attorneys for Receiver, Thomas W. McNamara*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS W. MCNAMARA, as the Court-Appointed Receiver for Triangle Media Corporation, Apex Capital Group, LLC; and their successors, assigns, affiliates, and subsidiaries,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO & COMPANY, a corporation, WELLS FARGO BANK, N.A., a national banking association,<br><br>Defendants. | Case No. **'21 CV 1245 AJB JLB**<br><br>**RECEIVER'S COMPLAINT FOR:**<br><br>**(1) Aiding and Abetting Fraud;**<br>**(2) Conspiracy to Commit Fraud;**<br>**(3) Breach of Fiduciary Duty;**<br>**(4) Aiding and Abetting Breach of Fiduciary Duty;**<br>**(5) Aiding and Abetting Conversion;**<br>**(6) Violation of California Penal Code § 496;**<br>**(7) Violation of California Business & Professions Code § 17200;**<br>**(8) Aiding and Abetting Fraudulent Transfers and/or Voidable Transfers;**<br>**(9) Unjust Enrichment/Constructive Trust;**<br>**(10) Negligent Supervision (in the Alternative);**<br>**(11) Negligence (in the Alternative); and**<br>**(12) Request for an Accounting**<br><br>**JURY TRIAL DEMAND** |

Plaintiff, Thomas W. McNamara ("Plaintiff" or "Receiver"), in his capacity as the court-appointed receiver for the Triangle and Apex Enterprises, as defined below, hereby brings the following Complaint against Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo," the "Bank," or "Defendants") and alleges the following.

## I.   INTRODUCTION: A NEW REVELATION OF WELLS FARGO'S FACILITATION OF CONSUMER FRAUD

1.     The Receiver brings this action against Wells Fargo to recover damages suffered as a result of Wells Fargo's knowing provision of substantial assistance to two multi-million-dollar fraudulent schemes perpetrated by the former operators of Triangle Media Corporation ("Triangle") and Apex Capital Group ("Apex").[1]

2.     The Receiver was appointed after the Federal Trade Commission ("FTC") brought lawsuits against the Triangle and Apex Enterprises in 2018.   The Enterprises ran similar, though separate, Internet risk-free trial schemes marketing dozens of products, most of which were personal care products and dietary supplements that purported to promote enhanced weight loss, hair growth, clear skin, muscle development, sexual performance, and cognitive abilities.  Consumers were offered "free" trials of the products for "just the cost of shipping and handling," usually $4.95.  Two weeks after consumers signed up for the "trial," they were charged the full price of the product (roughly $90) and enrolled in continuity programs, which continued to ship products on a monthly basis—charging the consumer the full $90 each time, of course.  Cancellation was difficult and obtaining a refund was nearly impossible.  The schemes, a category of frauds

---

[1] Triangle and Apex, along with their related entities and the individuals controlling those entities, are referred to herein as the "Triangle Enterprise" and the "Apex Enterprise," respectively, and collectively as the "Enterprises."

FTCSER-18

known as "negative option schemes,"[2] were incredibly successful, raking in more than $200 million from consumers.

3.    To execute the schemes, the Enterprises recruited unrelated individuals (sometimes referred to as "fronts", "signors", "nominees" or "straw owners") and paid them a modest monthly fee for the use of their names and identities to establish approximately 100 shell companies.  The Enterprises then immediately turned to Wells Fargo, which opened scores of Wells Fargo bank accounts – more than 150 in total[3] – in the names of the shell companies.  Having the Wells Fargo bank accounts was a prerequisite for the Enterprises to secure accounts with merchant processors, which the Enterprises needed to accept consumers' credit and debit card payments.

4.    Crucially, the Enterprises were able to obtain continued access to accounts with merchant processors, while concealing the identities of the Enterprises' owners from the merchant processors.  The practice of processing credit card transactions through other companies' merchant accounts is known as "credit card laundering," and it is an unlawful practice used by fraudulent merchants, like the Enterprises, to circumvent credit card associations' monitoring programs and avoid detection by consumers and law enforcement.

5.    Through his independent investigation, which gave him access to the Enterprises' email communications with Wells Fargo and Wells Fargo bank account statements, the Receiver discovered that Wells Fargo was providing substantial, knowing assistance to both the Triangle and Apex Enterprises' sales

---

[2] "Risk-free" trial scams are sometimes referred to as negative option scams, because they require consumers to affirmatively opt out (*i.e.*, exercise a negative option) of a program to avoid being charged.

[3] References to the numbers of Apex and Triangle-related bank accounts identified herein are estimates based on calculations made by the Receiver using only on information presently available to him.  The number is likely to grow when information on Wells Fargo is received in discovery.

scams.

6.     Wells Fargo bankers were aware of the Enterprises' risk-free trial schemes, understood the people listed as "owners" of the Wells Fargo accounts did not actually own or control them, and knew the Enterprises were engaged in credit card laundering.  Despite this knowledge, Well Fargo gladly opened ***more than 150 bank accounts for the shell companies and straw owners***, ***sometimes opening as many as 6 bank accounts in one day***.  Wells Fargo then allowed millions of dollars to be deposited in the accounts, knowing that these funds were unlawfully obtained in the risk-free trial schemes, and afterwards allowing the Enterprises' operators to transfer their ill-gotten gains from the shell accounts to third-party bank accounts, including accounts located outside of the United States.

7.     The principals of the Apex and Triangle Enterprises came to rely heavily upon Wells Fargo to aid their frauds by providing them with law oversight and atypical banking services, widely deviating from accepted banking standards and violating applicable banking laws and regulations.  As one telling example of this from very early in the Triangle scheme, owner Brian Phillips recruited a son and his mother to serve as straw owners of two of the shell companies Phillips actually owned. Wells Fargo promptly opened the bank accounts for the shell companies, listing the straw owners as "owners" of the accounts, and gave Phillips complete control over the shell accounts to Phillips. When the son expressed concerns that Wells Fargo might call his unaware mother to conduct due diligence into the relationship, Phillips plainly explained that it was Wells Fargo, and that would not be happening, emailing him:

| | |
|---|---|
| **From:** | Brian Phillips <brian@trianglemediacorp.com> |
| **Sent:** | Friday, November 11, 2011 8:18 PM |
| **To:** | Marty |
| **Subject:** | Re: Please see attached document |

Dude, you still don't understand how wells is totally different. The bank won't be calling her

On Nov 11, 2011 11:01 PM, "Marty" <mglinsky1@comcast.net> wrote:
Brian- Mom faxed signed doc to Wells Fargo today. Should we have a prepatory conv - you/me/mom so she doesnt get blindsided again?

Thanks Marty G.

**FTCSER-20**

Phillips was right. Wells Fargo didn't call her.

8. And during the period in which the Apex and Triangle Enterprises' risk-free trial scams were operating, Wells Fargo was indeed "totally different" from its banking peers. As Wells Fargo has since *admitted*, Wells Fargo's established corporate policies and sales incentives were fueling a high-pressure sales culture that required its bankers to open as many accounts as possible. As a direct result of that pernicious sales culture, and with the ongoing knowledge and authorization of Wells Fargo, an array of Wells Fargo bankers in multiple branch offices in California (and in a few cases, Texas) deliberately assisted the operators of the Apex and Triangle risk-free trial scams for an astonishingly long period of time: from at least 2009 to 2018 for the Triangle fraud and from at least 2014 to 2018 for the Apex fraud ("the Relevant Period"), until the filing of the FTC actions finally shut them down.

9. The Bank's high-pressure sales culture and near unattainable sales goals drove Wells Fargo bankers to open accounts regardless of the risk to the Bank or others; if the employees failed to deliver, the consequences were severe: "[i]t was common knowledge within the Bank that employees who could not meet sales goals could and would be terminated," and "[e]mployees' incentive compensation and promotional opportunities depended on their ability to meet the unreasonable sales goals."[4] As discussed in greater detail below, this drive for new accounts aligned perfectly with the Enterprises' constant need for shell accounts.

10. In the aftermath of Wells Fargo's much-publicized unauthorized accounts scandal caused by this sales culture, Wells Fargo's newly-installed CEO described the bank's corporate policies as excessively "focus[ed] on growing the

---

[4] January 23, 2020 Office of the Comptroller of the Currency Notice Of Charges For Orders Of Prohibition And Orders To Cease And Desist And Notice Of Assessments Of A Civil Money Penalty, AA-EC-2019-82 et al. (Jan. 23, 2020) ("OCC Notice of Charges") ¶¶ 72, 77.

number of accounts," admitting that Wells Fargo's actions were "just stupid." Unfortunately for Wells Fargo and the victims here, this "stupid" conduct had devastating consequences, as these policies encouraged and rewarded Wells Fargo bankers for aiding and abetting fraud in order to satisfy the pressurized sales culture and hit sales quotas. The Receiver's investigation revealed that Wells Fargo knowingly facilitated the opening of accounts by the Enterprises' principals for use in their fraud, all while making a conscious decision to let the fraud go unreported.

11.     Wells Fargo's misconduct centered around the Community Bank, which was the largest of Wells Fargo's three business units and contributed more than half (and in some years more than three-quarters) of the Bank's revenue. The Community Bank was responsible for the everyday banking products sold to businesses such as the Enterprises in this case.

12.     Commenting on the widespread nature of Wells Fargo's misconduct in the Community Bank, the Office of the Comptroller of the Currency (the "OCC"), the federal bank regulator which ensures safe and sound banking, found that: "To the extent [Wells Fargo] did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank." OCC Notice of Charges ¶ 6. Consistent with this finding, the Receiver's investigation has led him to conclude that Wells Fargo intentionally designed and maintained controls which served to conceal—rather than unmask—its customers' illegal activities, which Wells Fargo was actively facilitating.

13.     Wells Fargo knowingly assisted the operators of the Apex and Triangle Enterprises, including by, among other things: (i) authorizing or allowing the use of atypical banking procedures to assist the Enterprises in their frauds, (ii) counseling the Enterprises on how to set up deceptive bank accounts with straw owners, which enabled them to hide the fraud, (iii) accepting deposits obtained

5

Case No. _____
RECEIVER'S COMPLAINT

through the fraud, and (iv) authorizing suspicious inter-company transfers that enabled the wrongdoers to secrete the proceeds of their fraud, including in accounts located outside of the United States.

14. Wells Fargo has admitted wrongdoing and paid substantial fines and restitution for one consequence of its illegal sales culture, namely, the creation of fraudulent accounts in customers' names, opened without their consent. But the Receiver's investigation revealed that there were other, previously unidentified consequences of Wells Fargo's sales culture and its actions here: in this case, the consequences were hundreds of millions of dollars in harm, done to the thousands of consumers who signed up for Apex's and Triangle's risk-free trials, and the resulting liability of the Receivership Entities to make the defrauded consumers whole. To date, Wells Fargo has never compensated this newly-identified category of victims, including the Receivership Entities, that were harmed by Wells Fargo's sales culture and the resulting conduct that aided these fraudulent businesses.

15. The Receiver is therefore seeking to recover damages for the harm proximately caused to the Apex and Triangle Receivership Entities by Wells Fargo, including, but not limited to: (i) the Receivership Entities' legal obligations to satisfy the FTC judgments, which were premised on misconduct that could not have occurred but for Wells Fargo's assistance, (ii) the fees charged by Wells Fargo in connection with their account services, (iii) the account funds which were improperly transferred out of the Receivership Entities' accounts by Wells Fargo at the direction of the Enterprises' principals, and (iv) the costs of defending the actions by the FTC (including the resulting Receiverships).

## II. PRIOR FEDERAL TRADE COMMISSION PROCEEDINGS AND THE APPOINTMENTS OF THE RECEIVER

16. In June 2018 and November 2018, the FTC brought separate lawsuits in the Southern and Central Districts of California against Triangle Media Corporation and Apex Capital Group, LLC and their related entities (the

"*Triangle*" and "*Apex*" actions), respectively, each of which was operating deceptive online risk-free trial offer schemes in violation of consumer protection statutes. The FTC sued to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten gains, and other equitable relief. The FTC filed amended complaints in December 2018 and May 2019 in the Triangle and Apex actions, respectively.

### A. The *Apex* Action

17. Plaintiff is the Court-appointed Receiver in the *Apex* action: *Federal Trade Commission v. Apex Capital Group, LLC, et al.,* Case No. 2:18-cv-09573-JFW *(JPRx)* (C.D. Cal.). The Apex Preliminary Injunctions (the "Apex PIs," *id.*, ECF Nos. 40 (Peikos) and 41 (Barnett)) direct the Receiver to preserve the value of the assets of the Receivership Estate and authorize the Receiver to institute actions to preserve or recover those assets. *See id.*, ECF Nos. 40, 41 at 19-23.

18. Receivership Entities subject to the *Apex* action are expressly defined to include the following: the Corporate Defendants,[5] the Wyoming Related Companies,[6] and the U.K. Related Companies.[7] Apex PIs at 7, Definition K. In addition, the term "Receivership Entities" is defined to include "any other entity that has conducted any business related to Defendants' marketing or sale of

---

[5] The Corporate Defendants include: Apex Capital Group, LLC; Capstone Capital Solutions Limited; Clik Trix Limited; Empire Partners Limited; Interzoom Capital Limited; Lead Blast Limited; Mountain Venture Solutions Limited; Nutra Global Limited; Omni Group Limited; Rendezvous IT Limited; Sky Blue Media Limited; and Tactic Solutions Limited; and each of their subsidiaries, affiliates, successors, and assigns. Apex PIs at 6, Definition C.

[6] The Wyoming Related Companies include entities formed in Wyoming by Defendants, in the names of nominees, for the sole purpose of fronting merchant accounts. They are identified in Exhibit A to the *Apex* action Complaint.

[7] The U.K. Related Companies include entities formed in the U.K. by Defendants, in the names of nominees, to front merchant accounts. They are identified in Exhibit B to the *Apex* action Complaint.

products with a Negative Option Feature, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant." *Id*. To date, the Receiver has determined that multiple additional entities qualify as Receivership Entities under this definition.[8] These entities are collectively referred to herein as the "Apex Enterprise."

19.     As alleged in the *Apex* Complaint, Philip Peikos ("Peikos") and his one-time partner, David Barnett ("Barnett), and their agents ran an online "free trial" subscription scam through the Apex Enterprise. Peikos was the Chief Executive Officer and co-owner of Apex. At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Apex Enterprise.

20.     Barnett was the Chief Operating Officer of the Apex Enterprise. He was a co-owner of the Apex Enterprise until at least late 2017, when he transferred his shares to Peikos. At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Apex Enterprise.

21.     On September 11, 2019, the FTC and the *Apex* defendants stipulated to the entry of Orders for Permanent Injunctions (barring them from their illegal conduct) and Monetary Judgments resolving all matters in dispute between them.

**B.     The *Triangle* Action**

22.     Plaintiff is also the Court-appointed Receiver in the *Triangle* action:

---

[8] These include five nominee entities formed by Defendants for the purpose of opening new merchant accounts to conduct business inextricably related to the *FTC v. Apex* defendants' sale of products with a Negative Option Feature: Albright Solutions LLC ("Albright"); Asus Capital Solutions LLC ("Asus Capital"); Element Media Group LLC ("Element"); NextLevel Solutions LLC ("NextLevel"); and Vortex Media Group LLC ("Vortex").

*FTC v. Triangle Media Corporation, et al,* 3:18-cv-01388 (LAB-LL) (S.D. Cal.).[9] The Temporary Restraining Order (the "Triangle Order," *id.*, ECF No. 11) which first appointed the Receiver directs the Receiver to preserve the value of the assets of the Receivership Estate and authorizes the Receiver to institute actions to preserve or recover those assets. *See id.* at 18-19.

23. Receivership Entities subject to the Triangle Receivership are expressly defined to include Corporate Defendants Triangle Media Corporation ("Triangle"), Hardwire Interactive Inc. ("Hardwire"), and Jasper Rain Marketing LLC ("Jasper Rain"), and their respective dbas.[10] Triangle Order at 8, Definition N. Receivership Entities also include "any other entity that has conducted any business related to Defendants' marketing of negative option offers, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant."[11] These Entities are collectively referred to herein as the "Triangle Enterprise."

24. Brian Phillips ("Phillips") and his agents operated the Triangle online "free trial" subscription scam. During the relevant period, Phillips was an owner and officer of the Triangle Enterprise. At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the

---

[9] In the *Triangle* Complaint, the Corporate Defendants are defined as: Triangle Media Corporation also doing business as Triangle CRM, Phenom Health, Beauty and Truth, and E-Cigs; Jasper Rain Marketing LLC also doing business as, and each of their subsidiaries, affiliates, successors, and assigns. The Individual Defendant is Brian Phillips.

[10] These dbas include Cranium Power, Phenom Health, Beauty and Truth, and E-Cigs.

[11] The Receiver has determined that additional entities fall within this definition of Triangle-related Receivership Entities: (1) Global Northern Trading Ltd. ("Global Northern"), a Canadian corporation as to which Triangle transferred more than $44 million during the period 2013-2018; and (2) the nominee entities formed and controlled by Phillips but deliberately placed in the names of nominees.

Case No. _____
RECEIVER'S COMPLAINT

authority to control, or participated in the acts and practices of the Triangle Enterprise.

25.    During the relevant period, Devin Keer ("Keer") was also an owner and officer of the Triangle Enterprise.  At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control or participated in the acts and practices of the Triangle Enterprise.

26.    On May 30, 2019, the FTC and the *Triangle* defendants stipulated to the entry of Orders for Permanent Injunctions (barring them from their illegal conduct) and Monetary Judgments resolving all matters in dispute between them.

## C.    The Receiver's Investigation of Wells Fargo and Discovery of Wells Fargo's Wrongful Conduct.

27.    After conducting his initial investigations, the Receiver filed preliminary reports as to his conclusions in each of the Triangle and Apex FTC actions.  In both cases, the Receiver determined that the businesses could not continue to be operated lawfully and profitably.

28.    Based on initial and subsequent reviews of internal Apex and Triangle emails and bank records, the Receiver's investigation revealed that Wells Fargo was aiding and abetting both Enterprises by providing similar atypical banking services, as detailed herein, in furtherance of the frauds.

29.    During the investigation, the Receiver issued subpoenas to Wells Fargo regarding their relationships with the Apex and Triangle Enterprises.    In response, Wells Fargo made incomplete productions.  On information and belief, numerous internal bank records, including electronic documents and internal communications, still exist regarding the Apex and Triangle Enterprises, as Wells Fargo was obligated under applicable banking regulations and laws to maintain such records.

30.    In late October 2019 and January 2020, the Receiver filed motions in

---

10

Case No. _____
RECEIVER'S COMPLAINT

the *Triangle* and *Apex* actions, respectively, advising the Courts that he wished to retain counsel to pursue claims against Wells Fargo on behalf of the Receivership Entities. In the *Triangle* action, on November 19, 2019, Judge Burns ruled that "the Court finds good cause exists to grant the Receiver's motion to (1) extend the receivership for the sole purpose of pursuing litigation against Wells Fargo, (2) permit the Receiver to retain contingency counsel, and (3) administratively close the case while that litigation is pursued." In the *Apex* action, on March 9, 2020, Judge Walter similarly permitted the Receiver to retain contingency counsel to pursue claims against Wells Fargo.

## III. PARTIES

31. Plaintiff Thomas W. McNamara is the Court-appointed Receiver of the Triangle and Apex Entities. Triangle's principal place of business was 1350 Columbia Street, San Diego, California 92101 until May 17, 2018, when it filed paperwork with the California Secretary of State changing its principal place of business to Tampa, Florida, though the center of operations remained in San Diego. Apex was a Wyoming limited liability company which had business addresses in Westlake Village, California; Jackson, Wyoming; Beverly Hills, CA; and Woodland Hills, CA, though it was always, to the Receiver's knowledge, operated out of California during the Relevant Period.

32. Defendant Wells Fargo & Company is a nationwide, diversified, financial services company. Upon information and belief, its corporate headquarters are located in San Francisco, California. Defendant Wells Fargo & Company is the parent company of Wells Fargo Bank, N.A.

33. Defendant Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States. Upon information and belief, its corporate headquarters are located in South Dakota. It maintains multiple offices in the State of California and the Southern District of California for the purposes of maintaining checking, savings, business, and merchant accounts, and engaging in

Case No. _____
RECEIVER'S COMPLAINT

FTCSER-28

other business activities.

34.     The Defendants are collectively referred to herein as "Wells Fargo," the "Bank," or "Defendants."

**IV.    JURISDICTION AND VENUE**

35.     This Court has jurisdiction over this matter under 28 U.S.C. § 754, 28 U.S.C. § 1345, and 28 U.S.C. § 1367(a), and the doctrines of supplemental and ancillary jurisdiction.  *See S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004) ("[T]he receiver's complaint was brought to accomplish the objectives of the Receivership Order and was thus ancillary to the court's exclusive jurisdiction over the receivership estate").

36.     Venue in the Southern District of California is proper pursuant to 28 U.S.C. § 1391, because the *Triangle* Court retained jurisdiction of this matter for all purposes and appointed the Permanent Receiver in the Southern District of California on August 24, 2018,  and because this proceeding is supplemental to *FTC v. Triangle.  See Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 n.6 (6th Cir. 1981) ("[W]here jurisdiction is ancillary, the post-jurisdictional consideration of venue is ancillary as well."), and because the *Triangle* action was initiated prior to the filing of the *Apex* action in the Central District of California.

37.     The Court may exercise personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1692 because the funds sought to be recovered are assets of the Receivership Entities under the Court's Orders issued in the *Triangle* and *Apex* actions.

38.     This Court also has personal jurisdiction over Defendants named in this Complaint because Wells Fargo conducted business in California and it participated in California-based fraudulent schemes that injured Californians. Venue is also proper in this District because the conduct at issue took place and had an effect in this District and Wells Fargo regularly conducted and still regularly conducts substantial banking business in this District.  Defendants have

sufficient minimum contacts with the Southern District of California arising from the specific conduct committed in or directed to the Southern District of California.

## V.   WELLS FARGO'S UNATTAINABLE SALES GOALS AND HIGH-PRESSURE SALES CULTURE DROVE ITS BANKERS TO PARTICIPATE IN THE ENTERPRISES' FRAUDS

39.   During the Relevant Period, Wells Fargo engaged in rampant sales misconduct from the top down.  That misconduct has been repeatedly confirmed by multiple regulators, hearings, and lawsuits.  In September 2016, the CFPB imposed a fine of $100 million against Wells Fargo for opening more than two million new accounts not requested by customers in order to generate illicit fees.  The company also paid $35 million to the Office of the Comptroller of the Currency and $50 million to the City and County of Los Angeles.

40.   Despite signing consent orders with the CFPB and OCC, in 2018, those same two agencies fined Wells Fargo again (this time for *one billion* dollars) for selling unnecessary products to customers and for engaging in other improper practices.  Later, in February 2020, Wells Fargo agreed to pay *three billion* dollars to resolve federal civil and criminal investigations into the consumer account scandal; the settlement of those matters included a deferred prosecution agreement.

41.   Wells Fargo's sales misconduct began at least as early as 2002.  At that time, the Bank's internal investigations unit noticed an increase in "sales integrity" cases.  According to Wells Fargo's employees, sales goals were impossible to meet, and incentives for compensation and ongoing employment necessitated "gaming" the system.  Gradually, "gaming," which was defined in the Wells Fargo Code of Ethics as "the manipulation and/or misrepresentation of sales or referrals . . . in an attempt to receive compensation or to meet sales goals," became commonplace.

42.   To meet company sales quotas, employees opened accounts and credit lines, ordered credit cards without their customers' permission, and forged client

signatures on paperwork. Some employees urged family members to open ghost accounts.

43. Between 2011 and 2015, Wells Fargo employees opened more than 1.5 million deposit accounts and more than 565,000 credit card accounts that may not have been authorized. On a per-employee basis, the reports of sales-related misconduct tripled from the second quarter of 2007 through the fourth quarter of 2013.

44. Despite Wells Fargo's payment of a combined $185 million penalty to the OCC, CFPB, and the City and County of Los Angeles in 2016 to settle charges related to consumer account fraud, the next year in an August 4, 2017 quarterly 10-Q filing, Wells Fargo said it had expanded the period targeted for review (previously 2011 through 2015) to 2009 through 2016 and disclosed that the expansion of the review period could reveal a "significant increase" in unauthorized accounts.

45. On January 23, 2020, the OCC brought additional charges against several Wells Fargo executives for allowing long-term sales misconduct. As the OCC put it:

> **The Bank tolerated pervasive sales practices misconduct as an acceptable side effect of the Community Bank's profitable sales model**, and declined to implement effective controls to catch systemic misconduct. Instead, to avoid upsetting a financially profitable business model, senior executives…turned a blind eye to illegal and improper conduct across the entire Community Bank.…**To the extent the Bank did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank**. In short, Bank senior executives favored profits and other market rewards over taking action to stop the systemic issuance of unauthorized products and services to customers.

(Emphasis added).

46. In 2020, Wells Fargo also entered into a Deferred Prosecution Agreement ("DPA") with the United States Attorney's Offices for the Central District of California and the Western District of North Carolina that included a

Case No. _____
RECEIVER'S COMPLAINT

"Statement of Facts" in which Wells Fargo "admitted, accepted, acknowledged as true" (among other things) that "[d]espite [having] knowledge of the widespread sales practices problems" as early as 2002 and through 2016, "Community Bank senior leadership failed to take sufficient action to prevent and reduce the incidence of unlawful and unethical sales practices."  According to the DPA, Wells Fargo was alerted to the fraud by "Wells Fargo's internal investigations unit, the Community Bank's own internal sales quality oversight unit, and managers leading the Community Bank's geographic regions, as well as regular complaints by lower-level employees and Wells Fargo customers reporting serious sales practices violations."

47.    In the wake of Wells Fargo's consumer account scandal, the federal bank regulators, the OCC and the Federal Reserve, initiated a multi-phase "Sales Practices and Incentive Compensation Horizontal Review,"[12] with the goals including to determine whether *other* banks doing the very same things that Wells Fargo did.  After conducting its investigation, the regulators OCC concluded in 2017 that Wells Fargo was unique in terms of its sales culture, which prompted employees to open unauthorized, and even fraudulent, accounts in order to meet daily new account goals and keep their jobs.  The banking regulators' review confirmed that Wells Fargo's banking peers, unlike Wells Fargo, had taken seriously the significant compliance risks caused by an overly aggressive sales culture and lax oversight of branches.

48.    In other words, Wells Fargo's misconduct was not the norm within the industry and was tethered to Wells Fargo's uniquely toxic sales culture.  That same culture is at issue here but in an entirely different context, and one that was only discovered after the Receiver was appointed.  Here, Wells Fargo's corporate focus

---

[12] That review initially covered all large national banks, like Wells Fargo, and later significant regional banks.

Case No. _____
RECEIVER'S COMPLAINT

on the opening of new accounts at any cost resulted in the Bank opening *roughly one hundred and fifty bank accounts for shell companies across the Apex and Triangle frauds*—accounts which Apex and Triangle's principals required to secure merchant payment processing services (leaning on Wells Fargo's imprimatur and reference letters to convince the processors of the accounts' legitimacy) and then used to launder the proceeds from their consumer frauds.

## VI. WELLS FARGO'S CREATION AND MAINTENANCE OF BANK ACCOUNTS FOR DECEPTIVE SHELL COMPANIES WERE ESSENTIAL TO THE FRAUDS

49.     The Apex and Triangle frauds were simple in concept: bait consumers with deceptive internet ads offering "risk-free" trials for only the cost of shipping, and then use the consumers' billing information to charge for the product and impose a monthly continuity charge.  Make it impossible to cancel.  These schemes defrauded consumers of hundreds of millions of dollars.

50.     Simple as it was, the con was effective.  Consumers would be offered a full month's supply of a featured product and, at the time of the initial order, would only pay the nominal cost for the shipping and handling of the product.  But if the consumer did not cancel the order and return the unused portion of the product within a short period of time (often, fourteen calendar days), the Triangle and Apex Enterprises would automatically charge the consumer's card for the full price of the product (usually around $87 or $89).  The consumer would also be enrolled in an auto-ship program when signing up for the "risk-free" trial offer— meaning that unless the subscription was affirmatively canceled, the consumer was automatically charged monthly for additional product.

51.     Both the Apex and Triangle schemes required access to a steady stream of new bank accounts to function.  As such, Wells Fargo and the Enterprises' objectives were aligned: the Enterprises needed new bank accounts on a regular basis, and Wells Fargo was constantly pressuring its sales employees to

open more bank accounts.  As a result, the Enterprises, the individuals behind them, and the bank developed a symbiotic relationship.  Without Wells Fargo's assistance, the Enterprises' frauds could not have survived (let alone thrived) for as long as they did.

### A.    The Payment Processing System and Credit Card Laundering

52.    In order to charge consumers' credit or debit cards, the Triangle and Apex Enterprises (the "merchants") needed to establish an account with a merchant processor.  Merchant processors have access to credit card associations ("card networks") like MasterCard and VISA and thereby enable merchants to charge consumers' credit cards.

53.    Card networks require all participants within their networks to comply with detailed rules, including screening processes and underwriting standards for merchants.  These rules are put in place (1) to ensure that the merchants whose purchases are being processed are legitimate, bona fide businesses, and (2) to screen out merchants engaged in potentially fraudulent or illegal practices.  The rules also prohibit "credit card laundering," which encompasses the practice of processing card charges through the merchant accounts of shell companies like those used by the Enterprises.

54.    Merchants who pose a heightened risk of fraud to the card networks are subject to closer scrutiny by their merchant processors and may have their access to the card networks capped or terminated altogether.

55.    One sign of potential illicit activity by a merchant is the generation of an excessive number of transactions which have to be refunded to consumers ("chargebacks").

