**No. 22-56012**

In the

# United States Court of Appeals
## For the Ninth Circuit

———————————

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee,*

v.

TRIANGLE MEDIA CORPORATION, *et al.,*

*Defendants-Appellees.*

v.

WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A., proposed Intervenors,

*Movants-Appellants,*

———————————

THOMAS W. MCNAMARA,

*Receiver-Appellee.*

———————————

On Appeal from the United States District Court
for the Southern District of California
The Honorable Larry Alan Burns
Case No. 3:18-cv-01388-LAB-WVG

———————————

**FURTHER EXCERPTS OF RECORD OF APPELLANTS
WELLS FARGO & COMPANY AND WELLS FARGO BANK, N.A.
Volume 1 of 1**

———————————

*(Counsel listed on following page)*

———————————

June 29, 2023

Kevin M. Lally
MCGUIREWOODS LLP
355 South Grand Avenue
Suite 4200
Los Angeles, CA 90071
T: (213) 457-9862
klally@mcguirewoods.com

David C. Powell
Alicia A. Baiardo
Jenny Yi
MCGUIREWOODS LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
T: (415) 844-9944
dpowell@mcguirewoods.com
abaiardo@mcguirewoods.com
jyi@mcguirewoods.com

Brian D. Schmalzbach
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: (804) 775-1000
bschmalzbach@mcguirewoods.com

*Counsel for Movants-Appellants Wells Fargo & Co.*
*and Wells Fargo Bank, N.A.*

## INDEX

| Docket Number | Document | Page |
|---|---|---|
| 153-1 | Proposed Intervenors Wells Fargo & Company and Wells Fargo Bank N.A.'s Memorandum of Points and Authorities In Support of Motion and Motion to Intervene | FER4 |
| 92 | Receiver's Interim Status Report | FER32 |
| 92-1 | Exhibit A to Receiver's Interim Status Report – Receipts \|and Disbursement Summary | FER41 |

***McNamara v. Wells Fargo & Company, et al.***
**No. 3:21-cv-01245 (S.D. Cal.)**

| | | |
|---|---|---|
| 99-1 | Memorandum of Points and Authorities in Support of Receiver's Motion for Leave to Amend Complaint | FER44 |
| 99-2 | Receiver's Proposed First Amended Complaint | FER51 |
| N/A | *McNamara* Docket Sheet | FER146 |

i

1  **MCGUIREWOODS LLP**
   DAVID C. POWELL (SBN 129781)
2  dpowell@mcguirewoods.com
   ALICIA A. BAIARDO (SBN 254228)
3  abaiardo@mcguirewoods.com
   Two Embarcadero Center, Suite 1300
4  San Francisco, CA 94111-3821
   Telephone: 415.844.9944
5  Facsimile: 415.844.9922

6  **MCGUIREWOODS LLP**
   KEVIN M. LALLY (SBN 226402)
7  klally@mcguirewoods.com
   355 S. Grand Avenue, Suite 4200
8  Los Angeles, CA 90071
   Telephone: 213.627.2268
9  Facsimile: 213.627.2579

10 Attorneys for Proposed Intervenors
   Wells Fargo & Company and
11 Wells Fargo Bank N.A.

12                    **UNITED STATES DISTRICT COURT**

13                  **SOUTHERN DISTRICT OF CALIFORNIA**

14 FEDERAL TRADE                    CASE NO. 18-cv-1388-LAB-LL
15 COMMISSION,
                                    Judge: Hon. Larry Alan Burns
16           Plaintiff,

17      v.                          **PROPOSED INTERVENORS WELLS
                                    FARGO & COMPANY AND WELLS
18 TRIANGLE MEDIA                   FARGO BANK N.A.'S
   CORPORATION;                     MEMORANDUM OF POINTS AND
19 JASPER RAIN MARKETING            AUTHORITIES IN SUPPORT OF
   LLC;                             MOTION AND MOTION TO
20 HARDWIRE INTERACTIVE             INTERVENE
   INC;
21 GLOBAL NORTHERN                  Date: January 10, 2022
   TRADING LIMITED; BRIAN          Time: 11:15 a.m.
22 PHILLIPS; and DEVIN KEER,        Ctrm: 14A

23
             Defendants.
24

25

26

27

28

# **TABLE OF CONTENTS**

Page

MEMORANDUM OF POINTS AND AUTHORITIES..............................................1

I.      INTRODUCTION ...........................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND .....................................2

        A.      FTC's Action Against Defendants..........................................2

        B.      Wells Fargo's Role as Third-Party Witness .............................5

        C.      The Receiver's Appointment and Delegated Authorization.................5

        D.      The Supreme Court Holds that the Plain Language of Section
                13(b) Does Not Permit Recovery of Equitable Monetary Relief .........8

        E.      The Receiver's Complaint Against Wells Fargo ......................10

III.    ARGUMENT ...............................................................................12

        A.      Wells Fargo Is Entitled to Intervene as of Right .......................12

                1.      Wells Fargo's Motion to Intervene is Timely ...........................13

                2.      Wells Fargo has a Significantly Protectable Interest..............16

                3.      Disposition of This Case Will Impair Wells Fargo's
                        Ability to Protect Its Interest ...........................................17

                4.      No Other Party Can Adequately Protect Wells Fargo's
                        Interests.......................................................................177

        B.      Wells Fargo Also Satisfies All of the Requirements of
                Permissive Intervention..........................................................20

                1.      Wells Fargo's Motion to Intervene is Timely ...........................20

                2.      Wells Fargo Shares a Common Question of Law or Fact
                        with This Action ............................................................20

                3.      An Independent Basis for Jurisdiction Exists in this Action.....21

CONCLUSION...............................................................................22

CERTIFICATE OF SERVICE...........................................................23

i

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

5
*Alaniz v. Tillie Lewis Foods*,
   572 F.2d 657 (9th Cir. 1978)..................................................................20

6

7
*AMG Cap. Mgmt., LLC v. FTC*,
   141 S. Ct. 1341 (2021) ...........................................1, 3, 8, 10, 16, 22

8

9
*Beckman Indus. v. Int'l Ins. Co.*,
   966 F.2d 470 (9th Cir. 1992)..................................................................21

10

11
*Cal. Dep't of Toxic Substances Control v. Com. Realty Projects, Inc.*,
   309 F.3d 1113 (9th Cir. 2002) ..........................................................12, 15

12

13
*Citizens for Balanced Use v. Montana Wilderness Ass'n*,
   647 F.3d 893 (9th Cir. 2011)...........................................................12, 16

14
*Day v. Apoliona*,
   505 F.3d 963 (9th Cir. 2007) .................................................................15

15

16
*Freedom from Religion Found., Inc. v. Geithner*,
   644 F.3d 836 (9th Cir. 2011) .................................................................21

17

18
*FTC v. AMG Servs.*,
   2021 U.S. Dist. LEXIS 167700 (D. Nev. Sep. 3, 2021)......................9

19

20
*FTC v. AT&T Mobility Ltd. Liab. Co.*,
   883 F.3d 848 (9th Cir. 2018) ..................................................................22

21

22
*FTC v. Cardiff*,
   No. ED CV 18-2104-DMG, 2021 U.S. Dist. LEXIS 155342 (C.D.
   Cal. June 29, 2021).....................................................................................9

23

24
*FTC v. Hoyal & Assocs., Inc.*,
   2021 WL 2399707 (9th Cir. June 11, 2021)........................................8

25

26
*FTC v. Pantron I Corp.*,
   33 F.3d 1088 (9th Cir. 1994) ...................................................................6

27

28
*FTC v. Publishers Bus. Servs., Inc.*,
   849 F. App'x 700 (9th Cir. 2021)...........................................................8

i

*FTC v. VPL Med., Inc.*,
    846 F. App'x 561 (9th Cir. 2021) ........................................................................... 9

*McNamara v. Wells Fargo & Co. et al.*,
    No. 3:21-cv-01245-LAB-LL (S.D. Cal. July 8, 2021) ........................................ 2

*Nw. Forest Res. Council v. Glickman*,
    82 F.3d 825 (9th Cir. 1996) ........................................................................ 16, 21

*Officers for Justice v. Civil Serv. Comm'n*,
    934 F.2d 1092 (9th Cir. 1991) ................................................................... 13, 15

*In re Outlaw Labs., LP Litig.*,
    No. 18-cv-840-GPC-BGS, 2021 U.S. Dist. LEXIS 129429 (S.D.
    Cal. July 12, 2021) ................................................................................................ 18

*Petrol Stops Northwest v. Continental Oil Co.*,
    647 F.2d 1005 (9th Cir. 1981) ........................................................................... 12

*SEC v. Wencke*,
    622 F.2d 1363 (9th Cir. 1980) ............................................................................. 6

*Smith v. Los Angeles Unified Sch. Dist.*,
    830 F.3d 843 (9th Cir. 2016) ............................................................................. 13

*Spangler v. Pasadena City Bd. Of Ed.*,
    552 F.2d 1326 (9th Cir. 1977) ........................................................................... 20

*Sw. Ctr. for Biological Diversity v. Berg*,
    268 F.3d 810 (9th Cir. 2001) ....................................................................... 12, 17

*The Wilderness Soc'y v. U.S. Forest Serv.*,
    630 F.3d 1173 (9th Cir. 2011) ........................................................................... 12

*U.S. v. Alisal Water Corp.*,
    370 F.3d 915 (9th Cir. 2004) ............................................................................. 13

*U.S. v. City of Los Angeles*,
    288 F.3d 391 (9th Cir. 2002) ............................................................................. 18

*U.S. v. Oregon*,
    745 F.2d 550 (9th Cir. 1984) ....................................................................... 13, 14

ii

1

2
*U.S. v. Palomar-Santiago,*
    141 S. Ct. 1615 (2021) ........................................................................ 12

3

4
*Venegas v. Skaggs,*
    867 F.2d 527 (9th Cir. 1989) .............................................................. 21

5
**Statutes**

6
15 U.S.C. § 53b (FTC Act § 13(b)) ...................................................... *passim*

7
15 U.S.C. § 57b (FTC Act § 19) ............................................................ 3, 8

8
15 U.S.C. § 1693o(c) ............................................................................... 3

9
15 U.S.C. § 8404 ..................................................................................... 3

10

11
**Other Authorities**

12
Fed. R. Civ. P. 24(a) ......................................................................... *passim*

13
Fed. R. Civ. P. 24(b) ......................................................................... *passim*

14
Fed. R. Civ. P. 65 .................................................................................... 5

15
Local Rule 40.1.f-g .......................................................................... 10, 11

16

17

18

19

20

21

22

23

24

25

26

27

28

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S NOTICE OF
MOTION AND MOTION TO INTERVENE

**FER8**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Wells Fargo respectfully asks this Court to allow it to intervene in this action so it may challenge the continuing viability of orders issued in this case authorizing Receiver Thomas W. McNamara ("Receiver") to pursue litigation for over $170 million in monetary damages against Wells Fargo & Company and Wells Fargo Bank N.A. (collectively "Wells Fargo"). In 2019, this Court entered an order authorizing the Receiver to pursue litigation against Wells Fargo ("Wells Fargo Litigation")—which was not a party to this action—based on judgments for equitable monetary relief predicated on Section 13(b) of the Federal Trade Commission Act ("FTC Act"). The Supreme Court recently held, in *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021), that courts cannot award monetary relief under Section 13(b). Given this ruling, Wells Fargo should have the opportunity to explain why the Receiver should not be able to pursue monetary judgment against Wells Fargo. Wells Fargo therefore seeks to intervene in this action to ask the Court to vacate its order authorizing the Receiver to pursue litigation against Wells Fargo.[1]

Wells Fargo is not seeking intervention to contest the judgments imposed against the defendants in this action. It seeks intervention for the limited purpose of challenging the continuing viability of this Court's pre-*AMG Capital* order that allows the Receiver to pursue monetary damages against Wells Fargo. The orders empowering the Receiver to pursue the Wells Fargo Litigation should be vacated or modified to preclude such recovery as they are contrary to *AMG Capital's* directive that monetary damages cannot be awarded under Section 13(b).

Intervention is both proper and necessary as Wells Fargo's claim satisfies the

---

[1] Wells Fargo's proposed motion to vacate the Court's order authorizing the receiver to pursue litigation against Wells Fargo is attached hereto as Exhibit 1.

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S NOTICE OF MOTION AND MOTION TO INTERVENE

FER9

thresholds for intervention as of right, pursuant to Rule 24(a). Wells Fargo's motion to intervene is timely, having been filed just a few months after the Receiver sued Wells Fargo. *See McNamara v. Wells Fargo & Co. et al.*, No. 3:21-cv-01245-LAB-LL (S.D. Cal. July 8, 2021). It is indisputable that Wells Fargo has a significantly protectable interest in avoiding litigation the Receiver should not have been empowered to bring in light of *AMG Capital*, and Wells Fargo's ability to protect this interest will be impaired if the Court does not grant intervention. Further, no other party in the instant action adequately represents Wells Fargo's interests. Given the parties' stipulated judgments suspending more than $170 million in relief, the parties to this action have a decided interest against Wells Fargo.

If the Court does not grant intervention as of right (as it should), the Court should nevertheless exercise its discretion to permit permissive intervention, pursuant to Rule 24(b). Wells Fargo's motion is timely. Wells Fargo's motion to vacate the order authorizing the Receiver to pursue litigation shares common questions of law and fact with this action because the Receiver's action emanates from this action, as reflected by the Receiver's notice of related case. And Wells Fargo's motion to intervene does not attempt to expand the jurisdiction of this Court. Intervention is also appropriate because this Court expressly retained jurisdiction over the Receivership and motions relating to the Receivership, its prior judgments, and its orders in this case. For these reasons, and as described below, Wells Fargo's motion to intervene should be granted.

## II.  **FACTUAL AND PROCEDURAL BACKGROUND**

### A. FTC's Action Against Defendants

The Wells Fargo Litigation is a direct byproduct of this case: a 2018 Federal Trade Commission ("FTC") enforcement action brought pursuant to Section 13(b) of the FTC Act that charged Triangle Media Corporation, its principal owner Brian Phillips, Jasper Rain Marketing, LLC, Hardwire Interactive, Inc., and Global Northern Trading Limited, and Devin Keer (collectively, "Defendants") with

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S NOTICE OF MOTION AND MOTION TO INTERVENE

**FER10**

conducting a multi-tiered scheme that utilized deceptive practices and payment methods to sell millions of dollars of goods to defrauded customers.

In June 2018,[2] the FTC filed both a request for a Temporary Restraining Order and a Complaint for Permanent Injunction and Other Equitable Relief against Defendants, alleging that the Defendants, along with numerous affiliates, subsidiaries, and related entities, engaged in a multi-year fraud scheme that utilized multiple illicit practices—including deceptive "free trial" advertisements, order completion forms, and recurring billing practices and restrictive cancellation and refund practices—to sell millions of dollars of skincare products, electric cigarettes, and dietary supplements. Dkt. 1, at 5-6. As was its standard practice at the time, the FTC elected to forego the administrative procedures and remedies set forth in Section 19 of the FTC Act and instead, pursued both injunctive and equitable monetary relief directly in U.S. District Court for each of the alleged violations under Section 13(b), 15 U.S.C. § 53(b).[3] Dkt. 1 at 2; Dkt. 6 at 22; *see AMG Cap.*, 141 S. Ct. at 1346 (Section 13(b) has long been FTC's predominant enforcement tool). The Court partially granted the FTC's request for a TRO and granted the

_____

[2] A First Amended Complaint was filed on December 11, 2018. Dkt. 101. As it relates to this motion, the two Complaints do not materially differ.

[3] The FTC's Complaint alleged two additional causes of action. First, to the extent defendant's fraudulent practices involved use of deceptive online negative option schemes in which customers were unwittingly enrolled in monthly subscription services, such conduct was alleged to have violated Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404. Dkt. 1 at 20-22. Second, to the extent that the Defendants debited consumer accounts for products without first securing appropriate written approval to do so, such conduct was alleged to have violated Section 918(c) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693o(c).). *Id*. at 28-32. Notably, the Court did not rely on either alleged violation as a basis for appointing the Receiver.

1   FTC's request for a preliminary injunction in August 2018.[4] Dkts. 11 & 75.

2       In May 2019, the parties agreed to two settlements that fully resolved the

3   FTC's claims against the Defendants. Dkts. 121, 126-27. The Court accepted these

4   settlements when, on May 30, 2019, it entered a Modified Stipulated Order for

5   Permanent Injunction and Monetary Judgment as to Defendants Triangle Media

6   Corporation, Jasper Rain Marketing LLC, and Brian Phillips, in which it imposed

7   equitable monetary relief of $48,110,267.14 (the "Triangle Monetary Judgment"),

8   and a Modified Stipulated Order for Permanent Injunction and Monetary Judgment

9   as to Defendants Hardwire Interactive Inc., Global Northern Trading Limited, and

10  Devin Keer, in which it imposed equitable monetary relief of $123,095,438.18

11  ("Hardwire Monetary Judgment"). Dkt. 126 at 12-14, Dkt. 127 at 11-13. Through

12  these settlements, the FTC agreed—and the Court subsequently ordered—that the

13  Defendants needed to pay only a miniscule fraction of the actual judgment imposed,

14  with the remainder to be suspended pending successful completion of post-

15  settlement compliance requirements. *Id.* Specifically the parties to the Triangle

16  Monetary Judgment only were required to pay $399,795.00 of the $48,110,267.14

17  judgment (approximately 2.4%), and the parties to the Hardwire Monetary Judgment

18  only were required to pay $3,027,388.36 of the $123,095,438.18 judgment

19  (approximately 0.8%). *Id.* When coupled with approximately $5,500,000 recovered

20  from the Receivership Estate, the FTC required the Defendants to pay, and

21  Defendants did pay, approximately $9,000,000 of the $174,000,000+ combined

22  monetary judgments (approximately 5%).[5] Dkt.146. The Defendants, in turn, agreed

---

[4] The initial proceedings in this matter, including the TRO and the issuance of the preliminary injunction, were heard by United States District Judge Michael M. Anello. Following Judge Anello's recusal in November 2018, this Court took jurisdiction over this matter. Dkt. 88, 91.

[5] The FTC's public summary of the *Triangle* action notes that it has distributed

4

1  to exceptionally broad concessions in which they "waived all right to appeal or
2  challenge or contest the validity of this Order." Dkt. 126 at 2; Dkt. 127 at 2.

3      **B. Wells Fargo's Role as Third-Party Witness**

4      Throughout the entirety of the FTC proceedings, Wells Fargo was a third-
5  party corporate witness. In this capacity, it responded to subpoenas providing the
6  FTC with account and other documentary information relating to select accounts
7  opened by Defendants. As such, Wells Fargo was not a party to the underlying
8  litigation or the settlement.

9      **C. The Receiver's Appointment and Delegated Authorization**

10     The Court temporarily appointed the Receiver in June 2018, when it decided
11 the FTC's TRO application, which sought pursuant to Section 13(b),[6] "a temporary
12 equity receiver to take control of corporate Defendants Triangle Media Corporation,
13 Jasper Rain Marketing, LLC, Hardwire Interactive, Inc., and their assets." Dkt. 6 at
14 22, 35. In doing so, the Court ruled that it "has authority to issue this order pursuant
15 to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Fed. R. Civ. P. 65; and the All
16 Writs Act." Dkt. 11 at 5. Under this authority, the Court empowered the Receiver to
17 pursue monetary relief by "su[ing] for, collect[ing], and receiv[ing], all Assets of the
18 Receivership Entities and of other persons or entities whose interests are now under
19 the direction, possession, custody, or control of, the Receivership Entities," and by
20 "[i]nstitut[ing . . .] or otherwise becom[ing] party to any legal action . . . to preserve

21
22 _____

23 "checks totaling more than $8.7 million to 187,425 people" who acquired Triangle
24 products through the fraudulent scheme. RJN, Ex. F, Triangle Media Refunds, FTC
   (June 2020), available at https://www.ftc.gov/enforcement/cases-
25 proceedings/refunds/triangle-media-refunds (last accessed November 10, 2021).

26 [6] Dkt. 6 at 22, 35 ("Section 13(b) of the FTC Act authorizes the Commission to
27 seek, and this Court to issue, temporary, preliminary, and permanent injunctions"
   and allows for the appointment of a receiver as an appropriate remedy in the FTC's
28 pursuit of monetary damages.)

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S NOTICE OF
MOTION AND MOTION TO INTERVENE

**FER13**

or recover the Assets of the Receivership Entities, or to carry[ing] out the Receiver's mandates under this Order, including actions challenging fraudulent or voidable transfers." Dkt. 11 at 19, 21.

The Court made the Receiver's appointment permanent in August 2018, when it granted the FTC's request for a preliminary injunction. Dkt. 74. In doing so, the Court again expressly cited Section 13(b) as the basis of its "'broad authority to fashion appropriate remedies for violations of the [FTC] Act . . .[which] encompasses equitable powers such as the ordering of restitution, the freezing of assets, and the imposition of a receivership.' *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994); *Reebock Int'l Ltd. v. Martnatech Entres.*, Inc., 970 F.2d 552, 560 (9th Cir. 1992); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980)." Dkt. 74 at 10.

In May 2019, as part of the stipulated judgments resolving all claims between the FTC and the Defendants, the parties agreed to a 90-day period for the Receiver to complete its duties under previously entered orders. Dkt. 126 at 16-17;Dkt. 127 at 15-16. This Court adopted the parties' stipulations and instructed the Receiver to transfer the $4,000,000 previously acquired from the Defendant's companies and assets to the FTC, liquidate any remaining corporate assets, prepare a final report, and submit a final bill as part of the wind-down process. Dkt. 126 at 16; Dkt. 127 at 15.

On August 27, 2019 (one day before the ordered termination date), the Receiver asked this Court to extend its authorization for an additional 90 days to allow it "to complete its investigation and evaluation of a potential receivership estate lawsuit against a domestic financial institution."[7] Dkt. 129 at 1. In support of this request, the Receiver cited to its duty to recover "Assets of the Receivership

---

[7] The domestic financial institution was later identified as Wells Fargo.

Entities and institute . . . proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the assets of the Receivership Entities" and claimed, without documentation, that its review of "troubling conduct" by the financial institution subsequently identified as Wells Fargo indicated that there "may be a viable lawsuit against the financial institution." *Id*. at 2. The Receiver further noted that the expected litigation costs from this potential suit would be high, requested this Court authorize the retention of contingency fee counsel to pay such costs, and noted that it would immediately shut down the Receivership if this lawsuit was not pursued as it was "the last issue to resolve prior to terminating the Receivership." *Id.*

The government filed a "statement of non-opposition" to this request. Dkt. 137. The Defendants opposed the request to extend the Receivership, in part because the Receiver had been in possession of the documents on which the lawsuit against Wells Fargo would be based since July 2018 and should have proceeded with its lawsuit in a timelier manner. Dkt. 130 at 1-2. This Court initially resolved this dispute by halving the Receiver's extension request to 45 days. Dkt. 134. When the Receiver subsequently indicated its intent to proceed with a lawsuit against Wells Fargo to seek what it identified as a potentially "significant" monetary settlement, this Court, on November 18, 2019, ordered that: (1) this case be "administratively closed" as to the Defendants; (2) the Receiver's request to hire contingency fee counsel to fund this lawsuit be granted; (3) the Receiver's authorization would be extended "for the sole purpose of pursuing litigation against Wells Fargo"; and (4) until that lawsuit resolved, this Court would "continue to retain jurisdiction over the Receivership [and that . . .] matters related to the Receivership or enforcement of this Court's judgments, filings and other proceedings in this matter may therefore continue until further order of this Court." Dkt. 136 at 1; Dkt. 142 at 3.

### D. The Supreme Court Holds that the Plain Language of Section 13(b) Does Not Permit Recovery of Equitable Monetary Relief

While in November 2019, the Receiver signaled his intention to proceed with a lawsuit against Wells Fargo for monetary damages, he did not file his Complaint until July 8, 2021, twenty months later. Dkt. 136 at 1, Dkt. 142 at 3; Request for Judicial Notice ("RJN"), Ex. C, Wells Fargo Litig. Complaint. In the interim, the United States Supreme Court unanimously held that Section 13(b) was limited in scope to prospective injunctive relief and "did not grant the [FTC] authority to obtain equitable monetary relief." *AMG Cap.,* 141 S. Ct. at 1352. In doing so, the Supreme Court acknowledged that its decision effectively invalidated the principal enforcement mechanism the FTC had utilized for decades, albeit without lawful authority, to recover billions of dollars in damages and disgorgement (including the $1.27 billion judgment imposed as a remedy for the deceptive payday lending practices utilized by AMG Capital) as part of the injunctive proceedings brought before district courts at the outset of FTC actions. *Id.* at 1346-1349. The *AMG Capital* Court, in turn, explained that the FTC Act did permit recovery of limited equitable monetary relief to provide redress to consumer injuries – but did so under Section 19 – which requires the FTC to first proceed administratively against a targeted entity, and which places procedural restrictions (*i.e.*, three-year statute of limitations) and substantive limitations (*i.e.*, reasonable man standard; restitution but not exemplary or punitive damages) on such actions. *Id*. at 1348-49; *see also,* 15 U.S.C. § 57b.

Following the *AMG Capital* decision, the Ninth Circuit has vacated all FTC matters on direct appeal that included monetary awards based on Section 13(b) and remanded these matters to the district courts for further proceedings consistent with *AMG Capital. See, e.g.*, *AMG Cap. Mgmt.*, 998 F.3d 897 (9th Cir. 2021) (summarily reversing district court's award of equitable monetary relief to the FTC and remanding to district court for further proceedings); *FTC v. Hoyal & Assocs., Inc.*,

2021 WL 2399707 (9th Cir. June 11, 2021) (vacating the district court's equitable monetary judgment in light of *AMG Capital* but affirming the permanent injunction issued pursuant to Section 13(b)); *FTC v. Publishers Bus. Servs., Inc.,* 849 F. App'x 700 (9th Cir. 2021) (same); *FTC v. VPL Med., Inc.,* 846 F. App'x 561 (9th Cir. 2021) (vacating monetary judgment under Section 13(b)). The FTC, likewise, has conceded that Section 13(b) cannot be a basis for monetary relief in cases pending on direct review before a District or Circuit Court. *FTC v. AMG Cap. Services, Inc.*, 12-cv-00536-GMN-VCF (D. Nev. April 2, 2012) ("*AMG Services Inc.*"); RJN, Ex. B, Dkt. 1311 at 3 ("monetary relief awarded in this case will be vacated because it was predicated on Section 13(b) authority that no longer exists"). Two district courts, including the court in the *AMG Capital* matter,[8] have terminated receiverships/monitorships when implementing the *AMG Capital*-decision in post-*AMG Capital* Section 13(b) proceedings. *FTC v. AMG Servs.*, 2021 U.S. Dist. LEXIS 167700, at *37-38 (D. Nev. Sep. 3, 2021) (issuing summary judgment in favor of defendants, denying re-instatement of $1.27 billion judgment as monetary relief could not be obtained through Section 13(b), and ordering termination of monitorship, which had been involved in collections, settlement negotiations, and litigation against third parties); *FTC v. Cardiff*, No. ED CV 18-2104-DMG (PLAx), 2021 U.S. Dist. LEXIS 155342 * 5, 17-22, 25-28 (C.D. Cal. June 29, 2021) (denying FTC's ability to seek damages under alternative theories of liability and

---

[8] The Receiver here, Thomas McNamara, served as the Court-appointed Monitor in the *AMG Capital* proceedings. Following the issuance of the Supreme Court decision in that case, he conceded that the Monitor "no longer has the authority to pursue the [related litigation stemming from the underlying FTC action which were initiated pursuant to the duties conferred upon him by the court] in light of the Supreme Court's reversal of the monetary judgment" and that he "is of the view that he must dismiss the actions as part of the wind down process." RJN, Ex. A., *FTC v. AMG Servs.,* Dkt. 1333 at 1-2.

9

ordering termination of the receivership as there were no monetary damages to pursue.).

### E. The Receiver's Complaint Against Wells Fargo

The Receiver, undeterred by the Supreme Court's holding in *AMG Capital*, continued in its long-running pursuit of monetary relief from Wells Fargo. This culminated with the filing of the Wells Fargo Litigation on July 8, 2021.[9] RJN, Ex. C, WF Litig. Complaint. The Wells Fargo Litigation includes a dozen allegations sounding principally in fraud based upon Wells Fargo purportedly having "actual knowledge" of the independent Triangle and Apex fraud schemes and providing substantial assistance to aid and abet the Defendants in those separate schemes as they conducted the fraud that served as the basis of the underlying FTC actions. *Id*. It seeks monetary damages, including disgorgement of fees Wells Fargo charged for its banking services and satisfaction of the "'Receivership Entities' legal obligations to satisfy the FTC judgments." *Id*. at 6. Stated differently, the Wells Fargo Litigation involves a Receiver, who was appointed and empowered pursuant to Section 13(b) to pursue monetary damages based on an interpretation of Section 13(b) that has been invalidated by the Supreme Court.

In conjunction with filing the Complaint in the Wells Fargo Litigation, the Receiver filed a Notice of Related Case under Civil Local Rule 40.1.f-g in which the Receiver asserted that the newly filed Wells Fargo Litigation should be assigned to this Court to avoid a "substantial duplication of labor." RJN, Ex. D, Notice of Related Cases. Specifically, the Receiver cited Rule 40.1.g's requirement that the

---

[9] The Wells Fargo Litigation also incorporated allegations based on a separate and wholly unrelated FTC Action, *FTC v. Apex Capital Group, LLC, et al*., 18-cv-09573-JFW-JPR (C.D. Cal. November 11, 2018), in which the Receiver also was appointed, and which utilized a similar fraud scheme. As the Receiver filed near identical motions in that matter, Wells Fargo is also moving to intervene in that matter to challenge orders related to the scope of the Receiver's authority.

"related" matters involve "some of the same parties and [be] based on the same or similar claims" or involve "substantially the same facts and the same questions of law" and affirmatively asserted that "one or more of these criteria are met." *Id*. The Receiver further explained that "[t]he plaintiff in this lawsuit is the court-appointed receiver in the Triangle Media and Apex Capital actions" and that the Receiver "brings this action against the Defendants for conduct arising out of the same underlying facts at issue in the foregoing lawsuits, including, inter alia, Defendants alleged aiding and abetting of the fraudulent schemes at issue therein." *Id*. The clerk's office, in turn, assigned the matter to this Court, finding that it involved both "the same or substantially identical transactions, happenings, or events," and the "determination of the same or substantially identical questions of law." RJN, Ex. E, WF Litig. Order of Transfer. The clerk's order further stated that, while the Wells Fargo Litigation had been assigned to this Court, that case and the Triangle case "are NOT CONSOLIDATED at this point; all pleadings must still be filed separately in each case." *Id*. (*emphasis in original*).

Wells Fargo now seeks to intervene in this action to challenge the continuing viability of the orders addressing the scope of the Receiver's lawful delegation of duties to pursue monetary damages, when that Receiver has been appointed and empowered to act pursuant to Section 13(b), particularly given that any monetary recovery will be added to the balance of funds that remain outstanding from the FTC's pre-*AMG Capital* Section 13(b)-based settlements with the Defendants. Intervention in this matter is appropriate as Wells Fargo has satisfied the requirements of both Fed. R. Civ. P. 24(a) and 24(b) and this Court, in this action, expressly maintained jurisdiction over the Receivership and left open to future filings "matters related to the Receivership or enforcement of this Court's judgments." Dkt. 142 at 3. This is precisely what Wells Fargo's motion will address.

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S NOTICE OF MOTION AND MOTION TO INTERVENE

**FER19**

# III. <u>ARGUMENT</u>

The Court should grant Wells Fargo's motion to intervene as a matter of right. If, however, the Court determines that Wells Fargo is not entitled to mandatory intervention, the Court should exercise its discretion to allow permissive intervention.

## A. Wells Fargo Is Entitled to Intervene as of Right

Pursuant to Fed. R. Civ. P. 24(a), an applicant is entitled to intervene as a matter of right if four conditions are met: (1) the application is timely; (2) the applicant has a "significant protectable interest" in the action; (3) "the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest;" and (4) "the existing parties may not adequately represent the applicant's interest." *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011). The proposed intervenor bears the burden to demonstrate that the requirements of Rule 24 have been met. *Petrol Stops Northwest v. Continental Oil Co.,* 647 F.2d 1005, 1010 (9th Cir. 1981). The Ninth Circuit construes "Rule 24(a) liberally in favor of potential intervenors" and assesses motions for intervention "primarily by practical considerations, not technical distinctions." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 818 (quotation and citation omitted). Such a "liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *The Wilderness Soc'y v. U.S. Forest Serv.,* 630 F.3d 1173, 1179 (9th Cir. 2011). Because this Court expressly has maintained jurisdiction over both the Receivership and motions relating to its prior orders and judgments in this case, the appropriate means for doing so is through the filing of a Rule 24(a) motion in this case. Dkt. 142 at 3; *U.S. v. Palomar-Santiago*, 141 S. Ct. 1615, 1622 (2021) (collateral attack doctrine requires that challenge to an order be made in case in which the order was issued).

FER20

## 1. Wells Fargo's Motion to Intervene is Timely

Motions to intervene as of right must be timely pursued. FED. R. CIV. P. 24(b)(1); *Cal. Dep't of Toxic Substances Control v. Com. Realty Projects, Inc.,* 309 F.3d 1113, 1119 (9th Cir. 2002). "Timeliness is a flexible concept." *U.S. v. Alisal Water Corp.,* 370 F.3d 915, 921 (9th Cir. 2004); *see also Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016) (holding motion to intervene timely even though 20 years passed since plaintiff commenced the action after a change in circumstances occurred).When assessing timeliness, courts should weigh: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for, and length of, the delay. *Smith*, 830 F.3d at 854. Each of these factors weighs in favor of Wells Fargo and supports a finding that Wells Fargo's Motion is timely.