56.    Consumers initiate "chargebacks" when they dispute card charges (most often because of fraud or unauthorized use) by contacting their "issuing bank," which is the bank that issued the credit card to the consumer.  When a consumer successfully disputes the charge, the consumer's issuing bank credits the

---

17

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-34**

consumer's card for the disputed amount, and then recovers the chargeback amount from the merchant processor. The merchant processor, in turn, collects the chargeback amount from the bank account of its merchant client. In this case, merchant processors would seek to collect chargebacks from the Enterprises' Wells Fargo accounts.

57. In order to detect and prevent illegal, fraudulent, or unauthorized merchant activity, the card networks operate various chargeback monitoring and fraud monitoring programs. These chargeback monitoring programs are designed to flag merchant accounts with excessive chargeback ratios or an excessive number of chargebacks. For example, if a merchant account has chargeback levels that exceed the thresholds set by VISA's chargeback monitoring program, the merchant is subject to additional monitoring requirements and, in some cases, penalties, and termination.

58. Credit card laundering is commonly used by merchants who cannot meet a merchant processor's underwriting criteria or who cannot obtain merchant accounts under their own names (whether because of a prior history of excessive chargebacks, complaints, use of sales or industry practices prohibited by merchant processors, or other signs of illegal activity). To conceal their identities, merchants which are engaged in fraud will often create shell companies to act as fronts, and apply for merchant accounts under the names of these shell companies. Once the shell merchant accounts are approved, the fraudulent merchants then launder their own transactions through the shell companies' merchant accounts. This allows the merchants to circumvent card associations' onboarding and monitoring programs and avoid detection by consumers and law enforcement.

59. When a merchant is terminated, or if it has a high-risk account or excessive chargebacks, its name (and that of the merchant's owner) is put on a blacklist, which is often referred to as the "MATCH" list ("Merchant Alert To Control High-Risk"), as a terminated merchant file ("TMF"). Other reasons for

Case No. _____
RECEIVER'S COMPLAINT

being listed as a terminated merchant file include merchant collusion, fraud, and money laundering. Merchant processors use the MATCH list to screen potential merchant clients, and merchants on the list are often unable to open an account with a new merchant processor.

60. For credit card laundering to be effective long-term and on a large scale, then, a merchant needs access to a ready supply of merchant processing accounts, so that the merchants can move sales from one shell company to a newly-created shell company once the profits have been reaped and the chargeback rates or other "red flags" have attracted attention. An absolute prerequisite to a merchant processing account is a bank account in a shell company's name. Luckily for Apex and Triangle (and unluckily for consumers), Wells Fargo was more than happy to provide the latter.

**B.    Apex and Triangle's (Mis)Use of the Credit Card Processing System**

61. Entities associated with the Triangle and Apex Enterprises showed up again and again on the MATCH list during the Relevant Period, because they were flagged as high risk and/or routinely had high card chargebacks.

62. The average chargeback rate in the United States is 0.2% of the transaction rate and a chargeback rate greater than 1% is considered excessive. The Triangle and Apex Entities' chargeback rates were astronomical, with both and averaging over 20% on a monthly basis, with some months having chargeback rates of 70% or higher. The merchant processors would typically cancel accounts when chargebacks exceeded 3% of sales—a regular occurrence for the Apex and Triangle Entities.

63. Merchant processors would not deal with repeat offenders like the Apex and Triangle principals. To get around the merchant processors' restrictions, Apex and Triangle's owners hid their connection to the fraudulent businesses (and the high chargeback rates that they generated) by creating phony shell companies.

19

Case No. _____
RECEIVER'S COMPLAINT

64.     The Apex and Triangle Enterprises used a host of straw owners (which they sometimes referred to as "fronts" or "nominees" or "signors") to act as the "owners" of the shell companies.  These straw owners were individuals who would act as the "front" for a shell company, often in exchange for a payment of about $500 per month, typically.  The Enterprises would orchestrate the formation of the shell companies, the opening of the necessary Wells Fargo bank accounts, and the completion of applications for merchant processing in the shell companies' names.  When the merchant processor inevitably terminated processing for a shell company (typically due to excessive chargebacks), the Apex and Triangle Enterprises would use a new nominee to form another shell company and restart the whole process.  Rinse and repeat.

65.     For the scheme to work, the shell companies needed to be able to establish depository accounts with an actual bank.  Without bank accounts, merchant processing could not be acquired, and without bank accounts, the shell companies would have nowhere to transfer the funds they took from consumers.

66.     Enter Wells Fargo.  Wells Fargo's employees gladly helped the Enterprises set up bank accounts for the shell companies and readily provided them with bank reference letters, which the shell companies often needed to secure merchant processing services.  Merchant processors would never have provided merchant processing for the shell companies had they known the identity of the entities' true owners (Apex and Triangle's principals).

67.     When merchant processors charged consumers' cards for Apex or Triangle products, the transactions were processed through accounts secured in the names of the shell companies.  The consumer payments would then be sent to accounts at Wells Fargo, which nominally belonged to the shell companies but which were actually controlled by the owners of the Apex and Triangle Enterprises.  As discussed below, Wells Fargo was well aware of the shell companies' true ownership yet continued to assist the Enterprises in their creation

20

Case No. _____
RECEIVER'S COMPLAINT

of shell bank accounts needed to perpetrate and conceal their fraud.

68.     From at least 2014 through 2018 for the Apex Enterprise, and 2009 through 2018 for the Triangle Enterprise, Wells Fargo provided vital access to the enable the Enterprises to open approximately 150 Apex and Triangle shell bank accounts to accept fraudulently-obtained payments from consumers.  As detailed herein, Wells Fargo knew of this scheme, counseled the Enterprises' principals, and helped them hide the true ownership of the accounts.

## VII.   WELLS FARGO'S KNOWING INVOLVEMENT IN THE FRAUDS

### A.     Wells Fargo's Support of the Apex Enterprise

69.     Wells Fargo bankers in California regularly and repeatedly helped Apex executives advance their credit card laundering scheme in a number of ways. Wells Fargo bankers like Dominic Testa (Westlake Village Branch) developed long-term business relationships with Apex's principals: Peikos (Co-Owner), Barnett (Co-Owner), and Raul Camacho ("Camacho," Apex Chief Financial Officer).  Testa and other Wells Fargo bankers were able to keep—and grow—the Bank's business with Apex because Wells Fargo was willing to wade into the muck in ways that other banks would not.

70.     As early as 2014, Wells Fargo was helping Apex executives to open, and also close, accounts for dozens and dozens of shell companies owned and controlled by Apex owners Peikos and Barnett.  Wells Fargo, and in particular banker Testa, knew that Peikos and Barnett were using these shell companies to run high-risk internet sales operations that bilked consumers out of millions of dollars.  At the same time, Wells Fargo had visibility into the high number of chargeback refunds that were being withdrawn from the shell companies' Wells Fargo accounts to repay the alarmingly high proportion of consumers who disputed the charges.

71.     By early 2015, Apex employee Camacho was Testa's primary Apex contact point.  Camacho was also often listed as the "owner" of the Wells Fargo

Case No. _____
RECEIVER'S COMPLAINT

FTCSER-38

accounts Testa opened for the shell companies, although Testa was acutely aware that Peikos and Barnett were the true owners of Apex and the shell company bank accounts – and Camacho took directions from them. Testa, and other Wells Fargo bankers, also readily provided prized anonymous bank reference letters for the shell company accounts, which Apex then used to support merchant processing applications by the shell companies. Without Wells Fargo's imprimatur, these shell companies would not have been able to secure the essential merchant processing accounts. Further, without Wells Fargo's continually providing atypical bank services for Apex-related shell companies in a host of ways, the Apex fraudulent enterprise would not have been able to exist.

72. The Apex Enterprise generated millions of dollars in revenues—money that left the shell companies' accounts almost as soon as it hit them. Those funds went straight into the laundering chute, where Peikos and Barnett used the Wells Fargo accounts to clean the money, transferring the funds into external personal and third-party accounts to which they had access.

73. The success of Apex's fraudulent scheme was by no means inevitable. Wells Fargo in particular was in a rare position to stop the fraud very early on. Moreover, it had an obligation to do so pursuant to a host of banking regulations and laws. But it never did.

74. Instead, Wells Fargo actively assisted the Apex Enterprise by establishing dozens (upon dozens) of bank accounts for the Enterprises' shell companies, providing the corresponding bank reference letters for those shell companies, allowing Apex's principals to "wash" the dirty proceeds of their fraud by transferring funds through their Wells Fargo accounts, and otherwise performing atypical banking services for these fraudulent Enterprises. Through this and other conduct, coupled with their intentionally lax oversight, Wells Fargo flouted standard banking practices and in the process violated the Bank Secrecy Act, anti-money laundering ("AML") laws, and the Bank's own internal policies

Case No. _____
RECEIVER'S COMPLAINT

FTCSER-39

and procedures as they were written; as a result, Wells Fargo's conduct caused hundreds of millions of dollars in harm to consumers and to the Receivership Entities.

75. During the Relevant Period, the Apex principals dealt primarily with Wells Fargo bankers at a San Diego branch and at the Westlake Village Branch in the Los Angeles area, though other branches and bankers assisted the fraud. For instance, Wells Fargo's Woodland Hills office opened at least seven accounts for anonymous Wyoming LLCs that were part of the Apex Enterprise, and closed four of those accounts once the associated shell companies lost their access to merchant processing services (*i.e.*, the ability to charge consumers' credit cards).

76. On information and belief, the Wells Fargo bankers at the San Diego Branch, the Westlake Village Branch, and the Woodland Hills Branch, just like numerous other Wells Fargo Community Bank branches during the Relevant Period, were operating under intentionally deficient bank practices and policies effected by the most senior executives at Wells Fargo. Those practices and policies featured a reckless quota system that improperly pressured and incentivized Wells Fargo employees to provide atypical banking services, bend the rules, and even commit fraud when performing what should have been routine business tasks.

(i)    <u>The San Diego Branch</u>

77. In the Wells Fargo branch located at First and Market Street in downtown San Diego (the "San Diego Branch"), several bankers, often collaborating with one another as well as with Apex principals, knowingly facilitated Apex's fraud for their own—and Wells Fargo's—financial gain.

78. Apex's relationship with the San Diego Branch began in January 2014, when on two separate days Barnett walked into the branch with formation documents for eight Wyoming LLCs and asked to open bank accounts in each LLC's name. Barnett had no history with the bank; he was a walk-in off the street.

23

Case No. _____<br>RECEIVER'S COMPLAINT

**FTCSER-40**

The LLC documents that Barnett presented to the branch were also suspect with numerous indicia of fraud: they were nearly identical, with each of the LLCs based in Wyoming (which allows for the creation of LLCs without identification of the principals, effectively anonymizing the entities), each having the same Wyoming mail drop as its business address, and each having been formed on the same day four months earlier.

79.     Basic (AML) training that Wells Fargo bankers should have received during the Relevant Period taught how and why anonymous LLC accounts with shared addresses (especially a shared Wyoming mail drop) are used to camouflage ownership and further frauds.  Such basic AML training alerted bankers to look for transactions with other internal accounts in order to identify undisclosed relationships.   The circumstances required that all of the Apex accounts be evaluated together with bankers looking for similarities and patterns of activity that indicate fraud.

80.     Under many banks' policies, a customer who provided the same Wyoming mail drop address for multiple applications would have had those applications further reviewed and then rejected for failing to satisfy bank customer identification requirements.  At a minimum and per industry practice, additional follow-up by Wells Fargo was required.   A bank following the requisite due diligence consistent with industry practice would not have permitted these accounts to be opened.

81.     But the Wells Fargo banker didn't ask questions.  Instead, the banker promptly completed eight identical—generic—applications for Wells Fargo accounts for the shell companies.  Each of the accounts were funded with minimal opening deposits (generally $100, which was the minimum amount necessary for the banker to get sales quota credit for opening the account), and each of the account applications projected annual gross sales of $100.

82.     Under Wells Fargo's toxic sales culture and compensation system,

---

24                     Case No. _____

RECEIVER'S COMPLAINT

Barnett's appearance at the Wells Fargo branch was manna from heaven for the banker and Wells Fargo. While most banks would have refused to open the accounts or at least conducted more diligence, Wells Fargo just opened the accounts. And not just eight accounts. The banker opened sixteen accounts, when, unprompted, she opened a savings account for each of the eight checking accounts Barnett had requested.

83. The savings accounts were superfluous from the customer's perspective, but they were nevertheless valuable to Wells Fargo's bankers because they counted towards the extreme sales quotas that Wells Fargo put in place. Much later, upon a request to close some accounts by Peikos, Testa confirmed that the "[savings] accounts really have no purpose and can be shut down…".

84. After his initial success in establishing the shell company accounts at Wells Fargo, Barnett returned to the same branch three more times over the next seven months (March, August and September), opening 22 more business bank accounts for 11 more anonymous Wyoming LLCs. Each of these shell company bank account applications had the same indicia of fraud as the first batch, including anonymous principals, similar deposit and anticipated revenues information, and the same Wyoming mail drop address. Each time, Wells Fargo conducted no investigation, instead rubber-stamping the new accounts. When necessary, Wells Fargo also closed accounts that Apex had burned due to egregiously high chargeback rates.

85. For these later applications, Wells Fargo had the benefit of being able to review the activity in the prior Apex shell companies' bank accounts. Across the accounts, the same pattern of activity reappeared: after millions of dollars in consumer charges were deposited into the accounts (which had projected sales of $100 on their applications), extraordinarily high chargebacks would follow. In some monthly Wells Fargo account statements, the chargeback rates for these companies exceeded 70% and 80%.

---

Case No. _____
RECEIVER'S COMPLAINT

86.     Wells Fargo was fully aware that Apex was burning through shell companies, due to these high chargeback rates, which caused merchant processors to cease doing business with the shells, because Peikos and Barnett were also regularly asking Wells Fargo to close old accounts for shell companies that could no longer access merchant processing services due to their high chargeback rates.

87.     Notwithstanding numerous indicia of fraud, the rigorous Know-Your-Customer ("KYC") and AML requirements that were in place for the branch, and Wells Fargo's own internal policies and procedures that required (in theory) enhanced scrutiny of high-risk companies such as those associated with the Apex Enterprise, the San Diego Branch quickly approved every application and opened the accounts.

88.     Wells Fargo bankers at the San Diego Branch also provided reference letters which validated the shell companies' Wells Fargo accounts.  Initially, these letters were addressed to Barnett, but in May 2014, Apex's atypical banking requests to Wells Fargo grew bolder—and Wells Fargo's complicity in the fraud expanded.  Barnett asked the San Diego Branch to re-execute and re-sign *ten* reference letters for the initial Wyoming LLCs for which the branch had opened accounts; the new letters would have Barnett's name removed, making them anonymous, "Dear Company" letters.

89.     Without blinking, the San Diego Branch banker quickly re-executed the ten Wells Fargo reference letters, amending the address associated with the accounts to include just the company name, without any address and without Barnett's name.  Wells Fargo accommodated this remarkable request for anonymity without comment or question.

Case No. _____
RECEIVER'S COMPLAINT

FTCSER-43

**BEFORE:** **AFTER:**

90.     Under these particular circumstances, and given the Bank's KYC and Enhanced Due Diligence obligations for these high-risk customers, acceding to specific requests to omit this same owner's name from all ten of the reference letters previously issued for supposedly separate anonymous LLCs deviated from accepted banking practice.     While providing bank reference letters can be appropriate in other instances, the circumstances here made it clear to Wells Fargo that there were heightened risks that the bank reference letters would be misused. This should have set off alarm bells.  It did not.

91.     That is especially the case, because of Apex's choice of the so-called "anonymous LLCs" from Wyoming as its preferred corporate form.  As Wells Fargo knew, using anonymous LLCs created a high risk for financial crime that, from the outset, should have resulted in a higher level of scrutiny by Wells employees of both the accounts and their related individuals.  Wells Fargo should not only have categorized these accounts as high risk, requiring enhanced due diligence prior to opening the account, but going forward, Wells Fargo should also have treated these supposedly separate shell accounts with enhanced monitoring as

a family of accounts from a risk compliance perspective.

92.   Globally-recognized account opening and oversight standards in place for decades have classified anonymous LLCs entities as "high risk" entities and warned that these entities are one of the most widely used vehicles in laundering of the proceeds of crime, corruption, and other malfeasance.  Therefore, Wells Fargo was required to conduct due diligence sufficient to establish the true beneficial owners of LLCs before allowing them access to bank accounts—and were further required to document the results of that diligence correctly in the bank's files in order to assist the bank in its future monitoring endeavors.

93.   In light of the increased risks created from the outset, Barnett's specific request to reissue generic no-name letters to 10 related anonymous LLCs was highly suggestive of credit card laundering by Apex.  As the Bank knew, Apex could easily conceal the identities of its blacklisted owners from merchant processors by submitting applications in straw owners' name that were supported by the essential no-name reference letters from Wells Fargo.  And that's exactly what Apex did.

94.   The most basic compliance training would have taught these bankers that such tactics were highly suggestive of card laundering or some other nefarious activity.  This means one of two things is true: either Wells Fargo's high-pressure sales culture made it clear that identifying and stopping fraud was secondary to the Bank's profit motive, or Wells Fargo's training and oversight were intentionally designed to be so deficient that its employees were clueless as to the most obvious signs of fraud.

95.   In August 2014, Barnett was back and opened ten more Wyoming LLC shell company accounts at the San Diego Branch (this time with a different banker), and he requested and received ten more no-name reference letters.  Like the banker before her, the banker wrote and executed anonymous reference letters for the shell companies: they did not identify the accounts owners or include any

Case No. _____
RECEIVER'S COMPLAINT

FTCSER-45

other identifying information, e.g., company addresses. Rather than take any of the steps required by a bank when undertaking typical due diligence for new customers, multiple bankers at Wells Fargo's San Diego Branch instead continued to process identical business account applications. These bankers did so, because at Wells Fargo, opening these bank accounts was not only profitable for the Bank, but was also personally beneficial to Wells Fargo's employees, who were acting under corporate edicts to meet daily account opening goals.

96.     Despite the fact the initial shell companies accounts were established in January 2014 with a $100 deposit and minimal ($100) projected annual sales, deposit activity in the accounts was immediate, dramatic and inconsistent with the account applications. Millions of dollars began to flow through the accounts almost at once.

97.     In the month of February, these Wells Fargo Apex accounts took in $810,000 in consumer credit card payments from Apex's high-risk merchant processors. From February to December 2014, the Apex Wells Fargo accounts took in a whopping $12,300,000 in consumer credit card payments forwarded by merchant processors.[13] The vast difference between the expected and actual account activity was obvious to Wells Fargo and a huge red flag, which a bank following standard industry practice was required to investigate.

98.     Within a short time, the shell company bank accounts also began to suffer staggering merchant chargebacks and refunds. As a group, the Apex shell company bank accounts at Wells Fargo suffered more than 22% in chargebacks/refunds in 2014 through mid-2015. To put these numbers into perspective, a 1% chargeback rate is considered excessive and grounds to terminate a merchant's account with a merchant processor.

---

[13] This number is based only on information presently available to the Receiver, and is expected to grow when complete monthly account statements are received in discovery.

Case No. _____
RECEIVER'S COMPLAINT

99.     In some months, the chargeback rate was much higher.  As just one example, the August 2014 statement for an Apex shell company named "Bold Media" reflects a chargeback rate of 78% for the month.

100.   And the immense chargeback activity was obvious to Wells Fargo, on a monthly basis, given that the monthly account statements for all of the shell companies similarly reflected pages of chargebacks.  As the below example makes clear, the shell accounts' Wells Fargo monthly statements specifically identify the chargebacks in the "Withdrawals/Debits" column – often in the very same amounts again and again, for example, $87.67 and 97.88 (or multiplies thereof), as consumer after consumer requested chargebacks on their credit cards.

Case No. _____

RECEIVER'S COMPLAINT

FTCSER-47



Account number: ███2051 ■ November 1, 2014 - November 30, 2014 ■ Page 9 of 11

**Transaction history (continued)**

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 11/25 | | Bkcd Processing Bkcd Crgbk 2011 272400398512 Lion Capital LLC | | 87.67 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 2011 272400398512 Lion Capital LLC | | 87.67 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 2011 272400398421 Lion Capital LLC | | 97.68 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 2011 272400398421 Lion Capital LLC | | 97.88 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 2011 272400398512 Lion Capital LLC | | 97.88 | |
| 11/25 | | Bkcd Processing Bkcd Depst 2011 272400398512 Lion Capital LLC | | 145.69 | |
| 11/25 | | Bkcd Processing Bkcd Depst 2011 272400398421 Lion Capital LLC | | 592.23 | 721.29 |
| 11/26 | | Bkcd Processing Bkcd Depst 2011 272400398512 Lion Capital LLC | 172.73 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 2011 272400398512 Lion Capital LLC | 395.29 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 2011 272400398512 Lion Capital LLC | 552.80 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 2011 272400398405 Lion Capital LLC | 1,559.51 | | |
| 11/26 | | Humboldt MS Deposit 141125 8 201693883 Healthy Choice Savings | | 39.95 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398421 Lion Capital LLC | | 73.41 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398421 Lion Capital LLC | | 73.41 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398512 Lion Capital LLC | | 82.72 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398421 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398421 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398512 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398512 Lion Capital LLC | | 97.88 | |
| 11/26 | | Humboldt MS Deposit 141125 8 201689881 8446072489 Dermanique | | 195.76 | |
| 11/26 | | Humboldt MS Deposit 141125 8 201690889 8446317914 Dermanique | | 195.76 | |
| 11/26 | | Bkcd Processing Bkcd Depst 2011 272400398421 Lion Capital LLC | | 257.05 | 1,568.02 |
| 11/26 | | Bkcd Processing Bkcd Depst 2011 272400398405 Lion Capital LLC | 39.19 | | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 2011 272400398512 Lion Capital LLC | | 87.67 | |

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-48**

101.   Of course, Wells Fargo also knew about these excessive chargebacks, because Wells Fargo's very own customers, using credit cards issued by Wells Fargo, were among the many Apex customers requesting such chargebacks on their credit cards.  Wells Fargo's own customers even made consumer complaints about the "risk-free" trial schemes to the Better Business Bureau.

102.   Wells Fargo deliberately overlooked this early and obvious aberrational activity in the Apex shell company accounts.  Had even minimal investigation under standard banking procedures been conducted, with such obvious red flags – as Wells Fargo was required to do – the consumer losses could have been staunched almost immediately.  Wells Fargo took a different path instead.

103.   As described further below, Barnett's role as Apex's primary bank contact and shell company account opener transitioned to Apex co-owner Peikos in 2015 and Apex employee Camacho at the direction of Peikos.

(ii)    The Westlake Village Branch

104.   In April of 2015, the initial Apex shell company accounts that Barnett had established in 2014 had been open for fifteen months; most were inactive after having received (and then having transferred out) millions of dollars of consumer funds, even accounting for staggering consumer chargebacks.  These chargebacks, which ran through the Wells Fargo accounts, had resulted in nearly all of the shell companies being terminated by their merchant processors.   In spite of all this, Wells Fargo was still anxious to expand its business with Apex.

105.   Beginning in early 2015, Apex began to use Los Angeles County Wells Fargo branches, and its principals developed relationships with the Wells Fargo bankers at a Los Angeles County office located in Westlake Village (the "Westlake Village Branch").  Like the bankers at the San Diego Branch, the Wells Fargo bankers at the Westlake Village Branch were happy to facilitate Apex's ongoing consumer fraud and card-laundering activities in exchange for a revenue

Case No. _____
RECEIVER'S COMPLAINT

boost and assistance hitting sales quotas—even if that meant assisting a fraud and deliberately turning a blind eye to conduct that any banker would have recognized as bearing numerous indicia of fraud.

106. David Hannig ("Hannig") was an Assistant Vice President and Sr. Business Sales Consultant for Wells Fargo Merchant Services. On information and belief, Hannig was based out of the Los Angeles area but worked regularly with a number of branches, including the Westlake Village Branch, where he held meetings with Apex personnel and Wells Fargo customers.

107. Dominic Testa ("Testa") was a Business Banking Specialist for Wells Fargo at the Westlake Village Branch. On information and belief, Hannig and Testa had a close working relationship with each other and communicated frequently about how they could expand Wells Fargo's business with and sell new bank products to the Apex Enterprise.

108. The Westlake Village Branch was located nearby Apex's office in Woodland Hills, California. Wells Fargo banker Testa, who was part of Wells Fargo's Community Bank division, was able to develop and sustain a long-term and ongoing business relationship with the Apex Enterprise. He was particularly friendly with Apex's employee and CFO, Camacho, who often referred to Testa with nicknames like "bud." As Testa knew, Camacho was simply an employee of Apex and was not the true "owner" of any account in his name. Testa knew that Camacho was taking his instructions directly from Peikos, who was the true owner and controller of Apex. Testa also knew that Camacho was only an "owner" on paper of the accounts and shell companies held in his name.

109. Testa's interactions with Peikos and Camacho made it clear from early on that Peikos was the boss. As just one example, on April 17, 2015, Testa emailed Peikos about opening "new accounts for you". Testa noted "I'm assuming you'll be using Wyoming like your other LLCs" and requested the documentation and identification of the "owner." Peikos responded that Camacho, and not Peikos,

---

33

Case No. _____
RECEIVER'S COMPLAINT

would be the "owner" of the LLCs and the bank accounts that Peikos was instructing Testa to set up: "So we are clear, [Camacho] will be the 100% owner on these accounts, and I will have access like the current ones were set up." The "current ones" Peikos was referring to were the roughly 40 shell company accounts that Barnett had opened in San Diego which were lying mostly unused at that point because they had lost access to merchant processing services as a result of their extraordinarily high consumer chargeback rates. Testa told Peikos that he would put a fee waiver on the accounts for the next three months and recommended that Peikos "[k]eep in contact with me on when they should be closed and I can do it over the phone."

110. During this same time, Hannig, in coordination with Testa, encouraged the Apex Enterprise to apply for merchant processing with Wells Fargo. Apex employee Chris Carr met with Hannig and identified shell companies and products for which Apex wanted to obtain merchant processing services.

111. Wells Fargo requires merchant account applicants to undergo an underwriting process intended to ensure the applicant is a legitimate and creditworthy business and to weed out merchants engaged in illegal conduct and required the legitimacy of the business be verified/validated. Any material discrepancies must be documented, investigated, and resolved and the source of the verification should be in the merchant file. The Bank forbid the solicitation of merchants engaged in certain unacceptable business practices because they were presumptively illegal, violated card association rules, or created excessive risk exposure for the Bank.

112. Several days after their in-person meeting, on April 21, 2015, Carr followed up with an email to Hannig containing information for two shell companies. This opened a string of emails between the two in rapid succession, with emails being exchanged often literal minutes apart. Carr wrote, "Here is some information on the corps and URLs that we wanted to lead off with . . . Please let

Case No. _____
RECEIVER'S COMPLAINT

us know if you require additional information to Pre-fill these apps for us. We are eager to get started so as soon as you can send us the paperwork, we will turn it around with any additional documentation you require. Thanks!" Carr identified Arturo Oliveros and Julia Buenrostro as the "owners" of shell companies Alpha Group, LLC and Crest Capital LLC, respectively, both of which had the same Wyoming mail drop listed as their business address. Carr listed the shell companies' businesses as "supplement[s]" and "health plus", respectively, and included links to the companies' websites, www.virilitymuscle.com and www.evermaxbody.com.

113. Hannig reviewed the material and linked websites and quickly responded, identifying crucial and fundamental discrepancies in the information Apex provided:

> Chris,
>
> The bottom of the websites show different LLC's then what is listed below. That will need to be changed to the below listed LLC's on the websites before I can even start the process. **The people you listed below are not owners on the Wells Fargo bank account that you gave us. They must be owners of the business in order to use their name on the merchant accounts. The address also does not match up to what is on the website.** Everything needs to be matched up on the accounts or the applications won't not pass the submission process.
>
> Thank you,
>
> David Hannig
>
> (Emphasis Added).

114. Carr quickly replied claiming to have corrected the issues:

> David,
>
> Thanks for your reply. The company names and addresses have been updated on the websites.
>
> The Websites just had the product name in the footer as a placeholder until we got all of the docs in order.
>
> ***Arturo Oliveros and Julia Buenrostro are owners of the entities listed.***

---

35

Case No. _____
RECEIVER'S COMPLAINT

1   Thanks! - Chris

2   (Emphasis added).

3   ****

4   115.   Almost immediately, Hannig again responded:

5   I see the names changed so that will work. *The bank accounts still do not*
6   *show them as owners. Coordinate with Dominic [Testa] on how to get*
7   *this updated. Here is what we have listed on the bank accounts:*



17

18   David Hannig
     Assistant Vice President
19   Business Sales Consultant
     Wells Fargo Merchant Services

20   (Emphasis Added).

21   116.   The irregularities Hannig identified were troubling, particularly since,
22   as Hannig knew, Apex had already opened (and in almost every case, burned
23   through) roughly 40 shell bank accounts with Wells Fargo in which millions of
24   dollars had flowed through.   Apex's excuses and scramble to alter website and
25   product information on the fly only reinforced what Hannig already knew to be
26   true: that the "owners" of the shell companies were owners in name only.

27   117.   But most troubling were the discrepancies in information regarding
28   the key issue of the beneficial ownership of these anonymous Wyoming LLCs.

The two shell companies, Alpha Group and Crest Capital, had Wells Fargo accounts opened by Apex principal Barnett a year earlier in San Diego. When he opened the accounts, Barnett claimed to be the sole owner of the companies and presented anonymous Wyoming LLC documents and the same maildrop address for these shell companies.

118. By April of 2015, when Hannig flagged the issues, the accounts had been open for 11 months and had taken in more than a quarter of a million dollars in consumer payments from merchant processor deposits. But Hannig was now being told that the account holder, Barnett, did not in fact own the shell companies – and two people (Oliveros and Buenrostro), who were not listed on those Wells Fargo bank accounts or identified in any Wells Fargo bank records, did.