### i. *Intervention at this Stage in the Litigation is Appropriate*

To determine whether intervention is timely at the current stage of litigation, the court must consider whether "a party's interest in a specific phase of a proceeding may support intervention." *Alisal Water*, 370 F.3d at 921. "Where a change of circumstances occurs, and that change is the 'major reason' for the motion to intervene, the stage of proceedings factor should be analyzed by reference to the change in circumstances, and not the commencement of the litigation." *Id.* 854. The crucial date for assessing the timeliness of a motion to intervene is when proposed intervenors should have been aware that their interests would not be adequately protected by the existing parties. *Officers for Justice v. Civil Serv. Comm'n,* 934 F.2d 1092, 1095 (9th Cir. 1991)*; U.S. v. Oregon,* 745 F.2d 550, 552 (9th Cir. 1984).

The current stage of the proceedings is appropriate for Wells Fargo's intervention motion. Although the FTC filed its action against Defendants in 2018, Wells Fargo was, and always has been, nothing more than a third-party witness in this case. The FTC never charged Wells Fargo as either a defendant or a relief defendant, and never named Wells Fargo in any court filing in this matter as one of

13

the many identified companies that either directly participated in the charged

conduct or otherwise aided and abetted such conduct. Dkts. 1, 101, 126-27. On the

contrary, the FTC marshalled its evidence, charged the responsible parties (*i.e.*, the

Defendants), fully resolved its case against the Defendants, and agreed to the

administrative closure of this case without involving Wells Fargo in any way other

than in its traditional role as a third-party financial institution witness (which

included issuing subpoenas to Wells Fargo for the bad actor companies' bank

account statements). *Id*.

Moreover, while the Receiver, operating under a series of orders issued by

this Court, has pursued its separate investigation against Wells Fargo from at least

some point before the FTC's 2019 stipulated settlement with the Defendants in this

action, it only has been within the past several months that changed circumstances

arose such that intervention by Wells Fargo in this matter is warranted. Specifically,

it was not until April of this year that the Supreme Court held in *AMG Capital* that

the FTC lacked authority to obtain equitable monetary relief under Section 13(b) of

the FTC Act. The Receiver then filed the Wells Fargo Litigation in July 2021,

notwithstanding *AMG Capital*, seeking to prospectively recover monetary

judgments potentially exceeding $160,000,000 based on the outstanding balance in

the equitable monetary judgments awarded to the FTC as part of the underlying

Section 13(b) proceedings. RJN, Ex. C, WF Litig. Complaint. It was only at this

time that an actionable dispute warranting intervention arose. Given these recent

material changes in circumstance, it is appropriate for Wells Fargo to file its

intervention motion at this time.

### ii. *Wells Fargo's Proposed Intervention Will Not Unduly Delay or Prejudice the Parties*

Wells Fargo's intervention in this action at this time also will not "unduly

delay or prejudice the adjudication of the original parties' rights." FED. R. CIV. P.

24(b)(3). All allegations against the Defendants charged in this action have been

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S NOTICE OF
MOTION AND MOTION TO INTERVENE

**FER22**

1  fully resolved, and this Court ordered the case administratively closed as to the

2  original parties over two years ago. Dkts. 126-27, 142. As directly requested by the

3  Receiver and explicitly acknowledged in this Court's November 18, 2019 order, the

4  Receiver's continued authorization to operate in this action is limited exclusively to

5  one purpose: its pursuit of litigation against Wells Fargo. Dkt. 129 at 1-2; Dkt. 136

6  at 1; Dkt. 142 at 3. Because Wells Fargo's intervention motion seeks to address

7  orders in an otherwise closed matter, it cannot cause either undue delay or prejudice

8  to those original parties.[10] *Cal. Dep't of Toxic Substances Control*, 309 F.3d at 1120;

9  *see also Day v. Apoliona*, 505 F.3d 963, 966 (9th Cir. 2007) (granting motion to

10  intervene two years after action was filed, where intervention would not prejudice

11  existing parties or delay litigation).

12  ### iii.  *Wells Fargo Has Not Delayed in Seeking Intervention*

13  Wells Fargo also has not delayed in seeking to intervene. As discussed above,

14  grounds supporting intervention as of right only recently arose, with the *AMG*

15  *Capital* decision in April 2021 and the filing of the Wells Fargo Litigation, which

16  ignored the bright-line legal principal adopted in *AMG Capital*, in July 2021. RJN,

17  Ex. C, WF Litig. Complaint. In the brief period since the filing of the Wells Fargo

18  Litigation, it has become apparent that none of the parties to the instant action can,

19  or will, adequately represent Wells Fargo's interests in ensuring that the orders

20  delegating authority to the Receiver conform with the Supreme Court's holding in

21  *AMG Capital*. *See Officers for Justice*, 934 F.2d at 1095 (the focus of the length of

22  delay prong is on when "the person attempting to intervene should have been aware

23  his interests would no longer be protected adequately by the parties, rather than the

24

25  _____

26  [10] Again, Wells Fargo's substantive motion will not seek to disturb the previously

27  issued judgments against the Defendants and instead will address the scope of the
Receiver's authority to pursue monetary damages against Wells Fargo post-*AMG*

28  *Capital*.

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S NOTICE OF
MOTION AND MOTION TO INTERVENE

date the person learned of the litigation"). Wells Fargo has acted deliberately and expeditiously to protect its interests once an actionable claim materialized. Accordingly, this final factor, like the two before it, supports a finding in favor of the timeliness of Wells Fargo's motion.

## 2. Wells Fargo has a Significantly Protectable Interest

It is indisputable that Wells Fargo has a significant protectable interest in this action. *Citizens for Balanced Use*, 647 F.3d at 897 (citing *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996)) (a significantly protectable interest exists when the proposed intervenor can establish an interest that is protectable under some law and that is related to the claims at issue.). Wells Fargo has a significantly protectable interest in not having to defend itself against litigation that this Court authorized based on an invalidated legal principle.

The Wells Fargo Litigation was brought only after the Receiver acquired multiple orders from this Court: (1) extending the Receivership well past the conclusion of the FTC action so the Receiver could conduct a multi-year investigation into whether Wells Fargo had legal culpability arising from the Defendants' opening and use of accounts at Wells Fargo; (2) permitting the Receiver to retain contingency counsel to fund the litigation when the Receiver stated he would forego the suit and conclude the Receivership if its own funds were needed to pay for the litigation; and (3) expressly authorizing the Receiver to pursue litigation for monetary recovery from Wells Fargo to reduce the outstanding balance of the approximately $165,000,000 in judgments that remain unrecovered in the FTC's Section 13(b) enforcement action. Dkt. 129, 136, 142. While these orders, when issued, were generally aligned with Circuit precedent, it is now known, post-*AMG Capital*, that they were plainly erroneous to the extent that they allowed for monetary recovery under Section 13(b). *AMG Cap. Mgmt.*, 141 S. Ct. at 1348-1349.

Wells Fargo must now defend itself in the Wells Fargo Litigation, which is based on orders authorizing the Receiver's pursuit of monetary relief against Wells

16

Fargo. Accordingly, Wells Fargo has a significantly protectable interest that it should be permitted to pursue in this case under Rule 24(a).

### 3. Disposition of This Case Will Impair Wells Fargo's Ability to Protect Its Interest

It is equally indisputable that Wells Fargo's ability to protect its interests will be impaired if intervention is not granted. Fed. R. Civ. P. 24(a)(2); *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001). ("If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.") Absent intervention, the status quo will remain, and the Receiver, despite being empowered based on a fundamental misunderstanding of the actual equitable remedies permitted by Section 13(b), will remain unchecked in his efforts to secure redress that is now known to be impermissible under Section 13(b). It is only through intervention that Wells Fargo properly can address fundamental determinations regarding the scope of the Receiver's authority to seek monetary redress against Wells Fargo through the Wells Fargo Litigation. This includes determining whether this Court's prior orders authorizing the Receiver to pursue monetary damages against Wells Fargo can or should remain in place. This Court expressly retained jurisdiction over the Receivership and matters relating to "the enforcement of the Court's judgments." Dkt. 142 at 3. The questions to be litigated directly address these very issues. What is first required, however, is that Wells Fargo be permitted to intervene to protect these interests.

### 4. No Other Party Can Adequately Protect Wells Fargo's Interests

Simply stated, no party to this action can or will defend, much less adequately defend, Wells Fargo's interests. On the contrary, each has a directly competing interest that virtually ensures that, absent intervention, issues related to the appropriate scope of the Receiver's authority and actions post-*AMG Capital* will never be addressed in this case. *U.S. v. City of Los Angeles*, 288 F.3d 391, 398 (9th

17

Cir. 2002) (whether the movant's interests are adequately represented by the current parties depends on three factors: (1) "whether the interest of a present party is such that it will undoubtedly make all the [movant's] arguments"; (2) "whether the present party is capable and willing to make such arguments"; and (3) "whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect."). The FTC rightfully considers its case against the actual wrongdoers, the Defendants, to be complete. Dkt. 142 at 3. Its interests, therefore, lie squarely with protecting the finality of the order administratively closing the case against the Defendants, and thereby preserving the monetary judgments the FTC obtained against Defendants under what is now recognized to be an invalid theory of recovery under Section 13(b).

The Defendants, likewise, entered into highly favorable stipulated settlements with the FTC, and in return, agreed to waive all challenges to the validity of the monetary judgments and to cooperate with the FTC in matters relating to their settlement. Dkt. 126 at 16, Dkt. 127 at 14; *see, e.g., In re Outlaw Labs., LP Litig.*, No. 18-cv-840-GPC-BGS, 2021 U.S. Dist. LEXIS 129429, at *11 (S.D. Cal. July 12, 2021) (holding that a settling party agreeing to restrictions in a settlement cannot adequately represent a non-party in the litigation). Moreover, these very Defendants previously succeeded in limiting the ongoing authority of the Receiver to pursuing Wells Fargo and have no interest in altering that ruling because any funds the Receiver extracts from Wells Fargo would reduce their outstanding obligations to the FTC in the event that the suspended judgments are one day re-imposed due to violations of the forward-facing compliance requirements set forth in the permanent injunction orders. Dkt. 130 at 1-2, Dkt. 142 at 3.

Most compellingly, the Receiver's actions throughout this case vividly demonstrate that it neither can, nor will, seek to protect Wells Fargo's interests in securing a full and fair resolution of the issues relating to the proper scope of the Receiver's delegated duties in this action. The Receiver's pursuit of monetary

18

recovery from Wells Fargo has been nothing short of Quixotic. It has been marked
by the pursuit of a company that the FTC neither charged nor assigned any
culpability to in its settlement agreements. Dkts. 1, 101, 126-27. It has trudged along
for years after the FTC, which initially requested the Receiver's appointment,
entered into a stipulated agreement recommending a near-immediate wind down of
the Receivership. Dkt. 126 at 16, Dkt. 127 at 15. It has required the retention of
contingency counsel to provide basic funding, as the Receiver conceded that the suit
against Wells Fargo would not be an effective use of Receivership assets. Dkt. 129
at 1-2. It has persisted undeterred by either the *AMG Capital* decision (which
involved this very same Receiver who served as the court-appointed Monitor in that
case) or the Receiver's own acknowledgment in that case—the very same month he
filed the lawsuit against Wells Fargo—that the *AMG Capital* decision required that
all Monitor-related actions be terminated and/or unwound. The Receiver currently is
embroiled in the Wells Fargo Litigation, with unfounded claims of culpability and
the Receiver's efforts to use the authority provided to it under Section 13(b) to
recover significant monetary damages for the purpose of adding to the FTC's
Section 13(b)-based monetary judgments. RJN, Ex. C, WF Litig. Complaint. The
Receiver will continue until an interested party in this case acts to curb this
overreach and to realign the scope of the Receiver's rightful duties with the current
state of the law post-*AMG Capital*.

There is no entity other than Wells Fargo that has the particularized interest to
challenge the orders authorizing the Receiver to continue forward for the sole
purpose of pursuing monetary damages against it. Likewise, there is no entity better
positioned than Wells Fargo to make the necessary arguments how the Receiver's
current actions in that pursuit are contrary to law. Intervention by Wells Fargo,
therefore, is both necessary and appropriate.

Wells Fargo has established its right to mandatory intervention under Rule
24(a). This Court should grant its motion to intervene.

19

**FER27**

## B. Wells Fargo Also Satisfies All of the Requirements of Permissive Intervention

In the alternative, the Court may exercise its discretion to allow permissive intervention. In instances when intervention as of right is unavailable, permissive intervention can be obtained by a proposed intervenor provided the following three threshold requirements are met: (1) the motion is timely filed; (2) a common question of law or fact shared with the main action exists; and (3) an independent basis for the court to exercise jurisdiction over its claims is present. Fed. R. Civ. P. 24(b). District courts have broad discretion to grant permissive intervention under Rule 24(b). *See Spangler v. Pasadena City Bd. Of Ed.*, 552 F.2d 1326, 1329 (9th Cir. 1977). As explained below, Wells Fargo also meets the test for permissive intervention.

### 1. Wells Fargo's Motion to Intervene is Timely

Motions for permissive intervention also must be timely made. Fed. R. Civ. P. 24(b)(1). As addressed in detail above, Wells Fargo's motion is timely as it acted expeditiously to pursue intervention after the Receiver filed the Wells Fargo Litigation in July 2021, pursuing claims inconsistent with the letter and spirit of the Supreme Court's holding in *AMG Capital* which prohibits the recovery of monetary damages under Section 13(b) of the FTC Act. *See supra,* Section III.A.1; RJN, Ex. C, WF Litig. Complaint. Therefore, there exists ample basis for this Court to exercise its broad discretion to allow for intervention. *Alaniz v. Tillie Lewis Foods,* 572 F.2d 657, 659 (9th Cir. 1978).

### 2. Wells Fargo Shares a Common Question of Law or Fact with This Action

A potential intervenor need only show that it has a "claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B); *Beckman Indus. v. Int'l Ins. Co.,* 966 F.2d 470, 473 (9th Cir. 1992); *see Venegas v. Skaggs,* 867 F.2d 527, 530 (9th Cir. 1989) (district court may exercise its

20

discretion in permitting intervention where common questions of law or fact exists). There can be no question this requirement has been met because the Receiver asserted, and thereby conceded, this very fact when he filed a notice of related case with the Complaint in the Wells Fargo Litigation. RJN, Ex. D at 2 (Receiver "brings this action against the Defendants for conduct arising out of the same underlying facts at issue in the foregoing lawsuits, including, inter alia, Defendants alleged aiding and abetting of the fraudulent schemes at issue therein.")[11] Similarly, the clerk made findings on this very issue when assigning the Wells Fargo Litigation to this Court, citing to both the commonality of facts and legal issues. Thus, this factor weighs heavily in favor of a grant of permissive intervention.

### 3. An Independent Basis for Jurisdiction Exists in this Action

An applicant that seeks permissive intervention also must establish an independent basis for jurisdiction. *Nw. Forest Resource Council v. Glickman*, 82 F.3d 825, 839 (9th Cir. 1996). This requirement is primarily concerned with avoiding the inappropriate expansion of the district court's jurisdiction. *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011). Permitting Wells Fargo to intervene in this action will not expand the Court's jurisdiction.

---

[11] Other common issues and facts include: (1) whether this Court's orders authorizing the Receiver to pursue monetary damages against Wells Fargo must be withdrawn or otherwise modified in light of the *AMG Capital* holding; (2) should the Receiver be permitted to continue with this suit, whether any monetary judgment recovered could properly be added to offset outstanding balances on monetary judgments that were imposed pursuant to Section 13(b) and became final prior to the issuance of the *AMG Capital* decision; and (3) whether there exists any outstanding monetary damages to rightfully pursue given that the stipulated judgments between the parties suspended the entirety of the judgments beyond what had been paid at the time the suspension order was issued.

PROPOSED INTERVENORS WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S NOTICE OF MOTION AND MOTION TO INTERVENE

1         This Court expressly retained jurisdiction over the Receivership and motions

2    relating to its prior orders and judgments. Dkt. 142 at 3. The related case order

3    transferring the Wells Fargo Litigation to this Court made clear that the two cases,

4    while related, had not been consolidated and that motions needed to be filed in the

5    appropriate case. RJN, Ex. E, Order Relating Cases. By seeking to intervene in this

6    matter to contest the continued viability of the orders allowing the Receiver to

7    pursue monetary relief against Wells Fargo post-*AMG Capital*, Wells Fargo is

8    merely recognizing the independent basis for jurisdiction that exists within this case

9    and is complying with, rather than expanding, that jurisdiction *AMG Cap. Mgmt.*,

10   141 S. Ct. at 1348-1349; *see also, FTC v. AT&T Mobility Ltd. Liab. Co*., 883 F.3d

11   848, 853 (9th Cir. 2018) (holding that district court had federal question jurisdiction

12   because the dispute of the FTC Act arose under federal law).

13        As Wells Fargo's motion satisfies all of the requirements for permissive

14   intervention, this Court should exercise its discretion and grant its Rule 24(b)

15   motion.

16   **<u>CONCLUSION</u>**

17        For the foregoing reasons, this Court should grant Wells Fargo's motion for

18   intervention.

19

20   DATED: November 10, 2021       Respectfully submitted,

21                       **MCGUIREWOODS LLP**

22

23                      */s/ Alicia A. Baiardo*

24                     David C. Powell, Esq.

25                     Kevin M. Lally, Esq.
                       Alicia A. Baiardo, Esq.

26                     *Counsel for Proposed Intervenors*

27                     *Wells Fargo & Company and Wells Fargo*
                       *Bank, N.A.*

28

22

**FER30**

# CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2021, I electronically filed the foregoing document entitled with the Clerk of the Court for the United States District Court, Southern District of California using the CM/ECF system and served a copy of same upon all counsel of record via the Court's electronic filing system. Any counsel of record who has not consented to or registered for electronic service through the Court's CM/ECF system will be served by electronic mail, first class mail, facsimile, and/or overnight delivery.

By: */s/ Alicia A. Baiardo*
Alicia A. Baiardo

CERTIFICATE OF SERVICE

**FER31**

1 | Andrew W. Robertson (SBN 62541)
arobertson@mcnamarallp.com
2 | Edward Chang (SBN 268204)
echang@mcnamarallp.com
3 | McNamara Smith LLP
655 West Broadway, Suite 1600
4 | San Diego, California 92101
Telephone: 619-269-0400
5 | Facsimile:  619-269-0401

6 | *Attorneys for Court-Appointed Receiver*
*Thomas W. McNamara*

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10

11 | FEDERAL TRADE COMMISSION, | Case No. 3:18-cv-01388-LAB-LL

12 | Plaintiff, | **RECEIVER'S INTERIM STATUS REPORT**

13 | v.

14 | TRIANGLE MEDIA CORPORATION, a | JUDGE:    Hon. Larry Alan Burns
Delaware corporation, also doing business | CTRM:     14A
15 | as Triangle CRM, Phenom Health, Beauty
and Truth, and E-Cigs; JASPER RAIN
16 | MARKETING LLC, a California limited
liability company, also doing business as
17 | Cranium Power and Phenom Health;
HARDWIRE INTERACTIVE INC., a
18 | British Virgin Islands corporation, also
doing business as Phenom Health, Beauty
19 | and Truth, and E-Cigs; and BRIAN
PHILLIPS, individually and as an officer
20 | of Triangle Media Corporation,

21 | Defendants.

22

23

24

25

26

27

28

**FER32**

# RECEIVER'S INTERIM STATUS REPORT

## I.    INTRODUCTION

On June 29, 2018, this Court entered a Temporary Restraining Order with Asset Freeze and appointed Thomas W. McNamara as Temporary Receiver of the Receivership Entities (ECF No. 11) ("TRO").[1]  The Receiver filed his Preliminary Report on July 16, 2018 (ECF No. 30) and Declaration on August 6, 2018 (ECF No. 59), which recounted in detail the initial implementation of the receivership, summarized Defendants' operations and finances, and documented his conclusions that the business could not be operated lawfully and profitably going forward.  A hearing on the request for Preliminary Injunction hearing was held on August 9, 2018.  Afterwards, the Court entered a Preliminary Injunction, extended to the same Receivership Entities identified in the TRO, and appointed Mr. McNamara the Permanent Receiver ("Receiver") (ECF No. 75).

Since the entry of Preliminary Injunction, the Receiver has vacated office space, worked to secure electronic records held by a third-party, and coordinated with the parties as needed.[2]  However, the Receiver's primary focus has been the recovery of Defendants' assets in the U.S. and internationally.  Thus far, more than $1 million has been received from U.S. payment processors, and we are making efforts to recover funds held by foreign payment processors.

---

[1]  Receivership Entities are defined to include Triangle Media Corporation (d/b/a Triangle CRM, Phenom Health, Beauty and Truth and E-Cigs), Jasper Rain Marketing LLC (d/b/a Cranium Power and Phenom Health), Hardwire Interactive (d/b/a Phenom Health, Beauty and Truth, and E-Cigs) and each of their subsidiaries, affiliates, successors, and assigns, "as well as any other entity that has conducted any business related to Defendants' marketing of negative option offers, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant."  TRO, Definition N, page 8.

[2]  By the end of August 2018, we vacated the Tampa location and returned the office space to the landlord.  The Tampa business records and computers are now stored in San Diego.  Defendants also used Amazon Web Services ("AWS") to host virtual servers and store business records.  We are working with AWS to secure Defendants' business records.

## II.   SUMMARY OF RECEIVERSHIP ACTIVITIES

### a.   Nominee Merchant Accounts

As previously reported, the success of Defendants' business was dependent on the ability to charge consumers' credit cards.  In order to do so, Defendants amassed hundreds and hundreds of nominee – or straw owner – merchant accounts in the U.S. and internationally.  *See* ECF No. 30 at 12-14; ECF No. 30-12.  In turn, Defendants had to orchestrate the establishment of a like number of corporate entities, purportedly owned by the nominees or straw owners.  These nominee corporate entities were a necessary first step to opening the nominee merchant accounts.

### i.   U.S. Payment Processors

Defendants established hundreds of U.S. corporate entities over the life of the scheme.  At the time of this lawsuit, there were 33 U.S. corporate entities with at least 75 nominee merchant accounts at U.S. payment processors (many of which had been closed due to chargebacks).  To date, we recovered more than $1 million from nominee merchant accounts in the U.S. – the bulk of which came from payment processor Priority Payment Systems ($1,025,796.51).

Priority Payment Systems identified 37 nominee merchant accounts, all of which were closed by early February 2018.  Payment processors may hold reserve balances to protect themselves against returns or chargebacks from consumers even after merchant accounts are closed.  Typically, payment processors hold the reserve balances for 180 days post-closing of accounts.  Since the nominee merchant accounts at Priority Payment Systems were closed in early February 2018, we requested Priority Payment Systems release the reserve balances to the Receiver.  By late September 2018, we received $1,025,796.51 from Priority Payment Systems.

Paysafe Payment Processing Solutions, LLC ("Paysafe US") reported 37 nominee merchant accounts, of which 24 accounts held $253,665.80 in reserves

as of late September 2018.  Of the 24 merchant accounts with reserve balances, 15 accounts were closed by late April, so the 180-day hold on these reserve balances expired in late October.  On November 9, we received $139,586.13 from Paysafe US for the released reserve balances.  We expect the remaining reserve balances ($112,651.58 at present) will be available for release in late January 2019.

Other U.S. payment processors used by Defendants have represented they hold no additional reserve balances at this point.  We will continue to monitor the situation and pursue any additional funds owed to nominee merchant accounts.

### ii.     International Payment Processors

For the international nominee merchant accounts, Defendants worked closely with a middleman, independent sales organization Processing.com to acquire a stable of international merchant accounts.  At the time of this lawsuit, there were roughly two hundred foreign nominee corporate entities registered in U.K., Bulgaria, and France.  Each nominee entity, in turn, had several merchant accounts.  As a result, there were nearly 600 nominee merchant accounts processing customer transactions in U.S. dollars (315 accounts), euros (145 accounts), sterling pounds (124 accounts), Norwegian kroner (1 account), and Danish kroner (1 account).

Upon receipt of the TRO, Processing.com notified the international payment processors on July 2, 2018.  These payment processors, Borgun, CashFlows Europe Limited ("CashFlows"), E-Comprocessing ("ECP"), Kalixa Accept Ltd. ("Kalixa"), Paysafe Financial Services Limited ("Paysafe UK"), and Transact Europe, were instructed to pause transactions settlements and hold funds for the nominee merchant accounts.  On July 10, Processing.com provided copies of the TRO to Borgun, CashFlows, Kalixa, and Paysafe UK.[3]

///

---

[3] ECP has seven merchant accounts, of which only one has a small positive balance of approximately $100.

In late July 2018, Processing.com provided documents to the Receiver. Based on these documents, Borgun, CashFlows, Kalixa and Paysafe UK are holding significant amounts of money for the nominee merchant accounts:[4]

| Processor | U.S. Dollars | Euros | Sterling Pounds | Norwegian Kroner |
|---|---|---|---|---|
| Borgun | $287,035.00 | €713,780.00 | | |
| Cashflows | $1,235,021.45 | €442,873.15 | £176,761.12 | |
| Kalixa | $37,449.64 | €727,710.66 | £31,500.90 | kr 471,586.04 |
| Paysafe UK | $551,231.09 | | | |
| Transact Europe | $57,046.14 | €880,923.91 | £446,932.64 | |
| Total | $2,167,783.32 | €2,765,287.72 | £655,194.66 | kr 471,586.04 |

Processing.com forwarded our request that the international payment processors release the funds to the Receiver. We have yet to receive any funds. We have instituted direct contact with Borgun, CashFlows, Kalixa, and Paysafe UK and will continue to pursue the funds.

**b.  Foreign Nominee Entities**

In late August 2018, Defendant Hardwire Interactive Inc. ("Hardwire") contacted the Receiver and requested that he pay approximately $75,000 for corporate services and renewals related to 16 U.K. entities – £50,000 to R & L Partnership ("R&L") and £8,000 to Processing.com. Hardwire reported that the entities must remain in good standing in order to recover reserve funds from payment processors. Upon further review, we discovered the directors of these 16 U.K. entities resigned en masse on August 2, 2018.

///

---

[4]  Some merchant accounts, including the merchant account that processed Danish kroner, have a negative balance. These accounts were excluded from the above summary.

1    In the U.K., Companies House, U.K.'s registrar of companies, may strike off
2    (i.e., dissolve) a company if it is not carrying on business, not in operation, has no
3    directors, or has not made certain requisite filings.  However, before Companies
4    House strikes off a company, it is required to send notice to the company and
5    publish notice in the newspaper stating its intention to strike the company from the
6    register.  Provided there is no response, Companies House will strike off the
7    company two months after publication in the newspaper.  For these 16 U.K.
8    entities, Companies House started the strike off process on October 23, 2018.  The
9    entities may be stricken off the register around December 23.

10   In order to keep the 16 U.K. entities in good standing, Hardwire reported
11   that R&L has "a network of individuals in Europe who are retained for nominee
12   directorship services" and Processing.com "handles the corporate annual filings."
13   Without a director, Companies House will eventually strike off the 16 U.K.
14   entities.  According to Hardwire and based on their counsel's prior experience, to
15   recover reserve funds from payment processors, entities must remain in good
16   standing.  Hardwire therefore proposed that the Receiver continue the use of
17   nominee directors (arranged by R&L) for the 16 U.K. entities.

18   Given our discomfort in continuing the charade of nominee directors, and
19   because we have roughly 60 U.K. entities in which this issue is likely to surface,
20   we engaged U.K. counsel.[5]  She contacted Companies House to explain the
21   existence of this lawsuit and the Receiver.  Companies House seems receptive to
22   delaying the strike off process, so that the Receivership Entities can remain in good
23   standing and receive the reserve funds held by the international payment
24   processors.  The tentative plan, based on the guidance provided by Companies
25   House, is that our U.K. counsel will file an objection to the striking off of the

26   _____

27   [5]  Depending on the response from the international payment processors, we may
     have to engage Bulgarian and French counsel to keep the approximately 130
28   Bulgarian and 10 French entities in good standing while we pursue the merchant
     account funds.

entities on the grounds that they are holding proceeds of Defendants' negative option sales which are subject to the receivership. U.K. counsel recommends that we file the objection as soon as possible and no later than December 7. Based on U.K. counsel's conversation with Companies House, she believes the objection will stop the striking off process. To assist U.K. counsel and to prevent Companies House from striking off any U.K. entity that has a nominee merchant account, we may seek an order from the Court specifically identifying each foreign entity as a Receivership Entity.[6]

### c.    San Diego Condo

At the time of the lawsuit, Receivership Defendant Flat6 Development LLC ("Flat6") was in escrow to sell its downtown San Diego office condo. Upon learning of the escrow, we immediately contacted the selling broker and later the escrow agent. After getting the necessary background information, we reported we had no objection to the sale and confirmed the sales proceeds would be forwarded to a receivership bank account. After several extensions, the selling broker contacted us to report that the buyer could not complete the transaction. The broker recommended that Flat6 accept a pending back-up offer. After getting additional background from the broker, the Receiver indicated that he had no objection to proceeding with the back-up offer. That sale should close by the end of January 2019.[7]

## III.    RECEIVERSHIP ACCOUNTING

Attached as Exhibit A is a Receipts and Disbursements Summary from appointment on June 29, 2018 through November 9, 2018. During this time

---

[6] We attempted to obtain such an order through a stipulation, but Defendants refused the stipulation. Accordingly, we anticipate filing a motion.

[7] The original offer was for $520,000. The back-up offer is for $40,000 less, $480,000. The broker represented that the $480,000 sales price was reasonable and at market, and that the purchaser is known and will complete the purchase in short order.

1  period, receipts were $2,910,303.37, primarily comprised of transfers from the

2  Receivership Entities' frozen bank accounts ($1,190,170.36), Receivership

3  Entities' merchant accounts ($1,170,293.64), Hardwire's Hong Kong bank account

4  ($549,839.37), and the sales proceeds from the sale of Defendant Brian Phillips'

5  house ($497,686.49).  Disbursements were $206,643.64, primarily comprised of

6  professional fees approved by Order on September 25, 2018 (ECF No. 85)

7  ($81,909.39 for Receiver's fees and costs; $61,166.39 for legal fees and costs;

8  $15,741.36 for computer forensics expert and IT consultant; and $8,167.50 for

9  forensic accountant fees), $39,200.00 released to Defendant Brian Phillips for

10  living expenses as agreed upon between the FTC and Defendant Brian Phillips, and

11  $459 for private investigators.  In aggregate, the receivership bank accounts have a

12  current balance of $3,204,603.30.

13  Dated:  November 9, 2018                    MCNAMARA SMITH LLP

14

15                                             By:   /s/ Edward Chang
                                                   Edward Chang
16                                                 *Attorneys for Court-Appointed Receiver,*
                                                   *Thomas W. McNamara*
17                                                 Email: echang@mcnamarallp.com

# CERTIFICATE OF SERVICE

1

2    I hereby certify that on the 9th day of November, 2018, the foregoing
document was electronically transmitted to the Clerk's Office using the CM/ECF
3    System for filing, and for transmittal of a Notice of Electronic Filing to all
counsel of record who are deemed to have consented to electronic service via the
4    Court's CM/ECF system per Civil Local Rule 5.4.

5    **VIA CM/ECF**                          **VIA CM/ECF**
Samantha Gordon                       Adam L. Braverman
6    Matthew H. Wernz                      United States Attorney
Federal Trade Commission              Rebecca G. Church
7    230 South Dearborn, Suite 3030        Assistant U.S. Attorney
Chicago, Illinois 60604               Office of the U.S. Attorney
8    Tel.: 312-960-5623 (Gordon)           880 Front Street, Room 6293
Tel.: 312-960-5596 (Wernz)            San Diego, CA 92101-8893
9    sgordon@ftc.gov                       Tel.: 619-546-7701/7721
mwernz@ftc.gov                        Fax: 619-546-7751
10   *Attorneys for Plaintiff Federal Trade*   rebecca.church@usdoj.gov
*Commission*                          *Attorneys for Plaintiff Federal Trade*
11                                         *Commission*

12   **VIA CM/ECF**                          **VIA CM/ECF**
Frederick K. Taylor                   Ari N. Rothman
13   Matthew B. Shields                    Witt W. Chang
Nicholas S. Kawuka                    Venable LLP
14   Procopio Cory Hargreaves              2049 Century Park East, Suite 2300
  and Savitch LLP                     Los Angeles, CA 90067
15   525 B Street, Suite 2200              Tel.: 310-229-9900
San Diego, CA 92101-4469              Fax: 310-229-9901
16   Tel.: 619-238-1900                    anrothman@venable.com
Fax: 619-235-0398                     wchang@venable.com
17   fkt@procopio.com                      *Attorneys for Defendant Hardwire*
matthew.shields@procopio.com          *Interactive Inc.*
18   nka@procopio.com
*Attorneys for Defendants Triangle*
19   *Media Corporation; Jasper Rain*
*Marketing, LLC; and Brian Phillips*
20
**VIA CM/ECF**
21   Gerald S. Sachs / Stephen R. Freeland
Venable LLP
22   600 Massachusetts Ave. NW
Washington, DC 20004
23   Tel.: 202-344-4000
Fax: 202-344-8300
24   gssachs@venable.com
srfreeland@venable.com
25   *Attorneys for Defendant Hardwire*
*Interactive Inc.*
26

27    /s/ Edward Chang
Edward Chang
28   *Attorneys for Court-Appointed Receiver,*
*Thomas W. McNamara*

**FER40**

1

## **INDEX OF EXHIBITS**

2    Exhibit                                                                                      Page

3      A       Receipts and Disbursement Summary ..................................................... 1

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FER41**

Case 3:18-cv-01388-CAB-WMC Document 92-1 Filed 11/09/18 PageID.2568 Page 2 of 3

EXHIBIT A

**FER42**

**Triangle Media Receivership**
**Receipts and Disbursements Summary**
**June 29, 2018 through November 9, 2018**

Receipts

| | | | |
|---|---|---|---|
| | Assets Transferred | $ | 2,910,303.37 |
| | (Proceeds collected from payment processors, | | |
| | frozen bank accounts, and Defendant Hardwire | | |
| | Interactive's Hong Kong bank account) | | |
| | Sale of Brian Phillips' House | $ | 497,686.49 |
| | Sale of Equipment & Furniture | $ | 1,969.50 |
| | Receivership Money Market Acct. Interest | $ | 1,287.58 |
| Total Receipts | | $ | 3,411,246.94 |

Disbursements

| | | | | | |
|---|---|---|---|---|---|
| | Release of Funds to B. Phillips* | | | $ | (39,200.00) |
| | Professional Fees | | | $ | (166,984.64) |
| | Receiver's Fees and Costs | $ | (81,909.39) | | |
| | Legal Fees and Costs | $ | (61,166.39) | | |
| | IT Consultants | $ | (15,741.36) | | |
| | Forensic Accountants | $ | (8,167.50) | | |
| | Private Investigators | | | $ | (459.00) |
| Total Disbursements | | | | $ | (206,643.64) |

Net Cash at 11/09/2018          $ 3,204,603.30

* In accordance with Preliminary Injunction [75], page 11, lines 17-23.