119. Such information was an obvious indication that Apex was engaged in credit card laundering by listing owners on merchant account applications for an anonymous LLC, thus obscuring the identity of the true owners.

120. Apex's next response, sent just 23 minutes later, should have been even more alarming to Hannig and Testa. Rather than "updating" the information, Apex instead changed course and told Wells Fargo they had decided to use instead new anonymous Wyoming LLCs, supposedly now "owned" by Camacho, to apply for the merchant accounts. The new shell companies shared (as did every one of the Apex shell companies) the same Wyoming mail drop address.

> From: Chris Carr [mailto:chris@apexcapitalgrp.com]
> Sent: Tuesday, April 21, 2015 4:03 PM
> To: Hannig, David
> Cc: Raul A; Phillip Peikos; Testa, Dominic J
> Subject: Re: Information for New MIDs
>
> I see you are correct. Those accounts are, indeed, in David Barnett's name. **On review, we decided that we would like to run those two websites through these new corps that we just set up. They are owned by our CFO Raul Camacho**[. . . ]
>
> Raul will come in tomorrow and open bank accounts at your branch. EIN numbers are forthcoming. Websites have been updated. Sorry for all the changes. Will you be in tomorrow to help us set up the

accounts?

Thanks! - Chris

(Emphasis Added.)

121. The response of Hannig, who was specifically seeking to provide *merchant banking* for Apex, was problematic. He simply suggested Apex coordinate with the bank to get the ownership "updated". Notably, Hannig did not copy the actual account holder, Barnett, on any of this correspondence.

122. Hannig's cursory review had immediately identified fundamentally inconsistent information about the LLCs' ownership, the ownership of the bank accounts, and discrepancies between the websites and the products which Apex was hoping to sell on them. He had pointed out that the irregularities and discrepancies would cause the merchant applications he wanted to present on Apex's behalf to be rejected. As a merchant banker, Hannig knew that the discrepancies in the owners, coupled with the use of anonymous Wyoming LLCs and the pattern of burning through the LLCs' bank accounts, were indicative of fraud.

123. Instead of doing what he should have done under standard banking procedures – *e.g.*, refuse to submit the shell account's merchant processing applications; ask questions and demand answers about the troubling and inconsistent information being revealed; and communicate his concerns and report suspicious activity through Wells Fargo's established channels — Hannig simply directed Apex on how to change its paperwork, so the applications would not be flagged, allowing him to potentially pad his sales numbers and the bank itself to expand its banking relationship with the fraudulent Apex Enterprise.

124. During the years when the Apex fraud was in full bloom, on information and belief, such aggressive sales tactics were rewarded within Wells Fargo's misaligned compensation system. Hannig himself was recognized as a Wells Fargo "Sales Star" (winning that award in 2013, 2014, 2015, 2016, and

2017), and he was also named the #1 Wells Fargo Sales Representative out of 500 employees in 2013 and 2016.

125. Hannig was not the only Wells Fargo banker to advance Apex's ongoing fraud, however.  In light of Wells Fargo's pernicious sales culture and misaligned compensation system, this type of employee misconduct repeated itself again and again, across Wells Fargo bankers and branches. Indeed, as recently as January 23, 2020, the OCC recognized: "[t]he Bank tolerated pervasive sales practices misconduct as an acceptable side effect of the Community Bank's profitable sales model, and declined to implement effective controls to catch systemic misconduct.  Instead, to avoid upsetting a financially profitable business model, senior executives…turned a blind eye to illegal and improper *conduct across the entire Community Bank*." (Emphasis added.)

126.  Apex's last-minute pivot to the two new corporations they had "just set up" for merchant processing and which were now supposedly "owned" by Apex employee Camacho, necessitated getting new Wells Fargo bank accounts opened before the merchant account application could be completed.  Testa was more than happy to oblige.  When Camacho sent Testa documents for one of the new LLCs (with a Wyoming operating agreement signed that same day, April 21, 2015), Testa replied that the documents were "perfect" and the accounts were promptly opened.

127.  Once the new bank accounts were opened, Apex submitted the merchant processing application to Hannig listing Camacho as the "owner" and listing the Wyoming mail drop as the address.  But on April 30, 2015, Hannig informed Apex that higher-ups at Wells Fargo had rejected the application, as he had received a "decline email due to an unqualified business model for Wells Fargo. We tried, thank you for considering us."

128.  In response to questions from Apex, Hannig said the application was rejected because the companies were selling supplements.  In other words, despite

Case No. _____
RECEIVER'S COMPLAINT

FTCSER-56

Hannig's questionable efforts to obtain Wells Fargo's merchant processing services for Apex, Wells Fargo's merchant banking division had (correctly) categorized the shell companies as high-risk businesses with which they did not want a relationship. The Bank's merchant division was unwilling to take on the risk of processing for these companies, recognizing that they were in an industry rife with consumer deception, and there was the potential for high chargebacks and losses *for Wells Fargo* caused by fraudulent activity.

129. Of course, Wells Fargo was still perfectly willing to continue servicing the fraudulent LLCs at the branch level and opening bank accounts for additional shell companies, while letting *other* merchant processors (who had less insight into Apex's illegitimacy, and no insight into its obfuscated performance history and ownership legerdemain, and who would be reassured by the fact that Wells Fargo had approved them for bank accounts) take on that risk – and while allowing Apex to deceive more unsuspecting consumers (including even Wells Fargo's own credit card holders) with the lure of "free trial" products.

130. Knowing what it did, Wells Fargo was legally required to take a number of steps, including conducting a further investigation into the Apex Enterprise, evaluating patterns of misconduct and suspicious activity across the entire Apex relationship, terminating the Bank's relationship with Apex, its principals, and its associated shell companies, and/or following the Wells Fargo established procedures for reporting the suspicious activity both internally and externally.

131. Wells Fargo did none of these things. Instead, it kept doing business and looking for growth opportunities with Apex. Through Testa, Wells Fargo continued to open numerous shell company accounts for Apex. Similarly, Hannig periodically attempted to get merchant processing for Apex shell companies but was ultimately always unsuccessful.

132. In December of 2015, Camacho accidentally sent a spreadsheet of

Case No. _____
RECEIVER'S COMPLAINT

active and pending "MID's" (merchant processing accounts) to Hannig. The spreadsheet listed more than 25 LLCs with bank accounts at Wells Fargo, along with their corresponding accounts at various merchant processors. As was the case when Hannig had identified and flagged the central issue months earlier, *the purported owners of the LLCs were not the Wells Fargo account holders.* The spreadsheet made it absolutely clear that, at a minimum, Apex was engaged in large-scale credit card laundering and was using shell companies and straw owners to secure merchant processing services—something any banker in Hannig's position would have immediately recognized, particularly because of the incident some months earlier.

133. Within minutes, Camacho recognized that he did not want that spreadsheet in the Bank's files. He wrote to Hannig, asking him to "[p]lease delete ASAP" and adding that he "would greatly appreciate if you can keep the information confidential." Camacho concluded the email by asking Hannig to confirm with him once the email had been deleted.

134. Hannig promptly replied "Deleted." On information and belief, Hannig's prompt deletion of this e-mail and attachment from Wells Fargo records violated both Bank policy and the law. As an executive at Wells Fargo, Hannig had a duty under a number of federal laws to investigate and report Apex's suspicious activities. Those obligations did not disappear just because a customer asked that Hannig delete an email.

135. The spreadsheet was not sent to Hannig in a vacuum. Both he and Testa knew exactly who this very high-risk customer was. They were all too aware of Apex's history of hiding the true owners of the anonymous shell companies they created – and they had even helped Apex to mask these beneficial ownership issues and sanitize its merchant processing application at Wells Fargo. Hannig and Testa also knew that Wells Fargo had analyzed Apex's high-risk business earlier that year and had declined to provide merchant processing services to it. In light of the

Case No. _____
RECEIVER'S COMPLAINT

above, on information and belief, the deletion of Camacho's email and failure to take steps to report the suspicious actions were deliberate efforts to aid and abet Apex's fraud.

136.    Notwithstanding its knowledge of obvious fraud, Wells Fargo and the Westlake Village Branch continued to open bank accounts for Apex shell companies throughout 2015, 2016, 2017, and 2018; the new accounts only stopped when the FTC filed its lawsuit against Apex.  In 2015, Camacho opened 14 more Wells Fargo accounts for 13 anonymous shell companies.  In 2016, Camacho opened six accounts for six shell companies; in 2017, 19 accounts for 19 shell companies; and in 2018 12 accounts for 12 shell companies.  In total, Wells Fargo opened *at least* 92 bank accounts for more than 70 shell companies over the course of just four years.

137.    When opening and servicing the accounts, Wells Fargo bankers continued to provide atypical banking services, asking no questions and deliberately ignoring Apex's obvious efforts to launder money it obtained operating its high-risk, fraudulent business through anonymous shell companies fronted by straw owners.

138.    The pattern was clear – and only became clearer with time: Apex, primarily through Camacho, would periodically request that Wells Fargo close existing shell companies' bank accounts after those shell companies had been blacklisted and lost their merchant processing because of the massive levels of chargebacks.   At the same time, Camacho would request Wells Fargo open new shell company bank accounts—often six new bank accounts at a time—of which Camacho would be the "owner".  In this way, Wells Fargo's conduct enabled Apex to cycle through the burned shell companies and their associated bank accounts before creating new, "unrelated" and anonymous LLCs to use to defraud consumers.

139.    As was the case with the San Diego Branch, the Westlake Village

Case No. _____
RECEIVER'S COMPLAINT

Branch, via Testa, was more than willing to supply no-name reference letters for the shell companies. Testa provided large tranches of reference letters, routinely issuing 6 letters, and on one occasion 12 letters, at a time. He was also willing to vary the format and information contained in the reference letters based on requests made Camacho.

140. Across multiple branches and multiple bankers, between 2014 and 2018, Wells Fargo assisted the Apex Enterprise by opening account, after account, after account, for a host of shell companies. These shell companies were "anonymous" LLCs based out of Wyoming, though true their owners were not anonymous to Wells Fargo—Wells Fargo was well aware that all of these companies and accounts were part of the Apex Enterprise, owned and controlled by Barnett and Peikos. That clear not only based on the fact that core Apex personnel were always the ones opening the accounts, and also from the email that Camacho mistakenly sent to Hannig, which spelled out exactly what Apex was doing. Yet Wells Fargo was more than happy to keep, and even pursue, Apex's business by facilitating Apex's ongoing fraud.

**B. Wells Fargo's Support of the Triangle Enterprise**

(i) <u>Overview</u>

141. At the same time that Wells Fargo was providing banking services to the Apex Enterprise, it was also providing those same services to the Triangle Enterprise, which was also running "free trial" scams out of Southern California and which was operating using a business model strikingly similar to Apex's.

142. In the case of Triangle, as with Apex, multiple Wells Fargo bankers across multiple branches developed long-term and ongoing business relationships with Triangle's owner and controller, Brian Phillips; as with Apex, these Wells Fargo bankers eagerly opened bank accounts for a host of companies that they knew were shells being used by Phillips. And as with Apex, Wells Fargo's clear-eyed support of the Triangle Enterprise resulted in millions of dollars in consumer

harm—damages which spilled over to the Receivership Entities.

143. Wells Fargo began providing services to Phillips and Triangle in at least 2009. In addition to opening and closing accounts and executing reference letters for Phillips and his shell companies, Wells Fargo also provided a host of other services, including payroll services and tax return preparation. In each instance, Wells Fargo took instructions from Phillips and provided information directly to him, understanding that he was the owner and controller of all Triangle-related accounts even though numerous others were listed as the "owners" of the accounts. Wells Fargo provided these services to Phillips and Triangle even though it knew that those services were a prerequisite for money laundering and fraudulent business activity.

144. Like Apex, the Triangle fraud relied on the use of shell companies with straw owners, which Triangle generally referred to as "nominees", to keep their fraudulent businesses running. Phillips recruited nominees to be the "owners" of the shell companies by offering them a monthly fee, such as $500 per month, for allowing Phillips to use their names and identities to establish shell companies and accompanying bank accounts at Wells Fargo. Phillips' only requirement to qualify was that the nominees not be blacklisted on the MATCH list as a previously terminated merchant.

145. Phillips then served as the conduit between Wells Fargo and each nominee in order to secure the Wells Fargo bank accounts needed to carry out the Triangle fraud. Each time, Wells Fargo rubber-stamped the applications. From there, Phillips used the corporate documents and Wells Fargo account information (along with the essential Wells Fargo reference letters) to obtain merchant processing services in the nominee's name, which allowed the Triangle Enterprise to perpetrate its "free trial" scam at consumers' expense.

146. None of this would have been possible without Wells Fargo. Each time Phillips opened a new shell account, he instructed Wells Fargo that the

Case No. _____
RECEIVER'S COMPLAINT

nominee was the "100 % owner" on paper, but Phillips was always to be given immediate access and full control as a "co-signer" of the Wells Fargo bank account belonging to the supposed "100% owner." Each shell company's account opening paperwork falsely represented Phillips as a rank-and-file employee of the shell company—its supposed "Data Specialist"—a transparent effort understood by Wells Fargo to mask Phillips' true ownership of all of the shell companies. Wells Fargo always accommodated "employee" Phillips' requests, which was not in line with banking practices. As a result, Wells Fargo knew that Phillips retained the unfettered ability to transfer money from a nominee's shell account directly into the primary Triangle Enterprise account at Wells Fargo, which Wells Fargo knew was owned by Phillips.

147. The troubling pattern repeated itself, again and again, with Phillips driving all communications with Wells Fargo for the nominees. Notwithstanding known abuse of beneficial ownership for these types of high-risk businesses, and mounting evidence that Phillips was actively engaged in such abuse, Wells Fargo bankers happily opened this stream of new accounts in the names of nominees (in keeping with its sales culture prizing growth above all else). All the while Wells Fargo bankers conducted the most minimal level of due diligence, if any, on the nominee "owners", largely relying on Phillips' vouching for the new nominee "owner." Phillips himself routinely filled out the forms and gathered and submitted the signatures of the "owners" to Wells Fargo. If a Wells Fargo banker requested a cursory phone call with the "owner" before opening an account, Phillips arranged it. In the latter years of the fraud, Phillips even walked nominees into the local branches, and Wells Fargo promptly accepted the paperwork from the new "owners" before turning around to give "employee" Phillips full control as the co-signer. This arrangement benefitted Wells Fargo as well as Triangle and Phillips, because it gave Wells Fargo an easy way to open new accounts in perpetuity.

Case No. _____
RECEIVER'S COMPLAINT

FTCSER-62

148.   After dealing with the "owners" on only the most perfunctory level at account opening, if at all, Wells Fargo then dealt thereafter with Phillips, understanding him as their customer and the actual owner of all of the accounts. At Phillips' direction, Wells Fargo regularly swept funds in the shell company accounts into Triangle's primary bank account at Wells Fargo.  Once transferred to Triangle's main account, the funds would almost immediately be sent to a Canadian company owned by Triangle, Global Northern, at a Canadian bank.  In turn, Global Northern would forward the funds to Hardwire accounts in Hong Kong or Thailand.  Hardwire would then wire money back to Triangle in the U.S. to cover expenses to complete the laundering of the funds.

149.   From the very start, Phillips and Triangle's offshore-based principal, Devin Keer relied upon Wells Fargo as the best (and perhaps only) banking option for opening scores of essential bank accounts for the shell companies.  In 2009, near the start of Triangle's implementation of its "free trial" scam, Keer, then in Canada, emailed a merchant processor to ask:

> Do you guys work with/know any corp services type guys who incorporate US corps quickly?  Brian [Phillips] has a corp in NV that he just set up but there's no bank accounts and stuff set up yet. Would like your advice on the whole US corp issue before we drive down to Seattle to open bank accounts - if we can set up another corp for the purpose of this…deal that might be a better play for us.

The processor promised to look into it, but before he could, Keer wrote back: "*I think we can get Wells to take care of it*."  (Emphasis added.)  As it turned out, Keer was right.

150.   Phillips, Keer, and Triangle relied on Wells Fargo to deliberately overlook obvious beneficial ownership issues, which Wells Fargo was happy to do. Phillips was so confident in Wells Fargo's pliancy that when one nominee raised a concern about what would happen if Wells Fargo contacted his mother (whom he had enlisted to serve as another nominee for Phillips in 2011), Phillips responded by dismissing his concerns wholesale, responding, "*Dude, you still don't*

*understand how wells is totally different.   The bank won't be calling her.*" (Emphasis added).  Wells didn't call.

151.   Instead of conducting an investigation, increasing its monitoring of the Triangle accounts, reporting suspicious or unusual activity internally or externally, or simply refusing to provide banking services to the Triangle fraud, time and again Wells Fargo acceded to Phillips's requests for the Bank to open new shell company accounts with nominee owners, effectively legitimizing the shells in the eyes of the merchant processors.

### (ii) The Keller, Texas Branch

152.   The relationship between Wells Fargo, Phillips, and Triangle began in Texas on September 2, 2009, when Wells Fargo's Keller, Texas branch, principally through banker Lea Walker ("Walker"), but with assistance of others in the branch, including the branch manager, began opening shell company accounts for Phillips and providing him with reference letters.

153.   In roughly one year, Walker opened at least eight shell company accounts for Phillips and provided him with four reference letters for these accounts.

154.   In 2011, Walker opened four more accounts for shell companies at Phillips' request, providing him with three reference letters.  That year, another banker at the Keller, Texas branch, opened two more shell company accounts for Phillips and signed another reference letter.  Walker continued to open additional shell accounts for Phillips into 2012.  In total, this Wells Fargo branch opened more than 20 banks account at Phillips' request, with roughly half of those being for shell accounts nominally owned by others.

155.   Wells Fargo's understanding of Phillips' ownership interest in the accounts is abundantly clear in May 2012 emails that Phillips and Walker exchanged, in which Phillips asked Walker to remove certain approval requirements so that he could generate and send wires for accounts that he did not

Case No. _____
RECEIVER'S COMPLAINT

own on paper. Walker immediately fulfilled Phillips' request, which would have been unthinkable if she were not aware that he was the true owner of the accounts and that the purported "owner" was just a nominee.

(iii)    The Southern California Branches

156.    In or about 2013, Phillips began moving his banking relationship with Wells Fargo to Southern California. Across multiple Wells Fargo Community Bank branches in Southern California (and in partnership with multiple Wells Fargo bankers), Phillips came to open dozens more Wells Fargo accounts as the Triangle scheme expanded. In total, over the course of the Triangle scheme, Wells Fargo opened more than 85 Triangle-related accounts in California and Texas at Phillips' request. While Wells Fargo knew that all of the accounts were under Phillips' exclusive control, over 60% (approximately 55) of those accounts were bank accounts for the shell companies that were "owned" in the names of the nominees. Wells Fargo also opened more than 30 corporate bank accounts that Phillips directly owned. These included, most notably, numerous Wells Fargo bank accounts for the Triangle Media Corporation, into which Phillips regularly requested that Wells Fargo transfer funds from the shell company accounts "owned" by others, which Wells Fargo always did.

157.    Between 2013 and Triangle's demise in 2018, Phillips' business with Wells Fargo in California expanded rapidly. Over a nine-month period in 2015 alone, Wells Fargo opened a total of 12 shell company accounts "owned" by nominees for Phillips. Phillips established a close and continued relationship with Wells Fargo across multiple branches in Southern California. In total, over a dozen Wells Fargo Community Bank branches in Southern California provided an array of banking services for Phillips, Triangle, and his many related shell companies. Between fall 2013 and the end of Triangle in 2018, Wells Fargo opened more than 60 accounts at Phillips' request. More than 40 of those bank accounts, however, were for shell companies supposedly not "owned" by Phillips.

48                                    Case No. _____
                                    RECEIVER'S COMPLAINT

Phillips was a repeat player at many branches, including San Diego (1st and Market – 5 accounts and 3 reference letters), El Cajon (6 shell accounts and 9 reference letter), Palomar Vista (8 accounts and 2 reference letters), and San Marcos (6 accounts and 1 reference letter). Additionally, Phillips often made requests to open accounts to his Relationship Managers (Albana and Cording) working out of the Escondido branch, who expedited that process. Albana and Cording played the essential role of providing Phillips with ready access to reference letters (they wrote more than 30 such letters between 2015 and 2018).

158. The scope of the branches involved emphasizes that this was not one bad banker or one bad branch—rather, the bad conduct was reliably endemic at Wells Fargo. While the Escondido Branch was probably the worst offender (as discussed below), the misconduct at issue occurred across the Southern California branches noted above, all of which were operating under Wells Fargo's toxic sales culture. For example, in 2015 a banker from the San Diego Branch came to Phillips's aid when he asked her to set up a bank account for a shell company "with me and another signer on it." The banker responded that she needed the nominee owner's information to open the account, but that she would "switch the relationship once I have it." Phillips sent the banker the information she requested (the nominee's driver license, phone number, and social security number, among other things), and the banker proceeded to open the account, apparently untroubled by the fact that Phillips—not the nominee—was the one providing the information to open an account for a company that purported to be owned by the nominee.

159. The Wells Fargo bankers knew that all of these accounts were related, but on information and belief, that relationship was never risk-rated, monitored, or otherwise managed as would be befitting a relationship encompassing the volumes, number of accounts and global scope of what was an enterprise—not a series of individually-owned accounts.

---

49

Case No. _____
RECEIVER'S COMPLAINT

(iv)   The Escondido Branch

160.   Wells Fargo bankers at the Escondido Branch were especially accommodating to Phillips, particularly Haiman Albana ("Albana"), who was a Vice President and Business Relationship Manager at the branch, and Brian Cording ("Cording"), who was a Vice President and Senior Business Relationship Manager.   Compliance "rules" were easily bent or discarded for Phillips, in line with the OCC's conclusion that "[t]o the extent [Wells Fargo] did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank."   Albana, for example, initially told Phillips on October 30, 2013, that a shell company account (which Phillips had requested on October 24) hadn't yet been set up because Albana was "waiting to hear back from my compliance department" about it—but when Phillips complained that "when [he] was working with the branch on this stuff they could turn it around in 1 day" and asked whether he should "reach out to my branch contact," Albana sent him the forms for the next step *less than one hour later*.

161.   On August 25, 2014, Phillips sent an email to Albana about one shell company's accounts, asking Albana "to make sure that my name is not showing up on the [Vital Global Marketing] account (7355) at all.   These are [the nominee]'s accounts of which I have access too.   ***Can you please work to have my name replaced with her name?***   Let me know how quickly we can get this taken care of?" (Emphasis added.)   About a week later, Phillips forwarded forms purportedly completed by the nominee to add her and remove him from the shell account, at which point a Wells Fargo effected the change.

162.   Cording was fully aware that Phillips was the one in control of the shell accounts that Triangle had at Wells Fargo.   On August 19, 2015, for example, Phillips complained to Cording that he couldn't see accounts for shell companies H1 Marketing, Brand Junction, and Total Market Products "at the moment in a

Case No. _____
RECEIVER'S COMPLAINT

single portal view on my wells fargo login." Phillips explained that he "need[ed] to have key executive access" to the shell company accounts because "they need[ed] to have my status changed in the company." Cording immediately made changes to the profiles in Wells Fargo's system in order to allow Phillips "to see the accounts with the ability to transfer into the 3 of them."

163. Meanwhile, Phillips was making changes to the ownership of the Vital Global Marketing account—the account which, roughly a year earlier, he'd had Wells Fargo scrub his name from. Phillips sent over the paperwork to have the old nominee "owner" removed from the account on August 28, 2015. Less than a week later, he asked to have a different nominee added to another Vital Global Marketing account (x1053); a Wells Fargo banker business associate gave the new nominee control over the account, but when Phillips asked for documentation of a change in ownership, the Wells Fargo employee explained she would need an amended operating agreement. A few days after that, Cording chimed in to explain that the change in ownership would require a new account. The Wells Fargo employee sent over the required paperwork, explaining that Phillips "would want to list [the new nominee] as 100% owner to match your documents." Recognizing Phillips's true role in the operation, the banker added, "You will also need to list anyone (like yourself) who might have control of the company," and warned Phillips that as the technical owner of the shell company, the new nominee would have control over the other Vital Global Marketing account (x7355)—a warning she would not have needed to give if she'd believed the nominee was, in fact, the owner.

164. Cording also continued to accommodate Phillips' requests for visibility into accounts purportedly owned by others. On May 5, 2016, Phillips asked Cording to add another shell account, Sunset Order Marketing, to his "consolidated Business banking view in the portal." Cording asked another banker to make the change without hesitation. That banker, however, pointed out that the

Case No. _____
RECEIVER'S COMPLAINT

nominee for the account was the "100% owner, so in order to grant [Phillips] combine[d] view through online banking" she would need approval from the nominee. Phillips then asked, "why do these accounts keep getting setup this way where I have no right to visibility. Can we please get this and all accounts going forward switched to be in my consolidated view."

165. The Wells Fargo banker was quick to offer a couple work arounds:

If you aren't owner they can't automatically grant you combined view because you can transfer between other entities and personal accounts that way. **The work around is to have the owner grant you this authority but our online department requires it in writing incase there is some sort of internal fraud or something with the business, WF won't be liable**.

Unfortunately we cannot automatically do this every time. We have the work around but it requires an extra step. **In order to avoid this entirely we do offer the CEO portal for our large business clients**. (Emphasis added.)

166. Phillips made it absolutely clear that he wanted full access to multiple accounts for companies in which he had, on paper, no ownership interest. Though this is an obvious indication of potential fraud, no one at Wells Fargo appeared troubled by the request. In fact, when Phillips expressed exasperation with the process, one Wells Fargo banker even sympathized, apologizing for the Bank's (flimsy) procedural hurdle: "I'm sure somewhere along the lines an employee transferred out money from a business to his/her personal accounts and WF took a significant loss. So they now require an acknowledgement from the owner stating they are ok with the combine view."

167. Wells Fargo clearly understood that Phillips was in charge and that the nominee owner of the company was more or less irrelevant, but the Bank continued to do business with Phillips and Triangle. Wells Fargo did so in violation of KYC rules and regulations, which required the Bank to have a relationship with each of its customers. That posed a problem since Wells Fargo's only relationship with the shell companies was through Phillips.

168.   The rules changed in May 2016, but by December 2017—nearly a year and a half later—Wells Fargo had not yet implemented them.  On information and belief, the new rule, in fact, simply reflected what had been accepted as standard practices at many other banks for a number of years (but of course not Wells Fargo), going back as far as the establishment of new rules after the September 11, 2001 terrorist attacks.  That month, Cording emailed Phillips to explain the Bank's obligations under the "new" rule:

> In May 2016, the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) issued a rule strengthening the due diligence that certain financial institutions must perform with respect to their customers.  The new rule requires that financial institutions thoroughly understand the nature of the business of each of their clients.Wells Fargo and other banks are required to comply with these new and existing regulations related to the prevention of financial crimes.  As a result, we are enhancing our internal compliance and risk related policies.  Because of the size and scope of our organization, we are starting to collect customer information now to ensure that we are able to comply with the federal deadline.

169.   Cording sent Phillips pre-filled paperwork for 10 companies, seven of which were shell companies *but all of which listed Phillips as the owner*.  This was inconsistent with the owners listed on the Wells Fargo bank records, but Cording clearly considered Phillips to be the actual owner of all 10 companies in spite of this.  Predictably, Phillips responded and asked to have the "docs changed around" so he could "coordinate for each of the people to sign."  Cording replied: "Happy to do it, *I think the challenge is we may not be sure of the owners of each entity*."  Not only did Wells Fargo have zero idea who its account owners were (showing how little the Bank was concerned about Triangle's proliferation of shell accounts), but Cording, apparently unperturbed, continued doing business with Phillips even after he was once more faced with proof that Phillips was the *de facto* owner for a host of shell companies.

(v)   Triangle's Attempts at Securing ACH Processing

170.   Phillips periodically looked into securing ACH processing services from Wells Fargo, which would give Triangle another avenue to accept customer

FTCSER-70

payments..  Wells Fargo's incentive was obvious: they would be able to collect processing fees for any transactions that Triangle ran.

171.  As early as 2014, Albana was working with Phillips to try and secure web-based ACH processing for Triangle.  Apologizing for the delay in getting approval for Phillips' application, Albana explained that "[a]s you know your industry is high risk and the bank is scrutinizing each detail prior to getting approval, I am working diligently with credit supervision to get the approval."  In response to requests from Albana, Phillips provided him with a client list, sample agreement, key officer bios, and additional information.

172.  The 2014 push to get ACH processing for Triangle through Wells Fargo was dead by August, however.  As Keer wrote to another Triangle employee, "the entire ACH deal with Wells was scuttled because of some random text on [the Triangle website]."

173.  Emails the following month between Triangle personnel make it clear exactly what, in one employee's words, "wells' compliance team saw" that caused the Bank to back off: an old website for Triangle Media Corporation, which touted the company's ability to "provide expertise for your high-risk business" because its "seamless solutions offer your business the ability to market concepts normally rejected by traditional processors and banks."

174.  While Triangle had already removed the problematic language from its website, it was still popping up as the top google search for "Triangle Media," so   Phillips and his employees made efforts to bury it by "get[ting] new content to pile over the [problematic language]."

175.  Wells Fargo's compliance team's decision to reject Triangle's processing application demonstrates, as with the Bank's rejection of the Apex merchant processing applications, that Wells Fargo was unwilling to take on the risk of processing for these companies.  The Bank was careful when its own potential exposure was on the line.  Of course, the Bank remained perfectly willing

Case No. _____
RECEIVER'S COMPLAINT

FTCSER-71

to continue servicing the fraudulent shell companies at the branch level, open bank accounts for additional shell companies, and take other atypical steps to assist the schemes' success.

176. Despite the compliance team's decision to nix ACH processing, the sales imperative at the Bank was overwhelming. One year later in 2015, Cording, was doing his best to get ACH approval for Phillips and Triangle once again. Cording emailed Phillips that after "thinking through my strategy to get ACH approved on Triangle Media," he thought it would be useful to have some balance sheets and income statements, because they would allow him to "utilize the financial strength of the business [to] mitigate any risks."