EXHIBIT A
Page 1

**FER43**

1  LOGAN D. SMITH (#212041)
   CORNELIA J.B. GORDON (#320207)
2  **MCNAMARA SMITH LLP**
   655 West Broadway, Suite 900
3  San Diego, California 92101
   Telephone:   619-269-0400
4  Facsimile:   619-269-0401
   Email: lsmith@mcnamarallp.com
5
   LIONEL Z. GLANCY (#134180)
6  JONATHAN M. ROTTER (#234137)
   GARTH A. SPENCER (#335424)
7  **GLANCY PRONGAY & MURRAY LLP**
   1925 Century Park East, Suite 2100
8  Los Angeles, California 90067
   Telephone:   310-201-9150
9  Facsimile:   310-201-9160
   Email: info@glancylaw.com
10
11 *Attorneys for Receiver, Thomas W. McNamara*

12              **UNITED STATES DISTRICT COURT**
13              **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 14  THOMAS W. MCNAMARA, as the Court-Appointed Receiver for Triangle Media Corporation, Apex Capital Group, LLC; and their successors, assigns, affiliates, and subsidiaries, | Case No. 3:21-CV-01245-LAB-DDL |
| 17              Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RECEIVER'S MOTION FOR LEAVE TO AMEND COMPLAINT** |
| 18              v. | [Filed concurrently with Notice of Motion] |
| 19  WELLS FARGO & COMPANY, a corporation, WELLS FARGO BANK, N.A., a national banking association, | Hearing Date: June 12, 2023 |
| 22              Defendants. | |

23
24
25
26
27
28

Plaintiff, Thomas W. McNamara ("Plaintiff" or "Receiver"), in his capacity as the court-appointed receiver for the Triangle and Apex Enterprises, hereby moves for leave of Court to file the First Amended Complaint (the "FAC," filed herewith as Exhibit A) against Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo," the "Bank," or "Defendants").

## I. Introduction

The Receiver respectfully seeks leave of Court to amend the complaint to add allegations that the Court recently found sufficient to allege Wells Fargo's knowledge of fraud against consumers by the Triangle and Apex Enterprises in *McCraner v. Wells Fargo*, Case No. 3:21-cv-1246-LAB, and thus conform to the Court's ruling in *McCraner*.

## II. Procedural History

The Receiver initiated this action on July 8, 2021 by filing his original complaint (Dkt No. 1) ("Original Complaint"). At the same time, counsel for the Receiver also filed *McCraner v. Wells Fargo*, Case No. 3:21-cv-1246-LAB, on behalf of a class of consumers harmed by Wells Fargo's aiding and abetting of the Apex and Triangle frauds. The Original Complaint and the initial *McCraner* complaint contained similar factual allegations concerning Wells Fargo's misconduct, alleging that Wells Fargo knowingly facilitated the Apex and Triangle Enterprises' fraud against both merchant processers and consumers.

The Court found that the Original Complaint sufficiently alleged Wells Fargo's knowledge of the fraud against merchant processors, but not against consumers, allowing this action to proceed to discovery on certain claims. *See generally* Dkt No. 20 (order granting in part and denying in part motion to dismiss). In *McCraner*, the Court similarly found that the initial complaint in that action did not sufficiently allege Wells Fargo's knowledge of fraud against consumers, and so dismissed all claims with leave to amend. *See generally*

---

1

Case No. 3:21-cv-01245-LAB-DDL
MOTION FOR LEAVE TO AMEND

1  *McCraner v. Wells Fargo & Co.*, 2022 WL 959646 (S.D. Cal. Mar. 30, 2022)
2  (order granting motion to dismiss).

3      The *McCraner* plaintiffs then filed an amended complaint, containing
4  detailed new allegations showing Wells Fargo's knowledge of the consumer fraud,
5  based on evidence including email communications between Wells Fargo and the
6  Apex and Triangle Enterprises. *See McCraner*, Case No. 3:21-cv-1246-LAB, Dkt
7  No. 23 (*McCraner* amended complaint), at ¶¶215-42; *see also McCraner*, Case No.
8  3:21-cv-1246-LAB, Dkt No. 23-1 (redline comparison of *McCraner* amended
9  complaint to original). Recently, on March 30, 2023, the Court denied in
10 substantial part Wells Fargo's motion to dismiss the amended *McCraner*
11 complaint, finding those new allegations sufficient to allege Wells Fargo's
12 knowledge, and aiding and abetting, of consumer fraud by the Apex and Triangle
13 Enterprises. *See generally McCraner*, Case No. 3:21-cv-1246-LAB, Dkt No. 40
14 (order denying in part motion to dismiss amended complaint).

15  **III.   The Receiver's Proposed First Amended Complaint**

16      In the proposed First Amended Complaint (filed herewith as Exhibit A), the
17 Receiver adds the same factual allegations showing Wells Fargo's knowing
18 facilitation of the Apex and Triangle Enterprises' fraud against consumers that the
19 Court recently found sufficient to state a claim in the *McCraner* action. *See* Exhibit
20 B (filed herewith) (redline comparison of the FAC to the Original Complaint), at
21 ¶¶207-34. For example, the Receiver's FAC contains the same allegations cited by
22 the Court in upholding the sufficiency of the *McCraner* amended complaint:

| Receiver FAC ¶ | *McCraner* AC ¶ | Court's description of allegation (*McCraner* Dkt No. 40) |
|---|---|---|
| 211 | 219 | email to Phillips stating "we need to close [a Triangle-affiliated] account as Wells stated it was a prohibited business type (negative option followed by a free or low cost trial)" |

| Receiver FAC ¶ | *McCraner* AC ¶ | Court's description of allegation (*McCraner* Dkt No. 40) |
|---|---|---|
| 212 | 220 | email from Phillips to a Wells Fargo banker stating "we specialize in high risk continuity business. I'm pretty sure Wells doesn't provide processing for those business types." |
| 220 | 228 | emails between Apex personnel discussing Wells Fargo's revocation of an Apex-affiliated merchant processing account because Well Fargo "found the recurring billing model too risky" |
| 224 | 232 | Plaintiffs allege Wells Fargo placed a hold on the account of an Apex-affiliated LLC due to a high volume of chargebacks. |
| 225-30 | 233-38 | The FAC includes communications stemming from that hold which highlight the number of chargebacks that Wells Fargo, as a credit card issuer, was processing from the LLC's account. |
| 227-28 | 235-36 | The most common reasons consumers requested chargebacks were: "fraudulent transaction," "unauthorized transactions," "cancelled recurring transaction, and "refund not processed." |

As the Court held in *McCraner*, "[t]hese newly pleaded facts are sufficient to plausibly allege that Wells Fargo had actual knowledge that the Enterprises were engaging in fraudulent sales practices." *McCraner*, Case No. 3:21-cv-1246-LAB, Dkt No. 40 at 10.

In addition to adding the above-described allegations, the Receiver's FAC also streamlines his Original Complaint, in light of the Court's rulings in the instant case and in *McCraner*. In opposing Wells Fargo's motion to dismiss, the Receiver withdrew his claims for breach of fiduciary duty and unjust enrichment, and has likewise removed those causes of action from the FAC. *See* Dkt No. 16 at 25 (motion to dismiss opposition brief). The Court has previously dismissed the Receiver's claims for negligence, negligent supervision, and violation of the California Unfair Competition Law, Cal. Bus & Prof. Code § 17200, which the

Receiver no longer asserts in the FAC. *See* Dkt No. 20 (order grating in part and denying in part motion to dismiss the Original Complaint) at 15-18.

Finally, although the Court previously dismissed the Receiver's claim for violation of Cal. Penal Code § 496 (*see* Dkt No. 20 at 16-17), the Receiver's FAC remedies any pleading defect as to that claim, and so that claim is included in the FAC. As the Court recently ruled in *McCraner*, the new allegations contained in the *McCraner* amended complaint (which are also in the Receiver's FAC) overcome the reasons for the Court's prior dismissal of this claim. *See McCraner*, Case No. 3:21-cv-1246-LAB, Dkt No. 40 at 14-16 ("Because the Court has also determined that the FAC sufficiently alleges that Wells Fargo knew the Enterprises were defrauding consumers . . . the FAC plausibly states a claim for receiving stolen property in violation of California Penal Code § 496").

## IV.    Legal Standards

A party may amend its pleading with the court's leave, and "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "This policy is to be applied with extreme liberality." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (internal quotes and citation omitted).

> When deciding whether to grant leave to amend, courts consider five factors: undue delay, bad faith on the part of the movant, undue prejudice to the opposing party, whether the plaintiff has previously amended the complaint, and futility of amendment.

*Green v. United States Forest Serv.*, 2023 WL 2254549, at *2 (S.D. Cal. Feb. 27, 2023) (Burns, J.) (citing *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) and *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "The party opposing amendment bears the burden of show[ing] why leave should be denied." *Green*, 2023 WL 2254549, at *2. "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence*, 316 F.3d at 1052 (emphasis in original).

## V.    Argument

Here, each of the five *Foman* factors weighs heavily in favor of allowing the Receiver to file the FAC. First, there has been no undue delay. The Receiver is promptly moving to add allegations to his complaint shortly after those same allegations were upheld by the Court in the *McCraner* case. Second, the Receiver's proposed amendment is made in good faith to advance the merits of his claims, and not for any improper purpose.

Third, allowing the Receiver to file the FAC will not cause undue prejudice to Wells Fargo. From the outset of this action (and even earlier, during the parties' pre-filing discussions), the Receiver has made clear to Wells Fargo his claim that it knew of and facilitated the Apex and Triangle Enterprises' frauds against consumers. Such allegations featured prominently in the Original Complaint. *E.g.*, Original Complaint ¶244 (Wells Fargo "accept[ed] as deposits funds which Wells Fargo knew were fraudulently obtained from consumers"). Indeed, *Wells Fargo* has taken discovery concerning its own knowledge of the Apex and Triangle consumer frauds. For example, Wells Fargo's twenty-seventh request for production of documents seeks "[a]ll Documents . . . where the Enterprises provided any information to Wells Fargo . . . that it marketed, advertised, promoted, or sold any Products through risk-free trial offers, Negative Options, or similar sales tactics." And Wells Fargo has even noticed depositions in this action of three of the *McCraner* consumer plaintiffs. As such, the Receiver's proposed amendment comes as no surprise, and cannot prejudice Wells Fargo.

Fourth, the Receiver has not previously amended his complaint, further weighing in favor of granting leave to amend. Fifth, the proposed amendment is not futile. On the contrary, as determined by the Court's recent decision in *McCraner*, the new allegations sufficiently state a claim as to Wells Fargo's knowing assistance of the Enterprises' consumer frauds.

VI.    **Conclusion**

For the foregoing reasons the Receiver respectfully requests that the Court grant leave to file the First Amended Complaint.

Respectfully Submitted,

DATED: April 19, 2023            By:*/s/  Garth A. Spencer*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Jonathan M. Rotter
Garth A. Spencer
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  310-201-9150
Facsimile:   310-201-9160
Email: info@glancylaw.com

**MCNAMARA SMITH LLP**

Logan D. Smith
Cornelia J.B. Gordon
655 West Broadway, Suite 900
San Diego, California 92101
Telephone:  619-269-0400
Facsimile:   619-269-0401
Email: lsmith@mcnamarallp.com

*Attorneys for Court-Appointed Receiver*
*Thomas W. McNamara*

**FER50**

# EXHIBIT A

**FER51**

LOGAN D. SMITH (#212041)
CORNELIA J.B. GORDON (#320207)
**MCNAMARA SMITH LLP**
655 West Broadway, Suite 900
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401
Email: lsmith@mcnamarallp.com

LIONEL Z. GLANCY (#134180)
JONATHAN M. ROTTER (#234137)
GARTH A. SPENCER (#335424)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-201-9160
Email: info@glancylaw.com

*Attorneys for Receiver, Thomas W. McNamara*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS W. MCNAMARA, as the Court-Appointed Receiver for Triangle Media Corporation, Apex Capital Group, LLC; and their successors, assigns, affiliates, and subsidiaries,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO & COMPANY, a corporation, WELLS FARGO BANK, N.A., a national banking association,<br><br>Defendants. | Case No. 3:21-CV-01245-LAB-DDL<br><br>**RECEIVER'S FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) Aiding and Abetting Fraud;**<br>**(2) Conspiracy to Commit Fraud;**<br>**(3) Aiding and Abetting Breach of Fiduciary Duty;**<br>**(4) Aiding and Abetting Conversion;**<br>**(5) Violation of California Penal Code § 496;**<br>**(6) Aiding and Abetting Fraudulent Transfers and/or Voidable Transfers; and**<br>**(7) Request for an Accounting**<br><br>**JURY TRIAL DEMAND** |

Plaintiff, Thomas W. McNamara ("Plaintiff" or "Receiver"), in his capacity as the court-appointed receiver for the Triangle and Apex Enterprises, as defined below, hereby brings the following Complaint against Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo," the "Bank," or "Defendants") and alleges the following.

I.   **INTRODUCTION: A NEW REVELATION OF WELLS FARGO'S FACILITATION OF CONSUMER FRAUD**

1.    The Receiver brings this action against Wells Fargo to recover damages suffered as a result of Wells Fargo's knowing provision of substantial assistance to two multi-million-dollar fraudulent schemes perpetrated by the former operators of Triangle Media Corporation ("Triangle") and Apex Capital Group ("Apex").[1]

2.    The Receiver was appointed after the Federal Trade Commission ("FTC") brought lawsuits against the Triangle and Apex Enterprises in 2018.   The Enterprises ran similar, though separate, Internet risk-free trial schemes marketing dozens of products, most of which were personal care products and dietary supplements that purported to promote enhanced weight loss, hair growth, clear skin, muscle development, sexual performance, and cognitive abilities.  Consumers were offered "free" trials of the products for "just the cost of shipping and handling," usually $4.95.  Two weeks after consumers signed up for the "trial," they were charged the full price of the product (roughly $90) and enrolled in continuity programs, which continued to ship products on a monthly basis— charging the consumer the full $90 each time, of course.  Cancellation was difficult and obtaining a refund was nearly impossible.  The schemes, a category of frauds

---

[1] Triangle and Apex, along with their related entities and the individuals controlling those entities, are referred to herein as the "Triangle Enterprise" and the "Apex Enterprise," respectively, and collectively as the "Enterprises."

**FER53**

known as "negative option schemes,"[2] were incredibly successful, raking in more than $200 million from consumers.

3. To execute the schemes, the Enterprises recruited unrelated individuals (sometimes referred to as "fronts", "signors", "nominees" or "straw owners") and paid them a modest monthly fee for the use of their names and identities to establish approximately 100 shell companies. The Enterprises then immediately turned to Wells Fargo, which opened scores of Wells Fargo bank accounts – more than 150 in total[3] – in the names of the shell companies. Having the Wells Fargo bank accounts was a prerequisite for the Enterprises to secure accounts with merchant processors, which the Enterprises needed to accept consumers' credit and debit card payments.

4. Crucially, the Enterprises were able to obtain continued access to accounts with merchant processors, while concealing the identities of the Enterprises' owners from the merchant processors. The practice of processing credit card transactions through other companies' merchant accounts is known as "credit card laundering," and it is an unlawful practice used by fraudulent merchants, like the Enterprises, to circumvent credit card associations' monitoring programs and avoid detection by consumers and law enforcement. Wells Fargo knew that the Enterprises were defrauding the merchant processors through the use of unlawful tactics like credit card laundering, among others. It assisted the Enterprises in this ongoing fraud by, *inter alia*, opening bank accounts for the Enterprises' shell companies and providing bank reference letters, without which

---

[2] "Risk-free" trial scams are sometimes referred to as negative option scams, because they require consumers to affirmatively opt out (*i.e.*, exercise a negative option) of a program to avoid being charged.

[3] References to the numbers of Apex and Triangle-related bank accounts identified herein are estimates based on calculations made by the Receiver using only on information presently available to him. The number is likely to grow when information on Wells Fargo is received in discovery.

the Enterprises' consumer fraud (of which Wells Fargo was also fully aware) could not have continued. By providing the assistance that it did, Wells Fargo participated in the victimization of consumers.

5. Through his independent investigation, which gave him access to the Enterprises' email communications with Wells Fargo and Wells Fargo bank account statements, the Receiver discovered that Wells Fargo was providing substantial, knowing assistance to both the Triangle and Apex Enterprises' sales scams.

6. Wells Fargo bankers were aware of the Enterprises' risk-free trial schemes, understood the people listed as "owners" of the Wells Fargo accounts did not actually own or control them, and knew the Enterprises were engaged in credit card laundering. Despite this knowledge, Well Fargo gladly opened ***more than 150 bank accounts for the shell companies and straw owners***, ***sometimes opening as many as 6 bank accounts in one day***. Wells Fargo then allowed millions of dollars to be deposited in the accounts, knowing that these funds were unlawfully obtained in the risk-free trial schemes, and afterwards allowing the Enterprises' operators to transfer their ill-gotten gains from the shell accounts to third-party bank accounts, including accounts located outside of the United States.

7. The principals of the Apex and Triangle Enterprises came to rely heavily upon Wells Fargo to aid their frauds by providing them with law oversight and atypical banking services, widely deviating from accepted banking standards and violating applicable banking laws and regulations. As one telling example of this from very early in the Triangle scheme, owner Brian Phillips recruited a son and his mother to serve as straw owners of two of the shell companies Phillips actually owned. Wells Fargo promptly opened the bank accounts for the shell companies, listing the straw owners as "owners" of the accounts, and gave Phillips complete control over the shell accounts to Phillips. When the son expressed concerns that Wells Fargo might call his unaware mother to conduct due diligence

into the relationship, Phillips plainly explained that it was Wells Fargo, and that would not be happening, emailing him:



From: Brian Phillips <brian@trianglemediacorp.com>
Sent: Friday, November 11, 2011 8:18 PM
To: Marty
Subject: Re: Please see attached document

Dude, you still don't understand how wells is totally different. The bank won't be calling her

On Nov 11, 2011 11:01 PM, "Marty" <mglinsky1@comcast.net> wrote:
Brian- Mom faxed signed doc to Wells Fargo today. Should we have a prepatory conv - you/me/mom so she doesnt get blindsided again?

Thanks Marty G.

Phillips was right. Wells Fargo didn't call her.

8.     And during the period in which the Apex and Triangle Enterprises' risk-free trial scams were operating, Wells Fargo was indeed "totally different" from its banking peers.  As Wells Fargo has since *admitted*, Wells Fargo's established corporate policies and sales incentives were fueling a high-pressure sales culture that required its bankers to open as many accounts as possible.  As a direct result of that pernicious sales culture, and with the ongoing knowledge and authorization of Wells Fargo, an array of Wells Fargo bankers in multiple branch offices in California (and in a few cases, Texas) deliberately assisted the operators of the Apex and Triangle risk-free trial scams for an astonishingly long period of time: from at least 2009 to 2018 for the Triangle fraud and from at least 2014 to 2018 for the Apex fraud ("the Relevant Period"), until the filing of the FTC actions finally shut them down.

9.     The Bank's high-pressure sales culture and near unattainable sales goals drove Wells Fargo bankers to open accounts regardless of the risk to the Bank or others; if the employees failed to deliver, the consequences were severe: "[i]t was common knowledge within the Bank that employees who could not meet sales goals could and would be terminated," and "[e]mployees' incentive

4     Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

compensation and promotional opportunities depended on their ability to meet the unreasonable sales goals."[4]  As discussed in greater detail below, this drive for new accounts aligned perfectly with the Enterprises' constant need for shell accounts.

10.  In the aftermath of Wells Fargo's much-publicized unauthorized accounts scandal caused by this sales culture, Wells Fargo's newly-installed CEO described the bank's corporate policies as excessively "focus[ed] on growing the number of accounts," admitting that Wells Fargo's actions were "just stupid." Unfortunately for Wells Fargo and the victims here, this "stupid" conduct had devastating consequences, as these policies encouraged and rewarded Wells Fargo bankers for aiding and abetting fraud in order to satisfy the pressurized sales culture and hit sales quotas.  The Receiver's investigation revealed that Wells Fargo knowingly facilitated the opening of accounts by the Enterprises' principals for use in their fraud, all while making a conscious decision to let the fraud go unreported.

11.  Wells Fargo's misconduct centered around the Community Bank, which was the largest of Wells Fargo's three business units and contributed more than half (and in some years more than three-quarters) of the Bank's revenue.  The Community Bank was responsible for the everyday banking products sold to businesses such as the Enterprises in this case.

12.  Commenting on the widespread nature of Wells Fargo's misconduct in the Community Bank, the Office of the Comptroller of the Currency (the "OCC"), the federal bank regulator which ensures safe and sound banking, found that: "To the extent [Wells Fargo] did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the

_____

[4] January 23, 2020 Office of the Comptroller of the Currency Notice Of Charges For Orders Of Prohibition And Orders To Cease And Desist And Notice Of Assessments Of A Civil Money Penalty, AA-EC-2019-82 et al. (Jan. 23, 2020) ("OCC Notice of Charges") ¶¶ 72, 77.

illegal conduct that was pervasive throughout the Community Bank." OCC Notice of Charges ¶ 6. Consistent with this finding, the Receiver's investigation has led him to conclude that Wells Fargo intentionally designed and maintained controls which served to conceal—rather than unmask—its customers' illegal activities, which Wells Fargo was actively facilitating.

13. Wells Fargo knowingly assisted the operators of the Apex and Triangle Enterprises, including by, among other things: (i) authorizing or allowing the use of atypical banking procedures to assist the Enterprises in their frauds, (ii) counseling the Enterprises on how to set up deceptive bank accounts with straw owners, which enabled them to hide the fraud, (iii) accepting deposits obtained through the fraud, and (iv) authorizing suspicious inter-company transfers that enabled the wrongdoers to secrete the proceeds of their fraud, including in accounts located outside of the United States.

14. Wells Fargo has admitted wrongdoing and paid substantial fines and restitution for one consequence of its illegal sales culture, namely, the creation of fraudulent accounts in customers' names, opened without their consent. But the Receiver's investigation revealed that there were other, previously unidentified consequences of Wells Fargo's sales culture and its actions here: in this case, the consequences were hundreds of millions of dollars in harm, done to the thousands of consumers who signed up for Apex's and Triangle's risk-free trials, and the resulting liability of the Receivership Entities to make the defrauded consumers whole. To date, Wells Fargo has never compensated this newly-identified category of victims, including the Receivership Entities, that were harmed by Wells Fargo's sales culture and the resulting conduct that aided these fraudulent businesses.

15. The Receiver is therefore seeking to recover damages for the harm proximately caused to the Apex and Triangle Receivership Entities by Wells Fargo, including, but not limited to: (i) the Receivership Entities' legal obligations to satisfy the FTC judgments, which were premised on misconduct that could not

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

have occurred but for Wells Fargo's assistance, (ii) the fees charged by Wells Fargo in connection with their account services, (iii) the account funds which were improperly transferred out of the Receivership Entities' accounts by Wells Fargo at the direction of the Enterprises' principals, and (iv) the costs of defending the actions by the FTC (including the resulting Receiverships).

## II.   PRIOR FEDERAL TRADE COMMISSION PROCEEDINGS AND THE APPOINTMENTS OF THE RECEIVER

16.   In June 2018 and November 2018, the FTC brought separate lawsuits in the Southern and Central Districts of California against Triangle Media Corporation and Apex Capital Group, LLC and their related entities (the "*Triangle*" and "*Apex*" actions), respectively, each of which was operating deceptive online risk-free trial offer schemes in violation of consumer protection statutes.   The FTC sued to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten gains, and other equitable relief. The FTC filed amended complaints in December 2018 and May 2019 in the Triangle and Apex actions, respectively.

### A.   The *Apex* Action

17.   Plaintiff is the Court-appointed Receiver in the *Apex* action: *Federal Trade Commission v. Apex Capital Group, LLC, et al.,* Case No. 2:18-cv-09573-JFW *(JPRx)* (C.D. Cal.).    The Apex Preliminary Injunctions (the "Apex PIs," *id.*, ECF Nos. 40 (Peikos) and 41 (Barnett)) direct the Receiver to preserve the value of the assets of the Receivership Estate and authorize the Receiver to institute actions to preserve or recover those assets.  *See id.*, ECF Nos. 40, 41 at 19-23.

18.   Receivership Entities subject to the *Apex* action are expressly defined to include the following: the Corporate Defendants,[5] the Wyoming Related

---

[5] The Corporate Defendants include: Apex Capital Group, LLC; Capstone Capital Solutions Limited; Clik Trix Limited; Empire Partners Limited; Interzoom Capital

FER59

Companies,[6] and the U.K. Related Companies.[7]  Apex PIs at 7, Definition K.  In addition, the term "Receivership Entities" is defined to include "any other entity that has conducted any business related to Defendants' marketing or sale of products with a Negative Option Feature, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant." *Id*.  To date, the Receiver has determined that multiple additional entities qualify as Receivership Entities under this definition.[8]  These entities are collectively referred to herein as the "Apex Enterprise."

19.     As alleged in the *Apex* Complaint, Philip Peikos ("Peikos") and his one-time partner, David Barnett ("Barnett), and their agents ran an online "free trial" subscription scam through the Apex Enterprise.  Peikos was the Chief Executive Officer and co-owner of Apex. At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Apex Enterprise.

20.     Barnett was the Chief Operating Officer of the Apex Enterprise.  He was a co-owner of the Apex Enterprise until at least late 2017, when he transferred

---

Limited; Lead Blast Limited; Mountain Venture Solutions Limited; Nutra Global Limited; Omni Group Limited; Rendezvous IT Limited; Sky Blue Media Limited; and Tactic Solutions Limited; and each of their subsidiaries, affiliates, successors, and assigns.  Apex PIs at 6, Definition C.

[6] The Wyoming Related Companies include entities formed in Wyoming by Defendants, in the names of nominees, for the sole purpose of fronting merchant accounts.  They are identified in Exhibit A to the *Apex* action Complaint.

[7] The U.K. Related Companies include entities formed in the U.K. by Defendants, in the names of nominees, to front merchant accounts.  They are identified in Exhibit B to the *Apex* action Complaint.

[8] These include five nominee entities formed by Defendants for the purpose of opening new merchant accounts to conduct business inextricably related to the *FTC v. Apex* defendants' sale of products with a Negative Option Feature: Albright Solutions LLC ("Albright"); Asus Capital Solutions LLC ("Asus Capital"); Element Media Group LLC ("Element"); NextLevel Solutions LLC ("NextLevel"); and Vortex Media Group LLC ("Vortex").

his shares to Peikos. At times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Apex Enterprise.

21. On September 11, 2019, the FTC and the *Apex* defendants stipulated to the entry of Orders for Permanent Injunctions (barring them from their illegal conduct) and Monetary Judgments resolving all matters in dispute between them.

**B.** **The *Triangle* Action**

22. Plaintiff is also the Court-appointed Receiver in the *Triangle* action: *FTC v. Triangle Media Corporation, et al,* 3:18-cv-01388 (LAB-LL) (S.D. Cal.).[9] The Temporary Restraining Order (the "Triangle Order," *id.*, ECF No. 11) which first appointed the Receiver directs the Receiver to preserve the value of the assets of the Receivership Estate and authorizes the Receiver to institute actions to preserve or recover those assets. *See id.* at 18-19.

23. Receivership Entities subject to the Triangle Receivership are expressly defined to include Corporate Defendants Triangle Media Corporation ("Triangle"), Hardwire Interactive Inc. ("Hardwire"), and Jasper Rain Marketing LLC ("Jasper Rain"), and their respective dbas.[10] Triangle Order at 8, Definition N. Receivership Entities also include "any other entity that has conducted any business related to Defendants' marketing of negative option offers, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant."[11] These Entities are collectively referred to herein as the "Triangle

---

[9] In the *Triangle* Complaint, the Corporate Defendants are defined as: Triangle Media Corporation also doing business as Triangle CRM, Phenom Health, Beauty and Truth, and E-Cigs; Jasper Rain Marketing LLC also doing business as, and each of their subsidiaries, affiliates, successors, and assigns. The Individual Defendant is Brian Phillips.

[10] These dbas include Cranium Power, Phenom Health, Beauty and Truth, and E-Cigs.

---

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER61**

Enterprise."

24.    Brian Phillips ("Phillips") and his agents operated the Triangle online "free trial" subscription scam. During the relevant period, Phillips was an owner and officer of the Triangle Enterprise. At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Triangle Enterprise.

25.    During the relevant period, Devin Keer ("Keer") was also an owner and officer of the Triangle Enterprise. At all times material to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control or participated in the acts and practices of the Triangle Enterprise.

26.    On May 30, 2019, the FTC and the *Triangle* defendants stipulated to the entry of Orders for Permanent Injunctions (barring them from their illegal conduct) and Monetary Judgments resolving all matters in dispute between them.

**C.    The Receiver's Investigation of Wells Fargo and Discovery of Wells Fargo's Wrongful Conduct.**

27.    After conducting his initial investigations, the Receiver filed preliminary reports as to his conclusions in each of the Triangle and Apex FTC actions. In both cases, the Receiver determined that the businesses could not continue to be operated lawfully and profitably.

28.    Based on initial and subsequent reviews of internal Apex and Triangle emails and bank records, the Receiver's investigation revealed that Wells Fargo was aiding and abetting both Enterprises by providing similar atypical banking

---

[11] The Receiver has determined that additional entities fall within this definition of Triangle-related Receivership Entities: (1) Global Northern Trading Ltd. ("Global Northern"), a Canadian corporation as to which Triangle transferred more than $44 million during the period 2013-2018; and (2) the nominee entities formed and controlled by Phillips but deliberately placed in the names of nominees.

---

**FER62**

services, as detailed herein, in furtherance of the frauds.

29.    During the investigation, the Receiver issued subpoenas to Wells Fargo regarding their relationships with the Apex and Triangle Enterprises.    In response, Wells Fargo made incomplete productions.  On information and belief, numerous internal bank records, including electronic documents and internal communications, still exist regarding the Apex and Triangle Enterprises, as Wells Fargo was obligated under applicable banking regulations and laws to maintain such records.

30.    In late October 2019 and January 2020, the Receiver filed motions in the *Triangle* and *Apex* actions, respectively, advising the Courts that he wished to retain counsel to pursue claims against Wells Fargo on behalf of the Receivership Entities.  In the *Triangle* action, on November 19, 2019, Judge Burns ruled that "the Court finds good cause exists to grant the Receiver's motion to (1) extend the receivership for the sole purpose of pursuing litigation against Wells Fargo, (2) permit the Receiver to retain contingency counsel, and (3) administratively close the case while that litigation is pursued."  In the *Apex* action, on March 9, 2020, Judge Walter similarly permitted the Receiver to retain contingency counsel to pursue claims against Wells Fargo.

## III.   PARTIES

31.    Plaintiff Thomas W. McNamara is the Court-appointed Receiver of the Triangle and Apex Entities.  Triangle's principal place of business was 1350 Columbia Street, San Diego, California 92101 until May 17, 2018, when it filed paperwork with the California Secretary of State changing its principal place of business to Tampa, Florida, though the center of operations remained in San Diego.  Apex was a Wyoming limited liability company which had business addresses in Westlake Village, California; Jackson, Wyoming; Beverly Hills, CA; and Woodland Hills, CA, though it was always, to the Receiver's knowledge, operated out of California during the Relevant Period.

32.     Defendant Wells Fargo & Company is a nationwide, diversified, financial services company.   Upon information and belief, its corporate headquarters are located in San Francisco, California.   Defendant Wells Fargo & Company is the parent company of Wells Fargo Bank, N.A.

33.     Defendant Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States.   Upon information and belief, its corporate headquarters are located in South Dakota.   It maintains multiple offices in the State of California and the Southern District of California for the purposes of maintaining checking, savings, business, and merchant accounts, and engaging in other business activities.

34.     The Defendants are collectively referred to herein as "Wells Fargo," the "Bank," or "Defendants."

## IV.     JURISDICTION AND VENUE

35.     This Court has jurisdiction over this matter under 28 U.S.C. § 754, 28 U.S.C. § 1345, and 28 U.S.C. § 1367(a), and the doctrines of supplemental and ancillary jurisdiction.   *See S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004) ("[T]he receiver's complaint was brought to accomplish the objectives of the Receivership Order and was thus ancillary to the court's exclusive jurisdiction over the receivership estate").

36.     Venue in the Southern District of California is proper pursuant to 28 U.S.C. § 1391, because the *Triangle* Court retained jurisdiction of this matter for all purposes and appointed the Permanent Receiver in the Southern District of California on August 24, 2018,  and because this proceeding is supplemental to *FTC v. Triangle.  See Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 n.6 (6th Cir. 1981) ("[W]here jurisdiction is ancillary, the post-jurisdictional consideration of venue is ancillary as well."), and because the *Triangle* action was initiated prior to the filing of the *Apex* action in the Central District of California.

37.     The Court may exercise personal jurisdiction over the Defendants

pursuant to 28 U.S.C. § 1692 because the funds sought to be recovered are assets of the Receivership Entities under the Court's Orders issued in the *Triangle* and *Apex* actions.

38.     This Court also has personal jurisdiction over Defendants named in this Complaint because Wells Fargo conducted business in California and it participated in California-based fraudulent schemes that injured Californians. Venue is also proper in this District because the conduct at issue took place and had an effect in this District and Wells Fargo regularly conducted and still regularly conducts substantial banking business in this District. Defendants have sufficient minimum contacts with the Southern District of California arising from the specific conduct committed in or directed to the Southern District of California.