177. Cording still had not managed to obtain approval for Triangle to use Wells Fargo's ACH processing in early 2017, but that didn't mean that he had stopped trying. On February 16, he wrote Phillips that "[w]e did do some further due diligence internally and there is potential for us to fulfill the ACH request as well as we may have a solution for the account needs." Although it does not appear that Cording was ultimately able to secure ACH processing for Triangle, the fact that he was still willing to try (and that Wells Fargo was still apparently considering it) in light of everything that Cording and Wells Fargo knew about Phillips and Triangle speaks for itself. The evidence firmly establishes that Wells Fargo knew exactly what Triangle was doing, and that by assisting Triangle, it was violating banking regulations and the Bank's own (on paper) policies and procedures.

(vi)   <u>Wells Fargo Authorized Suspicious and Unusual Transactions that Made No Economic Sense.</u>

178. As all of the above examples indicate, Wells Fargo knew from very early on in its relationship with Triangle that Triangle was using nominees as fronts for shell companies, with Phillips regularly insisting that the nominees (as opposed to Phillips, who Wells Fargo knew was the true owner) be listed as the

"100% owners" of the accounts. Wells Fargo bankers had obligations under standard banking practices and banking laws and regulations to investigate and report Phillips' manipulation of the shell companies' beneficial ownership. Had Wells Fargo conducted a real investigation, its findings would have compelled it to refuse to do any more business with Phillips, shut down Phillips' accounts, and/or follow Wells Fargo's established processes regarding the making of internal and external reports of suspicious activity. In reality, of course, given all that it knew by this point, Wells Fargo already understood what the results of any such investigation would be.

179. Wells Fargo knew that Triangle's shell companies continually suffered massive chargebacks. Like with Apex, this was abundantly clear from the shell companies' monthly account statements.

180. Wells Fargo had an obligation under banking laws and regulations to look at the family of Triangle accounts as a whole, rather than looking at individual account activity in isolation. If one Triangle-related account needed to be closed, then all other Triangle accounts likely would have to be closed too. This obligation required the Bank to reassess its dealings with the Triangle Enterprise on a regular basis, including whenever it opened a new account at Phillips' request.

181. Wells Fargo was therefore obligated when conducting its account opening and at least annual diligence for Triangle-related entities under standard AML procedures to assess both new – and existing accounts in the context of the overall relationship with Triangle's beneficial owners and key parties, namely Phillips who had more than 30 personal and corporate accounts with Wells Fargo (in addition to the more than 50 shell accounts).

182. In particular, Wells Fargo should have conducted a critical examination of transfers between Phillips-owned and Phillips-associated companies, which there is no indication it did—even though there were multiple indicia of fraud present. Wells Fargo knew that Phillips was regularly requesting

that the Bank move money into his main Wells Fargo Triangle account, which Phillips himself exclusively owned. At Phillips' direction, Wells Fargo regularly processed suspicious large-figure, round-number transfers out of shell accounts (which were nominally owned by others) and into his own Triangle account. Wells Fargo bankers should have pressed Phillips on why significant amounts of money were being sent from accounts owned by others to Phillips' Triangle account, all while the listed owners (nominees) were receiving only nominal payments from the accounts that they supposedly owned. Wells Fargo was also knew that funds which hit Wells Fargo's Triangle account were regularly being transferred overseas. If Wells Fargo had any concern for protecting the interests of these "owners," or complying with anti-fraud or AML regulations, it would not have permitted Phillips and Triangle to do what they were doing.

183. Wells Fargo had no such concerns. Instead, after Wells Fargo had enabled Phillips himself, and not the supposed "owners," to direct these transfers from the LLC accounts to his Triangle accounts, thereafter Wells Fargo even transferred the recently-deposited funds from the Triangle account entirely out of the United States.

184. While Wells Fargo was disregarding problematic and unusual account activity, Wells Fargo was not at all ignoring Phillips or Triangle's accounts. However, instead of vigilantly monitoring these accounts for suspicious behavior in the context of a high-risk customer in a high-risk industry, making all manner of suspicious transactions out of accounts he did not "own," Wells Fargo was nurturing its relationship with Phillips to try to grow Wells Fargo's business. In other words, Wells Fargo was doing what it did best: opening accounts wherever it could, whether by providing new banks accounts for the shell companies or trying to provide add-on banking services, such as ACH processing, merchant processing, or even access to foreign accounts. Cross-selling clients, not compliance or client oversight, was the priority for Wells Fargo. *See, e.g.,* American Banker, *Bankshot:*

*Wells Fargo Should Have Seen Add-on-product Trouble Coming,* Kevin Wack, July 19, 2018.

185.   It is particularly troubling that over many years, Wells Fargo used so-called "Relationship Managers" (in this case Albana and Cording operating out of the Escondido branch) to serve as lead salespersons seeking to grow the Triangle relationship as much as possible.  Wells Fargo flouted the common industry role that positions such as Relationship Managers have as experienced bankers, providing an extra "first line of defense" layer of protection for a bank against fraud and money laundering.

186.   Wells Fargo designed a corporate structure prioritizing sales that instead used its designated Relationship Managers in a way that perpetuated fraud and weakened risk compliance, unlike other banks of its size.  Typically, a banker in such a position will conduct periodic due diligence reviews across families of accounts, especially for accounts like Triangle, operating in high-risk industries rife with fraud.  At other institutions following standard banking practices, a designated account representative such as this would have adhered to procedures such as requiring visits to an owner's place of business.  Such designated account representatives would also have been responsible for being familiar with the specific activity in the account and its purpose, and for providing updated predictions of expected activity in order to facilitate centrally managed, automated monitoring for potentially suspicious activity.  But, as Brian Phillips had learned early on, Wells Fargo was "totally different."

### C.    Wells Fargo Aided and Abetted Fraudulent Transfers

187.   There is additional evidence of Wells Fargo's knowledge of the scammers' modus operandi.  Millions of dollars consumers paid into the various shell company accounts were diverted to the individual fraudsters to maintain their lavish personal lifestyle, or to funnel monies out of the Enterprises into real estate and investments that they would purchase via trusts and corporations.  For

Case No. _____
RECEIVER'S COMPLAINT

example, in July 2014 emails between Triangle's Phillips and Tim Morgan, a Wells Fargo Private Mortgage Banker, Phillips notified Morgan that Phillips would receive a $2 million wire from Hardwire (a defendant in the FTC case), and then asked, "will this money need to be 'seasoned' before being used for a house purchase?"

188.   As set forth herein, Peikos and/or Barnett, and Phillips controlled the Apex and Triangle Enterprises (which are now Receivership Entities), and directed them to make numerous transfers out of proceeds of the fraud to themselves, and third parties (including Wells Fargo).  At the time of each fraudulent transfer, they intended to delay, defraud, or hinder their creditors (most notably the Receivership Entities under their control).

189.   Through the numerous acts identified herein, Wells Fargo substantially assisted Phillips, Peikos and Barnett in making these fraudulent transfers, despite knowing that the transfers were unlawful, they controlled the Receivership Entities and had no lawful claim to fraudulently-obtained consumer funds. Wells Fargo knowingly transferred shell company account funds to other Receivership Entity shell company accounts and then directly to Phillips, Peikos, and/or Barnett or to other third parties (at the direction of Phillips, Peikos, and/or Barnett) without the shell companies receiving a reasonably equivalent value in exchange for the transfers and which depleted the shell companies of all or substantially all of their assets.

190.   The transfers from the Wells Fargo accounts of the Receivership Entities to Phillips, Peikos, Barnett and Wells Fargo constitute fraudulent transfers under the California UVTA and UFTA for the following reasons, among others:

191.   Phillips, Peikos and Barnett made the transfers to themselves or third parties with the actual intent to hinder, delay, or defraud consumers;

192.   Phillips, Peikos and Barnett engaged in the free-trial schemes knowing that their assets and the assets of the Receivership Entities they controlled

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-76**

were unreasonably small considering that all of the assets were obtained by frauds on consumers and did not belong to them;

Phillips, Peikos and Barnett knew that through their fraudulent schemes, they incurred debts to the Receivership Entities and consumers beyond their ability to pay;They retained possession or control of the assets after the transfers.

193.   The Receivership Entities did not receive a reasonably equivalent value in exchange for the transfers from the Wells Fargo accounts because Phillips, Peikos, and Barnett drained the accounts for their own personal use and benefit, and the shell companies acted as mere pass-throughs to allow the fraudsters to avoid detection by creditors of their ownership and control of the funds;

194.   The Receivership Entities had no assets other than the fraudulently-obtained funds before or after the transfers;

195.   The transfers to Phillips, Peikos, and Barnett were as corporate insiders of the Receivership Entities;

196.   The transfers among and from the Wells Fargo accounts were intended to conceal the true ownership and recipients of the funds;

197.   When the transfers were made, Phillips, Peikos and Barnett knew they were likely to be sued for their wrongdoing;

198.   Phillips, Peikos, and Barnett removed and concealed receipt of the consumer funds from the Wells Fargo accounts by transferring them to unrelated, unidentified and undisclosed personal and offshore accounts;

199.   The transfers were of substantially all the Receivership Entities' assets;

200.   The Receivership Entities were insolvent or became insolvent shortly after the transfers were made or the obligations were incurred; and

201.   The transfers occurred shortly before or shortly after the substantial debts to consumers were incurred.

202.   Despite knowing that Phillips, Peikos and Barnett had no lawful claim

to the consumer funds and Phillips, Peikos, and Barnet lacked the assets to pay such amounts back to the Receivership Entities, Wells Fargo transferred such consumer funds, and depleted the Receivership Entities' assets, which allowed Phillips, Peikos, and/or Barnett to receive such funds directly.

203. Based on the allegations above, these transfers of Receivership Entity funds to Wells Fargo and Phillips, Peikos, and Barnett constitute fraudulent transfers which must be returned to the Receivership Entities. Accordingly, the Receiver seeks to recover as fraudulent transfers all Receivership Entity/consumer funds received by Wells Fargo as well as those funds transferred to Phillips, Peikos, and Barnett.

204. Wells Fargo knowingly aided and abetted the fraudulent transfers from the Receivership Entities under the control of Phillips, Peikos, and/or Barnett. This substantial assistance included the fraudulent transfer of consumer funds from the Wells Fargo accounts to Phillips, Peikos, and Barnett.

205. In addition, Wells Fargo accepted payments of consumer funds from Receivership Entities in connection with setting up and maintaining the fraudulent accounts. By collecting fees, charges, fines, reserve amounts, and other payments generated by the shell companies' and other Receivership Entities' payment processing, Wells Fargo was asserting that the Receivership Entities had a valid obligation to make these payments to Wells Fargo.

206. Wells Fargo, as a knowing aider and abettor of the fraudulent schemes, was not entitled to receive, and could not take in good faith, these payments from the Receivership Entities' funds derived from payments by defrauded consumers in connection with setting up and maintaining the fraudulent accounts for the Receivership Entities and thus constitute fraudulent transfers which must be returned to the Receivership Entities.

Case No. _____
RECEIVER'S COMPLAINT

## VIII. KNOWING VIOLATIONS OF BANKING LAWS AND PROCEDURES

207. Wells Fargo repeatedly and knowingly violated banking rules and regulations in its assistance and facilitation of the Apex and Triangle Enterprises, which is further evidence that Wells Fargo knew exactly what it was doing to assist a fraud. The lengths to which Wells Fargo went to substantially aid and abet these fraudulent enterprises is evidenced by not only their willful disregard of standard banking procedures, but also Wells Fargo's continued violations of a dizzying array of banking laws designed to protect against fraud and money laundering.[14]

208. The Bank Secrecy Act ("BSA") makes it a criminal act for banks and other financial institutions to aid and abet criminals in the laundering of money. FinCEN is the federal regulatory agency responsible for issuing regulations to combat money laundering. FinCEN defines money laundering as the process of making illegally-gained proceeds (*i.e.*, "dirty money") appear legal (*i.e.*, "clean"). Typically, it involves three steps: placement, layering, and integration. First, the illegitimate funds are introduced into a legitimate financial system (placement). Then, the money is moved around to create confusion, sometimes by wiring or transferring the funds through numerous accounts (layering). Finally, it is integrated into the financial system through additional transactions until the "dirty money" appears "clean" (integration).[15]

209. Under the BSA, banks must comply with certain Customer Identification Program (CIP) requirements when opening new accounts, including

---

[14] Plaintiff is not bringing any claims for violating the Bank Secrecy Act or related regulations, nor is he alleging that an express or implied duty arose to Plaintiff based on Wells Fargo's BSA violations. Wells Fargo's duties directly arose to the Receivership Entities as Wells Fargo's customers.

[15] *See* "History of Anti-Money Laundering Laws," FinCEN, *available at* https://www.fincen.gov/history-anti-money-laundering-laws.

---

maintaining account-opening procedures detailing the identifying information that must be obtained from each customer. As an established nationwide banking system, Wells Fargo and its bankers knew what these requirements were.

210. Section 326 of the USA PATRIOT Act was enacted following the 9/11 terrorist attacks and jointly implemented by the federal banking regulators, requires that banks to meet minimum standards with regard to collection of the name, address, date of birth and tax identification number or other means of positive identification for all customers for which it opens an account.

211. A circular issued jointly by the then four federal bank regulatory agencies, joining with FinCEN and the Department of Treasury stated that:

> "a bank's CIP **must** include risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable. ***It is critical that each bank develop procedures to account for all relevant risks including those presented by the types of accounts maintained by the bank***, the various methods of opening accounts provided, the type of identifying information available, and the bank's size, location, and type of business or customer base. ***Thus, specific minimum requirements in the rule, such as the four basic types of information to be obtained from each customer, should be supplemented by risk-based verification procedures, where appropriate, to ensure that the bank has a reasonable belief that it knows each customer's identity.*** (Emphasis added.)

212. Additionally, Wells Fargo was required as a part of federally-mandated account opening process to understand the business/account use ("Know Your Customer"), and to add extra steps in due diligence, especially where, as was the case with both Triangle and Apex, high risk existed: Customer Due Diligence ("CDD") and Enhanced Due Diligence ("EDD").

213. During the Relevant Period, it was standard industry practice (and expected by banks of Wells Fargo's size) to provide its branch employees with tailored training on how to comply with these laws and regulations, including how recognize and escalate suspicious activity in their roles.

---

Case No. _____
RECEIVER'S COMPLAINT

214.  Wells Fargo was required to train its employees on how to comply with the BSA and USA PATRIOT Act, including but not limited to:

- The importance of getting accurate identity information and beneficial owner identification;

- The ability to identify and act upon red flags for suspicious activity, including but not limited to

    o Suspicious designation of beneficiaries, assignees or joint owners
    o Suspicious use of multiple accounts
    o Transactions out-of-pattern for the customer or business situation
    o Transactions that don't make economic sense

- Understanding of various types of activity that require reporting in a number of categories including:

    o 31-Fraud, including
        ▪ e-credit/debit card
        ▪ h-mass marketing
        ▪ i-pyramid scheme

    o 33-Money Laundering
        ▪ d-suspicious designation of beneficiaries, assignees or joint owners
        ▪ h-suspicious use of multiple accounts
        ▪ l-transactions out-of-pattern for customers

    o 34-Identification/Documentation.

215.  The regulatory requirements under the BSA placed central importance on vigilantly monitoring to identify and verify customers and beneficial owners, to understand the nature and purpose of customer relationships to develop an accurate customer risk profile, and to undertake ongoing monitoring for reporting suspicious transactions and to maintain and update customer information.

216.  In a branch system, like Wells Fargo maintained, the branch employees were required to have a central role in complying with the law and related regulations.  Among other things, branch employees were typically the

primary source of reporting suspicious activity up the chain within Wells Fargo to enable the bank to determine whether it needed to take steps to fulfill its obligations to report such activity externally (to FinCEN). Wells Fargo routinely failed to follow the requirements of BSA/AML/CIP for Apex and Triangle. Wells Fargo's Community Bank gave its branches wide discretion and deficient oversight in performing these tasks, while at the same time incentivizing branch employees to open accounts and cross-sell under a high-pressure quota system.

217. As examples, Wells Fargo knowingly allowed accounts to have incorrect addresses and use identical Wyoming mail drops (in the case of Apex). Instead of identifying and verifying actual beneficial owners of the shell companies, Wells Fargo knew that actual owners were different from the listed owners, and undertook any number of steps to mask or paper over such inconsistencies.

218. Wells Fargo deliberately failed to compile an adequate customer risk profile for all of the shell companies. If the Bank had used commercially reasonable risk assessment techniques, it would never have opened these accounts or would have immediately closed the accounts after it processed transactions that were clearly suspicious.

219. Further, Wells Fargo knew that Apex and Triangle shell companies were routinely executing suspicious transactions using their Wells Fargo accounts, such as transferring funds between accounts and to external accounts in "round" dollar amounts—that is, round numbers with zeros on the end (*e.g.*, $100,000). An abundance of "round" dollar transactions (which the Apex and Triangle shell companies certainly had) is indicative of money laundering and has been referred to as "a fingerprint of fraud." *See* Nigrini, Mark J., "Round numbers: A fingerprint of fraud," Journal of Accountancy (May 1, 2018), *available at* https://www.journalofaccountancy.com/issues/2018/may/fraud-round-numbers.html.

---

Case No. _____
RECEIVER'S COMPLAINT

220.  As even the most cursory reviews of monthly account statements made abundantly clear, Wells Fargo was well aware of the Apex and Triangle shell companies' high chargeback rates, which were well in excess of the permitted chargeback rates under Visa/Mastercard rules for high-risk merchants.

221.  Regardless of the vantage point from which the Apex and Triangle Enterprises are viewed, Wells Fargo knew that they were high-risk relationships and accounts for multiple reasons.  As such, Wells Fargo knew that they were required to classify the family of Apex and Triangle accounts as high risk for misuse and as such, subject them to heightened oversight and enhanced due diligence.

222.  Further, Wells Fargo was well aware that Apex and Triangle were classified as high risk by merchant processors, including Wells Fargo's own merchant processing group.  This provided yet another reason for active monitoring of these accounts by Community Bank employees and branches.

223.  Indeed, the Bank's very own Merchant Processing Agreement and Credit Risk Guidelines confirm the many risks created by businesses like Apex and Triangle. The Processing Agreement specifically prohibits the solicitation of merchants engaged in certain unacceptable business practices, because they were presumptively illegal, violated card association rules, or created excessive risk exposure. The prohibited categories included, for example, debt consolidation services, Get Rich Quick Opportunities, and any merchant engaged in any form of deceptive marketing practices.

224.  Wells Fargo also prohibited the solicitation of merchants selling nutraceuticals through free trial offers, unless specifically pre-approved by Wells Fargo.  And when Wells Fargo periodically evaluated, and on several occasions reviewed, completed applications, for the Apex and Triangle Enterprises Wells Fargo declined to provide merchant processing.   (The exception was the small amount Triangle legacy merchant processing through a third party, which

Case No. _____
RECEIVER'S COMPLAINT

FTCSER-83

apparently stayed below Wells Fargo's radar for years – either by mistake or policy design.)

225.  Wells Fargo's Credit Risk Guidelines (the "Guidelines") require that merchants be scrutinized for evidence of deceptive marketing practices and, if found, immediately compel the merchant to eliminate these practices or terminate the merchant.  The Guidelines provide numerous examples of common warning signs of potential deceptive marketing practices, almost all of which the Enterprises employed. These include negative options and industries where deceptive marketing practices were prevalent, such as nutraceuticals.  Further, the Guidelines specifically warn about merchants opening multiple accounts, particularly via multiple shell companies with the same or similar principals (in some cases, hired "mules" with little or no business involvement which may be submitted to obscure the true ownership).

## IX.  WELLS FARGO EXECUTIVES AUTHORIZED AND RATIFIED BANKER PARTICIPATION IN THE FRAUDS

226.  Evidence of Wells Fargo's executives' pressure on managers and employees to participate in the fraudulent misconduct alleged herein also is set forth in numerous governmental and private lawsuits. In the SEC's complaint against Carrie L. Tolstedt, Senior Executive Vice President of Community Banking for Wells Fargo filed on November 13, 2020, the SEC alleged that for several years, until mid-2016, Wells Fargo opened millions of accounts or sold products that were unauthorized or fraudulent, and others that were unneeded and unwanted by retail banking customers.

227.  The Community Bank, which Tolstedt led from 2007 through mid-2016, was responsible for managing the large network of bank branches, referred to within Wells Fargo as "stores," as well as other sales channels through which Wells Fargo offered its products.  The branches employed, among others, bankers who were generally responsible for offering accounts and financial products or

services to customers. The bankers reported up through managers of the branches to Regional Bank Executives, who reported to Tolstedt. In addition, the persons who managed the various groups organized around products that the Community Bank offered also reported up to Tolstedt.

228. The Community Bank also had financial and risk officers who reported to Tolstedt and assessed the Community Bank's business progress and its risks. Those persons provided information to the financial and risk officers for the Company overall, often after first discussing the information with Tolstedt. In addition, at least quarterly, Tolstedt met with the CEO (and frequently others) to discuss the business of the Community Bank and to make strategic plans.

229. During the Relevant Period, Wells Fargo's CEO and other high-level executives and directors of the Bank encouraged employees to deliberately ignore indicia of fraud if it helped the Bank's bottom line—instructions which led to Wells Fargo and its employees aiding and abetting the Enterprise schemes.

230. Other higher-level employees and agents of Wells Fargo in the Community Bank branches encouraged and instructed their bankers and employees to do the same. These higher-level employees and agents included:

- David Hannig, who was an Assistant Vice President and Business Sales Consultant for Wells Fargo Merchant Services, and who worked directly with Apex's Barnett, Peikos, Camacho, and Carr;

- Lea Walker, who was a Business Specialist and subsequently an Assistant Vice President at Wells Fargo in the Keller, TX branch (910 Keller Parkway, Keller, TX 76248), and who worked directly with Triangle's Phillips;

- Haiman Albana, who was a Business Relationship Manager at Wells Fargo associated in the Escondido, CA branch (500 La Terraza Boulevard, Suite 200, Escondido, CA 92025), and who worked directly with Triangle's Phillips; and

- Brian Cording, who was a Senior Business Relationship Manager at Wells Fargo associated with the Escondido, CA branch (500 La Terraza Boulevard, Suite 200, Escondido, CA 92025), and who worked directly with Triangle's Phillips.

231. These are just some of the Wells Fargo employees who knowingly

Case No. _____
RECEIVER'S COMPLAINT

1   acted in collaboration and collusion with Apex and Triangle in furtherance of the

2   unlawful schemes.  Wells Fargo authorized or ratified the acts of these employees

3   as alleged herein.

## X.   INFORMATION ALLEGATIONS

5   232.  Allegations made in this Complaint are based on information and

6   belief, except those allegations that pertain directly to the Receiver, which are

7   based on his personal knowledge.  The Receiver's information and belief is based

8   on, *inter alia,* the investigation and review of publicly filed documents and from

9   the Receiver appointed in the FTC actions described above and his attorneys. Each

10  and every allegation and factual contention contained in this Complaint has

11  evidentiary support or, alternatively, is likely to have evidentiary support after

12  reasonable opportunity for further investigation or discovery by the Receiver or his

13  counsel.

## XI.   DELAYED DISCOVERY BY THE RECEIVER AND ESTOPPEL

15  233.  First and foremost, the Receiver's discovery of the Receivership

16  Entities' claims against Wells Fargo was impossible until his appointment; prior to

17  that, the Receivership Entities were controlled by Phillips, Barnett, and Peikos,

18  which made discovery of their wrongdoing impossible.  The statutes of limitations

19  were tolled until the time of the Receiver's appointment.

20  234.  The statutes of limitations were tolled past that point, however,

21  because the Receiver did not (and could not have) discovered the fraud

22  immediately upon his appointment.  The Receiver only discovered Wells Fargo's

23  misconduct related to the Apex and Triangle Enterprises in 2019.  There were two

24  primary reasons for this: (1) Wells Fargo took steps to conceal its role in the Apex

25  and Triangle frauds; and (2) the Receiver did not receive responses to subpoenas it

26  issued to Wells Fargo until June and July of 2019, before which there was

27  insufficient documentary evidence for the Receiver to discover the claims.  Once

28  the Receiver and his counsel had the documents in hand, they were finally able to

1 piece together Wells Fargo's role in facilitating the Apex and Triangle frauds, and
2 to confirm that the Bank knew of the fraudulent nature of the Apex and Triangle
3 Enterprises.[16]

4    235.   Because of Phillips's, Peikos's and Barnett's efforts to conceal the
5 Apex and Triangle frauds from consumers, along with the role Wells Fargo played
6 in those frauds, Wells Fargo is estopped from contending that any of the
7 Receiver's claims are barred by applicable statutes of limitations.

8 **XII.   CAUSES OF ACTION**

9              **First Cause of Action**

10            **(Aiding and Abetting Fraud)**

11   236.   The Receiver repeats and realleges the allegations of each and every
12 one of the prior paragraphs, inclusive, as if fully set forth herein.

13   237.   Phillips, Peikos, and Barnett, via the Apex and Triangle Enterprises,
14 operated online "free trial" scams, which falsely advertised that consumers would
15 only be charged the cost of shipping in exchange for a trial of a product.  In reality,
16 the consumers were being signed up for a subscription service and charged for the
17 full price of the product on the next billing cycle unless they affirmatively canceled
18 the subscription.

19   238.   Wells Fargo knew that the Apex and Triangle Enterprises were
20 engaged in a high-risk, fraudulent business, and Wells Fargo knew that they were
21 required to terminate or further investigate that business pursuant to the BSA,
22 FinCEN regulations, and their own internal policies. Multiple Wells Fargo
23 employees across multiple branches deliberately turned a blind eye to the Apex
24 and Triangle frauds, because the large number of accounts needed by the Apex and
25 Triangle Enterprises helped them to meet otherwise-unattainable sales quotas set

---

27 [16] The Receiver did not file until now pursuant to a Tolling Agreement with
28 Defendants.

by Wells Fargo's corporate headquarters.  Wells Fargo's corporate policies encouraged sales misconduct by setting unrealistic sales goals and requiring bankers to open as many accounts, and to sell as many services and bank products, as possible.

239.  Wells Fargo provided substantial assistance to the intentional torts committed by the primary wrongdoers by, among other things, creating accounts for shell companies used by the Apex and Triangle Enterprises to secure critical merchant processing services; assisting the Apex and Triangle principals in hiding their ownership of those accounts from the merchant processors, so that the principals could continue to secure merchant processing services for the underlying fraud; and allowing Apex and Triangle to launder money obtained from defrauded consumers through their Wells Fargo accounts.

240.  The substantial assistance that Wells Fargo provided to the Apex and Triangle frauds proximately caused substantial damages to the Receivership Entities in an amount to be proven at trial.  These damages include, but are not limited to: the fees charged by Wells Fargo for their banking services, which directly furthered the fraudulent schemes and depleted the funds of the Receivership Entities; the Receivership Entities' legal obligations to satisfy the FTC Judgments, which require the Receivership Entities to make whole the consumers who were defrauded as a result of the Apex and Triangle frauds that Wells Fargo facilitated; all fees and costs necessitated by the need to establish a Receivership; and the costs of defending the action by the FTC (including the resulting Receiverships).

241.  Wells Fargo's conduct was intentional, fraudulent, willful, malicious, and intended to injure the Receivership Entities, by virtue of which the Receiver prays for an award of exemplary and punitive damages.

## **Second Cause of Action**

### **(Conspiracy to Commit Fraud)**

Case No. _____
RECEIVER'S COMPLAINT

242.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

243.   Philips, Peikos, and Barnett engaged in the primary wrongs described herein.

244.   Wells Fargo entered into a conspiracy with Phillips, Barnett, and Peikos to perpetuate their frauds.   Wells Fargo agreed to assist the frauds by, among other things, and as described herein, (i) opening accounts for dozens of shell companies, which Wells Fargo knew were owned and controlled by Apex and Triangle's principals, (ii) executing reference letters that gave legitimacy to the shell companies and allowed them to secure merchant processing services, (iii) accepting as deposits funds which Wells Fargo knew were fraudulently obtained from consumers, (iv) transferring those funds to other accounts (including foreign accounts), which allowed the Apex and Triangle principals to launder the money they derived from the frauds, and (v) continually providing atypical banking services.

245.   The Receivership Entities suffered damages that were proximately caused by Wells Fargo's participation in the conspiracy (without which the Apex and Triangle Enterprises could not have functioned) and which are described herein.

### Third Cause of Action

### (Breach of Fiduciary Duty)

246.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

247.   Wells Fargo owed fiduciary duties to the Receivership Entities pursuant to their bank/client relationships.   Wells Fargo had a duty to their customers, the Receivership Entities, to discharge its duties in good faith, with reasonable care, and in a manner reasonably believed to be in the Receivership Entities' best financial interests.

72

Case No. _____
RECEIVER'S COMPLAINT

248.   Wells Fargo knew that Phillips, Peikos, and Barnett were engaging in fraud as described herein.

249.   Wells Fargo breached the fiduciary duties it owed to the Receivership Entities by willfully, fraudulently, recklessly, and/or negligently engaging in conduct which was not in the best financial interests of the Receivership Entities. Specifically, Wells Fargo (i) diverted funds that belonged to the Receivership Entities into Phillips, Peikos, and Barnett's pockets, and (ii) failed to, or refused to, fulfill its "know your customer" obligations, conduct due diligence, and abide by other banking regulations and standard practices.

250.   Wells Fargo's breaches of the fiduciary duties it owed to the Receivership Entities actually and proximately caused financial injury to the Receivership Entities as described herein.