## V.     WELLS FARGO'S UNATTAINABLE SALES GOALS AND HIGH-PRESSURE SALES CULTURE DROVE ITS BANKERS TO PARTICIPATE IN THE ENTERPRISES' FRAUDS

39.     During the Relevant Period, Wells Fargo engaged in rampant sales misconduct from the top down. That misconduct has been repeatedly confirmed by multiple regulators, hearings, and lawsuits. In September 2016, the CFPB imposed a fine of $100 million against Wells Fargo for opening more than two million new accounts not requested by customers in order to generate illicit fees. The company also paid $35 million to the Office of the Comptroller of the Currency and $50 million to the City and County of Los Angeles.

40.     Despite signing consent orders with the CFPB and OCC, in 2018, those same two agencies fined Wells Fargo again (this time for *one billion* dollars) for selling unnecessary products to customers and for engaging in other improper practices. Later, in February 2020, Wells Fargo agreed to pay *three billion* dollars to resolve federal civil and criminal investigations into the consumer account scandal; the settlement of those matters included a deferred prosecution agreement.

41.     Wells Fargo's sales misconduct began at least as early as 2002. At

---

that time, the Bank's internal investigations unit noticed an increase in "sales integrity" cases. According to Wells Fargo's employees, sales goals were impossible to meet, and incentives for compensation and ongoing employment necessitated "gaming" the system. Gradually, "gaming," which was defined in the Wells Fargo Code of Ethics as "the manipulation and/or misrepresentation of sales or referrals . . . in an attempt to receive compensation or to meet sales goals," became commonplace.

42.     To meet company sales quotas, employees opened accounts and credit lines, ordered credit cards without their customers' permission, and forged client signatures on paperwork. Some employees urged family members to open ghost accounts.

43.     Between 2011 and 2015, Wells Fargo employees opened more than 1.5 million deposit accounts and more than 565,000 credit card accounts that may not have been authorized. On a per-employee basis, the reports of sales-related misconduct tripled from the second quarter of 2007 through the fourth quarter of 2013.

44.     Despite Wells Fargo's payment of a combined $185 million penalty to the OCC, CFPB, and the City and County of Los Angeles in 2016 to settle charges related to consumer account fraud, the next year in an August 4, 2017 quarterly 10-Q filing, Wells Fargo said it had expanded the period targeted for review (previously 2011 through 2015) to 2009 through 2016 and disclosed that the expansion of the review period could reveal a "significant increase" in unauthorized accounts.

45.     On January 23, 2020, the OCC brought additional charges against several Wells Fargo executives for allowing long-term sales misconduct. As the OCC put it:

> **The Bank tolerated pervasive sales practices misconduct as an acceptable side effect of the Community Bank's profitable sales model,** and declined to implement effective controls to catch systemic

---

14                Case No. 3:21-cv-01245-LAB-DDL
                  FIRST AMENDED COMPLAINT

misconduct. Instead, to avoid upsetting a financially profitable business model, senior executives…turned a blind eye to illegal and improper conduct across the entire Community Bank….**To the extent the Bank did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank**. In short, Bank senior executives favored profits and other market rewards over taking action to stop the systemic issuance of unauthorized products and services to customers.

(Emphasis added).

46. In 2020, Wells Fargo also entered into a Deferred Prosecution Agreement ("DPA") with the United States Attorney's Offices for the Central District of California and the Western District of North Carolina that included a "Statement of Facts" in which Wells Fargo "admitted, accepted, acknowledged as true" (among other things) that "[d]espite [having] knowledge of the widespread sales practices problems" as early as 2002 and through 2016, "Community Bank senior leadership failed to take sufficient action to prevent and reduce the incidence of unlawful and unethical sales practices." According to the DPA, Wells Fargo was alerted to the fraud by "Wells Fargo's internal investigations unit, the Community Bank's own internal sales quality oversight unit, and managers leading the Community Bank's geographic regions, as well as regular complaints by lower-level employees and Wells Fargo customers reporting serious sales practices violations."

47. In the wake of Wells Fargo's consumer account scandal, the federal bank regulators, the OCC and the Federal Reserve, initiated a multi-phase "Sales Practices and Incentive Compensation Horizontal Review,"[12] with the goals including to determine whether *other* banks doing the very same things that Wells Fargo did. After conducting its investigation, the regulators OCC concluded in 2017 that Wells Fargo was unique in terms of its sales culture, which prompted

---

[12] That review initially covered all large national banks, like Wells Fargo, and later significant regional banks.

15

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

employees to open unauthorized, and even fraudulent, accounts in order to meet daily new account goals and keep their jobs. The banking regulators' review confirmed that Wells Fargo's banking peers, unlike Wells Fargo, had taken seriously the significant compliance risks caused by an overly aggressive sales culture and lax oversight of branches.

48. In other words, Wells Fargo's misconduct was not the norm within the industry and was tethered to Wells Fargo's uniquely toxic sales culture. That same culture is at issue here but in an entirely different context, and one that was only discovered after the Receiver was appointed. Here, Wells Fargo's corporate focus on the opening of new accounts at any cost resulted in the Bank opening *roughly one hundred and fifty bank accounts for shell companies across the Apex and Triangle frauds*—accounts which Apex and Triangle's principals required to secure merchant payment processing services (leaning on Wells Fargo's imprimatur and reference letters to convince the processors of the accounts' legitimacy) and then used to launder the proceeds from their consumer frauds.

## VI. WELLS FARGO'S CREATION AND MAINTENANCE OF BANK ACCOUNTS FOR DECEPTIVE SHELL COMPANIES WERE ESSENTIAL TO THE FRAUDS

49. The Apex and Triangle frauds were simple in concept: bait consumers with deceptive internet ads offering "risk-free" trials for only the cost of shipping, and then use the consumers' billing information to charge for the product and impose a monthly continuity charge. Make it impossible to cancel. These schemes defrauded consumers of hundreds of millions of dollars.

50. Simple as it was, the con was effective. Consumers would be offered a full month's supply of a featured product and, at the time of the initial order, would only pay the nominal cost for the shipping and handling of the product. But if the consumer did not cancel the order and return the unused portion of the product within a short period of time (often, fourteen calendar days), the Triangle

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER68**

and Apex Enterprises would automatically charge the consumer's card for the full price of the product (usually around $87 or $89). The consumer would also be enrolled in an auto-ship program when signing up for the "risk-free" trial offer— meaning that unless the subscription was affirmatively canceled, the consumer was automatically charged monthly for additional product.

51. Both the Apex and Triangle schemes required access to a steady stream of new bank accounts to function. As such, Wells Fargo and the Enterprises' objectives were aligned: the Enterprises needed new bank accounts on a regular basis, and Wells Fargo was constantly pressuring its sales employees to open more bank accounts. As a result, the Enterprises, the individuals behind them, and the bank developed a symbiotic relationship. Without Wells Fargo's assistance, the Enterprises' frauds could not have survived (let alone thrived) for as long as they did.

## A. The Payment Processing System and Credit Card Laundering

52. In order to charge consumers' credit or debit cards, the Triangle and Apex Enterprises (the "merchants") needed to establish an account with a merchant processor. Merchant processors have access to credit card associations ("card networks") like MasterCard and VISA and thereby enable merchants to charge consumers' credit cards.

53. Card networks require all participants within their networks to comply with detailed rules, including screening processes and underwriting standards for merchants. These rules are put in place (1) to ensure that the merchants whose purchases are being processed are legitimate, bona fide businesses, and (2) to screen out merchants engaged in potentially fraudulent or illegal practices. The rules also prohibit "credit card laundering," which encompasses the practice of processing card charges through the merchant accounts of shell companies like those used by the Enterprises.

54. Merchants who pose a heightened risk of fraud to the card networks

are subject to closer scrutiny by their merchant processors and may have their access to the card networks capped or terminated altogether.

55.     One sign of potential illicit activity by a merchant is the generation of an excessive number of transactions which have to be refunded to consumers ("chargebacks").

56.     Consumers initiate "chargebacks" when they dispute card charges (most often because of fraud or unauthorized use) by contacting their "issuing bank," which is the bank that issued the credit card to the consumer.  When a consumer successfully disputes the charge, the consumer's issuing bank credits the consumer's card for the disputed amount, and then recovers the chargeback amount from the merchant processor.  The merchant processor, in turn, collects the chargeback amount from the bank account of its merchant client.  In this case, merchant processors would seek to collect chargebacks from the Enterprises' Wells Fargo accounts.

57.     In order to detect and prevent illegal, fraudulent, or unauthorized merchant activity, the card networks operate various chargeback monitoring and fraud monitoring programs.  These chargeback monitoring programs are designed to flag merchant accounts with excessive chargeback ratios or an excessive number of chargebacks.  For example, if a merchant account has chargeback levels that exceed the thresholds set by VISA's chargeback monitoring program, the merchant is subject to additional monitoring requirements and, in some cases, penalties, and termination.

58.     Credit card laundering is commonly used by merchants who cannot meet a merchant processor's underwriting criteria or who cannot obtain merchant accounts under their own names (whether because of a prior history of excessive chargebacks, complaints, use of sales or industry practices prohibited by merchant processors, or other signs of illegal activity).  To conceal their identities, merchants which are engaged in fraud will often create shell companies to act as fronts, and

apply for merchant accounts under the names of these shell companies. Once the shell merchant accounts are approved, the fraudulent merchants then launder their own transactions through the shell companies' merchant accounts. This allows the merchants to circumvent card associations' onboarding and monitoring programs and avoid detection by consumers and law enforcement.

59.    When a merchant is terminated, or if it has a high-risk account or excessive chargebacks, its name (and that of the merchant's owner) is put on a blacklist, which is often referred to as the "MATCH" list ("Merchant Alert To Control High-Risk"), as a terminated merchant file ("TMF"). Other reasons for being listed as a terminated merchant file include merchant collusion, fraud, and money laundering. Merchant processors use the MATCH list to screen potential merchant clients, and merchants on the list are often unable to open an account with a new merchant processor.

60.    For credit card laundering to be effective long-term and on a large scale, then, a merchant needs access to a ready supply of merchant processing accounts, so that the merchants can move sales from one shell company to a newly-created shell company once the profits have been reaped and the chargeback rates or other "red flags" have attracted attention. An absolute prerequisite to a merchant processing account is a bank account in a shell company's name. Luckily for Apex and Triangle (and unluckily for consumers), Wells Fargo was more than happy to provide the latter.

**B.**    **Apex and Triangle's (Mis)Use of the Credit Card Processing System**

61.    Entities associated with the Triangle and Apex Enterprises showed up again and again on the MATCH list during the Relevant Period, because they were flagged as high risk and/or routinely had high card chargebacks.

62.    The average chargeback rate in the United States is 0.2% of the transaction rate and a chargeback rate greater than 1% is considered excessive.

The Triangle and Apex Entities' chargeback rates were astronomical, with both and averaging over 20% on a monthly basis, with some months having chargeback rates of 70% or higher. The merchant processors would typically cancel accounts when chargebacks exceeded 3% of sales—a regular occurrence for the Apex and Triangle Entities.

63. Merchant processors would not deal with repeat offenders like the Apex and Triangle principals. To get around the merchant processors' restrictions, Apex and Triangle's owners hid their connection to the fraudulent businesses (and the high chargeback rates that they generated) by creating phony shell companies.

64. The Apex and Triangle Enterprises used a host of straw owners (which they sometimes referred to as "fronts" or "nominees" or "signors") to act as the "owners" of the shell companies. These straw owners were individuals who would act as the "front" for a shell company, often in exchange for a payment of about $500 per month, typically. The Enterprises would orchestrate the formation of the shell companies, the opening of the necessary Wells Fargo bank accounts, and the completion of applications for merchant processing in the shell companies' names. When the merchant processor inevitably terminated processing for a shell company (typically due to excessive chargebacks), the Apex and Triangle Enterprises would use a new nominee to form another shell company and restart the whole process. Rinse and repeat.

65. For the scheme to work, the shell companies needed to be able to establish depository accounts with an actual bank. Without bank accounts, merchant processing could not be acquired, and without bank accounts, the shell companies would have nowhere to transfer the funds they took from consumers.

66. Enter Wells Fargo. Wells Fargo's employees gladly helped the Enterprises set up bank accounts for the shell companies and readily provided them with bank reference letters, which the shell companies often needed to secure merchant processing services. Merchant processors would never have provided

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER72**

merchant processing for the shell companies had they known the identity of the entities' true owners (Apex and Triangle's principals).

67.    When merchant processors charged consumers' cards for Apex or Triangle products, the transactions were processed through accounts secured in the names of the shell companies.  The consumer payments would then be sent to accounts at Wells Fargo, which nominally belonged to the shell companies but which were actually controlled by the owners of the Apex and Triangle Enterprises.  As discussed below, Wells Fargo was well aware of the shell companies' true ownership yet continued to assist the Enterprises in their creation of shell bank accounts needed to perpetrate and conceal their fraud.

68.    From at least 2014 through 2018 for the Apex Enterprise, and 2009 through 2018 for the Triangle Enterprise, Wells Fargo provided vital access to the enable the Enterprises to open approximately 150 Apex and Triangle shell bank accounts to accept fraudulently-obtained payments from consumers.  As detailed herein, Wells Fargo knew of this scheme, counseled the Enterprises' principals, and helped them hide the true ownership of the accounts.

## VII.   WELLS FARGO'S KNOWING INVOLVEMENT IN THE FRAUDS

### A.    Wells Fargo's Support of the Apex Enterprise

69.    Wells Fargo bankers in California regularly and repeatedly helped Apex executives advance their credit card laundering scheme in a number of ways. Wells Fargo bankers like Dominic Testa (Westlake Village Branch) developed long-term business relationships with Apex's principals: Peikos (Co-Owner), Barnett (Co-Owner), and Raul Camacho ("Camacho," Apex Chief Financial Officer).  Testa and other Wells Fargo bankers were able to keep—and grow—the Bank's business with Apex because Wells Fargo was willing to wade into the muck in ways that other banks would not.

70.    As early as 2014, Wells Fargo was helping Apex executives to open, and also close, accounts for dozens and dozens of shell companies owned and

controlled by Apex owners Peikos and Barnett. Wells Fargo, and in particular banker Testa, knew that Peikos and Barnett were using these shell companies to run high-risk internet sales operations that bilked consumers out of millions of dollars. At the same time, Wells Fargo had visibility into the high number of chargeback refunds that were being withdrawn from the shell companies' Wells Fargo accounts to repay the alarmingly high proportion of consumers who disputed the charges.

71. By early 2015, Apex employee Camacho was Testa's primary Apex contact point. Camacho was also often listed as the "owner" of the Wells Fargo accounts Testa opened for the shell companies, although Testa was acutely aware that Peikos and Barnett were the true owners of Apex and the shell company bank accounts – and Camacho took directions from them. Testa, and other Wells Fargo bankers, also readily provided prized anonymous bank reference letters for the shell company accounts, which Apex then used to support merchant processing applications by the shell companies. Without Wells Fargo's imprimatur, these shell companies would not have been able to secure the essential merchant processing accounts. Further, without Wells Fargo's continually providing atypical bank services for Apex-related shell companies in a host of ways, the Apex fraudulent enterprise would not have been able to exist.

72. The Apex Enterprise generated millions of dollars in revenues—money that left the shell companies' accounts almost as soon as it hit them. Those funds went straight into the laundering chute, where Peikos and Barnett used the Wells Fargo accounts to clean the money, transferring the funds into external personal and third-party accounts to which they had access.

73. The success of Apex's fraudulent scheme was by no means inevitable. Wells Fargo in particular was in a rare position to stop the fraud very early on. Moreover, it had an obligation to do so pursuant to a host of banking regulations and laws. But it never did.

74. Instead, Wells Fargo actively assisted the Apex Enterprise by establishing dozens (upon dozens) of bank accounts for the Enterprises' shell companies, providing the corresponding bank reference letters for those shell companies, allowing Apex's principals to "wash" the dirty proceeds of their fraud by transferring funds through their Wells Fargo accounts, and otherwise performing atypical banking services for these fraudulent Enterprises. Through this and other conduct, coupled with their intentionally lax oversight, Wells Fargo flouted standard banking practices and in the process violated the Bank Secrecy Act, anti-money laundering ("AML") laws, and the Bank's own internal policies and procedures as they were written; as a result, Wells Fargo's conduct caused hundreds of millions of dollars in harm to consumers and to the Receivership Entities.

75. During the Relevant Period, the Apex principals dealt primarily with Wells Fargo bankers at a San Diego branch and at the Westlake Village Branch in the Los Angeles area, though other branches and bankers assisted the fraud. For instance, Wells Fargo's Woodland Hills office opened at least seven accounts for anonymous Wyoming LLCs that were part of the Apex Enterprise, and closed four of those accounts once the associated shell companies lost their access to merchant processing services (*i.e.*, the ability to charge consumers' credit cards).

76. On information and belief, the Wells Fargo bankers at the San Diego Branch, the Westlake Village Branch, and the Woodland Hills Branch, just like numerous other Wells Fargo Community Bank branches during the Relevant Period, were operating under intentionally deficient bank practices and policies effected by the most senior executives at Wells Fargo. Those practices and policies featured a reckless quota system that improperly pressured and incentivized Wells Fargo employees to provide atypical banking services, bend the rules, and even commit fraud when performing what should have been routine business tasks.

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

(i)   The San Diego Branch

77.   In the Wells Fargo branch located at First and Market Street in downtown San Diego (the "San Diego Branch"), several bankers, often collaborating with one another as well as with Apex principals, knowingly facilitated Apex's fraud for their own—and Wells Fargo's—financial gain.

78.   Apex's relationship with the San Diego Branch began in January 2014, when on two separate days Barnett walked into the branch with formation documents for eight Wyoming LLCs and asked to open bank accounts in each LLC's name. Barnett had no history with the bank; he was a walk-in off the street. The LLC documents that Barnett presented to the branch were also suspect with numerous indicia of fraud: they were nearly identical, with each of the LLCs based in Wyoming (which allows for the creation of LLCs without identification of the principals, effectively anonymizing the entities), each having the same Wyoming mail drop as its business address, and each having been formed on the same day four months earlier.

79.   Basic (AML) training that Wells Fargo bankers should have received during the Relevant Period taught how and why anonymous LLC accounts with shared addresses (especially a shared Wyoming mail drop) are used to camouflage ownership and further frauds. Such basic AML training alerted bankers to look for transactions with other internal accounts in order to identify undisclosed relationships. The circumstances required that all of the Apex accounts be evaluated together with bankers looking for similarities and patterns of activity that indicate fraud.

80.   Under many banks' policies, a customer who provided the same Wyoming mail drop address for multiple applications would have had those applications further reviewed and then rejected for failing to satisfy bank customer identification requirements. At a minimum and per industry practice, additional follow-up by Wells Fargo was required. A bank following the requisite due

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER76**

1  diligence consistent with industry practice would not have permitted these
2  accounts to be opened.

3       81.    But the Wells Fargo banker didn't ask questions.  Instead, the banker
4  promptly completed eight identical—generic—applications for Wells Fargo
5  accounts for the shell companies.  Each of the accounts were funded with minimal
6  opening deposits (generally $100, which was the minimum amount necessary for
7  the banker to get sales quota credit for opening the account), and each of the
8  account applications projected annual gross sales of $100.

9       82.    Under Wells Fargo's toxic sales culture and compensation system,
10  Barnett's appearance at the Wells Fargo branch was manna from heaven for the
11  banker and Wells Fargo.  While most banks would have refused to open the
12  accounts or at least conducted more diligence, Wells Fargo just opened the
13  accounts.  And not just eight accounts.  The banker opened sixteen accounts, when,
14  unprompted, she opened a savings account for each of the eight checking accounts
15  Barnett had requested.

16       83.    The savings accounts were superfluous from the customer's
17  perspective, but they were nevertheless valuable to Wells Fargo's bankers because
18  they counted towards the extreme sales quotas that Wells Fargo put in place.
19  Much later, upon a request to close some accounts by Peikos, Testa confirmed that
20  the "[savings] accounts really have no purpose and can be shut down…".

21       84.    After his initial success in establishing the shell company accounts at
22  Wells Fargo, Barnett returned to the same branch three more times over the next
23  seven months (March, August and September), opening 22 more business bank
24  accounts for 11 more anonymous Wyoming LLCs.  Each of these shell company
25  bank account applications had the same indicia of fraud as the first batch, including
26  anonymous principals, similar deposit and anticipated revenues information, and
27  the same Wyoming mail drop address.  Each time, Wells Fargo conducted no
28  investigation, instead rubber-stamping the new accounts.  When necessary, Wells

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER77**

Fargo also closed accounts that Apex had burned due to egregiously high chargeback rates.

85.     For these later applications, Wells Fargo had the benefit of being able to review the activity in the prior Apex shell companies' bank accounts. Across the accounts, the same pattern of activity reappeared: after millions of dollars in consumer charges were deposited into the accounts (which had projected sales of $100 on their applications), extraordinarily high chargebacks would follow. In some monthly Wells Fargo account statements, the chargeback rates for these companies exceeded 70% and 80%.

86.     Wells Fargo was fully aware that Apex was burning through shell companies, due to these high chargeback rates, which caused merchant processors to cease doing business with the shells, because Peikos and Barnett were also regularly asking Wells Fargo to close old accounts for shell companies that could no longer access merchant processing services due to their high chargeback rates.

87.     Notwithstanding numerous indicia of fraud, the rigorous Know-Your-Customer ("KYC") and AML requirements that were in place for the branch, and Wells Fargo's own internal policies and procedures that required (in theory) enhanced scrutiny of high-risk companies such as those associated with the Apex Enterprise, the San Diego Branch quickly approved every application and opened the accounts.

88.     Wells Fargo bankers at the San Diego Branch also provided reference letters which validated the shell companies' Wells Fargo accounts. Initially, these letters were addressed to Barnett, but in May 2014, Apex's atypical banking requests to Wells Fargo grew bolder—and Wells Fargo's complicity in the fraud expanded. Barnett asked the San Diego Branch to re-execute and re-sign *ten* reference letters for the initial Wyoming LLCs for which the branch had opened accounts; the new letters would have Barnett's name removed, making them anonymous, "Dear Company" letters.

89.     Without blinking, the San Diego Branch banker quickly re-executed the ten Wells Fargo reference letters, amending the address associated with the accounts to include just the company name, without any address and without Barnett's name.     Wells Fargo accommodated this remarkable request for anonymity without comment or question.

**BEFORE:**          **AFTER:**



90.     Under these particular circumstances, and given the Bank's KYC and Enhanced Due Diligence obligations for these high-risk customers, acceding to specific requests to omit this same owner's name from all ten of the reference letters previously issued for supposedly separate anonymous LLCs deviated from accepted banking practice.     While providing bank reference letters can be appropriate in other instances, the circumstances here made it clear to Wells Fargo that there were heightened risks that the bank reference letters would be misused. This should have set off alarm bells.  It did not.

91.     That is especially the case, because of Apex's choice of the so-called "anonymous LLCs" from Wyoming as its preferred corporate form.  As Wells Fargo knew, using anonymous LLCs created a high risk for financial crime that,

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER79**

from the outset, should have resulted in a higher level of scrutiny by Wells employees of both the accounts and their related individuals. Wells Fargo should not only have categorized these accounts as high risk, requiring enhanced due diligence prior to opening the account, but going forward, Wells Fargo should also have treated these supposedly separate shell accounts with enhanced monitoring as a family of accounts from a risk compliance perspective.

92. Globally-recognized account opening and oversight standards in place for decades have classified anonymous LLCs entities as "high risk" entities and warned that these entities are one of the most widely used vehicles in laundering of the proceeds of crime, corruption, and other malfeasance. Therefore, Wells Fargo was required to conduct due diligence sufficient to establish the true beneficial owners of LLCs before allowing them access to bank accounts—and were further required to document the results of that diligence correctly in the bank's files in order to assist the bank in its future monitoring endeavors.

93. In light of the increased risks created from the outset, Barnett's specific request to reissue generic no-name letters to 10 related anonymous LLCs was highly suggestive of credit card laundering by Apex. As the Bank knew, Apex could easily conceal the identities of its blacklisted owners from merchant processors by submitting applications in straw owners' name that were supported by the essential no-name reference letters from Wells Fargo. And that's exactly what Apex did.

94. The most basic compliance training would have taught these bankers that such tactics were highly suggestive of card laundering or some other nefarious activity. This means one of two things is true: either Wells Fargo's high-pressure sales culture made it clear that identifying and stopping fraud was secondary to the Bank's profit motive, or Wells Fargo's training and oversight were intentionally designed to be so deficient that its employees were clueless as to the most obvious signs of fraud.

95.     In August 2014, Barnett was back and opened ten more Wyoming LLC shell company accounts at the San Diego Branch (this time with a different banker), and he requested and received ten more no-name reference letters.  Like the banker before her, the banker wrote and executed anonymous reference letters for the shell companies: they did not identify the accounts owners or include any other identifying information, e.g., company addresses.  Rather than take any of the steps required by a bank when undertaking typical due diligence for new customers, multiple bankers at Wells Fargo's San Diego Branch instead continued to process identical business account applications.  These bankers did so, because at Wells Fargo, opening these bank accounts was not only profitable for the Bank, but was also personally beneficial to Wells Fargo's employees, who were acting under corporate edicts to meet daily account opening goals.

96.     Despite the fact the initial shell companies accounts were established in January 2014 with a $100 deposit and minimal ($100) projected annual sales, deposit activity in the accounts was immediate, dramatic and inconsistent with the account applications.  Millions of dollars began to flow through the accounts almost at once.

97.     In the month of February, these Wells Fargo Apex accounts took in $810,000 in consumer credit card payments from Apex's high-risk merchant processors.  From February to December 2014, the Apex Wells Fargo accounts took in a whopping $12,300,000 in consumer credit card payments forwarded by merchant processors.[13]  The vast difference between the expected and actual account activity was obvious to Wells Fargo and a huge red flag, which a bank following standard industry practice was required to investigate.

98.     Within a short time, the shell company bank accounts also began to

---

[13] This number is based only on information presently available to the Receiver, and is expected to grow when complete monthly account statements are received in discovery.

suffer staggering merchant chargebacks and refunds. As a group, the Apex shell company bank accounts at Wells Fargo suffered more than 22% in chargebacks/refunds in 2014 through mid-2015. To put these numbers into perspective, a 1% chargeback rate is considered excessive and grounds to terminate a merchant's account with a merchant processor.

99. In some months, the chargeback rate was much higher. As just one example, the August 2014 statement for an Apex shell company named "Bold Media" reflects a chargeback rate of 78% for the month.

100. And the immense chargeback activity was obvious to Wells Fargo, on a monthly basis, given that the monthly account statements for all of the shell companies similarly reflected pages of chargebacks. As the below example makes clear, the shell accounts' Wells Fargo monthly statements specifically identify the chargebacks in the "Withdrawals/Debits" column – often in the very same amounts again and again, for example, $87.67 and 97.88 (or multiplies thereof), as consumer after consumer requested chargebacks on their credit cards.

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

Account number: ███2051 ▪ November 1, 2014 - November 30, 2014 ▪ Page 9 of 11

WELLS FARGO

**Transaction history** (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|--------------|-------------|-------------------|---------------------|---------------------|
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 311 272400398512 Lion Capital LLC | | 87.67 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 311 272400398512 Lion Capital LLC | | 87.67 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 311 272400398421 Lion Capital LLC | | 97.88 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 311 272400398421 Lion Capital LLC | | 97.88 | |
| 11/25 | | Bkcd Processing Bkcd Crgbk 20 311 272400398512 Lion Capital LLC | | 97.88 | |
| 11/25 | | Bkcd Processing Bkcd Depst 20 311 272400398512 Lion Capital LLC | | 145.69 | |
| 11/25 | | Bkcd Processing Bkcd Depst 20 311 272400398421 Lion Capital LLC | | 592.23 | 721.29 |
| 11/26 | | Bkcd Processing Bkcd Depst 20 311 272400398512 Lion Capital LLC | 172.73 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 311 272400398512 Lion Capital LLC | 395.29 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 311 272400398512 Lion Capital LLC | 552.80 | | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 311 272400398405 Lion Capital LLC | 1,559.51 | | |
| 11/26 | | Humboldt MS Deposit 141125 8 201693883 Heathy Choice Savings | | 39.95 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398421 Lion Capital LLC | | 73.41 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398421 Lion Capital LLC | | 73.41 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398512 Lion Capital LLC | | 82.72 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398405 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398421 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398421 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398512 Lion Capital LLC | | 97.88 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398512 Lion Capital LLC | | 97.88 | |
| 11/26 | | Humboldt MS Deposit 141125 8 201689881 8446072489 Dermanique | | 195.76 | |
| 11/26 | | Humboldt MS Deposit 141125 8 201690889 8446317914 Dermanique | | 195.76 | |
| 11/26 | | Bkcd Processing Bkcd Depst 20 311 272400398421 Lion Capital LLC | | 257.05 | 1,568.02 |
| 11/26 | | Bkcd Processing Bkcd Depst 20 311 272400398405 Lion Capital LLC | 39.19 | | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398512 Lion Capital LLC | | 87.67 | |
| 11/26 | | Bkcd Processing Bkcd Crgbk 20 311 272400398512 Lion Capital LLC | | 87.67 | |

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER83**

101.   Of course, Wells Fargo also knew about these excessive chargebacks, because Wells Fargo's very own customers, using credit cards issued by Wells Fargo, were among the many Apex customers requesting such chargebacks on their credit cards.  Wells Fargo's own customers even made consumer complaints about the "risk-free" trial schemes to the Better Business Bureau.

102.   Wells Fargo deliberately overlooked this early and obvious aberrational activity in the Apex shell company accounts.  Had even minimal investigation under standard banking procedures been conducted, with such obvious red flags – as Wells Fargo was required to do – the consumer losses could have been staunched almost immediately. Wells Fargo took a different path instead.

103.   As described further below, Barnett's role as Apex's primary bank contact and shell company account opener transitioned to Apex co-owner Peikos in 2015 and Apex employee Camacho at the direction of Peikos.

(ii)    The Westlake Village Branch

104.   In April of 2015, the initial Apex shell company accounts that Barnett had established in 2014 had been open for fifteen months; most were inactive after having received (and then having transferred out) millions of dollars of consumer funds, even accounting for staggering consumer chargebacks.  These chargebacks, which ran through the Wells Fargo accounts, had resulted in nearly all of the shell companies being terminated by their merchant processors.   In spite of all this, Wells Fargo was still anxious to expand its business with Apex.

105.   Beginning in early 2015, Apex began to use Los Angeles County Wells Fargo branches, and its principals developed relationships with the Wells Fargo bankers at a Los Angeles County office located in Westlake Village (the "Westlake Village Branch").  Like the bankers at the San Diego Branch, the Wells Fargo bankers at the Westlake Village Branch were happy to facilitate Apex's ongoing consumer fraud and card-laundering activities in exchange for a revenue

boost and assistance hitting sales quotas—even if that meant assisting a fraud and deliberately turning a blind eye to conduct that any banker would have recognized as bearing numerous indicia of fraud.

106. David Hannig ("Hannig") was an Assistant Vice President and Sr. Business Sales Consultant for Wells Fargo Merchant Services. On information and belief, Hannig was based out of the Los Angeles area but worked regularly with a number of branches, including the Westlake Village Branch, where he held meetings with Apex personnel and Wells Fargo customers.

107. Dominic Testa ("Testa") was a Business Banking Specialist for Wells Fargo at the Westlake Village Branch. On information and belief, Hannig and Testa had a close working relationship with each other and communicated frequently about how they could expand Wells Fargo's business with and sell new bank products to the Apex Enterprise.

108. The Westlake Village Branch was located nearby Apex's office in Woodland Hills, California. Wells Fargo banker Testa, who was part of Wells Fargo's Community Bank division, was able to develop and sustain a long-term and ongoing business relationship with the Apex Enterprise. He was particularly friendly with Apex's employee and CFO, Camacho, who often referred to Testa with nicknames like "bud." As Testa knew, Camacho was simply an employee of Apex and was not the true "owner" of any account in his name. Testa knew that Camacho was taking his instructions directly from Peikos, who was the true owner and controller of Apex. Testa also knew that Camacho was only an "owner" on paper of the accounts and shell companies held in his name.

109. Testa's interactions with Peikos and Camacho made it clear from early on that Peikos was the boss. As just one example, on April 17, 2015, Testa emailed Peikos about opening "new accounts for you". Testa noted "I'm assuming you'll be using Wyoming like your other LLCs" and requested the documentation and identification of the "owner." Peikos responded that Camacho, and not Peikos,

would be the "owner" of the LLCs and the bank accounts that Peikos was instructing Testa to set up: "So we are clear, [Camacho] will be the 100% owner on these accounts, and I will have access like the current ones were set up." The "current ones" Peikos was referring to were the roughly 40 shell company accounts that Barnett had opened in San Diego which were lying mostly unused at that point because they had lost access to merchant processing services as a result of their extraordinarily high consumer chargeback rates. Testa told Peikos that he would put a fee waiver on the accounts for the next three months and recommended that Peikos "[k]eep in contact with me on when they should be closed and I can do it over the phone."

110. During this same time, Hannig, in coordination with Testa, encouraged the Apex Enterprise to apply for merchant processing with Wells Fargo. Apex employee Chris Carr met with Hannig and identified shell companies and products for which Apex wanted to obtain merchant processing services.

111. Wells Fargo requires merchant account applicants to undergo an underwriting process intended to ensure the applicant is a legitimate and creditworthy business and to weed out merchants engaged in illegal conduct and required the legitimacy of the business be verified/validated. Any material discrepancies must be documented, investigated, and resolved and the source of the verification should be in the merchant file. The Bank forbid the solicitation of merchants engaged in certain unacceptable business practices because they were presumptively illegal, violated card association rules, or created excessive risk exposure for the Bank.

112. Several days after their in-person meeting, on April 21, 2015, Carr followed up with an email to Hannig containing information for two shell companies. This opened a string of emails between the two in rapid succession, with emails being exchanged often literal minutes apart. Carr wrote, "Here is some information on the corps and URLs that we wanted to lead off with . . . Please let

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

us know if you require additional information to Pre-fill these apps for us. We are eager to get started so as soon as you can send us the paperwork, we will turn it around with any additional documentation you require. Thanks!" Carr identified Arturo Oliveros and Julia Buenrostro as the "owners" of shell companies Alpha Group, LLC and Crest Capital LLC, respectively, both of which had the same Wyoming mail drop listed as their business address. Carr listed the shell companies' businesses as "supplement[s]" and "health plus", respectively, and included links to the companies' websites, www.virilitymuscle.com and www.evermaxbody.com.