### Fourth Cause of Action

### (Aiding and Abetting Breach of Fiduciary Duty)

251.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

252.   At all material times, Phillips, Peikos, and Barnett owned or controlled their respective Receivership Entities.  As the owners of the Triangle or Apex Enterprises, they had a fiduciary relationship with the Receivership Entities because the entities were under their complete control.  Phillips, Peikos, and Barnett owed the Receivership Entities a fiduciary duty to act in good faith, with reasonable care, and in a manner reasonably believed to be in the Receivership Entities' best financial interests.

253.   Phillips, Peikos, and Barnett breached their fiduciary duties owed to their respective Receivership Entities by willfully, fraudulently, recklessly, and/or negligently engaging in conduct which was not in the best financial interests of the Receivership Entities by engaging in the primary wrongs described herein and by diverting the Receivership Entities' assets into their own pockets with no

Case No. _____
RECEIVER'S COMPLAINT

legitimate or justifiable business purpose.

254.   Phillips, Peikos, and Barnett's breaches of the fiduciary duties they owed to the Receivership Entities actually and proximately caused financial injury to the Receivership Entities, as described herein, in an amount to be proven at trial.

255.   Wells Fargo had actual knowledge of Phillips, Peikos, and Barnett's breaches of their fiduciary duty and rendered substantial assistance in regard to such breaches by affording them or their agents special privileges, by enabling and allowing continuous, suspicious, and obviously fraudulent banking activity, and by failing to adhere to federal, local and internal regulatory banking procedures and policies.

256.   Wells Fargo is liable for all damages actually and proximately caused to the Receivership Entities through its acts and omissions, including those damages described above, in an amount to be proven at trial.

## Fifth Cause of Action

### (Aiding and Abetting Conversion)

257.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

258.   Phillips, Peikos, and Barnett wrongfully asserted dominion and control over the funds in the Apex and Triangle Enterprise accounts, which rightfully belonged to their respective Receivership Entities, by misappropriating consumer funds from those accounts and using the funds for their personal use and benefit.   Phillips, Peikos, and Barnett's actions resulted in the conversion of funds belonging to the Receivership Entities.

259.   Wells Fargo had actual knowledge of Phillips, Peikos, and Barnett's misappropriation of the Receivership Entities' funds, because those funds were wrongfully transferred into, between, and out of accounts held by Wells Fargo.

260.   Wells Fargo rendered substantial assistance to Phillips, Peikos, and Barnett in their conversion of the Receivership Entities' funds by executing their

Case No. _____
RECEIVER'S COMPLAINT

FTCSER-91

transactions, even though doing so violated banking regulations and other prudent and sound banking practices and procedures.

261. Wells Fargo is therefore liable for all damages actually and proximately caused to the Receivership Entities based on the conversion of funds undertaken by Phillips, Peikos, and Barnett, in an amount to be proven at trial.

### Sixth Cause of Action

### (Violation of California Penal Code § 496)

262. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

263. Penal Code § 496(c) permits "any" person who has been injured by a violation of § 496(a) to recover three times the amount of actual damages, costs of suit and attorney's fees in a civil suit. Penal Code § 496(a) creates an action against "any" person who (1) receives "any" property that has been obtained in any manner constituting theft, knowing the property to be so obtained, or (2) conceals, withholds, or aids in concealing or withholding "any" property from the owner, knowing the property to be so obtained.

264. Under Penal Code § 7, "person" includes a corporation as well as a natural person. Wells Fargo Bank, N.A., as a national banking association, and Wells Fargo & Co., as a corporation, are "persons" capable of violating § 496(a).

265. Phillips, Peikos, and Barnett obtained consumer funds by theft under Penal Code § 484, because those funds were obtained "knowingly and designedly, by any false or fraudulent representation or pretense," from consumers. These funds were so obtained because, among other things, consumers were falsely informed they were signing up for free trials but ended up paying for products or subscriptions without their consent.

266. Wells Fargo, knowing of their frauds, deliberately concealed and aided in concealing those frauds by, *inter alia*, hiding the identity of the individuals who were committing the fraud, and by setting up and maintaining the fraudulent

Case No. _____
RECEIVER'S COMPLAINT

accounts as described herein.

267. Additionally, Wells Fargo knowingly transferred property that was wrongfully obtained from consumers to Phillips, Peikos, Barnett, or third parties at their behest, as described herein.

268. As a direct and proximate result of Wells Fargo's violations of Penal Code § 496(a), the Receivership Entities were deprived of assets. Pursuant to Penal Code § 496(c), the Receiver seeks statutory treble damages, costs of suit, and reasonable attorney's fees.

**<u>Seventh Cause of Action</u>**

**(Violation of California Business and Professions Code § 17200)**

269. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

270. Business & Professions Code §§ 17200, et seq., prohibit acts of "unfair competition," a term which is defined by Business & Professions Code § 17200 as including "any unlawful, unfair or fraudulent business act or practice…."

271. Defendants have violated Business & Professions Code section 17200's prohibition against engaging in unlawful, unfair, and/or fraudulent business practices by, *inter alia*, aiding and abetting fraud, conspiring to commit fraud, and violating California Penal Code § 496.

272. The Receivership Entities suffered injury in fact and lost money as a result of Wells Fargo's substantial assistance in these unlawful business acts and practices.

273. As a result of Defendants' violations of Business & Professions Code § 17200, et seq., the Receiver is entitled to equitable relief in the form of full restitution of all monies wrongfully paid pursuant to the fraudulent schemes aided and abetted by Defendants.

Case No. _____
RECEIVER'S COMPLAINT

### Eighth Cause of Action

### (Aiding and Abetting Fraudulent Transfer/Voidable Transaction)

274. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

275. Prior to the establishment of the Receiverships, the physical operations of the Receivership Entities with which Defendants did business were primarily in the State of California. The *FTC v. Triangle* and *FTC v. Apex* actions in which the Receiver was appointed were then filed in the United States District Court for the Southern and Central Districts of California, respectively.

276. Effective January 1, 2016, California (similar to the majority of other States) adopted a version of the Uniform Voidable Transactions Act ("UVTA"), codified at California Civil Code §§ 3439, et seq. The UVTA defines a voidable transfer to include the following types of transfer or obligations incurred by a debtor:

A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

---

77

Case No. _____
RECEIVER'S COMPLAINT

(3)  Whether the transfer or obligation was disclosed or concealed.

(4)  Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5)  Whether the transfer was of substantially all the debtor's assets.

(6)  Whether the debtor absconded.

(7)  Whether the debtor removed or concealed assets.

(8)  Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9)  Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10)  Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11)  Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

277.   California Civil Code §3439.05(a) provides that transfers are voidable as to present creditors as follows:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

278.   The UVTA provides the following definitions, in relevant part:

(b) "Claim," except as used in "claim for relief," means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

(c) "Creditor" means a person that has a claim, and includes an assignee of a general assignment for the benefit of creditors, as defined in Section 493.010 of the Code of Civil Procedure, of a debtor.

(d) "Debt" means liability on a claim.

(e) "Debtor" means a person that is liable on a claim.

---

78

Case No. _____
RECEIVER'S COMPLAINT

279. Phillips, Peikos and Barnett are "debtors" under the UVTA because they are liable to the Receivership Entities and consumers who have a right to reimbursement for their claims of consumer fraud under the FTC judgments. Said Receivership Entities and consumers are "creditors" with "claims" under the meaning of the UVTA.

280. Prior to enactment of the UVTA, and relevant to transfers by Defendants prior to 2016, the California Uniform Fraudulent Transfer Act ("UFTA"), formerly codified at California Civil Code §§ 3439, et seq. ("UFTA"), provided in §3439.04:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

281. A "transfer" was defined in the UFTA to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." (Civ. Code, former § 3439.01, subd. (i)). A similar definition is found as subdivision (m) of the UVTA with one minor revision: "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, license and creation of a lien or other encumbrance."

282. As set forth herein, Phillips, Peikos, and/or Barnett controlled the

Case No. _____
RECEIVER'S COMPLAINT

Receivership Entities and directed them to make numerous transfers out of proceeds of the fraud to themselves, and third parties (including Wells Fargo). At the time of each fraudulent transfer, they intended to delay, defraud, or hinder their creditors (most notably the Receivership Entities under their control).

283. Through the numerous acts identified herein, Wells Fargo substantially assisted Phillips, Peikos and Barnett in making these fraudulent transfers, despite knowing that the transfers were unlawful, and that they controlled the Receivership Entities and had no lawful claim to fraudulently-obtained consumer funds. Wells Fargo knowingly transferred shell company account funds to other Receivership Entity shell company accounts and then directly to Phillips, Peikos, and/or Barnett or to other third parties (at the direction of Phillips, Peikos, and/or Barnett) without the shell companies receiving a reasonably equivalent value in exchange for the transfers and which depleted the shell companies of all or substantially all of their assets.

284. The transfers from the Wells Fargo accounts of the Receivership Entities to Phillips, Peikos, Barnett and Wells Fargo constitute fraudulent transfers under the California UVTA and UFTA for the following reasons, among others:

(a) Phillips, Peikos and Barnett made the transfers to themselves or third parties with the actual intent to hinder, delay, or defraud creditors (including the Receivership Entities and consumers);

(b) Phillips, Peikos and Barnett engaged in free trial schemes knowing that their assets and the assets of the Receivership Entities they controlled were unreasonably small considering that all of the assets were obtained by frauds on consumers and did not belong to them;

(c) Phillips, Peikos and Barnett knew that through their fraudulent schemes, they incurred debts to the Receivership Entities and consumers beyond their ability to pay;

(d) Phillips, Peikos and Barnett retained possession or control of the assets after the transfers;

(e) The Receivership Entities did not receive a reasonably equivalent value in exchange for the transfers from the Wells Fargo accounts because Phillips, Peikos, and Barnett drained the accounts for their own personal use and benefit, and the

shell companies acted as mere pass-throughs to allow the fraudsters to avoid detection by creditors of their ownership and control of the funds;

(f) The Receivership Entities had no assets other than the fraudulently-obtained funds before or after the transfers;

(g) The transfers to Phillips, Peikos, and Barnett were as corporate insiders of the Receivership Entities;

(h) The transfers among and from the Wells Fargo accounts were intended to conceal the true ownership and recipients of the funds;

(i) When the transfers were made, Phillips, Peikos and Barnett knew they were likely to be sued for their wrongdoing;

(j) Phillips, Peikos, and Barnett removed and concealed receipt of the consumer funds from the Wells Fargo accounts by transferring them to unrelated, unidentified and undisclosed personal and offshore accounts;

(k) The transfers were of substantially all the Receivership Entities' assets;

(l) The Receivership Entities were insolvent or became insolvent shortly after the transfers were made or the obligations were incurred; and

(m) The transfers occurred shortly before or shortly after the substantial debts to consumers were incurred.

285. Despite knowing that Phillips, Peikos and Barnett had no lawful claim to the consumer funds and Phillips, Peikos, and Barnet lacked the assets to pay such amounts back to the Receivership Entities, Wells Fargo transferred such consumer funds, and depleted the Receivership Entities' assets, which allowed Phillips, Peikos, and/or Barnett to receive such funds directly.

286. Based on the allegations above, these transfers of Receivership Entity funds to Wells Fargo and Phillips, Peikos, and Barnett constitute fraudulent transfers which must be returned to the Receivership Entities. Accordingly, the Receiver seeks to recover as fraudulent transfers all Receivership Entity/consumer funds received by Wells Fargo as well as those funds transferred to Phillips, Peikos, and Barnett.

287. Wells Fargo knowingly aided and abetted the fraudulent transfers

from the Receivership Entities under the control of Phillips, Peikos, and/or Barnett. This substantial assistance included the fraudulent transfer of consumer funds from the Wells Fargo accounts to Phillips, Peikos, and Barnett.

288.   In addition, Wells Fargo accepted payments of consumer funds from Receivership Entities in connection with setting up and maintaining the fraudulent accounts. By collecting fees, charges, fines, reserve amounts, and other payments generated by the shell companies' and other Receivership Entities' payment processing, Wells Fargo was asserting that the Receivership Entities had a valid obligation to make these payments to Wells Fargo.

289.   Wells Fargo, as a knowing aider and abettor of the fraudulent schemes, was not entitled to receive, and could not take in good faith, these payments from the Receivership Entities' funds derived from payments by defrauded consumers in connection with setting up and maintaining the fraudulent accounts for the Receivership Entities, and thus these payments constitute fraudulent transfers which must be returned to the Receivership Entities.

290.   Accordingly, the Receiver seeks to recover as fraudulent transfers any (a) Receivership Entity funds taken from the Wells Fargo accounts and transferred to Phillips, Peikos, and Barnett as a result of the fraudulent schemes and b) payments to Wells Fargo from Receivership Entities in connection with setting up and maintaining the fraudulent accounts.

291.    The Receiver therefore asks that the Court order Wells Fargo to pay to the Receiver all fraudulent transfers they received or transferred, as alleged herein and as further shown by proof at trial. The Receiver further asks that he be awarded pre- and post- judgment interest from Defendants from the date of the receipt of each fraudulent transfer.

### **Ninth Cause of Action**

### **(Unjust Enrichment/ Constructive Trust)**

292.   The Receiver repeats and realleges the allegations of each and every

Case No. _____
RECEIVER'S COMPLAINT

one of the prior paragraphs, inclusive, as if fully set forth herein.

293. Wells Fargo received payments (whether denominated as "fees," "charges," "fines," "reserves," or otherwise) from the Receivership Entities' accounts used in connection with the processing and maintenance of accounts, and also transferred fraudulently-obtained funds to Peikos, Barnett, and Phillips.

294. The payments received by Wells Fargo were made in furtherance of the fraudulent schemes and Wells Fargo has been unjustly enriched by the amount of these payments.

295. In addition, through Wells Fargo's knowing and substantial assistance in the wrongful transfer of account funds from the Receivership Entities, entities and individuals who owned or controlled the Receivership Entities were unjustly enriched in the amount of these transfers.

296. Because of Wells Fargo's own unjust enrichment and its knowing assistance in unjustly enriching the perpetrators of the frauds, the Receiver seeks an equitable remedy ordering that Wells Fargo is holding, and shall continue to hold, in constructive trust for the Receiver, the amount of the payments and transfers to itself, as well as funds in Wells Fargo accounts which were wrongfully transferred to third parties, including those who owned or controlled the Receivership Entities.

297. The Receiver further asks that he be awarded pre- and post- judgment interest from Defendants from the date of the receipt of each fraudulent transfer.

## Tenth Cause of Action (In the Alternative)

### (Negligent Supervision)

298. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

299. In the alternative to Causes of Action One through Nine, Wells Fargo negligently supervised the Wells Fargo employees named and/or described herein.

300. Wells Fargo knew or should have known that the policies and

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-100**

procedures permeating its Community Bank regarding sales incentives and quotas were deficient and created a sales culture pressuring its employees into opening accounts without concern for the repercussions, and which directly contributed to and incentivized branch-level employees under the fear of being terminated, aiding and abetting the Apex and Triangle frauds, cutting corners, and disregarding both applicable Bank procedures (on paper) and legal obligations when opening and monitoring accounts, and under the BSA and related rules. Wells Fargo's knowledge of its own toxic sales culture is described herein.

301. Wells Fargo also knew or should have known that a corporate policy pushing employees to open as many accounts as possible would facilitate money laundering activities, as it would make it substantially easier for the Bank's customers to open dozens of shell companies. The relevance of shell companies to money laundering and fraud is discussed herein.

302. Wells Fargo knew or should have known that its lax oversight and its implementation, design, and maintenance of proper controls to ensure branch-level compliance in the Community Bank with all legal obligations, including under the BSA, and to protect against fraudulent conduct, were deficient and would directly contribute to branch-level bankers' misconduct, by providing atypical services, assisting the frauds, and taking steps to conceal—rather than unmask or report—the Apex and Triangle Entities' fraud.

303. Wells Fargo knew or should have known that its deficient policies for the Community Bank, as detailed herein, leading to Wells Fargo's facilitation of the Apex and Triangle Enterprises' consumer fraud and money laundering activities would result in increased liabilities for, and substantial damage to, the Receivership Entities as described herein.

304. Had Wells Fargo properly supervised its employees, properly put in place appropriate policies and procedures in the Community Bank regarding sales practices and incentives, properly implemented, designed, and maintained proper

Case No. _____
RECEIVER'S COMPLAINT

**FTCSER-101**

1  controls to ensure branch-level compliance in the Community Bank with industry
2  standards and norms, and/or monitored and terminated employees who engaged in
3  misconduct (none of which occurred), the Receivership Entities would not have
4  suffered the damages that they did.

**Eleventh Cause of Action (In the Alternative)**

**(Negligence)**

7  305.  The Receiver repeats and realleges the allegations of each and every
8  one of the prior paragraphs, inclusive, as if fully set forth herein.

9  306.  In the alternative to Causes of Action One through Nine, the acts and
10  omissions of Wells Fargo as described herein were negligent.

11  307.  Wells Fargo provided banking services to the Apex and Triangle
12  Receivership Entities; as such, these entities were Wells Fargo's clients.

13  308.  Because the Receivership Entities were customers of Wells Fargo, the
14  Bank owed them a duty to act with reasonable care in its dealings with, and in
15  performing its services for, the Receivership Entities and their accounts.  That duty
16  included, without limitation, the duty to use the requisite care, skill and diligence
17  to detect, investigate and/or prevent the use of Wells Fargo accounts to perpetrate
18  fraud.

19  309.  Wells Fargo breached this duty because, without limitation, it
20  established corporate policies that prioritized the opening of accounts above
21  anything else—a policy which uniquely incentivized its employees to facilitate the
22  banking activities of shell companies, which any banker would know were key
23  indicia of fraud and money laundering.  Despite fully understanding that the
24  accounts opened by Apex and Triangle personnel were for shell companies used to
25  hide the true ownership of the accounts, Wells Fargo failed to timely stop or take
26  any action to prevent the fraud, including the transfer of Receivership Entities'
27  assets to Phillips, Peikos, Barnett, and/or third parties.

28  310.  Wells Fargo's breaches of its duties proximately caused damages to

the Receivership Entities in an amount to be determined at trial, because those breaches allowed Phillips, Peikos, Barnett, and/or third parties to commit massive fraud and to siphon off funds that rightfully belonged to the Receivership Entities for their own, personal use.

## **Twelfth Cause of Action**

### **(Request for an Accounting)**

311.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

312.   To ascertain the exact amounts received by Wells Fargo in connection with the Apex and Triangle Enterprises the Receiver seeks entry of an order compelling Wells Fargo to file with the Court and serve upon the Receiver an accounting, under oath, detailing: (i) the amounts received from all accounts owned or controlled by the Receivership Entities or related individuals and entities, including Peikos, Barnett, and Phillips; (ii) the current locations of the amounts, including the specific bank accounts to which any funds were transferred; and (iii) the fees which Wells Fargo obtained as a result of doing business with the Apex and Triangle Enterprises.

## **XIII.  PRAYER FOR RELIEF**

WHEREFORE, the Receiver respectfully prays for judgment against Defendants as follows:

1.   For all applicable damages to the Receivership Entities proximately caused by Wells Fargo's tortious conduct, including punitive damages pursuant to California Civil Code § 3294, and treble damages pursuant to California Penal Code § 496(c); in an amount to be determined at trial;

2.   For the return of funds acquired by Wells Fargo through fraudulent transfers and/or unjust enrichment at the expense of the Receivership Entities, including, but not limited to, funds acquired as fraudulent

Case No. _____
RECEIVER'S COMPLAINT

obligations supposedly owed to the Wells Fargo by the Receivership Entities;

3.    For imposition of a constructive trust in favor of the Receiver as to all funds received by Wells Fargo from the Receivership Entities;

4.    For a judgment ordering Wells Fargo to file an accounting, under oath, as requested herein;

5.    For pre- and post- judgment interest;

6.    For attorneys' fees and costs: and

7.    For such other and further relief as the Court may deem proper.

## XIV.  JURY DEMAND

The Receiver demands a jury trial.

Respectfully Submitted,


DATED: July 8, 2021                    By: */s/  Lionel Z. Glancy*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Jonathan M. Rotter
Garth A. Spencer
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  310-201-9150
Facsimile:   310-201-9160
Email: info@glancylaw.com

**MCNAMARA SMITH LLP**

Logan D. Smith
Cornelia J.B. Gordon
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  619-269-0400
Facsimile:   619-269-0401
Email: lsmith@mcnamarallp.com

*Attorneys for Court-Appointed Receiver*
*Thomas W. McNamara*

Case No. _____
RECEIVER'S COMPLAINT

1  **MCGUIREWOODS LLP**
   DAVID C. POWELL (SBN 129781)
2  dpowell@mcguirewoods.com
   ALICIA A. BAIARDO (SBN 254228)
3  abaiardo@mcguirewoods.com
   Two Embarcadero Center, Suite 1300
4  San Francisco, CA 94111-3821
   Telephone: 415.844.9944
5  Facsimile: 415.844.9922

6  **MCGUIREWOODS LLP**
   KEVIN M. LALLY (SBN 226402)
7  klally@mcguirewoods.com
   355 S. Grand Avenue, Suite 4200
8  Los Angeles, CA 90071
   Telephone: 213.627.2268
9  Facsimile: 213.627.2579

10

11 Attorneys for Proposed Intervenors
   Wells Fargo & Company and
12 Wells Fargo Bank N.A.

13              **UNITED STATES DISTRICT COURT**

14             **SOUTHERN DISTRICT OF CALIFORNIA**

15 FEDERAL TRADE                    CASE NO. 18-cv-1388-LAB (LL)
   COMMISSION,
16                                  The Hon. Larry Alan Burns
17          Plaintiff,
                                    **WELLS FARGO'S [PROPOSED]**
18       vs.                        **MOTION TO VACATE THE**
                                    **COURT'S ORDER AUTHORIZING**
19 TRIANGLE MEDIA                   **RECEIVER TO SUE WELLS FARGO**
   CORPORATION; JASPER RAIN
20 MARKETING LLC;                   Date: TBA
   HARDWIRE INTERACTIVE            Time: TBA
21 INC; and BRIAN PHILLIPS,        Ctrm: 14A
22          Defendants.
23

24

25

26

27

28

## B.    Rule 60(b)(5) Alternatively Requires the Order Be Vacated

Should this Court conclude that the Order Authorizing Litigation was not part of a proceeding on direct review at the time when the Supreme Court issued the *AMG Capital* decision, it still should vacate this order pursuant to Rule 60(b)(5) to prevent its inequitable enforcement. Rule 60(b)(5) provides relief from a final order where "applying [a judgment or order] prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004) (Rule 60(b)(5) relief appropriate where "it is no longer equitable that the judgment should have prospective application"); *California v. U.S. EPA*, 978 F.3d 708, 713 (9th Cir. 2020) (Rule 60(b)(5) employs a malleable standard; "this flexibility is a virtue, not a vice."). Relief is appropriate when a party seeking modification of an order establishes "that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 393 (1992).[8]

The *AMG Capital* decision unquestionably represents a significant change in the law relating to the scope of Section 13(b) of the FTC Act. The Supreme Court detailed at length how the FTC had misapplied and the Courts had misinterpreted Section 13(b) for decades to allow for monetary relief to be obtained under this provision when, in fact, the plain language of the provision did not allow for such relief.[9] *AMG Capital,* 141 S. Ct. at 1344. The Court further recognized that its

---

[8] The Ninth Circuit has clarified that "the *Rufo* standard applies to all Rule 60(b)(5) petitions brought on equitable grounds." *Bellevue Manor Assocs. v. U.S.*, 165 F.3d 1249, 1257 (9th Cir. 1999).

[9] Notably, the Supreme Court's interpretation does not constitute a change in the law, as it has interpreted the statute as always written. Instead, the change lies in discarding prior incorrect interpretations by lower courts and thereby, replacing an interpretation that was contrary to law with a correct interpretation of that law. *Rivers v. Roadway Express*, 511 U.S. 298, 312-13 (1994)("judicial construction of a statute is an authoritative statement of what the statute meant before as well as after

holding would significantly impact pending and future FTC enforcement actions by removing what had been the FTC's principal enforcement tool and noted that if the FTC wished to seek monetary damages under Section 13(b), it needed to have Congress pass legislation that actually would allow for this. *Id*. at 1351-1352.

In cases on direct review, the Ninth Circuit has vacated monetary judgments based on Section 13(b) and the FTC, as it must, has advised Courts that monetary relief can no longer be obtained under Section 13(b) due to the Supreme Court's interpretation of the scope of Section 13(b) in *AMG Capital*. Simply stated, the *AMG Capital* decision has "removed the legal basis for the continuing application of the court's Order." *California Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1032 (9th Cir. 2008). A "change in law" of this type "entitles petitioners to relief under Rule 60(b)(5)." *Id*.; *see also Agostini v. Felton,* 521 U.S. 203, 237 (1997) (reviewing denial of the modification of an injunction sought under Rule 60(b)(5) following a change in the Supreme Court's interpretation of the Establishment Clause, holding "[i]t is true that the trial court has discretion, but the exercise of discretion cannot be permitted to stand if we find it rests upon a legal principle that can no longer be sustained.")

Moreover, the requested modification is directly tailored to the changed circumstance and is fully consistent with principles of equity. The Ninth Circuit previously has recognized "[an] unbroken line of Supreme Court cases makes clear that it is an abuse of discretion to deny a modification of an injunction after the law underlying the order changes to permit what was previously forbidden." *California by & through Becerra*, 978 F.3d 708, 713–14 (9th Cir. 2020.) To not vacate this Court's prior order allowing the Receiver, who was appointed and empowered under Section 13(b), to proceed with a lawsuit to secure monetary damages against Wells

---

the decision of the case giving rise to construction.")

Fargo would present an even more compelling abuse of discretion as this Court would be authorizing the Receiver, who is an agent of the Court, to continue to pursue an outcome that is now forbidden under the law.[10] Wells Fargo simply seeks an order from this Court limiting the Receivership to the pursuit of injunctive relief and vacating its Order Authorization Litigation, as it is contrary to the plain limits of statutory authority set forth in Section 13(b).  As the Receiver has acknowledged that it has completed its work on all other aspects of its appointment, a narrow order from this Court implementing the Supreme Court's holding that monetary damages cannot be recovered under Section 13(b) and vacating the Order Authorizing Litigation will not have collateral consequences beyond the order itself.

In addition to this significant change in law introduced through the *AMG Capital* decision, other compelling equities weigh in favor of vacating the Order Authorizing Litigation pursuant to Rule 60(b)(5). In the underlying FTC litigation, the FTC, without requiring any admission of wrongdoing or culpability against the charged Defendants, entered into stipulated judgments totaling approximately $170 million dollars, and suspended this judgment after the Defendants paid approximately $9 million, or well less than 10 percent, of this amount. Wells Fargo

---

[10] The Order Authorizing Litigation is a prospective order that provides the prospective relief of "pursuing litigation against Wells Fargo."  Dkt. 142, at 2. The Court's Order retained jurisdiction over "matters related to the Receivership or enforcement of the Court's judgments, filings and other proceedings in this matter." *Id*. at 3.  As it has done throughout, the Court continues to monitor the Receivership and has final authority on a wide array of matters to include the retention of outside counsel, how lawsuits brought by the Receiver are funded, whether to extend the period of the Receiver's appointment to allow it to pursue third-party litigation, and issues related to the termination of the Receivership.   *Maraziti v. Thorpe*, 52 F.3d 252, 254 (9th Cir. 1995) ("The standard used in determining whether a judgment has prospective application is whether it is executory or involves the supervision of changing conduct or conditions." (internal quotations omitted).)

was not a party to the litigation. Courts have recognized that it "is fundamental to our notions of due process that a consent decree cannot prejudice the rights of a third party who fails to consent to it." *E.E.O.C. v. Pan Am. World Airways, Inc.*, 897 F.2d 1499, 1506 (9th Cir. 1990). Indeed, the FTC never **proved** that the defendants engaged in fraud, never held an administrative proceeding, never obtained a cease-and-desist order.

Moreover, regardless of the amount previously imposed or collected, the FTC would no longer be able to pursue any monetary relief from the Defendants had this Section 13(b) proceeding been brought today. Nevertheless, the Receiver, who was fully aware of the *AMG Capital* decision at the time he filed suit against Wells Fargo, persists with prospectively pursuing a monetary judgment from Wells Fargo for the outstanding balance of approximately $160 million dollars, despite the fact that the FTC never alleged any wrongdoing by Wells Fargo and likewise, could not now independently pursue this matter against Wells Fargo. The profound inequities of the Receiver's approach are facially apparent and give rise to due process considerations, similar to those raised in *AMG*.[11]

//

//

//

_____

[11] In *AMG Capital*, the Supreme Court reasoned that the monetary award was inconsistent with due process under *AMG Capital* because the FTC circumvented the administrative process and failed to follow the procedures of Section 5(b) of the FTC Act. 141 S. Ct. at 1348-49. The Supreme Court found that while the FTC could seek a permanent injunction to stop ongoing fraud or deceptive practices in connection with an administrative proceeding for monetary relief, Section 13(b) did not authorize the FTC to circumvent the administrative process to acquire that monetary relief. *AMG Capital*, 141 S. Ct. at 1349. Instead, the Court ruled that to enforce a monetary judgment in district court, due process required a finding under Section 5(b) procedures. *Id*

1   Andrew W. Robertson (SBN 62541)
    arobertson@mcnamarallp.com
2   Edward Chang (SBN 268204)
    echang@mcnamarallp.com
3   McNamara Smith LLP
    655 West Broadway, Suite 1600
4   San Diego, California 92101
    Telephone: 619-269-0400
5   Facsimile:  619-269-0401

6   *Attorneys for Court-Appointed Receiver*
    *Thomas W. McNamara*
7

8                    UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10

11  FEDERAL TRADE COMMISSION,              Case No. 3:18-cv-01388-LAB-LL

12                 Plaintiff,              **MEMORANDUM OF POINTS AND
                                           AUTHORITIES IN SUPPORT OF
13          v.                             RECEIVER'S MOTION FOR
                                           AUTHORIZATION TO ENGAGE
14  TRIANGLE MEDIA CORPORATION, a          CONTINGENCY FEE COUNSEL
    Delaware corporation, also doing business AND EXTEND RECEIVERSHIP**
15  as Triangle CRM, Phenom Health, Beauty
    and Truth, and E-Cigs; JASPER RAIN
16  MARKETING LLC, a California limited     JUDGE:    Hon. Larry A. Burns
    liability company, also doing business as CTRM:     14A
17  Cranium Power and Phenom Health;        DATE:     November 25, 2019
    HARDWIRE INTERACTIVE INC., a            TIME:     11:30 a.m.
18  British Virgin Islands corporation, also
    doing business as Phenom Health, Beauty
19  and Truth, and E-Cigs; and BRIAN
    PHILLIPS, individually and as an officer
20  of Triangle Media Corporation,

21                 Defendants.

22

23

24

25

26

27

28

## I.    Introduction

On September 9, 2019, this Court granted receiver Thomas W. McNamara's (the "Receiver") motion to extend the receivership to complete an investigation into a potential receivership estate lawsuit against a domestic financial institution. *See* ECF No. 134.  The receivership was extended until October 24, 2019.  The Receiver and counsel have completed their investigation and believe that the litigation should be pursued against the financial institution, Wells Fargo and Company ("Wells Fargo") (including its corporate siblings).  As such, the Receiver respectfully requests the Court's permission to engage contingency counsel and seeks to extend the receivership for the singular and limited purpose of allowing the Receiver to pursue the litigation for the reasons detailed herein.