113. Hannig reviewed the material and linked websites and quickly responded, identifying crucial and fundamental discrepancies in the information Apex provided:

> Chris,
>
> The bottom of the websites show different LLC's then what is listed below. That will need to be changed to the below listed LLC's on the websites before I can even start the process. **The people you listed below are not owners on the Wells Fargo bank account that you gave us. They must be owners of the business in order to use their name on the merchant accounts. The address also does not match up to what is on the website.** Everything needs to be matched up on the accounts or the applications won't not pass the submission process.
>
> Thank you,
>
> David Hannig
>
> (Emphasis Added).

114. Carr quickly replied claiming to have corrected the issues:

> David,
>
> Thanks for your reply. The company names and addresses have been updated on the websites.
>
> The Websites just had the product name in the footer as a placeholder until we got all of the docs in order.
>
> ***Arturo Oliveros and Julia Buenrostro are owners of the entities listed.***

1   Thanks! - Chris

2   (Emphasis added).

3   ****

4   115.   Almost immediately, Hannig again responded:

5   I see the names changed so that will work. **The bank accounts still do not**
6   **show them as owners. Coordinate with Dominic [Testa] on how to get**
7   **this updated. Here is what we have listed on the bank accounts:**



18  David Hannig
    Assistant Vice President
    Business Sales Consultant
19  Wells Fargo Merchant Services

20  (Emphasis Added).

21  116.   The irregularities Hannig identified were troubling, particularly since,
22  as Hannig knew, Apex had already opened (and in almost every case, burned
23  through) roughly 40 shell bank accounts with Wells Fargo in which millions of
24  dollars had flowed through.   Apex's excuses and scramble to alter website and
25  product information on the fly only reinforced what Hannig already knew to be
26  true: that the "owners" of the shell companies were owners in name only.

27  117.   But most troubling were the discrepancies in information regarding
28  the key issue of the beneficial ownership of these anonymous Wyoming LLCs.

The two shell companies, Alpha Group and Crest Capital, had Wells Fargo accounts opened by Apex principal Barnett a year earlier in San Diego. When he opened the accounts, Barnett claimed to be the sole owner of the companies and presented anonymous Wyoming LLC documents and the same maildrop address for these shell companies.

118.  By April of 2015, when Hannig flagged the issues, the accounts had been open for 11 months and had taken in more than a quarter of a million dollars in consumer payments from merchant processor deposits. But Hannig was now being told that the account holder, Barnett, did not in fact own the shell companies – and two people (Oliveros and Buenrostro), who were not listed on those Wells Fargo bank accounts or identified in any Wells Fargo bank records, did.

119.  Such information was an obvious indication that Apex was engaged in credit card laundering by listing owners on merchant account applications for an anonymous LLC, thus obscuring the identity of the true owners.

120.  Apex's next response, sent just 23 minutes later, should have been even more alarming to Hannig and Testa. Rather than "updating" the information, Apex instead changed course and told Wells Fargo they had decided to use instead new anonymous Wyoming LLCs, supposedly now "owned" by Camacho, to apply for the merchant accounts. The new shell companies shared (as did every one of the Apex shell companies) the same Wyoming mail drop address.

> From: Chris Carr [mailto:chris@apexcapitalgrp.com]
> Sent: Tuesday, April 21, 2015 4:03 PM
> To: Hannig, David
> Cc: Raul A; Phillip Peikos; Testa, Dominic J
> Subject: Re: Information for New MIDs
>
> I see you are correct. Those accounts are, indeed, in David Barnett's name. **On review, we decided that we would like to run those two websites through these new corps that we just set up. They are owned by our CFO Raul Camacho**[. . . ]
>
> Raul will come in tomorrow and open bank accounts at your branch. EIN numbers are forthcoming. Websites have been updated. Sorry for all the changes. Will you be in tomorrow to help us set up the

accounts?

Thanks! - Chris

(Emphasis Added.)

121. The response of Hannig, who was specifically seeking to provide *merchant banking* for Apex, was problematic. He simply suggested Apex coordinate with the bank to get the ownership "updated". Notably, Hannig did not copy the actual account holder, Barnett, on any of this correspondence.

122. Hannig's cursory review had immediately identified fundamentally inconsistent information about the LLCs' ownership, the ownership of the bank accounts, and discrepancies between the websites and the products which Apex was hoping to sell on them. He had pointed out that the irregularities and discrepancies would cause the merchant applications he wanted to present on Apex's behalf to be rejected. As a merchant banker, Hannig knew that the discrepancies in the owners, coupled with the use of anonymous Wyoming LLCs and the pattern of burning through the LLCs' bank accounts, were indicative of fraud.

123. Instead of doing what he should have done under standard banking procedures – *e.g.*, refuse to submit the shell account's merchant processing applications; ask questions and demand answers about the troubling and inconsistent information being revealed; and communicate his concerns and report suspicious activity through Wells Fargo's established channels — Hannig simply directed Apex on how to change its paperwork, so the applications would not be flagged, allowing him to potentially pad his sales numbers and the bank itself to expand its banking relationship with the fraudulent Apex Enterprise.

124. During the years when the Apex fraud was in full bloom, on information and belief, such aggressive sales tactics were rewarded within Wells Fargo's misaligned compensation system. Hannig himself was recognized as a Wells Fargo "Sales Star" (winning that award in 2013, 2014, 2015, 2016, and

FER90

2017), and he was also named the #1 Wells Fargo Sales Representative out of 500 employees in 2013 and 2016.

125.  Hannig was not the only Wells Fargo banker to advance Apex's ongoing fraud, however.  In light of Wells Fargo's pernicious sales culture and misaligned compensation system, this type of employee misconduct repeated itself again and again, across Wells Fargo bankers and branches. Indeed, as recently as January 23, 2020, the OCC recognized: "[t]he Bank tolerated pervasive sales practices misconduct as an acceptable side effect of the Community Bank's profitable sales model, and declined to implement effective controls to catch systemic misconduct.  Instead, to avoid upsetting a financially profitable business model, senior executives…turned a blind eye to illegal and improper ***conduct across the entire Community Bank***."  (Emphasis added.)

126.  Apex's last-minute pivot to the two new corporations they had "just set up" for merchant processing and which were now supposedly "owned" by Apex employee Camacho, necessitated getting new Wells Fargo bank accounts opened before the merchant account application could be completed.  Testa was more than happy to oblige.  When Camacho sent Testa documents for one of the new LLCs (with a Wyoming operating agreement signed that same day, April 21, 2015), Testa replied that the documents were "perfect" and the accounts were promptly opened.

127.  Once the new bank accounts were opened, Apex submitted the merchant processing application to Hannig listing Camacho as the "owner" and listing the Wyoming mail drop as the address.  But on April 30, 2015, Hannig informed Apex that higher-ups at Wells Fargo had rejected the application, as he had received a "decline email due to an unqualified business model for Wells Fargo. We tried, thank you for considering us."

128.  In response to questions from Apex, Hannig said the application was rejected because the companies were selling supplements.  In other words, despite

Hannig's questionable efforts to obtain Wells Fargo's merchant processing services for Apex, Wells Fargo's merchant banking division had (correctly) categorized the shell companies as high-risk businesses with which they did not want a relationship. The Bank's merchant division was unwilling to take on the risk of processing for these companies, recognizing that they were in an industry rife with consumer deception, and there was the potential for high chargebacks and losses *for Wells Fargo* caused by fraudulent activity.

129. Of course, Wells Fargo was still perfectly willing to continue servicing the fraudulent LLCs at the branch level and opening bank accounts for additional shell companies, while letting *other* merchant processors (who had less insight into Apex's illegitimacy, and no insight into its obfuscated performance history and ownership legerdemain, and who would be reassured by the fact that Wells Fargo had approved them for bank accounts) take on that risk – and while allowing Apex to deceive more unsuspecting consumers (including even Wells Fargo's own credit card holders) with the lure of "free trial" products.

130. Knowing what it did, Wells Fargo was legally required to take a number of steps, including conducting a further investigation into the Apex Enterprise, evaluating patterns of misconduct and suspicious activity across the entire Apex relationship, terminating the Bank's relationship with Apex, its principals, and its associated shell companies, and/or following the Wells Fargo established procedures for reporting the suspicious activity both internally and externally.

131. Wells Fargo did none of these things. Instead, it kept doing business and looking for growth opportunities with Apex. Through Testa, Wells Fargo continued to open numerous shell company accounts for Apex. Similarly, Hannig periodically attempted to get merchant processing for Apex shell companies but was ultimately always unsuccessful.

132. In December of 2015, Camacho accidentally sent a spreadsheet of

FER92

active and pending "MID's" (merchant processing accounts) to Hannig. The spreadsheet listed more than 25 LLCs with bank accounts at Wells Fargo, along with their corresponding accounts at various merchant processors. As was the case when Hannig had identified and flagged the central issue months earlier, *the purported owners of the LLCs were not the Wells Fargo account holders.* The spreadsheet made it absolutely clear that, at a minimum, Apex was engaged in large-scale credit card laundering and was using shell companies and straw owners to secure merchant processing services—something any banker in Hannig's position would have immediately recognized, particularly because of the incident some months earlier.

133. Within minutes, Camacho recognized that he did not want that spreadsheet in the Bank's files. He wrote to Hannig, asking him to "[p]lease delete ASAP" and adding that he "would greatly appreciate if you can keep the information confidential." Camacho concluded the email by asking Hannig to confirm with him once the email had been deleted.

134. Hannig promptly replied "Deleted." On information and belief, Hannig's prompt deletion of this e-mail and attachment from Wells Fargo records violated both Bank policy and the law. As an executive at Wells Fargo, Hannig had a duty under a number of federal laws to investigate and report Apex's suspicious activities. Those obligations did not disappear just because a customer asked that Hannig delete an email.

135. The spreadsheet was not sent to Hannig in a vacuum. Both he and Testa knew exactly who this very high-risk customer was. They were all too aware of Apex's history of hiding the true owners of the anonymous shell companies they created – and they had even helped Apex to mask these beneficial ownership issues and sanitize its merchant processing application at Wells Fargo. Hannig and Testa also knew that Wells Fargo had analyzed Apex's high-risk business earlier that year and had declined to provide merchant processing services to it. In light of the

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

above, on information and belief, the deletion of Camacho's email and failure to take steps to report the suspicious actions were deliberate efforts to aid and abet Apex's fraud.

136.   Notwithstanding its knowledge of obvious fraud, Wells Fargo and the Westlake Village Branch continued to open bank accounts for Apex shell companies throughout 2015, 2016, 2017, and 2018; the new accounts only stopped when the FTC filed its lawsuit against Apex.  In 2015, Camacho opened 14 more Wells Fargo accounts for 13 anonymous shell companies.  In 2016, Camacho opened six accounts for six shell companies; in 2017, 19 accounts for 19 shell companies; and in 2018 12 accounts for 12 shell companies.  In total, Wells Fargo opened *at least* 92 bank accounts for more than 70 shell companies over the course of just four years.

137.   When opening and servicing the accounts, Wells Fargo bankers continued to provide atypical banking services, asking no questions and deliberately ignoring Apex's obvious efforts to launder money it obtained operating its high-risk, fraudulent business through anonymous shell companies fronted by straw owners.

138.   The pattern was clear – and only became clearer with time: Apex, primarily through Camacho, would periodically request that Wells Fargo close existing shell companies' bank accounts after those shell companies had been blacklisted and lost their merchant processing because of the massive levels of chargebacks.   At the same time, Camacho would request Wells Fargo open new shell company bank accounts—often six new bank accounts at a time—of which Camacho would be the "owner".  In this way, Wells Fargo's conduct enabled Apex to cycle through the burned shell companies and their associated bank accounts before creating new, "unrelated" and anonymous LLCs to use to defraud consumers.

139.   As was the case with the San Diego Branch, the Westlake Village

Branch, via Testa, was more than willing to supply no-name reference letters for the shell companies. Testa provided large tranches of reference letters, routinely issuing 6 letters, and on one occasion 12 letters, at a time. He was also willing to vary the format and information contained in the reference letters based on requests made Camacho.

140. Across multiple branches and multiple bankers, between 2014 and 2018, Wells Fargo assisted the Apex Enterprise by opening account, after account, after account, for a host of shell companies. These shell companies were "anonymous" LLCs based out of Wyoming, though true their owners were not anonymous to Wells Fargo—Wells Fargo was well aware that all of these companies and accounts were part of the Apex Enterprise, owned and controlled by Barnett and Peikos. That was clear not only based on the fact that core Apex personnel were always the ones opening the accounts, and also from the email that Camacho mistakenly sent to Hannig, which spelled out exactly what Apex was doing. Yet Wells Fargo was more than happy to keep, and even pursue, Apex's business by facilitating Apex's ongoing fraud.

**B.     Wells Fargo's Support of the Triangle Enterprise**

(i) <u>Overview</u>

141. At the same time that Wells Fargo was providing banking services to the Apex Enterprise, it was also providing those same services to the Triangle Enterprise, which was also running "free trial" scams out of Southern California and which was operating using a business model strikingly similar to Apex's.

142. In the case of Triangle, as with Apex, multiple Wells Fargo bankers across multiple branches developed long-term and ongoing business relationships with Triangle's owner and controller, Brian Phillips; as with Apex, these Wells Fargo bankers eagerly opened bank accounts for a host of companies that they knew were shells being used by Phillips. And as with Apex, Wells Fargo's clear-eyed support of the Triangle Enterprise resulted in millions of dollars in consumer

1  harm—damages which spilled over to the Receivership Entities.

2  143.  Wells Fargo began providing services to Phillips and Triangle in at
3  least 2009.  In addition to opening and closing accounts and executing reference
4  letters for Phillips and his shell companies, Wells Fargo also provided a host of
5  other services, including payroll services and tax return preparation.  In each
6  instance, Wells Fargo took instructions from Phillips and provided information
7  directly to him, understanding that he was the owner and controller of all Triangle-
8  related accounts even though numerous others were listed as the "owners" of the
9  accounts.  Wells Fargo provided these services to Phillips and Triangle even
10 though it knew that those services were a prerequisite for money laundering and
11 fraudulent business activity.

12 144.  Like Apex, the Triangle fraud relied on the use of shell companies
13 with straw owners, which Triangle generally referred to as "nominees", to keep
14 their fraudulent businesses running.  Phillips recruited nominees to be the
15 "owners" of the shell companies by offering them a monthly fee, such as $500 per
16 month, for allowing Phillips to use their names and identities to establish shell
17 companies and accompanying bank accounts at Wells Fargo.  Phillips' only
18 requirement to qualify was that the nominees not be blacklisted on the MATCH list
19 as a previously terminated merchant.

20 145.  Phillips then served as the conduit between Wells Fargo and each
21 nominee in order to secure the Wells Fargo bank accounts needed to carry out the
22 Triangle fraud.  Each time, Wells Fargo rubber-stamped the applications.  From
23 there, Phillips used the corporate documents and Wells Fargo account information
24 (along with the essential Wells Fargo reference letters) to obtain merchant
25 processing services in the nominee's name, which allowed the Triangle Enterprise
26 to perpetrate its "free trial" scam at consumers' expense.

27 146.  None of this would have been possible without Wells Fargo.  Each
28 time Phillips opened a new shell account, he instructed Wells Fargo that the

nominee was the "100 % owner" on paper, but Phillips was always to be given immediate access and full control as a "co-signer" of the Wells Fargo bank account belonging to the supposed "100% owner." Each shell company's account opening paperwork falsely represented Phillips as a rank-and-file employee of the shell company—its supposed "Data Specialist"—a transparent effort understood by Wells Fargo to mask Phillips' true ownership of all of the shell companies. Wells Fargo always accommodated "employee" Phillips' requests, which was not in line with banking practices. As a result, Wells Fargo knew that Phillips retained the unfettered ability to transfer money from a nominee's shell account directly into the primary Triangle Enterprise account at Wells Fargo, which Wells Fargo knew was owned by Phillips.

147. The troubling pattern repeated itself, again and again, with Phillips driving all communications with Wells Fargo for the nominees. Notwithstanding known abuse of beneficial ownership for these types of high-risk businesses, and mounting evidence that Phillips was actively engaged in such abuse, Wells Fargo bankers happily opened this stream of new accounts in the names of nominees (in keeping with its sales culture prizing growth above all else). All the while Wells Fargo bankers conducted the most minimal level of due diligence, if any, on the nominee "owners", largely relying on Phillips' vouching for the new nominee "owner." Phillips himself routinely filled out the forms and gathered and submitted the signatures of the "owners" to Wells Fargo. If a Wells Fargo banker requested a cursory phone call with the "owner" before opening an account, Phillips arranged it. In the latter years of the fraud, Phillips even walked nominees into the local branches, and Wells Fargo promptly accepted the paperwork from the new "owners" before turning around to give "employee" Phillips full control as the co-signer. This arrangement benefitted Wells Fargo as well as Triangle and Phillips, because it gave Wells Fargo an easy way to open new accounts in perpetuity.

148.   After dealing with the "owners" on only the most perfunctory level at account opening, if at all, Wells Fargo then dealt thereafter with Phillips, understanding him as their customer and the actual owner of all of the accounts. At Phillips' direction, Wells Fargo regularly swept funds in the shell company accounts into Triangle's primary bank account at Wells Fargo.  Once transferred to Triangle's main account, the funds would almost immediately be sent to a Canadian company owned by Triangle, Global Northern, at a Canadian bank.  In turn, Global Northern would forward the funds to Hardwire accounts in Hong Kong or Thailand.  Hardwire would then wire money back to Triangle in the U.S. to cover expenses to complete the laundering of the funds.

149.   From the very start, Phillips and Triangle's offshore-based principal, Devin Keer relied upon Wells Fargo as the best (and perhaps only) banking option for opening scores of essential bank accounts for the shell companies.  In 2009, near the start of Triangle's implementation of its "free trial" scam, Keer, then in Canada, emailed a merchant processor to ask:

> Do you guys work with/know any corp services type guys who incorporate US corps quickly?  Brian [Phillips] has a corp in NV that he just set up but there's no bank accounts and stuff set up yet. Would like your advice on the whole US corp issue before we drive down to Seattle to open bank accounts - if we can set up another corp for the purpose of this…deal that might be a better play for us.

The processor promised to look into it, but before he could, Keer wrote back: "*I think we can get Wells to take care of it*."  (Emphasis added.)  As it turned out, Keer was right.

150.   Phillips, Keer, and Triangle relied on Wells Fargo to deliberately overlook obvious beneficial ownership issues, which Wells Fargo was happy to do. Phillips was so confident in Wells Fargo's pliancy that when one nominee raised a concern about what would happen if Wells Fargo contacted his mother (whom he had enlisted to serve as another nominee for Phillips in 2011), Phillips responded by dismissing his concerns wholesale, responding, "***Dude, you still don't***

1  *understand how wells is totally different.   The bank won't be calling her.*"
2  (Emphasis added).  Wells didn't call.

3       151.  Instead of conducting an investigation, increasing its monitoring of
4  the Triangle accounts, reporting suspicious or unusual activity internally or
5  externally, or simply refusing to provide banking services to the Triangle fraud,
6  time and again Wells Fargo acceded to Phillips's requests for the Bank to open
7  new shell company accounts with nominee owners, effectively legitimizing the
8  shells in the eyes of the merchant processors.

9                  (ii) <u>The Keller, Texas Branch</u>

10       152.  The relationship between Wells Fargo, Phillips, and Triangle began in
11  Texas on September 2, 2009, when Wells Fargo's Keller, Texas branch, principally
12  through banker Lea Walker ("Walker"), but with assistance of others in the branch,
13  including the branch manager, began opening shell company accounts for Phillips
14  and providing him with reference letters.

15       153.  In roughly one year, Walker opened at least eight shell company
16  accounts for Phillips and provided him with four reference letters for these
17  accounts.

18       154.  In 2011, Walker opened four more accounts for shell companies at
19  Phillips' request, providing him with three reference letters.  That year, another
20  banker at the Keller, Texas branch, opened two more shell company accounts for
21  Phillips and signed another reference letter.  Walker continued to open additional
22  shell accounts for Phillips into 2012.  In total, this Wells Fargo branch opened
23  more than 20 banks account at Phillips' request, with roughly half of those being
24  for shell accounts nominally owned by others.

25       155.  Wells Fargo's understanding of Phillips' ownership interest in the
26  accounts is abundantly clear in May 2012 emails that Phillips and Walker
27  exchanged, in which Phillips asked Walker to remove certain approval
28  requirements so that he could generate and send wires for accounts that he did not

own on paper. Walker immediately fulfilled Phillips' request, which would have been unthinkable if she were not aware that he was the true owner of the accounts and that the purported "owner" was just a nominee.

### (iii) The Southern California Branches

156. In or about 2013, Phillips began moving his banking relationship with Wells Fargo to Southern California. Across multiple Wells Fargo Community Bank branches in Southern California (and in partnership with multiple Wells Fargo bankers), Phillips came to open dozens more Wells Fargo accounts as the Triangle scheme expanded. In total, over the course of the Triangle scheme, Wells Fargo opened more than 85 Triangle-related accounts in California and Texas at Phillips' request. While Wells Fargo knew that all of the accounts were under Phillips' exclusive control, over 60% (approximately 55) of those accounts were bank accounts for the shell companies that were "owned" in the names of the nominees. Wells Fargo also opened more than 30 corporate bank accounts that Phillips directly owned. These included, most notably, numerous Wells Fargo bank accounts for the Triangle Media Corporation, into which Phillips regularly requested that Wells Fargo transfer funds from the shell company accounts "owned" by others, which Wells Fargo always did.

157. Between 2013 and Triangle's demise in 2018, Phillips' business with Wells Fargo in California expanded rapidly. Over a nine-month period in 2015 alone, Wells Fargo opened a total of 12 shell company accounts "owned" by nominees for Phillips. Phillips established a close and continued relationship with Wells Fargo across multiple branches in Southern California. In total, over a dozen Wells Fargo Community Bank branches in Southern California provided an array of banking services for Phillips, Triangle, and his many related shell companies. Between fall 2013 and the end of Triangle in 2018, Wells Fargo opened more than 60 accounts at Phillips' request. More than 40 of those bank accounts, however, were for shell companies supposedly not "owned" by Phillips.

Phillips was a repeat player at many branches, including San Diego (1st and Market – 5 accounts and 3 reference letters), El Cajon (6 shell accounts and 9 reference letter), Palomar Vista (8 accounts and 2 reference letters), and San Marcos (6 accounts and 1 reference letter). Additionally, Phillips often made requests to open accounts to his Relationship Managers (Albana and Cording) working out of the Escondido branch, who expedited that process. Albana and Cording played the essential role of providing Phillips with ready access to reference letters (they wrote more than 30 such letters between 2015 and 2018).

158. The scope of the branches involved emphasizes that this was not one bad banker or one bad branch—rather, the bad conduct was reliably endemic at Wells Fargo. While the Escondido Branch was probably the worst offender (as discussed below), the misconduct at issue occurred across the Southern California branches noted above, all of which were operating under Wells Fargo's toxic sales culture. For example, in 2015 a banker from the San Diego Branch came to Phillips's aid when he asked her to set up a bank account for a shell company "with me and another signer on it." The banker responded that she needed the nominee owner's information to open the account, but that she would "switch the relationship once I have it." Phillips sent the banker the information she requested (the nominee's driver license, phone number, and social security number, among other things), and the banker proceeded to open the account, apparently untroubled by the fact that Phillips—not the nominee—was the one providing the information to open an account for a company that purported to be owned by the nominee.

159. The Wells Fargo bankers knew that all of these accounts were related, but on information and belief, that relationship was never risk-rated, monitored, or otherwise managed as would be befitting a relationship encompassing the volumes, number of accounts and global scope of what was an enterprise—not a series of individually-owned accounts.

### (iv)  The Escondido Branch

160.  Wells Fargo bankers at the Escondido Branch were especially accommodating to Phillips, particularly Haiman Albana ("Albana"), who was a Vice President and Business Relationship Manager at the branch, and Brian Cording ("Cording"), who was a Vice President and Senior Business Relationship Manager.  Compliance "rules" were easily bent or discarded for Phillips, in line with the OCC's conclusion that "[t]o the extent [Wells Fargo] did implement controls, the Bank intentionally designed and maintained controls to catch only the most egregious instances of the illegal conduct that was pervasive throughout the Community Bank."  Albana, for example, initially told Phillips on October 30, 2013, that a shell company account (which Phillips had requested on October 24) hadn't yet been set up because Albana was "waiting to hear back from my compliance department" about it—but when Phillips complained that "when [he] was working with the branch on this stuff they could turn it around in 1 day" and asked whether he should "reach out to my branch contact," Albana sent him the forms for the next step *less than one hour later*.

161.  On August 25, 2014, Phillips sent an email to Albana about one shell company's accounts, asking Albana "to make sure that my name is not showing up on the [Vital Global Marketing] account (7355) at all.  These are [the nominee]'s accounts of which I have access too.  ***Can you please work to have my name replaced with her name?***  Let me know how quickly we can get this taken care of?" (Emphasis added.)  About a week later, Phillips forwarded forms purportedly completed by the nominee to add her and remove him from the shell account, at which point a Wells Fargo effected the change.

162.  Cording was fully aware that Phillips was the one in control of the shell accounts that Triangle had at Wells Fargo.  On August 19, 2015, for example, Phillips complained to Cording that he couldn't see accounts for shell companies H1 Marketing, Brand Junction, and Total Market Products "at the moment in a

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

single portal view on my wells fargo login." Phillips explained that he "need[ed] to have key executive access" to the shell company accounts because "they need[ed] to have my status changed in the company." Cording immediately made changes to the profiles in Wells Fargo's system in order to allow Phillips "to see the accounts with the ability to transfer into the 3 of them."

163. Meanwhile, Phillips was making changes to the ownership of the Vital Global Marketing account—the account which, roughly a year earlier, he'd had Wells Fargo scrub his name from. Phillips sent over the paperwork to have the old nominee "owner" removed from the account on August 28, 2015. Less than a week later, he asked to have a different nominee added to another Vital Global Marketing account (x1053); a Wells Fargo banker business associate gave the new nominee control over the account, but when Phillips asked for documentation of a change in ownership, the Wells Fargo employee explained she would need an amended operating agreement. A few days after that, Cording chimed in to explain that the change in ownership would require a new account. The Wells Fargo employee sent over the required paperwork, explaining that Phillips "would want to list [the new nominee] as 100% owner to match your documents." Recognizing Phillips's true role in the operation, the banker added, "You will also need to list anyone (like yourself) who might have control of the company," and warned Phillips that as the technical owner of the shell company, the new nominee would have control over the other Vital Global Marketing account (x7355)—a warning she would not have needed to give if she'd believed the nominee was, in fact, the owner.

164. Cording also continued to accommodate Phillips' requests for visibility into accounts purportedly owned by others. On May 5, 2016, Phillips asked Cording to add another shell account, Sunset Order Marketing, to his "consolidated Business banking view in the portal." Cording asked another banker to make the change without hesitation. That banker, however, pointed out that the

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

nominee for the account was the "100% owner, so in order to grant [Phillips] combine[d] view through online banking" she would need approval from the nominee. Phillips then asked, "why do these accounts keep getting setup this way where I have no right to visibility. Can we please get this and all accounts going forward switched to be in my consolidated view."

165. The Wells Fargo banker was quick to offer a couple work arounds:

If you aren't owner they can't automatically grant you combined view because you can transfer between other entities and personal accounts that way. **The work around is to have the owner grant you this authority but our online department requires it in writing incase there is some sort of internal fraud or something with the business, WF won't be liable**.

Unfortunately we cannot automatically do this every time. We have the work around but it requires an extra step. **In order to avoid this entirely we do offer the CEO portal for our large business clients**. (Emphasis added.)

166. Phillips made it absolutely clear that he wanted full access to multiple accounts for companies in which he had, on paper, no ownership interest. Though this is an obvious indication of potential fraud, no one at Wells Fargo appeared troubled by the request. In fact, when Phillips expressed exasperation with the process, one Wells Fargo banker even sympathized, apologizing for the Bank's (flimsy) procedural hurdle: "I'm sure somewhere along the lines an employee transferred out money from a business to his/her personal accounts and WF took a significant loss. So they now require an acknowledgement from the owner stating they are ok with the combine view."

167. Wells Fargo clearly understood that Phillips was in charge and that the nominee owner of the company was more or less irrelevant, but the Bank continued to do business with Phillips and Triangle. Wells Fargo did so in violation of KYC rules and regulations, which required the Bank to have a relationship with each of its customers. That posed a problem since Wells Fargo's only relationship with the shell companies was through Phillips.

168.   The rules changed in May 2016, but by December 2017—nearly a year and a half later—Wells Fargo had not yet implemented them.  On information and belief, the new rule, in fact, simply reflected what had been accepted as standard practices at many other banks for a number of years (but of course not Wells Fargo), going back as far as the establishment of new rules after the September 11, 2001 terrorist attacks. That month, Cording emailed Phillips to explain the Bank's obligations under the "new" rule:

> In May 2016, the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) issued a rule strengthening the due diligence that certain financial institutions must perform with respect to their customers.  The new rule requires that financial institutions thoroughly understand the nature of the business of each of their clients.Wells Fargo and other banks are required to comply with these new and existing regulations related to the prevention of financial crimes.  As a result, we are enhancing our internal compliance and risk related policies.  Because of the size and scope of our organization, we are starting to collect customer information now to ensure that we are able to comply with the federal deadline.

169.   Cording sent Phillips pre-filled paperwork for 10 companies, seven of which were shell companies *but all of which listed Phillips as the owner*.  This was inconsistent with the owners listed on the Wells Fargo bank records, but Cording clearly considered Phillips to be the actual owner of all 10 companies in spite of this.  Predictably, Phillips responded and asked to have the "docs changed around" so he could "coordinate for each of the people to sign."  Cording replied: "Happy to do it, *I think the challenge is we may not be sure of the owners of each entity*." Not only did Wells Fargo have zero idea who its account owners were (showing how little the Bank was concerned about Triangle's proliferation of shell accounts), but Cording, apparently unperturbed, continued doing business with Phillips even after he was once more faced with proof that Phillips was the *de facto* owner for a host of shell companies.

(v)   Triangle's Attempts at Securing ACH Processing

170.   Phillips periodically looked into securing ACH processing services from Wells Fargo, which would give Triangle another avenue to accept customer

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

payments..  Wells Fargo's incentive was obvious: they would be able to collect processing fees for any transactions that Triangle ran.

171.  As early as 2014, Albana was working with Phillips to try and secure web-based ACH processing for Triangle.  Apologizing for the delay in getting approval for Phillips' application, Albana explained that "[a]s you know your industry is high risk and the bank is scrutinizing each detail prior to getting approval, I am working diligently with credit supervision to get the approval."  In response to requests from Albana, Phillips provided him with a client list, sample agreement, key officer bios, and additional information.

172.  The 2014 push to get ACH processing for Triangle through Wells Fargo was dead by August, however.  As Keer wrote to another Triangle employee, "the entire ACH deal with Wells was scuttled because of some random text on [the Triangle website]."

173.  Emails the following month between Triangle personnel make it clear exactly what, in one employee's words, "wells' compliance team saw" that caused the Bank to back off: an old website for Triangle Media Corporation, which touted the company's ability to "provide expertise for your high-risk business" because its "seamless solutions offer your business the ability to market concepts normally rejected by traditional processors and banks."

174.  While Triangle had already removed the problematic language from its website, it was still popping up as the top google search for "Triangle Media," so   Phillips and his employees made efforts to bury it by "get[ting] new content to pile over the [problematic language]."

175.  Wells Fargo's compliance team's decision to reject Triangle's processing application demonstrates, as with the Bank's rejection of the Apex merchant processing applications, that Wells Fargo was unwilling to take on the risk of processing for these companies.  The Bank was careful when its own potential exposure was on the line.  Of course, the Bank remained perfectly willing

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

to continue servicing the fraudulent shell companies at the branch level, open bank accounts for additional shell companies, and take other atypical steps to assist the schemes' success.

176.  Despite the compliance team's decision to nix ACH processing, the sales imperative at the Bank was overwhelming.  One year later  in 2015, Cording, was doing his best to get ACH approval for Phillips and Triangle once again. Cording emailed Phillips that after "thinking through my strategy to get ACH approved on Triangle Media," he thought it would be useful to have some balance sheets and income statements, because they would allow him to "utilize the financial strength of the business [to] mitigate any risks."

177.  Cording still had not managed to obtain approval for Triangle to use Wells Fargo's ACH processing in early 2017, but that didn't mean that he had stopped trying.  On February 16, he wrote Phillips that "[w]e did do some further due diligence internally and there is potential for us to fulfill the ACH request as well as we may have a solution for the account needs."  Although it does not appear that Cording was ultimately able to secure ACH processing for Triangle, the fact that he was still willing to try (and that Wells Fargo was still apparently considering it) in light of everything that Cording and Wells Fargo knew about Phillips and Triangle speaks for itself.  The evidence firmly establishes that Wells Fargo knew exactly what Triangle was doing, and that by assisting Triangle, it was violating banking regulations and the Bank's own (on paper) policies and procedures.

(vi)   Wells Fargo Authorized Suspicious and Unusual Transactions that Made No Economic Sense.

178.  As all of the above examples indicate, Wells Fargo knew from very early on in its relationship with Triangle that Triangle was using nominees as fronts for shell companies, with Phillips regularly insisting that the nominees (as opposed to Phillips, who Wells Fargo knew was the true owner) be listed as the

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

"100% owners" of the accounts. Wells Fargo bankers had obligations under standard banking practices and banking laws and regulations to investigate and report Phillips' manipulation of the shell companies' beneficial ownership. Had Wells Fargo conducted a real investigation, its findings would have compelled it to refuse to do any more business with Phillips, shut down Phillips' accounts, and/or follow Wells Fargo's established processes regarding the making of internal and external reports of suspicious activity. In reality, of course, given all that it knew by this point, Wells Fargo already understood what the results of any such investigation would be.

179. Wells Fargo knew that Triangle's shell companies continually suffered massive chargebacks. Like with Apex, this was abundantly clear from the shell companies' monthly account statements.