As pursuing this litigation is the only remaining duty for the Receiver, the Receiver respectfully suggests that the case could be administratively closed, but the Court retain jurisdiction and permit the Receivership to continue for the limited purpose of allowing the pursuit of the contemplated litigation.  A similar approach was followed in connection with a receivership in this district.  *See S.E.C. v. Khanna* and *CFTC v. Khanna*, No. 3:09-cv-01783-BEN-WVG, ECF No. 130 (S.D. Cal. Mar. 18, 2013), Order Closing Actions and Retaining Post-Judgment Jurisdiction Over Receivership (attached hereto as Exhibit A).

## II.    Request to Hire Contingency Counsel

The Receiver and counsel have now completed their investigation into a potential lawsuit.  The Receiver believes that the anticipated litigation against Wells Fargo is meritorious, and the potential recovery for the Receivership Estate is significant.  But all litigation is uncertain.  It will be expensive, as the conduct involved occurred over several years and involved many individuals and entities, and the case will be likely be vigorously defended at all stages.

The Receiver has evaluated the balance of (1) the assessment that viable claims exist that should be vigorously pursued with (2) the potential costs to the

Receivership Estate in bringing the litigation.  Because the litigation will likely be hard-fought, expensive, and long, the Receiver has determined that the cost and risk of pursuing litigation on an hourly basis would be prohibitive.  This caused the Receiver to evaluate alternative fee arrangements, which would shift the risk away from the Receivership Estate.  While a hybrid (reduced hourly rate and reduced contingency rate) arrangement was considered, the Receiver ultimately concluded that a pure contingency fee arrangement makes the most sense; a contingency fee arrangement eliminates direct costs to the Receivership Estate because the significant professional fees necessary to prosecute the cases would not be paid by the estate.  Attorney's fees would only be paid out of litigation recoveries should the cases be successfully settled or litigated.

The Receiver generally has the discretion to hire counsel as he deems necessary.  *See* Preliminary Injunction, Section XVII. Receivership Duties, "IT IS FURTHER ORDERED that the Receiver is directed and authorized to accomplish the following: . . . H. "Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order".  (ECF No. 75 at p. 18.) However, it is common when a receiver intends to retain contingency counsel to seek permission for the retention from the appointing court.  *See e.g*., *S.E.C. v. Capital Cove Bancorp, LLC*, et al., Case No. CV15-000980-JLS (C.D. Cal.); *S.E.C. v. Diversified Lending Group, Inc., et al.*, Case No. 2:09-cv-01533-R-SS (C.D. Cal.); *S.E.C. v. Ruderman, et al.*, Case No. 2:09-cv-02974-VBF (C.D. Cal.).[1]

Based upon his conclusion that the only way to pursue the litigation is on a contingency basis, the Receiver reached out to experienced contingency counsel to

---

[1] If the Court deems it necessary, the Receiver can describe underlying facts and theories that will be pursued in the litigation via an *in camera* submission (which would avoid publicly revealing his evaluation of the litigation and legal strategy and potentially harm the prosecution of the case).

discuss possible claims that might be brought and the potential contours of litigation. As a result of these discussions, he identified and has spoken on numerous occasions with partners at Glancy Prongay & Murray LLP, a national law firm based in Los Angeles with offices in New York and Berkeley which prosecutes class action cases and complex litigation in federal and state courts throughout the country. Glancy Prongay & Murray has reviewed substantial materials regarding the potential case provided by the Receiver, and its lawyers have conducted their own independent investigation into the merits of a prospective litigation.[2]

Glancy Prongay & Murray has concluded that it is willing to pursue the litigation on behalf of the Receiver. The firm has represented investors and consumers for over 25 years in financial and consumer fraud cases. It specializes in prosecuting class actions and complex litigation in federal and state courts throughout the country. As lead counsel or as a member of the Plaintiff's Counsel Executive Committees, the firm has recovered billions for its clients. As such, the Receiver believes the firm is eminently qualified to represent the Receivership Estate's interest.[3]

---

[2] The Receiver initially identified the facts and potential claims, and he and attorneys at McNamara Smith LLP (where the Receiver is a partner) then conducted an in-depth factual examination to support possible claims. This information was then presented to Glancy Prongay & Murray for evaluation which, in turn, conducted its own review over the course of several months.

[3] It is likely that Glancy Prongay & Murray will also pursue claims on behalf of the class of defrauded Triangle consumers. Under established receivership law, a Receiver generally has no standing to bring any claims directly for victim consumers. *See, e.g.*, *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 625-26 (6th Cir. 2003) (discussing cases). Accordingly, the Receiver has different causes of action against the financial institution than defrauded Triangle consumers do. However, because of the identity of interests between defrauded consumers and the Receivership Estate, the Receiver's claims could be pursued at the same time as claims on behalf of a class of defrauded Triangle consumers were being pursued. Coordinating with a related class of victims has been an effective strategy employed by several receivers to enlarge the recovery for the estate. *See e.g., SEC v. NASI*, Case No. 2:14-cv-07249 (C.D. Cal.) ECF No. 284 (explaining coordination between receiver and class in motion to approve global settlement).

McNamara Smith professionals have dedicated substantial efforts over the last year working closely with the Receiver to understand the facts, identify various parties and review voluminous transactions related to the litigation.  They are thus uniquely suited to prosecute the litigation because of their in-depth understanding of the factual background and deep knowledge of the legal issues peculiar to receiverships.  McNamara Smith attorneys regularly represent fiduciaries, including receivers, in matters across the country, and they have worked with the Receiver to return more than $100 million to defrauded investors and consumers. The firm is willing to continue on in collaboration with Glancy Prongay & Murray pursuant to a contingency fee arrangement.

Here, Glancy Prongay & Murray has agreed to act as counsel for the Receiver for a contingent fee equal to 28.5% of the gross recovery up until a ruling on summary judgment and 33.3% contingent fee on gross recovery received after a ruling on summary judgment.  Under this arrangement, the Receivership Estate will **not** be obligated to advance litigation costs, *e.g.*, court fees, discovery and expert costs.  The proposed contingent fees fall well within the range of fees approved in other receivership cases, and the Receiver believes that the proposed arrangement is reasonable, especially in light of the agreement by counsel to advance litigation costs and thus remove any financial risk to the Receivership Estate.  The Receiver negotiated with Glancy, Prongay & Murray for the costs of the litigation to be fronted by counsel, under the express condition that the Receivership Estate will only be responsible for the costs in the event that there is a recovery through settlement or judgment.  The Receiver believes that this is the most cost-effective approach and will also result in the greatest possible recovery for the Receivership Estate.

## III.    The Proposed Terms of the Contingent Fee Agreement Are Reasonable

The Court's power to supervise an equity receivership and to determine the appropriate action to be taken in the receivership, including the retention and

compensation of counsel, is extremely broad.  *See SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (district court has broad discretion to approve appropriate action to be taken in the administration of a receivership); *see also CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) ("This court affords 'broad deference' to the [district] court's supervisory role and 'we generally uphold reasonable procedures instituted by the district court that serve th[e] purpose' of orderly and efficient administration of the receivership for the benefit of creditors.").

Courts in this Circuit have considered and approved contingent fee arrangements in order to compensate a receiver's counsel to recover assets for the receivership.  There is no particular formula employed by the courts.  *See e.g.*, *S.E.C. v. Diversified Lending Group, Inc., et al.*, Case No. 2:09-cv-01533-R-SS (C.D. Cal.) (district court approved contingent fee arrangement, including 25 percent of pre-suit recovery, 35 percent if settled up until 120 days before trial and 45 percent thereafter); *S.E.C. v. Ruderman, et al.*, Case No. 2:09-cv-02974-VBF (C.D. Cal.) (approving contingency fee arrangement, 33 percent of recovery up to 60 days before trial, 40 percent after that date); *S.E.C. v. Capital Cove Bancorp, LLC, et al.*, Case No. CV15-000980-JLS (C.D. Cal.) (approving contingency fee of between 25 and 40 percent, rate changing depending on timing and size of gross recoveries).

In a recent case, *S.E.C. v. JCS Enterprises, Inc., et al.,* Case No. 14-CV-80468 (S.D. Fla.), the district court approved a standard contingent fee arrangement for one counsel (25 percent of gross recoveries before summary judgment, and 30 percent after that date) and a hybrid contingent agreement for a second counsel ($200 per hour and 20% of gross recoveries).  *See also S.E.C. v. We the People, Inc. of the United States*, Case No. 2:13-cv-14050-JEM (S.D. Fla.) (approving a 33.3 percent contingent fee).

///

Here, the total contingent fee is equal to 28.5% of the gross recovery up until a ruling on summary judgment, and 33.3% contingent fee on gross recovery received after a ruling on summary judgment.  Under this arrangement, the Receivership Estate will ***not*** be obligated to advance litigation costs, *e.g.*, court fees, discovery and expert costs.  The proposed contingent fees fall well within the range of fees approved in other receivership cases, and the Receiver believes that the proposed arrangement is reasonable, especially in light of the agreement by counsel to advance litigation costs and thus remove any financial risk to the Receivership Estate.

## IV.    The Receivership Should Be Extended for the Limited Purpose of Pursuing the Litigation

As the Court is aware, the litigation is the only remaining item to complete in the receivership.  The Receiver respectfully requests that the receivership be extended only for the limited purpose of pursuing the litigation.  In another case in this District, the Court administratively closed the underlying cases, but allowed the receivership to continue to complete necessary duties.  *See S.E.C. v. Khanna* and *CFTC v. Khanna*, Order Closing Actions and Retaining Post-Judgment Jurisdiction Over Receivership (attached hereto as Exhibit A).  The Receiver believes that since all other duties are completed other than this Receivership that a similar approach makes sense, such that this case could be administratively closed but the Court should retain jurisdiction and permit the Receivership to continue for the limited purpose allowing the Receivership to pursue the contemplated litigation.

## V.    Conclusion

Based on the foregoing, the Receiver respectfully requests that the Court take the following steps, as set forth in the Proposed Order, submitted herewith: (1) grant the Receiver permission to engage contingency counsel to represent the Receiver, as identified herein; (2) extend the receivership for the singular limited

purpose of allowing the Receiver to pursue the litigation discussed above; and (3) administratively close the case but retain jurisdiction over the Receivership to permit the Receiver to pursue the litigation described above.

Dated:  October 22, 2019             MCNAMARA SMITH LLP


By:   /s/ Edward Chang
Edward Chang
*Attorneys for Court-Appointed Receiver,*
*Thomas W. McNamara*
Email: echang@mcnamarallp.com

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                                        Plaintiff,<br><br>v.<br><br>TRIANGLE MEDIA CORPORATION;<br>JASPER RAIN MARKETING LLC;<br>HARDWIRE INTERACTIVE INC.; and<br>BRIAN PHILLIPS,<br><br>                                        Defendants. | Case No.:  18cv1388-MMA (NLS)<br><br>**MEMORANDUM ORDER RE:<br>PRELIMINARY INJUNCTION**<br><br><br><br><br><br>[Doc. No. 5] |

On June 25, 2018, Plaintiff the Federal Trade Commission ("Plaintiff" or "the FTC") filed its Complaint for Permanent Injunction and Other Equitable Relief against Defendants Triangle Media Corporation ("Triangle Media"), Jasper Rain Marketing LLC ("Jasper Rain"), Hardwire Interactive, Inc. ("Hardwire"), and Brian Phillips ("Phillips"), for violations of Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, and Section 918(c) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c).  Doc. No. 1 ("Compl.").  On June 29, 2018, the Court granted in part the FTC's request to issue an *ex parte* Temporary Restraining Order ("TRO"), in which the Court appointed a Receiver and ordered an asset freeze.  Doc. No. 11 ("TRO").  After

Defendants received notice of this action, the Court extended the expiration date of the TRO to August 9, 2018, on stipulation of the parties.  Doc. Nos. 19, 22.  On July 17, 2018, the Court denied Hardwire's motion to modify the TRO.  Doc. No. 31.  Upon consideration of the FTC's and Receiver's briefs and evidence in support of its request for continued injunctive relief in the form of a preliminary injunction (Doc. Nos. 30, 46, 47, 59), Defendants' briefs and evidence in opposition (Doc. Nos. 34, 36, 41, 63), and the arguments and evidence presented at the Preliminary Injunction hearing held on August 9, 2018 (*see* Doc. Nos. 65, 66), the Court affirms its tentative ruling and **GRANTS IN PART** the FTC's request for a preliminary injunction against Defendants [Doc. No. 5], which is issued this date in a separate document entitled "Preliminary Injunction."

## FACTUAL BACKGROUND

### A.   *Defendants' Practices*

Defendants advertise, market, promote, distribute, and sell skincare products, electronic cigarettes, and dietary supplements online.  Compl., ¶12.  Defendants allegedly offer trials of these products for the cost of shipping and handling.  *Id.*  However, Plaintiff alleges that Defendants instead charge consumers who accept the trial offers as much as $98.71 for a single shipment and enroll them in a continuity program costing the same amount on a monthly basis.  *Id.*  According to Plaintiff, Defendants also frequently charge consumers for additional products and enroll consumers in continuity programs related to these additional products without the consumers' knowledge or consent.  *Id.*  Plaintiff alleges that when consumers who discover the charges seek a refund, they often are unable to get their money back because of Defendants' undisclosed refund restrictions.  *Id.*  Allegedly, Defendants have brought in tens of millions of dollars through their "deceptive trial offers."  *Id.*

#### 1.   Trial Offers

Plaintiff alleges that Defendants advertise through third-party websites, blog posts, banner advertisements, and surveys, offering consumers a trial of products, including "Wrinkle Rewind," "Pro Vapor," "Cerebral X," "Test X Core," and "Garcinia Clean

XT." Compl., ¶ 13. The advertisements often say consumers can receive a trial for just the cost of shipping and handling. *Id.* When consumers click on the advertisements, they are re-directed to Defendants' websites, including findthebeautyandtruth.com, trycerebralx.com, tryphenomcore.com, tryprovapor.com, and trygarciniaclean.com. *Id.* These websites offer a "RISK FREE" trial of Defendants' products and "create a sense of urgency by telling consumers there is a limited supply of the trial product and that they need to act quickly." Compl., ¶ 14.

Consumers interested in the trial offer are asked to provide their contact information and directed to a payment page on which Defendants request their credit or debit card information and represent that consumers need only pay a shipping and handling charge to receive a trial of the product. Compl., ¶ 15. Once consumers enter their billing information, they are asked to place their order by clicking a brightly colored button that says either "GET MY RISK FREE TRIAL" or "CONTINUE." Compl., ¶ 17. Fifteen days later and unbeknownst to consumers, Defendants charge consumers the full price of the product. Compl., ¶ 18. Additionally, Defendants allegedly enroll consumers who accept the trial offer into a continuity program where Defendants send consumers additional shipments of the product each month and charge consumers' credit or debit cards the full price of each product shipped. Compl., ¶ 19. Plaintiff alleges that consumers typically do not learn that the trial was not free and that they have been enrolled in a continuity program until they see Defendants' monthly charges on their credit card or bank statements. Compl., ¶ 20.

Plaintiff alleges that Defendants either hide the terms of their offer in "barely discernable print far below the colorful graphics and text where consumers input their personal and payment information and continue with their purchase, or bury them in a separate 'Terms & Conditions' hyperlink." Compl., ¶ 21. Typically, the terms reveal that the consumer has usually fifteen days to cancel the trial or they will be charged the full price of the product and that they will be charged for additional shipments of the product every 30 days until they cancel. *Id.* According to Plaintiff, "[a]s a result of these

FTCSER-120

18cv1388-MMA (NLS)

inadequate disclosures, Defendants' websites misrepresent the total cost of Defendants' trial products, and fail to adequately apprise consumers that they are being enrolled in a continuity program." Compl., ¶ 23.

       2.    *Order Completion Page*

      After consumers click on the "GET MY RISK FREE TRIAL" or "CONTINUE" buttons, Plaintiff alleges they are directed to a webpage that indicates their order is not complete. Compl., ¶ 24. The webpage also offers a "FREE" trial of a different product. *Id.* Below the advertisement for the additional free trial is a button that says "COMPLETE CHECKOUT." Compl., ¶ 25. When consumers click that button, Plaintiff alleges "they are deemed by Defendants to have ordered a trial of both the original product and the second product." Compl., ¶ 26. However, if consumers do not click the "COMPLETE CHECKOUT" button, they will still receive a trial of the first product. *Id.*

      Defendants allegedly represent the second product is free, but charge the consumer the full price of the product 18 days later. Compl., ¶ 27. Additionally, consumers who click the "COMPLETE CHECKOUT" button are enrolled in a second continuity program, meaning they will be charged for monthly shipments of the second product. *Id.* The "order completion page" allegedly fails to disclose important terms and conditions of the offer, including adequate disclosure that Defendants will charge the consumer the full price of the product after 18 days and will enroll them in a continuity program. *Id.* Plaintiff concedes that these terms appear on the page, but only "in small, faint print well below the prominent 'COMPLETE CHECKOUT' button." Compl., ¶ 28. Also in tiny, faint print, and below a line-break, there is a hyperlink that consumers can click to decline the second offer. Compl., ¶ 29. Consumers who click this link are then re-directed to a series of webpages that make similar deceptive offers. *Id.*

      Once consumers place an order for one or more of Defendants' products, they allegedly receive a confirmation email which either does not list any charges associated with the products or lists only the shipping and handling charges. Compl., ¶ 30. Plaintiff

alleges that, therefore, the confirmation emails reinforce the false impression that other than the obligation to pay shipping and handling the trial product is free.  *Id.*

### 3.     *Cancellation and Refund Practices*

"In numerous instances, consumers who ordered Defendants' trial products report that Defendants subsequently charge them without their knowledge or consent for the full price of these products and sign them up for one or more continuity programs."  Compl., ¶ 31.  Many consumers then try to cancel their enrollment in the continuity programs and to obtain a refund of the unauthorized charges.  *Id.*  Plaintiff alleges that these consumers often have difficulty cancelling and obtaining refunds.  *Id.*  Allegedly, consumers who call Defendants to cancel the trial and continuity programs have difficulty reaching Defendants' customer service representatives, and even if they do reach a customer service representative to request cancellation, consumers report that they often continue to receive and be charged for shipments even after cancelling.  Compl., ¶ 32.  The same is allegedly "sometimes true" when consumers use Defendants' "easy" online cancellation. *Id.*  Consumers who request a refund are often told they cannot obtain one because of Defendants' terms and conditions, which require that refund requests be made within 30 days.  Compl., ¶ 33.  Where consumers call within 30 days, consumers are told they can only get a refund if they return the trial product unopened and at the consumer's expense. *Id.*  Plaintiff alleges that often, consumers who send back the product unopened and within the refund period are still refused a refund.  *Id.*  In these instances, Defendants' customer service representatives tell the consumer that Defendants never received the return shipment.  *Id.*

"In many instances, consumers attempt to get their money back by initiating chargebacks with their credit card companies.  In other instances, consumers receive refunds directly from Defendants only after they complain to the Better Business Bureau or a state regulatory agency.  Even in those instances, however, Defendants have not always issued full refunds, but have refunded only the monthly continuity program charges."  Compl., ¶ 34.

5

**FTCSER-122**

### 4. Consumer Injury

As a result of these allegations, Plaintiff alleges that consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations outlined below. Compl., ¶ 65. In addition, Plaintiff alleges Defendants have been unjustly enriched as a result of their unlawful acts or practices. *Id.*

Plaintiff prays for the following relief: (1) temporary and preliminary injunctive relief and ancillary relief necessary to avert the likelihood of consumer injury during the pendency of the action; (2) a permanent injunction to prevent future violations of the FTC Act, ROSCA, and the EFTA by Defendants; (3) relief necessary to redress consumer injury, including rescission or reformation of contracts, restitution, the refund of monies paid, and disgorement of ill-gotten monies; and (4) the cost of bringing the action.

## B. **_Causes of Action_**

Accordingly, the FTC raises six causes of action. *See generally*, Compl.

### 1. *Violations of the FTC Act*

Section 5(a) of the FTC Act prohibits unfair or deceptive practices in or affecting commerce. Compl., ¶ 35. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices under section 5(a). Compl., ¶ 36. Moreover, acts and practices are unfair under section 5(a) if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. *Id.*

#### a. Count 1: Misrepresentations of the Price of the Trial Offers

Plaintiff alleges that Defendants' representation that they will charge consumers at most only shipping and handling for a one-time shipment of Defendants' products is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act because Defendants actually charge consumers more than shipping and handling fees for one or more shipments of Defendants' products. Compl., ¶¶ 38-40.

//
//

6

18cv1388-MMA (NLS)

### b.   Count 2: Misrepresentation that Order is Not Complete

Plaintiff alleges that Defendants' representation that consumers orders are not complete until they click the "COMPLETE CHECKOUT" button is false and misleading and constitutes a deceptive act in violation of Section 5(a) of the FTC Act because the orders were complete and clicking the "COMPLETE CHECKOUT" button orders additional product and enrolls consumers in a continuity plan for that additional product. Compl., ¶¶ 41-43.

### c.   Count 3: Failure to Disclose Adequately Material Terms of Trial Offer

Plaintiff alleges that Defendants' representation that consumers can obtain a trial of Defendants' product for the cost of shipping and handling, or for free, is a deceptive act in violation of Section 5(a) of the FTC Act because Defendants have failed to disclose, or adequately disclose, material terms and conditions of their offer, including the cost of the product, that Defendants will charge consumers the total cost of the trial product upon expiration of the trial period, that Defendants will automatically enroll consumers in a continuity plan with additional charges, and the cost of the continuity plan and the frequency and duration of the recurring charges.  Compl., ¶¶ 44-46.

### d.   Count 4: Unfairly Charging Consumers Without Authorization

Plaintiff alleges that Defendants' practices of charging consumers without their express informed consent cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition and constitute unfair acts or practices in violation of Section 5(a) of the FTC Act.  Compl., ¶ 47-49.

### 2.   *Violations of ROSCA*

The ROSCA generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature unless the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express

informed consent before making the charge; and (c) provides a simple mechanism to stop recurring charges. Compl., ¶ 51. A negative option feature is defined as follows: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as an acceptance of the offer." Compl., ¶ 52. Plaintiff alleges that Defendants' auto-renewal continuity plan constitutes a negative option feature. Compl., ¶ 53.

> a.   Count 5: Auto-Renewal Continuity Plan

Plaintiff alleges that Defendants' failure to (1) clearly and conspicuously disclose all material terms of the negative option feature of the product transaction before obtaining the consumer's billing information; (2) obtain the consumers' express informed consent to the negative option feature before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction; and/or (3) provide simple mechanisms for a consumer to stop recurring charges for products to the consumer's credit card, debit card, bank account, or other financial account, violates section 4 of ROSCA, 15 U.S.C. § 8403, and therefore also violates a rule promulgated under section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act.

> 3.   *Violations of EFTA and Regulation E*

Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized" electronic fund transfer from a consumer's account may be "authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." Compl., ¶ 57. Section 903(1) of the EFTA, 15 U.S.C. § 1693a(10), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals." Compl., ¶ 58. Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing

8

signed or similarly authenticated by the consumer.  The person that obtains the authorization shall provide a copy to the consumer."  Compl., ¶ 59.  Finally, section 1005.10 of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), cmt. 5, Supp. I, states that "[t]he authorization process should evidence the consumer's identity and assent to the authorization" and that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable."  Compl., ¶ 60.

> a. _Count 6: Unauthorized Debiting from Consumers' Accounts_

Plaintiff alleges that Defendants debit consumers' bank accounts on a recurring basis without obtaining written authorization signed or authenticated by consumers for preauthorized electronic fund transfers from their accounts, and without providing a copy of written authorization signed or authenticated by the consumer for preauthorized electronic fund transfers from their accounts.  Compl., ¶¶ 61-62.  Accordingly, Defendants are allegedly in violation of Section 907(a) of the EFTA, Section 1005.10(b) of Regulation E, and are also violating the FTC Act by virtue of their EFTA and Regulation E violations, pursuant to section 918(c) of the EFTA.  Compl., ¶¶ 63-64.

## **LEGAL STANDARD**

Section 13(b) of the FTC Act allows a district court to grant the FTC a preliminary injunction "upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."  15 U.S.C. § 53(b)(2).  "Section 13(b), therefore, 'places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard; the Commission need not show irreparable harm to obtain a preliminary injunction.'"  *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999) (quoting *FTC v. Warner Commc'ns., Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984)).  "When the FTC seeks an injunction, it need only show that two of these factors are satisfied: (1) that it is likely to succeed on the merits and (2) that the balance of equities weigh in favor of an

9

18cv1388-MMA (NLS)

1    injunction." *FTC v. Alliance Document Preparation*, 296 F. Supp. 3d 1197, 1203 (C.D.

2    Cal. 2017) (citing *Affordable Media*, 179 F.3d at 1233).

3         Section 13(b) of the FTC Act also "gives the federal courts broad authority to

4    fashion appropriate remedies for violations of the Act," including "the authority to grant

5    any ancillary relief necessary to accomplish complete justice." *FTC v. Pantron I Corp.*,

6    33 F.3d 1088, 1102 (9th Cir. 1994) (citations and internal quotation marks omitted). This

7    encompasses equitable powers such as the ordering of restitution, the freezing of assets,

8    and the imposition of a receivership. *Id.*; *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*,

9    970 F.2d 552, 560 (9th Cir. 1992); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980).

10                                    **DISCUSSION**

11        In opposing a preliminary injunction in part, Defendants do not challenge the

12   likelihood of success on the merits of the causes of action in the Complaint; rather they

13   focus on narrowing any injunctive relief to: (1) omit certain business operations; (2)

14   unfreeze assets and/or permit for a release of frozen funds for particular expenses; (3)

15   limit the scope to domestic affairs only. *See* Doc. Nos. 41-1, 36.

16   **A.    *Triangle Defendants' Opposition***

17        Defendants Triangle Media, Jasper Rain, and Phillips (the "Triangle Defendants")

18   seek to narrow the scope of the injunction in two ways. Doc. No. 41-1. First, they

19   request the Court narrow the scope of the Receivership to business operations which are

20   the subject of the lawsuit, thereby allowing Defendants' legal and profitable businesses

21   segregated from the FTC's allegations to continue. *See id.* Second, they request the

22   Court either remove the asset freeze from the injunction or, at a minimum, provide the

23   Defendants' with monthly normal living expenses and attorneys' fees to defend

24   themselves. *See id.*

25        1.    *Narrowed Business Operations*

26        The Triangle Defendants note that the Receiver identified certain business

27   operations which could be lawful and profitable businesses. Doc. No. 41-1 at 9. The

28   Triangle Defendants contend that these businesses are not only lawful and profitable, but

1    they are completely separate from the allegations in the Complaint.  *Id.*  Specifically,

2    Triangle Connect, Triangle Fraud Alerts, Triangle Payments, Triangle IQ, Triangle CRM,

3    and Komaxo IVR, involve neither risk free trial continuity tactics nor negative option

4    features.  *Id.*  As such, the Triangle Defendants urge the Court to narrow the scope of any

5    preliminary injunctive relief to omit these lawful and profitable business entities.  *Id.* at

6    10.  As noted by the FTC, the Triangle Defendants provide no documentation as to these

7    business lines' current or future earnings or current or future business practices.  *See id.*;

8    *see also* Doc. No. 46 at 4.  Phillips declares that he is "unable to provide more

9    comprehensive descriptions or demonstrations of" the lawful and profitable business at

10   this time due to the restriction of access to webpages and files under the TRO.  Doc. No.

11   41-3 ("Phillips Amend. Decl."), ¶ 10.

12        The FTC counters that the Receiver determined that although these business lines

13   could "in theory" be lawful and profitable businesses, they could not in this instance be

14   operated profitably.  Doc. No. 46 at 3.  The FTC also contends that Phillips himself

15   conceded this fact when he told the Receiver he planned to shut down Triangle entirely.