180. Wells Fargo had an obligation under banking laws and regulations to look at the family of Triangle accounts as a whole, rather than looking at individual account activity in isolation. If one Triangle-related account needed to be closed, then all other Triangle accounts likely would have to be closed too. This obligation required the Bank to reassess its dealings with the Triangle Enterprise on a regular basis, including whenever it opened a new account at Phillips' request.

181. Wells Fargo was therefore obligated when conducting its account opening and at least annual diligence for Triangle-related entities under standard AML procedures to assess both new – and existing accounts in the context of the overall relationship with Triangle's beneficial owners and key parties, namely Phillips who had more than 30 personal and corporate accounts with Wells Fargo (in addition to the more than 50 shell accounts).

182. In particular, Wells Fargo should have conducted a critical examination of transfers between Phillips-owned and Phillips-associated companies, which there is no indication it did—even though there were multiple indicia of fraud present. Wells Fargo knew that Phillips was regularly requesting

that the Bank move money into his main Wells Fargo Triangle account, which Phillips himself exclusively owned. At Phillips' direction, Wells Fargo regularly processed suspicious large-figure, round-number transfers out of shell accounts (which were nominally owned by others) and into his own Triangle account. Wells Fargo bankers should have pressed Phillips on why significant amounts of money were being sent from accounts owned by others to Phillips' Triangle account, all while the listed owners (nominees) were receiving only nominal payments from the accounts that they supposedly owned. Wells Fargo was also knew that funds which hit Wells Fargo's Triangle account were regularly being transferred overseas. If Wells Fargo had any concern for protecting the interests of these "owners," or complying with anti-fraud or AML regulations, it would not have permitted Phillips and Triangle to do what they were doing.

183. Wells Fargo had no such concerns. Instead, after Wells Fargo had enabled Phillips himself, and not the supposed "owners," to direct these transfers from the LLC accounts to his Triangle accounts, thereafter Wells Fargo even transferred the recently-deposited funds from the Triangle account entirely out of the United States.

184. While Wells Fargo was disregarding problematic and unusual account activity, Wells Fargo was not at all ignoring Phillips or Triangle's accounts. However, instead of vigilantly monitoring these accounts for suspicious behavior in the context of a high-risk customer in a high-risk industry, making all manner of suspicious transactions out of accounts he did not "own," Wells Fargo was nurturing its relationship with Phillips to try to grow Wells Fargo's business. In other words, Wells Fargo was doing what it did best: opening accounts wherever it could, whether by providing new banks accounts for the shell companies or trying to provide add-on banking services, such as ACH processing, merchant processing, or even access to foreign accounts. Cross-selling clients, not compliance or client oversight, was the priority for Wells Fargo. *See, e.g.,* American Banker, *Bankshot:*

*Wells Fargo Should Have Seen Add-on-product Trouble Coming,* Kevin Wack, July 19, 2018.

185.   It is particularly troubling that over many years, Wells Fargo used so-called "Relationship Managers" (in this case Albana and Cording operating out of the Escondido branch) to serve as lead salespersons seeking to grow the Triangle relationship as much as possible.  Wells Fargo flouted the common industry role that positions such as Relationship Managers have as experienced bankers, providing an extra "first line of defense" layer of protection for a bank against fraud and money laundering.

186.   Wells Fargo designed a corporate structure prioritizing sales that instead used its designated Relationship Managers in a way that perpetuated fraud and weakened risk compliance, unlike other banks of its size.  Typically, a banker in such a position will conduct periodic due diligence reviews across families of accounts, especially for accounts like Triangle, operating in high-risk industries rife with fraud.  At other institutions following standard banking practices, a designated account representative such as this would have adhered to procedures such as requiring visits to an owner's place of business.  Such designated account representatives would also have been responsible for being familiar with the specific activity in the account and its purpose, and for providing updated predictions of expected activity in order to facilitate centrally managed, automated monitoring for potentially suspicious activity.  But, as Brian Phillips had learned early on, Wells Fargo was "totally different."

### C.   Wells Fargo Aided and Abetted Fraudulent Transfers

187.   There is additional evidence of Wells Fargo's knowledge of the scammers' modus operandi.  Millions of dollars consumers paid into the various shell company accounts were diverted to the individual fraudsters to maintain their lavish personal lifestyle, or to funnel monies out of the Enterprises into real estate and investments that they would purchase via trusts and corporations.  For

example, in July 2014 emails between Triangle's Phillips and Tim Morgan, a Wells Fargo Private Mortgage Banker, Phillips notified Morgan that Phillips would receive a $2 million wire from Hardwire (a defendant in the FTC case), and then asked, "will this money need to be 'seasoned' before being used for a house purchase?"

188. As set forth herein, Peikos and/or Barnett, and Phillips controlled the Apex and Triangle Enterprises (which are now Receivership Entities), and directed them to make numerous transfers out of proceeds of the fraud to themselves, and third parties (including Wells Fargo). At the time of each fraudulent transfer, they intended to delay, defraud, or hinder their creditors (most notably the Receivership Entities under their control).

189. Through the numerous acts identified herein, Wells Fargo substantially assisted Phillips, Peikos and Barnett in making these fraudulent transfers, despite knowing that the transfers were unlawful, they controlled the Receivership Entities and had no lawful claim to fraudulently-obtained consumer funds. Wells Fargo knowingly transferred shell company account funds to other Receivership Entity shell company accounts and then directly to Phillips, Peikos, and/or Barnett or to other third parties (at the direction of Phillips, Peikos, and/or Barnett) without the shell companies receiving a reasonably equivalent value in exchange for the transfers and which depleted the shell companies of all or substantially all of their assets.

190. The transfers from the Wells Fargo accounts of the Receivership Entities to Phillips, Peikos, Barnett and Wells Fargo constitute fraudulent transfers under the California UVTA and UFTA for the following reasons, among others:

191. Phillips, Peikos and Barnett made the transfers to themselves or third parties with the actual intent to hinder, delay, or defraud consumers;

192. Phillips, Peikos and Barnett engaged in the free-trial schemes knowing that their assets and the assets of the Receivership Entities they controlled

---

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER111**

1   were unreasonably small considering that all of the assets were obtained by frauds

2   on consumers and did not belong to them;

3   Phillips, Peikos and Barnett knew that through their fraudulent schemes, they

4   incurred debts to the Receivership Entities and consumers beyond their ability to

5   pay;They retained possession or control of the assets after the transfers.

6       193.   The Receivership Entities did not receive a reasonably equivalent

7   value in exchange for the transfers from the Wells Fargo accounts because Phillips,

8   Peikos, and Barnett drained the accounts for their own personal use and benefit,

9   and the shell companies acted as mere pass-throughs to allow the fraudsters to

10  avoid detection by creditors of their ownership and control of the funds;

11      194.   The Receivership Entities had no assets other than the fraudulently-

12  obtained funds before or after the transfers;

13      195.   The transfers to Phillips, Peikos, and Barnett were as corporate

14  insiders of the Receivership Entities;

15      196.   The transfers among and from the Wells Fargo accounts were

16  intended to conceal the true ownership and recipients of the funds;

17      197.   When the transfers were made, Phillips, Peikos and Barnett knew they

18  were likely to be sued for their wrongdoing;

19      198.   Phillips, Peikos, and Barnett removed and concealed receipt of the

20  consumer funds from the Wells Fargo accounts by transferring them to unrelated,

21  unidentified and undisclosed personal and offshore accounts;

22      199.   The transfers were of substantially all the Receivership Entities'

23  assets;

24      200.   The Receivership Entities were insolvent or became insolvent shortly

25  after the transfers were made or the obligations were incurred; and

26      201.   The transfers occurred shortly before or shortly after the substantial

27  debts to consumers were incurred.

28      202.   Despite knowing that Phillips, Peikos and Barnett had no lawful claim

---

to the consumer funds and Phillips, Peikos, and Barnet lacked the assets to pay such amounts back to the Receivership Entities, Wells Fargo transferred such consumer funds, and depleted the Receivership Entities' assets, which allowed Phillips, Peikos, and/or Barnett to receive such funds directly.

203.   Based on the allegations above, these transfers of Receivership Entity funds to Wells Fargo and Phillips, Peikos, and Barnett constitute fraudulent transfers which must be returned to the Receivership Entities.   Accordingly, the Receiver seeks to recover as fraudulent transfers all Receivership Entity/consumer funds received by Wells Fargo as well as those funds transferred to Phillips, Peikos, and Barnett.

204.   Wells Fargo knowingly aided and abetted the fraudulent transfers from the Receivership Entities under the control of Phillips, Peikos, and/or Barnett. This substantial assistance included the fraudulent transfer of consumer funds from the Wells Fargo accounts to Phillips, Peikos, and Barnett.

205.   In addition, Wells Fargo accepted payments of consumer funds from Receivership Entities in connection with setting up and maintaining the fraudulent accounts. By collecting fees, charges, fines, reserve amounts, and other payments generated by the shell companies' and other Receivership Entities' payment processing, Wells Fargo was asserting that the Receivership Entities had a valid obligation to make these payments to Wells Fargo.

206.   Wells Fargo, as a knowing aider and abettor of the fraudulent schemes, was not entitled to receive, and could not take in good faith, these payments from the Receivership Entities' funds derived from payments by defrauded consumers in connection with setting up and maintaining the fraudulent accounts for the Receivership Entities and thus constitute fraudulent transfers which must be returned to the Receivership Entities.

## VIII. WELLS FARGO KNEW THE ENTERPRISES WERE DEFRAUDING CONSUMERS

207. Wells Fargo knew that the Enterprises were defrauding not only merchant processing services, but also the Enterprises' own consumer customers.

208. Wells Fargo's relationship with the Enterprises was neither transitory nor circumscribed. Over the course of multiple years, Wells Fargo opened scores of shell accounts, allowing the Enterprises to continue perpetuating their fraud on consumers. In other words, if Wells Fargo didn't know what the Enterprises were doing by the fourth account, it certainly knew by the thirtieth or fortieth.

209. Wells Fargo also knew that the Enterprises were employing extremely troubling direct-to-consumer sales tactics, including negative option sales, free trial offers, and automatic periodic billing (whether referred to as recurring, continuity, or subscription programs). As detailed herein, in providing atypical banking services to the Enterprises, Wells Fargo repeatedly scrutinized information that was directly related to the Enterprises' fraudulent businesses, such as the Enterprises' product websites and billing and refund policies, which revealed the true nature of the Enterprises' fraud.

210. Wells Fargo's account opening process included (as is standard practice for any bank considering opening new accounts for a business) review of information regarding the type of business applying for the account, and a thorough review of the business's associated websites.

211. As early as 2010, Wells Fargo shut down an account associated with Triangle principal Brian Phillips because it employed the very same fraudulent business model at issue here. In a November 24, 2010 email from Brittney Bond of Meritus Payment Solutions[14] to Phillips, Bond stated "[h]i Brian, we need to close

---

[14] Meritus Payment Solutions was an independent sales organization and reseller of card processing services for merchant accounts, and performed services for the Triangle Enterprise.

your Kaboom internet account as Wells stated it was a prohibited business type (negative option followed by a free or low cost trial) . . . Wells does random reviews of our direct marketing accounts, the rest of your accounts are still in good standing." As Wells Fargo knew, "direct marketing" is a consumer-oriented type of business, *i.e.* one that markets directly to consumers. Phillips forwarded the message to his Triangle Enterprise co-principal Devin Keer, stating "FYI, our Wells Kaboom MID is being closed."[15]

212.   Notwithstanding Wells Fargo's closure of this Triangle-affiliated company's account for being a "prohibited business type," Wells Fargo employees still sought to offer merchant services to the Triangle Enterprise. Lea Walker of Wells Fargo pitched these services to Triangle's Phillips in a December 10, 2013 email, offering to have a Wells Fargo merchant services representative named Melissa contact him. Phillips responded "I'm happy to speak with your rep Melissa, but just tell her we specialize in high risk continuity business. I'm pretty sure Wells doesn't provide processing for those business types."

213.   As discussed *supra*, in 2014 Haiman Albana of Wells Fargo wrote to Phillips stating, "[a]s you know your industry is high risk and the bank is scrutinizing each detail prior to getting approval."  In response to requests from Albana, Phillips provided him with a client list, sample agreement, key officer bios, and additional information. Wells Fargo's scrutiny resulted in the rejection of Triangle's ACH processing application. As Triangle's Keer wrote to another Triangle employee, "the entire ACH deal with Wells was scuttled because of some random text on [the Triangle website]."

214.   Wells Fargo also repeatedly scrutinized information such as websites and return policies for entities associated with the Apex Enterprise, which revealed

---

[15] "MID" stands for merchant ID, it is a unique number used to identify a merchant bank account.

FER115

the true nature of Apex's business as a consumer fraud scheme.

215.   As discussed *supra*, on April 21, 2015, Chris Carr of Apex and David Hannig of Wells Fargo exchanged emails in which they discussed the Apex product websites www.virilitymuscle.com and www.evermaxbody.com.

216.   In an April 24, 2015 email with the subject line "Changes made to terms and conditions," Carr wrote to Hannig, apparently responding to questions from Hannig relating to these same websites. In that email, Carr stated:

> We have also deleted a legacy reference to trial / continuity billing that was carried over in our terms and conditions. I believe you will now find them consistent with our model which offers the following two options:
>
> You can review the changes here on section 9:
>
> https://virilitymuscle.com/terms.php
>
> https://evermaxbody.com/terms.php
>
> Option A. Buy one bottle
>
> Option B. Buy two bottles.
>
> Again, we are not offering any recurring or subscriptions based sales of these products in the US.

While Carr claimed that Apex was not using subscription based sales (at least "for these products," for sales "in the US"), Wells Fargo knew that Apex had used such sales methods in the past, and, as discussed below, Wells Fargo knew that Apex had not, in fact, abandoned the recurring billing model.

217.   Shortly thereafter, Wells Fargo's Hannig replied, advising Apex's Carr on further changes to be made to an Apex website for the Evermax product, and even including a screenshot of the website to make his point:

Take out the word Follicure where it says buy 1 bottle.

**David Hannig**
Assistant Vice President
Business Sales Consultant
Wells Fargo Merchant Services
Cell 818.388.5309 | Fax 866.694.1018

Merchant Customer Service: 800.451.5817

218.   In another series of emails sent on July 2, 2015, with the subject line "NEED ADDITIONAL INFO," Hannig wrote Carr saying "[w]e're not out of the woods yet," and that Wells Fargo underwriters required information including "[a] complete Website or additional Mock Up Pages that include, Product, Pricing, Return Policy, Contact Page with Phone Number, Privacy Policy and Shopping Cart."  Carr responded "I can get you the mock up pages, pricing, return policy all that. Not a problem." Hannig replied that "they will shut down the account by 7/6 if we do not have the biz license, pricing on the website, and the contact page with

phone number."

219.   In what appears to be a related email sent from Hannig to Carr on July 6, 2015, Hannig states:

> Chris,
>
> They are shutting down your account unless you can address the subscription basis below….
>
> At this time the merchant is not supportive of this merchant account and it will be closed, please advise your merchant.
>
> According to the mock ups provided he is offering memberships monthly and quarterly and is not supportive, of this higher risk business model.

220.   Despite having scrutinized Apex websites, pricing, and return policies that revealed it to be engaged in a high-risk automatic subscription business, Wells Fargo pitched merchant services to the Apex Enterprise, and sought related business information and website information from Apex. In a series of emails over October 14-15, 2015, Apex CFO Raul Camacho sent Dominic Testa of Wells Fargo documents to open three new bank accounts for Apex-affiliated LLCs. David Hannig of Wells Fargo responded to that email, saying:

> Dom wanted me to reach out to you to get more information about this business to see if we can do the credit card processing for you. Please answer the below questions:
>
> -What is the nature of this business?
>
> -Is the website complete yet?

Camacho forwarded that message to Apex employee Chris Carr, stating "Can you please provide the information below for David at Wells Fargo, we are trying to set up MID's for Seekfly." Carr responded "[t]hey already declined Seekfly once. They issued a MID and then took it back. The official reason was that the [sic] found the recurring billing model too risky."

221.   These allusions to "risky" billing models and "high-risk" businesses are pseudonyms for consumer fraud.  On information and belief, Wells Fargo knew that with this kind of business model, with the kind of chargebacks they were seeing, and with the other indicators of fraud discussed herein (*e.g.*, the use of credit card laundering), at least some portion of consumers were being defrauded by the Enterprises.

222.   For similar reasons, Wells Fargo, in its capacity as a credit card issuer, declined to process a substantial number of transactions for a Triangle Enterprise entity. In a January 30, 2017 email from Triangle principal Devin Keer to Triangle employee Henrik Risvang, Keer stated:

> I know you know this, but I think Hardwire is being bled to death by declines (Invalid Card Number) on US Visa Debit issuers, most noticeably Wells Fargo.

> I reviewed some data over the weekend and it's probably more serious than I'd thought. Especially with the diet traffic Hardwire is bringing in which has a heavy distribution of those cards. Can you offer a timeline on the fixes that you had suggested (platform routing Omaha/Nashville, etc) as well as the initial meeting with Wilson?

> Hardwire is losing hundreds of thousands, probably millions to this, given the competition doesn't have the same issue. I would call this priority 1 in terms of "fixes" for TPG on existing services.

> Let me know your thoughts. We've known about this a long time but with the data from other marketers I think it's clear there's something truly amiss and its reach is broad.

223.   As discussed *supra*, consumers initiate "chargebacks" when they dispute credit card charges by contacting their credit card issuing bank, in a process that ultimately results in the funds being recovered (or at least, attempted to be recovered) from the merchant's business bank accounts. In this case, Wells Fargo (and other banks) issued credit cards to consumers that the Enterprises imposed fraudulent charges on, and for which the consumers initiated chargebacks.

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

Such chargebacks were recovered (or attempted to be recovered) from the Enterprises' business banking accounts, including those at Wells Fargo.

224.   In a July 12, 2017 email with the subject line "FW: Global Products 897212716889 Chargeback Reduction Plan Hold," Maura Bevilacqua of Connected.Co[16] wrote to Apex CFO Camacho, copying a message received from Laird Allen of Humboldt Merchant Services,[17] which stated:

> Based on the chargebacks on this account, we are placing it on hold until we see a plan for dealing with this issue. Please take the time to correct whatever issue is causing these chargebacks, as the current trend is not compatible with continued operation.
>
> If we do not see improvement, we will be forced to take further action.

Camacho replied on July 18, 2017, stating "[a]ttached is the CB Reduction plan, please let me know if you need anything else. Thanks!"

225.   Attached to Camacho's email was a document titled "MITIGATION PLAN," dated July 18, 2017 regarding the merchant "GLOBAL PRODUCTS, LLC," which it described as "a developing company in the Health and Beauty industry." The attachment contained the following chart of chargebacks for this LLC by bank, showing that Wells Fargo itself had the highest percentage of chargebacks in June of that year – that is, Wells Fargo knew that there was consumer fraud because Wells Fargo itself, acting in its capacity as a credit card issuer, was cancelling charges made to Wells Fargo credit cards for customers citing fraud as the reason for cancelling:

---

[16] Connected.Co provides merchant services to what it describes as "high-risk businesses."

[17] Humboldt Merchant Services provides credit card payment processing services.



226.   In addition, the attachment provided the following analysis of "automated chargebacks" for this LLC imposed by banks including Wells Fargo.

**1.   RISK DETERMINANT: AUTOMATED CHARGEBACKS**

An analysis of our INN/BIN transactions uncovered 3 major contributors to our chargeback inflation from June to present. This is indicative of an automated rule based system flagging our sales using criterion that are often antiquated relative to our vertical. The following banks were identified as such:

- Citibank (June, 12%)

- JP Morgan Chase Bank (June, 12% - July 13%)

- Wells Fargo Bank (June, 15%)

227.   The attachment also included pie charts of chargebacks by reason category. When a credit card issuing bank initiates a chargeback on behalf of a consumer, it assigns a standardized reason code to the chargeback request. A chargeback reason code is a short alphanumeric code, which is meant to identify

the reason for the dispute. Each of the major credit card brands (including American Express, Discover, Visa and Mastercard) use standardized lists of reason codes. These reason codes are communicated by the issuing bank to the bank at which the merchant maintains its accounts from which the chargeback funds are sought, and ultimately communicated to the merchant. The attachment's pie charts reflecting a categorization of chargeback reason codes for this LLC were as follows:



Chargebacks by Reason Category

228. These charts show that the vast majority of chargebacks for this LLC relate to fraudulent transactions, cancelled recurring charges, unauthorized transactions, and refunds not processed, *i.e.*, that they were overwhelmingly due to the Enterprises' fraud against consumers. Wells Fargo knew the reason codes associated with the Enterprises' chargebacks due to its dual roles as the issuer of credit cards to consumers who initiated chargebacks from the Enterprises, and as the provider business banking accounts for the Enterprises from which chargebacks were (or were sought to be) recouped.

229. As discussed *supra*, the Apex shell company bank accounts at Wells Fargo suffered on average more than 22% in chargebacks in 2014 through mid-2015. In some months, the chargeback rate exceeded 70% or even 80%, rates

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

whose only possible explanation is wholesale fraud by the merchant. The Wells Fargo monthly account statements for Triangle Enterprise shell companies reflected similarly high chargeback levels.

230. A 1% chargeback rate is considered excessive and grounds to terminate a merchant's account with a merchant processor. The immense chargeback activity was obvious to Wells Fargo, on a monthly basis, given that the monthly account statements for all of the shell companies similarly reflected pages of chargebacks.

231. While a high level of chargeback rates in a high-risk industry known to be rife with fraud did not put Wells Fargo on notice of the consumer fraud in and of itself, Wells Fargo must have become aware of the consumer fraud based on the pattern of conduct it witnessed over the course of multiple years. The exact point in time when Wells Fargo came to possess knowledge of the consumer fraud will be learned in discovery. For example, consumer requests for chargebacks are often accompanied by written or recorded phone complaints. On information and belief, Wells Fargo received and possesses copies of such complaints, which revealed that the Enterprises were defrauding consumers.

232. There was no other plausible reason for the continually high chargeback levels that Wells Fargo continued to witness time and again, where those chargebacks were uniform across dozens of entities owned and controlled by the same people – *i.e.*, the Enterprises' owners – from whom Wells Fargo continued to take direction.

233. Wells Fargo knew the specific reason codes associated with the chargebacks initiated by its own consumer credit cardholders against the Enterprises, as well as for chargebacks sought to be recouped from the Enterprises' Wells Fargo accounts. Wells Fargo knew that the reason codes tied to the chargebacks flagged the transactions as fraudulent, unauthorized, recurring charges, and/or unprocessed refunds.

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

234. Indeed, Wells Fargo did not even need access to the chargeback reason codes (though it certainly had it) to know that these Enterprises' chargebacks had no innocent explanation. The most common reasons for chargebacks are identity/card theft (30%), goods shipped but not received (26%), and delivery of the wrong product (15%) – none of which made sense in light of the ongoing, years-long, repeating series of identical chargebacks that Wells Fargo was seeing across every entity involved in the Enterprises. Consumer fraud was the only possible explanation, just as the chargeback reason codes indicated. As a sophisticated financial institution, an experienced issuer of consumer credit cards to consumers, and as a large-scale provider of business banking accounts, Wells Fargo was intimately familiar with and knew the different types of chargeback causes and their frequencies. The idea that Wells Fargo didn't know what the Enterprises were doing is not plausible: based on the magnitude, consistency, and pattern of chargebacks that Wells Fargo saw, Wells Fargo *must have known* they were engaging in consumer fraud, even if Wells Fargo did not know the exact contours of that fraud.

## IX.    KNOWING VIOLATIONS OF BANKING LAWS AND PROCEDURES

235. Wells Fargo repeatedly and knowingly violated banking rules and regulations in its assistance and facilitation of the Apex and Triangle Enterprises, which is further evidence that Wells Fargo knew exactly what it was doing to assist a fraud. The lengths to which Wells Fargo went to substantially aid and abet these fraudulent enterprises is evidenced by not only their willful disregard of standard banking procedures, but also Wells Fargo's continued violations of a dizzying array of banking laws designed to protect against fraud and money laundering.[18]

---

[18] Plaintiff is not bringing any claims for violating the Bank Secrecy Act or related regulations, nor is he alleging that an express or implied duty arose to Plaintiff based on Wells Fargo's BSA violations. Wells Fargo's duties directly arose to the Receivership Entities as Wells Fargo's customers.

236.   The Bank Secrecy Act ("BSA") makes it a criminal act for banks and other financial institutions to aid and abet criminals in the laundering of money. FinCEN is the federal regulatory agency responsible for issuing regulations to combat money laundering.  FinCEN defines money laundering as the process of making illegally-gained proceeds (*i.e.*, "dirty money") appear legal (*i.e.*, "clean"). Typically, it involves three steps: placement, layering, and integration.  First, the illegitimate funds are introduced into a legitimate financial system (placement). Then, the money is moved around to create confusion, sometimes by wiring or transferring the funds through numerous accounts (layering).   Finally, it is integrated into the financial system through additional transactions until the "dirty money" appears "clean" (integration).[19]

237.   Under the BSA, banks must comply with certain Customer Identification Program (CIP) requirements when opening new accounts, including maintaining account-opening procedures detailing the identifying information that must be obtained from each customer.  As an established nationwide banking system, Wells Fargo and its bankers knew what these requirements were.

238.   Section 326 of the USA PATRIOT Act was enacted following the 9/11 terrorist attacks and jointly implemented by the federal banking regulators, requires that banks to meet minimum standards with regard to collection of the name, address, date of birth and tax identification number or other means of positive identification for all customers for which it opens an account.

239.   A circular issued jointly by the then four federal bank regulatory agencies, joining with FinCEN and the Department of Treasury stated that:

"a bank's CIP **must** include risk-based procedures for verifying the identity

---

[19]   *See* "History of Anti-Money Laundering Laws," FinCEN, *available at* https://www.fincen.gov/history-anti-money-laundering-laws.

---

73                  Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER125**

of each customer to the extent reasonable and practicable. ***It is critical that each bank develop procedures to account for all relevant risks including those presented by the types of accounts maintained by the bank***, the various methods of opening accounts provided, the type of identifying information available, and the bank's size, location, and type of business or customer base. ***Thus, specific minimum requirements in the rule, such as the four basic types of information to be obtained from each customer, should be supplemented by risk-based verification procedures, where appropriate, to ensure that the bank has a reasonable belief that it knows each customer's identity.*** (Emphasis added.)

240. Additionally, Wells Fargo was required as a part of federally-mandated account opening process to understand the business/account use ("Know Your Customer"), and to add extra steps in due diligence, especially where, as was the case with both Triangle and Apex, high risk existed: Customer Due Diligence ("CDD") and Enhanced Due Diligence ("EDD").

241. During the Relevant Period, it was standard industry practice (and expected by banks of Wells Fargo's size) to provide its branch employees with tailored training on how to comply with these laws and regulations, including how recognize and escalate suspicious activity in their roles.

242. Wells Fargo was required to train its employees on how to comply with the BSA and USA PATRIOT Act, including but not limited to:

- The importance of getting accurate identity information and beneficial owner identification;

- The ability to identify and act upon red flags for suspicious activity, including but not limited to

  o Suspicious designation of beneficiaries, assignees or joint owners
  o Suspicious use of multiple accounts
  o Transactions out-of-pattern for the customer or business situation
  o Transactions that don't make economic sense

- Understanding of various types of activity that require reporting in a number of categories including:

o 31-Fraud, including
- e-credit/debit card
- h-mass marketing
- i-pyramid scheme

o 33-Money Laundering
- d-suspicious designation of beneficiaries, assignees or joint owners
- h-suspicious use of multiple accounts
- l-transactions out-of-pattern for customers

o 34-Identification/Documentation.

243.   The regulatory requirements under the BSA placed central importance on vigilantly monitoring to identify and verify customers and beneficial owners, to understand the nature and purpose of customer relationships to develop an accurate customer risk profile, and to undertake ongoing monitoring for reporting suspicious transactions and to maintain and update customer information.

244.   In a branch system, like Wells Fargo maintained, the branch employees were required to have a central role in complying with the law and related regulations.  Among other things, branch employees were typically the primary source of reporting suspicious activity up the chain within Wells Fargo to enable the bank to determine whether it needed to take steps to fulfill its obligations to report such activity externally (to FinCEN).  Wells Fargo routinely failed to follow the requirements of BSA/AML/CIP for Apex and Triangle. Wells Fargo's Community Bank gave its branches wide discretion and deficient oversight in performing these tasks, while at the same time incentivizing branch employees to open accounts and cross-sell under a high-pressure quota system.

245.   As examples, Wells Fargo knowingly allowed accounts to have incorrect addresses and use identical Wyoming mail drops (in the case of Apex). Instead of identifying and verifying actual beneficial owners of the shell companies, Wells Fargo knew that actual owners were different from the listed

FER127

1  owners, and undertook any number of steps to mask or paper over such
2  inconsistencies.

3      246.   Wells Fargo deliberately failed to compile an adequate customer risk
4  profile for all of the shell companies.   If the Bank had used commercially
5  reasonable risk assessment techniques, it would never have opened these accounts
6  or would have immediately closed the accounts after it processed transactions that
7  were clearly suspicious.

8      247.   Further, Wells Fargo knew that Apex and Triangle shell companies
9  were routinely executing suspicious transactions using their Wells Fargo accounts,
10  such as transferring funds between accounts and to external accounts in "round"
11  dollar amounts—that is, round numbers with zeros on the end (*e.g.*, $100,000). An
12  abundance of "round" dollar transactions (which the Apex and Triangle shell
13  companies certainly had) is indicative of money laundering and has been referred
14  to as "a fingerprint of fraud." *See* Nigrini, Mark J., "Round numbers: A fingerprint
15  of fraud," Journal of Accountancy (May 1, 2018), *available at*
16  https://www.journalofaccountancy.com/issues/2018/may/fraud-round-
17  numbers.html.

18      248.   As even the most cursory reviews of monthly account statements
19  made abundantly clear, Wells Fargo was well aware of the Apex and Triangle shell
20  companies' high chargeback rates, which were well in excess of the permitted
21  chargeback rates under Visa/Mastercard rules for high-risk merchants.

22      249.   Regardless of the vantage point from which the Apex and Triangle
23  Enterprises are viewed, Wells Fargo knew that they were high-risk relationships
24  and accounts for multiple reasons.   As such, Wells Fargo knew that they were
25  required to classify the family of Apex and Triangle accounts as high risk for
26  misuse and as such, subject them to heightened oversight and enhanced due
27  diligence.

28      250.   Further, Wells Fargo was well aware that Apex and Triangle were

classified as high risk by merchant processors, including Wells Fargo's own merchant processing group. This provided yet another reason for active monitoring of these accounts by Community Bank employees and branches.

251. Indeed, the Bank's very own Merchant Processing Agreement and Credit Risk Guidelines confirm the many risks created by businesses like Apex and Triangle. The Processing Agreement specifically prohibits the solicitation of merchants engaged in certain unacceptable business practices, because they were presumptively illegal, violated card association rules, or created excessive risk exposure. The prohibited categories included, for example, debt consolidation services, Get Rich Quick Opportunities, and any merchant engaged in any form of deceptive marketing practices.

252. Wells Fargo also prohibited the solicitation of merchants selling nutraceuticals through free trial offers, unless specifically pre-approved by Wells Fargo. And when Wells Fargo periodically evaluated, and on several occasions reviewed, completed applications, for the Apex and Triangle Enterprises Wells Fargo declined to provide merchant processing. (The exception was the small amount Triangle legacy merchant processing through a third party, which apparently stayed below Wells Fargo's radar for years – either by mistake or policy design.)

253. Wells Fargo's Credit Risk Guidelines (the "Guidelines") require that merchants be scrutinized for evidence of deceptive marketing practices and, if found, immediately compel the merchant to eliminate these practices or terminate the merchant. The Guidelines provide numerous examples of common warning signs of potential deceptive marketing practices, almost all of which the Enterprises employed. These include negative options and industries where deceptive marketing practices were prevalent, such as nutraceuticals. Further, the Guidelines specifically warn about merchants opening multiple accounts, particularly via multiple shell companies with the same or similar principals (in

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

some cases, hired "mules" with little or no business involvement which may be submitted to obscure the true ownership).

## X. WELLS FARGO EXECUTIVES AUTHORIZED AND RATIFIED BANKER PARTICIPATION IN THE FRAUDS

254. Evidence of Wells Fargo's executives' pressure on managers and employees to participate in the fraudulent misconduct alleged herein also is set forth in numerous governmental and private lawsuits. In the SEC's complaint against Carrie L. Tolstedt, Senior Executive Vice President of Community Banking for Wells Fargo filed on November 13, 2020, the SEC alleged that for several years, until mid-2016, Wells Fargo opened millions of accounts or sold products that were unauthorized or fraudulent, and others that were unneeded and unwanted by retail banking customers.

255. The Community Bank, which Tolstedt led from 2007 through mid-2016, was responsible for managing the large network of bank branches, referred to within Wells Fargo as "stores," as well as other sales channels through which Wells Fargo offered its products. The branches employed, among others, bankers who were generally responsible for offering accounts and financial products or services to customers. The bankers reported up through managers of the branches to Regional Bank Executives, who reported to Tolstedt. In addition, the persons who managed the various groups organized around products that the Community Bank offered also reported up to Tolstedt.

256. The Community Bank also had financial and risk officers who reported to Tolstedt and assessed the Community Bank's business progress and its risks. Those persons provided information to the financial and risk officers for the Company overall, often after first discussing the information with Tolstedt. In addition, at least quarterly, Tolstedt met with the CEO (and frequently others) to discuss the business of the Community Bank and to make strategic plans.

257. During the Relevant Period, Wells Fargo's CEO and other high-level

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER130**

executives and directors of the Bank encouraged employees to deliberately ignore indicia of fraud if it helped the Bank's bottom line—instructions which led to Wells Fargo and its employees aiding and abetting the Enterprise schemes.