16   *Id.*

17        After reviewing Phillips' declaration and the Triangle Defendants' opposition to

18   preliminary injunction, the Receiver declared that none of the six listed business

19   components, on their own or together, are lawful and profitable.  Doc. No. 59 ("Receiver

20   Bus. Decl."), ¶ 4.  For example, Triangle Connect depended almost entirely on the

21   Hardwire/Triangle risk free trial/negative option scheme at the heart of this case.  *Id.*, ¶ 8.

22   The schedule of Triangle Connect's current clientele and active sales programs confirms

23   that nearly all programs were Hardwire or Hardwire-related and only 10 programs were

24   non-Hardwire related.  *Id.*, ¶ 10.  Eight of the non-Hardwire programs involved risk

25   free/negative option programs, which would violate the TRO.  *Id.*  Two of the programs

26   "may not be risk free trials," but these programs brought in less than $28,000 in 2018.  *Id.*

27   Moreover, the Receiver found "nothing in the documents" reviewed that would support

28   Phillips' claim that Triangle Connect is profitable.  *Id.*, ¶ 11.  Additionally, employees of

1    Triangle Payments informed the Receiver that "Hardwire is the **only entity** currently

2    using Triangle's payment gateway." *Id.*, ¶ 13 (emphasis in original). Further, Phillips

3    told the Receiver that Triangle spent $2-3 million to develop the payment gateway, but

4    Phillips was recently unsuccessful in selling the gateway for $250,000 and indicated to

5    the Receiver that he had "given up on his efforts to sell the gateway." *Id.*, ¶ 14. Phillips

6    declared that Triangle Payments has a direct agreement with Elavon, which would allow

7    it to "build its own portfolio," but just a few weeks before the TRO, Phillips told Elavon

8    that "we are getting out of the processing business" and would terminate Elavon's

9    account with Triangle Payments. *Id.*, ¶ 15. Similarly, Triangle Fraud Alerts is an

10   extension of Triangle Payments, such that if Triangle Payments cannot operate legally

11   and profitably, neither can Triangle Fraud Alerts. *See id.*, ¶ 17.

12          With respect to Triangle CRM, the Receiver states that it was sold to Hardwire.

13   *Id.*, ¶ 19. While Triangle CRM had seven customers other than Hardwire, all have either

14   moved to a different CRM or have shut down. *Id.*, ¶ 20. On July 4, 2018, Phillips told

15   the Receiver that Triangle CRM was not cost-effective and had been transferred to

16   Hardwire. *Id.*, ¶ 21. The Receiver also found "no active operations of business under"

17   the name Komaxo IVR, and noted that Phillips had told the Receiver it is an "interactive

18   voice response platform in 'the final launch stage.'" *Id.*, ¶ 22. Finally, the Receiver

19   declares that Triangle IQ "was a name sometimes internally applied to the fraud alerts

20   and chargeback services resold by Triangle and provided by third party vendors." *Id.*, ¶

21   23.

22          Based on the parties' briefing and arguments at the August 9, 2018 hearing, the

23   Court concludes that these business operations will remain in the preliminary injunction.[1]

24   //

25

26

27   ---

[1] At the hearing, the Triangle Defendants requested access to particular software codes. The Court
28   declines to address that argument as it was not raised in opposition to the preliminary injunction and the
     FTC has not had an opportunity to review the Triangle Defendants' request.

2. *Asset Freeze*

The Triangle Defendants next contend that the FTC has not demonstrated that there is a likelihood of dissipation of assets, and therefore, any preliminary injunction entered should not include an asset freeze.  Doc. No. 41-1 at 10-14.  The Triangle Defendants contend that less drastic measures can be taken to assure that the funds will not be dissipated.  *Id.* at 14-17.  However, if the Court finds that an asset freeze is warranted, the Triangle Defendants request the Court permit the Triangle Defendants to obtain $25,000 per month for attorneys' fees and costs related to this litigation and that Phillips receive $25,000 per month for personal expenses.  *Id.* at 17-19.

A court's authority to grant injunctive relief under Section 13(b) of the FTC Act includes "all the inherent equitable powers . . . for the proper and complete exercise" of the court's equity jurisdiction.  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982) (quotation and citation omitted).  One such power is the authority to freeze a defendant's assets.  *Id.* at 1113; *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1088-89 (9th Cir. 1985).  An asset freeze may only be ordered when necessary to preserve the efficacy of other forms of equitable relief.  *H.N. Singer*, 668 F.2d at 1112 ("[T]he authority to free assets by a preliminary injunction must rest upon the authority to give a form of final relief to which the asset freeze is an appropriate provisional remedy."); *FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir. 1982) ("In the exercise of this inherent equitable jurisdiction the district court may order temporary, ancillary relief preventing dissipation of assets or funds that may constitute part of the relief eventually ordered in the case.").  Before ordering a defendant's assets frozen, a court must carefully balance the potential benefit to injured consumers against the potential for serious disruption of the defendant's business:

> Freezing assets under certain circumstances . . . might thwart the goal of compensating investors if the freeze were to cause such disruption of [the] defendants' business affairs that they would be financially destroyed.  Thus, the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief.

*H.N. Singer*, 668 F.2d at 1113 (quotation and citation omitted); *see also Evans Prods.*, 775 F.2d at 1088-89.  "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted."  *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).

The Court finds that an asset freeze is warranted.  The FTC estimates that the amount of money that Defendants' wrongfully gained by their allegedly unlawful and deceptive conduct is roughly $30 million, while Defendants' frozen assets amount to $1.8 million.  Doc. No. 46 at 8.  As such, it is extremely unlikely that the frozen assets will be adequate to redress consumer injuries, which supports maintaining the asset freeze.  *World Patent Mktg.*, No. 17-cv-20848-GAYLES, 2017 WL 3508639, at *16 (S.D. Fla. Aug. 16, 2017).

Moreover, at this stage of the litigation, there is a concern that Defendants will dissipate the assets if not enjoined.  First, as the Court lays out in more detail below, the Defendants have the infrastructure and means to move millions of dollars within the United States and offshore.  Second, even absent an illicit movement of assets, "Defendants' request to unfreeze assets to pay for legal fees and expenses constitutes a dissipation of assets, as these expenditures would deplete the assets available for consumer redress."  *Id.* at *17; *see also Johnson v. Couturier*, 572 F.3d at 1085.

However, the Triangle Defendants argue the Court should modify any asset freeze to allow funds to be released for attorneys' fees and for Phillips' ordinary living expenses.  Doc. No. 41-1 at 17.  Triangle Media and Jasper Rain assert that they are incapable of representing themselves without counsel and need funds to pay for representation in the instant action.  *Id.* at 18.  Thus, the Triangle Defendants request the Court provide them a monthly allowance of $25,000 for attorneys' fees and costs related to this litigation.  *Id.*  Also, Phillips requests $25,000 a month to permit him to pay spousal and child support payments which "could be as much as $18,600 per month," and "$7,000 per month" for normal living expenses, including his monthly mortgage payment.  *Id.* at 19.

"The Ninth Circuit recognizes district courts' discretion in civil cases to 'forbid or limit payment of attorney fees out of frozen assets.'" *FTC v. Ideal Fin. Sols., Inc.*, No. 2:13-CV-00143-JAD-GWF, 2014 WL 4541191, at *2 (D. Nev. Sept. 9, 2014) (quoting *Commodity Futures Trading Com'n v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995). "The likelihood that frozen assets may not cover the claims of victims may not always justify denying an award of attorney's fees; the court should also consider the fact the wrongdoing has not yet been proven. Trial courts should also consider whether a release of living expenses will deplete the assets available for potential victims." *Id.* (citing *Noble Metals Int'l, Inc.*, 67 F.3d at 775; *FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307, 1313-14 (S.D. Fla. 2013).

Here, Defendants' conclusory arguments do not give this Court any legitimate basis to release funds after finding good cause for an asset freeze. The frozen assets are significantly less than the estimated injury to consumers, weighing towards denying the Triangle Defendants' request. Moreover, the Court is hesitant about awarding $25,000 per month for attorneys' fees and $25,000 per month for ordinary living expenses given the lack of documentation of the living and legal expenses.

For example, Phillips requests $25,000 per month for living expenses, which consist of spousal and child support payments in connection with his divorce proceedings, which he "anticipates could be as much as $18,600 per month," and "$7,000 per month" for "other normal living expenses," including his mortgage payment. Doc. No. 41-1 at 19. In support, Phillips attaches a report prepared by a financial and accounting analyst opining that he has $18,622 available for support monthly. *See* Phillips Amend. Decl., Exhibit 1. However, the spousal and child support payment amounts have apparently not been set by the court presiding over Phillips' divorce proceedings. As a result, Phillips may ultimately be required to pay less than his "anticipated" spousal and child support payments. Additionally, Phillips declares that his normal living expenses going forward will be approximately $7,000 per month, but he provides no documentation of these expenses, such as receipts, cancelled checks, invoices

or bills.  The Court cannot verify the reasonableness of these expenses without more detailed information.  Moreover, as noted by the FTC, the $25,000 per month requested by Phillips amounts to $300,000 per year.  *See* Doc. No. 46 at 9.  "[T]he size of the request makes plain that it goes beyond satisfying mere necessities and would continue to fund a lifestyle unavailable to nearly all Americans."  *IAB Mktg. Assocs., LP*, 972 F. Supp. 2d at 1314 (finding an annual amount of $415,800 unreasonable and unnecessary as a release of funds from an asset freeze for ordinary living expenses).

With respect to attorneys' fees, the Ninth Circuit has repeatedly held that whether to allow payment of attorneys' fees out of frozen assets lies within the district court's discretion.  *Noble Metals Int'l, Inc.*, 67 F.3d at 775; *Fed. Sav. & Loan Ins. Corp. v. Ferm*, 909 F.2d 372, 374 (9th Cir. 1990); *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).  "These decisions recognized the importance of preserving the integrity of disputed assets to ensure that such assets are not squandered by one party to the potential detriment of another."  *Ferm*, 909 F.2d at 374.  As such, the Court also declines to release the amount for attorneys' fees requested.  Phillips declares that he retained Procopio, Cory, Hargreaves & Savitch LLP ("Procopio") for counsel to assist in the defense of this action and that the three retained attorneys agreed to reduce their rates on this matter.  Phillips Amend. Decl., ¶ 7.  Based on the reduced rates, Procopio "estimates that it will incur approximately $25,000 per month in fees to defend this matter."  *Id.*  However, these are estimates and the Court will not advance funds to pay for future services not yet incurred.

In its reply and at the hearing, the FTC indicated it would consider requests for reasonable living expenses and attorneys' fees once it receives adequate financial disclosures.  Doc. No. 46 at 9 n.13.  In light of this, and despite the fact that the frozen assets fall short of the amount needed to compensate injured consumers, the Court notes that a final judgment on the merits has not yet been reached.  Additionally, "[c]orporations and other unincorporated associations must appear in court through an attorney."  *In re Am. W. Airlines*, 40 F.3d 1058, 1059 (9th Cir. 1994).  For this reason, the

16

1    preliminary injunction provides a method for Defendants or their attorneys to request

2    reasonable attorneys' fees and living expenses from the Receiver.

3    **B.**    ***Hardwire's Opposition***

4         Hardwire does not oppose the issuance of a preliminary injunction with respect to

5    its conduct within the United States; rather it seeks to prevent the Court from issuing an

6    order enjoining its foreign operations.  Doc. No. 36.  Hardwire makes four arguments: (1)

7    the FTC has not demonstrated a likelihood of success on the merits that Hardwire's

8    foreign conduct is within the scope of the FTC Act; (2) the balance of the equities tips in

9    favor of not enjoining Hardwire's foreign conduct; (3) there is no basis for an asset freeze

10   of foreign assets; and (4) the TRO and any preliminary injunction is unenforceable as to

11   its foreign conduct pursuant to the laws of the British Virgin Islands.  *See id.*

12        *1.    Scope of the FTC Act*

13        Hardwire contends that the FTC lacks subject matter jurisdiction over its foreign

14   conduct because the FTC has not demonstrated a likelihood of success on the merits that

15   Hardwire's foreign conduct is causing, or has a likelihood of causing "reasonably

16   foreseeable injury within the United States," or that its foreign conduct "involves material

17   conduct occurring within the United States."  Doc. No. 36 at 18 (quoting 15 U.S.C. §

18   45(a)(4)(A)).  In analyzing this argument, the Court considers Hardwire's conduct on its

19   own and the Defendants' conduct as a common enterprise.

20             a.    Individual Conduct

21        In its denial of Hardwire's motion to modify the TRO, the Court found that the

22   FTC has demonstrated a likelihood of success on the merits that the FTC Act reached

23   Hardwire's foreign conduct.  *See* Doc. No. 31.  Hardwire contends that the evidence

24   presented by the FTC and relied upon by the Court is incorrect.  *See* Doc. No. 36.

25   Hardwire states that: (1) it does not charge U.S. consumers in foreign currencies; (2) U.S.

26   consumers cannot purchase Hardwire products from foreign websites, in foreign

27   currencies or otherwise; (3) funds from foreign transactions with foreign consumers flow

28   entirely through international channels for the benefit of Hardwire and never flow

1    through the U.S.; and (4) the list of vendors used by Hardwire that the FTC claims are

2    located in the U.S. have not been shown to be tied to any allegedly unlawful conduct.

3    *See id.*

4            The FTC's "field of action is foreign as well as interstate commerce."  *Eastman*

5    *Kodak Co. v. FTC*, 7 F.2d 994, 996 (2d Cir. 1925).  "The exercise by the United States of

6    its sovereign control over its commerce and the acts of its resident citizens therein is no

7    invasion of the sovereignty of any other country or any attempt to act beyond the

8    territorial jurisdiction of the United States."  *Branch v. FTC*, 141 F.2d 31, 35 (7th Cir.

9    1944).  Thus, the FTC Act specifically authorizes the exercise of jurisdiction over some

10   acts done outside the territorial jurisdiction of the United States.  *Id.* at 36.  To enjoin

11   Hardwire's foreign business operations, the FTC must demonstrate a likelihood of

12   success on the merits that Hardwire's foreign conduct either (1) causes or is likely to

13   cause reasonably foreseeable injury within the United States; or (2) involves material

14   conduct occurring within the United States.  15 U.S.C. § 45(a)(4)(A).

15           Hardwire asserts that its international operations are "entirely separate and distinct

16   from its U.S. operations."  Doc. No. 36 at 19.  For example, it states that its foreign

17   websites selling products to foreign consumers are designed, owned, and operated by

18   entities outside of the U.S. and sales to foreign consumers are consummated entirely

19   outside the U.S.  *Id.*  Hardwire asserts that funds from those foreign sales flow only

20   through international channels to Hardwire, not through the U.S.  *Id.*  However, Plaintiff

21   contends that Hardwire relies on Triangle Media for "back-office support functions in the

22   United States, including the monitoring of Hardwire's customer service calls from

23   consumers in the United States and abroad."  Doc. No. 28 at 14.  Moreover, Plaintiff

24   contends that Defendants used United States call centers and payment gateways to charge

25   United States consumers and consumers abroad.  *Id.* at 14-15.  Even further, Plaintiff

26   contends that Hardwire's online marketing operations, including marketing to consumers

27   in the United States and those abroad, are run through a Florida-based online marketing

28   network.  *Id.*

**FTCSER-135**

18cv1388-MMA (NLS)

1    Additionally, the Receiver states that one month before the TRO was entered,

2    Hardwire, through the Los Angeles office of Processing.com, caused nominee merchants

3    to file dozens of foreign merchant account applications to process consumer charges in

4    U.S. dollars.  Doc. No. 53 at 4.  For example, on May 29, 2018, a Bulgarian citizen

5    applied for a merchant account in a corporate name, Glossyibis EOOD.  *Id.*  The

6    merchant account application stated an intent to process roughly $100,000.00 U.S. dollars

7    per month, listing rosepetal-skin.com and energetic-health.com as its websites and

8    providing U.S. toll free numbers as contact information for the Bulgarian merchant.  *Id.*

9    Both of these websites were registered by Hardwire.  *Id.*  The Receiver identified another

10   Bulgarian nominee corporation, Wiskerowl EEOD, seeking to process $600,000.00 per

11   year in U.S. dollars, specifying it wanted to receive services in the USA and listing

12   amazingherbaldiet.com as its website with a U.S. toll free number.  *Id.*  This website was

13   also registered by Hardwire.  *Id.*  As noted by the Receiver, "the use of a Los Angeles

14   company to file Bulgarian merchant applications to process in U.S. dollars, while at the

15   same time filing numerous other applications on behalf of Hardwire seeking to process in

16   euros and pounds, demonstrates that Hardwire's operation was not run as separate U.S.

17   and international operations, but instead is one unified operation with significant roots in

18   this company."  *Id.* at 5.

19   Based on the declarations and evidence provided by the FTC and the Receiver, it

20   appears that Hardwire's foreign conduct involves material conduct (i.e., call centers,

21   payment gateways, and marketing operations with respect to both U.S. and foreign

22   consumers) within the United States.  *See* 15 U.S.C. § 45(a)(4)(A).  As such, the Court

23   finds that the declarations and evidence, as it currently stands, show a likelihood that

24   Hardwire's foreign conduct involves material conduct occurring within the United States

25

26

27

28

**FTCSER-136**

18cv1388-MMA (NLS)

1    and is also reasonably likely to cause or has caused reasonably foreseeable injury in the

2    United States.[2]

3              b.   Common Enterprise

4              In further support of the applicability of the FTC Act to Hardwire's foreign

5    conduct, the Court finds that the FTC has shown a likelihood in success of proving on the

6    merits that Defendants acted as a common enterprise.  "The general rule is that, absent

7    highly unusual circumstances, the corporate entity will not be disregarded."  *P.F. Collier*

8    *& Son Corp. v. FTC*, 427 F.2d 261, 266 (6th Cir. 1970).  However, "where the public

9    interest is involved, as it is in the enforcement of Section 5 of the [FTC Act], a strict

10   adherence to common law principles is not required . . . where strict adherence would

11   enable the corporate device to be used to circumvent the policy of the statute."  *Id.* at 267

12   (making this statement in the context of determining whether a parent should be held

13   liable for the acts of the subsidiary).  "Thus, in situations where corporations are so

14   entwined that a judgment absolving one of them of liability would provide the other

15   defendants with 'a clear mechanism for avoiding the terms of the order,' courts have been

16   willing to find the existence of a common enterprise."  *FTC v. Nat'l Urological Group,*

17   *Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008) (quoting *Delaware Watch Co. v. FTC*,

18   332 F.2d 745, 746-47 (2d Cir. 1964) (affirming an FTC order holding a company liable

19   because it was part of a "maze of interrelated companies" through which "the same

20   individuals were transacting an integrated business")).  As a result, when corporations act

21   as a common enterprise, each may be liable for the deceptive acts and practices of the

22   other.  *Commodity Futures Trading Comm'n. v. Wall Street Underground, Inc.*, 281 F.

23   Supp. 2d 1260, 1271 (D. Kan. 2003) (citing *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d

24   1171, 1175 (1st Cir. 1973); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011

25   (N.D. Ind. 2000)).

26

27

28   _____

     [2] The Court's prior order denying Hardwire's motion to modify the TRO provides additional reasoning
     supporting this finding.  *See* Doc. No. 31.

1   "[T]he pattern and frame-work of the whole enterprise must be taken into

2   consideration" when determining whether a common enterprise exists. *Delaware Watch*

3   *Co.*, 332 F.2d at 746 (internal quotation marks and citations omitted). Some of the

4   factors evaluated by Courts to determine whether a common enterprise exists include: (1)

5   common control and ownership; (2) the pooling of resources and staff; (3) whether the

6   companies shared phone numbers, employees, and email systems; (4) whether business is

7   transacted through a maze of interrelated companies; (5) the commingling of corporate

8   funds and failure to maintain separation of companies; (6) unified advertising; (7)

9   whether the companies jointly participated in a 'common venture' in which they

10  benefited from a shared business scheme or referred customers to one another; and (8)

11  evidence that reveals no real distinction exists between the corporate defendants. *Nat'l*

12  *Urological Group, Inc.*, 645 F.2d at 1167; *FTC v. Network Servs. Depot, Inc.*, 617 F.3d

13  1127, 1143 (9th Cir. 2010); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d

14  1052, 1082 (C.D. Cal. 2012).

15       Here, with respect to common control and ownership, the Receiver explains that

16  Phillips and Devin Keer have been in the risk free trial offer business for a decade. Doc.

17  No. 30 at 16. Phillips confirmed with the Receiver that he and Keer began working

18  together in 2008 by setting up an entity in McKinney, Texas, which was ultimately shut

19  down when it "ran afoul of the BBB." *Id.* Keer's role was the "mastermind, marketer,

20  and businessman, while Phillips' primary role was to obtain and maintain merchant

21  accounts in the United States." *Id.* Phillips and Keer established, commonly owned, and

22  ran several companies, including Triangle Media and Hardwire. *Id.* The Receiver also

23  identified a third person, Brett Bond, who is reportedly very close with Keer and Phillips

24  and plays a management role at, and possibly has an ownership interest in, Hardwire. *Id.*

25  Bond "has held himself out as Hardwire's general manager and Triangle's COO." *Id.* at

26  17.

27       In the Fall of 2017, Triangle and Hardwire made structural changes so that the two

28  companies have been vendor and client. *Id.* However, a September 25, 2017 email from

Keer to Triangle employees indicates no change. *Id.* Keer wrote that the "change in corporate structure . . . really is mostly a formality." *Id.* Keer reports that through his entity Mantra Media Capital BVI ("Mantra Media"), which is also the parent of Hardwire, he sold his 50% interest in Triangle for $1,000,000. *Id.* However, the Receiver located a contemporaneous Consultancy Agreement between Phillips and Mantra Media, wherein Mantra Media engaged Phillips to consult on e-commerce matters for a two-part consultancy fee—a $1,000,000 engagement fee and a $1,000,000 service fee payable to Phillips at $50,000 per month for 20 months. *See* Doc. Nos. 26-3 at 29-34; 30-16. The Receiver explains that "Keer appears, therefore, to have transferred his interest in Triangle to Phillips for no consideration and Phillips remains on the payroll at $50,000 per month for 20 months." Doc. No. 30 at 18. Hardwire disputes the validity of this consultancy agreement for purposes of making a common enterprise determination, by noting that the Receiver's copy is not signed by Keer. Doc. No. 36 at 15.

Phillips states that he has not had ownership interest in Hardwire since 2014. Doc. No. 30 at 18. In 2014, Phillips and Keer sold Hardwire to a publicly traded company, Electronic Cigarettes International Group, Ltd. ("ECIGS"). *Id.* at 18 n.11. ECIGS paid $5 million, granted stock options to Keer and Phillips, and entered employment contracts with them. *Id.* The deal terms required that the "Seller Parties" "cause[] all the assets owned by Global Northern Trading Ltd to be transferred" to Hardwire prior to the sale to ECIGS. *Id.* Accordingly, Hardwire and Global Northern "apparently had common ownership" prior to the 2014 sale. *Id.* In 2016, ECIGS sold the assets back to Hardwire "for a much reduced purchase price, the relinquishment of the stock options by . . . Keer and Phillips, and the termination of their employment contracts." *Id.* Phillips contends he was not involved in the buyback. *Id.* The Receiver has doubts that Phillips has no ownership interest in Hardwire. *Id.* at 18. In support, the Receiver notes that Phillips' "wife asserts in pleadings that [Phillips] did have an interest in Hardwire up until last year and only attempted to transfer complete ownership to . . . Keer in the summer of

2017, when divorce was imminent . . . ." *Id.* Keer also declares that Phillips had no ownership interest or decision-making authority over Hardwire since December 1, 2013. *Id.* However, the Receiver obtained a Distribution Agreement, dated October 5, 2016, between Hardwire and Abran Limited, wherein Phillips executed the agreement on behalf of Hardwire as its COO. *Id.*; Doc. No. 30-18. Mr. Bond signed on behalf of Abran Limited. Doc. No. 30 at 18-19.

With respect to common operation, the Receiver explained that the companies "appear to be separate on paper, but the flow of funds, behavior, strategy decisions, and fluidity of the companies' tell another story." Doc. No. 30 at 20. The enterprise purportedly works as follows: U.S. consumers order from Global Northern via US nominee[3] companies, are invoiced by the US nominee, and make payment to the US nominee company; the US nominee companies remit receipts to Triangle Media for consolidation, and then Triangle sends the receipts to Global Northern which sends them to Hardwire; non-US consumers paid a nominee, who sent the money directly to Hardwire. *Id.* at 19. Thus, the funds deposited in nominee bank accounts moved around the world, but remained in the Receivership Entities' control. *Id.* at 20. Until September of 2017, consumer funds deposited to the nominee bank accounts were periodically transferred to Triangle's Wells Fargo account. *Id.* Triangle then transferred, roughly twice a month, the balance of the account to the Canadian bank account of Global Northern, which is an entity ultimately controlled by Keer through intermediate entities. *Id.* Global Northern paid for fulfillment and other product-related expenses and then sent the remaining money to the Hardwire bank account in Hong Kong. *Id.* Hardwire then routed funds back to Triangle to cover Triangle's expenses. *Id.* The Receiver is unclear

---

[3] The Receiver states that Defendants' scheme is dependent upon their access to merchant accounts through which consumer charges can be processed. Doc. No. 30 at 4. Because banks will not approve merchant accounts for negative option sales, "Defendants have built a network of merchant accounts by forming shell companies and convincing ordinary people, for a minimum of $500 per month, to act as the "front" (aka "signer" or "nominee") for the shell company and a merchant account in its name. *Id.*

FTCSER-140

about the operations following September 2017, partly due to Hardwire's refusal to cooperate with the TRO. *Id.* at 21. Phillips explains that transfers from nominee bank accounts are now transferred to a Global Northern bank account in the United States, but the Receiver states that this has not been confirmed and is inconsistent with other evidence. *Id.*

It also appears that the companies share officers and employees. The Receiver notes that Phillips, Keer, and possibly Bond had an ownership interest in the Corporate Defendants and management roles spanning across the companies. *Id.* For example, Phillips acted as CEO of Triangle and in October 2016, he signed a binding contract on behalf of Hardwire as its COO. *Id.* As indicated previously, it also appears that Phillips is presently being paid $50,000 per month by Mantra Media (the parent of Hardwire). *Id.* Hardwire's general manager, Bond, was stationed in Triangle's San Diego office as COO for most of 2017, and in March 2018 Bond was apparently acting for both companies. *Id.* Keer purportedly uses both Hardwire and Triangle email addresses interchangeably. *Id.* The pooling of employees is also apparent. For example, Steven Sproules is a Hardwire employee based in Bangkok, but also acted in an operations role for Global Northern; Juliana Lashley had nominee merchant supervision roles at Hardwire and accounting/banking roles at Global Northern. *Id.*

When the operations of the Defendant companies are considered as a whole, it appears that they function as a common enterprise. All were controlled by the same primary parties, shared employees and resources, commingled corporate funds, and appear to transact business through a maze of interrelated companies. *See Nat'l Utological Group, Inc.*, 645 F.2d at 1167; *Network Servs. Depot, Inc.*, 617 F.3d at 1143; *John Beck Amazing Profits, LLC*, 865 F. Supp. 2d at 1082. Most importantly, if one of these companies escaped liability, it would likely afford the other Defendant companies a means for continuing their operations. The few distinctions between the companies—the fact that they maintained separate bank accounts, for instance—are superficial in nature in comparison to the overwhelming evidence of the companies' interrelated functions.

1   Accordingly, this serves as an additional basis for finding that the FTC is likely to

2   succeed on the merits of its claim that it has jurisdiction over the operation of all

3   Defendants, both foreign and domestic, because much of this establishes that material

4   conduct occurs within the United States and causes or is likely to cause reasonably

5   foreseeable injury within the United States.

6           2.     *Balance of the Equities and Public Interest*

7         Second, Hardwire contends that the public interest that the FTC seeks to protect is

8   not served by enjoining Hardwire's international conduct.  Doc. No. 36 at 20.  Here, the

9   stated public interest is to protect consumers from Defendants' risk free trial continuity

10  programs by prohibiting misrepresentations and requiring clear and conspicuous

11  affirmative disclosures as to any sales with a negative option feature.  Doc. No. 11 at 8-

12  12.  The Court has already determined that the FTC has a likelihood of success on the

13  merits in proving Hardwire's international conduct causes or is likely to cause reasonably

14  foreseeable injury within the United States, and that there is material conduct within the

15  United States.  Accordingly, the public interest is served by preliminarily enjoining

16  Hardwire's foreign conduct by protecting consumers from Hardwire's allegedly unlawful

17  and deceptive conduct.

18          3.     *Asset Freeze of Foreign Assets*

19        Hardwire also contends that there is no basis for a freeze of foreign assets or

20  receivership oversight over Hardwire's foreign operations.  Doc. No. 36 at 21-23.  In

21  support, Hardwire asserts that such a freeze would "be a commercial death sentence."  *Id.*

22  at 22.  In this Circuit, "when a district court balances the hardships of the public interest

23  against a private interest, the public interest should receive greater weight."  *World Wide*

24  *Factors, Ltd.*, 882 F.2d at 347.  "Obviously, the public interest in preserving the illicit

25  proceeds . . . for restitution to victims is great."  *Affordable Media*, 179 F.3d at 1236.  As

26  discussed in the Court's analysis regarding common enterprise, the funds obtained from

27  the allegedly unlawful and deceptive acts of Defendants were often transferred from

28  nominee bank accounts to Triangle's Wells Fargo bank account, then to a Global

Northern bank account in Canada, then to Hardwire's bank account in Hong Kong, and then back to Triangle.  In light of the frequent movement of funds throughout the world, it is in the public's interest to freeze Hardwire's foreign assets.  *See id.*  As discussed previously, the fact that the FTC indicates that Hardwire's frozen assets are valued at approximately $1.8 million and the identified amount of U.S. consumer harm is nearly $30 million further strengthens the public interest in freezing Hardwire's foreign assets.  In addition to the public's interest in maintaining restitution funds, the public has a compelling interest in ensuring the robust enforcement of federal consumer protection laws, and that interest would be harmed if Hardwire were permitted to continue operations.  *Alliance Document Preparation*, 296 F. Supp. 3d at 1212.  As such, the Court finds an asset freeze of Hardwire's foreign assets appropriate.