258. Other higher-level employees and agents of Wells Fargo in the Community Bank branches encouraged and instructed their bankers and employees to do the same. These higher-level employees and agents included:

- David Hannig, who was an Assistant Vice President and Business Sales Consultant for Wells Fargo Merchant Services, and who worked directly with Apex's Barnett, Peikos, Camacho, and Carr;

- Lea Walker, who was a Business Specialist and subsequently an Assistant Vice President at Wells Fargo in the Keller, TX branch (910 Keller Parkway, Keller, TX 76248), and who worked directly with Triangle's Phillips;

- Haiman Albana, who was a Business Relationship Manager at Wells Fargo associated in the Escondido, CA branch (500 La Terraza Boulevard, Suite 200, Escondido, CA 92025), and who worked directly with Triangle's Phillips; and

- Brian Cording, who was a Senior Business Relationship Manager at Wells Fargo associated with the Escondido, CA branch (500 La Terraza Boulevard, Suite 200, Escondido, CA 92025), and who worked directly with Triangle's Phillips.

259. These are just some of the Wells Fargo employees who knowingly acted in collaboration and collusion with Apex and Triangle in furtherance of the unlawful schemes. Wells Fargo authorized or ratified the acts of these employees as alleged herein.

## XI. INFORMATION ALLEGATIONS

260. Allegations made in this Complaint are based on information and belief, except those allegations that pertain directly to the Receiver, which are based on his personal knowledge. The Receiver's information and belief is based on, *inter alia,* the investigation and review of publicly filed documents and from the Receiver appointed in the FTC actions described above and his attorneys. Each and every allegation and factual contention contained in this Complaint has evidentiary support or, alternatively, is likely to have evidentiary support after

reasonable opportunity for further investigation or discovery by the Receiver or his counsel.

## XII.  DELAYED DISCOVERY BY THE RECEIVER AND ESTOPPEL

261.  First and foremost, the Receiver's discovery of the Receivership Entities' claims against Wells Fargo was impossible until his appointment; prior to that, the Receivership Entities were controlled by Phillips, Barnett, and Peikos, which made discovery of their wrongdoing impossible.  The statutes of limitations were tolled until the time of the Receiver's appointment.

262.  The statutes of limitations were tolled past that point, however, because the Receiver did not (and could not have) discovered the fraud immediately upon his appointment.  The Receiver only discovered Wells Fargo's misconduct related to the Apex and Triangle Enterprises in 2019.  There were two primary reasons for this: (1) Wells Fargo took steps to conceal its role in the Apex and Triangle frauds; and (2) the Receiver did not receive responses to subpoenas it issued to Wells Fargo until June and July of 2019, before which there was insufficient documentary evidence for the Receiver to discover the claims.  Once the Receiver and his counsel had the documents in hand, they were finally able to piece together Wells Fargo's role in facilitating the Apex and Triangle frauds, and to confirm that the Bank knew of the fraudulent nature of the Apex and Triangle Enterprises.[20]

263.  Because of Phillips's, Peikos's and Barnett's efforts to conceal the Apex and Triangle frauds from consumers, along with the role Wells Fargo played in those frauds, Wells Fargo is estopped from contending that any of the Receiver's claims are barred by applicable statutes of limitations.

---

[20]  The Receiver did not file until now pursuant to a Tolling Agreement with Defendants.

# XIII. CAUSES OF ACTION

## **First Cause of Action**

### **(Aiding and Abetting Fraud)**

264.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

265.   Phillips, Peikos, and Barnett, via the Apex and Triangle Enterprises, operated online "free trial" scams, which falsely advertised that consumers would only be charged the cost of shipping in exchange for a trial of a product.  In reality, the consumers were being signed up for a subscription service and charged for the full price of the product on the next billing cycle unless they affirmatively canceled the subscription.

266.   Wells Fargo knew that the Apex and Triangle Enterprises were engaged in a high-risk, fraudulent business, and Wells Fargo knew that they were required to terminate or further investigate that business pursuant to the BSA, FinCEN regulations, and their own internal policies. Multiple Wells Fargo employees across multiple branches deliberately turned a blind eye to the Apex and Triangle frauds, because the large number of accounts needed by the Apex and Triangle Enterprises helped them to meet otherwise-unattainable sales quotas set by Wells Fargo's corporate headquarters.  Wells Fargo's corporate policies encouraged sales misconduct by setting unrealistic sales goals and requiring bankers to open as many accounts, and to sell as many services and bank products, as possible.

267.   Wells Fargo provided substantial assistance to the intentional torts committed by the primary wrongdoers by, among other things, creating accounts for shell companies used by the Apex and Triangle Enterprises to secure critical merchant processing services; assisting the Apex and Triangle principals in hiding their ownership of those accounts from the merchant processors, so that the principals could continue to secure merchant processing services for the underlying

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER133**

fraud; and allowing Apex and Triangle to launder money obtained from defrauded consumers through their Wells Fargo accounts.

268.  The substantial assistance that Wells Fargo provided to the Apex and Triangle frauds proximately caused substantial damages to the Receivership Entities in an amount to be proven at trial.  These damages include, but are not limited to: the fees charged by Wells Fargo for their banking services, which directly furthered the fraudulent schemes and depleted the funds of the Receivership Entities; the Receivership Entities' legal obligations to satisfy the FTC Judgments, which require the Receivership Entities to make whole the consumers who were defrauded as a result of the Apex and Triangle frauds that Wells Fargo facilitated; all fees and costs necessitated by the need to establish a Receivership; and the costs of defending the action by the FTC (including the resulting Receiverships).

269.  Wells Fargo's conduct was intentional, fraudulent, willful, malicious, and intended to injure the Receivership Entities, by virtue of which the Receiver prays for an award of exemplary and punitive damages.

## Second Cause of Action

### (Conspiracy to Commit Fraud)

270.  The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

271.  Philips, Peikos, and Barnett engaged in the primary wrongs described herein.

272.  Wells Fargo entered into a conspiracy with Phillips, Barnett, and Peikos to perpetuate their frauds.  Wells Fargo agreed to assist the frauds by, among other things, and as described herein, (i) opening accounts for dozens of shell companies, which Wells Fargo knew were owned and controlled by Apex and Triangle's principals, (ii) executing reference letters that gave legitimacy to the shell companies and allowed them to secure merchant processing services, (iii)

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

accepting as deposits funds which Wells Fargo knew were fraudulently obtained from consumers, (iv) transferring those funds to other accounts (including foreign accounts), which allowed the Apex and Triangle principals to launder the money they derived from the frauds, and (v) continually providing atypical banking services.

273. The Receivership Entities suffered damages that were proximately caused by Wells Fargo's participation in the conspiracy (without which the Apex and Triangle Enterprises could not have functioned) and which are described herein.

### **Third Cause of Action**

### **(Aiding and Abetting Breach of Fiduciary Duty)**

274. The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

275. At all material times, Phillips, Peikos, and Barnett owned or controlled their respective Receivership Entities. As the owners of the Triangle or Apex Enterprises, they had a fiduciary relationship with the Receivership Entities because the entities were under their complete control. Phillips, Peikos, and Barnett owed the Receivership Entities a fiduciary duty to act in good faith, with reasonable care, and in a manner reasonably believed to be in the Receivership Entities' best financial interests.

276. Phillips, Peikos, and Barnett breached their fiduciary duties owed to their respective Receivership Entities by willfully, fraudulently, recklessly, and/or negligently engaging in conduct which was not in the best financial interests of the Receivership Entities by engaging in the primary wrongs described herein and by diverting the Receivership Entities' assets into their own pockets with no legitimate or justifiable business purpose.

277. Phillips, Peikos, and Barnett's breaches of the fiduciary duties they owed to the Receivership Entities actually and proximately caused financial injury

to the Receivership Entities, as described herein, in an amount to be proven at trial.

278.   Wells Fargo had actual knowledge of Phillips, Peikos, and Barnett's breaches of their fiduciary duty and rendered substantial assistance in regard to such breaches by affording them or their agents special privileges, by enabling and allowing continuous, suspicious, and obviously fraudulent banking activity, and by failing to adhere to federal, local and internal regulatory banking procedures and policies.

279.   Wells Fargo is liable for all damages actually and proximately caused to the Receivership Entities through its acts and omissions, including those damages described above, in an amount to be proven at trial.

## Fourth Cause of Action

### (Aiding and Abetting Conversion)

280.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

281.   Phillips, Peikos, and Barnett wrongfully asserted dominion and control over the funds in the Apex and Triangle Enterprise accounts, which rightfully belonged to their respective Receivership Entities, by misappropriating consumer funds from those accounts and using the funds for their personal use and benefit.  Phillips, Peikos, and Barnett's actions resulted in the conversion of funds belonging to the Receivership Entities.

282.   Wells Fargo had actual knowledge of Phillips, Peikos, and Barnett's misappropriation of the Receivership Entities' funds, because those funds were wrongfully transferred into, between, and out of accounts held by Wells Fargo.

283.   Wells Fargo rendered substantial assistance to Phillips, Peikos, and Barnett in their conversion of the Receivership Entities' funds by executing their transactions, even though doing so violated banking regulations and other prudent and sound banking practices and procedures.

284.   Wells Fargo is therefore liable for all damages actually and

proximately caused to the Receivership Entities based on the conversion of funds undertaken by Phillips, Peikos, and Barnett, in an amount to be proven at trial.

### **Fifth Cause of Action**

### **(Violation of California Penal Code § 496)**

285.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

286.   Penal Code § 496(c) permits "any" person who has been injured by a violation of § 496(a) to recover three times the amount of actual damages, costs of suit and attorney's fees in a civil suit.   Penal Code § 496(a) creates an action against "any" person who (1) receives "any" property that has been obtained in any manner constituting theft, knowing the property to be so obtained, or (2) conceals, withholds, or aids in concealing or withholding "any" property from the owner, knowing the property to be so obtained.

287.   Under Penal Code § 7, "person" includes a corporation as well as a natural person.   Wells Fargo Bank, N.A., as a national banking association, and Wells Fargo & Co., as a corporation, are "persons" capable of violating § 496(a).

288.   Phillips, Peikos, and Barnett obtained consumer funds by theft under Penal Code § 484, because those funds were obtained "knowingly and designedly, by any false or fraudulent representation or pretense," from consumers.   These funds were so obtained because, among other things, consumers were falsely informed they were signing up for free trials but ended up paying for products or subscriptions without their consent.

289.   Wells Fargo, knowing of their frauds, deliberately concealed and aided in concealing those frauds by, *inter alia*, hiding the identity of the individuals who were committing the fraud, and by setting up and maintaining the fraudulent accounts as described herein.

290.   Additionally, Wells Fargo knowingly transferred property that was wrongfully obtained from consumers to Phillips, Peikos, Barnett, or third parties at

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER137**

their behest, as described herein.

291.   As a direct and proximate result of Wells Fargo's violations of Penal Code § 496(a), the Receivership Entities were deprived of assets.   Pursuant to Penal Code § 496(c), the Receiver seeks statutory treble damages, costs of suit, and reasonable attorney's fees.

### Sixth Cause of Action

### (Aiding and Abetting Fraudulent Transfer/Voidable Transaction)

292.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

293.   Prior to the establishment of the Receiverships, the physical operations of the Receivership Entities with which Defendants did business were primarily in the State of California. The *FTC v. Triangle* and *FTC v. Apex* actions in which the Receiver was appointed were then filed in the United States District Court for the Southern and Central Districts of California, respectively.

294.   Effective January 1, 2016, California (similar to the majority of other States) adopted a version of the Uniform Voidable Transactions Act ("UVTA"), codified at California Civil Code §§ 3439, et seq.  The UVTA defines a voidable transfer to include the following types of transfer or obligations incurred by a debtor:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

**FER138**

(B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

(3) Whether the transfer or obligation was disclosed or concealed.

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5) Whether the transfer was of substantially all the debtor's assets.

(6) Whether the debtor absconded.

(7) Whether the debtor removed or concealed assets.

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

295. California Civil Code §3439.05(a) provides that transfers are voidable as to present creditors as follows:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

296. The UVTA provides the following definitions, in relevant part:

(b) "Claim," except as used in "claim for relief," means a right to payment, whether or not the right is reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

(c) "Creditor" means a person that has a claim, and includes an assignee of a general assignment for the benefit of creditors, as defined in Section 493.010 of the Code of Civil Procedure, of a debtor.

(d) "Debt" means liability on a claim.

(e) "Debtor" means a person that is liable on a claim.

297. Phillips, Peikos and Barnett are "debtors" under the UVTA because they are liable to the Receivership Entities and consumers who have a right to reimbursement for their claims of consumer fraud under the FTC judgments. Said Receivership Entities and consumers are "creditors" with "claims" under the meaning of the UVTA.

298. Prior to enactment of the UVTA, and relevant to transfers by Defendants prior to 2016, the California Uniform Fraudulent Transfer Act ("UFTA"), formerly codified at California Civil Code §§ 3439, et seq. ("UFTA"), provided in §3439.04:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

299. A "transfer" was defined in the UFTA to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." (Civ. Code, former §

3439.01, subd. (i)). A similar definition is found as subdivision (m) of the UVTA with one minor revision: "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, license and creation of a lien or other encumbrance."

300. As set forth herein, Phillips, Peikos, and/or Barnett controlled the Receivership Entities and directed them to make numerous transfers out of proceeds of the fraud to themselves, and third parties (including Wells Fargo). At the time of each fraudulent transfer, they intended to delay, defraud, or hinder their creditors (most notably the Receivership Entities under their control).

301. Through the numerous acts identified herein, Wells Fargo substantially assisted Phillips, Peikos and Barnett in making these fraudulent transfers, despite knowing that the transfers were unlawful, and that they controlled the Receivership Entities and had no lawful claim to fraudulently-obtained consumer funds. Wells Fargo knowingly transferred shell company account funds to other Receivership Entity shell company accounts and then directly to Phillips, Peikos, and/or Barnett or to other third parties (at the direction of Phillips, Peikos, and/or Barnett) without the shell companies receiving a reasonably equivalent value in exchange for the transfers and which depleted the shell companies of all or substantially all of their assets.

302. The transfers from the Wells Fargo accounts of the Receivership Entities to Phillips, Peikos, Barnett and Wells Fargo constitute fraudulent transfers under the California UVTA and UFTA for the following reasons, among others:

    (a)   Phillips, Peikos and Barnett made the transfers to themselves or third parties with the actual intent to hinder, delay, or defraud creditors (including the Receivership Entities and consumers);

    (b)   Phillips, Peikos and Barnett engaged in free trial schemes knowing that their assets and the assets of the Receivership Entities they controlled were unreasonably small considering that all of the assets were obtained by frauds on consumers and did not belong to them;

(c)    Phillips, Peikos and Barnett knew that through their fraudulent schemes, they incurred debts to the Receivership Entities and consumers beyond their ability to pay;

(d)    Phillips, Peikos and Barnett retained possession or control of the assets after the transfers;

(e)    The Receivership Entities did not receive a reasonably equivalent value in exchange for the transfers from the Wells Fargo accounts because Phillips, Peikos, and Barnett drained the accounts for their own personal use and benefit, and the shell companies acted as mere pass-throughs to allow the fraudsters to avoid detection by creditors of their ownership and control of the funds;

(f)    The Receivership Entities had no assets other than the fraudulently-obtained funds before or after the transfers;

(g)    The transfers to Phillips, Peikos, and Barnett were as corporate insiders of the Receivership Entities;

(h)    The transfers among and from the Wells Fargo accounts were intended to conceal the true ownership and recipients of the funds;

(i)    When the transfers were made, Phillips, Peikos and Barnett knew they were likely to be sued for their wrongdoing;

(j)    Phillips, Peikos, and Barnett removed and concealed receipt of the consumer funds from the Wells Fargo accounts by transferring them to unrelated, unidentified and undisclosed personal and offshore accounts;

(k)    The transfers were of substantially all the Receivership Entities' assets;

(l)    The Receivership Entities were insolvent or became insolvent shortly after the transfers were made or the obligations were incurred; and

(m)    The transfers occurred shortly before or shortly after the substantial debts to consumers were incurred.

303.    Despite knowing that Phillips, Peikos and Barnett had no lawful claim to the consumer funds and Phillips, Peikos, and Barnet lacked the assets to pay such amounts back to the Receivership Entities, Wells Fargo transferred such consumer funds, and depleted the Receivership Entities' assets, which allowed Phillips, Peikos, and/or Barnett to receive such funds directly.

304.    Based on the allegations above, these transfers of Receivership Entity

**FER142**

funds to Wells Fargo and Phillips, Peikos, and Barnett constitute fraudulent transfers which must be returned to the Receivership Entities. Accordingly, the Receiver seeks to recover as fraudulent transfers all Receivership Entity/consumer funds received by Wells Fargo as well as those funds transferred to Phillips, Peikos, and Barnett.

305. Wells Fargo knowingly aided and abetted the fraudulent transfers from the Receivership Entities under the control of Phillips, Peikos, and/or Barnett. This substantial assistance included the fraudulent transfer of consumer funds from the Wells Fargo accounts to Phillips, Peikos, and Barnett.

306. In addition, Wells Fargo accepted payments of consumer funds from Receivership Entities in connection with setting up and maintaining the fraudulent accounts. By collecting fees, charges, fines, reserve amounts, and other payments generated by the shell companies' and other Receivership Entities' payment processing, Wells Fargo was asserting that the Receivership Entities had a valid obligation to make these payments to Wells Fargo.

307. Wells Fargo, as a knowing aider and abettor of the fraudulent schemes, was not entitled to receive, and could not take in good faith, these payments from the Receivership Entities' funds derived from payments by defrauded consumers in connection with setting up and maintaining the fraudulent accounts for the Receivership Entities, and thus these payments constitute fraudulent transfers which must be returned to the Receivership Entities.

308. Accordingly, the Receiver seeks to recover as fraudulent transfers any (a) Receivership Entity funds taken from the Wells Fargo accounts and transferred to Phillips, Peikos, and Barnett as a result of the fraudulent schemes and b) payments to Wells Fargo from Receivership Entities in connection with setting up and maintaining the fraudulent accounts.

309. The Receiver therefore asks that the Court order Wells Fargo to pay to the Receiver all fraudulent transfers they received or transferred, as alleged

Case No. 3:21-cv-01245-LAB-DDL
FIRST AMENDED COMPLAINT

herein and as further shown by proof at trial. The Receiver further asks that he be awarded pre- and post- judgment interest from Defendants from the date of the receipt of each fraudulent transfer.

## **Seventh Cause of Action**

### **(Request for an Accounting)**

310.   The Receiver repeats and realleges the allegations of each and every one of the prior paragraphs, inclusive, as if fully set forth herein.

311.   To ascertain the exact amounts received by Wells Fargo in connection with the Apex and Triangle Enterprises the Receiver seeks entry of an order compelling Wells Fargo to file with the Court and serve upon the Receiver an accounting, under oath, detailing: (i) the amounts received from all accounts owned or controlled by the Receivership Entities or related individuals and entities, including Peikos, Barnett, and Phillips; (ii) the current locations of the amounts, including the specific bank accounts to which any funds were transferred; and (iii) the fees which Wells Fargo obtained as a result of doing business with the Apex and Triangle Enterprises.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, the Receiver respectfully prays for judgment against Defendants as follows:

1.   For all applicable damages to the Receivership Entities proximately caused by Wells Fargo's tortious conduct, including punitive damages pursuant to California Civil Code § 3294, and treble damages pursuant to California Penal Code § 496(c); in an amount to be determined at trial;

2.   For the return of funds acquired by Wells Fargo through fraudulent transfers at the expense of the Receivership Entities, including, but not limited to, funds acquired as fraudulent obligations supposedly owed to the Wells Fargo by the Receivership Entities;

1       3.      For a judgment ordering Wells Fargo to file an accounting, under

2               oath, as requested herein;

3       4.      For pre- and post- judgment interest;

4       5.      For attorneys' fees and costs: and

5       6.      For such other and further relief as the Court may deem proper.

6 **XV.  JURY DEMAND**

7       The Receiver demands a jury trial.

8                              Respectfully Submitted,

9

10 DATED: April 19, 2023         By:*/s/ Garth A. Spencer*

11                       **GLANCY PRONGAY & MURRAY LLP**
                             Lionel Z. Glancy

12                       Jonathan M. Rotter
                       Garth A. Spencer

13                       1925 Century Park East, Suite 2100
                       Los Angeles, California 90067

14                       Telephone:  310-201-9150
                       Facsimile:   310-201-9160

15                       Email: info@glancylaw.com

16

17                       **MCNAMARA SMITH LLP**

18                       Logan D. Smith
                       Cornelia J.B. Gordon

19                       655 West Broadway, Suite 900
                       San Diego, California 92101

20                       Telephone:  619-269-0400
                       Facsimile:   619-269-0401

21                       Email: lsmith@mcnamarallp.com

22                       *Attorneys for Court-Appointed Receiver*
                       *Thomas W. McNamara*

23

24

25

26

27

28

**FER145**

.,ENE,LNO,PROTO

## U.S. District Court
## Southern District of California (San Diego)
## CIVIL DOCKET FOR CASE #: 3:21−cv−01245−LAB−DDL

McNamara v. Wells Fargo & Company et al
Assigned to: Judge Larry Alan Burns
Referred to: Magistrate Judge David D. Leshner
Related Case:  3:18−cv−01388−LAB−WVG
Cause: 28:1331fr Fed. Question: Fraud

Date Filed: 07/08/2021
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Federal Question

**Plaintiff**

**Thomas W. McNamara**
*as the Court−Appointed Receiver for Triangle Media Corporation, Apex Capital Group, LLC, and their successors, assigns, affiliates, and subsidiaries*

represented by **Cornelia J.B. Gordon**
McNamara Smith LLP
655 West Broadway
Suite 900
San Diego, CA 92101
(619) 269−0400
Fax: (619) 269−0401
Email: cgordon@mcnamarallp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan M. Rotter**
Glancy Prongay & Murray LLP
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
310−201−9154
Email: jrotter@glancylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lionel Z Glancy**
Glancy Prongay & Murray LLP
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
(310)201−9150
Fax: (310)201−9160
Email: info@glancylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Logan Daniel Smith**
McNamara Smith LLP
655 West Broadway
Suite 900
San Diego, CA 92101
619−269−0400
Fax: 619−269−0401
Email: lsmith@mcnamarallp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Garth A. Spencer**
Glancy Prongay & Murray LLP
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
310−201−9150
Email: gspencer@glancylaw.com
*ATTORNEY TO BE NOTICED*

## FER146

V.

**Defendant**

**Wells Fargo & Company**
*a corporation*

represented by **Alicia A. Baiardo**
McGuireWoods LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
415–844–9944
Email: abaiardo@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anthony Q Le**
McGuireWoods LLP
1800 Century Park East
8th Floor
Los Angeles, CA 90067
310–315–8225
Email: ale@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David C. Powell**
McGuireWoods LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
415–844–1948
Fax: 415–844–1928
Email: dpowell@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Molly M. White**
McGuirewoods
1800 Century Park East
8th Floor
Los Angeles, CA 90067
310–315–8200
Fax: 310–315–8210
Email: mwhite@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Kirschenbaum**
Kirschenbaum Law, PC
328 15th Street
Oakland
Lafayette, CA 94549
510–740–9260
Email: jeff@kirschenbaumlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Wells Fargo Bank, N.A.**
*a national banking association*

represented by **Alicia A. Baiardo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anthony Q Le**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**David C. Powell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Molly M. White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/08/2021 | 1 | COMPLAINT With Jury Demand Against Wells Fargo & Company, Wells Fargo Bank, N.A. (Filing fee $402.00 receipt number ACASDC−15907027.), filed by Thomas W. McNamara. (Attachments: # 1 Civil Cover Sheet) The new case number is 3:21−cv−1245−AJB−JLB. Judge Anthony J. Battaglia and Magistrate Judge Jill L. Burkhardt are assigned to the case. (Glancy, Lionel) (fth)(jrd) (Entered: 07/09/2021) |
| 07/08/2021 | 2 | NOTICE OF RELATED CASE(S) by Thomas W. McNamara of case(s): 18−cv−01388−LAB−LL.(fth)(jrd) (Entered: 07/09/2021) |
| 07/09/2021 | 3 | Summons Issued. **Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1.** (fth)(jrd) (Entered: 07/09/2021) |
| 07/12/2021 | 4 | NOTICE of Appearance by Logan Daniel Smith on behalf of Thomas W. McNamara (Smith, Logan)Attorney Logan Daniel Smith added to party Thomas W. McNamara(pty:pla)(jrm). (Entered: 07/12/2021) |
| 07/12/2021 | 5 | NOTICE of Appearance by Cornelia J.B. Gordon on behalf of Thomas W. McNamara (Gordon, Cornelia)Attorney Cornelia J.B. Gordon added to party Thomas W. McNamara(pty:pla) (jrm). (Entered: 07/12/2021) |
| 07/14/2021 | 6 | NOTICE of Appearance by Garth A. Spencer on behalf of Thomas W. McNamara (Spencer, Garth)Attorney Garth A. Spencer added to party Thomas W. McNamara(pty:pla) (jrm). (Entered: 07/14/2021) |
| 07/14/2021 | 7 | NOTICE of Appearance by Jonathan Moshe Rotter on behalf of Thomas W. McNamara (Rotter, Jonathan)Attorney Jonathan Moshe Rotter added to party Thomas W. McNamara(pty:pla)(jrm). (Entered: 07/14/2021) |
| 07/19/2021 | 8 | ORDER OF TRANSFER PURSUANT TO LOW NUMBER RULE. Case reassigned to Judge Larry Alan Burns and Magistrate Judge Linda Lopez for all further proceedings. Judge Anthony J. Battaglia, Magistrate Judge Jill L. Burkhardt no longer assigned to case. Create association to 3:18−cv−01388−LAB−LL. The new case number is 3:21−cv−01245−LAB−LL. Signed by Judge Anthony J. Battaglia on 7/16/2021. Signed by Judge Larry Alan Burns on 7/19/2021.(jrm) (Entered: 07/19/2021) |
| 07/28/2021 | 9 | Joint MOTION for Extension of Time to File Response/Reply *as to 1 Complaint, Stipulated Joint Motion to Extend Deadline to Respond to the Complaint and Modify Motion Briefing Schedule* by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Attachments: # 1 [Proposed] Order Granting Stipulated Joint Motion to Extend Deadline to Respond to the Complaint and Modify Motion Briefing Schedule)(Le, Anthony)Attorney Anthony Q Le added to party Wells Fargo & Company(pty:dft), Attorney Anthony Q Le added to party Wells Fargo Bank, N.A.(pty:dft) QC Mailer, re: proposed order (jmr). (Entered: 07/28/2021) |
| 07/30/2021 | 10 | NOTICE of Appearance *of David C. Powell* by David C. Powell on behalf of Wells Fargo & Company, Wells Fargo Bank, N.A. (Powell, David)Attorney David C. Powell added to party Wells Fargo & Company(pty:dft), Attorney David C. Powell added to |

| | | |
|---|---|---|
| | | party Wells Fargo Bank, N.A.(pty:dft)(jmr). (Entered: 07/30/2021) |
| 07/30/2021 | 11 | NOTICE of Appearance *Alicia A. Baiardo* by Alicia A. Baiardo on behalf of Wells Fargo & Company, Wells Fargo Bank, N.A. (Baiardo, Alicia)Attorney Alicia A. Baiardo added to party Wells Fargo & Company(pty:dft), Attorney Alicia A. Baiardo added to party Wells Fargo Bank, N.A.(pty:dft) (jmr). (Entered: 07/30/2021) |
| 07/30/2021 | 12 | ORDER granting 9 Stipulated Joint Motion to Extend Deadline to Respond to the Complaint and Modify Motion Briefing Schedule. Signed by Judge Larry Alan Burns on 7/30/2021. (jmr) (Entered: 07/30/2021) |
| 08/05/2021 | 13 | Corporate Disclosure Statement by Wells Fargo & Company, Wells Fargo Bank, N.A. identifying Corporate Parent Wells Fargo & Company for Wells Fargo & Company, Wells Fargo Bank, N.A... (Le, Anthony) (sjt). (Entered: 08/05/2021) |
| 08/25/2021 | 14 | MOTION to Dismiss *Complaint with Prejudice* by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Attachments: # 1 Memo of Points and Authorities, # 2 Request for Judicial Notice, # 3 Exhibit A to Request for Judicial Notice, # 4 Exhibit B to Request for Judicial Notice, # 5 Exhibit C to Request for Judicial Notice)(Baiardo, Alicia) (jmr). (Entered: 08/25/2021) |
| 10/08/2021 | 15 | RESPONSE in Opposition re 14 MOTION to Dismiss *Complaint with Prejudice (Request for Judicial Notice)* filed by Thomas W. McNamara. (Smith, Logan) (dxf). (Entered: 10/08/2021) |
| 10/08/2021 | 16 | RESPONSE in Opposition re 14 MOTION to Dismiss *Complaint with Prejudice* filed by Thomas W. McNamara. (Smith, Logan) (dxf). (Entered: 10/08/2021) |
| 10/25/2021 | 17 | REPLY to Response to Motion re 14 MOTION to Dismiss *Complaint with Prejudice* filed by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (dxf). (Entered: 10/25/2021) |
| 10/25/2021 | 18 | REPLY – Other re 15 Response in Opposition to Motion *to Dismiss Complaint with Prejudice (Request for Judicial Notice)* filed by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (dxf). (Entered: 10/25/2021) |
| 12/28/2021 | 19 | MINUTE ORDER OF TRANSFER: IT IS HEREBY ORDERED that this case be transferred from the calendar of the Honorable Linda Lopez to the calendar of the Honorable William V. Gallo for all further proceedings. All conference or hearing dates currently set before Magistrate Judge Lopez remain as scheduled before Magistrate Judge Gallo. Any dates set before any district judge remain unchanged. The new case number is 21cv1245 LAB (WVG).(no document attached) (jcj) (Entered: 12/28/2021) |
| 03/30/2022 | 20 | ORDER granting in part and denying in part 14 Motion to Dismiss. Signed by Judge Larry Alan Burns on 3/30/2022. (jms) (Entered: 03/30/2022) |
| 04/08/2022 | 21 | NOTICE *of Intent Not to Amend* by Thomas W. McNamara re 1 Complaint, (Smith, Logan) (jms). (Entered: 04/08/2022) |
| 04/13/2022 | 22 | Joint MOTION for Extension of Time to File Answer re 1 Complaint, *Joint Motion to Extend Time to Respond to Initial Complaint Pursuant to L.R. 7.2* by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (jms). (Entered: 04/13/2022) |
| 04/15/2022 | 23 | ORDER granting 22 Motion for Extension of Time to Answer re 22 Joint MOTION for Extension of Time to File Answer re 1 Complaint, *Joint Motion to Extend Time to Respond to Initial Complaint Pursuant to L.R. 7.2* Wells Fargo & Company answer due 4/27/2022; Wells Fargo Bank, N.A. answer due 4/27/2022.. Signed by Judge Larry Alan Burns on 4/15/2022. (jms) (Entered: 04/15/2022) |
| 04/27/2022 | 24 | ANSWER to 1 Complaint, by Wells Fargo & Company, Wells Fargo Bank, N.A..(Baiardo, Alicia) (jms). (Entered: 04/27/2022) |
| 06/03/2022 | 25 | NOTICE AND ORDER for Early Neutral Evaluation Conference; Case Management Conference; and Telephonic Status Conference. Signed by Magistrate Judge William V. Gallo on 6/2/2022.(jms) (Entered: 06/03/2022) |
| 07/05/2022 | 26 | ORDER Setting Briefing Schedule on Discovery Dispute. Signed by Magistrate Judge William V. Gallo on 7/5/2022.(ave) (Entered: 07/05/2022) |

| | | |
|---|---|---|
| 07/06/2022 | 27 | JOINT DISCOVERY PLAN by Thomas W. McNamara (Rotter, Jonathan) (jms). (Entered: 07/06/2022) |
| 07/11/2022 | 28 | NOTICE *Defendants Wells Fargo & Company and Wells Fargo Bank N.A.s Discovery Brief* by Wells Fargo & Company, Wells Fargo Bank, N.A. re 26 Order Setting Briefing Schedule (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Baiardo, Alicia) (jms). (Entered: 07/11/2022) |
| 07/18/2022 | 29 | RESPONSE re 26 Order Setting Briefing Schedule, 28 Notice (Other), *[and Receiver's Discovery Brief]* filed by Thomas W. McNamara. (Attachments: # 1 Exhibit C – Objections to RFPs, # 2 Exhibit D – Camenich v. Umpqua Bank Order)(Rotter, Jonathan) (fth). (Entered: 07/18/2022) |
| 07/19/2022 | 30 | Joint MOTION for Protective Order by Thomas W. McNamara. (Spencer, Garth)(jms). (Entered: 07/19/2022) |
| 07/19/2022 | 31 | Joint MOTION for Production of Electronically Stored Information (ESI) *Protocol* by Thomas W. McNamara. (Spencer, Garth) (jms). (Entered: 07/19/2022) |
| 07/25/2022 | 32 | ORDER granting 30 Joint Motion for Protective Order. Signed by Magistrate Judge William V. Gallo on 7/25/2022. (jms) (Entered: 07/25/2022) |
| 07/25/2022 | 33 | ORDER re 31 Joint Motion for Order Governing Discovery of Electronically Stored Information (ESI). Signed by Magistrate Judge William V. Gallo on 7/22/2022. (fth) (Entered: 07/25/2022) |
| 07/29/2022 | 34 | ORDER on Discovery Disputes. Signed by Magistrate Judge William V. Gallo on 7/29/2022.(djk) (Entered: 07/29/2022) |
| 08/09/2022 | 35 | SCHEDULING ORDER Regulating Discovery and Other Pre–Trial Proceedings – Mandatory Settlement Conference set for 5/23/2023 09:00 AM before Magistrate Judge William V. Gallo. Proposed Pretrial Order due by 2/26/2024. Final Pretrial Conference set for 3/4/2024 12:00 PM before Judge Larry Alan Burns. Signed by Magistrate Judge William V. Gallo on 8/9/2022.(ave) (Entered: 08/09/2022) |
| 08/15/2022 | 36 | ORDER OF TRANSFER. Magistrate Judge William V. Gallo is no longer assigned. Case reassigned to Magistrate Judge David D. Leshner for all further proceedings. The new case number is 21cv1245–LAB–DDL. Signed by Magistrate Judge William V. Gallo on 8/15/2022.(jms) (Entered: 08/15/2022) |
| 09/30/2022 | 37 | Joint MOTION for Discovery *Re: SAR Privilege* by Thomas W. McNamara. (Attachments: # 1 Exhibit 1)(Smith, Logan) (jms). (Entered: 09/30/2022) |
| 10/05/2022 | 38 | Joint MOTION to Continue *Deadline to Raise Discovery Disputes* by Thomas W. McNamara. (Spencer, Garth) (jms). (Entered: 10/05/2022) |
| 10/06/2022 | 39 | MINUTE ORDER. The Court hereby sets a remote counsel–only Discovery Conference regarding the parties' Joint Motion re: SAR Privilege (Dkt. No. 37 ) for October 13, 2022 at 4:00 p.m. Instructions for remote appearances to follow. (Discovery Conference set for 10/13/2022 04:00 PM before Magistrate Judge David D. Leshner.) (no document attached) (kmc) (Entered: 10/06/2022) |
| 10/07/2022 | 40 | ORDER Granting Joint Motion To Continue Deadline To Raise Discovery [Dkt.No. 38 ]. Signed by Magistrate Judge David D. Leshner on 10/7/2022. (ddf) (Entered: 10/07/2022) |
| 10/14/2022 | 41 | Minute Order for proceedings held before Magistrate Judge David D. Leshner: Discovery Conference held on 10/13/2022. Defense counsel to submit documents for *in camera* review by or before October 21, 2022. (Plaintiff Attorneys Logan Daniel Smith; Jonathan M. Rotter; Garth A. Spencer). (Defendants' Attorneys Anthony Q. Le; David C. Powell). (no document attached) (kmc) (Entered: 10/14/2022) |
| 10/26/2022 | 42 | STATUS REPORT *(Joint)* by Thomas W. McNamara. (Gordon, Cornelia) (jms). (Entered: 10/26/2022) |
| 10/27/2022 | 43 | MINUTE ORDER: A remote, counsel–only Status Conference before Magistrate Judge David D. Leshner is set for November 3, 2022 at 4:00 p.m. Instructions for remote appearances to follow. (Status Conference set for 11/3/2022 04:00 PM before Magistrate Judge David D. Leshner.) (no document attached) (kmc) (Entered: |