### 4.   *Enforceability of Injunctive Relief*

Finally, Hardwire argues that any preliminary injunction entered against Hardwire's international business is "legally ineffective and without any force" in the British Virgin Islands, where Hardwire is incorporated and has its principal place of business.  Doc. No. 36 at 23.  In doing so, Hardwire raises two arguments: (1) the Court lacks personal jurisdiction over Hardwire;[4] and (2) the Court cannot enforce any injunctive relief as to Hardwire's foreign conduct because it is unenforceable under the laws of the British Virgin Islands.

### a.   Personal Jurisdiction

Hardwire contends the Court lacks personal jurisdiction over only its foreign conduct.  Doc. No. 36 at 25-26.  The FTC contends that it has established specific personal jurisdiction over Hardwire.  Doc. No. 47 at 7-8.

---

[4] At the hearing, Hardwire argued it is not raising a personal jurisdiction argument, but, as will be discussed below, the case Hardwire relies upon requires a finding of personal jurisdiction before determining enforceability of an injunction.

26

18cv1388-MMA (NLS)

A defendant is subject to specific personal jurisdiction where sufficient contacts with the forum state exist such that the assertion of personal jurisdiction does not offend traditional notions of fair play and substantial justice.  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  The Ninth Circuit has established a three-pronged test for analyzing specific personal jurisdiction:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's forum related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  The plaintiff bears the burden of proving the first two prongs and then the defendant must show that the court's exercise of jurisdiction would be unreasonable.  *Id.*

Section 13(b) of the FTC Act provides for worldwide service of process, stating "in any suit under this section, process may be served on any person, partnership, or corporation wherever it may be found."  15 U.S.C. § 53(b)(2).  When a federal statute contains a nationwide or worldwide service of process provision, federal due process demands that the defendant's minimum contacts with the United States as a whole, not the forum in particular, justify the exercise of personal jurisdiction.  *See Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1316 (9th Cir. 1985).  As such, "the inquiry to determine 'minimum contacts' is . . . 'whether the defendant has acted within any district of the United States or sufficiently caused foreseeable consequences in this country.'"  *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (quoting *Vigman*, 764 F.2d at 1316).

Here, the Court has already found that Hardwire's foreign conduct involves material conduct occurring within the United States via its operation of call centers,

payment gateways, and marketing operations which allegedly service both U.S. consumers and foreign consumers, and also is reasonably likely to cause reasonably foreseeable injury in this country. *See* Doc. No. 28 at 14-15; Doc. No. 31 at 3-4. As such, the Court finds that Hardwire has sufficient minimum contacts with the United States. The FTC's claims are also sufficiently related to these contacts, because they represent material conduct within the United States giving rise to the alleged violations of the FTC Act, ROSCA, and the EFTA. *See* Compl. Thus, the minimum contacts analysis is met.

When minimum contacts have been established, the defendant "must present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) (emphasis added). The exercise of specific personal jurisdiction is reasonable unless it offends traditional notions of fair play and substantial justice. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1021 (9th Cir. 2002). Here, exercising personal jurisdiction over Hardwire's foreign conduct would not offend traditional notions of fair play and substantial justice. Hardwire does not oppose a preliminary injunction with respect to its conduct within the United States. Accordingly, Hardwire will defend this action in this district already with respect to its domestic conduct. Moreover, Hardwire has not provided a compelling reason that a finding of personal jurisdiction would be unreasonable. As will be discussed below, Hardwire argues that any order would be unenforceable in the British Virgin Islands, but the case law relied upon by Hardwire does not support its contention. Accordingly, the Court should find that it has personal jurisdiction over Hardwire.

     b.   <u>Enforceability</u>

Hardwire contends that the district court does not have the judicial authority to enforce a preliminary injunction with respect to its foreign conduct. Hardwire relies heavily upon one case in particular, *Reebok Int'l v. McLaughlin*, 49 F.3d 1387 (9th Cir. 1995), for its contention that the TRO, and any future injunctive relief, is unenforceable

as to Hardwire's foreign conduct because it is unenforceable according to the laws of the British Virgin Islands. Hardwire asserts that *Reebok* holds that "[w]here a temporary restraining order issued by a federal district court is not recognized or enforceable under the laws of a foreign nation, the district court has no authority to enforce its terms against a *party* who resides in that foreign nation." Doc. No. 36 at 24 (emphasis added). Hardwire asserts that the Ninth Circuit "concluded that a foreign entity could not be held in contempt for refusing to comply with a temporary restraining order issued by the [district court] because the temporary restraining order had no effect in that foreign entity's country of operations." *Id.*

The holding in *Reebok* is not as broad as Hardwire suggests. In *Reebok*, the Ninth Circuit concluded that district courts lack specific personal jurisdiction to order foreign *non-party* banks with no contact in the United States to comply with an asset freeze injunction. *Reebok, Int'l*, 49 F.3d at 1389, 1392. Thus, a foreign *non-party* could not be held in contempt for noncompliance with a TRO because the district court lacked personal jurisdiction over the *non-party*. *Id.* As a result, *Reebok* is inapposite to this case because Hardwire is a party in this action with contacts in the United States, and because the Court has personal jurisdiction over Hardwire. Once personal jurisdiction over a party is obtained, district courts have authority to issue injunctions, including orders to freeze property under its control, whether within or without the United States. *See United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965). Accordingly, the Court does have the judicial authority to enforce its TRO and the preliminary injunction with respect to Hardwire's foreign conduct.

//
//
//
//
//
//

*C.*    <u>**Conclusion**</u>

       For the foregoing reasons, the Court finds a preliminary injunction and continued asset freeze appropriate. The Court also finds it appropriate to appoint the temporary receiver as the permanent receiver in this action. Accordingly, the Court **GRANTS IN PART** the FTC's request for a preliminary injunction, which is issued this date in a separate document entitled "Preliminary Injunction."

       **IT IS SO ORDERED**.

Dated: August 24, 2018

Hon. Michael M. Anello
United States District Judge

**FTCSER-147**

18cv1388-MMA (NLS)

1   Andrew W. Robertson (SBN 62541)
    arobertson@mcnamarallp.com
2   Edward Chang (SBN 268204)
    echang@mcnamarallp.com
3   McNamara Smith LLP
    655 West Broadway, Suite 1600
4   San Diego, California 92101
    Telephone: 619-269-0400
5   Facsimile: 619-269-0401

6   *Attorneys for Temporary Receiver*

7

8                UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11  FEDERAL TRADE COMMISSION,          Case No. 3:18-cv-01388-MMA-NLS

12              Plaintiff,             **PRELIMINARY REPORT OF**
                                       **TEMPORARY RECEIVER**
13      v.

14  TRIANGLE MEDIA CORPORATION, a
    Delaware corporation, also doing business
15  as Triangle CRM, Phenom Health, Beauty
    and Truth, and E-Cigs; JASPER RAIN
16  MARKETING LLC, a California limited
    liability company, also doing business as
17  Cranium Power and Phenom Health;
    HARDWIRE INTERACTIVE INC., a
18  British Virgin Islands corporation, also
    doing business as Phenom Health, Beauty
19  and Truth, and E-Cigs; and BRIAN
    PHILLIPS, individually and as an officer
20  of Triangle Media Corporation,

21              Defendants.

22

23

24

25

26

27

28

In the UK, there were approximately 510,000 sales (£1.9 million), 270,000 recurring sales (£16.9 million), 87,000 refunds (£2.4 million) and 41,000 voided transactions (£340,000) for net sales of approximately £16 million.

In the EU, there were approximately 270,000 sales (€3.4 million), 230,000 recurring sales (€14.9 million), 62,000 refunds (€2.4 million), and 2,000 voided transactions (€17,000) for net sales of approximately €16 million.

## V.

## ASSETS AND LIABILITIES

### A.    Asset Freeze

Beginning July 2, 2018, we served the TRO/Asset Freeze on banks and other financial institutions where the Receivership Entities were known to have accounts or credit card merchant accounts.  The following accounts were frozen:

| Account Name | Financial Institution | Acct. No. | Amt. Frozen |
|---|---|---|---|
| BH Wellness LLC | Wells Fargo | 7745 | $63,249.73 |
| Blended Wellness Marketing LLC | Wells Fargo | 6788 | $7,929.96 |
| Brand Junction Wellness LLC | Wells Fargo | 2091 | $55,066.93 |
| Centered Energy Marketing LLC | Wells Fargo | 4332 | $1,548.46 |
| Clear Option Wellness LLC | Wells Fargo | 5572 | $204.82 |
| Concur Marketing Solutions LLC | Wells Fargo | 4631 | $6,700.28 |
| Direct Access Products LLC | Wells Fargo | 4091 | $1,513.36 |
| Endeavour Steel Marketing LLC | Wells Fargo | 9161 | $22,229.44 |
| Everjoy Nutrition LLC | Wells Fargo | 2737 | $14,960.23 |
| Fast Order Marketing LLC | Wells Fargo | 8053 | $3,932.93 |
| Flat6 Development LLC (proceeds from sale of San Diego business condo) | IOLTA Accts. of Phillips' counsel and Mrs. Phillips' counsel | | $1,048,090.31 |
| Flat6 Development LLC dba Kit and Kaboodle | Wells Fargo | 5864 | $5.60 |

| Account Name | Financial Institution | Acct. No. | Amt. Frozen |
|---|---|---|---|
| Flat6 Development LLC dba Kit and Kaboodle | Wells Fargo | 7828 | $5,656.11 |
| Flat6 Development LLC dba Kit and Kaboodle | Wells Fargo | 7910 | $6,751.40 |
| Global Northern Trading Ltd. | Royal Bank of Canada | 4835 | $4,913.38 |
| Global Northern Trading Ltd. | Royal Bank of Canada | 3158 | $1,493.19 |
| Global Northern Trading Ltd. | Royal Bank of Canada | 9593 | $1,749.25 |
| Global Northern Trading Ltd. | Royal Bank of Canada | 7102 | $0.33 |
| Global Northern Trading Ltd. | Royal Bank of Canada | 7201 | $0.27 |
| Global Northern Trading Ltd. | Royal Bank of Canada | 7219 | $0.09 |
| Global Northern Trading Ltd. | Royal Bank of Canada | 7227 | $0.20 |
| Global Northern Trading Ltd. | Royal Bank of Canada | 2407 | $4.75 |
| Great Plains Nutrition LLC | Wells Fargo | 7208 | $14,969.92 |
| Green Valley Wellness LLC | Wells Fargo | 3007 | $61,683.63 |
| H1 Marketing LLC | Wells Fargo | 6108 | $67,877.80 |
| Jasper Rain Marketing LLC | Priority Payment Systems | 8750 | $14,095.24 |
| Jasper Rain Marketing LLC | Wells Fargo | 4167 | $4,764.31 |
| Jester Youth Marketing LLC | Wells Fargo | 5917 | $1,980.74 |
| Jet Time Marketing LLC | Wells Fargo | 4655 | $1,895.52 |
| Joint Capital Marketing LLC | Wells Fargo | 7516 | $20,506.86 |
| Jolt Line Marketing | Wells Fargo | 8215 | $1,635.12 |
| Kinetic Products Marketing LLC | Wells Fargo | 5765 | $34,201.18 |
| Little Kite Wellness LLC | Wells Fargo | 5759 | $27,872.79 |
| Mass Drift Marketing LLC | Wells Fargo | 7287 | $94,635.72 |

| Account Name | Financial Institution | Acct. No. | Amt. Frozen |
|---|---|---|---|
| Mind Wellness Marketing LLC | Wells Fargo | 0058 | $1,484.58 |
| Rainbow Drop Wellness LLC | Wells Fargo | 3304 | $4,808.45 |
| Real Vitality Marketing LLC | Wells Fargo | 8402 | $25.00 |
| Rivers Edge Marketing LLC | Wells Fargo | 5907 | $249.09 |
| Simple Gig Marketing LLC | Wells Fargo | 3061 | $2,771.91 |
| Sunrise Pointe Wellness LLC | Wells Fargo | 2446 | $28,905.90 |
| Sunset Orders Marketing LLC | Wells Fargo | 4939 | $9,931.51 |
| Total Market Products LLC | Wells Fargo | 4558 | $35,565.83 |
| Triangle Media Corp. | Wells Fargo | 0203 | $70.95 |
| Triangle Media Corporation | Wells Fargo | 0572 | $530.12 |
| Triangle Media Corporation | Wells Fargo | 4362 | $88,807.82 |
| Triangle Media Corporation | Wells Fargo | 5717 | $82,379.18 |
| Turbid Elite Marketing | Wells Fargo | 4175 | $31,997.00 |
| Zoom Standard Marketing LLC | Wells Fargo | 3215 | $449.14 |
| **Total** | | | **$1,880,096.33** |

Individual accounts of Mr. Phillips have also been frozen, but are not presented here.

**B.     Other Assets and Liabilities**

Flat6 Development has entered into a sale agreement for the sale of the second condominium in San Diego – when that transaction closes, the net funds will be frozen.

We are investigating potential claims against third parties who may hold assets of Receivership Entities and potential fraudulent conveyance claims against third parties who may have received funds in connection with their participation in the scheme.

///

///

1  SAMANTHA GORDON (IL Bar No. 6272135)
2  sgordon@ftc.gov
   MATTHEW H. WERNZ (IL Bar No. 6294061)
3  mwernz@ftc.gov
4  Federal Trade Commission
   230 South Dearborn, Suite 3030
5  Chicago, Illinois 60604
6  312.960.5623 (Gordon)
   312.960.5596 (Wernz)
7  ATTORNEYS FOR PLAINTIFF

8
          UNITED STATES DISTRICT COURT
9        SOUTHERN DISTRICT OF CALIFORNIA
10

11 FEDERAL TRADE COMMISSION,          Case No.: 18-cv-1388-MMA (NLS)

12                      Plaintiff,    Exhibits to Plaintiff Federal Trade
                                      Commission's Memorandum in
13 v.                                 Opposition to Hardwire Interactive
                                      Inc.'s Motion to Modify Temporary
14 TRIANGLE MEDIA                     Restraining Order and for Other
15 CORPORATION; JASPER RAIN           Equitable Relief
   MARKETING LLC; HARDWIRE
16 INTERACTIVE INC.; and BRIAN        Judge:  Hon. Michael M. Anello
17 PHILLPS,                           Hearing Date:  July 19, 2018
                                      Hearing Time:  10:30 a.m.
18                      Defendants.   Courtroom: 3D
19

20

21

22

23 Plaintiff's Exhibit 11

24 First Supplemental Declaration of Douglas M. McKenney ......................................3
25      Investigator, Federal Trade Commission
        Attachments
26      McKenney Attachment A ................................................................................20
27      McKenney Attachment B ................................................................................22
28
                                      1
                      FTC's Opposition to Hardwire Interactive Inc.'s Motion to Modify TRO
                                          Case No. 18-cv-1388-MMA (NLS)

McKenney Attachment C ................................................................24
McKenney Attachment D ................................................................28
McKenney Attachment E ................................................................30
McKenney Attachment F ................................................................38
McKenney Attachment G ................................................................41
McKenney Attachment H ................................................................61
McKenney Attachment I ................................................................70
McKenney Attachment J ................................................................79
McKenney Attachment K ..............................................................109
McKenney Attachment L ..............................................................128
McKenney Attachment M ..............................................................157

Respectfully submitted,

Dated: July 16, 2018

ALDON F. ABBOTT
General Counsel

/s/ Samantha Gordon
Samantha Gordon
Matthew H. Wernz
Federal Trade Commission
Midwest Region

# FIRST SUPPLEMENTAL DECLARATION OF
## DOUGLAS M. MCKENNEY
### <u>PURSUANT TO 28 U.S.C. § 1746</u>

I, Douglas M. McKenney, hereby declare as follows:

1.      My name is Douglas M. McKenney.  I am a United States citizen over eighteen years of age.  I am an investigator with the Federal Trade Commission ("Commission" or "FTC"), a position that I have held for approximately eleven years.  Prior to becoming an investigator, I was a paralegal specialist with the FTC for approximately two years.  My business address is Federal Trade Commission, Midwest Region, 230 South Dearborn Street, Suite 3030, Chicago, Illinois 60604.

2.      As an investigator, my duties include monitoring and investigating persons or companies that are suspected of engaging in unfair or deceptive acts or practices in violation of the Federal Trade Commission Act ("FTC Act") and any other laws or rules that the FTC enforces.  I am also custodian of documents and records that the FTC obtains during the course of investigations to which I am assigned.  I previously submitted a declaration in *Federal Trade Commission v. Triangle Media Corporation, et al.*, Case No. 18-cv-01388-MMA (NLS), which I executed on June 20, 2018 (Dkt. #5-3).  Sensitive personal information has been redacted where appropriate from several attachments to this declaration.  In working on this matter, I have acquired personal knowledge and information about the facts stated herein, and, if called, would testify to the same.

PX 11
3

## WELLS FARGO RECORDS

3.      Wells Fargo Bank previously produced records to the FTC concerning bank accounts held by Triangle Media Corporation, and others, including account statements for the period of January 1, 2015 to August 31, 2017.  On July 2, 2018, Wells Fargo Bank was served with a copy of the *Ex Parte* Temporary Restraining Order with an Asset Freeze, Appointment of a Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("TRO").  Pursuant to Section VIII.D of the TRO, Wells Fargo produced account statements for Triangle Media Corporation's account ending in 4362 for September 1, 2017 to June 30, 2018, to the FTC.  The account statements for account ending 4362 show Triangle Media Corporation received regular wire transfers from Hardwire Interactive Inc. from, as early as, January 2015 to June 2018, totaling $14,054,458.46.  I created the below table to show the total monthly amount transferred by Hardwire Interactive Inc. to Triangle Media Corporation:

PX 11
4

1   ALDON F. ABBOTT
    General Counsel
2
3   SAMANTHA GORDON (IL Bar No. 6272135)
    sgordon@ftc.gov
4   MATTHEW H. WERNZ (IL Bar No. 6294061)
    mwernz@ftc.gov
5   Federal Trade Commission
6   230 South Dearborn, Suite 3030
7   Chicago, Illinois 60604
    312.960.5623 (Gordon)
8   312.960.5596 (Wernz)
9   ATTORNEYS FOR PLAINTIFF

10
                **UNITED STATES DISTRICT COURT**
11              **SOUTHERN DISTRICT OF CALIFORNIA**

12
13  FEDERAL TRADE COMMISSION,          Case No.:   18-cv-01388-BEN-NLS

14                          Plaintiff,  Appendix of Declarations in Support
15  v.                                  of Plaintiff's *Ex Parte* Motion for
                                        Temporary Restraining Order with
16  TRIANGLE MEDIA                      Asset Freeze, Appointment of a
17  CORPORATION, a Delaware             Receiver, Other Equitable Relief, and
    corporation, also doing business as Order to Show Cause Why a
18  Triangle CRM, Phenom Health, Beauty Preliminary Injunction Should Not
19  and Truth, and E-Cigs, *et al.*,    Issue

20                          Defendants.  (Volume 2 of 2)
21
22                              **Declarations**

23  **Plaintiff's Exhibit ("PX") 10 – Declaration of Douglas McKenney**................**161**
            Investigator, Federal Trade Commission
24          Attachments
25          McKenney Attachment A........................................229
26          McKenney Attachment B ........................................231
            McKenney Attachment C ........................................234
27          McKenney Attachment D........................................237
28          McKenney Attachment E ........................................241

                              159

g. The processing statistics show that from the date the account was opened, in February 2017, through the date of the CID response, on or about September 29, 2017, Jasper Rain Marketing LLC's JetPay merchant account processed:

    i. 11,524 gross sales totaling $309,367.18;

    ii. 3,236 refunds totaling $64,400.58 (or 20.8% of the gross amount); and

    iii. 381 chargebacks totaling $21,149.54 (or 6.8% of the gross amount).

## **BANK ACCOUNTS**

139. In response to a CID, on or about November 3, 2017, and supplemented on later dates, Wells Fargo Bank produced records for bank accounts opened on behalf of businesses, for which Brian Phillips is a signatory. The records produced by Wells Fargo Bank include account applications, signature card documents, monthly account statements and check images.

140. On or about August 10, 2017, JPMorgan Chase Bank ("Chase Bank") produced records in response to a CID for bank accounts opened on behalf of businesses, for which Brian Phillips is a signatory. The records produced by Chase Bank include account applications, signature card documents, monthly account statements and check images.

**PX 10**
**216**

141. According to the records produced by Wells Fargo Bank, Brian Phillips is the sole signatory on the following bank accounts:

    a. Triangle Media Corporation's Wells Fargo accounts ending x4362, x5584, x1517, x7444, x0130, x1428, x1436, x0572, x0203, x0211, x5717 and x1434;

    b. Direct Access Products LLC's Wells Fargo account ending x4091;

    c. Fast Order Marketing LLC's Wells Fargo account ending x8053;

    d. Kinetic Products Marketing LLC's Wells Fargo account ending x5767;

    e. Little Kite Wellness LLC's Wells Fargo account ending x5759; and

    f. Vital Global Marketing LLC's Wells Fargo accounts ending x1053, and x7355.

142. According to the records produced by Wells Fargo Bank and Chase Bank, Brian Phillips has signing authority on the following bank accounts:

    a. Centered Energy Marketing LLC's Chase Bank account ending x8791;

    b. Everjoy Nutrition LLC's Chase Bank account ending x9688;

    c. Jasper Rain Marketing LLC's Chase Bank accounts ending x3577 and x8529;

    d. Rainbow Drop Wellness LLC's Chase Bank account ending x3017;

**PX 10**
**217**

e. Real Vitality Marketing LLC's Chase Bank account ending x5936;

f. Sunrise Pointe Wellness LLC's Chase Bank account ending x8776 and Wells Fargo account ending x4771;

g. Turbid Elite Marketing LLC's Chase Bank account ending x6683;

h. BH Wellness LLC's Wells Fargo account ending x7745;

i. Blended Wellness Marketing LLC's Wells Fargo account ending x6788;

j. Brand Junction Wellness LLC's Wells Fargo accounts ending x4665, x8210, x5944, and x2070;

k. Clear Option Wellness LLC's Wells Fargo account ending x5572;

l. Great Plains Nutrition LLC's Wells Fargo accounts ending x1236 and x7208;

m. Green Valley Wellness LLC's Wells Fargo accounts ending x1111 and x3007;

n. H1 Marketing LLC's Wells Fargo accounts ending x4799 and x6108;

o. Joint Capital Marketing LLC's Wells Fargo account ending x7516;

p. Mind Wellness Marketing LLC's Wells Fargo account ending x0058;

q. Rivers Edge Marketing LLC's Wells Fargo accounts ending x1228 and x5907;

r. Simple Gig Marketing LLC's Wells Fargo account ending x3061;

**PX 10**
**218**

s. Sunset Orders Marketing LLC's Wells Fargo account ending x4939;

t. Total Market Products LLC's Wells Fargo accounts ending x4558, x8186 and x5936; and

u. Vital Global Marketing LLC's Wells Fargo account ending x6047.

143. I have reviewed the monthly account statements produced by Wells Fargo and Chase Bank for the bank accounts to which Brian Phillips is a signatory, specifically, those business accounts listed in above paragraphs 141.b-f and 142.a-u. Since January 1, 2015, those bank accounts have received over $40 million dollars in deposits from various merchant processors.

### Jasper Rain Marketing LLC

144. Attached hereto as **McKenney Att. V** are true and correct copies of the account applications and signature card documents for Jasper Rain Marketing LLC's Chase Bank accounts ending in x3577 and x8529. Certain identifying information has been redacted from McKenney Att. V. As discussed previously in above paragraph 142.c, Brian Phillips has signing authority on both Jasper Rain Marketing LLC's accounts at Chase Bank.

145. The monthly account statements for account ending in x3577 listed Jasper Rain Marketing LLC's address as 1350 Columbia Street, Suite 303, San Diego, California 92101, the same address as Triangle Media Corporation.

146.   The monthly account statements for account ending x8529 showed deposits from Priority Payment Systems in relation to Jasper Rain Marketing LLC's Cranium Power merchant account.

147.   Triangle Media Corporation's monthly account statements for its Wells Fargo Bank account ending x5584 showed that the company received multiple wire transfers and ACH payments from Jasper Rain Marketing LLC's Chase Bank accounts ending x3577 and x8529, for example:

  a. $18,384.12 on April 20, 2017;

  b. $19,072.87 on June 1, 2017;

  c. $40,000.00 on July 10, July 17, and July 20, 2017;

  d. $22,000.00 on August 4, 2017;

  e. $45,000.00 on August 9, 2017;

  f. $20,000.00 on August 17, 2017;

  g. $12,000.00 on September 19, 2017; and

  h. $11,000.00 on September 26, 2017.

**Triangle Media Corporation**

148.   As previously described above, Brian Phillips is the sole signatory on at least twelve Triangle Media Corporation bank accounts opened at Wells Fargo Bank, specifically the accounts ending in x4362, x5584, x1517, x7444, x0130,

**PX 10**
**220**

x1428, x1436, x0572, x0203, x0211, x5717 and x1434. The monthly statements for these twelve accounts show various levels of activity.

149. Attached hereto as **McKenney Att. W** are true and correct copies of the account applications and signature card documents for three of Triangle Media Corporation's Wells Fargo Bank accounts, specifically the accounts ending in x4362, x5584 and x5717. Certain identifying information has been redacted from McKenney Att. W.

150. Monthly statements for Triangle Media Corporation's Wells Fargo account ending in x5584 show that from January 1, 2015 to September 7, 2017, the account received $27,619,843 in deposits from those Wells Fargo and Chase Bank accounts that Brian Phillips is an authorized signatory, which are listed in above paragraphs 141.b-f and 142.a-u. The same monthly statements further show that during the same period, Triangle Media Corporation wire transferred $26,796,358 to Global Northern Trading Limited's bank accounts at Canadian Imperial Bank of Canada and Royal Bank of Canada.

151. Monthly statements for Triangle Media Corporation's Wells Fargo account ending in x4362 show that it received frequent wire transfers from Hardwire Interactive Inc.'s HSBC Hong Kong bank account, for example:

    a. $138,009.94 on July 10, 2017;

    b. $114,674.50 on July 17, 2017;

**PX 10**
**221**

    c.  $92,435.70 on August 1, 2017;

    d.  $62,011.69 on August 7, 2017;

    e.  $207,287.00 on August 14, 2017;

    f.  $111,569.50 on August 24, 2017;

    g.  $133,706.87 on August 29, 2017;

    h.  $147,016.00 on September 12, 2017;

    i.  $107,171.89 on September 18, 2017;

    j.  $147,127.10 on September 27, 2017; and

    k.  $159,630.00 on September 29, 2017.

152.   The same monthly statements for Triangle Media Corporation's Wells Fargo account ending in x4362 also show frequent transfers to Triangle Media Corporation's Wells Fargo account ending in x5717. Monthly statements for Triangle Media Corporation's Wells Fargo account ending in x5717 show bimonthly payments for payroll and payroll taxes, payments to American Express for the benefit of Brian Phillips, payments to call centers, payments to NobelBiz for telecommunications services, and rent payments for a Tampa office, for example:

    a.  Payments for payroll, for example: $52,265.51 on August 14, 2017, $52,105.55 on August 31, 2017, $52,391.28 on September 14, 2017, and $52,679.90 on September 28, 2017;

**PX 10**
**222**

b. Payments for payroll taxes, for example: $25,414.85 on August 14, 2017, $25,195.90 on August 31, 2017, $25,289.10 on September 14, 2017, and $24,711.86 on September 28, 2017;

c. Payments to American Express to benefit Brian Phillips, for example: $48,603.06 on July 17, 2017, $53,951.31 on August 17, 2017, and $60,504.20 on September 22, 2017;

d. $140,007.70 payment to Infocu5 on June 6, 2016;

e. $28,515.82 payment to ADV Communications Jamaica Limited on July 21, 2017;

f. $41,857.57 payment to NobelBiz on April 21, 2017; and

g. $3,795.83 payment for "Tampa Rent" on August 31, 2017.

## **DEFENDANTS' RELATED ENTITIES**

153. As previously described, Brian Phillips is an authorized signer on multiple business bank accounts at Wells Fargo Bank and Chase Bank, which are listed in above paragraphs 141.b-f and 142.a-u. State corporate registrations for nearly all of those companies do not identify Brian Phillips as an officer, member or managing member. However, some state corporate registrations identify Triangle Media Corporation employees in those roles, specifically:

a. Sierra Owen, an administrative assistant at Triangle Media Corporation, is the current officer, member or managing member of

**PX 10**
**223**

Jasper Rain Marketing LLC, Sunset Orders Marketing LLC, Brand

Junction Wellness LLC, Fast Order Marketing LLC, Everjoy

Nutrition LLC, Rainbow Drop Wellness LLC and Real Vitality

Marketing LLC; and

b.  Brittany Wise, a former client services manager at Triangle Media

Corporation, is the current managing member of Blended Wellness

Marketing LLC and was a managing member of Vital Global

Marketing LLC, until its dissolution on November 15, 2016.

Attached hereto as **McKenney Att. X** is a true and correct printout of

Brittany Wise's profile that I found and printed from LinkedIn on

May 26, 2017.  According to her LinkedIn profile, Brittany Wise

resides in the San Diego, California area.

154.  Additionally, based on online searches, FTC staff has determined that

the primary business address listed on the state corporate registration of each of

these companies corresponds to a virtual office address operated by a third party

such as Regus, or to a residential address, rather than to a business location

operated by the company listed on the corporate registration.  In particular, these

companies' primary business addresses are as follows:

| Company | Address | Address type |
|---|---|---|
| Direct Access | [REDACTED] | Residential |

**PX 10**
**224**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Supplemental

Excerpts of Record on May 8, 2023 using the appellate CM/ECF system. All

participants in the case are registered CM/ECF users, and service will be

accomplished by the CM/ECF system.

Dated: May 8, 2023                    /s/ *Michael D. Bergman*
                                      Michael D. Bergman
                                      Attorney
                                      Federal Trade Commission
                                      600 Pennsylvania Ave., N.W.
                                      Washington, D.C. 20580