| | | |
|---|---|---|
| | | 10/27/2022) |
| 10/27/2022 | 44 | NOTICE of Videoconference Information for Status Conference (Dkt. No. 43 ) (jms) (Entered: 10/27/2022) |
| 11/03/2022 | 45 | Minute Entry for proceedings held before Magistrate Judge David D. Leshner: The Court held a Status Conference regarding the SAR privilege on 11/3/2022. Logan Daniel Smith, Jonathan M. Rotter, and Garth A. Spencer appeared on behalf of Plaintiff; Anthony Q. Le and David C. Powell appeared on behalf of Defendant. The Court conducted a further Status Conference *in camera* with defense counsel regarding the documents submitted for review. (no document attached) (kmc) (Entered: 11/03/2022) |
| 11/09/2022 | 46 | NOTICE of Appearance by Molly M. White on behalf of Wells Fargo & Company, Wells Fargo Bank, N.A. (White, Molly)Attorney Molly M. White added to party Wells Fargo & Company(pty:dft), Attorney Molly M. White added to party Wells Fargo Bank, N.A.(pty:dft) (jms). (Entered: 11/09/2022) |
| 11/22/2022 | 47 | ORDER Re *In Camera* Review of Documents. Signed by Magistrate Judge David D. Leshner on 11/22/2022.(jms) (Entered: 11/22/2022) |
| 11/28/2022 | 48 | Minute Order Setting Discovery Conference. At the parties' request and pursuant to Judge Leshner's Chambers Rules, the Court hereby sets a Discovery Conference for Wednesday, November 30, 2022 at 4:30 p.m. The Discovery Conference will be conducted by Zoom. A videoconference link will be posted to the docket by separate notice. (Discovery Conference set for 11/30/2022 04:30 PM before Magistrate Judge David D. Leshner.)(no document attached) (src) (Entered: 11/28/2022) |
| 11/28/2022 | 49 | NOTICE of Videoconference Information for November 30, 2022 Discovery Conference (jms) (Entered: 11/28/2022) |
| 12/01/2022 | 50 | MINUTE ORDER: Magistrate Judge David D. Leshner held a Discovery Conference on 11/30/2022. Logan Daniel Smith, Jonathan M. Rotter, and Garth A. Spencer appeared on behalf of Plaintiff; Anthony Q. Le and Molly M. White appeared on behalf of Defendants. As discussed on the record, the Court directs the parties to meet and confer regarding outstanding discovery issues, including both parties' ongoing document productions. The parties shall resolve any issues with respect to search terms for document productions on or before **December 7, 2022**. On or before **December 7, 2022**, the parties shall file a Joint Status Report not to exceed three (3) pages. Defendants shall file any motion to compel further responses to Special Interrogatory Nos. 3, 5, 8, and 10 and Request for Production No. 12 on or before **December 14, 2022**. Plaintiff shall file a response to the motion on or before **December 21, 2022**. There is a 10–page limit for both the motion and the response. Defendants shall not file any reply unless requested by the Court. (no document attached) (kmc) (Entered: 12/01/2022) |
| 12/07/2022 | 51 | Stricken per ECF 52 (alns). (Main Document 51 replaced on 12/9/2022) (alns). (Entered: 12/07/2022) |
| 12/09/2022 | 52 | Order Striking Joint Status Report. Signed by Magistrate Judge David D. Leshner on 12/9/2022.(alns) (Additional attachment(s) added on 12/9/2022: # 1 Stricken Document) (alns). (Entered: 12/09/2022) |
| 12/13/2022 | 53 | Joint MOTION to Continue *Joint Motion to Continue Deadline to File a Motion to Compel* by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia)(jms). (Entered: 12/13/2022) |
| 12/14/2022 | 54 | MOTION to Compel by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Attachments: # 1 Memo of Points and Authorities, # 2 Declaration of Molly M. White, # 3 Exhibit A–S in support of Declaration of Molly M. White)(Baiardo, Alicia) (jms). (Entered: 12/14/2022) |
| 12/15/2022 | 55 | ORDER granting 53 Joint Motion to Continue Deadline to File a Motion to Compel. Signed by Magistrate Judge David D. Leshner on 12/15/2022. (jms) (Entered: 12/15/2022) |
| 12/16/2022 | 56 | STATUS REPORT *Joint Status Report re Discovery* by Wells Fargo & Company, Wells Fargo Bank, N.A. (Baiardo, Alicia) (cxl1). (Entered: 12/16/2022) |

FER151

| 12/23/2022 | 57 | STATUS REPORT *Joint Status Report Re: Motion to Compel* by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Le, Anthony)(ave). (Entered: 12/23/2022) |
|---|---|---|
| 01/06/2023 | 58 | RESPONSE in Opposition re 54 MOTION to Compel filed by Thomas W. McNamara. (Smith, Logan) (jms). (Entered: 01/06/2023) |
| 01/09/2023 | 59 | MINUTE ORDER: A remote, counsel–only Discovery Conference is set for **January 13, 2023 at 3:30 p.m.** before Magistrate Judge David D. Leshner. Instructions for remote appearances to follow. (Discovery Conference set for 1/13/2023 03:30 PM before Magistrate Judge David D. Leshner.) (no document attached) (kmc) (Entered: 01/09/2023) |
| 01/09/2023 | 60 | NOTICE of Teleconference Information Sheet for Discovery Conference. Teleconference for January 13, 2023 at 3:30 p.m.. (jms) (Entered: 01/10/2023) |
| 01/13/2023 | 61 | ORDER (1) Denying 54 Motion to Compel; and (2) Setting Briefing Schedule for Discovery Motions. Signed by Magistrate Judge David D. Leshner on 1/13/2023. (jms) (Entered: 01/17/2023) |
| 01/26/2023 | 62 | STATUS REPORT *Joint Status Report Regarding Case Status* by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia). (Entered: 01/26/2023) |
| 01/30/2023 | 63 | MOTION to Compel by Thomas W. McNamara. (Attachments: # 1 Exhibit 1 – October 14, 2015 Email, # 2 Exhibit 2 – February 22, 2016 Email, # 3 Exhibit 3 – February 23, 2017 Email, # 4 Exhibit 4 – July 24, 2017 Email, # 5 Exhibit 5 – October 13, 2017 Email, # 6 Exhibit 6 – August 17, 2015 Email, # 7 Exhibit 7 – January 18, 2017 Email, # 8 Exhibit 8 – October 23, 2017 Letter, # 9 Exhibit 9 – October 23, 2017 Email, # 10 Exhibit 10 – February 8, 2018 Email, # 11 Exhibit 11 – September 10, 2015 Email, # 12 Exhibit 12 – May 31, 2016 Email, # 13 Exhibit 13 – May 5, 2016 Email)(Rotter, Jonathan) (jms). (Entered: 01/30/2023) |
| 01/31/2023 | 64 | TRANSCRIPT ORDER – For hearing(s) on January 13, 2023 by Thomas W. McNamara. (Rotter, Jonathan) (jms). (Entered: 01/31/2023) |
| 01/31/2023 | 65 | TRANSCRIPT ORDER – For hearing(s) on January 13, 2023 by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia)(jms). (Entered: 01/31/2023) |
| 02/13/2023 | 66 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 1/13/2023, before Judge David D. Leshner. Court Reporter/Transcriber James C. Pence–Aviles. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 3/6/2023. Redacted Transcript Deadline set for 3/16/2023. Release of Transcript Restriction set for 5/15/2023. (jms) (Entered: 02/13/2023) |
| 02/13/2023 | 67 | RESPONSE in Opposition re 63 MOTION to Compel *Defendants Wells Fargo & Company and Wells Fargo Bank N.A.s Opposition to Plaintiffs Motion to Compel* filed by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Attachments: # 1 Declaration Declaration of Alicia Baiardo in Support of Wells Fargo & Company and Wells Fargo Bank N.A.s Opposition to Plaintiffs Motion to Compel, # 2 Declaration Declaration of Jill Griset in Support of Wells Fargo & Company and Wells Fargo Bank N.A.s Opposition to Plaintiffs Motion to Compel, # 3 Declaration Declaration of Eric Zimmerman in Support of Wells Fargo & Company and Wells Fargo Bank N.A.s Opposition to Plaintiffs Motion to Compel, # 4 Declaration Declaration of Tony Schroeder in Support of Wells Fargo & Company and Wells Fargo Bank N.A.s Opposition to Plaintiff's Motion to Compel)(Baiardo, Alicia). (jms). (Entered: 02/13/2023) |
| 02/16/2023 | 68 | MINUTE ORDER: The Court hereby sets a remote Discovery Hearing regarding Plaintiff's Motion to Compel (Dkt. No. 63 ) for **February 24, 2023 at 11:30 a.m.** Instructions for remote appearances to follow. (Discovery Hearing set for 2/24/2023 11:30 AM before Magistrate Judge David D. Leshner.) (no document attached) (kmc) (Entered: 02/16/2023) |

| 02/21/2023 | 69 | NOTICE of Videoconference Information Sheet. Discovery Hearing Teleconference set for February 24, 2023 at 11:30 a.m.. (jms) (Entered: 02/21/2023) |
|---|---|---|
| 02/24/2023 | 70 | TRANSCRIPT ORDER – For hearing(s) on 2/24/2023 by Thomas W. McNamara. (Rotter, Jonathan)(jms). (Entered: 02/24/2023) |
| 02/24/2023 | 71 | TRANSCRIPT ORDER – For hearing(s) on February 24, 2023 by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (jms). (Entered: 02/24/2023) |
| 02/24/2023 | 73 | Minute Entry for proceedings held before Magistrate Judge David D. Leshner: A Discovery Hearing was held on 2/24/2023. (no document attached) (src) (Entered: 03/02/2023) |
| 02/28/2023 | 72 | ORDER Denying 63 Motion to Compel Without Prejudice. Signed by Magistrate Judge David D. Leshner on 2/28/2023. (jms) (Entered: 02/28/2023) |
| 03/03/2023 | 74 | Joint MOTION for Order *on Joint Motion for Court's Determination of SAR Privilege Redactions* by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (sjt). (Entered: 03/03/2023) |
| 03/08/2023 | 75 | ORDER Re Joint Motion for Determination of SAR Privilege Redactions (Doc. No. 74 ). Signed by Magistrate Judge David D. Leshner on 3/8/2023. (jms) (Entered: 03/08/2023) |
| 03/10/2023 | 76 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 2/24/2023, before Judge David D. Leshner. Court Reporter/Transcriber James C. Pence–Aviles. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 3/31/2023. Redacted Transcript Deadline set for 4/10/2023. Release of Transcript Restriction set for 6/8/2023. (jms) (Entered: 03/13/2023) |
| 03/14/2023 | 77 | MINUTE ORDER: A Mandatory Settlement Conference ("MSC") is currently set for May 23, 2023 at 9:00 a.m. before Magistrate Judge David D. Leshner. Due to a scheduling conflict on the Court's calendar at that time, the MSC must be reset to May 23, 2023 at **1:30 p.m.** The parties advised that this is a time change only. Further information regarding the MSC will be provided in advance of the conference. (Mandatory Settlement Conference set for 5/23/2023 01:30 PM before Magistrate Judge David D. Leshner.) (no document attached) (kmc) (Entered: 03/14/2023) |
| 03/23/2023 | 78 | MINUTE ORDER. All parties are ordered to review and comply with the attached Mandatory Settlement Conference Procedures, which shall be effective for all Mandatory Settlement Conferences scheduled on or after May 1, 2023. (rmc) (Entered: 03/23/2023) |
| 03/24/2023 | 79 | MINUTE ORDER: A remote, counsel–only Discovery Conference is set for **March 27, 2023, at 12:00 p.m.** before Magistrate Judge David D. Leshner. Instructions for remote appearances to follow. (Discovery Conference set for 3/27/2023 12:00 PM before Magistrate Judge David D. Leshner.) (no document attached) (kmc) (Entered: 03/24/2023) |
| 03/24/2023 | 80 | NOTICE of Videoconference Information for Discovery Conference. A Discovery Conference is set for 3/27/2023 at 12:00 p.m. (rmc) (Entered: 03/24/2023) |
| 03/27/2023 | 81 | MINUTE ORDER: A Discovery Conference was held on 3/27/2023 before Magistrate Judge David D. Leshner. Logan D. Smith, Jonathan M. Rotter, and Garth A. Spencer appeared for Plaintiff. Anthony Q. Le and David C. Powell appeared for Defendant. For the reasons discussed on the record, the Court hereby ORDERS as follows: <br><br> (1)The parties shall meet and confer regarding Interrogatory Nos. 3, 4, 5, and 6, and continue their ongoing meet and confer efforts regarding Interrogatory Nos. 1 and 8. <br><br> (2) To the extent the parties are unable to resolve any dispute concerning the interrogatories, each party shall file concurrent briefing, with Plaintiff's brief |

| | | |
|---|---|---|
| | | concerning his motion to compel responses to his interrogatories and Defendant's brief addressing any opposition thereto. Each party must file its brief on or before **April 10, 2023**, not exceed 15 pages in length exclusive of exhibits.<br><br>(3) In addition to any opposition to Plaintiff's motion to compel interrogatory responses, Defendant's brief shall also include a motion for a protective order regarding the third–party deposition of Carrie Tolstedt. (no document attached) (kmc) (Entered: 03/27/2023) |
| 03/28/2023 | 82 | TRANSCRIPT ORDER – For hearing(s) on March 27, 2023 by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (Entered: 03/28/2023) |
| 03/28/2023 | 83 | Request to Appear Pro Hac Vice ( Filing fee received: $ 213 receipt number ACASDC–17706978.) (Application to be reviewed by Clerk.) (Rottmann, Emily) (Entered: 03/28/2023) |
| 03/28/2023 | 84 | TRANSCRIPT ORDER – For hearing(s) on 3/27/2023 by Thomas W. McNamara. (Rotter, Jonathan) (Entered: 03/28/2023) |
| 04/03/2023 | 85 | ORDER Denying the Pro Hac Vice Application of Emily Rottmann. Signed by Judge Larry Alan Burns on 4/3/2023.(jrm) (Entered: 04/03/2023) |
| 04/05/2023 | 86 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 3/27/2023, before Judge David D. Leshner. Court Reporter/Transcriber James C. Pence–Aviles. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 4/26/2023. Redacted Transcript Deadline set for 5/8/2023. Release of Transcript Restriction set for 7/5/2023. (rmc) (Entered: 04/05/2023) |
| 04/10/2023 | 87 | MINUTE ORDER: At the request of the parties, a remote, counsel–only Discovery Conference will be held on **April 12, 2023, at 9:00 a.m.** before Magistrate Judge David D. Leshner. Instructions for remote appearances to follow. (Discovery Conference set for 4/12/2023 09:00 AM before Magistrate Judge David D. Leshner.) (no document attached) (kmc) (Entered: 04/10/2023) |
| 04/10/2023 | 88 | NOTICE of Videoconference Information for Discovery Conference (rmc) (Entered: 04/10/2023) |
| 04/10/2023 | 89 | RESPONSE in Opposition re 63 MOTION to Compel *Defendants Wells Fargo & Company and Wells Fargo Bank N.A.S Discovery Brief on Motion for Protective Order and Plaintiffs Motion to Compel Further Responses to Interrogatories 3 Through 6* filed by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Attachments: # 1 Declaration Declaration of Alicia A. Baiardo in Support of Wells Fargo & Company and Wells Fargo N.A.s Discovery Brief on Motion for Protective Order and Plaintiffs Motion to Compel Further Responses to Interrogatories 3 Through 6)(Baiardo, Alicia) (rmc). Modified on 4/17/2023 to construe as Motion for Protective Order per DDL chambers (rmc). (Entered: 04/10/2023) |
| 04/10/2023 | 90 | RESPONSE re 81 Discovery Conference,,,, filed by Thomas W. McNamara. (Attachments: # 1 Exhibit A – First Set of Interrogatories, # 2 Exhibit B – Objections and Responses, # 3 Exhibit C – Subpoena Notice, # 4 Exhibit D – Prosecution Agreement, # 5 Exhibit E – Sales Practices Report, # 6 Exhibit F – Plea Agreement, # 7 Exhibit G – Discovery Conference Transcript, # 8 Exhibit H – Neutral Statement of Dispute)(Spencer, Garth) (rmc). Modified on 4/17/2023 to construe as Motion to Compel Discovery per DDL chambers (rmc). (Entered: 04/10/2023) |
| 04/11/2023 | 91 | Joint MOTION on Receiver's Request to Continue Pre–Trial dates by Thomas W. McNamara. (Spencer, Garth) (rmc). (Entered: 04/11/2023) |
| 04/12/2023 | 92 | MINUTE ORDER: A Discovery Conference regarding the noticed Rule 30(b)(6) deposition of Plaintiff Receiver was held on 4/12/2023 before Magistrate Judge David D. Leshner. Logan Smith, Cornelia Gordon, and Garth A. Spencer appeared for |

| | | |
|---|---|---|
| | | Plaintiff. Molly M. White, David C. Powell, and T.J. Gohn appeared for Defendant. Counsel shall reconvene for a further remote Discovery Conference on **April 13, 2023, at 8:30 a.m.** Instructions for remote appearances to follow. (Discovery Conference set for 4/13/2023 08:30 AM before Magistrate Judge David D. Leshner.) (no document attached) (kmc) (Entered: 04/12/2023) |
| 04/12/2023 | 93 | TRANSCRIPT ORDER – For hearing(s) on April 12, 2023 @ 9:00 a.m. by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (Entered: 04/12/2023) |
| 04/12/2023 | 94 | NOTICE of Videoconference Information for Further Discovery Conference (rmc) (Entered: 04/12/2023) |
| 04/13/2023 | 95 | MINUTE ORDER: A further Discovery Conference was held on 4/13/2023 before Magistrate Judge David D. Leshner. Logan Smith and Garth A. Spencer appeared for Plaintiff. Molly M. White and David C. Powell appeared for Defendant. For the reasons discussed on the record, the parties shall email Judge Leshner's chambers by April 14, 2023, regarding (1) any further need for a Discovery Conference to resolve the dispute concerning the Rule 30(b)(6) deposition of Plaintiff; and (2) the parties' availability for purposes of resetting the Settlement Conference. (no document attached) (kmc) (Entered: 04/13/2023) |
| 04/17/2023 | 96 | ORDER Granting in Part 91 Joint Motion on Plaintiff's Request to Continue Pretrial Dates. Signed by Magistrate Judge David D. Leshner on 4/17/2023. (rmc) (Entered: 04/17/2023) |
| 04/17/2023 | 97 | MINUTE ORDER: A remote Discovery Motion Hearing regarding the parties' briefs on Defendant's Motion for Protective Order (Dkt. No. 89 ) and Plaintiff's Motion to Compel Interrogatory Responses (Dkt. No. 90 ) is set for **May 1, 2023, at 12:00 p.m.** before Magistrate Judge David D. Leshner. Instructions for remote appearances to follow. (Discovery Hearing set for 5/1/2023 12:00 PM before Magistrate Judge David D. Leshner.) (no document attached) (kmc) (Entered: 04/17/2023) |
| 04/18/2023 | 98 | NOTICE of Appearance *of Jeffrey Kirschenbaum and Raymond Loughrey* by Jeffrey Kirschenbaum on behalf of Wells Fargo & Company (Kirschenbaum, Jeffrey)Attorney Jeffrey Kirschenbaum added to party Wells Fargo & Company(pty:dft) (rmc). (Entered: 04/18/2023) |
| 04/19/2023 | 99 | MOTION for Leave to File *Amended Complaint* by Thomas W. McNamara. (Attachments: # 1 Memo of Points and Authorities, # 2 Exhibit A – First Amended Complaint, # 3 Exhibit B – Redline Comparison, # 4 Proof of Service)(Spencer, Garth) (rmc). (Entered: 04/19/2023) |
| 04/19/2023 | 100 | NOTICE of Conventional Filing by Wells Fargo & Company (Kirschenbaum, Jeffrey) (rmc). (Entered: 04/19/2023) |
| 04/19/2023 | 101 | MINUTE ORDER: A Mandatory Settlement Conference ("MSC") is currently set for May 23, 2023. Pursuant to this Court's Order Granting in Part the Joint Motion on Plaintiff's Request to Continue Pretrial Dates (Dkt. No. 96 ), the MSC is hereby CONTINUED. The parties shall appear in–person for the MSC on **July 18, 2023, at 1:30 p.m.** at a court location to be announced prior to the MSC. The deadlines associated with the MSC are also CONTINUED. The parties shall comply with deadlines in accordance with this Court's Mandatory Settlement Conference Procedures. (Mandatory Settlement Conference set for 7/18/2023 01:30 PM before Magistrate Judge David D. Leshner.) (no document attached) (kmc) (Entered: 04/19/2023) |
| 04/19/2023 | 102 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/12/2023, before Judge David D. Leshner. Court Reporter/Transcriber James C. Pence–Aviles. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 5/10/2023. Redacted Transcript Deadline set for 5/22/2023. Release of Transcript Restriction set for 7/18/2023. (rmc) (Entered: 04/20/2023) |

| 04/20/2023 | 103 | ORDER: On April 19, 2023, Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. ("Defendants"), filed a "Notice of Service of Subpoenas" stating that Defendants will serve subpoenas on J.P. Morgan Chase Bank, National Association, seeking production of documents and deposition testimony. (Dkt. No. 100 .) The Federal Rules of Civil Procedure do not require any party to notify the Court when serving subpoenas or propounding discovery requests, and the parties shall not file similar notices with respect to future discovery. Signed by Magistrate Judge David D. Leshner on April 20, 2023. (no document attached) (kmc) (Entered: 04/20/2023) |
|---|---|---|
| 04/21/2023 | 104 | TRANSCRIPT ORDER – For hearing(s) on April 13, 2023 by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (Entered: 04/21/2023) |
| 04/25/2023 | 105 | ORDER: On April 24, 2023, the Court received an email from Plaintiff's counsel wherein the parties jointly requested a briefing schedule for Plaintiff's motion for a protective order regarding the Rule 30(b)(6) deposition of Plaintiff. The request is GRANTED. The Court sets a briefing schedule, as follows:<br><br>(1) On or before **May 5, 2023**, Plaintiff shall file his motion for a protective order and attach a proposed protective order. The motion shall not exceed 10 pages in length, excluding exhibits and the attached proposed protective order.<br><br>(2) On or before **May 16, 2023**, Defendant shall file a response to the motion for a protective order. The response shall not exceed 10 pages in length, excluding exhibits.<br><br>Signed by Magistrate Judge David D. Leshner on April 25, 2023. (no document attached) (kmc) (Entered: 04/25/2023) |
| 04/26/2023 | 106 | SUPPLEMENTAL DOCUMENT by Thomas W. McNamara re 90 MOTION to Compel . (Attachments: # 1 Exhibit I – Supplemental Responses and Objections to First Interrogatories, # 2 Exhibit J – Responses and Objections to the Receivers Third Set of Interrogatories)(Rotter, Jonathan) (rmc). (Entered: 04/26/2023) |
| 04/28/2023 | 107 | NOTICE of Videoconference Information for Discovery Hearing (rmc) (Entered: 04/28/2023) |
| 04/28/2023 | 108 | RESPONSE re 106 Supplemental Document, *Defendants Wells Fargo & Company and Wells Fargo Bank N.A.s Response to Plaintiffs Supplemental Submission Regarding Plaintiffs Motion to Compel and Deposition of Carrie Tolstedt* filed by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (rmc). (Entered: 04/28/2023) |
| 05/01/2023 | 109 | Minute Entry: Discovery Hearing held on 5/1/2023 before Magistrate Judge David D. Leshner. Jonathan M. Rotter, Logan D. Smith, and Garth A. Spencer appeared for Plaintiff. Anthony Q. Le, David C. Powell, and Alicia A. Baiardo appeared for Defendant. Written order to follow. (no document attached) (kmc) (Entered: 05/01/2023) |
| 05/01/2023 | 110 | TRANSCRIPT ORDER – For hearing(s) on Discovery Hearing held on 5/1/2023 before Magistrate Judge David D. Leshner by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (Entered: 05/01/2023) |
| 05/01/2023 | 111 | TRANSCRIPT ORDER – For hearing(s) on 5/1/2023 by Thomas W. McNamara. (Rotter, Jonathan) (Entered: 05/01/2023) |
| 05/01/2023 | 112 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 4/13/2023, before Judge David D. Leshner. Court Reporter/Transcriber James C. Pence–Aviles. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E–File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 5/22/2023. Redacted Transcript Deadline set for 6/1/2023. Release of Transcript Restriction set for 7/31/2023. (rmc) (Entered: 05/02/2023) |

| 05/05/2023 | 113 | MOTION for Protective Order by Thomas W. McNamara. (Attachments: # 1 Exhibit #1, # 2 Exhibit #2, # 3 Exhibit #3, # 4 Exhibit #4, # 5 Exhibit #5, # 6 Exhibit #6)(Smith, Logan) (rmc). (Entered: 05/05/2023) |
|---|---|---|
| 05/06/2023 | 114 | MOTION to Consolidate Cases *for all Pre−Trial Proceedings* by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Attachments: # 1 Memo of Points and Authorities, # 2 Declaration of Anthony Q. Le, # 3 Exhibit A−C in support of Declaration of Anthony Q. Le)(Baiardo, Alicia) (rmc). (Entered: 05/06/2023) |
| 05/08/2023 | 115 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Discovery Hearing held on 5/1/2023, before Judge David D. Leshner. Court Reporter/Transcriber James C. Pence−Aviles. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E−File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 5/30/2023. Redacted Transcript Deadline set for 6/8/2023. Release of Transcript Restriction set for 8/7/2023. (jrd) (Entered: 05/09/2023) |
| 05/10/2023 | 116 | ORDER (1) Granting in Part and Denying in Part 89 Plaintiff's Motion to Compel and (2) Denying 90 Defendant's Motion for Protective Order. Signed by Magistrate Judge David D. Leshner on 5/10/2023. (rmc) (Entered: 05/10/2023) |
| 05/16/2023 | 117 | RESPONSE in Opposition re 113 MOTION for Protective Order filed by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Attachments: # 1 Declaration of M. White ISO Opposition)(White, Molly) (rmc). (Entered: 05/16/2023) |
| 05/25/2023 | 118 | Minute Order Setting Discovery Hearing. The Court will hold a hearing on Plaintiff's Motion for a Protective Order [Dkt. No. 113] on June 6, 2023 at 2:00 p.m. in Courtroom 13A of the Carter−Keep United States Courthouse, 333 W. Broadway, San Diego, CA 92101. All appearances will be in person. (Discovery Hearing set for 6/6/2023 02:00 PM in Courtroom 13A before Magistrate Judge David D. Leshner.)(no document attached) (src) (Entered: 05/25/2023) |
| 05/26/2023 | 119 | RESPONSE in Opposition re 114 MOTION to Consolidate Cases *for all Pre−Trial Proceedings* filed by Thomas W. McNamara. (Attachments: # 1 Declaration of Garth Spencer iso Opposition to Motion to Consolidate)(Spencer, Garth) (rmc). (Entered: 05/26/2023) |
| 05/26/2023 | 120 | RESPONSE in Opposition re 99 MOTION for Leave to File *Amended Complaint* filed by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (rmc). (Entered: 05/26/2023) |
| 05/30/2023 | 121 | MINUTE ORDER: At the request of the parties, the Court sets a Discovery Conference to address the disputes set forth in Plaintiff's email dated May 24, 2023. The Court will hold the Discovery Conference concurrently with the Discovery Hearing set for **June 6, 2023, at 2:00 p.m.** (*see* Dkt. No. 118). (Discovery Conference set for 6/6/2023 02:00 PM before Magistrate Judge David D. Leshner.) (no document attached) (kmc) (Entered: 05/30/2023) |
| 06/02/2023 | 122 | Joint MOTION Re Deposition Date of Carrie Tolstedt by Thomas W. McNamara. (Spencer, Garth) (rmc). (Entered: 06/02/2023) |
| 06/05/2023 | 123 | REPLY − Other re 99 MOTION for Leave to File *Amended Complaint* filed by Thomas W. McNamara. (Spencer, Garth) (rmc). (Entered: 06/05/2023) |
| 06/05/2023 | 124 | REPLY to Response to Motion re 114 MOTION to Consolidate Cases *for all Pre−Trial Proceedings Defendants Reply in Support of Motion to Consolidate All Pre−Trial Proceedings* filed by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Attachments: # 1 Declaration Declaration of Anthony Q. Le in Support of Defendants Reply in Support of Motion to Consolidate All Pre−Trial Proceedings)(Baiardo, Alicia) (rmc). (Entered: 06/05/2023) |
| 06/06/2023 | 125 | MINUTE ORDER. Currently on calendar for Monday, June 12, 2023 at 11:30 am is a hearing on Plaintiff's motion for leave to file an amended complaint, 99 , and Defendant's motion to consolidate this action with McCraner v. Wells Fargo & |

| | | |
|---|---|---|
| | | Company, No. 21−cv−1246−LAB−WVG, for pre−trial proceedings, 114 . The Court finds these motions suitable for decision without oral argument. The hearing is vacated. No appearances before Judge Burns will be required in this case on June 12, 2023.(rmc) (Entered: 06/06/2023) |
| 06/06/2023 | 126 | Minute Entry: Discovery Hearing and Discovery Conference held on 6/6/2023 before Magistrate Judge David D. Leshner. Logan D. Smith appeared for Plaintiff. Molly M. White and Max. B. Bogost appeared for Defendants. Written order to follow. (no document attached) (kmc) (Entered: 06/06/2023) |
| 06/07/2023 | 127 | TRANSCRIPT ORDER – For hearing(s) on Discovery Hearing and Discovery Conference held on 6/6/2023 before Magistrate Judge David D. Leshner by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Baiardo, Alicia) (Entered: 06/07/2023) |
| 06/07/2023 | 128 | ORDER Granting 122 Joint Motion Regarding Deposition Date of Carrie Tolstedt. Signed by Magistrate Judge David D. Leshner on 6/7/2023. (rmc) (Entered: 06/07/2023) |
| 06/07/2023 | 129 | DECLARATION re 117 Response in Opposition to Motion *[Supplemental]* by Defendants Wells Fargo & Company, Wells Fargo Bank, N.A.. (White, Molly) (rmc). (Entered: 06/07/2023) |
| 06/09/2023 | 130 | ORDER Following Discovery Hearing and Discovery Conference on June 6, 2023. Plaintiff's 113 Motion is granted in part and denied in part. Signed by Magistrate Judge David D. Leshner on 6/9/2023. (rmc) (Entered: 06/09/2023) |
| 06/13/2023 | 131 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Discovery Hearing and Discovery Conference held on 6/6/2023, before Magistrate Judge David D. Leshner. Court Reporter/Transcriber James C. Pence−Aviles. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E−File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 7/5/2023. Redacted Transcript Deadline set for 7/14/2023. Release of Transcript Restriction set for 9/11/2023. (jcp) (Entered: 06/13/2023) |
| 06/16/2023 | 132 | Joint MOTION for Protective Order *Joint Motion for Modified Protective Order* by Wells Fargo & Company, Wells Fargo Bank, N.A.. (Le, Anthony) (rmc). (Entered: 06/16/2023) |
| 06/20/2023 | 133 | MOTION to Compel *Wells Fargo's Response to RFA No. 12* by Thomas W. McNamara. (Attachments: # 1 Declaration of Logan D. Smith, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3)(Smith, Logan) (rmc). (Entered: 06/20/2023) |
| 06/21/2023 | 134 | Entry of Modified Protective Order. Signed by Magistrate Judge David D. Leshner on 6/21/2023. (rmc) (Entered: 06/21/2023) |
| 06/27/2023 | 135 | TRANSCRIPT ORDER – For hearing(s) on 10/13/22, 11/3/22, 11/30/22, 4/12/23, 4/13/23, 6/6/23 by Thomas W. McNamara. (Rotter, Jonathan) (Entered: 06/27/2023) |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 29, 2023, the foregoing was filed with the Clerk of the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system, which will also serve counsel of record.


Dated: June 29, 2023                  */s/ Brian D. Schmalzbach*
                                        Brian D. Schmalzbach